## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **STEVEN D. MILLER,** | |
| *Plaintiff,* | |
| v. | Case No. _____ |
| **BAUSCH HEALTH COMPANIES, INC.; BAUSCH + LOMB CORPORATION; THOMAS ROSS; CHRISTINA ACKERMANN; GAOXIANG HU; ICAHN ENTERPRISES L.P.; ICAHN ENTERPRISES G.P. INC.; ICAHN CAPITAL LP; CARL ICAHN; BRETT ICAHN,** | **COMPLAINT** JURY DEMANDED |
| *Defendants.* | |

     Plaintiff Steven D. Miller ("Plaintiff"), by and through his counsel, and for his Complaint against Defendants Bausch Health Companies, Inc. ("Bausch Health" or "BHC"), Bausch + Lomb Corporation ("Bausch + Lomb" or "BLCO"), Thomas "Tom" Ross, Christina Ackermann, Gaoxiang "Gary" Hu, Icahn Enterprises L.P. and its general partner Icahn Enterprises G.P. Inc. (collectively, "IEP"), Icahn Capital LP ("Icahn Capital"), Carl Icahn, and Brett Icahn (collectively, "Defendants"), hereby alleges as follows:

### NATURE OF THE ACTION

    1.    This is a racial discrimination case in which a public company, Bausch + Lomb, entered into a written agreement allowing its major investor, Icahn Capital, to appoint two new members to its board of directors, provided one such director must be "Diverse," a term that all the relevant actors knew would require Icahn Capital to appoint a *non-white* director.

1

2.      The proviso worked as designed. It caused Icahn Capital to forgo appointing its expressly (and repeatedly) announced and preferred appointee, i.e., Plaintiff, solely because he is white, and instead appoint an Asian American. It was obvious why Plaintiff was Icahn Captial's preferred appointee. He has served on six other public company boards with a perfect record of shareholders voting in favor of his re-election. But according to Bausch + Lomb's self-imposed diversity mandate, his skin was the wrong color. Bausch + Lomb's general counsel, knowing the illegality of this racial discrimination, even devised a scheme to hide the discriminatory proviso from a required securities filing by placing it in a "side letter" that Bausch + Lomb did not disclose to regulators. Plaintiff ████████████████████████████████████
████████████████████████████████████████████████████

3.      As explained below, Defendants' actions violate 42 U.S.C. § 1981, which bars racial discrimination in contracting, and also amounted to a breach of the covenant of good faith in Plaintiff's employment contract, tortious interference with that contract, and unjust enrichment of Bausch + Lomb board members who directed or willingly participated in the discrimination.

4.      Aside from these race-based claims, ████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████

*** 

5.      At all relevant times, Plaintiff has been a Portfolio Manager at investment fund Icahn Capital under a ██████████ Employment Agreement dated October 1, 2020.

6.      As an activist investment fund, Icahn Capital's strategy involves buying large ownership stakes in publicly traded companies, negotiating the right to appoint new highly motivated directors to such company's board, and relying on these directors to implement operational and strategic improvements.

7.      Under this strategy, Plaintiff proposed and became responsible for an investment in Bausch + Lomb and related entities. ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ Plaintiff was entitled to a bonus at the end of his Employment Agreement tied to ███ % of his profits on this and other investments, a provision that was reasonably expected to result in Plaintiff receiving ███████████████ dollars.

8.      In March 2021, Plaintiff and his manager, Brett Icahn, were appointed to the Bausch Health board (not Bausch + Lomb, to be clear) under an appointment agreement.

9.      When Bausch + Lomb established its own independent board in connection with its May 2022 Initial Public Offering ("IPO"), Icahn Capital sought similar appointment rights to the Bausch + Lomb board.

10.      Icahn Capital inserted Plaintiff's name into the appointment agreement, where it appeared *four times* as one of two contemplated appointees to the board (together with Brett Icahn).

11.      However, in the course of negotiations, ████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████

12.     Icahn Capital's general counsel acknowledged ███████████████████████

████████████████████████, but Bausch + Lomb demanded and ultimately obtained a covenant from

Icahn Capital that allowed it to appoint one "Diverse" director and one other director.

13.     Bausch + Lomb was required to file this agreement (the "Director Appointment and

Nomination Agreement") with the United States Securities and Exchange Commission ("SEC").

However, in a scheme to hide the racially discriminatory covenant from the SEC and the public,

the diversity covenant was extracted and labeled a "Side Letter regarding the Director Appointment

and Nomination Agreement," which was executed on the same date by the same parties. Bausch +

Lomb's general counsel assured her counterpart at Icahn Capital that ██████████████████████

████████████████████████████████████

14.     This "side letter" meant that Plaintiff had to go. He was classified as "white" and

therefore did not help Bausch + Lomb meet ISS's non-binding racial quota. Contemporaneous

e-mail records confirm the decision was made to ████████████████████████████████████

████████████████████████████████████

15.     Thus, even though he had been expressly named as a presumptive board member

*four times* beforehand in the appointment agreement, and even though Brett Icahn confirmed that

Plaintiff and Brett Icahn were the firm's only two preferred board members, Plaintiff was not

chosen for the board in June 2022 when Icahn Capital exercised its appointment rights at Bausch

+ Lomb.

16.     Instead of Plaintiff, Icahn Capital appointed Gaoxiang "Gary" Hu, another Portfolio

Manager at Icahn Capital with the same role and tenure as Plaintiff but who identifies as a Chinese

American man. At no point did the relevant players claim that Hu was selected on any basis aside from race. ███████████████████████████████████████████

███████████████████████████████████████████████

17.     As Brett Icahn acknowledged, ███████████████████████ Unlike Gary Hu, Plaintiff remained responsible for the Bausch Investment, had ████████████ ████████████, was highly motivated because he was entitled to a bonus tied to ███ % of the investment's profits, personally owned Bausch Health stock, and was already intimately familiar with Bausch + Lomb by serving on its parent company's board. Unsurprisingly, Gary Hu later demonstrated no exceptional effort on the board of Bausch + Lomb.

18.     Given this record, no inference is needed: it was openly acknowledged that Hu was chosen over Plaintiff because of race.

19.     Selecting Hu over Plaintiff had predictably disastrous consequences for Bausch + Lomb. Plaintiff had a detailed track record of exceptional performance improving shareholder value at other companies, whereas Hu proved to be an absentee board member who did nothing as the company made repeated poor decisions that Plaintiff tried to stop—and he could have stopped them if he had not been excluded from the board due to his race.

20.     For a brief period from June 2022 to December 2022, Plaintiff was hopeful that he could vigorously execute the activist strategy he engineered for Bausch + Lomb by performing many of Gary Hu's duties in substance. In August 2022, ███████████████████████ ██████████████████████████████████████ Gary Hu was not invited. In December 2022, ███████████████████████████████ ███████████████████████████. Gary Hu did not attend. In December 2022, Plaintiff was in direct contact with Bausch + Lomb's Chief Financial Officer and its Chief Medical

Officer to engage in due diligence inquiries of the sort that would be customary for an activist director.

21. ███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████ In response, Brett Icahn directed Plaintiff to ████████████████

███████████████████████████████████████████████████

███████████ Plaintiff was humiliated by the practice, which was a continuation of the underlying discriminatory arrangement.

22. As a direct result of this situation, on January 9, 2023, Plaintiff ████████

██████████████████████████████████ Plaintiff ████████████████

███████████████████████ "Section 1981," which bars racial discrimination in contracting. ███████████████████████████████████ Brett

Icahn instructed Plaintiff to ███████████████████████████████

███████████ and directed Plaintiff █████████████████████████

23. Gary Hu ██████████████████████ in December 2024 following ████████

██████████████ but nonetheless remained on the board of Bausch + Lomb.

24. While Plaintiff was barred from the Bausch + Lomb boardroom from June 2022 onward, the company failed to meet budget forecasts by hundreds of millions of dollars and

███████████████████████████████████████████████████

████████████████████████████████████████

25. In fact, Plaintiff's service on other public company boards of directors—a total of six to be exact—demonstrates a track record and the necessary skills to prevent these blunders.

26.     Plaintiff's reasonable expectations of earning a substantial bonus from Icahn Capital through the Bausch Investment were obliterated, while the discriminatory covenant left him powerless to meaningfully affect the situation, as he otherwise would have done as a director of Bausch + Lomb, but for his race-based exclusion.

27.     Defendants' actions clearly violated 42 U.S.C. § 1981, which bars race-based contracting. Icahn Capital's ████████████████████████████████████████████ ██████████████████████████████████████████████████ And the racial discrimination further entitles Plaintiff to restitution of the director's fees that were awarded to two other directors because of the racially discriminatory covenant.

28.     In addition to those race-based claims, █████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████████████████

29.     █████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ █████████████████████████████████████

30.  

31.     Defendants' actions were unlawful. Their discrimination violated Plaintiff's civil rights, breached and tortiously interfered with the Employment Agreement, and caused unjust enrichment. And ████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

32.     As a result of Defendants' unlawful conduct, Plaintiff has suffered harm in the forms of lost past and future income and business opportunities, reputational harm, and emotional pain and suffering. Because of the nature of these harms, damages are reasonably calculated to be well over a hundred million dollars, and the jury should further award punitive damages.

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because this action involves a claim arising under 42 U.S.C. § 1981 and claims arising under state law that share a "common nucleus of operative fact" with the federal claim, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, particularly Plaintiff's employment at Icahn Capital, Icahn Capital's negotiation of the racially discriminatory covenant, and the actual discrimination against Plaintiff, occurred in this district.

35.     Venue is proper in this district also pursuant to the forum selection clause in Plaintiff's Employment Agreement with Icahn Capital, which provides that ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████

## PARTIES

36.     Plaintiff Steven Miller is a resident of the State of Florida. Since October 1, 2020, Plaintiff has been employed as a Portfolio Manager of Icahn Capital LP, reporting ████████████

████████████   From February 24, 2021, to August 14, 2025, Plaintiff served on the Board of Directors of Bausch Health Companies Inc. Plaintiff's ancestors immigrated to the United States from present-day Ireland and Poland. Plaintiff's race would be commonly described as "white," ██████████████████████████████████████ (Ex. F at 1).

37.     Defendant Bausch Health Companies Inc. is incorporated under the provincial laws of British Columbia, Canada, and maintains its U.S. headquarters in Somerset County, New Jersey. Together with its subsidiaries, it operates as a diversified specialty pharmaceutical and medical device company. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BHC."

38.     Defendant Bausch + Lomb Corporation is incorporated under the federal laws of Canada and maintains its U.S. headquarters in Somerset County, New Jersey, and an executive

office for its Chief Executive Officer in Miami-Dade County, Florida. Together with its subsidiaries, it operates as a diversified eye health company.

39.     Prior to the completion of its initial public offering on May 10, 2022, Bausch + Lomb was wholly owned by Bausch Health and its subsidiaries. After the initial public offering, Bausch + Lomb became approximately 88% owned by Bausch Health and its subsidiaries and 12% owned by public shareholders including its directors and officers. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BLCO."

40.     Defendant Thomas "Tom" Ross has served on the board of Bausch + Lomb since April 2022, including as Chairman of the Board from July 19, 2022, to March 6, 2023, and as Lead Independent Director from May 2022 to July 18, 2022, and from March 6, 2023, to present. On February 10, 2025, Mr. Ross attended a Bausch + Lomb board meeting in Florida. Mr. Ross served on the board of Bausch Health from March 2016 to May 14, 2024, including as Lead Independent Director from June 2016 to June 2022.

41.     Defendant Christina Ackermann was general counsel of Bausch Health from August 2016 to May 2022. Ms. Ackermann was general counsel and President of Ophthalmic Pharmaceuticals at Bausch + Lomb from May 2022 until April 28, 2023.

42.     Defendant Gaoxiang "Gary" Hu was a Portfolio Manager of Icahn Capital at its headquarters in Miami-Dade County, Florida from October 1, 2020, to December 2024 and, as a result of intentional race discrimination against Plaintiff, was a director of Bausch + Lomb from June 23, 2022, to August 14, 2025.

43.     Defendant Icahn Enterprises L.P. is a master limited partnership formed in Delaware and headquartered in Miami-Dade County, Florida. Together with its subsidiaries and

affiliates, it manages an investment securities segment and several other non-investment segments which operate businesses in several industries.

44.     Defendant Icahn Enterprises G.P. Inc. is the general partner of Icahn Enterprises L.P. (the two collectively, "IEP"). Icahn Enterprises G.P. Inc. is also formed in Delaware and headquartered in Miami-Dade County, Florida. References to the Board of Directors of IEP and to its Chairman refer to the Board of Directors of Icahn Enterprises G.P. Inc. References to the SEC filings, partnership assets, and subsidiaries of IEP refer to those of Icahn Enterprises L.P. According to IEP's SEC filings, Icahn Enterprises G.P. Inc. "has exclusive management powers over the business and affairs of Icahn Enterprises [L.P.]."

45.     Defendant Icahn Capital LP is a subsidiary of IEP (Ex. F at 2) which operates IEP's investment securities segment. Icahn Capital LP is also formed in Delaware and headquartered in Miami-Dade County, Florida. From December 14, 2020, Icahn Capital and its subsidiaries funded the Bausch Investment, consisting principally of shares in Bausch Health and Bausch + Lomb.

46.     Defendant Carl Icahn is a resident of Miami-Dade County, Florida. Carl Icahn is and was at all relevant times the Chairman of IEP and the Chief Executive Officer of Icahn Capital. According to IEP's filings with the SEC, Carl Icahn has at all relevant times indirectly owned and controlled Icahn Enterprises G.P. Inc., the general partner of IEP. According to the same, Carl Icahn owned approximately 86% of the limited partnership depository units of IEP as of December 31, 2024, and has owned a substantial majority of such units at all other relevant times.

47.     Defendant Brett Icahn is a resident of Miami-Dade County, Florida. Since October 1, 2020, Brett Icahn has been employed as a Portfolio Manager of Icahn Capital, reporting to Carl Icahn. ███████████████████████████████████████████████████████████████

████████████████████   From February 24, 2021, to August 14, 2025, Brett Icahn served on the

Board of Directors of Bausch Health. From June 23, 2022, to August 14, 2025, Brett Icahn served

on the Board of Directors of Bausch + Lomb. Since October 1, 2020, Brett Icahn has served on

the Board of Directors of IEP. Brett Icahn is the son of Carl Icahn.

48.     The "Icahn Group" refers collectively to Carl Icahn and the entities under common

control by him, namely Icahn Capital and IEP.

**FACTUAL ALLEGATIONS**

I.     **PLAINTIFF'S EMPLOYMENT AT ICAHN CAPITAL**

49.     Plaintiff was born and raised in Palm Beach County, Florida, where he was a high

school valedictorian and awarded the National Merit Scholarship. Plaintiff received a Bachelor of

Science degree, *summa cum laude*, from Duke University in May 2011.

50.     From July 2011 to February 2013, Plaintiff was employed as an analyst at Goldman,

Sachs & Co. in New York City. From February 2013 to December 2019, Plaintiff was employed

as research analyst at hedge fund BlueMountain Capital Management, LLC ("BlueMountain") in

New York City with a starting annual compensation of $200,000 in 2013.

51.     Plaintiff excelled at BlueMountain. Following a series of successful investments,

his taxable compensation from the firm grew as follows (Ex. F at 3–10):

| | |
|---|---:|
| Tax year 2015 | $496,126 |
| Tax year 2016 | $1,177,282 |
| Tax year 2017 | $1,856,149 |
| Tax year 2018 | $684,229 |
| Tax year 2019 + subsequent vesting | $3,207,050 |
| Total | $7,420,836 |

52.     On April 2, 2020, Plaintiff first spoke with Brett Icahn about potential employment

as a Portfolio Manager at Icahn Capital after being introduced by an executive search firm.

53.     The "Portfolio Manager" title is commonly used in the hedge fund and investment management industry to designate a firm's most senior and highly compensated investment professionals. This represented a promotion from Plaintiff's prior title of "research analyst" and came with generally higher market compensation expectations.

54.     Plaintiff was already aware of Icahn Capital's reputation as an activist investor—a type of investment fund that seeks to generate returns by acquiring influential or controlling equity stakes in publicly traded companies, negotiating significant corporate influence through board appointment rights, and capitalizing on that influence to enact shareholder-friendly changes to business strategy, management composition, cost structure, and capital allocation.

55.     Plaintiff was also aware of Icahn Capital's reputation of overseeing substantial cost cuts at its portfolio companies in pursuit of its activist strategy.[1] Plaintiff reasonably expected to be able to oversee the implementation of such measures at portfolio companies as part of his employment.

56.     Plaintiff was also aware of, and induced by, the Icahn Group's history of paying large performance-based bonuses to its investment professionals. Plaintiff was aware that co-Portfolio Managers Brett Icahn, then age 36, and David Schechter, then age 40, were each paid a ███████ bonus in 2016 as the culmination of a management agreement struck in 2012.

57.     Over the subsequent six months, ████████████████████████████
████████████████████████████████████████████████████████

---

[1] In a November 2015 interview describing his investment strategy, Carl Icahn recounted that, after conferring with a consulting firm, he had once fired "twelve floors of people" at railcar manufacturer ACF Industries. Similarly, IEP stated that "[m]anagement teams often fail to improve their operations and profitability, relying on lax oversight from an overly friendly board of directors" which is therefore "conducive to activism."

████████████████████████████████████████████████████████████████

██████████████████████████████████

58.     The four Portfolio Managers were, alphabetically, Gary Hu, Brett Icahn, Plaintiff Steven Miller, and Andrew Teno. Brett Icahn reported directly to Carl Icahn and his compensation was governed by the Manager Agreement. The other three reported ████████████████████ ████ and had identical Employment Agreements.

59.     Brett Icahn told Plaintiff that he had reviewed approximately one hundred candidates prior to selecting Plaintiff and his two peers. Plaintiff and Andrew Teno ████████████ ████████████████████████ while Gary Hu █████████████████████████ ██████████████████████

60.     On October 1, 2020, the Manager Agreement and Employment Agreements (Ex. C) were executed, IEP issued a press release describing the agreements and naming the four Portfolio Managers, and Plaintiff's employment began. The IEP press release made Plaintiff's employment as a Portfolio Manager a matter of public record (Ex. J at 35).

61.     Accompanying the press release, IEP filed a Form 8-K with the SEC disclosing a facsimile of the Manager Agreement. The Manager Agreement in turn refers to the employment of "up to three portfolio managers … pursuant to the agreements attached hereto as Exhibit A."

62.     While "Exhibit A" was redacted from the Form 8-K, the Manager Agreement discloses that the compensation for the three Portfolio Managers involves three components: "Base Salary", "Bonus Amounts", and "Net Profit-Sharing Amounts."

63.     The Employment Agreements themselves stated they ████████████████████ ████████████████████████████████████████████████ ██████████████████████ Governing law for tort or statutory claims ████████████████

14

64.    The Employment Agreements provided that a bonus would be payable to each Portfolio Manager ████████████████████████████████████ For each new investment, the Portfolio Manager proposing such investment would be allocated ██% of the profits and losses, while each other Portfolio Manager could also elect to be allocated an additional ██% of the profits and losses, in all cases subject to a ██% hurdle rate.[2] The final bonus for each Portfolio Manager would be the sum of such allocations for every investment, subject to various other adjustments.

65.    The new Portfolio Managers ███████████████████ $9.3 billion in investment funds, of which $4.3 billion was funded by IEP and $5.0 billion was funded by Carl Icahn personally.[3] From the execution of the Employment Agreements until 2024, the four new hires were Icahn Capital's only Portfolio Managers and, together with Carl Icahn, had ███████ ████████████████████████████████████ From and after January 2025, Plaintiff and Brett Icahn were the only two Portfolio Managers of Icahn Capital.

66.    Exhibit 4 to the Employment Agreements provided examples to illustrate the calculation of Portfolio Manager compensation and the final bonus. Even the lowest scenario contemplated ████████████████████ over the term of the agreement.

67.    Each Portfolio Manager was further entitled to retain any compensation personally received in connection with service on the Board of Directors of any public company, provided ████████████████████████████

---

[2] A hurdle rate is a return rate that an investment must achieve before its manager is entitled to any share of profits. Here, for example, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

[3] As disclosed in the IEP annual report of December 31, 2020.

68.     Plaintiff was aware of, and induced by, the fact that many of Icahn Capital's former Portfolio Managers and investment professionals continued to serve long terms and earn compensation on certain public company boards even after Icahn Capital had exited the relevant investment and terminated any related appointment agreement.[4] Plaintiff understood a customary term for public company board members to be 15 years.

69.     At various times during Plaintiff's tenure with Icahn Capital, he served on six public company boards of directors: Bausch Health and JetBlue Airways Corp., █████████ ████████ and also Conduent Inc., Dana Inc., Herc Holdings Inc., and Xerox Holdings Corp.

**Icahn Capital's Prior Compensation Practices for Portfolio Managers**

70.     Plaintiff's Employment Agreement was consistent with Icahn Capital's historical practice of contractual performance-based compensation for its Portfolio Managers. Over the preceding ten years, Icahn Capital had previously entered into three iterations of such deals.

71.     The first iteration, known as Old Sargon, was in effect from April 1, 2010, to August 1, 2012. According to IEP's SEC filings, Portfolio Managers Brett Icahn and David Schechter managed a portfolio of not more than $3 billion and were entitled to a final payment of 5.1% of the profits in excess of an undisclosed hurdle rate. After termination of the deal, each of the Portfolio Managers had accrued approximately ████ million in compensation.[5] This represented per-annum compensation of about ████ million.

---

[4] Among former Icahn Group senior employees, Jonathan Christodoro has served on the board of PayPal since 2015 (10 years). Sam Merksamer has served on the board of Transocean since 2013 (12 years). Vince Intrieri has served on the board of Transocean since 2014 (11 years) and Hertz since 2016 (9 years).

[5] ████████████████████████████████████████████████████
████

72.     The second iteration, known as New Sargon, was in effect from August 1, 2012, until July 31, 2016. Brett Icahn and David Schechter reprised their roles as Portfolio Managers and were entitled each to 7.5% of the profits in excess of a 4.0% hurdle rate. The initial portfolio was allocated ███████████ of which was funded personally by Carl Icahn. At the termination of the deal, each of the Portfolio Managers was paid ███████. [6] This represented per-annum compensation of about ██████████. It was disclosed that the combined "Sargon Portfolio generated annualized gross returns of 26.8% from its formation on April 1, 2010, through its expiration on July 31, 2016."

73.     The third iteration was in effect from December 2016 until March 2020. Carl Icahn selected two new Portfolio Managers, Courtney Mather and Nicholas Graziano. The terms were not publicly disclosed because neither was considered a related party of IEP, unlike Carl Icahn's son Brett.

74.     In summary, over the ten-year period, Icahn Capital disclosed ██████████ in compensation to its Portfolio Managers, of which it had only two at any given time. This represents per-annum compensation for each of at least █████████.

**The Icahn Group Makes an Investment in Bausch Health**

75.     On December 1, 2020, Plaintiff████████████████████████████ ████████████████████████████████████ Bausch Health.

76.     By December 14, 2020, the proposed investment ███████████████████ ████████████████████████████████████████

---

[6] According to the SEC filings, this amount was $256 million as of December 31, 2015, ████████ ██████████████████. The former amount was widely reported in the press.

██████████████████████████████ Icahn Capital began acquiring shares of Bausch

Health on the open market.[7]

77.    The investment thesis accepted within Icahn Capital generally held that ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

78.    ████████████████████████████████████████

██████ distributed Bausch + Lomb shares, ████████████████████ remainco shares.

Therefore, operational excellence at Bausch + Lomb was paramount to Icahn Capital's expectation

to ██████████████████

79.    On February 11, 2021, the Icahn Group publicly filed a Schedule 13D with the SEC

declaring it had acquired beneficial ownership of 27,807,410 shares of Bausch Health's common

stock, representing 7.83% of the outstanding amount.

**Plaintiff Is Appointed to the Board of Directors of Bausch Health**

80.    On February 23, 2021, following a negotiation with Bausch Health, the Icahn

Group entered into a Director Appointment and Nomination Agreement under which Brett Icahn

and Plaintiff were to be appointed to the Board of Directors of Bausch Health on or prior to March

17, 2021.

81.    On March 17, 2021, Brett Icahn and Plaintiff were appointed to the Board of

Directors of Bausch Health (to be clear, not Bausch + Lomb).

---

[7] References to securities transactions by Icahn Capital include transactions by funds advised by Icahn Capital and by Icahn Capital's subsidiaries, including by non-parties Icahn Partners LP and Icahn Partners Master Fund LP.

82.     Plaintiff disclosed his employment with Icahn Capital to Bausch Health in his initial directors' and officers' questionnaire dated February 22, 2021, ███████████████

███████████████████████████████████████████████████████████████

███████████████████████ (Ex. J at 83).

83.     On March 18, 2021, Bausch Health filed its annual Definitive Proxy Statement with the SEC to solicit shareholder votes for the upcoming Annual General Meeting. The statement included a description of Plaintiff's professional background and the following endorsement: "The Board has determined that Mr. Miller's experience as a portfolio manager and securities analyst has provided him with experience in investing and finance and complex debt matters, respectively, which qualifies him to serve as a member of the Board and the committees on which he serves."

84.     On or about March 29, 2021, Bausch Health delivered a presentation (Ex. F at 15-136) to Plaintiff and Brett Icahn, which Plaintiff saw as validating Icahn Capital's investment thesis and reinforcing expectations of significant profit. As shown below, ██████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████



85.     On April 27, 2021, the Annual General Meeting of Bausch Health was held. Plaintiff received 200,857,243 shareholder votes, representing approval by approximately 97% of votes cast, thereby being elected to a further one-year term on the board.

## II.   DEFENDANTS' SCHEME BARS PLAINTIFF FROM BAUSCH + LOMB BOARD

## Bausch + Lomb Prepares for IPO

86.     On August 6, 2020, Bausch Health issued a press release announcing its intention to "spin off" its Bausch + Lomb business as a separate publicly traded company.

87.     Over the subsequent 21 months, as documented extensively in Bausch Health board materials provided to Plaintiff, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

88.     On January 13, 2022, Bausch + Lomb filed its Form S-1 with the SEC. In the Form S-1, it listed eight directors to govern the company after the consummation of the IPO: Joseph Papa (CEO and Chairman), Thomas Ross (Lead Director), Nathalie Bernier, Andrew von Eschenbach, Sarah Kavanaugh, John Paulson, Russel Robertson, and Richard De Schutter.

89.     Of these eight directors, two identified as women and none then identified as minorities.[8]

90.     Bausch + Lomb decided to engage in overt discrimination to change that.

---

[8] ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

**Bausch + Lomb Adopts a Minority Quota for Its Board of Directors**

91.     Maryland-based Institutional Shareholder Services Inc. ("ISS") operates as a "proxy advisor," i.e., a for-profit company that makes influential voting recommendations with respect to public company annual general meetings and other corporate actions. It provides these recommendations to "its approximately 4,200 clients" including "many of the world's leading institutional investors."

92.     ISS has no formal governmental or regulatory authority. Instead, it threatens to direct its clients to vote in a coordinated fashion against certain, specifically identified, director nominees at an issuer's upcoming annual general meeting.

93.     On November 12, 2020, ISS published a change to its "proxy voting guidelines" for certain U.S.-listed public companies (Ex. G at 6). According to the new policy:

> For companies in the Russell 3000 or S&P 1500 indices, effective for meetings on or after Feb. 1, 2022, [ISS will] generally [recommend that its clients] vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members.

94.     On November 30, 2022, ISS adopted the substantially same race quota policy for certain Canadian-listed public companies (Ex. G at 73). The Canadian policy defined diversity as:

> Aboriginal peoples (means persons who are Indigenous, Inuit or Métis) and members of visible minorities (means persons, other than Aboriginal peoples, who are non-Caucasian in race or non-white in colour).

95.     At the time, Bausch + Lomb had no diverse directors (compared to the ISS quota of one).

96.     To demonstrate its intended conformance to ISS's "guidelines," Bausch + Lomb included a new disclosure in its Amendment No. 2 to Form S-1, filed with the SEC on April 28, 2022, that "[t]he Company has proposed to achieve a target of 30% of [sic] women and/or minority representation on the Board of Directors by the end of 2024."

97.     Plaintiff was not privy to Bausch + Lomb's full internal deliberations about adopting a racial quota, but Plaintiff was able to observe Bausch Health's concerns, ███████

████████████████████████████████████████████████████████

████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

98.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

99.     To prevent this, Bausch + Lomb would engage in intentional race discrimination and insist that the Icahn Group do so, too.

**The Icahn Group Negotiates Bausch + Lomb Board Representation**

100.    On December 14, 2021, Bausch + Lomb's general counsel, Christina Ackermann, sent an initial draft of a shareholder agreement to IEP's and Icahn Capital's general counsel, Jesse Lynn (Ex. G at 95–96). The draft shareholder agreement was designed to ███████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

101.    In phone conversations beginning December 17, 2021, and continuing in the subsequent weeks, Brett Icahn, Carl Icahn, and Plaintiff discussed ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

102.    ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

103.    ████████████████████████████████

████████████████████████████████████████

104.    On January 13, 2022, Jesse Lynn sent Christina Ackermann a draft Director Appointment and Nomination Agreement that provided ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

105.    On January 17, 2022, Christina Ackermann delivered a markup of the agreement (Ex. G at 182–214) that now required ██████████████████

████████████████████████████████████████████

████

106.    In the same email, she made note of the following "policy" (Ex. G at 173):



107.    Plaintiff studied the markup and immediately became concerned that the new provisions could be used to exclude him or other preferred appointees from the board on the basis of their race. Plaintiff ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

108.    On January 18, 2022, Plaintiff asked Jesse Lynn, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ Mr. Lynn replied that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



109.    Mr. Lynn ultimately made two relevant edits to the draft (Ex. G at 217–49). First, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*Id.* at 247). Second, ▮▮▮▮▮▮▮▮▮▮, Mr. Lynn drafted the following protective clause and sent the modified agreement to Christina Ackermann (Ex. G at 251–52):



110.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

111.    Ms. Ackermann apparently failed to appreciate the evidentiary value of Plaintiff's name appearing four times in the draft agreement. She did not strike the references to "Brett Icahn and Steven Miller," which ultimately survived to the final execution version and was filed publicly.

112.    That same day, Jesse Lynn ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████ Plaintiff noted to the Icahn team ████████████████████████████████████████ Tom Ross ████████████ (*Id.* at 291).

113.    On January 21, 2022, at 1:47 pm, Jesse Lynn replied to Christina Ackermann with a draft that ████████████████████████████████████████ ████████████████████. In his email to Plaintiff and Brett Icahn describing the edits, ██ ████████████████████████████████████████████ ██ ████

114.    Sometime in the subsequent two hours, Jesse Lynn and Christina Ackermann engaged in a phone call, immediately after which the concept of a "side letter" appeared. In an email at 3:18 pm, Jesse Lynn acknowledged ████████████████████████████ ████████████████ In an email at 4:16 pm, Jesse Lynn sent the first draft of the side letter to Ms. Ackermann ████████████████████████████████████████ ████████████████ (Ex. G at 300). ████████████████████████████████████████████ ████████████████████████████████████████

**The Racially Discriminatory Side Letter**

115.    The draft side letter (Ex. G at 309–12) ("Side Letter regarding the Director Appointment and Nomination Agreement") to which its parties, who did not include Plaintiff,

...

preliminarily agreed (*Id.* at 313) on January 21, 2022, operated primarily through the following

paragraph (*Id.* at 309):



116.    In substance, the agreement allowed the Icahn Group to appoint ████████

██████████████████████████████████████████████████████████████

███████████████████ (Ex. G at 324–25).

117.    Furthermore, as Bausch + Lomb and its specialist activist-defense counsel

(Wachtell, Lipton, Rosen & Katz) knew or should have known, Icahn Capital had a consistent and

longstanding practice of preferring to appoint its own Portfolio Managers and other senior

employees to board seats,[9] and as Icahn Capital at all relevant times only employed male Portfolio

Managers, in practice it would give Icahn one "white" seat and one "non-white" seat.

118.    This situation perfectly coincided with Bausch + Lomb's interests because ████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████

---

[9] Carl Icahn was quoted in the Illumia Inc. 2023 definitive proxy statement as stating that "he 'would not even support Jesus Christ' as an independent candidate over an Icahn Nominee as 'my guys answer to me.'" In the case of Illumina, all three Icahn Nominees were current or former employees of the Icahn Group.

119.    Over the subsequent three months, the Director Appointment and Nomination Agreement was held in anticipation of being signed immediately prior to the filing of the final Form S-1 with the SEC.

120.    On April 18, 2022, Christina Ackermann sent the "final execution agreements" to Jesse Lynn (Ex. A, D). Paragraph 1 of the side letter was unchanged from Jesse Lynn's first draft, except that ██████████████████████████████████████ had been stricken:



121.    On April 28, 2022, the Director Appointment and Nomination Agreement and the Side Letter regarding the Director Appointment and Nomination Agreement were executed.

**Christina Ackermann Intentionally Omits the Side Letter from the SEC Filing**

122.    As a new issuer under the U.S. securities laws, Bausch + Lomb was required under 17 C.F.R. § 229.601(b)(10) to attach copies of certain "material contract[s]" as exhibits to its initial registration statement (known as Form S-1). However, in a scheme to hide the racially discriminatory covenant from the SEC and the public, the "Director Appointment and Nomination Agreement" ("head agreement") was indeed filed as an exhibit to the S-1, but the "Side Letter regarding the Director Appointment and Nomination Agreement," which was executed on the same date by the same parties, was not.

123.    The side letter has the ███████████████████████████████████████
███████████████████████████████████████████████████████████████████

█████████████████████ There was no bona fide reason not to combine them. In fact, they were part and parcel.

124.    Instead, on information and belief, the only purpose of splitting the parties' agreement into a "head agreement" and a "side letter" was to attempt to evade the SEC regulation by cleverly purporting that the side letter, standing alone, was immaterial and need not be filed.

125.    In fact, the "side letter" was material because ███████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████

126.    On April 25, 2022, Christina Ackermann sent an email to Jesse Lynn noting that

████████████████████████████████████████████████████████

█████████ (Ex. G at 333).

127.    Indeed, on April 28, 2022, Bausch + Lomb filed Amendment No. 2 to Form S-1 with the SEC. On page 200, the Director Appointment and Nomination Agreement was described in detail. However, the description on page 200 makes no reference to the side letter, either expressly or in substance.

128.    Further, as Exhibit 10.25 to the same filing, a facsimile of the Director Appointment and Nomination Agreement—together with five various schedules, exhibits, and annexes—was filed in its entirety (Ex. D). However, no mention whatsoever was made to the racially discriminatory side letter in Exhibit 10.25, the Form S-1, or in any other SEC filing.

129.    Exhibit 10.25 purports to indicate that any information that had been redacted for immateriality had been identified with bracketed asterisks.[10] However, only certain personal phone numbers and email addresses were identified with bracketed asterisks as being redacted. No disclosure was made that the part-and-parcel side letter had been redacted from Exhibit 10.25 or that it existed at all.

**The IPO Is Consummated; Icahn Buys Bausch + Lomb Shares**

130.    On May 5, 2022, Bausch + Lomb priced its IPO, selling 35 million shares at a price of $18.00/share. The transaction closed on May 10, 2022.

131.    As part of the IPO, Icahn Capital directly acquired 3,500,000 shares (approximately 1% of the outstanding) of Bausch + Lomb at the IPO price of $18.00/share. The Icahn Group disclosed its ownership of these shares as of June 30, 2022, on its form 13F-HR, filed with the SEC on August 15, 2022.

132.    Icahn Capital's buying continued after the IPO. In "more than one hundred trades, executed between May 26, 2021 and September 8, 2023," the Icahn Group acquired "additional long economic exposure to 90.72 million [Bausch Health] shares through equity swaps," according to a regulatory disclosure by Bausch Health. "Taken together Icahn now has an economic interest covering approximately 34% of [Bausch Health's] outstanding common shares."

133.    █████████████████████████████████████████████
████████████████████████████████████████

134.    In summary, the Bausch Investment ████████████████████████
████████████████████████████████████████

---

[10] "Certain identified information, indicated by [*****], has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm if publicly disclosed."

███████████████████████████████████████████████

██████████████  The total investment had a cost basis of ████████

135.    Plaintiff's ████% interest in Icahn Capital's investment profits covered each of these direct and indirect interests in Bausch + Lomb, thereby highly motivating Plaintiff to improve the financial performance of Bausch + Lomb through all the means available to the Icahn Group as a significant activist investor.

**The IPO Disappoints; Icahn Seeks to Exercise Board Rights**

136.    The IPO price of $18.00/share was disappointingly below the "between $21.00 and $24.00 per common share" range disclosed just two weeks earlier in the Second Amended Form S-1 filed April 28, 2022.

137.    Additionally, the 35 million shares represented a sale of only about 10% of its outstanding shares, █████████████████████████████████

138.    The execution was so poor that Bausch + Lomb canceled its ceremonial bell ringing at the New York Stock Exchange, which Plaintiff was scheduled to attend (Ex. G at 336–37).

139.    After the IPO, Carl Icahn informed Brett Icahn and Plaintiff that ████████



140.    Therefore, beginning after the May 10, 2022, IPO and culminating on June 21, 2022, the Icahn Group negotiated to exercise its rights to appoint two directors to the Bausch + Lomb board under the Director Appointment and Nomination Agreement.

**Brett Icahn Expresses a Preference to Appoint Plaintiff, But for His Race**

141.    On or about the week of June 13, 2022, Brett Icahn called Plaintiff to inform him that he had demanded that Bausch + Lomb seat both himself and Plaintiff as the two Icahn

appointees. However, Mr. Icahn stated that Christina Ackermann and Tom Ross would not allow it pursuant to the side letter because of Plaintiff's race.

142.    Brett's preference to appoint Plaintiff was no surprise. Plaintiff was the Portfolio Manager responsible for the Bausch Investment, served on the parent company board, ██████ ████████████ was incentivized by a ███% interest in the investment profits, and was further incentivized by personal ownership of Bausch Health stock earned from past board service and from personal open market purchases.

143.    Bausch + Lomb must not have been surprised by the request either. "Brett Icahn and Steven Miller" were mentioned by name as the only two hypothetical appointees in the publicly filed Director Appointment and Nomination Agreement, which Bausch + Lomb negotiated and signed.

144.    The appointment of Plaintiff would have been a foregone conclusion and would have complied with all other corporate governance policies of Bausch + Lomb. Nothing prevented his appointment—except his race.

**Gary Hu Is Appointed to the Board**

145.    On June 20, 2022, Christina Ackermann sent an email to Jesse Lynn memorializing that: ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████

146.    Gary Hu, who identifies as a Chinese-American, was also Portfolio Manager of Icahn Capital, starting such role on the same day and under the same terms as Plaintiff.

147.    Ms. Ackermann noted that Mr. Hu had ████████████████████████ ████████████████████████████████████ (Ex. G at 343–45).

148.   ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████

████████████████████████████████████████████████████████

███████████████████████████████

149.   On June 23, 2022, Bausch + Lomb issued a press release announcing that "Brett Icahn and Gary Hu Have Been Appointed to its Board of Directors." It also disclosed that the Director Appointment and Nomination Agreement had been amended (Ex. E) to allow the new directors to be seated immediately, rather than waiting until Bausch + Lomb had been established as a completely independent company from Bausch Health.

150.   Brett Icahn and Gary Hu remained on the Bausch + Lomb board for the subsequent three years, until August 14, 2025.

**Plaintiff Was Better Qualified and Understandably the Icahn Group's First Choice**

151.   As of June 23, 2022, Plaintiff was better qualified than Gary Hu to serve on the board of Bausch + Lomb and understandably was the Icahn Group's first choice. Both Plaintiff and Gary Hu had a similar academic and professional background and similar years of experience. Both started at Icahn Capital on the same date. However, as of June 23, 2022, Plaintiff had the following distinct and objective advantages:

152.   First, Plaintiff had the confidence of Icahn Capital. The Director Appointment and Nomination Agreement that gave Icahn Capital the right to appoint two directors to the Bausch + Lomb Board listed Plaintiff's name, along with Brett Icahn, as Icahn Capital's putative choice of directors. Plaintiff's name appeared in that document as a preferred candidate *four times*. Brett Icahn confirmed that Plaintiff remained Icahn Capital's preferred candidate even as it engaged in

the discrimination against him. In June 2022, Brett Icahn expressed his regret to Plaintiff that, because of the discriminatory covenant, Icahn Capital was unable to appoint both Brett Icahn and Plaintiff, despite this being the firm's preference.

153.    <u>Second</u>, Plaintiff had greater familiarity with Bausch + Lomb than Gary Hu. Plaintiff had ███████████████████████████████████████████ Plaintiff had engaged frequently with Bausch + Lomb's incoming management team. In addition to regular board meetings, ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████. On information and belief, Gary Hu had done no such work as of June 23, 2022.

154.    <u>Third</u>, Plaintiff was the Portfolio Manager on the investment and therefore had a greater incentive to perform. Plaintiff's ███% allocation of the profits of the Bausch Investment was ████████ Gary Hu's ████% allocation. The greater relevance of the investment to Plaintiff's track record and industry reputation also better incentivized him to perform.

155.    <u>Fourth</u>, Plaintiff had a further financial incentive to perform through his personal stock ownership. According to SEC filings, Plaintiff beneficially owned 107,616 shares of Bausch Health stock as of June 24, 2022. These shares had a market value of approximately $782,368 as of the same date. On information and belief, Gary Hu owned no shares of either Bausch Health or Bausch + Lomb at that time.

156.    <u>Fifth</u>, Plaintiff's investments at Icahn Capital were ████████████████████

████████████████████████████████████████████████████████

████████████████████████████

157.    In summary, as of June 23, 2022, there was no basis in fact to support any novel pretext that Gary Hu could have been selected for any superior merit or even personal favoritism. At no point did any of the Defendants in fact even offer Plaintiff such a pretext.

158.    However, Gary Hu identified as a Chinese American. This sole fact led to his appointment to the Bausch + Lomb board, at the expense of Plaintiff.

**Even Without a Board Seat, Plaintiff Endeavors to Engage with Bausch + Lomb**

159.    Despite Gary Hu's appointment to the Bausch + Lomb Board, Plaintiff remained the Icahn Group's lead Portfolio Manager on the Bausch + Lomb investment and attempted to engage with its management team to the greatest extent he could.

160.    From June 2022 to December 2022, Plaintiff was optimistic that it would be possible for him to continue to influence the investment by performing some of Gary Hu's duties in substance, a plan to which Gary Hu did not object.

161.    On July 20, 2022, Bausch + Lomb announced that its CEO Joseph Papa had been removed as Chairman of the Board effective immediately and would remain interim CEO until a successor was found. Immediately thereafter, █████████████████████

████████████████████████████

162.    ████████████████████████

████████████████████████████

████████████████████████████

██████████████ Brent Saunders, ████████████████, was ultimately selected as Bausch + Lomb's next CEO.

163.    ████████████████████████

████████████████████████████

████████████████████████████

34

████████████████████████████████████████████████████████

██████████████████████████████████████████████

164.    On December 14, 2022, Plaintiff ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████ Gary Hu did

not attend (Ex. G at 352, 354).

165.    Plaintiff ██████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████

166.    Plaintiff sent a four-page summary of his notes to the board of Bausch + Lomb

immediately thereafter and received positive feedback from directors Tom Ross (Ex. G at 360) and

Russ Robertson (*Id.* at 354).

**General Counsel Christina Ackermann Demands Gary Hu ████████ Plaintiff**

167.    Plaintiff's initial period of relatively unimpeded involvement with Bausch + Lomb

came to an end in January 2023.

168.    On December 8, 2022, ██████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ Plaintiff copied Brett Icahn

and Gary Hu on the email. On December 15 (*Id.* at 372) and December 28 (*Id.* at 371), ████████

████████████████████████████████████████████

169.    On December 15, 2022, Plaintiff contacted ██████████████████

████████████████████████████████████████████████████████

██████████████████

170.     On or about January 4, 2023, Plaintiff and Gary Hu were informed verbally by Jesse

Lynn that Ms. Ackermann had requested that Mr. Hu ███████████ Plaintiff in future

interactions with Bausch + Lomb. ████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████

171.     On January 4, 2023, Gary Hu—now deputized as Plaintiff's chaperone—responded

to the plant expansion analysis email, stating "I would be really interested in seeing this model as

well. Please send it over as soon as possible" (Ex. G at 371).

172.     Later that day,████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████

173.     On January 9, 2023, Plaintiff sent a follow up email to █████████████████

██████████████████████. On January 10, 2023, Christina Ackermann forwarded this email

to Icahn general counsel Jesse Lynn (Ex. G at 378) with the note: ███████████████████

███████████████████████████████████████████████████

174.     Later that day, Jesse Lynn forwarded Ms. Ackermann's email to Plaintiff. Plaintiff

then forwarded Mr. Lynn's email to Brett Icahn, stating ████████████████████████████

████████████████████ (Ex. G at 378).

175.     Brett Icahn thereafter directed Plaintiff ████████████████████████████████

████████████████████████████████ The next day, Gary Hu copied and pasted

Plaintiff's prepared questions into an email to Mr. Hashad (Ex. G at 388–89).

176.     Mr. Hu plagiarized Plaintiff's questions (Ex. G at 395–96) verbatim and without attribution, removed Plaintiff's signature, and sent the email in his own name.

**Plaintiff Complains that the Side Letter Violates Section 1981**

177.     After the events of the first two weeks of January 2023, Plaintiff could no longer contain his disappointment with the racially discriminatory arrangement that kept him from being a bona fide member of the Bausch + Lomb board.

178.     Plaintiff found the experience of being plagiarized by Gary Hu—ultimately for no other reason than his skin color—to be dishonest and humiliating.

179.     Plaintiff sought to devise a solution that could vindicate his civil rights and lead to his installation as a Bausch + Lomb director, so that he would have a fair chance to improve the performance of the investment and earn the attendant compensation.

180.     Familiar with the legal concept of the unenforceability of an illegal agreement, Plaintiff began to research whether the operative provisions of the racially discriminatory side letter might violate an existing law. Plaintiff hoped that, with the right legal resources to substantiate the argument and confront Bausch + Lomb, the situation could be resolved informally and amicably.

181.     Based on his initial research, on January 9, 2023, Plaintiff sent the following email (Ex. B) to Brett Icahn and Jesse Lynn:

Brett / Jesse,

████████████████████████████████████████████████

████████████████████████████████████████████████

42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. *See McDonald v. Santa*

*Fe Trail Transp. Co.,* 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In *Runyon v. McCrary, 427 U.S. 160 (1976)*, the Supreme Court held that Section 1981 regulated private conduct as well as governmental action."—Third Circuit model jury instructions memo (2020)



182.    Plaintiff attached a copy of the side letter to the email.

183.    That same day, Jesse Lynn responded, ███████████████████ Later that day, Brett Icahn replied, ███████████████████████ (Ex. G at 397–400).

**<u>Brett Icahn</u>** ███████████████████████

184.    A call with Plaintiff, Brett Icahn, and Jesse Lynn was scheduled for 5:00 pm on January 10, 2023. Eager to discuss the issue, Plaintiff called Brett Icahn directly before the scheduled call to explain his motivations.

185.    Plaintiff described the entire arrangement with Gary Hu as "the most humiliating and infuriating event in my entire career." Brett Icahn ███████████████████████

186.    The conversation turned to more practical considerations. Brett Icahn expressed his concern that ███████████████████████████████████████████████████████████████████████

187.     Specifically, Brett Icahn recounted his belief that the number one priority ████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████

188.     Indeed, ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████ (Ex. G at 401–05).

189.     These threats moved Brett Icahn to instruct Plaintiff to, ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

190.     At no point during this call, nor or at any other time, did Brett Icahn even attempt

to suggest that Gary Hu had been chosen based on merit.

191.     On the scheduled call with Brett Icahn and Jesse Lynn, Brett Icahn ███████████

████████████████████████████████████████████████████████████████

Plaintiff was instructed to ███████████████████████████████████████████

██████████████████████

192.     ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████

**Plaintiff to** ████ **and** ████████

193.    On February 8, 2023—following Plaintiff's complaints to Brett Icahn and Jesse Lynn—Christina Ackermann sent a message addressed to Mr. Icahn and Mr. Hu, with Plaintiff copied, stating that she would be ███████████████████████████████████████ ████████████████████

194.    She recited that ████████████████████████████████████████ ███████████████████████████████████ She continued, █████████ ██████████████████████████████████████████████ (Ex. G at 406).

195.    Plaintiff again felt humiliated by the charade that—solely because of skin color— he was relegated to "████" and "██████" Gary Hu.

196.    On February 16, 2023, Mr. Hu informed Plaintiff that Christina Ackermann had instructed that Plaintiff was ████████████████████████████████████████ ██████████████████████████ (Ex. K at 19).

**Carl Icahn Acknolwedges Gary Hu's Board Tenure Was a Failure**

197.    After being instructed ███████████████████████████████████████ ██████████████████ Plaintiff feared adverse employment consequences at Icahn Capital if he further pushed the envelope of his relationship with Bausch + Lomb. Throughout 2023 and 2024, Plaintiff was invited to participate in numerous meetings with Bausch + Lomb management discussing a variety of matters. Gary Hu was generally in attendance, and Plaintiff did not attempt to break out of his second-class status.

198.    However, Plaintiff observed that Gary Hu's effort and involvement in Bausch + Lomb decreased over time, coinciding with the leadup to Mr. Hu's ██████████ at Icahn Capital in December 2024, after █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████

199.    Beginning in 2024, Carl Icahn began to acknowledge Mr. Hu's board tenure was a failure by excluding Mr. Hu from meetings involving himself and Bausch + Lomb management. For instance, Carl Icahn did not invite Mr. Hu to a dinner with Plaintiff, Brett Icahn, and Bausch + Lomb CEO Brent Saunders at Carl Icahn's home on May 7, 2024 (Ex. G at 408). At the dinner, Plaintiff did not recall any objection by Mr. Saunders to Mr. Hu's absence, despite Mr. Hu ostensibly being the Icahn Group's board designee and living only a few miles away.

200.    Gary Hu's comparative lack of engagement was also evidenced by his scant written work product. During his tenure, Mr. Hu had authored ███████████████████████████ ███████████████████████████████, whereas Plaintiff had authored ████████████ ████████████████████████████████.

201.    Following Gary Hu's ██████████ at Icahn Capital in December 2024, none of Plaintiff's subsequent calls with Bausch + Lomb management involved Mr. Hu, who still remained on the board. For example, Plaintiff attended a scheduled call on July 17, 2025, with Brett Icahn and the CEO and CFO of Bausch + Lomb to discuss ████████████████ (Ex. G at 410–14). Plaintiff came prepared with questions and observations. Mr. Hu was not invited and did not attend.

**Gary Hu Receives $993,255 from Bausch + Lomb; Plaintiff Receives $0**

202.    By virtue of being the nominal board member of Bausch + Lomb, Gary Hu received full director compensation. According to Bausch + Lomb's annual proxy statements filed with the SEC, Mr. Hu's vested compensation from June 2022 to August 14, 2025 had a grant-date value of $993,255. According to the same, Mr. Hu's pay would have been $350,000 for the board term ending May 2026.

203.    Plaintiff, who would have been the board designee but for his race, was paid nothing in director compensation from Bausch + Lomb, despite his efforts to directly engage with and improve Bausch + Lomb, which were far greater than Gary Hu's efforts to do the same.

204.    At those rates, Plaintiff expected to earn, and would have earned, not less than $5,250,000 over a typical fifteen-year term on the board of Bausch + Lomb, just in director compensation. As explained in Section III, Plaintiff also lost out on hundreds of millions in reasonably expected Icahn Capital compensation.

**Defendants' Pattern of Discriminatory Director Recruiting**

205.    The Icahn Group, Bausch Health, and Tom Ross discussed other sex and race-conscious board appointments both before and after the appointment of Gary Hu.

206.    On July 27, 2021, Plaintiff texted Brett Icahn that Bausch Health director Tom Ross told Plaintiff it ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████ Mr. Icahn replied, ████████████████████████

███████████████████████ (Ex. K at 10–11).

207.    On March 9, 2023, Brett Icahn directed Plaintiff ████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████ Subsequently, Mr. Icahn forwarded Plaintiff a ███████████████████████████████████████████

███████████████████████████████████████ (Ex. G at 415–23).

**Several Icahn Group Officials** ███████████████████

208. ████████████████████████████

███████████████████████████████

███████████████████████████████

209. ████████████████████████████

███████████████████████████████

██████ (Bill Ackman is "like one of those little Jewish boys crying that the world was taking advantage of him" https://t.ly/9_4xf at 0:04–0:09).

210. ████████████████████████████

███████████████████████████████

██ ███████████████████████████

███████████████████████████████

███████████████████████████████

████████████████ █ ██████████████

███████████████████████████████

████████████████

## III. DEFENDANTS' SCHEME DEPRIVES PLAINTIFF OF EXPECTED BONUSES

**Plaintiff Expected Bausch + Lomb to Meet Its Own December 2021 Forecast**

211. Plaintiff's baseline expectations for the long-term financial performance of Bausch + Lomb—immediately prior to the June 2022 appointment of Gary Hu—were established at a

---

11 ███████████████████████████████████████████
███████████████████████████████████████████
████████████

meeting of the Bausch Health Board of Directors[12] on December 7, 2021 ██████████ Joseph Papa, who was selected to become the Bausch + Lomb CEO following the IPO, presented the ██████ ████████████ (Ex. H at 2–7).



212.    ████████████████████████████████████████████
████████████████████████████████████

213.    ████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

---

[12] The meeting was styled a ██████████████████████████████
██████

[13] Earnings Before Interest, Taxes, and Depreciation & Amortization, a common metric of business cashflow.

[14] ██████████████████████████████████████████████
██████████████

███████████████████████████████████████████

████████████████

**After One Year, Bausch + Lomb** ███████████████████████████

214.   One year after Plaintiff was first excluded from the boardroom, ████████

███████████████████████████████████████████

███████████████████████████████

215.   Plaintiff ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ (Ex. H at 11).

216.   █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

**After Three Years, Bausch + Lomb Had** █████████████████████

217.   Three years after Plaintiff was first excluded from the boardroom, Bausch + Lomb

███████████████████████████████████████████

████████████████████████ (Ex. H at 23).

218.   █████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████

219. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

220.    In Plaintiff's experience as a securities analyst and six-time corporate board member, Bausch + Lomb's ████████████████████████████████████

████████████████████████████████████████████

221.    Plaintiff watched from the sidelines in dismay while his expectations of a significant performance-based payout were upended. ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████ The additional second-order impacts—████████████████

████████████████████████████—were of comparable or greater magnitude.

**Plaintiff's Exclusion from the Boardroom Prevented Him from** ████████████████████████

222.    While Plaintiff tried his best to engage with and improve Bausch + Lomb from outside the boardroom, the formal exclusion of Plaintiff from a true directorship doomed his ability to implement the activism strategy he was hired and compensated by Icahn Capital to perform.

███   ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████

224.     Shareholder activists often oversee the planning and implementation of margin improvement initiatives. In years when Plaintiff served on the boards of JetBlue, Xerox, and Dana, each company announced margin improvement plans of $800 to $900 million ("JetForward"), $300 million ("Reinvention"), and $200 million, respectively. Further, Xerox announced another $825 million of cost-cut realizations from 2021 to 2022 from an earlier plan ("Project Own-It").

225.     Plaintiff expected no less from Bausch + Lomb. ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

226.     ██████████████████████████████████

████████████████████████████████████████

227.     ██████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████.

228.     Finally, after Mr. Hu had left the board, Bausch + Lomb held its first-ever investor day as a public company on November 13, 2025. It announced that the "next phase of our strategy" was to "expand profitability" by driving a "step change margin expansion profile." ████████████



229.    Shareholder activists often exercise skepticism over the wisdom of business

acquisitions and set a high bar for underwriting and due diligence.

234.     Shareholder activists seek to select, motivate, and, when appropriate, replace members of management to drive a successful outcome. █████████████████████████



240.    As one example, Plaintiff was a member and later elevated to chairman of the Finance and Transactions Committee of the board of parent Bausch Health. ████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████

241.    In another example, ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

242.    As another example, ███████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

**Plaintiff's Bausch Health Board Seat Was No Substitute**

243.    Plaintiff's service on the Bausch Health board was not an adequate substitute for also serving on the Bausch + Lomb board. The seat was separate and inherently unequal.

244.    While Plaintiff served on the Bausch Health board from March 17, 2021, through August 14, 2025, factors unique to the structure of the Bausch Health board limited his ability to influence Bausch + Lomb as a Bausch Health director.

245.    Following the IPO of Bausch + Lomb, ███████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

On February 8, 2023, Plaintiff complained to Bausch Health general counsel Seana Carson that

████████████████████████████████████ (Ex. K at 15).

246.    Additionally, the Bausch Health board regularly ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████

247.    Finally, Plaintiff had no oversight over Bausch + Lomb's discriminatory board diversity policy and practices. By comparison, he was involved in the reversal of such policies as a director of Bausch Health. At the July 2025 board meeting, he voted to "[r]emove [the] numerical [race] target" and "[r]etire" the Bausch Health Board Diversity Policy (Ex. L).

**Brett Icahn's Efforts** ██████████████████████

248.    With respect to Brett Icahn, at all relevant times he had responsibility for ███████ ███ investments—more than Plaintiff—and therefore he did not have as much time to dedicate to Bausch + Lomb. By contrast, Bausch was at all relevant times Plaintiff's ████████████ principal focus. This distinction manifested itself, for instance, in Plaintiff encamping with Alvarez & Marsal at Bausch + Lomb's headquarters while Brett Icahn was concerned with other matters.

249.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████

52

███████████████████████████████████ █ ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████

250.     On information and belief, in the three years since Gary Hu and Brett Icahn were

appointed to the Bausch + Lomb board, ███████████████████████████████████████

███████████████████████████

**Gary Hu Was an Ineffective Proxy**

251.     The process of requiring Plaintiff to use Gary Hu as a "████████" was slow and

cumbersome. ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████

252.     On March 2, 2023, Gary Hu ████████████████████████████████████

█████████████████████████████████████████████████████

_____

18 ███
████████████████████████████████████████████████████████████
████████████████████████████████████████████

**Access to Information Was a Separate Source of Harm**

253.   Plaintiff was also harmed in the performance of his duties as an Icahn Capital Portfolio Manager by his lack of direct access to the same information on Bausch + Lomb available to its directors to inform Icahn Capital's investment and trading decisions subject to applicable law. During authorized quarterly trading windows, Plaintiff could have recommended that Icahn Capital buy or sell shares based on his firsthand appraisal of the ability of Bausch + Lomb to achieve its long-term forecasts. Additionally, Plaintiff's firsthand knowledge could have proved instrumental in persuading the Icahn Group ████████████████████████████████████████ ████████████████████████████████[19]

**IV.** ████████████████████████████████████████████████

████ ████████████████████████████████████████████

████████████████████████████████████████████████

████ ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

████ ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[19] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████









276.   On April 8, 2025,



282.     Under the terms of the respective appointment agreements, Brett Icahn and Plaintiff were deemed to resign from the board of Bausch Health and Brett Icahn and Gary Hu were deemed to resign from the board of Bausch + Lomb, in both cases effective August 14, 2025.














316.





321. ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███ ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

_____

██████████████████████████████████████████████

██████████████████████████████████████













## FIRST CAUSE OF ACTION

### (Intentional Race Discrimination in Violation of Section 1981—All Defendants)

339.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

340.    Section 1981 guarantees to all "persons within the jurisdiction of the United States" the "right … to make and enforce contracts" and "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).

341.    "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (first quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999), then citing 42 U.S.C. § 1981). "[A] private corporate employer … sued under

74

§ 1981 may be liable under respondeat superior for the unlawful discriminatory employment decisions and actions of its employees occurring within the scope of their employment." *Taylor v. Birmingham Airport Auth.*, No. 2:24-CV-0056-JHE, 2024 WL 4048840, at \*6 (N.D. Ala. Sept. 4, 2024). And employees are personally liable when they, "through their 'own individual actions,' have 'acted with discriminatory purpose' to infringe Plaintiff's contractual rights." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

342.    Additionally, Section 1981 "is applicable to racial discrimination in private employment against white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976). "[A] plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).

343.    Defendants violated Section 1981 by preventing Plaintiff from serving on the Bausch + Lomb board of directors, substituting Gary Hu for Plaintiff because of Plaintiff's race. This discrimination denied Plaintiff the right to contract with Bausch + Lomb[26] and denied him

---

[26] Corporate directorships involve a variety of contract rights protected by Section 1981. In this instance, the contractual relationship of a Bausch + Lomb director includes duties and relationships arising under the company's corporate governance documents, arising under the Canada Business Corporations Act and/or British Columbia Business Corporations Act, and other express and implied-in-fact agreements. Specifically, an appointed director of Bausch + Lomb becomes a party to or a beneficiary of at least four express contracts: the "Consent to Act as Director" agreement (*see* Ex. M, Plaintiff's signed "Consent to Act as Director" agreement with Bausch Health), the 2022 Omnibus Incentive Plan (as amended, replaced, or superseded) through which stock compensation is granted, a Confidentiality Agreement through which information is shared, and a Power of Attorney Agreement which facilitates the filing of SEC documents. Other written agreements governing the contractual relationship include Bausch + Lomb's Articles of Incorporation, its Charter of the Board of Directors, and the charters of each respective board committee. Other agreements which are at least implied-in-fact include recurring quarterly cash compensation payable to the director, access rights to an electronic data room for board materials, the right to attend and participate in board meetings, and access to management and facilities.

the enjoyment of benefits, privileges, terms, and conditions of his Employment Agreement with Icahn Capital because his appointment to serve as a director of Bausch + Lomb was a benefit, privilege, term, or condition of Plaintiff's Employment Agreement, which Plaintiff was induced to enter on the understanding that it would lead to his appointment as a director of companies he led investment in, as was customary for Portfolio Managers.

344.    Defendants' entry into the side letter, which in practice , was immediately responsible for the Icahn Group not appointing Plaintiff, who was the Icahn Group's preferred appointee, its most qualified appointee, and its best suited appointee. Entry into the side letter therefore denied Plaintiff the opportunity, because of his race, to enter into one or more prospective contractual relationship(s) directly with Bausch + Lomb to serve on its board of directors.

345.    This discriminatory act further denied Plaintiff enjoyment of the Employment Agreement's benefits, privileges, terms, and conditions by interfering with his ability to earn compensation under the Employment Agreement in at least two ways. First, Defendants' discriminatory decision to appoint a less competent director, Gary Hu, reduced the percentage-of-profits compensation due to Plaintiff under the Employment Agreement because Gary Hu's poor performance reduced the Bausch Investment's profits. Second, Defendants' discrimination denied

Plaintiff the compensation he would have received in connection with his service on Bausch +

Lomb's board of directors, which he was also entitled to retain under the Employment Agreement.

346.     Drafts of the Director Appointment and Nomination Agreement, the side letter, and

email correspondence about these documents are direct evidence that the decision not to appoint

Plaintiff to the Bausch + Lomb board of directors was made with discriminatory intent. An early

draft of the Director Appointment and Nomination Agreement named "Brett Icahn and Steven

Miller" as the directors Icahn Capital would intend to appoint to the Bausch + Lomb board. But

the side letter required that, under conditions then present, ████████████████████████████

███████████████████████████████████████████████████████████

████ Bausch + Lomb general counsel Christina Ackermann wrote ███████████████████

███████████████████ and it became clear that Plaintiff—as a white man—would not qualify.

Accordingly, Icahn Capital replaced Plaintiff with Gary Hu as its choice of director, as documented

in Christina Ackerman's June 20, 2022, email.

347.     This written evidence requires no inference to conclude that Plaintiff was replaced

with Gary Hu because of Plaintiff's race. The director chosen had to ███████████████ And

while Plaintiff, Icahn Capital's first choice, did not qualify, Gary Hu (an Asian male) did.

348.     There is also indirect evidence of a Section 1981 violation. This requires the

plaintiff to show: (1) he is a member of a protected class, (2) he was subjected to an adverse

employment action, (3) his employer treated similarly situated employees who are not members

of his protected class more favorably, and (4) he was qualified for the job or job benefit at issue.

*Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842–43 & n.11 (11th Cir. 2000).

349.     All four elements are present here.

350.   First, Plaintiff, who would be classified as "white," is a member of a protected racial class. *See Santa Fe Trail Transp. Co.*, 427 U.S. at 286–87.

351.   Second, Plaintiff suffered the adverse employment actions of (i) Defendants denying him a seat on the Bausch + Lomb board of directors, and (ii) receiving less compensation under his Employment Agreement than he would have absent that discriminatory action.

352.   Third, Defendants, as Plaintiff's employer or prospective employer, treated Gary Hu, a similarly situated employee and prospective employee outside Plaintiff's racial class, more favorably by appointing Gary Hu to the Bausch + Lomb board even though all acknowledged that Icahn Capital believed at all times that Plaintiff was the better candidate.

353.   Fourth, Defendant was qualified to be a director of Bausch + Lomb and receive the attendant benefits of that position under his Employment Agreement, as Icahn Capital acknowledged by making Plaintiff its first choice to serve alongside Brett Icahn as Bausch + Lomb director.

354.   Additional evidence shows that Defendants intended to replace Plaintiff with Gary Hu because of Plaintiff's race:

    a)   Defendant Tom Ross intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against his reelection as a director of Bausch + Lomb beginning with the 2023 Annual General Meeting. ████████████████████████████

    ████████████████████████████████████████

    b)   Defendant Christina Ackermann intended to discriminate on the basis of race because she considered it expedient to her career to take direction from Tom Ross

and separately to act in furtherance of Bausch + Lomb's purported ESG goals by insisting on the racially discriminatory covenant in the side letter.

c)   Defendant Bausch + Lomb intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against the election of Tom Ross as a director of Bausch + Lomb. Bausch + Lomb expressly described the appointment of Gary Hu as being "in furtherance of the BLCO Board's commitment to Board diversity." The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

d)   Defendant Bausch Health intended to discriminate on the basis of race because its own board resolution authorizing its subsidiary's appointment of Gary Hu stated that ████████████████████████████████████████ ████████████████ Bausch Health intended to enforce Bausch + Lomb board diversity, by means of discrimination, to serve its own purported ESG goals as the corporate parent. The intention of Bausch Health to discriminate on the basis of race is further evidenced by its pattern of race-based recruiting on its own board (*see supra* ¶¶ 205-207). The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

e)   Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital ████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

███████████████████████████████████

███████████████

355.     Punitive damages are appropriate where a discriminatory act is performed with malice or reckless indifference to an employee's or prospective employee's federally protected rights. That means showing the employer "at least discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Austrum v. Fed. Cleaning Contractors, Inc.*, 190 F. Supp. 3d 1132, 1134 (S.D. Fla. 2016) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).

356.     Defendants knowingly discriminated in the face of a perceived risk that their conduct was unlawful, as evidenced by their attempt to conceal the side letter from regulators and the public.

357.     Defendant Bausch + Lomb discriminated in the face of a perceived risk that its conduct was unlawful because it wrote its discriminatory intent into an express agreement approved by its Board of Directors and directed in part by Lead Independent Director Tom Ross, and the agreement was reviewed and approved by general counsel Christina Ackermann, who herself received advice from outside counsel on the Director Appointment and Nomination Agreement.

358.     Defendant Tom Ross discriminated in the face of a perceived risk that his conduct was unlawful because, as a former lawyer and state court judge, Mr. Ross perceived a risk that the discriminatory covenant upon which he insisted violated federal law. Mr. Ross also intended the covenant to subject Plaintiff to racial discrimination.

359.     Defendant Christina Ackermann discriminated in the face of a perceived risk that her conduct was unlawful because, as a lawyer and the general counsel of a global pharmaceutical

company that regularly received advice from sophisticated outside counsel, Ms. Ackermann perceived a risk that the discriminatory covenant violated federal law.

360.    Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital ████████████



361.    Icahn Capital's Employee Handbook confirmed that ████████████

362.    Defendants Bausch Health, Bausch + Lomb, IEP, and Icahn Capital are liable for the discrimination of their representatives Christina Ackermann, Tom Ross, and Jesse Lynn because these individuals' discriminatory actions were within the scope of their employment. Relevant to the instant action, Christina Ackermann, directed by Tom Ross, negotiated the racially discriminatory side letter in January 2022 while Ms. Ackermann was serving as general counsel of both Bausch Health and Bausch + Lomb and while Mr. Ross was serving as a director of Bausch Health and knew he would be appointed Lead Independent Director of the Bausch + Lomb board on or about April 2022 and would be seeking to maintain his seat at the company's first Annual General Meeting. Further, Christina Ackermann's and Tom Ross's creation of and insistence upon

the side letter scheme shows that they acted willfully, intending to subject Plaintiff to adverse employment action because of his race.

363.    Defendant Carl Icahn 

364.    Defendant IEP

365.

366.    Defendants' discrimination against Plaintiff has caused him to lose past and future income, compensation, and benefits that his Employment Agreement with Icahn Capital entitled him to and the contractual relationship he would have had with Bausch + Lomb, if only he were not white.

367.    When awarding backpay, "uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer."

*EEOC v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1376 (S.D. Fla. 1998) (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5th Cir. 1974)).

368.    Because Defendants' discrimination obscured any direct measurement of the Bausch Investment's outcome with Plaintiff rightfully on the board of Bausch + Lomb, "back pay equal to the maximum amount which could have been earned but for the discrimination is appropriate." *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 549 (6th Cir. 1989).

369.    Plaintiff accordingly seeks back pay in the amount of the Make Whole Bonus, as defined herein, calculated as though the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach ████ *see infra* ¶ 384, or alternatively, in the amount of ████████, which would true-up his cumulative past compensation from Icahn Capital of $1,242,583.21 (Ex. I at 55–61) to the ████████ for each New Sargon Portfolio Manager, which set a benchmark for the compensation expectations of a performing Icahn Capital Portfolio Manager.

370.    The New Sargon bonus is an appropriate benchmark for determining Plaintiff's reasonable expectations because, at the outset of his Employment Agreement, Plaintiff was similarly situated to Brett Icahn at the outset of the New Sargon deal on August 1, 2012. Both started their careers at Goldman Sachs, obtained about nine to ten years of experience as buy-side investment professionals, earned multi-million-dollar per annum compensation in their prior employment based on superior investment returns, and had thereafter negotiated with Carl Icahn to become Portfolio Managers of Icahn Capital. Plaintiff is also entitled to back pay, in an amount to be proven at trial, for lost past board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

371.     With respect to front pay, Plaintiff could have reasonably expected to earn similar per-annum compensation for the remainder of his career had Defendants' actions not: (i) damaged his investment track record and industry reputation from the Bausch Investment's poor performance during the discriminatory period, and (ii) deprived Plaintiff of the recognition and business relationships that would have attended serving on the board of Bausch + Lomb starting from June 2022 and extending into the future. This amount is to be proven at trial. Plaintiff is also entitled to injunctive relief or, alternatively, front pay in an amount to be proven at trial, for future service on the Bausch Health and Bausch + Lomb boards that would have occurred but for the discrimination.

372.     With respect to damages at law, Plaintiff is entitled to an amount not less than the Make Whole Bonus for harms suffered related to the Employment Agreement and an amount to be proven at trial for lost past and future board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

373.     Plaintiff is entitled to additional damages in an amount to be proven at trial for lost earnings capacity resulting from the reputational harm. *See Hanna v. WCI Cmty.*, 348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004) ("When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [he] cannot be made whole without compensation for the lost future earnings [he] would have received absent the employer's unlawful activity.") (citations omitted).

374.     Defendants' discrimination against Plaintiff has also caused him to suffer severe mental anguish and emotional pain and suffering for the three years he was excluded from the Bausch + Lomb boardroom on the basis of race and unable to control his destiny in his career at

Icahn Capital, compensable in an amount to be proven at trial.

### SECOND CAUSE OF ACTION

███████████████████████████████

375.   Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

376.   The "implied covenant of good faith and fair dealing exists in every employment contract in Delaware." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992). The covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up).

377.   Intentional race discrimination by an employer violates this implied covenant in an employment contract. Thus, a Plaintiff can "sustain a disparate treatment claim for a breach of the implied covenant of good faith and fair dealing" by showing "that []he suffered intentional discrimination because of h[is] race, as evidenced by an employer's disparate treatment of h[im] and similarly situated persons, and that the intentional discrimination resulted in an adverse employment action." *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005).

██ ██████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████
██ ██████████████████████████████████████
████████████████████████████████████████





383.    Because "the standard remedy for breach of contract is based upon" the "principle of expectation damages," *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001), ███████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ████████████████████████ Such an amount "is based upon the reasonable expectations of the parties *ex ante*." *Id.*

384.    Assuming that the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach ███████, the amount of the Make Whole Bonus is no less than $235,846,562.94, calculated as follows:

385.     Compared to the New Sargon bonus of ████████, Plaintiff's Make Whole Bonus of approximately $236 million contemplates greater initial investment capital ($9.2 billion[27] vs. $3.0 billion), ██████ duration to compound ██████ vs. 4 years), ██████ percentage payouts (██% and ██% co-invest vs. 7.5%), and capital being divided evenly across three peer Portfolio Managers instead of being shared by two. The 26.8% rate of return of the combined Sargon portfolio is held constant.

386.     It was reasonable for Icahn Capital's representatives Carl Icahn and Brett Icahn to expect that their new partnership would achieve similar investment performance to the Icahn father-son duo's last such deal together, Sargon. Evidencing this expectation, IEP's October 1, 2020, press release announcing the deal touted the "26.8%" investment returns achieved under Sargon. In fact, Sargon's performance was █████████████████████████████████ ███████████████████████████████████ (Ex. J at 33–36):

| Fund | Period | Annual Gross Return |
|---|---|---|
| ████████████████████████ ██████████████████ | ████ | |
| Icahn Partners L.P.—February 2011 press release | 2004-2011 | 10.9% |
| Sargon portfolio—October 2020 press release | 2010-2016 | 26.8% |
| **Compound Average** | ████ | ████ |

387.     With respect to Plaintiff's reasonable expectations, he similarly believed that the Sargon performance could be achieved or exceeded; further, he expected that his talent, discipline, and work ethic—as evidenced by his prior track record as an investment professional—would be

---

[27] The investment capital was expected by both parties to have future inflows as IEP was in the process of undertaking a significant "At the Market" sale of units. IEP realized $833 million in proceeds in calendar 2021. This implied over $4 billion in future expected inflows throughout the Term of the Employment Agreement.

additive to this performance. Both parties knew that "[e]lite portfolio managers at hedge-fund firms can command pay packages of more than $100 million over several years."[28]

388.    While the Make Whole Bonus does not explicitly contemplate the Bausch Investment, it is consistent with the reasonable expectations of the parties that the Sargon return could be achieved. According to the parties' own valuations of BHC shares (Ex. J at 37, 43, 58), the parties clearly expected to ███████████████████ over the life of the Bausch Investment:

| Valuation Date | | BHC low | BHC high | Midpoint | Cost basis[29] | 4Y return[30] |
|---|---|---|---|---|---|---|
| Brett Icahn | ██████ | ██ | ██ | ██ | ██ | ██ |
| Plaintiff | ███ | | | | | |
| Plaintiff | ████ | | | | | |

389.    Even reducing the amount to reflect present value as of the breach date yields a significant sum. The table below calculates the present value of the Make Whole Bonus payable on December 29, 2027, at each possible breach date alleged in this complaint █████████ ████████ [31] Pre- and post-judgment interest subsequently accrues on the breach-date value.

| Breach Date | Present Value of Make Whole Bonus |
|---|---|
| October 2, 2020 | $171,456,631.01 |
| December 14, 2020 | $172,972,691.83 |
| January 21, 2022 | $181,586,694.73 |
| June 23, 2022 | $184,968,235.48 |
| January 10, 2023 | $189,506,541.88 |

---

[28] Peter Rudgeair & Gregory Zuckerman, *The Frenzied Pursuit of Wall Street's Low-Profile All-Stars*, WSJ (June 13, 2025, 9:00 PM), https://www.wsj.com/finance/investing/the-frenzied-pursuit-of-wall-streets-low-profile-all-stars-ee51b33a.

[29] Cost basis of BHC shares on the relevant breach date (either January 21, 2022, or June 23, 2022).

[30] Compound annualized return over a four-year period from the cost basis to the midpoint price target.

[31] The Employment Agreement provides that the final bonus is due and payable on the ███ day following ██████

390.     Plaintiff is entitled to additional damages to be proven at trial, resulting from lost earnings capacity caused by the reputational harm.

391.     Under Delaware law, when there is a "continuous contract and continuing breach, the applicable statute of limitations begins to run only when full damages can be ascertained and recovered," which is "typically" not "until the termination of the entire contract." *Palisades Collection, LLC v. Unifund CCR Partners*, No. CVN14C08036EMDCCLD, 2015 WL 6693962, at *5 (Del. Super. Ct. Nov. 3, 2015). The doctrine applies both when a single "discrete and readily determinable breach" causes "damages that could not have been known (or sought) at the time of the breach," *In re ASHINC Corp.*, No. AP 13-50530-CSS, 2022 WL 2666888, at *11 (D. Del. July 11, 2022), *dismissed,* No. 22-2442, 2023 WL 9596751 (3d Cir. Sept. 12, 2023) (citations omitted), and when the breaching party commits multiple "wrongful acts" that are "so inexorably intertwined that there is but one continuing wrong," *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. CV 7639-VCS, 2016 WL 4440476, at *12 (Del. Ch. Aug. 22, 2016). The doctrine has also been applied to a contract that prescribed obligations "for a fixed … period" where the contract was "continuously acknowledged by both parties throughout." *Matter of Burger*, 125 B.R. 894, 902 (Bankr. D. Del. 1991).

392.     ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████

393.     ███████████████████████████████████████████████████
████████████████████████████████████████████████████████████

█ ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

**THIRD CAUSE OF ACTION**

████████████████████████████████████████

█ ████████████████████████████████████████████

████████████████████

█ ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

█ ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

█ ████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████

█ ████████████████████████████████████████████

██████████████████████████████████████████████████





████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

410.   ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

411.   ██████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

## FOURTH CAUSE OF ACTION

████████████████████████████████████

412.   ██████████████████████████████

███████████████



[32] Because the choice-of-law clause in Plaintiff's Employment Agreement ███████ ███ *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009), each of Plaintiff's tort claims is governed by the law of the state that has the most significant relationship to the claim, *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003), which is generally Florida.



██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████

422.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████

## FIFTH CAUSE OF ACTION

███████████████████████████████████████

423.   ███████████████████████████████████████

███████████████████

██   ███████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████





428.

429.

430.

## SIXTH CAUSE OF ACTION

**(Tortious Interference with Contract/Business Relationship—Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross)**

431.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

432.    "The elements of tortious interference with a business relationship are: (1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation omitted). "An action for intentional interference is appropriate even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Id.* Even if the law of New Jersey applied (where Bausch + Lomb and Bausch Health have their corporate headquarters), there would be no difference because it similarly requires "(1) a protected interest; (2) … defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *Vosough v. Kierce*, 97 A.3d 1150, 1159 (N.J. App. Div. 2014); *accord MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996).

433.    Christina Ackermann and Tom Ross, individually and as representatives of Bausch + Lomb and Bausch Health, intentionally interfered with Plaintiff's Employment Agreement with Icahn Capital by insisting on execution and enforcement of a racially discriminatory covenant in the side letter regarding the Director Appointment and Nomination Agreement between Icahn Capital and Bausch + Lomb, which: (1) induced Icahn Capital to breach the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement; (2) denied Plaintiff the Bausch + Lomb director position that he otherwise would have received as a result of the Employment Agreement; and (3) substantially reduced Plaintiff's profits-based compensation under the Employment Agreement by preventing him from (i) implementing his proven activist strategy for increasing Bausch + Lomb's profitability, (ii) directly opposing the unwise acquisition of XIIDRA,

and (iii) implementing better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

434.    On February 22, 2021, the date Plaintiff disclosed his employment with Icahn Capital in Bausch Health's directors' and officers' questionnaire, Christina Ackermann was the general counsel of Bausch Health. Plaintiff is informed and believes she received and read the questionnaire because she replied to the email Plaintiff sent to her containing the questionnaire (Ex. J at 59–63).

435.    On January 21, 2021, the date Bausch + Lomb and Icahn Capital preliminarily agreed to the discriminatory covenant, Christina Ackermann was still general counsel of Bausch Health.

436.    On the date Gary Hu was appointed to the Bausch + Lomb board, June 23, 2022, Christina Ackermann was general counsel of Bausch + Lomb. Her knowledge of Plaintiff's disclosure of the profits-based nature (Ex. J at 83) of his compensation was permitted to travel with her under the confidentiality provisions of the Master Separation Agreement by and between Bausch Health and Bausch + Lomb and is thereby imputed to Bausch + Lomb.

437.    Bausch Health and Bausch + Lomb, being advised by outside activist-defense bankers and law firms, either knew about the ███████ terms of Plaintiff's employment, which had been publicly disclosed by IEP's October 1, 2020, press release and accompanying Form 8-K filing, or knew generally about the profits-based compensation arrangements of activist hedge funds, in particular those of Icahn Capital. Christina Ackermann, as an experienced lawyer, and Tom Ross, as a former judge, also knew that Plaintiff's Employment Agreement contained an implied covenant of good faith and fair dealing by operation of state law and that racial discrimination by Icahn Capital against Plaintiff would materially breach that covenant. Bausch

Health and Bausch + Lomb knew the same through the knowledge of their representatives Ms. Ackermann and Mr. Ross and separately through the advice of inside and outside counsel.

438.    Bausch Health and Bausch + Lomb, through their employment of Christina Ackermann, Tom Ross, and others, knew that Plaintiff's Employment Agreement would have caused Plaintiff's appointment as a director of Bausch + Lomb because Plaintiff's name appeared four times in the draft Director Appointment and Nomination Agreement that Ms. Ackermann edited with Mr. Ross's review and approval, and the prospect of Plaintiff's appointment was the impetus for Ms. Ackermann and Mr. Ross to insist on a racially discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement.

439.    Bausch Health and Bausch + Lomb, through their shared representatives Christina Ackermann and Tom Ross, demanded and obtained the racially discriminatory covenant from Icahn Capital in the Side Letter regarding the Director Appointment and Nomination Agreement and applied it against Plaintiff to unjustifiably prevent his appointment to Bausch + Lomb's board.

440.    This intentional act by Bausch + Lomb and Bausch Health induced Icahn Capital to breach the Employment Agreement with Plaintiff, namely the implied covenant of good faith and fair dealing thereunder, by causing Icahn Capital to participate in intentional race discrimination against Plaintiff.

441.    This same act further interfered with Plaintiff's Employment Agreement by preventing it from operating to cause Plaintiff's appointment to Bausch + Lomb's board, as it otherwise would have.

442.    This same act further interfered with Plaintiff's Employment Agreement by foreseeably reducing his profits-based compensation under it as a result of his inability to (i) implement his proven activist strategy for increasing Bausch + Lomb's profitability as a

member of its board, (ii) ███████████████████████████, and (iii) implement better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

443.    Bausch + Lomb's, Bausch Health's, Christina Ackermann's, and Tom Ross's insistence on and enforcement of the racially discriminatory covenant is unjustified, used improper means, and had improper motives because the covenant itself is illegal on its face, was intended to discriminate against Plaintiff on the basis of his race (*see supra* ¶¶ 344, 354),was made self-servingly in breach of Tom Ross's fiduciary duty to Bausch + Lomb and Bausch Health, to protect his own board seat, was against the best interests of each company and its respective shareholders because of the material liability it created, was unlawfully concealed from the shareholders and regulators by Christina Ackermann because of its wrongfulness, was not a suitable exercise of business judgment, and was against public policy, including under Section 1981. Sufficient "bad motive" under Florida law exists in a "tortious interference claim where [the] sole basis for defendant's interference was plaintiff's race." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 & n.9 (11th Cir. 2001) (citing *Nizzo v. Amoco Oil Co.*, 333 So. 2d 491, 493 (Fla. 11th DCA 1976)).

444.    Plaintiff here specifically realleges the injury allegations in his breach of contract claim based on race discrimination (Second Cause of Action).

445.    Plaintiff is additionally entitled to an award of punitive damages.

## **SEVENTH CAUSE OF ACTION**

### **(Unjust Enrichment—Tom Ross, Gary Hu)**

446.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

104

447.    Assuming Delaware law applies to this claim, "the standard Delaware formulation" of unjust enrichment looks for "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)). "Outside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law." *Id.* at 351. Nor need a claimant "suffer an actual financial loss" if he is "deprived of the benefit unjustifiably conferred upon the defendant," *id.* at 345, because "the restitutionary recovery is not, as in damages, the *harm* to the plaintiff, but rather the *benefit* received by the defendant," *id.* at 344.

448.    Tom Ross received ongoing director's fees from his seat on the Bausch + Lomb board only because he directed Christina Ackermann to insist upon the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement to ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ *See supra* ¶ 98. These fees enriched Tom Ross by no less than $1,165,900 within the three-year limitations period.

449.    Tom Ross's insistence that Bausch + Lomb engage in discrimination so that he could continue serving on the board caused him to receive this benefit of director's fees, which Plaintiff would have received instead, if not for Tom Ross's discrimination to protect himself at Plaintiff's expense. Plaintiff was thus impoverished by Tom Ross's enrichment. *See Garfield*, 277 A.3d at 345.

450.    This intentional race discrimination was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

451.    Plaintiff is accordingly entitled to restitution in an amount not less than $1,165,900, the amount of director's fees Tom Ross received within the three-year limitations period as a result of discriminating against Plaintiff.

452.    Gary Hu received director's fees from his seat on the Bausch + Lomb board only because the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement prevented Plaintiff's appointment to the board by requiring that the appointee be non-white. These fees enriched Gary Hu by no less than $966,589 within the three-year limitations period.

453.    Gary Hu retained these fees even though he knew that he had been appointed rather than Plaintiff only because of their race and that Plaintiff performed many of the duties of a Bausch + Lomb director, which Gary Hu neglected and willingly allowed Plaintiff to perform without compensation. Gary Hu even plagiarized Plaintiff's questions and requests without attribution on multiple occasions. Gary Hu further participated in Bausch Health's, Bausch + Lomb's, Christina Ackermann's, and Tom Ross's racial discrimination against Plaintiff by acting as Plaintiff's ███████ at Christina Ackermann's insistence from January 4, 2023, onward.

454.    Gary Hu would not have received director's fees had he not willingly participated in intentional race discrimination against Plaintiff. If not for the intentional race discrimination against Plaintiff, Plaintiff would have received these fees instead.

455.    Gary Hu's participation in intentional race discrimination against Plaintiff was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

456.    Plaintiff is accordingly entitled to restitution in an amount not less than $966,589, the amount of director's fees Gary Hu received within the three-year limitations period as a result of his participation in intentional discrimination against Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate 42 U.S.C. § 1981;

B.    A declaratory judgment that Icahn Capital ███████████████████████ ████████████████████████████████████████

C.    A declaratory judgment that IEP, Icahn Capital, Carl Icahn ████████ ████████████████████████████████████████ ████████████████████████████████

D.    A declaratory judgment that IEP, Icahn Capital, Carl Icahn, ████████ ████████████████████████████████████

E.    A declaratory judgment that Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross tortiously interfered with Plaintiff 's Employment Agreement with Icahn Capital.

F.    An injunction and order that Bausch + Lomb appoint Plaintiff to its board of directors effective immediately, that Bausch + Lomb award Plaintiff back pay in an amount to be proven at trial, that Bausch + Lomb continue to nominate Plaintiff alongside its other director

candidates in its own proxy statement for election at each subsequent annual general meeting until Plaintiff has served for 15 years; or, in the alternative, an award of back and front pay in an amount not less than $5,250,000;

G.     The same injunction and order with respect to Bausch Health; or, in the alternative, an award of back and front pay in an amount not less than $3,850,000;

H.     An award of damages, back pay, and front pay against all Defendants to compensate Plaintiff for all the economic harm he suffered from disparate treatment based on his race in an amount to be determined at trial not less than $221,757,417, plus prejudgment interest;

I.     An award of damages against ███████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████ ;

J.     An award of damages against Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross for tortiously interfering with Plaintiff's Employment Agreement with Icahn Capital in an amount to be determined at trial not less than $181,586,695, plus prejudgment interest;

K.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all mental anguish and emotional pain and suffering;

L.     An award of back pay, front pay, and damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation, earnings capacity, and loss of career fulfillment;

M.     An award of punitive damages in an amount to be proven at trial;

N.      An award of restitution against Tom Ross in an amount not less than $1,245,164;

O.      An award of restitution against Gary Hu in an amount not less than $966,589;

P.      An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

Q.      Such other and further relief as the Court may deem just and proper.

### <u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 15th day of December 2025.

<u>/s/ Emily Percival</u>
Gene Hamilton (*pro hac vice* forthcoming)
Emily Percival (Fla. Bar No. 119313)
Will Scolinos (*pro hac vice* forthcoming)
James Rogers (*pro hac vice* forthcoming)
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, D.C. 20003
(301) 893-4177
emily.percival@aflegal.org
william.scolinos@aflegal.org
james.rogers@aflegal.org

Jared M. Kelson (*pro hac vice* forthcoming)
Nicholas A. Cordova (*pro hac vice* forthcoming)
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900
Washington DC 20006
(202) 955-0620
jkelson@boydengray.com
ncordova@boydengray.com

*Counsel for Plaintiff*
