## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **STEVEN D. MILLER,** | |
| *Plaintiff,* | |
| v. | Case No.1:25-cv-25893 |
| **BAUSCH HEALTH COMPANIES, INC.; BAUSCH + LOMB CORPORATION; THOMAS ROSS; CHRISTINA ACKERMANN; GAOXIANG HU; ICAHN ENTERPRISES L.P.; ICAHN ENTERPRISES G.P. INC.; ICAHN CAPITAL LP; CARL ICAHN; BRETT ICAHN,** | **COMPLAINT**[*] <br><br> JURY DEMANDED |
| *Defendants.* | |

Plaintiff Steven D. Miller ("Plaintiff"), by and through his counsel, and for his Complaint against Defendants Bausch Health Companies, Inc. ("Bausch Health" or "BHC"), Bausch + Lomb Corporation ("Bausch + Lomb" or "BLCO"), Thomas "Tom" Ross, Christina Ackermann, Gaoxiang "Gary" Hu, Icahn Enterprises L.P. and its general partner Icahn Enterprises G.P. Inc. (collectively, "IEP"), Icahn Capital LP ("Icahn Capital"), Carl Icahn, and Brett Icahn (collectively, "Defendants"), hereby alleges as follows:

---

[*]This Complaint and the attached exhibits comply with Plaintiff's representation to the Court in his December 17, 2025 Motion for Leave to File Complaint and Exhibits Under Seal that he would publicly file a version of the Complaint with only limited redactions. *See* ECF No. 14 at 6–7; *see also* ECF No. 15 (granting Motion). All parties have conferred and agreed to the redactions in this version of the Complaint and attached exhibits. Plaintiff, however, expressly reserves all rights as to the admissibility of the redacted information and does not concede that any redacted information is subject to any privilege.

## **NATURE OF THE ACTION**

1.      This is a racial discrimination case in which a public company, Bausch + Lomb, entered into a written agreement allowing its major investor, Icahn Capital, to appoint two new members to its board of directors, provided one such director must be "Diverse," a term that all the relevant actors knew would require Icahn Capital to appoint a *non-white* director.

2.      The proviso worked as designed. It caused Icahn Capital to forgo appointing its expressly (and repeatedly) announced and preferred appointee, i.e., Plaintiff, solely because he is white, and instead appoint an Asian American. It was obvious why Plaintiff was Icahn Captial's preferred appointee. He has served on six other public company boards with a perfect record of shareholders voting in favor of his re-election. But according to Bausch + Lomb's self-imposed diversity mandate, his skin was the wrong color. Bausch + Lomb's general counsel, knowing the illegality of this racial discrimination, even devised a scheme to hide the discriminatory proviso from a required securities filing by placing it in a "side letter" that Bausch + Lomb did not disclose to regulators. Plaintiff made a written complaint to Icahn Capital arguing the proviso violated federal law, but he was directed to sweep the incident under the rug.

3.      As explained below, Defendants' actions violate 42 U.S.C. § 1981, which bars racial discrimination in contracting, and also amounted to a breach of the covenant of good faith in Plaintiff's employment contract, tortious interference with that contract, and unjust enrichment of Bausch + Lomb board members who directed or willingly participated in the discrimination.

4.      Aside from these race-based claims, Plaintiff also alleges breach of contract, intentional misrepresentation, and fraudulent inducement because his employer Icahn Capital and its affiliates committed a massive and well-publicized fraud by unlawfully misstating their debt balances to Plaintiff and the SEC by over $5 billion. The ensuing SEC investigation, penalty, and

debt spiral led to the collapse of Icahn Capital, the liquidation of the majority of its investment funds, and substantial harm to Plaintiff's investment portfolio and career.

*\*\*\**

5.    At all relevant times, Plaintiff has been a Portfolio Manager at investment fund Icahn Capital under a seven-year Employment Agreement dated October 1, 2020.

6.    As an activist investment fund, Icahn Capital's strategy involves buying large ownership stakes in publicly traded companies, negotiating the right to appoint new highly motivated directors to such company's board, and relying on these directors to implement operational and strategic improvements.

7.    Under this strategy, Plaintiff proposed and became responsible for an investment in Bausch + Lomb and related entities. The investment consisted principally of a 34% interest in the shares of Bausch Health—sole and later supermajority owner of Bausch + Lomb, its "crown jewel" subsidiary—at a cost of approximately ███████. Plaintiff was entitled to a bonus at the end of his Employment Agreement tied to ██% of his profits on this and other investments, a provision that was reasonably expected to result in Plaintiff receiving hundreds of millions of dollars.

8.    In March 2021, Plaintiff and his manager, Brett Icahn, were appointed to the Bausch Health board (not Bausch + Lomb, to be clear) under an appointment agreement.

9.    When Bausch + Lomb established its own independent board in connection with its May 2022 Initial Public Offering ("IPO"), Icahn Capital sought similar appointment rights to the Bausch + Lomb board.

10.    Icahn Capital inserted Plaintiff's name into the appointment agreement, where it appeared *four times* as one of two contemplated appointees to the board (together with Brett Icahn).

11.     However, in the course of negotiations, Bausch + Lomb's general counsel expressed concerns to her counterpart at Icahn Capital that the preliminary board slate would consist only of white men and women, therefore falling afoul of racial diversity quotas Bausch + Lomb adopted to please Institutional Shareholder Services Inc. ("ISS"), a proxy advisory company that had announced that it would recommend voting against certain board candidates if a company's board did not have a minimum number of members who were "non-Caucasian in race or non-white in colour."

12.     Icahn Capital's ███████████████████████████████████████████ ████████████████, but Bausch + Lomb demanded and ultimately obtained a covenant from Icahn Capital that allowed it to appoint one "Diverse" director and one other director.

13.     Bausch + Lomb was required to file this agreement (the "Director Appointment and Nomination Agreement") with the United States Securities and Exchange Commission ("SEC"). However, in a scheme to hide the racially discriminatory covenant from the SEC and the public, the diversity covenant was extracted and labeled a "Side Letter regarding the Director Appointment and Nomination Agreement," which was executed on the same date by the same parties. Bausch + Lomb's general counsel assured her counterpart at Icahn Capital that "[w]e will attach the agreement (Not the side letter)" to the required SEC filing.

14.     This "side letter" meant that Plaintiff had to go. He was classified as "white" and therefore did not help Bausch + Lomb meet ISS's non-binding racial quota. Contemporaneous e-mail records confirm the decision was made to appoint "non-white" directors, also explicitly referred to as racial "minorities" in contemporaneous discussions.

15.     Thus, even though he had been expressly named as a presumptive board member *four times* beforehand in the appointment agreement, and even though Brett Icahn confirmed that

Plaintiff and Brett Icahn were the firm's only two preferred board members, Plaintiff was not chosen for the board in June 2022 when Icahn Capital exercised its appointment rights at Bausch + Lomb.

16.     Instead of Plaintiff, Icahn Capital appointed Gaoxiang "Gary" Hu, another Portfolio Manager at Icahn Capital with the same role and tenure as Plaintiff but who identifies as a Chinese American man. At no point did the relevant players claim that Hu was selected on any basis aside from race. To the contrary, the accompanying board resolutions openly described his appointment as being "in furtherance of the [Bausch + Lomb] Board's commitment to Board diversity."

17.     As Brett Icahn acknowledged, Plaintiff was in fact the better candidate. Unlike Gary Hu, Plaintiff remained responsible for the Bausch Investment, had written Icahn Capital's investment memorandum, was highly motivated because he was entitled to a bonus tied to ██ of the investment's profits, personally owned Bausch Health stock, and was already intimately familiar with Bausch + Lomb by serving on its parent company's board. Unsurprisingly, Gary Hu later demonstrated no exceptional effort on the board of Bausch + Lomb.

18.     Given this record, no inference is needed: it was openly acknowledged that Hu was chosen over Plaintiff because of race.

19.     Selecting Hu over Plaintiff had predictably disastrous consequences for Bausch + Lomb. Plaintiff had a detailed track record of exceptional performance improving shareholder value at other companies, whereas Hu proved to be an absentee board member who did nothing as the company made repeated poor decisions that Plaintiff tried to stop—and he could have stopped them if he had not been excluded from the board due to his race.

20.     For a brief period from June 2022 to December 2022, Plaintiff was hopeful that he could vigorously execute the activist strategy he engineered for Bausch + Lomb by performing

many of Gary Hu's duties in substance. In August 2022, Plaintiff was invited to become a non-official member of the highly sensitive Bausch + Lomb CEO search committee. Gary Hu was not invited. In December 2022, Bausch + Lomb arranged for Plaintiff to undertake a listening tour, meeting with eye surgeons and ophthalmologists. Gary Hu did not attend. In December 2022, Plaintiff was in direct contact with Bausch + Lomb's Chief Financial Officer and its Chief Medical Officer to engage in due diligence inquiries of the sort that would be customary for an activist director.

21.     However, in January 2023, Bausch + Lomb's general counsel put a stop to Plaintiff's efforts. She demanded that Gary Hu "chaperone" Plaintiff in future interactions with Bausch + Lomb. In response, Brett Icahn directed Plaintiff to send drafts of future questions to Gary Hu, who then plagiarized them in messages to Bausch + Lomb sent under his own name and without attribution. Plaintiff was humiliated by the practice, which was a continuation of the underlying discriminatory arrangement.

22.     As a direct result of this situation, on January 9, 2023, Plaintiff sent a written complaint to Brett Icahn and Icahn Capital's general counsel. Plaintiff argued that the agreement to pick Hu over Plaintiff had violated "Section 1981," which bars racial discrimination in contracting. His written complaint was rebuffed in a meeting on January 10, 2023, in which Brett Icahn instructed Plaintiff to, in substance, "take one for the team" to maintain good relations with Bausch + Lomb and directed Plaintiff not to contact Bausch + Lomb regarding the matter.

23.     Gary Hu was forced out of Icahn Capital in December 2024 following his losses on unrelated investments but nonetheless remained on the board of Bausch + Lomb.

24.     While Plaintiff was barred from the Bausch + Lomb boardroom from June 2022 onward, the company failed to meet budget forecasts by hundreds of millions of dollars and

engaged in a multi-billion-dollar drug acquisition it later regretted—an acquisition that Plaintiff had tried to warn against but could not directly oppose before the Bausch + Lomb board.

25.    In fact, Plaintiff's service on other public company boards of directors—a total of six to be exact—demonstrates a track record and the necessary skills to prevent these blunders.

26.    Plaintiff's reasonable expectations of earning a substantial bonus from Icahn Capital through the Bausch Investment were obliterated, while the discriminatory covenant left him powerless to meaningfully affect the situation, as he otherwise would have done as a director of Bausch + Lomb, but for his race-based exclusion.

27.    Defendants' actions clearly violated 42 U.S.C. § 1981, which bars race-based contracting. Icahn Capital's blatant race discrimination was also an act of bad faith toward Plaintiff, breaching the Employment Agreement's implied covenant of good faith and fair dealing. And the racial discrimination further entitles Plaintiff to restitution of the director's fees that were awarded to two other directors because of the racially discriminatory covenant.

28.    In addition to those race-based claims, Plaintiff also seeks recovery for breach of contract, intentional misrepresentation, and fraudulent inducement because of Icahn Capital's careful concealment from Plaintiff of the fact that Carl Icahn had borrowed $5.1 billion against his ownership stake in IEP, used the proceeds to personally supplement Icahn Capital's investment liquidity, and unlawfully concealed the scheme from his securities disclosures with the SEC.

29.    Despite Plaintiff reporting directly to Carl Icahn, the massive debt amounts were concealed from Plaintiff both before and during his employment. When Plaintiff asked for information about available investment funds during negotiations on the Employment Agreement—at one point asking to "sign an NDA to get more detail" on IEP—Brett Icahn made false and misleading representations, referred Plaintiff to the deficient securities filings, and

refused requests for additional private information. Brett Icahn thereby intentionally misled Plaintiff and deprived him of any opportunity to discover the loan. Plaintiff would not have signed the Employment Agreement had he known that his career at Icahn Capital would depend on a fraudulent $5.1 billion scheme never coming to light.

30.     This loan and the scheme to conceal it posed a severe threat to Icahn Capital's liquidity and thus to Plaintiff's ability to function as a Portfolio Manager at Icahn Capital. Indeed, that threat materialized when the SEC discovered the undisclosed loan, leading Carl Icahn's lenders to insist on accelerated paydowns that, together with investment losses from forced liquidations, reduced the funds available for investment by over 65 percent, from $9.3 billion to $3.2 billion. Icahn Capital was forced to liquidate shares of Plaintiff's primary investment at deeply discounted prices, even as Carl Icahn's own son insisted the shares were "way undervalued," which thus annihilated any possibility of Plaintiff receiving his non-discretionary, profits-based performance bonus.

31.     Defendants' actions were unlawful. Their discrimination violated Plaintiff's civil rights, breached and tortiously interfered with the Employment Agreement, and caused unjust enrichment. And Icahn Capital's concealment of the $5.1 billion margin loans propped up by ongoing securities violations breached the Employment Agreement, fraudulently induced Plaintiff to enter it, and intentionally misrepresented Icahn Capital's financial situation to him.

32.     As a result of Defendants' unlawful conduct, Plaintiff has suffered harm in the forms of lost past and future income and business opportunities, reputational harm, and emotional pain and suffering. Because of the nature of these harms, damages are reasonably calculated to be well over a hundred million dollars, and the jury should further award punitive damages.

## JURISDICTION AND VENUE

33.     The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because this action involves a claim arising under 42 U.S.C. § 1981 and claims arising under state law that share a "common nucleus of operative fact" with the federal claim, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

34.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, particularly Plaintiff's employment at Icahn Capital, Icahn Capital's negotiation of the racially discriminatory covenant, and the actual discrimination against Plaintiff, occurred in this district.

35.     Venue is proper in this district also pursuant to the forum selection clause in Plaintiff's Employment Agreement with Icahn Capital, which provides that "all disputes arising out of or related to [the Employment Agreement] shall be submitted to the state and federal courts of Florida located in Miami-Dade County" and that Icahn Capital "irrevocably consents to such personal jurisdiction and waives all objections thereto."

## PARTIES

36.     Plaintiff Steven Miller is a resident of the State of Florida. Since October 1, 2020, Plaintiff has been employed as a Portfolio Manager of Icahn Capital LP, reporting jointly to Carl Icahn and Brett Icahn. From February 24, 2021, to August 14, 2025, Plaintiff served on the Board of Directors of Bausch Health Companies Inc. Plaintiff's ancestors immigrated to the United States from present-day Ireland and Poland. Plaintiff's race would be commonly described as "white," as he disclosed to Icahn Capital in a pre-employment questionnaire (Ex. F at 1).

37.     Defendant Bausch Health Companies Inc. is incorporated under the provincial laws of British Columbia, Canada, and maintains its U.S. headquarters in Somerset County, New Jersey.

Together with its subsidiaries, it operates as a diversified specialty pharmaceutical and medical device company. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BHC."

38.     Defendant Bausch + Lomb Corporation is incorporated under the federal laws of Canada and maintains its U.S. headquarters in Somerset County, New Jersey, and an executive office for its Chief Executive Officer in Miami-Dade County, Florida. Together with its subsidiaries, it operates as a diversified eye health company.

39.     Prior to the completion of its initial public offering on May 10, 2022, Bausch + Lomb was wholly owned by Bausch Health and its subsidiaries. After the initial public offering, Bausch + Lomb became approximately 88% owned by Bausch Health and its subsidiaries and 12% owned by public shareholders including its directors and officers. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BLCO."

40.     Defendant Thomas "Tom" Ross has served on the board of Bausch + Lomb since April 2022, including as Chairman of the Board from July 19, 2022, to March 6, 2023, and as Lead Independent Director from May 2022 to July 18, 2022, and from March 6, 2023, to present. On February 10, 2025, Mr. Ross attended a Bausch + Lomb board meeting in Florida. Mr. Ross served on the board of Bausch Health from March 2016 to May 14, 2024, including as Lead Independent Director from June 2016 to June 2022.

41.     Defendant Christina Ackermann was general counsel of Bausch Health from August 2016 to May 2022. Ms. Ackermann was general counsel and President of Ophthalmic Pharmaceuticals at Bausch + Lomb from May 2022 until April 28, 2023.

42.     Defendant Gaoxiang "Gary" Hu was a Portfolio Manager of Icahn Capital at its headquarters in Miami-Dade County, Florida from October 1, 2020, to December 2024 and, as a result of intentional race discrimination against Plaintiff, was a director of Bausch + Lomb from June 23, 2022, to August 14, 2025.

43.     Defendant Icahn Enterprises L.P. is a master limited partnership formed in Delaware and headquartered in Miami-Dade County, Florida. Together with its subsidiaries and affiliates, it manages an investment securities segment and several other non-investment segments which operate businesses in several industries.

44.     Defendant Icahn Enterprises G.P. Inc. is the general partner of Icahn Enterprises L.P. (the two collectively, "IEP"). Icahn Enterprises G.P. Inc. is also formed in Delaware and headquartered in Miami-Dade County, Florida. References to the Board of Directors of IEP and to its Chairman refer to the Board of Directors of Icahn Enterprises G.P. Inc. References to the SEC filings, partnership assets, and subsidiaries of IEP refer to those of Icahn Enterprises L.P. According to IEP's SEC filings, Icahn Enterprises G.P. Inc. "has exclusive management powers over the business and affairs of Icahn Enterprises [L.P.]."

45.     Defendant Icahn Capital LP is a subsidiary of IEP (Ex. F at 2) which operates IEP's investment securities segment. Icahn Capital LP is also formed in Delaware and headquartered in Miami-Dade County, Florida. From December 14, 2020, Icahn Capital and its subsidiaries funded the Bausch Investment, consisting principally of shares in Bausch Health and Bausch + Lomb.

46.     Defendant Carl Icahn is a resident of Miami-Dade County, Florida. Carl Icahn is and was at all relevant times the Chairman of IEP and the Chief Executive Officer of Icahn Capital. According to IEP's filings with the SEC, Carl Icahn has at all relevant times indirectly owned and controlled Icahn Enterprises G.P. Inc., the general partner of IEP. According to the same, Carl Icahn

owned approximately 86% of the limited partnership depository units of IEP as of December 31, 2024, and has owned a substantial majority of such units at all other relevant times.

47.     Defendant Brett Icahn is a resident of Miami-Dade County, Florida. Since October 1, 2020, Brett Icahn has been employed as a Portfolio Manager of Icahn Capital, reporting to Carl Icahn. From about 2017 until September 30, 2020, Brett Icahn was a consultant to IEP under a consulting agreement. From February 24, 2021, to August 14, 2025, Brett Icahn served on the Board of Directors of Bausch Health. From June 23, 2022, to August 14, 2025, Brett Icahn served on the Board of Directors of Bausch + Lomb. Since October 1, 2020, Brett Icahn has served on the Board of Directors of IEP. Brett Icahn is the son of Carl Icahn.

48.     The "Icahn Group" refers collectively to Carl Icahn and the entities under common control by him, namely Icahn Capital and IEP.

## FACTUAL ALLEGATIONS

## I.     PLAINTIFF'S EMPLOYMENT AT ICAHN CAPITAL

49.     Plaintiff was born and raised in Palm Beach County, Florida, where he was a high school valedictorian and awarded the National Merit Scholarship. Plaintiff received a Bachelor of Science degree, *summa cum laude*, from Duke University in May 2011.

50.     From July 2011 to February 2013, Plaintiff was employed as an analyst at Goldman, Sachs & Co. in New York City. From February 2013 to December 2019, Plaintiff was employed as research analyst at hedge fund BlueMountain Capital Management, LLC ("BlueMountain") in New York City with a starting annual compensation of $200,000 in 2013.

51.     Plaintiff excelled at BlueMountain. Following a series of successful investments, his taxable compensation from the firm grew as follows (Ex. F at 3–10):

| Tax year 2015 | $496,126 |
| Tax year 2016 | $1,177,282 |

| Tax year 2017 | $1,856,149 |
| Tax year 2018 | $684,229 |
| Tax year 2019 + subsequent vesting | $3,207,050 |
| Total | $7,420,836 |

52.     On April 2, 2020, Plaintiff first spoke with Brett Icahn about potential employment as a Portfolio Manager at Icahn Capital after being introduced by an executive search firm.

53.     The "Portfolio Manager" title is commonly used in the hedge fund and investment management industry to designate a firm's most senior and highly compensated investment professionals. This represented a promotion from Plaintiff's prior title of "research analyst" and came with generally higher market compensation expectations.

54.     Plaintiff was already aware of Icahn Capital's reputation as an activist investor—a type of investment fund that seeks to generate returns by acquiring influential or controlling equity stakes in publicly traded companies, negotiating significant corporate influence through board appointment rights, and capitalizing on that influence to enact shareholder-friendly changes to business strategy, management composition, cost structure, and capital allocation.

55.     Plaintiff was also aware of Icahn Capital's reputation of overseeing substantial cost cuts at its portfolio companies in pursuit of its activist strategy.[1] Plaintiff reasonably expected to be able to oversee the implementation of such measures at portfolio companies as part of his employment.

56.     Plaintiff was also aware of, and induced by, the Icahn Group's history of paying large performance-based bonuses to its investment professionals. Plaintiff was aware that co-

---

[1] In a November 2015 interview describing his investment strategy, Carl Icahn recounted that, after conferring with a consulting firm, he had once fired "twelve floors of people" at railcar manufacturer ACF Industries. Similarly, IEP stated that "[m]anagement teams often fail to improve their operations and profitability, relying on lax oversight from an overly friendly board of directors" which is therefore "conducive to activism."

Portfolio Managers Brett Icahn, then age 36, and David Schechter, then age 40, were each paid a $223 million bonus in 2016 as the culmination of a management agreement struck in 2012.

57.     Over the subsequent six months, Plaintiff, Brett Icahn, and the Icahn Group negotiated a series of agreements under which Icahn Capital, led by Chief Executive Officer Carl Icahn, would employ four Portfolio Managers to execute the firm's activist investment strategy, including by serving on relevant corporate boards.

58.     The four Portfolio Managers were, alphabetically, Gary Hu, Brett Icahn, Plaintiff Steven Miller, and Andrew Teno. Brett Icahn reported directly to Carl Icahn and his compensation was governed by the Manager Agreement. The other three reported jointly to Carl Icahn and Brett Icahn and had identical Employment Agreements.

59.     Brett Icahn told Plaintiff that he had reviewed approximately one hundred candidates prior to selecting Plaintiff and his two peers. Plaintiff and Andrew Teno were originally notified of their selection in July 2020, while Gary Hu was selected in September 2020 as a backup after another candidate dropped out.

60.     On October 1, 2020, the Manager Agreement and Employment Agreements (Ex. C) were executed, IEP issued a press release describing the agreements and naming the four Portfolio Managers, and Plaintiff's employment began. The IEP press release made Plaintiff's employment as a Portfolio Manager a matter of public record (Ex. J at 35).

61.     Accompanying the press release, IEP filed a Form 8-K with the SEC disclosing a facsimile of the Manager Agreement. The Manager Agreement in turn refers to the employment of "up to three portfolio managers … pursuant to the agreements attached hereto as Exhibit A."

62.     While "Exhibit A" was redacted from the Form 8-K, the Manager Agreement discloses that the compensation for the three Portfolio Managers involves three components: "Base Salary", "Bonus Amounts", and "Net Profit-Sharing Amounts."

63.     The Employment Agreements themselves stated they "shall be governed by and construed in accordance with the laws of the [sic] Delaware applicable to agreements made and/or to be performed in that State." Governing law for tort or statutory claims was not specified.

64.     The Employment Agreements provided that a bonus would be payable to each Portfolio Manager after the September 30, 2027 termination of the agreement. For each new investment, the Portfolio Manager proposing such investment would be allocated ██ % of the profits and losses, while each other Portfolio Manager could also elect to be allocated an additional ██ % of the profits and losses, in all cases subject to a ██ % hurdle rate.[2] The final bonus for each Portfolio Manager would be the sum of such allocations for every investment, subject to various other adjustments.

65.     The new Portfolio Managers had access to the Icahn Group's full $9.3 billion in investment funds, of which $4.3 billion was funded by IEP and $5.0 billion was funded by Carl Icahn personally.[3] From the execution of the Employment Agreements until 2024, the four new hires were Icahn Capital's only Portfolio Managers and, together with Carl Icahn, had exclusive responsibility for all new investments made during that time. From and after January 2025, Plaintiff and Brett Icahn were the only two Portfolio Managers of Icahn Capital.

---

[2] A hurdle rate is a return rate that an investment must achieve before its manager is entitled to any share of profits. Here, for example, ████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████

[3] As disclosed in the IEP annual report of December 31, 2020.

66.     Exhibit 4 to the Employment Agreements provided examples to illustrate the calculation of Portfolio Manager compensation and the final bonus. Even the lowest scenario contemplated multi-million-dollar compensation over the term of the agreement.

67.     Each Portfolio Manager was further entitled to retain any compensation personally received in connection with service on the Board of Directors of any public company, provided such company was not majority-owned by IEP.

68.     Plaintiff was aware of, and induced by, the fact that many of Icahn Capital's former Portfolio Managers and investment professionals continued to serve long terms and earn compensation on certain public company boards even after Icahn Capital had exited the relevant investment and terminated any related appointment agreement.[4] Plaintiff understood a customary term for public company board members to be 15 years.

69.     At various times during Plaintiff's tenure with Icahn Capital, he served on six public company boards of directors: Bausch Health and JetBlue Airways Corp., which were Plaintiff's investments, and also Conduent Inc., Dana Inc., Herc Holdings Inc., and Xerox Holdings Corp.

**Icahn Capital's Prior Compensation Practices for Portfolio Managers**

70.     Plaintiff's Employment Agreement was consistent with Icahn Capital's historical practice of contractual performance-based compensation for its Portfolio Managers. Over the preceding ten years, Icahn Capital had previously entered into three iterations of such deals.

71.     The first iteration, known as Old Sargon, was in effect from April 1, 2010, to August 1, 2012. According to IEP's SEC filings, Portfolio Managers Brett Icahn and David Schechter

---

[4] Among former Icahn Group senior employees, Jonathan Christodoro has served on the board of PayPal since 2015 (10 years). Sam Merksamer has served on the board of Transocean since 2013 (12 years). Vince Intrieri has served on the board of Transocean since 2014 (11 years) and Hertz since 2016 (9 years).

managed a portfolio of not more than $3 billion and were entitled to a final payment of 5.1% of the profits in excess of an undisclosed hurdle rate. After termination of the deal, each of the Portfolio Managers had accrued approximately $17 million in compensation.[5] This represented per-annum compensation of about $7.3 million.

72.     The second iteration, known as New Sargon, was in effect from August 1, 2012, until July 31, 2016. Brett Icahn and David Schechter reprised their roles as Portfolio Managers and were entitled each to 7.5% of the profits in excess of a 4.0% hurdle rate. The initial portfolio was allocated $3 billion, 20% of which was funded personally by Carl Icahn. At the termination of the deal, each of the Portfolio Managers was paid $223 million.[6] This represented per-annum compensation of about $55.8 million. It was disclosed that the combined "Sargon Portfolio generated annualized gross returns of 26.8% from its formation on April 1, 2010, through its expiration on July 31, 2016."

73.     The third iteration was in effect from December 2016 until March 2020. Carl Icahn selected two new Portfolio Managers, Courtney Mather and Nicholas Graziano. The terms were not publicly disclosed because neither was considered a related party of IEP, unlike Carl Icahn's son Brett.

74.     In summary, over the ten-year period, Icahn Capital disclosed $480 million in compensation to its Portfolio Managers, of which it had only two at any given time. This represents per-annum compensation for each of at least $24 million.

---

[5] This $17 million disclosure was made as of December 31, 2012, and therefore may include New Sargon compensation from August 1, 2012 onward. The Old Sargon payment date was March 31, 2013.

[6] According to the SEC filings, this amount was $256 million as of December 31, 2015, but reduced by $33 million during 2016. The former amount was widely reported in the press.

**The Icahn Group Makes an Investment in Bausch Health**

75.     On December 1, 2020, Plaintiff delivered an investment memorandum to Carl Icahn and Brett Icahn describing a proposed investment in the common stock of Bausch Health.

76.     By December 14, 2020, the proposed investment had received unanimous support from Carl Icahn, Brett Icahn, and each of the other two Portfolio Managers, who elected to receive their █████% allocation of the profits (Ex. F at 14). Icahn Capital began acquiring shares of Bausch Health on the open market.[7]

77.     The investment thesis accepted within Icahn Capital generally held that Bausch + Lomb was the "crown jewel" asset of Bausch Health, ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████

78.     In summary, the majority of the future value of the investment was expected to come from distributed Bausch + Lomb shares, while a minority would come from ████████ shares. Therefore, operational excellence at Bausch + Lomb was paramount to Icahn Capital's expectation to profit from the investment.

79.     On February 11, 2021, the Icahn Group publicly filed a Schedule 13D with the SEC declaring it had acquired beneficial ownership of 27,807,410 shares of Bausch Health's common stock, representing 7.83% of the outstanding amount.

---

[7] References to securities transactions by Icahn Capital include transactions by funds advised by Icahn Capital and by Icahn Capital's subsidiaries, including by non-parties Icahn Partners LP and Icahn Partners Master Fund LP.

**Plaintiff Is Appointed to the Board of Directors of Bausch Health**

80.     On February 23, 2021, following a negotiation with Bausch Health, the Icahn Group entered into a Director Appointment and Nomination Agreement under which Brett Icahn and Plaintiff were to be appointed to the Board of Directors of Bausch Health on or prior to March 17, 2021.

81.     On March 17, 2021, Brett Icahn and Plaintiff were appointed to the Board of Directors of Bausch Health (to be clear, not Bausch + Lomb).

82.     Plaintiff disclosed his employment with Icahn Capital to Bausch Health in his initial directors' and officers' questionnaire dated February 22, 2021, by stating "I am a Portfolio Manager of Icahn Capital LP, and my compensation may be affected by the performance of the Icahn entities' investment in the Company" (Ex. J at 83).

83.     On March 18, 2021, Bausch Health filed its annual Definitive Proxy Statement with the SEC to solicit shareholder votes for the upcoming Annual General Meeting. The statement included a description of Plaintiff's professional background and the following endorsement: "The Board has determined that Mr. Miller's experience as a portfolio manager and securities analyst has provided him with experience in investing and finance and complex debt matters, respectively, which qualifies him to serve as a member of the Board and the committees on which he serves."

84.     On or about March 29, 2021, Bausch Health delivered a presentation (Ex. F at 15-136) to Plaintiff and Brett Icahn, which Plaintiff saw as validating Icahn Capital's investment thesis and reinforcing expectations of significant profit. As shown below, it forecast a Bausch Health share price of ███ ███ after executing the company's strategic plan, compared to a then-current share price of ███ representing a compound return of ███ per annum.



85.     On April 27, 2021, the Annual General Meeting of Bausch Health was held. Plaintiff received 200,857,243 shareholder votes, representing approval by approximately 97% of votes cast, thereby being elected to a further one-year term on the board.

## II.     DEFENDANTS' SCHEME BARS PLAINTIFF FROM BAUSCH + LOMB BOARD

### Bausch + Lomb Prepares for IPO

86.     On August 6, 2020, Bausch Health issued a press release announcing its intention to "spin off" its Bausch + Lomb business as a separate publicly traded company.

87.     Over the subsequent 21 months, as documented extensively in Bausch Health board materials provided to Plaintiff, preparations were made to conduct an IPO to sell approximately ███ of Bausch + Lomb shares to the public and list those shares on the New York Stock Exchange. Plans further called for the remaining approximately ███ of Bausch + Lomb shares to subsequently be distributed to Bausch Health shareholders via a tax-free distribution, subject to achieving a successful IPO and obtaining a solvency opinion for Bausch Health.

88.     On January 13, 2022, Bausch + Lomb filed its Form S-1 with the SEC. In the Form S-1, it listed eight directors to govern the company after the consummation of the IPO: Joseph

Papa (CEO and Chairman), Thomas Ross (Lead Director), Nathalie Bernier, Andrew von Eschenbach, Sarah Kavanaugh, John Paulson, Russel Robertson, and Richard De Schutter.

89.     Of these eight directors, two identified as women and none then identified as minorities.[8]

90.     Bausch + Lomb decided to engage in overt discrimination to change that.

**Bausch + Lomb Adopts a Minority Quota for Its Board of Directors**

91.     Maryland-based Institutional Shareholder Services Inc. ("ISS") operates as a "proxy advisor," i.e., a for-profit company that makes influential voting recommendations with respect to public company annual general meetings and other corporate actions. It provides these recommendations to "its approximately 4,200 clients" including "many of the world's leading institutional investors."

92.     ISS has no formal governmental or regulatory authority. Instead, it threatens to direct its clients to vote in a coordinated fashion against certain, specifically identified, director nominees at an issuer's upcoming annual general meeting.

93.     On November 12, 2020, ISS published a change to its "proxy voting guidelines" for certain U.S.-listed public companies (Ex. G at 6). According to the new policy:

> For companies in the Russell 3000 or S&P 1500 indices, effective for meetings on or after Feb. 1, 2022, [ISS will] generally [recommend that its clients] vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members.

---

[8] John Paulson, who had previously been identified by Bausch Health and, on information and belief, by Bausch + Lomb as "white," began to describe himself as "diverse" beginning with the 2023 Annual General Meeting. This change was formally documented at the October 20, 2022, meeting of the Bausch Health Nomination and Corporate Governance Committee (Ex. G at 94). Prior to this date, Plaintiff and Brett Icahn understood Mr. Paulson to be "white."

94.     On November 30, 2022, ISS adopted the substantially same race quota policy for certain Canadian-listed public companies (Ex. G at 73). The Canadian policy defined diversity as:

> Aboriginal peoples (means persons who are Indigenous, Inuit or Métis) and members of visible minorities (means persons, other than Aboriginal peoples, who are non-Caucasian in race or non-white in colour).

95.     At the time, Bausch + Lomb had no diverse directors (compared to the ISS quota of one).

96.     To demonstrate its intended conformance to ISS's "guidelines," Bausch + Lomb included a new disclosure in its Amendment No. 2 to Form S-1, filed with the SEC on April 28, 2022, that "[t]he Company has proposed to achieve a target of 30% of [sic] women and/or minority representation on the Board of Directors by the end of 2024."

97.     Plaintiff was not privy to Bausch + Lomb's full internal deliberations about adopting a racial quota, but Plaintiff was able to observe Bausch Health's concerns, which for instance were expressed in the following October 20, 2022, excerpt presented to the Nomination and Corporate Governance Committee (Ex. G at 91):



98.     This excerpt from Bausch Health's board materials shows that Bausch + Lomb had a problem. More specifically, Chairman of the Nominating and Corporate Governance Committee ("NCGC") Tom Ross had a problem. He feared that, at ISS's recommendation, shareholders would vote him out of the chairmanship because Bausch + Lomb had no non-white directors.

99.     To prevent this, Bausch + Lomb would engage in intentional race discrimination and insist that the Icahn Group do so, too.

**The Icahn Group Negotiates Bausch + Lomb Board Representation**

100.     On December 14, 2021, Bausch + Lomb's general counsel, Christina Ackermann, sent an initial draft of a shareholder agreement to IEP's and Icahn Capital's general counsel, Jesse Lynn (Ex. G at 95–96). The draft shareholder agreement was designed to govern the relationship between the Icahn Group and Bausch + Lomb after the IPO. In particular, Bausch + Lomb sought to limit the Icahn Group's ability to dispose of shares of Bausch Health or Bausch + Lomb █████ ██████████████████████████████████████████████████████████████

101.     In phone conversations beginning December 17, 2021, and continuing in the subsequent weeks, Brett Icahn, Carl Icahn, and Plaintiff discussed potential responses to the request (Ex. G at 98). Carl Icahn observed that Bausch Health had made a strategic error in not demanding such a foreseeably necessary ████████ covenant in its earlier February 2021 agreement. He proposed that the Icahn Group only agree to the ████████ covenant on the condition that it receive certain board appointment rights at Bausch + Lomb.

102.     The discussion turned to whether to immediately exercise any such rights. Brett Icahn argued against seeking immediate representation, because he thought it would be too onerous to subject the Icahn Group to the periodic insider trading restrictions on Bausch + Lomb stock that accompany board representation. Brett Icahn believed that Bausch + Lomb stock would trade favorably after the IPO and subsequent spin off, and therefore he wanted the flexibility to sell in the open market without restriction.

103.     Therefore, the Icahn Group did not seek immediate board representation at Bausch + Lomb. Instead it sought appointment rights it could elect to exercise at a later date.

104. On January 13, 2022, Jesse Lynn sent Christina Ackermann a draft Director Appointment and Nomination Agreement that provided the Icahn Group the right to appoint two directors to the Bausch + Lomb board (Ex. G at 100–33). The draft, which was redlined to the February 2021 agreement with Bausch Health, contained no covenants related to the race or ethnicity of the two appointees.

105. On January 17, 2022, Christina Ackermann delivered a markup of the agreement (Ex. G at 182–214) that now required the initial Icahn Designees to also satisfy certain "Director Criteria," which was broadly defined to include any "guidelines" and "policies" adopted by the board.

106. In the same email, she made note of the following "policy" (Ex. G at 173):

Additionally, please keep in mind that at the July 26, 2021 board meeting, at the N&CGC, the committee (confirmed at the board meeting on July 27) agreed to amend its Board Diversity Policy to adhere to the Canadian ISS voting guidelines to have 30% female representation on boards. At the July N&CGC meeting, the board agreed to the edits to the Board diversity policy requiring the company to achieve a target 30% women and/or minority representation by the end of 2024. Since B+L is a Canadian company as well, the same policy was adopted. At this time, we have 8 board members and 2 are female. As Brett and Steven know, it is the intention of the board to look and engage another female/minority over time.

107. Plaintiff studied the markup and immediately became concerned that the new provisions could be used to exclude him or other preferred appointees from the board on the basis of their race. Plaintiff implored Jesse Lynn to fight back.

108. On January 18, 2022, Plaintiff asked Jesse Lynn, ████████████████████ ████  Mr. Lynn replied that ████████████████████████████████ ████████████████████████████████████████████ (Ex. G at 215).



109. Mr. Lynn ultimately made two relevant edits to the draft (Ex. G at 217–49). First, Mr. Lynn created a record that "Brett Icahn and Steven Miller" were in fact the Icahn Group's

preferred appointees by inserting their names *four times* into the agreement through the use of a clarifying example (*Id.* at 247). Second, at Plaintiff's insistence, Mr. Lynn drafted the following protective clause and sent the modified agreement to Christina Ackermann (Ex. G at 251–52):

> […] to the extent that the Board Diversity Policy would prevent any Icahn Designee or Replacement Designee from joining the Board, the size of the Board would be expanded to accommodate the seating of such Icahn Designee or Replacement Designee.

110.    On January 20, 2022, Christina Ackermann struck the proposed protective clause (Ex. G at 250–82). She noted in a cover email that "I spoke with [Lead Independent Director and Chairman of the Nominating and Corporate Governance Committee] Tom Ross earlier today and [Ms. Ackerman's] edits on this point were approved by him" (*Id.* at 283).

111.    Ms. Ackermann apparently failed to appreciate the evidentiary value of Plaintiff's name appearing four times in the draft agreement. She did not strike the references to "Brett Icahn and Steven Miller," which ultimately survived to the final execution version and was filed publicly.

112.    That same day, Jesse Lynn sent an ███████ to the Icahn team. ███████



███████ (Ex. G at 293). Plaintiff noted to the Icahn team that ███████

███████ (*Id.* at 291).

113.    On January 21, 2022, at 1:47 pm, Jesse Lynn replied to Christina Ackermann with a draft that re-inserted the protective clause exempting Icahn appointees from the Board Diversity Policy (*See* Ex. G at 295–99). In his email to Plaintiff and Brett Icahn describing the edits, he joked, ███████

(*Id.* at 294).

114.     Sometime in the subsequent two hours, Jesse Lynn and Christina Ackermann engaged in a phone call, immediately after which the concept of a "side letter" appeared. In an email at 3:18 pm, Jesse Lynn acknowledged to Ms. Ackermann that "per our conversation … Draft side letter to follow." In an email at 4:16 pm, Jesse Lynn sent the first draft of the side letter to Ms. Ackermann and acknowledged that "Brett and Steven are receiving [this document for the first time] simultaneously" (Ex. G at 300). By contrast, Mr. Lynn's draft side letter bore a signature block for Carl Icahn (Ex. G at 311), indicating that Carl Icahn had, without consulting Plaintiff, already authorized Mr. Lynn—who himself lacked such authority—to offer the deal.

**The Racially Discriminatory Side Letter**

115.     The draft side letter (Ex. G at 309–12) ("Side Letter regarding the Director Appointment and Nomination Agreement") to which its parties, who did not include Plaintiff, preliminarily agreed (*Id.* at 313) on January 21, 2022, operated primarily through the following paragraph (*Id.* at 309):

> **1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(1) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (y) one or more incumbent directors will resign or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; **provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy** [emphasis added]**.**

116.     In substance, the agreement allowed the Icahn Group to appoint one "Diverse" director and one other director. When asked to clarify "Diverse," Christina Ackermann said "[w]omen and minorities" (Ex. G at 324–25).

117.    Furthermore, as Bausch + Lomb and its specialist activist-defense counsel (Wachtell, Lipton, Rosen & Katz) knew or should have known, Icahn Capital had a consistent and longstanding practice of preferring to appoint its own Portfolio Managers and other senior employees to board seats,[9] and as Icahn Capital at all relevant times only employed male Portfolio Managers, in practice it would give Icahn one "white" seat and one "non-white" seat.

118.    This situation perfectly coincided with Bausch + Lomb's interests because only the appointment of a non-white director would prevent ISS from advising its clients to vote Bausch + Lomb NCGC Chairman Tom Ross off the board; the appointment of a white female would not have satisfied the racial quota.

119.    Over the subsequent three months, the Director Appointment and Nomination Agreement was held in anticipation of being signed immediately prior to the filing of the final Form S-1 with the SEC.

120.    On April 18, 2022, Christina Ackermann sent the "final execution agreements" to Jesse Lynn (Ex. A, D). Paragraph 1 of the side letter was unchanged from Jesse Lynn's first draft, except that clause (y) (i.e., "(y) one or more incumbent directors will resign") had been stricken:

**1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(i) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.

---

[9] Carl Icahn was quoted in the Illumia Inc. 2023 definitive proxy statement as stating that "he 'would not even support Jesus Christ' as an independent candidate over an Icahn Nominee as 'my guys answer to me.'" In the case of Illumina, all three Icahn Nominees were current or former employees of the Icahn Group.

121.    On April 28, 2022, the Director Appointment and Nomination Agreement and the Side Letter regarding the Director Appointment and Nomination Agreement were executed.

**Christina Ackermann Intentionally Omits the Side Letter from the SEC Filing**

122.    As a new issuer under the U.S. securities laws, Bausch + Lomb was required under 17 C.F.R. § 229.601(b)(10) to attach copies of certain "material contract[s]" as exhibits to its initial registration statement (known as Form S-1). However, in a scheme to hide the racially discriminatory covenant from the SEC and the public, the "Director Appointment and Nomination Agreement" ("head agreement") was indeed filed as an exhibit to the S-1, but the "Side Letter regarding the Director Appointment and Nomination Agreement," which was executed on the same date by the same parties, was not.

123.    The side letter has the same parties, signatories, effective date, and subject matter as the head agreement. The side letter and head agreement share defined terms and the side letter references the head agreement. There was no bona fide reason not to combine them. In fact, they were part and parcel.

124.    Instead, on information and belief, the only purpose of splitting the parties' agreement into a "head agreement" and a "side letter" was to attempt to evade the SEC regulation by cleverly purporting that the side letter, standing alone, was immaterial and need not be filed.

125.    In fact, the "side letter" was material because it directly contradicted the head agreement's implication that "Brett Icahn and Steven Miller" were eligible and contemplated to be appointed by Icahn Capital. It was also material because it proved determinative in the selection of Gary Hu as a future director of Bausch + Lomb. Finally, being illegal on its face, it was material because of the potential material liability it created for the company.

126.    On April 25, 2022, Christina Ackermann sent an email to Jesse Lynn noting that "We will attach the agreement (Not the side letter) to the S-1 that we will file Wednesday morning at 7:00 AM" (Ex. G at 333).

127.    Indeed, on April 28, 2022, Bausch + Lomb filed Amendment No. 2 to Form S-1 with the SEC. On page 200, the Director Appointment and Nomination Agreement was described in detail. However, the description on page 200 makes no reference to the side letter, either expressly or in substance.

128.    Further, as Exhibit 10.25 to the same filing, a facsimile of the Director Appointment and Nomination Agreement—together with five various schedules, exhibits, and annexes—was filed in its entirety (Ex. D). However, no mention whatsoever was made to the racially discriminatory side letter in Exhibit 10.25, the Form S-1, or in any other SEC filing.

129.    Exhibit 10.25 purports to indicate that any information that had been redacted for immateriality had been identified with bracketed asterisks.[10] However, only certain personal phone numbers and email addresses were identified with bracketed asterisks as being redacted. No disclosure was made that the part-and-parcel side letter had been redacted from Exhibit 10.25 or that it existed at all.

**The IPO Is Consummated; Icahn Buys Bausch + Lomb Shares**

130.    On May 5, 2022, Bausch + Lomb priced its IPO, selling 35 million shares at a price of $18.00/share. The transaction closed on May 10, 2022.

131.    As part of the IPO, Icahn Capital directly acquired 3,500,000 shares (approximately 1% of the outstanding) of Bausch + Lomb at the IPO price of $18.00/share. The Icahn Group

---

[10] "Certain identified information, indicated by [*****], has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm if publicly disclosed."

disclosed its ownership of these shares as of June 30, 2022, on its form 13F-HR, filed with the SEC on August 15, 2022.

132.    Icahn Capital's buying continued after the IPO. In "more than one hundred trades, executed between May 26, 2021 and September 8, 2023," the Icahn Group acquired "additional long economic exposure to 90.72 million [Bausch Health] shares through equity swaps," according to a regulatory disclosure by Bausch Health. "Taken together Icahn now has an economic interest covering approximately 34% of [Bausch Health's] outstanding common shares."

133.    Finally, Icahn Capital ███████████████████████████████████ ███████████████████████████████████.

134.    In summary, the Bausch Investment stood relatively constant from September 8, 2023, to August 13, 2025, with ████████ shares in Bausch Health (which owned 88% of Bausch + Lomb) at a cost basis of ██████████ and ██ million shares in Bausch + Lomb at a cost basis of ██████████. The total investment had a cost basis of $ ██████████.

135.    Plaintiff's █████ interest in Icahn Capital's investment profits covered each of these direct and indirect interests in Bausch + Lomb, thereby highly motivating Plaintiff to improve the financial performance of Bausch + Lomb through all the means available to the Icahn Group as a significant activist investor.

**The IPO Disappoints; Icahn Seeks to Exercise Board Rights**

136.    The IPO price of $18.00/share was disappointingly below the "between $21.00 and $24.00 per common share" range disclosed just two weeks earlier in the Second Amended Form S-1 filed April 28, 2022.

137.    Additionally, the 35 million shares represented a sale of only about 10% of its outstanding shares, a disappointment compared to the prior plan of ████.

138.    The execution was so poor that Bausch + Lomb canceled its ceremonial bell ringing at the New York Stock Exchange, which Plaintiff was scheduled to attend (Ex. G at 336–37).

139.    After the IPO, Carl Icahn informed Brett Icahn and Plaintiff that he was disappointed in the low IPO price that was realized, which Carl Icahn attributed to a lack of investor confidence in CEO Joseph Papa.

140.    Therefore, beginning after the May 10, 2022, IPO and culminating on June 21, 2022, the Icahn Group negotiated to exercise its rights to appoint two directors to the Bausch + Lomb board under the Director Appointment and Nomination Agreement.

**Brett Icahn Expresses a Preference to Appoint Plaintiff, But for His Race**

141.    On or about the week of June 13, 2022, Brett Icahn called Plaintiff to inform him that he had demanded that Bausch + Lomb seat both himself and Plaintiff as the two Icahn appointees. However, Mr. Icahn stated that Christina Ackermann and Tom Ross would not allow it pursuant to the side letter because of Plaintiff's race.

142.    Brett's preference to appoint Plaintiff was no surprise. Plaintiff was the Portfolio Manager responsible for the Bausch Investment, served on the parent company board, wrote the investment memo, was incentivized by a ███ interest in the investment profits, and was further incentivized by personal ownership of Bausch Health stock earned from past board service and from personal open market purchases.

143.    Bausch + Lomb must not have been surprised by the request either. "Brett Icahn and Steven Miller" were mentioned by name as the only two hypothetical appointees in the publicly filed Director Appointment and Nomination Agreement, which Bausch + Lomb negotiated and signed.

144.     The appointment of Plaintiff would have been a foregone conclusion and would have complied with all other corporate governance policies of Bausch + Lomb. Nothing prevented his appointment—except his race.

**Gary Hu Is Appointed to the Board**

145.     On June 20, 2022, Christina Ackermann sent an email to Jesse Lynn memorializing that: "I understand that Brett and the Icahn Group have requested that 2 board members be appointed and join the B+L board now (shortly) rather than upon full spin or thereafter. To that end the Icahn Group identified 2 persons: Brett Icahn and Gary Hu" (Ex. G at 341).

146.     Gary Hu, who identifies as a Chinese-American, was also Portfolio Manager of Icahn Capital, starting such role on the same day and under the same terms as Plaintiff.

147.     Ms. Ackermann noted that Mr. Hu had not yet cleared a "back ground check [sic]," but notwithstanding that, "the board may take action as early as tomorrow" (Ex. G at 343–45).

148.     On June 21, 2022, Bausch Health solicited consent from its directors to approve the appointment of Brett Icahn and Gary Hu to its subsidiary Bausch + Lomb's board. The resolution's recitals (Ex. G at 347) expressly cite "furtherance of … Board diversity" as the reason for the solicitation:

> WHEREAS, in furtherance of the BLCO Board's commitment to Board diversity, BLCO requests the Company's approval to appoint two Icahn Group designees and increase the size of the BLCO Board from eight (8) to ten (10) directors;

149.     On June 23, 2022, Bausch + Lomb issued a press release announcing that "Brett Icahn and Gary Hu Have Been Appointed to its Board of Directors." It also disclosed that the Director Appointment and Nomination Agreement had been amended (Ex. E) to allow the new directors to be seated immediately, rather than waiting until Bausch + Lomb had been established as a completely independent company from Bausch Health.

150.     Brett Icahn and Gary Hu remained on the Bausch + Lomb board for the subsequent three years, until August 14, 2025.

**Plaintiff Was Better Qualified and Understandably the Icahn Group's First Choice**

151.     As of June 23, 2022, Plaintiff was better qualified than Gary Hu to serve on the board of Bausch + Lomb and understandably was the Icahn Group's first choice. Both Plaintiff and Gary Hu had a similar academic and professional background and similar years of experience. Both started at Icahn Capital on the same date. However, as of June 23, 2022, Plaintiff had the following distinct and objective advantages:

152.     <u>First</u>, Plaintiff had the confidence of Icahn Capital. The Director Appointment and Nomination Agreement that gave Icahn Capital the right to appoint two directors to the Bausch + Lomb Board listed Plaintiff's name, along with Brett Icahn, as Icahn Capital's putative choice of directors. Plaintiff's name appeared in that document as a preferred candidate *four times*. Brett Icahn confirmed that Plaintiff remained Icahn Capital's preferred candidate even as it engaged in the discrimination against him. In June 2022, Brett Icahn expressed his regret to Plaintiff that, because of the discriminatory covenant, Icahn Capital was unable to appoint both Brett Icahn and Plaintiff, despite this being the firm's preference.

153.     <u>Second</u>, Plaintiff had greater familiarity with Bausch + Lomb than Gary Hu. Plaintiff had authored the Icahn Group's investment memoranda and financial models. Plaintiff had engaged frequently with Bausch + Lomb's incoming management team. In addition to regular board meetings, Plaintiff had already conducted a plant tour and spent approximately a week in the Bausch + Lomb headquarters in December 2021 reviewing its Fiscal 2022 budget with consultants from Alvarez & Marsal. On information and belief, Gary Hu had done no such work as of June 23, 2022.

154.   <u>Third</u>, Plaintiff was the Portfolio Manager on the investment and therefore had a greater incentive to perform. Plaintiff's ███ allocation of the profits of the Bausch Investment was eight times Gary Hu's ███ allocation. The greater relevance of the investment to Plaintiff's track record and industry reputation also better incentivized him to perform.

155.   <u>Fourth</u>, Plaintiff had a further financial incentive to perform through his personal stock ownership. According to SEC filings, Plaintiff beneficially owned 107,616 shares of Bausch Health stock as of June 24, 2022. These shares had a market value of approximately $782,368 as of the same date. On information and belief, Gary Hu owned no shares of either Bausch Health or Bausch + Lomb at that time.

156.   <u>Fifth</u>, Plaintiff's investments at Icahn Capital were allocated more capital than those of Gary Hu, showing that Plaintiff was more respected at Icahn Capital and his investments were reasonably anticipated to perform better.

157.   In summary, as of June 23, 2022, there was no basis in fact to support any novel pretext that Gary Hu could have been selected for any superior merit or even personal favoritism. At no point did any of the Defendants in fact even offer Plaintiff such a pretext.

158.   However, Gary Hu identified as a Chinese American. This sole fact led to his appointment to the Bausch + Lomb board, at the expense of Plaintiff.

**<u>Even Without a Board Seat, Plaintiff Endeavors to Engage with Bausch + Lomb</u>**

159.   Despite Gary Hu's appointment to the Bausch + Lomb Board, Plaintiff remained the Icahn Group's lead Portfolio Manager on the Bausch + Lomb investment and attempted to engage with its management team to the greatest extent he could.

160.   From June 2022 to December 2022, Plaintiff was optimistic that it would be possible for him to continue to influence the investment by performing some of Gary Hu's duties in substance, a plan to which Gary Hu did not object.

161.    On July 20, 2022, Bausch + Lomb announced that its CEO Joseph Papa had been removed as Chairman of the Board effective immediately and would remain interim CEO until a successor was found. Immediately thereafter, Plaintiff was invited to become a non-official member of the highly sensitive Bausch + Lomb CEO search committee.

162.    From August 11, 2022, to August 18, 2022, Plaintiff interviewed four Bausch + Lomb CEO candidates alongside Bausch + Lomb board members Brett Icahn, Andrew von Eschenbach, Richard de Schutter, Tom Ross, and John Paulson (Ex. G at 348). Gary Hu was not invited and did not attend. Brent Saunders, whom Plaintiff interviewed, was ultimately selected as Bausch + Lomb's next CEO.

163.    The invitation to Plaintiff—who was not a director of Bausch + Lomb—to participate in the CEO interviews instead of Gary Hu was an acknowledgement by Bausch + Lomb, Brett Icahn, and the Icahn Group that they believed Plaintiff would have been a better director than Gary Hu, and had already begun to shift some of the directorship's duties to Plaintiff while allowing Gary Hu to enjoy all of its financial and reputational benefits.

164.    On December 14, 2022, Plaintiff proactively arranged through Bausch + Lomb management to spend a day meeting with ophthalmologists and optometrists in the South Florida area, accompanied by several members of the local Bausch + Lomb sales field force. Gary Hu did not attend (Ex. G at 352, 354).

165.    Plaintiff met with six doctors and took copious notes on their feedback on Bausch + Lomb products. One such doctor—an ophthalmic surgeon at the Bascom Palmer teaching hospital—invited Plaintiff to scrub up and enter his operating room while he performed a cataract surgery involving a Bausch + Lomb intraocular lens.

166.    Plaintiff sent a four-page summary of his notes to the board of Bausch + Lomb immediately thereafter and received positive feedback from directors Tom Ross (Ex. G at 360) and Russ Robertson (*Id.* at 354).

**General Counsel Christina Ackermann Demands Gary Hu "Chaperone" Plaintiff**

167.    Plaintiff's initial period of relatively unimpeded involvement with Bausch + Lomb came to an end in January 2023.

168.    On December 8, 2022, Plaintiff, after conferring with Brett Icahn, sent an email to Bausch + Lomb CFO Sam Eldessouky requesting an analysis of the company's ▮▮▮▮▮▮ ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Ex. G at 373–74). Plaintiff copied Brett Icahn and Gary Hu on the email. On December 15 (*Id.* at 372) and December 28 (*Id.* at 371), Plaintiff followed up with Mr. Eldessouky on the requested ▮▮▮▮▮▮▮ analysis, to no avail.

169.    On December 15, 2022, Plaintiff contacted Bausch + Lomb Chief Medical Officer Yehia Hashad requesting a follow up discussion on the findings of his meetings with doctors and surgeons (Ex. G at 380).

170.    On or about January 4, 2023, Plaintiff and Gary Hu were informed verbally by Jesse Lynn that Ms. Ackermann had requested that Mr. Hu "chaperone" Plaintiff in future interactions with Bausch + Lomb. Plaintiff was taken aback. Plaintiff later texted Jesse Lynn to ask if he had been able to "resolve this issue with Christina," to which he replied, "no satisfactory resolution."

171.    On January 4, 2023, Gary Hu—now deputized as Plaintiff's chaperone—responded to the ▮▮▮▮▮▮▮ analysis email, stating "I would be really interested in seeing this model as well. Please send it over as soon as possible" (Ex. G at 371).

172.    Later that day, Mr. Eldessouky sent over the requested plant expansion analysis. In his cover email—which was addressed directly to Gary Hu—Mr. Eldessouky noted, "I understand

that Christina [Ackermann] already had a discussion with your legal team regarding the sharing of this data" (Ex. G at 370).

173.    On January 9, 2023, Plaintiff sent a follow up email to Yehia Hashad to arrange to discuss the eye doctor meetings. On January 10, 2023, Christina Ackermann forwarded this email to Icahn general counsel Jesse Lynn (Ex. G at 378) with the note: "Seems that Steven continues to directly reach out to B+L. Can we talk again? Or have you resolved this at Ichan?"

174.    Later that day, Jesse Lynn forwarded Ms. Ackermann's email to Plaintiff. Plaintiff then forwarded Mr. Lynn's email to Brett Icahn, stating "see below—Christina now telling people not to even reply to me" (Ex. G at 378).

175.    Brett Icahn thereafter directed Plaintiff to prepare and send a question list to his "chaperone" Gary Hu to be sent onward to Mr. Hashad. The next day, Gary Hu copied and pasted Plaintiff's prepared questions into an email to Mr. Hashad (Ex. G at 388–89).

176.    Mr. Hu plagiarized Plaintiff's questions (Ex. G at 395–96) verbatim and without attribution, removed Plaintiff's signature, and sent the email in his own name.

**Plaintiff Complains that the Side Letter Violates Section 1981**

177.    After the events of the first two weeks of January 2023, Plaintiff could no longer contain his disappointment with the racially discriminatory arrangement that kept him from being a bona fide member of the Bausch + Lomb board.

178.    Plaintiff found the experience of being plagiarized by Gary Hu—ultimately for no other reason than his skin color—to be dishonest and humiliating.

179.    Plaintiff sought to devise a solution that could vindicate his civil rights and lead to his installation as a Bausch + Lomb director, so that he would have a fair chance to improve the performance of the investment and earn the attendant compensation.

180.     Familiar with the legal concept of the unenforceability of an illegal agreement, Plaintiff began to research whether the operative provisions of the racially discriminatory side letter might violate an existing law. Plaintiff hoped that, with the right legal resources to substantiate the argument and confront Bausch + Lomb, the situation could be resolved informally and amicably.

181.     Based on his initial research, on January 9, 2023, Plaintiff sent the following email (Ex. B) to Brett Icahn and Jesse Lynn:

Brett / Jesse,



Here's a blurb:

42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In *Runyon v. McCrary, 427 U.S. 160 (1976)*, the Supreme Court held that Section 1981 regulated private conduct as well as governmental action."—Third Circuit model jury instructions memo (2020)

182.     Plaintiff attached a copy of the side letter to the email.

183.     That same day, Jesse Lynn responded, ███████████████████████████ Later that day, Brett Icahn replied, ███████████████████████████ (Ex. G at 397–400).

**Brett Icahn Rebuffs Plaintiff's Complaint**

184.    A call with Plaintiff, Brett Icahn, and Jesse Lynn was scheduled for 5:00 pm on January 10, 2023. Eager to discuss the issue, Plaintiff called Brett Icahn directly before the scheduled call to explain his motivations.

185.    Plaintiff described the entire arrangement with Gary Hu as "the most humiliating and infuriating event in my entire career." Brett Icahn jokingly responded, "you clearly have not had that much of an interesting career, then."

186.    The conversation turned to more practical considerations. Brett Icahn expressed his concern that fighting the side letter would be an unnecessary waste of the Icahn Group's political capital with the Bausch Health and Bausch + Lomb boards, such capital being both finite and better used elsewhere.

187.    Specifically, Brett Icahn recounted his belief that the number one priority for using political capital was ensuring the "full spin"—the ███ distribution to shareholders of 88% of Bausch + Lomb shares still owned by the heavily indebted Bausch Health—which required the cooperation of both the Bausch Health and Bausch + Lomb boards.

188.    Indeed, ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████.

189.    These threats moved Brett Icahn to instruct Plaintiff to, in substance, "take one for the team," so that the Icahn Group could save all its political capital with the Bausch Health and Bausch + Lomb boards to achieve the "full spin."

190. At no point during this call, nor or at any other time, did Brett Icahn even attempt to suggest that Gary Hu had been chosen based on merit.

191. On the scheduled call with Brett Icahn and Jesse Lynn, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

192. Therefore, Icahn Capital, IEP, and their representatives Brett Icahn and Jesse Lynn did not take the actions requested by Plaintiff in his complaint. Specifically, ████████████████

████████████████████████████████████████████████████

████████████████████████████████

**Plaintiff to "Assist" and "Support"**

193. On February 8, 2023—following Plaintiff's complaints to Brett Icahn and Jesse Lynn—Christina Ackermann sent a message addressed to Mr. Icahn and Mr. Hu, with Plaintiff copied, stating that she would be providing Plaintiff with electronic access to the Bausch + Lomb board meeting books.

194. She recited that "in order to assist you [Brett and Gary] as BLCO board members, you would like Steven to review some of the BLCO board documents." She continued, "Steven, the data is being provided to you solely to support the Icahn BLCO board members" (Ex. G at 406).

195. Plaintiff again felt humiliated by the charade that—solely because of skin color—he was relegated to "assist" and "support" Gary Hu.

196. On February 16, 2023, Mr. Hu informed Plaintiff that Christina Ackermann had instructed that Plaintiff was not to inspect Bausch + Lomb's Tampa, Florida manufacturing facility without Mr. Hu acting as a chaperone (Ex. K at 19).

**Carl Icahn Acknolwedges Gary Hu's Board Tenure Was a Failure**

197.     After being instructed not to confront Bausch + Lomb on the discriminatory appointment agreement, Plaintiff feared adverse employment consequences at Icahn Capital if he further pushed the envelope of his relationship with Bausch + Lomb. Throughout 2023 and 2024, Plaintiff was invited to participate in numerous meetings with Bausch + Lomb management discussing a variety of matters. Gary Hu was generally in attendance, and Plaintiff did not attempt to break out of his second-class status.

198.     However, Plaintiff observed that Gary Hu's effort and involvement in Bausch + Lomb decreased over time, coinciding with the leadup to Mr. Hu's termination at Icahn Capital in December 2024, after his own unrelated investments had been underwater for years. As of December 31, 2024, Gary Hu's investments had lost a total of ▇▇▇▇▇ for Icahn Capital. ▇
▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇

199.     Beginning in 2024, Carl Icahn began to acknowledge Mr. Hu's board tenure was a failure by excluding Mr. Hu from meetings involving himself and Bausch + Lomb management. For instance, Carl Icahn did not invite Mr. Hu to a dinner with Plaintiff, Brett Icahn, and Bausch + Lomb CEO Brent Saunders at Carl Icahn's home on May 7, 2024 (Ex. G at 408). At the dinner, Plaintiff did not recall any objection by Mr. Saunders to Mr. Hu's absence, despite Mr. Hu ostensibly being the Icahn Group's board designee and living only a few miles away.

200.     Gary Hu's comparative lack of engagement was also evidenced by his scant written work product. During his tenure, Mr. Hu had authored only a handful of documents saved to Icahn Capital's shared network about the Bausch Investment, whereas Plaintiff had authored well over one hundred despite being denied a Bausch + Lomb director's role.

201. Following Gary Hu's termination at Icahn Capital in December 2024, none of Plaintiff's subsequent calls with Bausch + Lomb management involved Mr. Hu, who still remained on the board. For example, Plaintiff attended a scheduled call on July 17, 2025, with Brett Icahn and the CEO and CFO of Bausch + Lomb to discuss ███████████████ (Ex. G at 410–14). Plaintiff came prepared with questions and observations. Mr. Hu was not invited and did not attend.

**Gary Hu Receives $993,255 from Bausch + Lomb; Plaintiff Receives $0**

202. By virtue of being the nominal board member of Bausch + Lomb, Gary Hu received full director compensation. According to Bausch + Lomb's annual proxy statements filed with the SEC, Mr. Hu's vested compensation from June 2022 to August 14, 2025 had a grant-date value of $993,255. According to the same, Mr. Hu's pay would have been $350,000 for the board term ending May 2026.

203. Plaintiff, who would have been the board designee but for his race, was paid nothing in director compensation from Bausch + Lomb, despite his efforts to directly engage with and improve Bausch + Lomb, which were far greater than Gary Hu's efforts to do the same.

204. At those rates, Plaintiff expected to earn, and would have earned, not less than $5,250,000 over a typical fifteen-year term on the board of Bausch + Lomb, just in director compensation. As explained in Section III, Plaintiff also lost out on hundreds of millions in reasonably expected Icahn Capital compensation.

**Defendants' Pattern of Discriminatory Director Recruiting**

205. The Icahn Group, Bausch Health, and Tom Ross discussed other sex and race-conscious board appointments both before and after the appointment of Gary Hu.

206. On July 27, 2021, Plaintiff texted Brett Icahn that Bausch Health director Tom Ross told Plaintiff it "would be great if [Brett Icahn] knew any women [director candidates]" and therefore "it seems like [Tom Ross] would accept a 3rd [Icahn-appointed Bausch Health] board

member who's a woman." Mr. Icahn replied, "Let's just get them to be ok with [Dr. Richard M]ulligan and let them find another woman" (Ex. K at 10–11).

207.    On March 9, 2023, Brett Icahn directed Plaintiff to ask IEP's CEO if "he can find anyone diverse for [Bausch Health's] audit comm[ittee] chair." After Plaintiff suggested one female candidate, Mr. Icahn asked "Is she diverse?" When Plaintiff suggested she was not "diverse," Mr. Icahn replied "Woman is fine. It checks the box." (Ex. K at 12–14). Later, Mr. Icahn noted "there just aren't [many] female / diverse pharma execs". Subsequently, Mr. Icahn forwarded Plaintiff a presentation from an executive search firm proposing six candidates for the Bausch Health Audit and Risk Committee seat, none of whom were white men (Ex. G at 415–23).

**Several Icahn Group Officials Made Racialized and Other Inappropriate Remarks**

208.    Several Defendants made improper remarks during the period at issue here, confirming a heightened and inappropriate focus on race and other protected categories and demonstrating that any purported interest in director diversity was opportunistic and cynical.

209.    For example, Carl Icahn used inflammatory language about African Americans ("[n]igger in the woodpile" (Ex. K at 24) (at approximately 2:54 PM on December 20, 2023)) and about Jews (Bill Ackman is "like one of those little Jewish boys crying that the world was taking advantage of him" https://t.ly/9_4xf at 0:04–0:09).

210.    Jesse Lynn made "jokes" about Catholics (asking Plaintiff, who is Catholic, if he was "eating wafers or some shit like that" on Good Friday (Ex. K at 1)), white people ("no honkies" (*Id.* at 29–30)), the Israelis ("the Israeli accent makes me want to stab someone" (*Id.* at 2)), the French ("Frenchy," "cook me some snails" (*Id.* at 3-4)), about women ("I broadened your wife's aperture" (*Id.* at 5)), immigrants ("not down with accents," "eat cats and dogs" (*Id.* at 6–7)), and

disabled people ("retarded" (*Id.* at 8)). [11] Mr. Lynn mocked the "insights" of 

after used a speech synthesizer to participate in his final

prior to his death from ALS (*Id.* at 9).

## III.    DEFENDANTS' SCHEME DEPRIVES PLAINTIFF OF EXPECTED BONUSES

## Plaintiff Expected Bausch + Lomb to Meet Its Own December 2021 Forecast

211.    Plaintiff's baseline expectations for the long-term financial performance of Bausch

+ Lomb—immediately prior to the June 2022 appointment of Gary Hu—were established at a

meeting of the Bausch Health Board of Directors[12] on December 7, 2021 (Ex. H at 1). Joseph Papa,

who was selected to become the Bausch + Lomb CEO following the IPO, presented the forecast

reproduced below (Ex. H at 2–7).

---

[11] Mr. Lynn sent additional such remarks to Plaintiff over Microsoft Teams, but on information and belief they and other relevant communications were automatically deleted on a rolling basis of not more than one year despite Mr. Lynn being on notice of Plaintiff's "Section 1981" complaint in January 2023.

[12] The meeting was styled a Special Transaction Committee meeting, but the entire board was invited.



212.    The major finding of Bausch + Lomb's December 2021 forecast was that the company's EBITDA[13] ███████████████████████████████.[14]

213.    Management incorporated a version of the forecast's conclusions in its "roadshow" materials for its SEC-regulated IPO. For example, while the internal forecast contemplated a ████ ██████████████████████████████████, the public-facing "roadshow" materials dated December 1, 2021, expressed "low 20s" margins "near-term" and "mid-20s long-term" (Ex. H at 8).

---

[13] Earnings Before Interest, Taxes, and Depreciation & Amortization, a common metric of business cashflow.

[14] Such amount does not include any EBITDA from the subsequent acquisition of XIIDRA, discussed below.

**After One Year, Bausch + Lomb Had** ████████████████████████████████████ .

214.    One year after Plaintiff was first excluded from the boardroom, Bausch + Lomb prepared a new forecast based on the views of incoming CEO Brent Saunders, who took office on March 6, 2023, and began pursuing a large acquisition opportunity in June 2023.

215.    Plaintiff received a presentation from Bausch + Lomb, dated June 5, 2023, discussing the proposed acquisition of the drug XIIDRA from Novartis AG. The presentation contained two new long-term forecasts of Bausch + Lomb, both with and without the XIIDRA acquisition (Ex. H at 11).

216.    Under the status quo without the XIIDRA acquisition, management's forecast of ████████████████████████████████ . This represented ████████████████████████████ from the year ███████████████████████████ presented to Plaintiff in December 2021.

**After Three Years, Bausch + Lomb** ████████████████████████████████████████

217.    Three years after Plaintiff was first excluded from the boardroom, Bausch + Lomb prepared a new forecast in connection with evaluating ██████████████ . Plaintiff received this forecast in a presentation dated July 2025 (Ex. H at 23).

218.    Under the status quo without ████████████████ (but with the XIIDRA acquisition having closed), management's forecast ████████████████████ . This had ██████████████████ of ████████████ (inclusive of ████████ of XIIDRA EBITDA) from the June 5, 2023, presentation. This represented ████████████████ ████

219.    In total, the █████████████████████████████████████ ████ (pro-forma for ████████ from XIIDRA) in December 2021 to ████████ in July 2025. This represents ████████████████████████

220.    In Plaintiff's experience as a securities analyst and six-time corporate board member, Bausch + Lomb's ██████████████████████████ from December 2021 onward was highly unusual for a mature company and indicative of poor oversight.

221.    Plaintiff watched from the sidelines in dismay while his expectations of a significant performance-based payout were upended. The first-order impact of the ████████ swing was at least ████████ in lost market equity value for Bausch + Lomb, ████████ in lost profit for Icahn Capital's direct and indirect interest in BLCO of about ████, and ████ million in lost bonus for Plaintiff's ████ interest. The additional second-order impacts—increased debt, higher interest rates, and reduced valuation multiples—were of comparable or greater magnitude.

**Plaintiff's Exclusion from the Boardroom Prevented Him from Performing His Paramount Function Under the Employment Agreement, Implementing the Activist Strategy He Devised**

222.    While Plaintiff tried his best to engage with and improve Bausch + Lomb from outside the boardroom, the formal exclusion of Plaintiff from a true directorship doomed his ability to implement the activism strategy he was hired and compensated by Icahn Capital to perform.

223.    As further discussed below, Plaintiff had overseen a consulting project identifying up to ████████ in margin improvement for Bausch + Lomb, but Mr. Hu instead allowed the project to be abandoned, leading to ████████ in budget declines. Instead of a focus on costs, Mr. Hu allowed management to be distracted by the unwise, multi-billion dollar acquisition of the drug XIIDRA, which Plaintiff opposed and ████████████████████████████████ ████. Only once Mr. Hu was gone did management revisit a margin improvement program, belatedly validating Plaintiff's earlier findings of substantial unrealized cost and revenue potential.

**Gary Hu Failed to Implement Plaintiff's Margin Improvement Strategy**

224.    Shareholder activists often oversee the planning and implementation of margin improvement initiatives. In years when Plaintiff served on the boards of JetBlue, Xerox, and Dana,

each company announced margin improvement plans of $800 to $900 million ("JetForward"), $300 million ("Reinvention"), and $200 million, respectively. Further, Xerox announced another $825 million of cost-cut realizations from 2021 to 2022 from an earlier plan ("Project Own-It").

225.    Plaintiff expected no less from Bausch + Lomb. In December 2021, Plaintiff rallied support to engage respected consulting firm Alvarez & Marsal to develop such a plan. Plaintiff then flew to Bausch + Lomb's headquarters in New Jersey to embed himself with the Alvarez & Marsal team while they interviewed several layers of management, inspected general ledger level financial statements, and spoke with outside industry experts (Ex. H at 28–58). ███████████

███████████████████████████████████████████████

███████████████████████████████████████████

226.    However, during Mr. Hu's tenure, the plan was never implemented, and instead, Bausch + Lomb ██████████████████████████████████████████████.

227.    Plaintiff, having been relegated by Christina Ackermann to "assist" and "support," could no longer spearhead the initiative. For example, the Alvarez & Marsal report recommended that Bausch + Lomb ████████████████████████. Even after Mr. Hu was appointed, Plaintiff continued to ask Christina Ackermann whether management █████████████████████, but he was supplied with shifting answers (Ex. H at 178–185). In fact, as of the date of this complaint, ████████████████████████████████████████████████.

228.    Finally, after Mr. Hu had left the board, Bausch + Lomb held its first-ever investor day as a public company on November 13, 2025. It announced that the "next phase of our strategy" was to "expand profitability" by driving a "step change margin expansion profile." As part of this supposedly new, comprehensive program, management disclosed $306 to $375 million in margin

expansion levers.[15] It was a much-belated admission that Plaintiff's concerns over the cost and margin structure were correct all along and that Mr. Hu had failed to take timely action.

**Gary Hu Failed to Implement Plaintiff's Capital Discipline Strategy**

229.    Shareholder activists often exercise skepticism over the wisdom of business acquisitions and set a high bar for underwriting and due diligence. Plaintiff was able to successfully block acquisitions on several of the boards on which he served when he found them unwise.

230.    Such a situation arose in June 2023, when Bausch + Lomb management proposed to acquire the drug XIIDRA from Novartis AG. After studying the limited information provided to him regarding the deal, Plaintiff found it "marginal" and recommended to Brett Icahn and Gary Hu that Bausch + Lomb ███████████████ in what was described to Plaintiff as a competitive auction (Ex H at 186-188). Mr. Hu agreed with Plaintiff (*Id.*), but, armed with few facts from his own limited due diligence, Mr. Hu was unable to persuade management or the board. To win the auction, Bausch + Lomb ultimately raised its headline purchase price to $2.5 billion.[16]

231.    The acquisition failed spectacularly. Management's due diligence, overseen in part by Mr. Hu, predicted that XIIDRA, already an established and mature product, would contribute ███████████ in revenue to Bausch + Lomb in 2024 (Ex. H at 11). Instead, it added ███████ (Ex. H at 198), making the estimates off by ███████████, or ████. Plaintiff was told that ████ ███████████████████████████████████████████████████████████████████████████████

---

[15] Specifically, it disclosed 250 basis points of "product mix [and] manufacturing efficiencies" and 400 basis points of "operating efficiencies [and] P&L leverage," offset by negative 50 basis points of "R&D investment." These apply to a $5,100 million revenue guidance for 2025 and up to $6,248 million in revenue projected for 2028.

[16] Of this $2.5 billion amount, $1.75 billion represented upfront cash and the rest represented milestone payments.

232.    The results were so devastating that Bausch + Lomb management began exploring the possibility that ███████████████ XIIDRA's ███████████████ ███████████████████████████—a risk Plaintiff had identified prior to his recommendation not to bid higher. Plaintiff, chaperoned by Gary Hu, was later invited to a call with Bausch + Lomb's new general counsel Bob Bailey—held March 14, 2024—to discuss ████████████████████ By then, however, the damage had been done.

233.    This result would likely not have occurred with Plaintiff on the board. For instance, in his directorship at Bausch Health, Plaintiff was instrumental in blocking the acquisition of ██ ████████████████. Plaintiff leaned into the due diligence and was granted access to review the drug's then-confidential Phase 3 clinical trial data together with fellow board member and Harvard Medical School professor Richard Mulligan, Ph.D. (Ex. H at 236–37). At a meeting on ███████ (Ex. H at 235), Plaintiff, Dr. Mulligan, and Brett Icahn succeeded in persuading the board of Bausch Health to adopt a more conservative bidding strategy than proposed by management, leading to the ultimate demise of the deal (Ex. H at 233–34).

**Gary Hu Failed to Implement Plaintiff's Management Oversight Strategy**

234.    Shareholder activists seek to select, motivate, and, when appropriate, replace members of management to drive a successful outcome. For example, during Plaintiff's service at Dana, the board oversaw the replacement of its CEO "effective immediately" (Ex. H at 25–27).

235.    However, on Mr. Hu's watch, Bausch + Lomb's CEO Brent Saunders refused to relocate to the corporate headquarters in New Jersey and instead established a small satellite office for himself in Miami-Dade County. Flight records indicate the corporate jet made at least 30 round trips between Florida and New Jersey in 2024, apparently to accommodate this arrangement.

236.    Blocked from the boardroom, Plaintiff was unable to question management during board meetings about the ███████████████████, the failure of the XIIDRA

acquisition, or the questionable appearance of a remote CEO. Plaintiff could not identify pockets of frustration or dissent on the board or build support for tougher oversight.

237.    Outside the boardroom, Plaintiff knew his ongoing ad hoc access to Bausch + Lomb management was limited and being offered as a courtesy, as he was not a bona fide board member. Plaintiff knew that if he became too critical or pried too much, he could be shut out entirely. This reality limited Plaintiff's ability to engage in critical evaluation of management's plans.

238.    Plaintiff also had limited oversight over other Bausch + Lomb personnel decisions. For example, Plaintiff was not consulted on the replacement of its seasoned Chief Quality Officer with another executive, without the same credentials, who had been ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.[17] Later, in April 2025, Bausch + Lomb encountered a serious and costly quality lapse that caused it to recall a significant volume of its intraocular lenses used in cataract surgeries after reports of infections. In addition to damaging the company's reputation with surgeons, the recall caused a 3% reduction to revenue, or about $38 million, in the second quarter of 2025 alone.

**Plaintiff was Blocked from Serving on Bausch + Lomb Board Committees**

239.    Plaintiff was unable to serve on, or chair, the various board committees of Bausch + Lomb. On several other boards, Plaintiff has served as chairman of board committees, including two he helped found. Such committees can engage and retain outside professional firms at the company's expense, allowing them to solve discrete problems more nimbly than a full board.



[17]

240.    As one example, Plaintiff was a member and later elevated to chairman of the Finance and Transactions Committee of the board of parent Bausch Health. Plaintiff was deeply involved in the selection and direction of counsel and financial advisors which ultimately led to a series of coercive below-par debt exchanges and open-market debt repurchases that reduced Bausch Health's debt by approximately $3 billion. After this success led to him being promoted to chairman, Plaintiff insisted that the committee meet weekly for over a year—a highly unusual cadence for a board committee but demonstrative of Plaintiff's work ethic.

241.    In another example, Plaintiff was the founding chairman of the Litigation Committee of the board of parent Bausch Health (Ex. H at 248). Plaintiff was involved in proposing and selecting counsel for appellate proceedings which in April 2024 ultimately upheld the patent protection and market exclusivity of Bausch Pharma's largest product, XIFAXAN, which generated revenue of approximately $2 billion in 2024 (*Id.* at 251-255; Ex. K at 18). Plaintiff reviewed at least one key brief prior to filing and was the only independent director to attend oral arguments at the Court of Appeals for the Federal Circuit (Ex. H at 256, 258).

242.    As another example, Plaintiff was the founding chairman of the Technology Committee of the board of Xerox Holdings Corporation, publicly disclosed to be chartered to review "matters of technology, innovation and capital allocation, including investments in research and development, and commercial initiatives."

**Plaintiff's Bausch Health Board Seat Was No Substitute**

243.    Plaintiff's service on the Bausch Health board was not an adequate substitute for also serving on the Bausch + Lomb board. The seat was separate and inherently unequal.

244.    While Plaintiff served on the Bausch Health board from March 17, 2021, through August 14, 2025, factors unique to the structure of the Bausch Health board limited his ability to influence Bausch + Lomb as a Bausch Health director.

245.    Following the IPO of Bausch + Lomb, the Bausch Health board meeting agendas did not regularly dedicate time to discussing the Bausch + Lomb operations or regularly require its CEO Brent Saunders to present. Instead, the agendas focused on Bausch Pharma operations. On February 8, 2023, Plaintiff complained to Bausch Health general counsel Seana Carson that "the BHC board materials have inadequate information on BLCO" (Ex. K at 15).

246.    Additionally, the Bausch Health board regularly deferred to Bausch + Lomb on matters pertaining to the latter's business. Plaintiff cannot recall any request by Bausch + Lomb, approved by its board, which the Bausch Health board then formally denied. In substance, it was a rubber stamp.

247.    Finally, Plaintiff had no oversight over Bausch + Lomb's discriminatory board diversity policy and practices. By comparison, he was involved ███████████████████ as a director of Bausch Health. At the July 2025 board meeting, he voted to "████████████████ ██████████████████████████████ (Ex. L).

**Brett Icahn's Efforts Were No Substitute**

248.    With respect to Brett Icahn, at all relevant times he had responsibility for roughly a dozen investments—more than Plaintiff—and therefore he did not have as much time to dedicate to Bausch + Lomb. By contrast, Bausch was at all relevant times Plaintiff's largest investment and principal focus. This distinction manifested itself, for instance, in Plaintiff encamping with Alvarez & Marsal at Bausch + Lomb's headquarters while Brett Icahn was concerned with other matters.

249.    Plaintiff complied with his contractual requirements to work in person at Icahn Capital's Florida headquarters, while Brett Icahn primarily worked from home starting no later

than 2023 despite a provision in the Manager Agreement to the contrary.[18] While Brett Icahn was working remotely, Plaintiff recalls Mr. Icahn occasionally being unreachable during business hours or with background noise indicating he was in a car or a restaurant. After believing he missed a call scheduled the morning of January 26, 2023, Mr. Icahn texted Plaintiff at 10:30 am, "[s]orry I overslept" (Ex. K at 16). After missing the August 12, 2025, Bausch Health board meeting, Mr. Icahn texted Plaintiff, "I forgot about it. Whoops" (*Id.* at 17).

250.    On information and belief, in the three years since Gary Hu and Brett Icahn were appointed to the Bausch + Lomb board, neither had engaged in an in-person operational review similar to Plaintiff's Alvarez & Marsal engagement.

**Gary Hu Was an Ineffective Proxy**

251.    The process of requiring Plaintiff to use Gary Hu as a "chaperone" was slow and cumbersome. As one anecdote, it took over five weeks for Mr. Hu to receive an adequate response to Plaintiff's question regarding consultant expenses (Ex. H at 240–47). On January 23, 2023, Plaintiff asked Gary Hu to request that Bausch + Lomb produce a table of its ten largest outside vendors for professional services, including those of consultant McKinsey & Company. As was the custom, Mr. Hu plagiarized Plaintiff's request to Bausch + Lomb's CFO under his own name later that day. Over the subsequent five weeks, Gary Hu failed to obtain the requested information. Twice during that period, Mr. Hu had forgotten to follow up with Bausch + Lomb. When asked each time by Plaintiff whether he had remembered to follow up, Mr. Hu replied, "Nope."

252.    On March 2, 2023, Gary Hu finally obtained the requested information. Jesse Lynn had noted it was "[o]dd that this information cannot be produced within 15 minutes."

---

[18] "Cause" for Brett Icahn's termination defined as "(c) failure to come to work on a full-time basis at Employer's offices in Sunny Isles Beach, Florida, other than on holidays, vacation days, sick days, or other days off under Employer's business Policies … ."

**Access to Information Was a Separate Source of Harm**

253.    Plaintiff was also harmed in the performance of his duties as an Icahn Capital Portfolio Manager by his lack of direct access to the same information on Bausch + Lomb available to its directors to inform Icahn Capital's investment and trading decisions subject to applicable law. During authorized quarterly trading windows, Plaintiff could have recommended that Icahn Capital buy or sell shares based on his firsthand appraisal of the ability of Bausch + Lomb to achieve its long-term forecasts. Additionally, Plaintiff's firsthand knowledge could have proved instrumental in persuading the Icahn Group to undertake a leveraged buyout of Bausch + Lomb, which in fact was put up for sale in 2024.[19]

## IV.    THE ICAHN GROUP'S SCHEME TO HIDE AN ENORMOUS LOAN FROM PLAINTIFF AND THE SEC UNRAVELS, FURTHER HARMING PLAINTIFF

254.    In addition to the unlawful race-based actions described above, the Icahn Group was engaged in other unlawful conduct it improperly hid from Plaintiff, much to his detriment.

255.    As explained in more detail below, beginning in May 2023, Plaintiff began to discover that the Icahn Group had been deceiving him and IEP's unitholders by failing to make the mandatory securities disclosure that, since at least 2018, Carl Icahn had personally entered into margin loans totaling about $5.1 billion, collateralized by his stake in IEP, primarily to supplement Icahn Capital's investment liquidity (collectively "margin loans").

256.    When Plaintiff specifically asked Brett Icahn for a more detailed accounting of the assets available for investments while negotiating the Employment Agreement in 2020, Brett Icahn made false and misleading representations, directed Plaintiff to IEP's deficient securities filings,

---

[19] The Icahn Group publicly described this strategy as "taking outright control of a company in order to bring about the change we think is required to unlock value" and "acquiring control of those target companies that we believe we could run more profitably ourselves." Former targets of this strategy include Trans World Airlines and Pep Boys.

which did not disclose the margin loans' existence, and refused requests for additional private information. This concealment amounted to a $5.1 billion overstatement of the Icahn Group's liquidity, which Plaintiff relied on when he proposed the Bausch Investment in December 2020, believing that Icahn Capital had the resources to hold or increase the Bausch Investment for as long as it remained undervalued and that it was a suitable activist target.

257.    When the margin loans came to light, however, Icahn Capital's assets dropped precipitously, eventually forcing Icahn Capital to sell the Bausch Investment at prices far below what Plaintiff and Brett Icahn believed it to be worth, to Plaintiff's significant detriment.

**Carl Icahn and IEP Fined by the SEC for Failing to Disclose $5.1 Billion Margin Loans**

258.    On February 23, 2022, IEP filed its annual report for 2021, which disclosed for the first time that Carl Icahn had pledged 181 million out of the 300 million IEP shares he beneficially owned as collateral for certain "personal indebtedness" of an undisclosed amount.

259.    On May 2, 2023, the research firm Hindenburg Research, LLC published a memorandum critical of IEP and noted that it had "taken a short position in units of Icahn Enterprises L.P." The memorandum was critical of IEP's limited disclosure regarding Carl Icahn's margin loan scheme, adding that "Icahn has not disclosed basic metrics around his margin loans like loan to value (LTV), maintenance thresholds, principal amount, or interest rates." In fact, each of these was a material term that should have been disclosed.

260.    In the month since the report was published, the closing price of IEP units fell from $50.42 on May 1 to $21.81 on June 1—a decline of 57%.

261.    According to IEP's subsequent securities filings, "Icahn Enterprises L.P. was contacted on May 3, 2023 by the U.S. Attorney's office for the Southern District of New York and on June 21, 2023 by the staff of the Division of Enforcement of the U.S. Securities and Exchange Commission."

262.     On August 19, 2024, the SEC issued Cease-and-Desist Orders under Section 21C of the Securities Exchange Act of 1934 against both Carl Icahn and IEP. The orders state that the SEC found (Ex. I at 1–5):

> IEP, a public company, failed to disclose that Carl C. Icahn, its founder, controlling shareholder, and Chairman of the Board of Directors of its general partner, pledged IEP securities as collateral to secure personal margin loans under agreements with various lenders in its Forms 10-K for at least the fiscal years ended December 31, 2018 through December 31, 2020, as required by Item 403(b) of Regulation S-K. IEP's failures to disclose deprived existing and prospective IEP investors of information required to be disclosed.

> As a result, IEP violated Section 13(a) of the Exchange Act and Rule 13a-1 thereunder.

263.     The order against Carl Icahn stated that (Ex. I at 6–12):

> Notwithstanding his collateral pledges, [Carl] Icahn did not file amendments to his Schedule 13D, as required by Section 13(d)(2) and Rule 13d-2(a) to reflect material changes to the facts reported under Item 6, describing his personal margin loan agreements and associated amendments that pledged IEP securities as collateral, until July 10, 2023, and similarly did not file exhibits under Item 7 of his Schedule 13D, disclosing his wholly-owned entities' entry into guaranty agreements in connection with the aforementioned loan agreements and amendments, including with respect to the amendment to Schedule 13D filed on July 10, 2023. The failures to file amendments to Schedule 13D deprived existing and prospective IEP investors of required information.

> As a result, [Carl] Icahn violated Section 13(d)(2) of the Exchange Act and Rule 13d2(a) thereunder.

264.     On the same date, "IEP and [Carl] Icahn agreed to cease and desist from future violations and to pay the civil penalties" of $1.5 million for IEP and $500,000 for Carl Icahn.

**Banks Demand Repayment from Carl Icahn**

265.     Following the Hindenburg report and SEC investigation, Carl Icahn was forced by his lenders to pay down at least ██████ of the margin loans through August 2025.

266.     From December 2022 to July 2023, Carl Icahn paid down about ██████ of the $5.1 billion margin loans described by the SEC, including a full paydown for 2 of the 7 margin lender banks.

267. On July 10, 2023, Carl Icahn entered into a new loan agreement (Ex. I at 14) with the 5 remaining banks, which "consolidates all borrowings of Mr. Icahn" of approximately $3.6 billion. The consolidated loan agreement required a "principal payment of $500 million on or before September 1, 2023, quarterly principal payments of $87.5 million beginning in September 2024, and a final principal payment of $2.5 billion at the end of the [three year] term."

268. On July 2, 2024, Carl Icahn entered into the first amendment to the loan agreement (Ex. I at 18). The amendment required Carl Icahn to post additional IEP shares as collateral, accelerated the payment schedule to require an immediate "principal payment of approximately $453 million," and extended the final maturity to July 9, 2027.

269. On August 13, 2025, Carl Icahn entered into the third amendment to the loan agreement. The amendment required Carl Icahn to post additional IEP shares as collateral, accelerated the payment schedule to require an immediate "approximately $300 million" payment on the loan, and extended the final maturity to July 7, 2028 (Ex. I at 34).

**Icahn Capital Sells Investments to Cover Margin Loans**

270. In order to fund at least ███████ in Carl Icahn's margin calls, pay an ongoing quarterly cash dividend at IEP, and cover other operating and financial cashflows at IEP, investments were sold within the Investment segment from May 2023 onward.

271. From December 2020 until September 2025, the available investment funds declined from $9.3 billion to $3.2 billion. The $6.1 billion decline proved material to Plaintiff's ability to profit from existing investments and propose new investments of comparable size to those expected at the outset of the Employment Agreement.

| "Investment Funds" Disclosed by IEP (*In $MM*) | | | | | | |
|---|---|---|---|---|---|---|
| | Dec-20 | Dec-21 | Dec-22 | Dec-23 | Dec-24 | Sep-25 |
| C. Icahn Investment | 5,000 | 5,000 | 4,900 | 2,100 | 1,500 | 800 |
| (+) IEP Investment | 4,300 | 4,200 | 4,200 | 3,200 | 2,800 | 2,400 |

| Total Funds | 9,300 | 9,200 | 9,100 | 5,300 | 4,300 | 3,200 |
|---|---|---|---|---|---|---|

272.    IEP expressly acknowledged that investments were being sold to cover the margin loans. For example, on February 25, 2025, IEP disclosed that "Mr. Icahn has made withdrawals from the Investment Funds in recent months, including in connection with the principal payment made in connection with Amendment No. 1 to the Loan Agreements, and may make additional withdrawals in the future, in order to repay a portion of his loans and for other purposes."

273.    During this period, Icahn Capital completely exited significant activist investments in Cheniere Energy Inc., Conduent Inc., Crown Holdings Inc., Dana Inc., First Energy Corp., Herc Holdings Inc., and Xerox Holdings Corp.

**Bausch Investment Untouched as Brett Icahn Insists It Is "Way Undervalued"**

274.    Despite the significant reduction in Icahn Capital's funds following Carl Icahn's margin calls, not a single share of the Bausch Investment was sold from the May 2, 2023, Hindenburg report until August 13, 2025. This was because Carl Icahn, Brett Icahn, and Plaintiff all expressed the belief that the shares were undervalued.

275.    From 2021 to 2025, Brett Icahn consistently expressed the opinion that Bausch Health shares were undervalued. For example, in one independent valuation dated March 15, 2025, Mr. Icahn presented a single scenario to Plaintiff and Carl Icahn which valued Bausch Health shares at ███████ compared to the last closing price of $7.15/share (Ex. I at 37–38).

276.    On April 8, 2025, Brett Icahn sent an email to Bausch Health Chairman John Paulson and the CEO and CFO of Bausch Health, copying Plaintiff. Mr. Icahn stated he agreed with Mr. Paulson that "the stock price [of Bausch Health] is way undervalued relative to our underlying value" (Ex. I at 39).

**Bausch Shares Sold to Cover Carl Icahn's Margin Loans**

277.    On August 13, 2025, Carl Icahn entered into the third amendment to his consolidated margin loan agreement, requiring an immediate "approximately $300 million" paydown (Ex. I at 34).

278.    On August 14, 2025, Icahn Capital sold $312 million worth of shares of Bausch Health in a single block trade ███████████ (Ex. I at 43).

279.    In substance, the Bausch shares were sold to cover Carl Icahn's previously undisclosed margin loans, even though Icahn Capital, as stated by its representative Brett Icahn, believed the shares to be "way undervalued" by a factor of about ██████. This was the epitome of a forced sale.

280.    This trade represented the sale of all of Icahn Capital's approximately 9% interest in the voting stock of Bausch Health. Icahn Capital retained its interest in a non-voting cash settled swap agreement with Nomura representing a further approximately 25% of the shares of Bausch Health.

281.    Carl Icahn's decision to finally begin selling the Bausch Investment to cover his margin loans was mainly influenced by the investment's excessive concentration in Icahn Capital's portfolio caused by Icahn Capital's dwindling capital base. On information and belief, it was also likely influenced by his son's ill-fated attempt to ████████████████████████████████ ████████████████████████████████[20]

---

[20] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

282.     Under the terms of the respective appointment agreements, Brett Icahn and Plaintiff were deemed to resign from the board of Bausch Health and Brett Icahn and Gary Hu were deemed to resign from the board of Bausch + Lomb, in both cases effective August 14, 2025.

**The Margin Loan Debacle Shrank Plaintiff's Compensation Under the Employment Agreement**

283.     Plaintiff's final bonus was dramatically reduced by the collapse of Icahn Capital resulting from the undisclosed margin loans and ongoing securities law violations that had been concealed from Plaintiff when entering into the Employment Agreement and when making the Bausch Investment.

284.     First, Plaintiff would not have agreed in October 2020 to key economic terms of the Employment Agreement—such as the ███ payout—had he known that the Icahn Group's liquidity was actually $5.1 billion lower than indicated by the deficient public filings to which he was referred by Brett Icahn.

285.     Second, Plaintiff would not have recommended the Bausch Investment in December 2020, including being formally allocated the investment on December 3 (Ex. F at 14) and recommending the first trade on December 14, had he known the Icahn Group's actual liquidity. He would have concluded that Bausch Health's market capitalization of approximately $7 billion at the end of December 2020 was too large relative to the Icahn Group's actual investment liquidity for it to be a suitable activist target.

286.     Third, Plaintiff never would have recommended investing ███ in the Bausch Investment from 2020 to 2023 if he knew that margin calls would lead to its forced liquidation in 2025 despite Brett Icahn's insistence that the investment was "way undervalued."

███████████████████████████████████████

287.     Fourth, because the Icahn Group lost the wherewithal to make significant follow-on investments, Plaintiff lost the opportunity to benefit from further investment in components of the Bausch Investment from May 2023 onward, up to and including a leveraged buyout.

288.     In fact, the Icahn Group was presented by Bausch Health with a draft Investment and Backstop Agreement dated August 9, 2024, and concurrent discussions contemplated up to a ███████████████████████████████████████ (Ex. I at 45). In discussions with Plaintiff, Carl Icahn seriously considered the proposal but lacked the wherewithal to move forward.

289.     Later, on December 12, 2024, Bausch + Lomb announced it was conducting a process "to explore a potential sale" of the company. Again, as a direct result of the margin calls, the Icahn Group no longer had the wherewithal to even consider a bid to acquire the company.

290.     Fifth, because the Icahn Group was primarily occupied with liquidating investments from May 2023 onward, Plaintiff had a greatly diminished opportunity and balance sheet to make new and profitable investments for the final four years of the term of the Employment Agreement and thereby augment his final bonus.

**Plaintiff Also Suffered Reputational Harm from the Margin Loan Debacle**

291.     Plaintiff's career and future income were also harmed by the margin loan scheme through (i) the harm to his track record from the forced liquidation of the Bausch Investment and (ii) the harm to his professional reputation through his association with the Icahn Group during a time when it was determined to have violated the securities laws.

## V.     PLAINTIFF RELIED UPON FALSE AND MISLEADING REPRESENTATIONS OF AVAILABLE INVESTMENT FUNDS BOTH PRIOR TO AND DURING HIS EMPLOYMENT; ACTIVE CONCEALMENT ALSO OCCURRED

**During Negotiations, Brett Icahn Represented Up to $██████ in Investment Capacity**

292.     During the initial negotiation of the Employment Agreement, Plaintiff repeatedly sought access to private information concerning the amount and structure of IEP's and Icahn

Capital's investment funds to evaluate his expected compensation. During this time, Brett Icahn generally directed Plaintiff to IEP's securities filings, but he also made certain express representations to Plaintiff concerning the capacity to make investments.

293.   On April 18, 2020, Brett Icahn stated that it was "conservative" to assume the team would make twelve investments, each garnering ███████ from IEP and Carl Icahn, for a total of ██████ invested—of which ██████ was from IEP and ██████ was from Carl Icahn (Ex. I at 47–49). An attached spreadsheet contained a sensitivity which increased these "conservative" amounts by up to 50%, resulting in a high estimate of ██████ invested.

294.   On May 25, 2020, Brett Icahn amended his spreadsheet to further increase the high estimate of funds invested to $██████ (Ex. I at 50–51).

**Plaintiff Consulted and Relied on IEP's Filings**

295.   To evaluate Brett Icahn's representation concerning a "conservative" average investment size of $██████, Plaintiff consulted and relied upon a disclosure on page 19 of IEP's 2019 Annual Report, which stated that the Investment Segment's five largest holdings had an average size of $1.2 billion each. The largest investment was a $2.1 billion position in the stock of Caesars Entertainment Corporation.

296.   To evaluate Brett Icahn's representation concerning up to ██████ of investment capacity, Plaintiff consulted and relied upon a disclosure on page 32 of IEP's 2019 Annual Report, which stated that the "fair market value of investments in the Investment Funds" was $8.8 billion—of which $4.3 billion was funded by IEP and $4.5 billion was funded by Carl Icahn.

297.   To evaluate Brett Icahn's representation concerning Carl Icahn's capability to personally fund a portion of the investment capital, Plaintiff consulted and relied upon the same $4.5 billion disclosure of Carl Icahn's investment in the funds.

298.    For the same purpose, Plaintiff also consulted and relied upon page 127 of IEP's 2019 Annual Report, which stated that Carl Icahn beneficially owned approximately 197 million units of IEP as of December 31, 2019. The units, assuming they were unencumbered, had an IEP-calculated "Indicative Net Asset Value" of about $6.5 billion. This disclosure of the 197 million units was specifically required under 17 C.F.R. § 229.403(b) to indicate whether any of these units had been "pledged as security." No such disclosure was made. In fact, the SEC investigation subsequently revealed that 108.5 million such units were pledged as collateral for $5.0 billion in margin debt as of December 31, 2019.

299.    Plaintiff also consulted and relied upon the risk factors identified on pages 10 to 27 of IEP's 2019 Annual Report. This disclosure was required under 17 C.F.R. § 229.105 to disclose "material factors that make an investment in the registrant or offering speculative or risky." No disclosure of the risks posed by Carl Icahn's then-undisclosed personal margin loans was made. Following the SEC investigation, IEP began to make voluminous such disclosures beginning with its 2023 Annual Report.

**Brett Icahn Actively Concealed the Margin Loans When Plaintiff Inquired**

300.    Plaintiff could not entirely square Brett Icahn's representations concerning investment capacity with the disclosures in IEP's securities filings. Brett Icahn's "conservative" ██████████ average investment size was materially lower than IEP's $1.2 billion disclosure for the average size of each of its five largest investments. Brett Icahn's ██████ ratio of IEP vs. Carl Icahn funding was materially different from the approximate 1-to-1 ratio disclosed in the 2019 Annual Report. Finally, Brett Icahn's "conservative" $██████ in total investment funds was materially lower than IEP's $8.8 billion disclosure, while the $██████ number was materially higher.

301.    Accordingly, Plaintiff wanted more private information on the amount and structure of the investment funds and other factors material to the deal. For example, on May 12, 2020, Plaintiff requested to "sign an NDA to get more detail" on IEP (Ex. F at 12).

302.    However, Brett Icahn actively concealed the requested information by not granting the request and withholding further private information concerning the funds.

303.    Plaintiff again requested private information concerning the funds on a phone call on or about August 26, 2020. Plaintiff recalls that Brett Icahn expressed frustration at the request and described Plaintiff's ability to ascertain the desired information from IEP's public reporting as a test of Plaintiff's aptitude as a securities analyst.

**Brett Icahn's Representations Were Knowingly False or Misleading**

304.    In fact, Brett Icahn's representations did not square with IEP's public reporting because Brett Icahn knew the risks presented by Carl Icahn's $5.0 billion margin loan and had accounted for some of this risk in his own ███████ "conservative" case.

305.    Brett Icahn knew his "conservative" case was misleading because Plaintiff had no way to discern or evaluate the margin loan risk himself because both IEP and Brett Icahn concealed it from him and the public. Instead, Plaintiff consulted IEP's filings and dismissed the "conservative" case as too conservative.

306.    Brett Icahn knew his "conservative" case was false because he knew IEP's investment funds were only $3.8 billion as of December 31, 2019, after subtracting the $5.0 billion margin loan which propped them up. In fact, IEP's investment funds fell to $3.2 billion as of September 30, 2025, after the SEC investigation of the margin loans and the subsequent debt spiral.

307.    Brett Icahn knew his shifting upside case—originally ███████ on April 18, 2020, and later ███████ on May 25, 2025—was false and misleading because his concern over the margin loans led him to create the "conservative" case. Brett Icahn "found" the ██

███ in fictitious additional funds in May 2020 in order to further induce Plaintiff to continue negotiating and ultimately enter into the Employment Agreement.

308.    Brett Icahn knew that IEP's securities filings were materially false because the 2019 Annual Report failed to disclose that Carl Icahn's shares were pledged as required by 17 C.F.R. § 229.403(b) and that this presented a material risk disclosable under 17 C.F.R. § 229.105. Brett Icahn directed Plaintiff to these filings anyway because they presented a more favorable picture of Plaintiff's expected compensation than was truthful.

**During Plaintiff's Employment, "Carl's End of Day Report" Was Misleading**

309.    Beginning on the afternoon of October 1, 2020, Plaintiff began to receive "Carl's End of Day report," which was provided to the Portfolio Managers and other senior executives of IEP and Icahn Capital (Ex. J at 31). Plaintiff is informed and believes that the format and substance of this report was dictated by Carl Icahn.

310.    These daily reports never disclosed the existence or the amounts of Carl Icahn's personal margin loans, despite disclosing other affiliate liabilities including IEP's corporate debt and accrued interest (Ex. I at 52).

311.    Instead, they made misleading disclosures that further inflated the apparent investment resources available to Icahn Capital.

312.    For example, the October 1, 2020, report noted that assets under management were approximately $███, consistent with public disclosure. However, the report added a round ███ in "cash" attributable to IEP and Carl Icahn to produce a "Grand Total" of ███ of investment funds. The report further noted ███ in "Additional Borrowing Power Available at Prime Brokers," resulting ███ in total liquidity (Ex. I at 53).

313.    Carl Icahn knew that the report was false and misleading because it did not disclose Mr. Icahn's $5.0 billion in margin loans. Instead, Mr. Icahn misled Plaintiff and the other Portfolio

Managers by instead making disclosures with further positive bias, such as disclosing $5.6 billion in additional "cash" and prime broker liquidity.

## VI.   CARL ICAHN KNEW THAT THE MARGIN LOANS WERE MATERIAL TO PLAINTIFF AND UNITHOLDERS AND THAT CONCEALING IT WAS UNLAWFUL

314.   At all relevant times, Carl Icahn knew of the margin loans because he personally entered into them. IEP knew of the margin loans because Carl Icahn was the Chairman of its Board and indirectly owned its general partner. Icahn Capital knew of the margin loans because Carl Icahn was its Chief Executive Officer. Brett Icahn knew of the margin loans because he was Carl Icahn's son and Plaintiff is informed and believes Brett Icahn discussed the margin loans with his father and attended meetings with the margin lender banks on his behalf.

315.   The margin loans were material information to the securities holders of IEP and to Plaintiff because the loans were obtained at such a high loan-to-value ("LTV") ratio that it was highly probable that a margin call or an inability to refinance in similar terms would occur. As disclosed in the table below, Carl Icahn's LTV ratio was higher than 100% for every year since 2020—even favorably assuming he had pledged all of his units—indicating he had borrowed more money than the underlying collateral was deemed to be worth by IEP in its own public filings.

| Carl Icahn Personal Margin Loan LTV (*in $MM unless indicated*) | | | | | |
|---|---|---|---|---|---|
| | Dec-18 | Dec-19 | Dec-20 | Dec-21 | Dec-22 |
| IEP "Indicative NAV" | 8,152 | 7,067 | 3,548 | 5,121 | 5,643 |
| Carl Icahn Ownership (%) | 92% | 92% | 92% | 90% | 87% |
| Carl Icahn "NAV" | 7,500 | 6,502 | 3,264 | 4,609 | 4,909 |
| Carl Icahn Margin Loan | 4,600 | 5,000 | 5,100 | 5,000 | 5,000 |
| **Loan-to-Value (%)** | **61%** | **77%** | **156%** | **108%** | **102%** |

316.   Carl Icahn knew that the material terms of the margin loans—the total size, number of counterparty banks, interest rates, and covenants—were material to the average investor in IEP because Mr. Icahn was himself a sophisticated investor with extensive experience in public

company investing and thereby knew, for instance in December 2020, that a $5.1 billion margin loan with 156% LTV by a 92% controlling unitholder would be material information to the company's minority unitholders.

**Carl Icahn Intended to Obtain $1.9 Billion by Fraud**

317.    Carl Icahn concealed the margin loan terms from Plaintiff and the public, despite knowing their materiality and the obligation to disclose them because keeping the material terms of the margins loans a closely guarded secret was essential to avoid upsetting the favorable results of IEP's ongoing unit issuance program and to induce investors to participate.

318.    From 2020 until the program's suspension in 2023 amid the SEC investigation, IEP issued $1.9 billion in stock to what it admits were "almost entirely … individual investors" through an at-the-market ("ATM") stock issuance program.

319.    Carl Icahn directed IEP to engage in the ATM issuance because the prices realized in the issuance were significantly higher than IEP's own, publicly disclosed "Indicative Net Asset Value" per unit. This allowed IEP to sell the units with "blue-sky" value, meaning extra value over and above net asset value. This was accretive and beneficial to any existing IEP unitholder who did not participate in purchasing the ATM shares. The largest beneficiary of this "blue-sky" issuance value was Carl Icahn.

320.    A table of IEP's ATM issuances, based on its public filings, is shown below. In summary, Carl Icahn was personally enriched by the ATM issuances in the amount of $1.2 billion, such amount representing the "blue-sky" value of the shares sold, multiplied by Carl Icahn's personal ownership percentage of IEP's limited partnership interests. Substantially all of this enrichment, about $1.0 billion, occurred prior to the proper disclosure of the material terms of the margin loans.

| Carl Icahn Personal "Blue-Sky" Enrichment from ATM Program | | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
| ATM proceeds ($MM) | 101 | 833 | 759 | 175 | 102 | 1,970 |
| (/) ATM units (MM) | 1.9 | 15.2 | 14.6 | 3.4 | 5.8 | 40.9 |
| Price / ATM unit ($) | $53.16 | $54.80 | $51.99 | $51.47 | $17.59 | $48.17 |
| (-) NAV / unit ($)[21] | $(24.04) | $(16.69) | $(17.03) | $(13.61) | $(8.69) | $(15.76) |
| Blue-sky / unit ($) | $29.12 | $38.11 | $34.95 | $37.86 | $8.90 | $32.40 |
| (x) ATM units (MM) | 1.9 | 15.2 | 14.6 | 3.4 | 5.8 | 40.9 |
| Blue-sky issued ($MM) | 55 | 579 | 510 | 129 | 52 | 1,325 |
| (x) C. Icahn shares (%) | 92% | 90% | 87% | 86% | 86% | 88% |
| C. Icahn Blue-sky $MM | 51 | 521 | 441 | 110 | 44 | 1,168 |

321.　From 2024 onward, the ATM was later resumed. However, with the truth about Carl Icahn's margin loans and SEC violations made public, IEP realized much lower market unit prices, volumes, and proceeds. This proved that ATM investors were only willing to buy the shares at inflated prices during the period the fraudulent scheme was active.

322.　Carl Icahn intended to defraud the ATM investors, and incidentally Plaintiff, into believing that units purchased in the ATM program would afford them the privilege to "truly invest *alongside* the iconic Mr. Icahn as co-owners of IEP," next to a "significant portion of Mr. Icahn's personal net worth," leading to "Mr. Icahn's true alignment with their interests." In truth, investors were unknowingly investing alongside the over-levered collateral of an undisclosed syndicate of banks, who under certain conditions could foreclose upon the units and dump them on the market.

323.　New investors in the ATM issuance were further induced to purchase shares with "blue-sky" value because IEP offered them an attractive but unsustainable dividend yield—described by Hindenburg as "Ponzi-like"—where dividends exceeded IEP's net income in every year from 2020 to 2024.

---

[21] "Indicative Net Asset Value" as disclosed by IEP. NAV-per-unit is calculated by (a) taking the average of start-of-period NAV and end-of-period NAV disclosed by IEP and (b) dividing this average by the average diluted unit count for the period disclosed by IEP.

| IEP Pays an Unsustainable Dividend to Induce ATM Investors | | | | | |
|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 |
| Net Income (Loss) / Unit ($) | $(7.33) | $(2.32) | $(0.57) | $(1.75) | $(0.94) |
| Dividends / Unit ($) | $8.00 | $8.00 | $8.00 | $6.00 | $3.50 |
| (/) Price / ATM Unit ($) | $53.16 | $54.80 | $51.99 | $51.47 | $17.59 |
| Issued Dividend Yield (%) | 15% | 15% | 15% | 12% | 20% |

324.     The ATM program was of such great personal importance to Mr. Icahn that the so-called "Carl's End of Day report," which was printed daily for him, contained a scoreboard of the cumulative ATM proceeds obtained since the program's inception on May 7, 2019. This scoreboard was typically on one of the first few pages of the approximately 30-page daily report; its prominence was typically second only to the daily and year-to-date profit and loss (Ex. I at 54). This practice continued from at least October 1, 2020, to March 1, 2024. The removal of the scoreboard occurred during the pendency of the SEC investigation.

325.     Eight days after the Hindenburg report's publication, Carl Icahn, rather than recuse himself, instead largely dictated a press release issued by IEP which failed to admit or correct any deficiencies in its securities filings, claimed IEP was a "victim" of the whistleblower, and stated that the ATM scheme was really about "welcom[ing] new investors to the IEP family."

326.     In summary, Carl Icahn knew of the materiality of the margin loans but he and IEP failed to disclose them at all until February 2022 and failed to disclose them completely until no earlier than July 2023 because he was too captivated by being personally enriched by over $1.0 billion in "blue-sky" value from the ATM program, which came at the direct detriment of investors who later lost a substantial amount of money when the scheme unraveled.

**Absence of Mistake or Lack of Accident Demonstrated by Related Conduct**

327.     The margin loan scheme would not have been the only failure of Carl Icahn to make an Item 6 disclosure on Schedule 13D. On April 17, 2025, an investigation by Bausch Health found

that Mr. Icahn had failed to disclose under Item 6 that he had an interest in about 25% of all outstanding Bausch Health shares under a cash settled swap agreement, despite a new SEC rule[22] specifically aimed at disclosing such swaps (Ex. N at 1–5). Bausch Health, citing the materiality to its own shareholders, ultimately undertook to disclose this amount itself (*Id.* at 25–27).

328.     The margin loan scheme would not have been the only instance where Icahn Group business records were falsified at the direction of Carl Icahn.



[23]

**Carl Icahn's Scienter Revealed by His Reaction to the Bill Hwang Investigation and Arrest**

329.     Plaintiff is informed and believes that Carl Icahn and IEP made the first disclosure of the margin loans' existence in February 2022—despite the SEC alleging its existence dating back to 2005—because Carl Icahn and Jesse Lynn were shaken by the collapse of Archegos Capital

---

[22] The SEC amended 17 C.F.R. § 240.13d-101 with an effective date of February 5, 2024 (Ex. N at 24). The new rule required Item 6 of Schedule 13D to, "describe any contracts … with respect to … security-based swaps or any other derivative securities" (*Id.*). In response, on February 7, 2024, Carl Icahn filed an amended Schedule 13D with the SEC with respect to Bausch Health (*Id.* at 20-21). Mr. Icahn elected to "describe" his interest in cash settled swaps referencing 90,720,000 Bausch Health shares by merely disclosing the *existence* of a swap position, without specifying the number of shares, which "increased [his] economic exposure" (*Id.*). The failure to disclose the number of underlying shares was inconsistent with the practice of at least five other peer funds (*Id.* at 28–100), was a misleading "half truth," and was not corrected for months after the entry of the Cease-and-Desist Order.

[23] Determining the motive requires discovery. Perhaps relatedly, although occurring later in time, on January 16, 2024, an Icahn Group employee was found by a civil court to have undertaken "unauthorized dissemination of Illumina's privileged and confidential information" to members of the Icahn Group, which then made "unauthorized use of it" (Ex. N at 185).

Management on March 26, 2021, and the investigation and subsequent arrest of its founder Bill Hwang on April 27, 2022, as a result of undisclosed securities lending and swaps arrangements with various banks.

330.    From May to December 2021, Jesse Lynn copied Plaintiff on five separate messages to Mr. Icahn mentioning the Archegos matter (Ex. J at 1–18, 24–30). During 2021, Plaintiff personally discussed the subject of Archegos with Carl Icahn in the context of the firm's swaps arrangements. In November 2021, Plaintiff, referencing the Archegos collapse,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ (Ex. J at 21).

331.    Plaintiff is informed and believes that Carl Icahn's and IEP's sudden change of course in favor of making a partial disclosure of the margin loans for the first time on February 25, 2022, in the IEP 2021 Annual Report, prompted by the concomitant federal criminal investigation of Archegos for a similar fact pattern, evidences Mr. Icahn's scienter.

332.    Plaintiff is informed and believes that there was no other bona fide reason for Mr. Icahn to direct IEP to make the February 2022 disclosure besides the newfound fear of being caught in the act like Mr. Hwang. There was no material difference in the size of the margin loans in connection with the 2021 Annual Report as compared to the 2020 Annual Report; in fact, it was $100 million smaller at the end of 2021 according to the SEC. There was no material difference in closing unit price between the two years; 2020 closed at $50.67/unit and 2021 closed at $49.59/unit. Likewise, there was no material difference in net asset value per unit. There was a

material increase in consolidated revenue for IEP from $6 billion in 2020 to $11 billion in 2021; if anything, this would serve to increase IEP's overall materiality threshold and militate against a new disclosure. Similarly, net income was more favorable in 2021 compared to 2020.

**Carl Icahn's Scienter Revealed by the "Half Truth" in the 2021 Annual Report**

333. Prompted by the Archegos collapse, the first disclosure of Carl Icahn's margin loans in IEP's 2021 report was a "half-truth" compared to the more fulsome disclosure made in the 2023 report while under SEC investigation.

334. As summarized in the table below, the "half-truth" in February 2022 failed to disclose anything about the $5.1 billion principal balance of the loans, or their various maturity dates or covenants. Rather than undertake its own investigation or demand that Carl Icahn amend his Schedule 13D to make the appropriate disclosures, IEP instead deferred to Mr. Icahn's own personal assurance (as quoted in the footnote to the table below).

| IEP Annual Report Statements on Carl Icahn Margin Loan | | |
|---|---|---|
| Year 2020 | Feb-2022 (Year 2021) | Feb-2024 (Year 2023) |
| Item 1A: Risk Factors: "Risks Relating to Our Structure" | | |
| [None] | [None] | (a) Identification of the margin loan as a risk factor, (b) date of latest Loan Agreement, (c) description of loan collateral, (d) number of IEP units pledged, (e) principal balance, final maturity date, and amortization schedule of loan, (f) description of loan covenants, (g) risk of liquidations in the Investment Segment, (h) risk that Carl Icahn may sell IEP units and depress unit prices, (i) risk that a "margin call" or "foreclosure" could lead to Carl Icahn ceasing to be General Partner. |
| Item 12: Security Ownership of Certain Beneficial Owners and Management […] | | |
| [None] | (a) Number of IEP units pledged, (b) conclusory statement that "Mr. Icahn" | (a) Number of IEP units pledged, (b) reference to "Item 1A, Risk Factors" to |

| | had deemed that a default or margin call is unlikely.[24] | the terms of the loan and the risks presented. |
|---|---|---|

335.    Carl Icahn, by providing IEP with the assurance in connection with the annual report, was therefore obviously involved in the drafting of the "half-truth" disclosure.

336.    However, Carl Icahn's "half-truth" became twice as bad on April 27, 2022.[25] Carl Icahn, who two months earlier had clearly discussed his securities law disclosure obligations related to his personal margin loans in connection with giving his personal assurances in the Annual Report, filed his 64th amendment to his Schedule 13D with respect to IEP. The filing, which he signed, failed to disclose the material terms of the margin loans under Item 6 and Item 7 as required by law, including under 15 U.S.C. § 78m(d).

**Carl Icahn's Scienter Revealed by His Extreme Secrecy**

337.    Carl Icahn's scienter is further evidenced by the fact that he concealed the size and terms of the margin loans from Plaintiff even after Plaintiff's employment and confidentiality obligations began, despite the fact that Plaintiff reported directly to Mr. Icahn and the margin loan information was essential to Plaintiff's performance as an employee of Icahn Capital at all relevant times, including in relation to at least a billion dollars in investments after about June 2021. Under Mr. Icahn's direction, Icahn Capital's accountants provided Plaintiff with daily profit-and-loss and net-asset-value reports (Ex. J at 31) which never contained any reference to Carl Icahn's personal

---

[24] "Mr. Icahn has advised that he and his affiliates have sufficient additional assets to satisfy any obligations pursuant to these loans without recourse to the depositary units, he has no need or intention to allow foreclosure on such collateral, and that he is current on all principal and interest payments with respect to the loans, and there has never been an event of default or a default under any of the loans."

[25] Perhaps not coincidentally, that same morning Bill Hwang was arrested on 11 federal felony counts.

margin loans. In fact, Plaintiff never received or was provided access to any business records pertaining to the margin loans besides IEP and Carl Icahn's public filings. Plaintiff's ignorance of the margin loan amounts was demonstrated by the fact that Plaintiff was never interviewed by IEP's counsel, the SEC, or the Department of Justice during their respective investigations.

338.    Plaintiff is informed and believes that Mr. Icahn's extreme secrecy with Plaintiff, despite Plaintiff's genuine business need-to-know, demonstrates Carl Icahn feared adverse consequences from disclosing the size and terms of the margin loans to Plaintiff because: (i) Mr. Icahn knew he was violating the securities laws; (ii) Mr. Icahn was afraid that Plaintiff would disclose the existence of the margin loans, by means of an SEC whistleblower report or otherwise, resulting in adverse consequences for the Icahn Group such as those which actually occurred after the Hindenburg report (including the investigations by the SEC and Department of Justice); and (iii) Mr. Icahn was concerned that Plaintiff would be able to discover that he had been defrauded in connection with the Employment Agreement and take action adverse to the Icahn Group.

## FIRST CAUSE OF ACTION

### (Intentional Race Discrimination in Violation of Section 1981—All Defendants)

339.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

340.    Section 1981 guarantees to all "persons within the jurisdiction of the United States" the "right … to make and enforce contracts" and "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).

341.    "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (first quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999), then citing 42 U.S.C. § 1981). "[A] private corporate employer … sued under

§ 1981 may be liable under respondeat superior for the unlawful discriminatory employment decisions and actions of its employees occurring within the scope of their employment." *Taylor v. Birmingham Airport Auth.*, No. 2:24-CV-0056-JHE, 2024 WL 4048840, at *6 (N.D. Ala. Sept. 4, 2024). And employees are personally liable when they, "through their 'own individual actions,' have 'acted with discriminatory purpose' to infringe Plaintiff's contractual rights." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

342.    Additionally, Section 1981 "is applicable to racial discrimination in private employment against white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976). "[A] plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).

343.    Defendants violated Section 1981 by preventing Plaintiff from serving on the Bausch + Lomb board of directors, substituting Gary Hu for Plaintiff because of Plaintiff's race. This discrimination denied Plaintiff the right to contract with Bausch + Lomb[27] and denied him

---

[27] Corporate directorships involve a variety of contract rights protected by Section 1981. In this instance, the contractual relationship of a Bausch + Lomb director includes duties and relationships arising under the company's corporate governance documents, arising under the Canada Business Corporations Act and/or British Columbia Business Corporations Act, and other express and implied-in-fact agreements. Specifically, an appointed director of Bausch + Lomb becomes a party to or a beneficiary of at least four express contracts: the "Consent to Act as Director" agreement (*see* Ex. M, Plaintiff's signed "Consent to Act as Director" agreement with Bausch Health), the 2022 Omnibus Incentive Plan (as amended, replaced, or superseded) through which stock compensation is granted, a Confidentiality Agreement through which information is shared, and a Power of Attorney Agreement which facilitates the filing of SEC documents. Other written agreements governing the contractual relationship include Bausch + Lomb's Articles of Incorporation, its Charter of the Board of Directors, and the charters of each respective board committee. Other agreements which are at least implied-in-fact include recurring quarterly cash compensation payable to the director, access rights to an electronic data room for board materials, the right to attend and participate in board meetings, and access to management and facilities.

the enjoyment of benefits, privileges, terms, and conditions of his Employment Agreement with Icahn Capital because his appointment to serve as a director of Bausch + Lomb was a benefit, privilege, term, or condition of Plaintiff's Employment Agreement, which Plaintiff was induced to enter on the understanding that it would lead to his appointment as a director of companies he led investment in, as was customary for Portfolio Managers.

344.    Defendants' entry into the side letter, which in practice restricted the Icahn Group to selecting one "white" and one "non-white" Portfolio Manager, was immediately responsible for the Icahn Group not appointing Plaintiff, who was the Icahn Group's preferred appointee, its most qualified appointee, and its best suited appointee. Entry into the side letter therefore denied Plaintiff the opportunity, because of his race, to enter into one or more prospective contractual relationship(s) directly with Bausch + Lomb to serve on its board of directors. Parties to the side letter and others involved in its procurement intended to discriminate against Plaintiff on the basis of his race because they knew that Icahn Capital's four Portfolio Managers were the only people whom Icahn Capital would consider appointing to the Bausch + Lomb board and that, of these four, only one—Gary Hu—was "diverse" because he is Asian American. The parties to the side letter also knew that the very purpose of the provision was to replace Plaintiff with Gary Hu as an Icahn Capital appointee.

345.    This discriminatory act further denied Plaintiff enjoyment of the Employment Agreement's benefits, privileges, terms, and conditions by interfering with his ability to earn compensation under the Employment Agreement in at least two ways. First, Defendants' discriminatory decision to appoint a less competent director, Gary Hu, reduced the percentage-of-profits compensation due to Plaintiff under the Employment Agreement because Gary Hu's poor performance reduced the Bausch Investment's profits. Second, Defendants' discrimination denied

Plaintiff the compensation he would have received in connection with his service on Bausch +
Lomb's board of directors, which he was also entitled to retain under the Employment Agreement.

346.    Drafts of the Director Appointment and Nomination Agreement, the side letter, and
email correspondence about these documents are direct evidence that the decision not to appoint
Plaintiff to the Bausch + Lomb board of directors was made with discriminatory intent. An early
draft of the Director Appointment and Nomination Agreement named "Brett Icahn and Steven
Miller" as the directors Icahn Capital would intend to appoint to the Bausch + Lomb board. But
the side letter required that, under conditions then present, "one of the two individuals designated
by the Icahn Group must qualify as 'Diverse' in accordance with the terms of the [Board Diversity]
Policy." Bausch + Lomb general counsel Christina Ackermann wrote that "Diverse" meant
"[w]omen and minorities," and it became clear that Plaintiff—as a white man—would not qualify.
Accordingly, Icahn Capital replaced Plaintiff with Gary Hu as its choice of director, as documented
in Christina Ackerman's June 20, 2022, email.

347.    This written evidence requires no inference to conclude that Plaintiff was replaced
with Gary Hu because of Plaintiff's race. The director chosen had to "qualify as 'Diverse.'" And
while Plaintiff, Icahn Capital's first choice, did not qualify, Gary Hu (an Asian male) did.

348.    There is also indirect evidence of a Section 1981 violation. This requires the
plaintiff to show: (1) he is a member of a protected class, (2) he was subjected to an adverse
employment action, (3) his employer treated similarly situated employees who are not members
of his protected class more favorably, and (4) he was qualified for the job or job benefit at issue.
*Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842–43 & n.11 (11th Cir. 2000).

349.    All four elements are present here.

350.    First, Plaintiff, who would be classified as "white," is a member of a protected racial class. *See Santa Fe Trail Transp. Co.*, 427 U.S. at 286–87.

351.    Second, Plaintiff suffered the adverse employment actions of (i) Defendants denying him a seat on the Bausch + Lomb board of directors, and (ii) receiving less compensation under his Employment Agreement than he would have absent that discriminatory action.

352.    Third, Defendants, as Plaintiff's employer or prospective employer, treated Gary Hu, a similarly situated employee and prospective employee outside Plaintiff's racial class, more favorably by appointing Gary Hu to the Bausch + Lomb board even though all acknowledged that Icahn Capital believed at all times that Plaintiff was the better candidate.

353.    Fourth, Defendant was qualified to be a director of Bausch + Lomb and receive the attendant benefits of that position under his Employment Agreement, as Icahn Capital acknowledged by making Plaintiff its first choice to serve alongside Brett Icahn as Bausch + Lomb director.

354.    Additional evidence shows that Defendants intended to replace Plaintiff with Gary Hu because of Plaintiff's race:

    a)  Defendant Tom Ross intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against his reelection as a director of Bausch + Lomb beginning with the 2023 Annual General Meeting. Mr. Ross received not less than $1,245,164 in Bausch + Lomb director's fees, including $827,484 after the 2023 Annual General Meeting.

    b)  Defendant Christina Ackermann intended to discriminate on the basis of race because she considered it expedient to her career to take direction from Tom Ross

and separately to act in furtherance of Bausch + Lomb's purported ESG goals by insisting on the racially discriminatory covenant in the side letter.

c)   Defendant Bausch + Lomb intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against the election of Tom Ross as a director of Bausch + Lomb. Bausch + Lomb expressly described the appointment of Gary Hu as being "in furtherance of the BLCO Board's commitment to Board diversity." The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

d)   Defendant Bausch Health intended to discriminate on the basis of race because its own board resolution authorizing its subsidiary's appointment of Gary Hu stated that the appointment was "in furtherance of the BLCO Board's commitment to Board diversity." Bausch Health intended to enforce Bausch + Lomb board diversity, by means of discrimination, to serve its own purported ESG goals as the corporate parent. The intention of Bausch Health to discriminate on the basis of race is further evidenced by its pattern of race-based recruiting on its own board (*see supra* ¶¶ 205-207). The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

e)   Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital intended to discriminate on the basis of race because it was expedient to obtaining the Director Appointment and Nomination Agreement and maintaining "political capital" with the board and management of Bausch Health and Bausch + Lomb by enabling them

to pursue their purported ESG goals and by facilitating Tom Ross's election to the Bausch + Lomb board.

355.    Punitive damages are appropriate where a discriminatory act is performed with malice or reckless indifference to an employee's or prospective employee's federally protected rights. That means showing the employer "at least discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Austrum v. Fed. Cleaning Contractors, Inc.*, 190 F. Supp. 3d 1132, 1134 (S.D. Fla. 2016) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).

356.    Defendants knowingly discriminated in the face of a perceived risk that their conduct was unlawful, as evidenced by their attempt to conceal the side letter from regulators and the public.

357.    Defendant Bausch + Lomb discriminated in the face of a perceived risk that its conduct was unlawful because it wrote its discriminatory intent into an express agreement approved by its Board of Directors and directed in part by Lead Independent Director Tom Ross, and the agreement was reviewed and approved by general counsel Christina Ackermann, who herself received advice from outside counsel on the Director Appointment and Nomination Agreement.

358.    Defendant Tom Ross discriminated in the face of a perceived risk that his conduct was unlawful because, as a former lawyer and state court judge, Mr. Ross perceived a risk that the discriminatory covenant upon which he insisted violated federal law. Mr. Ross also intended the covenant to subject Plaintiff to racial discrimination.

359.    Defendant Christina Ackermann discriminated in the face of a perceived risk that her conduct was unlawful because, as a lawyer and the general counsel of a global pharmaceutical

company that regularly received advice from sophisticated outside counsel, Ms. Ackermann perceived a risk that the discriminatory covenant violated federal law.

360.    Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital discriminated in the face of a perceived risk that their conduct was unlawful because their general counsel, Jesse Lynn, ████████████████████████████████████████ and they continued their discrimination for over two years after Plaintiff informed them that the discrimination likely violated Section 1981.

361.    Icahn Capital's Employee Handbook confirmed that all "decisions regarding employees," including "training and development, benefits, [and] promotion," must be made "without discrimination or harassment based on race, color … or any other category protected by federal, state, or local law." This further confirms these Defendants knew that making race-based decisions was unlawful—yet they did so anyway. Further, as listed above, several Icahn Capital officials repeatedly made "jokes" about ethnicity and religion, and used inflammatory racialized language.

362.    Defendants Bausch Health, Bausch + Lomb, IEP, and Icahn Capital are liable for the discrimination of their representatives Christina Ackermann, Tom Ross, and Jesse Lynn because these individuals' discriminatory actions were within the scope of their employment. Relevant to the instant action, Christina Ackermann, directed by Tom Ross, negotiated the racially discriminatory side letter in January 2022 while Ms. Ackermann was serving as general counsel of both Bausch Health and Bausch + Lomb and while Mr. Ross was serving as a director of Bausch Health and knew he would be appointed Lead Independent Director of the Bausch + Lomb board on or about April 2022 and would be seeking to maintain his seat at the company's first Annual General Meeting. Further, Christina Ackermann's and Tom Ross's creation of and insistence upon

the side letter scheme shows that they acted willfully, intending to subject Plaintiff to adverse employment action because of his race.

363.    Defendant Carl Icahn is liable for the discriminatory decision to replace Plaintiff with Gary Hu as Icahn Capital's choice of Bausch + Lomb director because Carl Icahn signed the racially discriminatory side letter acting within the scope of his employment as Chief Executive Officer of Icahn Capital.

364.    Defendant IEP is liable for the actions of Carl Icahn because Carl Icahn signed the racially discriminatory side letter acting within the scope of his employment as Chairman of IEP.

365.    Defendants knowingly and willfully agreed, combined, and conspired amongst themselves to deprive Plaintiff of the rights guaranteed by 42 U.S.C. § 1981. The side letter constituted the express agreement of Bausch + Lomb, Carl Icahn, IEP, and Icahn Capital to discriminate on the basis of race on future board appointments. Christina Ackermann, directed by Tom Ross, caused Bausch + Lomb to enter into the agreement within the scope of her employment at Bausch Health. In furtherance of this conspiracy, Defendants engaged in overt acts including, but not limited to: (i) the Icahn Group's nomination of Gary Hu to the board of Bausch + Lomb, in lieu of Plaintiff, for the sole reason of his race, as Brett Icahn informed Plaintiff, and (ii) Gary Hu's plagiarism, directed by Brett Icahn, of Plaintiff's work, knowing race had barred his service.

366.    Defendants' discrimination against Plaintiff has caused him to lose past and future income, compensation, and benefits that his Employment Agreement with Icahn Capital entitled him to and the contractual relationship he would have had with Bausch + Lomb, if only he were not white.

367.    When awarding backpay, "uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer."

*EEOC v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1376 (S.D. Fla. 1998) (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5th Cir. 1974)).

368.   Because Defendants' discrimination obscured any direct measurement of the Bausch Investment's outcome with Plaintiff rightfully on the board of Bausch + Lomb, "back pay equal to the maximum amount which could have been earned but for the discrimination is appropriate." *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 549 (6th Cir. 1989).

369.   Plaintiff accordingly seeks back pay in the amount of the Make Whole Bonus, as defined herein, calculated as though the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach or fraud, *see infra* ¶ 384, or alternatively, in the amount of $221,757,416.79, which would true-up his cumulative past compensation from Icahn Capital of $1,242,583.21 (Ex. I at 55–61) to the $223 million for each New Sargon Portfolio Manager, which set a benchmark for the compensation expectations of a performing Icahn Capital Portfolio Manager.

370.   The New Sargon bonus is an appropriate benchmark for determining Plaintiff's reasonable expectations because, at the outset of his Employment Agreement, Plaintiff was similarly situated to Brett Icahn at the outset of the New Sargon deal on August 1, 2012. Both started their careers at Goldman Sachs, obtained about nine to ten years of experience as buy-side investment professionals, earned multi-million-dollar per annum compensation in their prior employment based on superior investment returns, and had thereafter negotiated with Carl Icahn to become Portfolio Managers of Icahn Capital. Plaintiff is also entitled to back pay, in an amount to be proven at trial, for lost past board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

371.    With respect to front pay, Plaintiff could have reasonably expected to earn similar per-annum compensation for the remainder of his career had Defendants' actions not: (i) damaged his investment track record and industry reputation from the Bausch Investment's poor performance during the discriminatory period, and (ii) deprived Plaintiff of the recognition and business relationships that would have attended serving on the board of Bausch + Lomb starting from June 2022 and extending into the future. This amount is to be proven at trial. Plaintiff is also entitled to injunctive relief or, alternatively, front pay in an amount to be proven at trial, for future service on the Bausch Health and Bausch + Lomb boards that would have occurred but for the discrimination.

372.    With respect to damages at law, Plaintiff is entitled to an amount not less than the Make Whole Bonus for harms suffered related to the Employment Agreement and an amount to be proven at trial for lost past and future board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

373.    Plaintiff is entitled to additional damages in an amount to be proven at trial for lost earnings capacity resulting from the reputational harm. *See Hanna v. WCI Cmty.*, 348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004) ("When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [he] cannot be made whole without compensation for the lost future earnings [he] would have received absent the employer's unlawful activity.") (citations omitted).

374.    Defendants' discrimination against Plaintiff has also caused him to suffer severe mental anguish and emotional pain and suffering for the three years he was excluded from the Bausch + Lomb boardroom on the basis of race and unable to control his destiny in his career at Icahn Capital, compensable in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Breach of Contract (Discrimination)—Icahn Capital)

375.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

376.    The "implied covenant of good faith and fair dealing exists in every employment contract in Delaware." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992). The covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up).

377.    Intentional race discrimination by an employer violates this implied covenant in an employment contract. Thus, a Plaintiff can "sustain a disparate treatment claim for a breach of the implied covenant of good faith and fair dealing" by showing "that []he suffered intentional discrimination because of h[is] race, as evidenced by an employer's disparate treatment of h[im] and similarly situated persons, and that the intentional discrimination resulted in an adverse employment action." *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005).

378.    To find a breach of the covenant of good faith and fair dealing, "the analysis should proceed under the same considerations as a claim under Title VII." *Rizzitiello v. McDonald's Corp.*, No. CIV.A. 00C-12-027CLS, 2004 WL 396411, at *2 (Del. Super. Ct. Feb. 11, 2004), *aff'd,* 868 A.2d 825 (Del. 2005). Title VII has a statutory "motivating factor" causation standard, 42 U.S.C. § 2000e-2(m), which is far exceeded here.

379.    The same allegations that support Plaintiff's claim under Section 1981 (First Cause of Action) also establish that Icahn Capital breached the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement by subjecting him to disparate treatment in

connection with his employment when Icahn Capital denied him a seat on Bausch + Lomb's board of directors because of his race.

380.    Icahn Capital—through the actions of its representatives Carl Icahn, Brett Icahn, and Jesse Lynn—further exacerbated and continued this breach by: (i) reaching a preliminary agreement on the racially-discriminatory covenant with Bausch + Lomb on January 21, 2022, over Plaintiff's express objections; (ii) executing the final agreement on April 28, 2022; (iii) harming Plaintiff's reputation by agreeing with Bausch + Lomb to hide that race was the true reason for Mr. Hu's selection over Plaintiff; (iv) directing Plaintiff to use Gary Hu as a "chaperone" from January 4, 2023, onward; (v) directing Plaintiff to create work product which Mr. Hu fraudulently plagiarized as his own from January 4, 2023, onward; (vi) ignoring Plaintiff's written complaint on January 9, 2023, that the arrangement likely violated Section 1981; (vii) directing Plaintiff on January 10, 2023, not to contact Bausch + Lomb or otherwise pursue his Section 1981 claim; and (viii) harming Plaintiff's ability to control his destiny in the pursuit of a final bonus.

381.    Icahn Capital again breached the implied covenant and caused further reputational harm on November 5, 2025, when, two weeks after Plaintiff made a confidential discrimination complaint to Icahn Capital related to the instant action, Carl Icahn was quoted in an on-the-record interview with the *Wall Street Journal* which reported the relationship with Plaintiff "recently became contentious" (Ex. I at 65). Icahn Capital breached its express representations in its employee handbook that "allegations of discrimination" will be handled with "confidentiality" and that "retaliation" is prohibited, defined to include "remarks" and "revenge."

382.    Under the express terms of the Employment Agreement, Plaintiff would have had a right or expectation to serve on the board of Bausch + Lomb. The agreement provides that: (i) "every [investment] will be allocated to one—and only one—of the [three Portfolio

Managers]," (ii) Plaintiff may "be requested by Employer … to act as an officer, director, advisor or agent" of such target company, and (iii) "remuneration or other property obtained as a result of acting as an officer, director, advisor or agent … shall remain the property of Employee." As the Bausch Investment was expressly allocated to Plaintiff (Ex. F at 14), Plaintiff expected to serve on the Bausch + Lomb board to the exclusion of any of the other Portfolio Managers, namely Gary Hu.

383.   Because "the standard remedy for breach of contract is based upon" the "principle of expectation damages," *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001), Plaintiff is entitled to expectation damages in the amount of the Make Whole Bonus, which is reasonably equivalent to the amount of the bonus Plaintiff would have received had there been no breach of the Employment Agreement. Such an amount "is based upon the reasonable expectations of the parties *ex ante*." *Id.*

384.   Assuming that the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach or fraud, the amount of the Make Whole Bonus is no less than $235,846,562.94, calculated as follows:

| Make Whole Bonus Calculation |
| --- |
| Gross Pay = (Capital/Port. Mgr.)*((1 + Return - Hurdle)^(Term) - 1)*(▮ + ▮ + ▮) |
| Gross Pay = ($9,200 / 3)*((1 + 26.8% - ▮)^(7) - 1)*(▮) |
| Gross Pay = ($3,066)*(▮)*(▮) |
| Gross Pay = $237 million = $237,089,146.15 |
| Make Whole Bonus = Gross Pay - Cumulative Compensation Paid (Oct. 2020 to Nov. 2025) |
| Make Whole Bonus = $237,089,146.15 - $1,242,583.21 = $235,846,562.94 |

385.     Compared to the New Sargon bonus of $223 million, Plaintiff's Make Whole Bonus of approximately $236 million contemplates greater initial investment capital ████ [27] vs. $3.0 billion), longer duration to compound (████ vs. 4 years), lower percentage payouts (████ ████ vs. 7.5%), and capital being divided evenly across three peer Portfolio Managers instead of being shared by two. The 26.8% rate of return of the combined Sargon portfolio is held constant.

386.     It was reasonable for Icahn Capital's representatives Carl Icahn and Brett Icahn to expect that their new partnership would achieve similar investment performance to the Icahn father-son duo's last such deal together, Sargon. Evidencing this expectation, IEP's October 1, 2020, press release announcing the deal touted the "26.8%" investment returns achieved under Sargon. In fact, Sargon's performance was below Carl Icahn's average historical audited investment returns of ████ in the 26 years during and prior to Sargon (Ex. J at 33–36):

| Fund | Period | Annual Gross Return |
|---|---|---|
| Carl Icahn "Exam-Level Review by KPMG" | 1990-1995 | ████ |
| Carl Icahn "Exam Level Review by Grant Thornton" | 1996-2004 | ████ |
| Icahn Partners L.P.—February 2011 press release | 2004-2011 | 10.9% |
| Sargon portfolio—October 2020 press release | 2010-2016 | 26.8% |
| **Compound Average** | **1990-2016** | ████ |

387.     With respect to Plaintiff's reasonable expectations, he similarly believed that the Sargon performance could be achieved or exceeded; further, he expected that his talent, discipline, and work ethic—as evidenced by his prior track record as an investment professional—would be

---

[27] The investment capital was expected by both parties to have future inflows as IEP was in the process of undertaking a significant "At the Market" sale of units. IEP realized $833 million in proceeds in calendar 2021. This implied over $4 billion in future expected inflows throughout the Term of the Employment Agreement.

additive to this performance. Both parties knew that "[e]lite portfolio managers at hedge-fund firms can command pay packages of more than $100 million over several years."[28]

388.    While the Make Whole Bonus does not explicitly contemplate the Bausch Investment, it is consistent with the reasonable expectations of the parties that the Sargon return could be achieved. According to the parties' own valuations of BHC shares (Ex. J at 37, 43, 58), the parties clearly expected to exceed 26.8% annualized returns over the life of the Bausch Investment:

| Valuation Date | BHC low | BHC high | Midpoint | Cost basis[29] | 4Y return[30] |
|---|---|---|---|---|---|
| Brett Icahn (Apr. 19, 2021) | █ | █ | █ | █ | 41.7% |
| Plaintiff (Jul. 29, 2021) | █ | █ | █ | █ | 36.0% |
| Plaintiff (Mar. 17, 2022) | █ | █ | █ | █ | 31.4% |

389.    Even reducing the amount to reflect present value as of the breach date yields a significant sum. The table below calculates the present value of the Make Whole Bonus payable on December 29, 2027, at each possible breach date alleged in this complaint using the agreed █████████.[31] Pre- and post-judgment interest subsequently accrues on the breach-date value.

| Breach Date | Present Value of Make Whole Bonus |
|---|---|
| October 2, 2020 | $171,456,631.01 |
| December 14, 2020 | $172,972,691.83 |
| January 21, 2022 | $181,586,694.73 |
| June 23, 2022 | $184,968,235.48 |
| January 10, 2023 | $189,506,541.88 |

---

[28] Peter Rudgeair & Gregory Zuckerman, *The Frenzied Pursuit of Wall Street's Low-Profile All-Stars*, WSJ (June 13, 2025, 9:00 PM), https://www.wsj.com/finance/investing/the-frenzied-pursuit-of-wall-streets-low-profile-all-stars-ee51b33a.

[29] Cost basis of BHC shares on the relevant breach date (either January 21, 2022, or June 23, 2022).

[30] Compound annualized return over a four-year period from the cost basis to the midpoint price target.

[31] The Employment Agreement provides that the final bonus is due and payable on the 90th day following Term End.

390.    Plaintiff is entitled to additional damages to be proven at trial, resulting from lost earnings capacity caused by the reputational harm.

391.    Under Delaware law, when there is a "continuous contract and continuing breach, the applicable statute of limitations begins to run only when full damages can be ascertained and recovered," which is "typically" not "until the termination of the entire contract." *Palisades Collection, LLC v. Unifund CCR Partners*, No. CVN14C08036EMDCCLD, 2015 WL 6693962, at *5 (Del. Super. Ct. Nov. 3, 2015). The doctrine applies both when a single "discrete and readily determinable breach" causes "damages that could not have been known (or sought) at the time of the breach," *In re ASHINC Corp.*, No. AP 13-50530-CSS, 2022 WL 2666888, at *11 (D. Del. July 11, 2022), *dismissed,* No. 22-2442, 2023 WL 9596751 (3d Cir. Sept. 12, 2023) (citations omitted), and when the breaching party commits multiple "wrongful acts" that are "so inexorably intertwined that there is but one continuing wrong," *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. CV 7639-VCS, 2016 WL 4440476, at *12 (Del. Ch. Aug. 22, 2016). The doctrine has also been applied to a contract that prescribed obligations "for a fixed … period" where the contract was "continuously acknowledged by both parties throughout." *Matter of Burger*, 125 B.R. 894, 902 (Bankr. D. Del. 1991).

392.    Icahn Capital's discrete breach of Plaintiff's Employment Agreement by racially discriminating against him, including through the actions of its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, caused him monetary damages that, because of the Employment Agreement's compensation structure, could not have been known at the time of the breach.

393.    Additionally, these individuals' later wrongful actions exacerbating that discrete discriminatory act are so inexorably intertwined with it that they constitute one continuing harm.

394.     Furthermore, Plaintiff's Employment Agreement is for a fixed term that ends September 30, 2027, and the parties have continuously acknowledged it even after Plaintiff was denied a seat on the Bausch + Lomb board of directors because of his race.

## THIRD CAUSE OF ACTION

### (Breach of Contract (Margin Loans)—Icahn Capital)

395.     Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

396.     An employer breaches the implied covenant of good faith and fair dealing when the employer "induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." *Merrill*, 606 A.2d at 101.

397.     For the six months from March to September 2020, Plaintiff discussed the terms of his future employment at Icahn Capital, including negotiating the Employment Agreement. During this period, Plaintiff had numerous discussions with Brett Icahn and Jesse Lynn and also spoke with Carl Icahn.

398.     Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, knew and concealed from Plaintiff that (i) Carl Icahn had $5.1 billion in margin loans against his shares in IEP, which posed a grave risk to Icahn Capital and IEP; (ii) Carl Icahn was in ongoing violation of the securities laws by failing to disclose his margin loans on his Schedule 13D with respect to IEP; and (iii) IEP was in ongoing violation of the securities laws by failing to disclose Carl Icahn's margin loans.

399.     Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, intended this concealment to deceive Plaintiff into believing that the Icahn Group had $5.1 billion more liquidity

than it actually did and was not vulnerable to a reputation-damaging SEC investigation and penalties.

400.    Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, intended these misrepresentations to induce Plaintiff to enter the Employment Agreement. Brett Icahn, for example, demonstrated his intent to deceive by making false and misleading representations and directing Plaintiff to rely upon IEP's securities filings—which Brett Icahn knew illegally concealed the margin loans—to appraise the financial situation of Icahn Capital and the Icahn Group.

401.    Plaintiff did consult and rely on these filings, including the 2019 Annual Report, while negotiating and when deciding to enter into the Employment Agreement.

402.    The $5.1 billion overstatement of the Icahn Group's liquidity was material to Plaintiff's decision to enter the Employment Agreement because it vastly overstated the funds that would be available to Plaintiff to perform his duties, and thus vastly overstated his profit potential, under the Employment Agreement.

403.    The concealment of the ongoing securities violations was material to Plaintiff's decision to enter the Employment Agreement because these violations exposed Plaintiff's professional reputation to potential severe damage by causing him to be associated with the SEC investigation and Cease-and-Desist Orders that could and did result from these violations.

404.    Plaintiff would not have entered into the Employment Agreement on the same terms, or any terms, nor forgone alternative employment as a hedge fund Portfolio Manager had either Carl Icahn's margin loans or the ongoing securities violations been disclosed to him.

405.    The ongoing concealment of the margin loans during Plaintiff's employment, by means of the misleading "Carl's End of Day report," the filing of additional unlawfully deficient SEC filings, and the continued silence of Carl Icahn and Brett Icahn, further harmed Plaintiff by

misinforming him at the inception of the Bausch Investment and later leading to the liquidation of all of Icahn Capital's Bausch Health voting shares on August 14, 2025, which reduced the compensation Plaintiff was entitled to under the Employment Agreement. *See supra* ¶ 278.

406.    "The doctrine of fraudulent concealment tolls the statute of limitations and extends the time for suit under the doctrine of laches 'when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth.'" *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1214 (Del. Ch. 2022) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 581 (Del. Ch. 2007), *abrogated on other grounds by In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016)).

407.    "To prevail under the doctrine of fraudulent concealment, a plaintiff must show: (1) defendant's knowledge of the alleged wrong and (2) an affirmative act by defendant to conceal the alleged wrong." *Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 330 (D. Del. 2017) (citation omitted). Where this doctrine applies, "[t]olling ends when the plaintiff … knew or should have known about the wrongful act." *Collis*, 287 A.3d at 1214.

408.    Plaintiff has pleaded that Icahn Capital, through its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, knew of the $5.1 billion margin loans and ongoing securities violations when negotiating the Employment Agreement with Plaintiff. For example, Carl Icahn personally entered the loans, but he nonetheless submitted securities filings that omitted mention of the loans. As a sophisticated investor with sophisticated legal advice, Carl Icahn knew this omission was unlawful.

409.    Plaintiff has pleaded also that Icahn Capital, through its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, affirmatively concealed the $5.1 billion margin loans and ongoing securities violations from Plaintiff, including by Carl Icahn and IEP making securities filings that

omitted or only partially disclosed the margin loans, Brett Icahn directing Plaintiff to those filings to appraise Icahn Capital's and the Icahn Group's financial situation when Plaintiff inquired about it, and Brett Icahn making other knowingly false and misleading representations concerning investment funds. *See supra* ¶¶ 292-308; *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1148 (Del. 2025) (holding that fraudulent concealment's affirmative act requirement can be satisfied by "partial disclosure of facts in a misleading or incomplete way") (citation omitted).

410.    Because "the standard remedy for breach of contract is based upon" the "principle of expectation damages," which "require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract," *Duncan*, 775 A.2d at 1022, Plaintiff is entitled to expectation damages in the amount of the Make Whole Bonus. *See supra* ¶ 384. Such an amount "is based upon" Plaintiff's "reasonable expectations," *id.*, because it is comparable to the New Sargon bonus earned by past Icahn Capital Portfolio Managers. Plaintiff is entitled to additional damages to be proven at trial, resulting from lost earnings capacity caused by the reputational harm.

411.    Even if Plaintiff's Employment Agreement were not a continuous contract that tolls the commencement of the statute of limitations until the contract's termination, Icahn Capital's fraudulent concealment would still toll the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation, giving Plaintiff inquiry notice of the margin loans and deficient securities filings.

### FOURTH CAUSE OF ACTION

**(Fraudulent Concealment—IEP, Icahn Capital, Carl Icahn, Brett Icahn**)

412.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

413.     Fraudulent concealment occurs when "(1) the [defendants] concealed or failed to disclose a material fact; (2) the [defendants] knew or should have known the material fact should be disclosed; (3) the [defendants] knew their concealment of or failure to disclose the material fact would induce the plaintiffs to act; (4) the [defendants] had a duty to disclose the material fact; and (5) the plaintiff[] detrimentally relied on the misinformation." *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015) (quotation omitted). The same is true under Delaware law,[32] which requires "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

414.     Plaintiff's pleadings in support of his breach of contract claim based on Carl Icahn's $5.1 billion margin loans and Carl Icahn's and IEP's ongoing securities violations (Third Cause of Action), also support his claim for fraudulent concealment.

415.     Carl Icahn and Brett Icahn, individually and as representatives of IEP and Icahn Capital (also represented by Jesse Lynn), deliberately concealed the facts of Carl Icahn's margin loans and the ongoing securities violations from Plaintiff during negotiation of the Employment Agreement, in part by directing Plaintiff to assess Icahn Capital's and Icahn Group's financial situation by securities filings that unlawfully omitted mention of the margin loans and also by Brett Icahn making false and misleading representations concerning available investment funds.

---

[32] Because the choice-of-law clause in Plaintiff's Employment Agreement does not extend to tort claims, *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009), each of Plaintiff's tort claims is governed by the law of the state that has the most significant relationship to the claim, *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003), which is generally Florida.

Plaintiff has pleaded that these were material facts because Plaintiff would not have entered into the Employment Agreement on the same terms, or any terms, nor forgone alternative employment as a hedge fund Portfolio Manager had either the margin loans or the ongoing securities violations been disclosed to him.

416.    Carl Icahn and Brett Icahn, individually and as representatives of IEP and Icahn Capital, also knew that they should have disclosed Carl Icahn's margin loans and the ongoing securities violations because they knew that these materially affected Icahn Capital's and Icahn Group's financial situation and that an accurate understanding of this situation was necessary for Plaintiff to decide whether to accept employment as a Portfolio Manager at Icahn Capital. Brett Icahn, individually and as a representative of IEP and Icahn Capital, also knew that he should have disclosed this information because Plaintiff directly asked him for information about Icahn Capital's and the Icahn Group's financial situation.

417.    Carl Icahn, Brett Icahn, IEP, and Icahn Capital each had a duty to disclose the margin loans and ongoing securities violations, and their submission of deficient securities filings and subsequent failure to disclose the margin loans and securities violations to Plaintiff during negotiation of the Employment Agreement are also silence in the face of a duty to speak. *See Palmer v. Shearson*, 622 So. 2d 1085, 1093 (Fla. 1st DCA 1993) ("violation of the statutory reporting requirements are legally sufficient to show the existence of a legal duty owed" to those harmed by the nondisclosure); *see also Greco v. Columbia/HCA Healthcare Corp.*, No. CIV. A. 16801, 1999 WL 1261446, at *9 (Del. Ch. Feb. 12, 1999) (expressing "little doubt that" "officer[s] of a Delaware corporation" negotiating "a highly expensive contract" "have an affirmative duty to disclose" a personal financial position relevant to the subject of the contract).

418.     Carl Icahn, Brett Icahn, IEP, and Icahn Capital also each acted with scienter because Carl Icahn and Brett Icahn knew about the $5.1 billion margin loans, their materiality to the Employment Agreement, and their duty to disclose the loans in their securities filings, yet intentionally concealed the loans from the SEC and from Plaintiff.

419.     Florida law imputes Carl Icahn's and Brett Icahn's knowledge of materiality and wrongdoing to IEP and Icahn Capital because Carl Icahn and Brett Icahn each deceived Plaintiff when "acting in the course of his employment" at IEP and Icahn Capital. *Nerbonne, N.V. v. Lake Bryan Int'l Props.*, 685 So. 2d 1029, 1032 (Fla. 5th DCA 1997). Likewise, Delaware law imputes Carl Icahn's and Brett Icahn's scienter to IEP and Icahn Capital because, at the time of these acts, Carl Icahn was the Chairman of the Board of the former and the Chief Executive Officer of the latter and Brett Icahn was then engaged as a consultant of IEP, held himself out to Plaintiff as an agent of IEP and Icahn Capital, and knew he would imminently begin serving as a director of IEP and Portfolio Manager at Icahn Capital to whom Plaintiff would report. *See In re Tyson Foods, Inc.*, No. CIV.A. 01-425-SLR, 2004 WL 1396269, at *12 (D. Del. June 17, 2004) (explaining that, for scienter to be imputed to a corporation "scienter must be present with respect to at least one of the officers or agents").

420.     The Icahn Group Defendants intended their concealment to induce Plaintiff to enter the Employment Agreement and knew that it would have this inducing effect.

421.     Defendants' concealment of the $5.1 billion margin loans and ongoing securities violations caused Plaintiff damage by (i) causing the Icahn Group's liquidation of significant portions of the Bausch Investment to pay down part of the loan, which significantly reduced the compensation Plaintiff was entitled to under the Employment Agreement; (ii) inducing Plaintiff to forgo alternative employment as a Portfolio Manager at another firm that was not in an undisclosed

precarious financial situation; and (iii) harming Plaintiff's professional reputation by causing him to be associated with a forced sale of a major investment and an SEC investigation and Cease-and-Desist Orders issued for securities violations. The amount of these damages is to be determined through discovery and proven at trial, not less than the Make Whole Bonus amount above, plus additional damages resulting from lost earnings capacity caused by the reputational harm, plus punitive damages.

422.    The Icahn Group Defendants' fraudulent concealment tolled the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation. *See S.A.P. v. State, Dep't of Health & Rehab. Servs.*, 704 So. 2d 583, 585 (Fla. 1st DCA 1997) (explaining that fraudulent concealment tolls statute of limitations under Florida law).

## FIFTH CAUSE OF ACTION

### (Fraudulent Inducement—IEP, Icahn Capital, Carl Icahn, Brett Icahn)

423.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

424.    The elements of fraudulent inducement are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012) (citation omitted), or, under Delaware's formulation: "1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result." *ITW Glob. Invs. Inc. v. Am. Indus. Partners*

*Cap. Fund IV, L.P.*, No. CVN14C10236JRJCCLD, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) (citation omitted).

425.    Plaintiff's pleadings in support of his breach of contract claim based on Carl Icahn's $5.1 billion margin loans and Carl Icahn's and IEP's ongoing securities violations (Third Cause of Action) and his fraudulent concealment claim (Fourth Cause of Action) also support his fraudulent inducement claim. Plaintiff pleaded that the Icahn Group Defendants knowingly misled Plaintiff into entering into the Employment Agreement by knowingly misrepresenting to him that the Icahn Group and Icahn Capital had $5.1 billion more liquidity than they did and that Carl Icahn and IEP were in ongoing violation of the securities laws by failing to disclose $5.1 billion in margin loans. Plaintiff pleaded that these Defendants intended for him to rely on these misrepresentations to enter into the Employment Agreement, that this reliance was reasonable because Brett Icahn directed him to deficient securities filings to assess Icahn Capital's and IEP's financial situation, and that this reliance caused harm to his compensation and professional reputation because, if not for the fraud, Plaintiff would have accepted alternative employment as a Portfolio Manager at a comparable firm.

426.    Brett Icahn made false statements of material fact to Plaintiff that Mr. Icahn knew to be false and were intended to, and did, induce reliance by Plaintiff including: (i) that it was "conservative" that ███████ would be invested under the Employment Agreements, (ii) that this amount could be as high as $██████, and (iii) that, one month later, this amount could be as high as $███████ without any justification for the $██████ increase.

427.    "[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. 4th DCA 1994). An arm's length party "may have no duty to speak, yet 'if he does assume to speak, he must

make a full and fair disclosure as to the matters about which he assumes to speak. He must then avoid a deliberate nondisclosure.'" *Prentice v. R.J. Reynolds*, 338 So. 3d 831, 839–40 (Fla. 2022) (citations omitted).

428.     Brett Icahn's judgment of a "conservative" amount of funds to be invested required him to disclose all material facts relevant to forming such a judgment, including the risk of a debt spiral triggered by the undisclosed margin loans. The "conservative" judgment was a statement of fact, but even if it were an opinion, "[a] statement of a party having … superior knowledge may be regarded as a statement of fact although it would be considered as opinion if the parties were dealing on equal terms." *Vokes v. Arthur Murray*, 212 So. 2d 906, 909 (Fla. 2nd DCA 1968) (citation omitted).

429.     Plaintiff is therefore entitled to an award of damages in an amount to be determined through discovery and proven at trial, not less than the Make Whole Bonus amount, plus additional damages resulting from lost earnings capacity caused by the reputational harm, plus punitive damages.

430.     The Icahn Group Defendants' fraudulent concealment of the $5.1 billion loans and ongoing securities violations from Plaintiff tolled the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation.

## **SIXTH CAUSE OF ACTION**

### **(Tortious Interference with Contract/Business Relationship—Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross)**

431.     Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

432.    "The elements of tortious interference with a business relationship are: (1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation omitted). "An action for intentional interference is appropriate even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Id.* Even if the law of New Jersey applied (where Bausch + Lomb and Bausch Health have their corporate headquarters), there would be no difference because it similarly requires "(1) a protected interest; (2) … defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *Vosough v. Kierce*, 97 A.3d 1150, 1159 (N.J. App. Div. 2014); *accord MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996).

433.    Christina Ackermann and Tom Ross, individually and as representatives of Bausch + Lomb and Bausch Health, intentionally interfered with Plaintiff's Employment Agreement with Icahn Capital by insisting on execution and enforcement of a racially discriminatory covenant in the side letter regarding the Director Appointment and Nomination Agreement between Icahn Capital and Bausch + Lomb, which: (1) induced Icahn Capital to breach the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement; (2) denied Plaintiff the Bausch + Lomb director position that he otherwise would have received as a result of the Employment Agreement; and (3) substantially reduced Plaintiff's profits-based compensation under the Employment Agreement by preventing him from (i) implementing his proven activist strategy for increasing Bausch + Lomb's profitability, (ii) directly opposing the unwise acquisition of XIIDRA,

and (iii) implementing better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

434.    On February 22, 2021, the date Plaintiff disclosed his employment with Icahn Capital in Bausch Health's directors' and officers' questionnaire, Christina Ackermann was the general counsel of Bausch Health. Plaintiff is informed and believes she received and read the questionnaire because she replied to the email Plaintiff sent to her containing the questionnaire (Ex. J at 59–63).

435.    On January 21, 2021, the date Bausch + Lomb and Icahn Capital preliminarily agreed to the discriminatory covenant, Christina Ackermann was still general counsel of Bausch Health.

436.    On the date Gary Hu was appointed to the Bausch + Lomb board, June 23, 2022, Christina Ackermann was general counsel of Bausch + Lomb. Her knowledge of Plaintiff's disclosure of the profits-based nature (Ex. J at 83) of his compensation was permitted to travel with her under the confidentiality provisions of the Master Separation Agreement by and between Bausch Health and Bausch + Lomb and is thereby imputed to Bausch + Lomb.

437.    Bausch Health and Bausch + Lomb, being advised by outside activist-defense bankers and law firms, either knew about the profit-based terms of Plaintiff's employment, which had been publicly disclosed by IEP's October 1, 2020, press release and accompanying Form 8-K filing, or knew generally about the profits-based compensation arrangements of activist hedge funds, in particular those of Icahn Capital. Christina Ackermann, as an experienced lawyer, and Tom Ross, as a former judge, also knew that Plaintiff's Employment Agreement contained an implied covenant of good faith and fair dealing by operation of state law and that racial discrimination by Icahn Capital against Plaintiff would materially breach that covenant. Bausch

Health and Bausch + Lomb knew the same through the knowledge of their representatives Ms. Ackermann and Mr. Ross and separately through the advice of inside and outside counsel.

438.    Bausch Health and Bausch + Lomb, through their employment of Christina Ackermann, Tom Ross, and others, knew that Plaintiff's Employment Agreement would have caused Plaintiff's appointment as a director of Bausch + Lomb because Plaintiff's name appeared four times in the draft Director Appointment and Nomination Agreement that Ms. Ackermann edited with Mr. Ross's review and approval, and the prospect of Plaintiff's appointment was the impetus for Ms. Ackermann and Mr. Ross to insist on a racially discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement.

439.    Bausch Health and Bausch + Lomb, through their shared representatives Christina Ackermann and Tom Ross, demanded and obtained the racially discriminatory covenant from Icahn Capital in the Side Letter regarding the Director Appointment and Nomination Agreement and applied it against Plaintiff to unjustifiably prevent his appointment to Bausch + Lomb's board.

440.    This intentional act by Bausch + Lomb and Bausch Health induced Icahn Capital to breach the Employment Agreement with Plaintiff, namely the implied covenant of good faith and fair dealing thereunder, by causing Icahn Capital to participate in intentional race discrimination against Plaintiff.

441.    This same act further interfered with Plaintiff's Employment Agreement by preventing it from operating to cause Plaintiff's appointment to Bausch + Lomb's board, as it otherwise would have.

442.    This same act further interfered with Plaintiff's Employment Agreement by foreseeably reducing his profits-based compensation under it as a result of his inability to (i) implement his proven activist strategy for increasing Bausch + Lomb's profitability as a

member of its board, (ii) formally oppose the unwise acquisition of XIIDRA, and (iii) implement better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

443.    Bausch + Lomb's, Bausch Health's, Christina Ackermann's, and Tom Ross's insistence on and enforcement of the racially discriminatory covenant is unjustified, used improper means, and had improper motives because the covenant itself is illegal on its face, was intended to discriminate against Plaintiff on the basis of his race (*see supra* ¶¶ 344, 354),was made self-servingly in breach of Tom Ross's fiduciary duty to Bausch + Lomb and Bausch Health, to protect his own board seat, was against the best interests of each company and its respective shareholders because of the material liability it created, was unlawfully concealed from the shareholders and regulators by Christina Ackermann because of its wrongfulness, was not a suitable exercise of business judgment, and was against public policy, including under Section 1981. Sufficient "bad motive" under Florida law exists in a "tortious interference claim where [the] sole basis for defendant's interference was plaintiff's race." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 & n.9 (11th Cir. 2001) (citing *Nizzo v. Amoco Oil Co.*, 333 So. 2d 491, 493 (Fla. 11th DCA 1976)).

444.    Plaintiff here specifically realleges the injury allegations in his breach of contract claim based on race discrimination (Second Cause of Action).

445.    Plaintiff is additionally entitled to an award of punitive damages.

### **SEVENTH CAUSE OF ACTION**

### **(Unjust Enrichment—Tom Ross, Gary Hu)**

446.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

447.     Assuming Delaware law applies to this claim, "the standard Delaware formulation" of unjust enrichment looks for "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)). "Outside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law." *Id.* at 351. Nor need a claimant "suffer an actual financial loss" if he was "deprived of the benefit unjustifiably conferred upon the defendant," *id.* at 345, because "the restitutionary recovery is not, as in damages, the *harm* to the plaintiff, but rather the *benefit* received by the defendant," *id.* at 344.

448.     Tom Ross received ongoing director's fees from his seat on the Bausch + Lomb board only because he directed Christina Ackermann to insist upon the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement to prevent Plaintiff's appointment to the board in favor of a non-white candidate, since only this would prevent ISS from recommending that shareholders vote against Tom Ross beginning with the initial April 24, 2023 Annual General Meeting. *See supra* ¶ 98. These fees enriched Tom Ross by no less than $1,165,900 within the three-year limitations period.

449.     Tom Ross's insistence that Bausch + Lomb engage in discrimination so that he could continue serving on the board caused him to receive this benefit of director's fees, which Plaintiff would have received instead, if not for Tom Ross's discrimination to protect himself at Plaintiff's expense. Plaintiff was thus impoverished by Tom Ross's enrichment. *See Garfield*, 277 A.3d at 345.

450.    This intentional race discrimination was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

451.    Plaintiff is accordingly entitled to restitution in an amount not less than $1,165,900, the amount of director's fees Tom Ross received within the three-year limitations period as a result of discriminating against Plaintiff.

452.    Gary Hu received director's fees from his seat on the Bausch + Lomb board only because the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement prevented Plaintiff's appointment to the board by requiring that the appointee be non-white. These fees enriched Gary Hu by no less than $966,589 within the three-year limitations period.

453.    Gary Hu retained these fees even though he knew that he had been appointed rather than Plaintiff only because of their race and that Plaintiff performed many of the duties of a Bausch + Lomb director, which Gary Hu neglected and willingly allowed Plaintiff to perform without compensation. Gary Hu even plagiarized Plaintiff's questions and requests without attribution on multiple occasions. Gary Hu further participated in Bausch Health's, Bausch + Lomb's, Christina Ackermann's, and Tom Ross's racial discrimination against Plaintiff by acting as Plaintiff's "chaperone" at Christina Ackermann's insistence from January 4, 2023, onward.

454.    Gary Hu would not have received director's fees had he not willingly participated in intentional race discrimination against Plaintiff. If not for the intentional race discrimination against Plaintiff, Plaintiff would have received these fees instead.

455.    Gary Hu's participation in intentional race discrimination against Plaintiff was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

456.    Plaintiff is accordingly entitled to restitution in an amount not less than $966,589, the amount of director's fees Gary Hu received within the three-year limitations period as a result of his participation in intentional discrimination against Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate 42 U.S.C. § 1981;

B.    A declaratory judgment that Icahn Capital breached the implied covenant of good faith and fair dealing under Plaintiff's Employment Agreement dated October 1, 2020;

C.    A declaratory judgment that IEP, Icahn Capital, Carl Icahn intentionally misrepresented and fraudulently concealed Icahn Capital's and the Icahn Group's financial situation during and after negotiation of the Employment Agreement with Plaintiff;

D.    A declaratory judgment that IEP, Icahn Capital, Carl Icahn, and Brett Icahn fraudulently induced Plaintiff to enter into the Employment Agreement with Icahn Capital;

E.    A declaratory judgment that Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross tortiously interfered with Plaintiff 's Employment Agreement with Icahn Capital.

F.    An injunction and order that Bausch + Lomb appoint Plaintiff to its board of directors effective immediately, that Bausch + Lomb award Plaintiff back pay in an amount to be proven at trial, that Bausch + Lomb continue to nominate Plaintiff alongside its other director

candidates in its own proxy statement for election at each subsequent annual general meeting until Plaintiff has served for 15 years; or, in the alternative, an award of back and front pay in an amount not less than $5,250,000;

G.      The same injunction and order with respect to Bausch Health; or, in the alternative, an award of back and front pay in an amount not less than $3,850,000;

H.      An award of damages, back pay, and front pay against all Defendants to compensate Plaintiff for all the economic harm he suffered from disparate treatment based on his race in an amount to be determined at trial not less than $221,757,417, plus prejudgment interest;

I.      An award of damages against the Icahn Group for breaching Plaintiff's Employment Agreement, intentionally misrepresenting Icahn Capital's financial situation to him, and fraudulently inducing him to enter into the Employment Agreement with Icahn Capital in an amount to be determined at trial not less than $171,456,631, plus prejudgment interest;

J.      An award of damages against Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross for tortiously interfering with Plaintiff's Employment Agreement with Icahn Capital in an amount to be determined at trial not less than $181,586,695, plus prejudgment interest;

K.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all mental anguish and emotional pain and suffering;

L.      An award of back pay, front pay, and damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation, earnings capacity, and loss of career fulfillment;

M.      An award of punitive damages in an amount to be proven at trial;

N.      An award of restitution against Tom Ross in an amount not less than $1,245,164;

O.    An award of restitution against Gary Hu in an amount not less than $966,589;

P.    An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

Q.    Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 5th day of February 2026.

/s/ Emily Percival
Gene Hamilton (*pro hac vice*)
Emily Percival (Fla. Bar No. 119313)
Will Scolinos (*pro hac vice*)
James Rogers (*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, D.C. 20003
(301) 893-4177
emily.percival@aflegal.org
william.scolinos@aflegal.org
james.rogers@aflegal.org

Jared M. Kelson (*pro hac vice*)
Jim Wedeking (*pro hac vice*)
Nicholas A. Cordova (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900
Washington DC 20006
(202) 955-0620
jkelson@boydengray.com
jwedeking@boydengray.com
ncordova@boydengray.com

*Counsel for Plaintiff*