UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

|  |  |
|---|---|
| STEVEN D. MILLER,<br><br>　　　*Plaintiff*,<br><br>v.<br><br>**BAUSCH HEALTH COMPANIES, INC;<br>BAUSCH + LOMB CORPORATION;<br>THOMAS ROSS; CHRISTINA<br>ACKERMANN; GAOXIANG HU;<br>ICAHN ENTERPRISES, L.P.; ICAHN<br>ENTERPRISES G.P. INC.; ICAHN<br>CAPITAL, LP; CARL ICAHN; BRETT<br>ICAHN,**<br><br>　　　*Defendants*. | Case No. 1:25-cv-25893-BLOOM/Elfenbein |

**PLAINTIFF'S CONSOLIDATED OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................................ iv

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 5

       A.      Plaintiff Joins Icahn Capital and Crafts the Bausch Investment Strategy.............. 5

       B.      Defendants Keep Plaintiff Off the Bausch + Lomb Board Due to His Race.......... 6

       C.      Icahn Defendants Mislead Plaintiff by Hiding Massive $5.1B Margin Loans....... 8

LEGAL STANDARD ...................................................................................................... 10

ARGUMENT ..................................................................................................................11

I.      Plaintiff States Prima Facie Claims Under 42 U.S.C. § 1981..............................11

       A.      Race Caused Plaintiff's Exclusion from the Board. ............................................. 13

       B.      The Side Letter's Legal Effect on Day of Mr. Hu's Appointment Is Irrelevant. .. 16

       C.      Defendants Denied Plaintiff a Race-Neutral Employment Agreement. ............... 18

       D.      Icahn Capital Intended to Discriminate Against Plaintiff Based on His Race...... 23

       E.      Damages from the Section 1981 Violation are Well-Pleaded............................. 24

II.     Plaintiff Properly Pleaded Tortious Interference Claims. .................................... 27

III.    This Court Has Personal Jurisdiction Over All Defendants............................... 28

       A.      The Corporate Shield Doctrine Does Not Apply Here. ....................................... 29

       B.      Personal Jurisdiction Satisfies Due Process........................................................ 32

IV.   Plaintiff Properly Pled Fraud Claims Against the Icahn Defendants............................... 34

       A.      Florida Law Governs Plaintiff's Fraud Claims.................................................... 35

       B.      The Complaint States a Claim for Fraudulent Inducement. ................................ 36

       C.      The Complaint States a Claim for Fraudulent Concealment. .............................. 38

       D.      The Integration Clause Does Not Bar Plaintiffs' Fraud Claims........................... 42

V.     Plaintiff Properly Pleaded Breach of Contract Claims Against Icahn Defendants.......... 43

A.     Racial Discrimination Breaches Good Faith and Fair Dealing............................ 44

B.     Fraud in the Inducement Is a Breach of Good Faith and Fair Dealing. ................ 45

C.     Defendants' Opinions on Plaintiff's Damages Do Not Support Dismissal. ......... 46

D.     Plaintiff's Claims Are Timely. ................................................................................ 47

CONCLUSION ................................................................................................................. 52

CERTIFICATE OF SERVICE ........................................................................................ 53

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AcryliCon USA, LLC v. Silikal GmbH,*
  985 F.3d 1350 (11th Cir. 2021).................................................................................. 10

*Adem v. Jefferson Mem'l Hosp. Ass'n,*
  No. 411-CV-2102-JAR, 2012 WL 5493856 (E.D. Mo. Nov. 13, 2012).................................. 22

*Agency Holding Corp. v. Malley-Duff & Assocs., Inc.,*
  483 U.S. 143 (1987) ............................................................................................... 30

*Akridge v. Alfa Ins. Companies,*
  93 F.4th 1181 (11th Cir. 2024)................................................................................. 15

*Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC,*
  103 F.4th 765 (11th Cir. 2024)........................................................................ 12, 21, 22

*AM Gen. Holdings LLC v. The Renco Grp., Inc.,*
  No. 7639-VCS & 7668-VCS, 2016 WL 4440476 (Del. Ch., 2016).................................. 47, 50

*Am. Tower Corp. v. Unity Commc'ns, Inc.,*
  No. CIV.A. 09C-03-122 PLA, 2010 WL 1077850 (Del. Super. Ct. Mar. 8, 2010) ............. 48, 49

*Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.,*
  829 A.2d 143 (Del. Ch. 2003) ................................................................................. 46

*Apollo Mgmt. Grp. v. Croxall,*
  No. 22-62398-CIV, 2023 WL 11799719 (S.D. Fla. July 17, 2023).......................................... 37

*ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC,*
  50 A.3d 434 (Del. Ch. 2012) ................................................................................. 44

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................................. 28

*Aviation W. Charters, LLC v. Freer,*
  No. C.A. No. N14C–09–271 WCC CCLD, 2015 WL 5138285 (Del. Super. Ct. July 2, 2015) 39

*BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.,*
  No. CIV.A. 20456, 2004 WL 1739522 (Del. Ch. Aug. 3, 2004) .............................................. 39

*Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.,*
  543 F.2d 1107 (5th Cir. 1976)............................................................................. 25, 26

*Banks v. Pub. Storage Mgmt., Inc.*,
  585 So. 2d 476 (Fla. 3d DCA 1991) ......................................................................... 41

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................ 40

*Bostock v. Clayton Cnty.*,
  590 U.S. 644 (2020) ........................................................................................... 15, 16

*Burton v. Linotype Co.*,
  556 So. 2d 1126 (Fla. 3d DCA 1989) ....................................................................... 41

*Busby v. City of Orlando*,
  931 F.2d 764 (11th Cir. 1991)............................................................................. 21, 22

*Calder v. Jones*,
  465 U.S. 783 (1984) ........................................................................................... 32, 33

*Carvelli v. Ocwen Fin. Corp.*,
  934 F.3d 1307 (11th Cir. 2019)................................................................................. 37

*CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*,
  No. 3:16-CV-186-J-34JRK, 2018 WL 905752 (M.D. Fla. Feb. 15, 2018)................................ 41

*Chapter 7 Tr. v. Gate Gourmet, Inc.*,
  683 F.3d 1249 (11th Cir. 2012)................................................................................. 11

*City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*,
  746 F. Supp. 3d 1395 (S.D. Fla. 2024) ..................................................................... 37

*Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media*,
  589 U.S. 327 (2020) ......................................................................................... Passim

*Cooper v. Meridian Yachts, Ltd.*,
  575 F.3d 1151 (11th Cir. 2009)................................................................................. 35

*Cornell Glasgow, LLC v. La Grange Props., LLC*,
  No. C.A. No. N11C–05–016 JRS CCLD, 2012 WL 2106945 (Del. Super. Ct. June 6, 2012).. 44

*Cush–Crawford v. Adchem Corp.*,
  271 F.3d 352 (2d Cir.2001)....................................................................................... 26

*Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*,
  302 A.3d 430 (Del. Ch. 2023) ................................................................................... 46

v

*Domino's Pizza, Inc. v. McDonald*,
    546 U.S. 470 (2006) ................................................................................................ 21, 22

*Dunlap v. State Farm Fire & Cas. Co.*,
    878 A.2d 434 (Del.2005) ............................................................................................... 43

*E.I. DuPont de Nemours & Co. v. Pressman*,
    679 A.2d 436 (Del. 1996) .............................................................................................. 43

*EEOC v. Joe's Stone Crab, Inc.*,
    15 F. Supp. 2d 1364 (S.D. Fla. 1998) ........................................................................... 26

*Ethan Allen, Inc. v. Georgetown Manor, Inc.*,
    647 So. 2d 812 (Fla. 1994) ............................................................................................ 27

*Faraca v. Clements*,
    506 F.2d 956 (5th Cir. 1975)................................................................................. 18, 21, 22

*Ferrill v. Parker Grp., Inc.*,
    168 F.3d 468 (11th Cir. 1999)................................................................................. 11, 23

*Ford Motor Co. v. EEOC*,
    458 U.S. 219 (1982) ....................................................................................................... 25

*Foster v. Echols Cnty. Sch. Dist.*,
    169 F.4th 1291 (11th Cir. 2026)............................................................................... 19, 20

*Garcia v. Pub. H. Trust of Dade Cnty.*,
    841 F.2d 1062 (11th Cir.1988)...................................................................................... 35

*Garfield on behalf of ODP Corp. v. Allen*,
    277 A.3d 296 (Del. Ch. 2022) ....................................................................................... 46

*Goodman v. Lukens Steel Co.*,
    482 U.S. 656 (1987), ..................................................................................................... 30

*Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*,
    341 F.3d 1292 (11th Cir. 2003)................................................................................. 35, 36

*Hess v. Philip Morris USA, Inc.*,
    175 So. 3d 687 (Fla. 2015) ............................................................................................ 38

*HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*,
    685 So. 2d 1238 (Fla. 1996) .......................................................................................... 41

*In re ASHINC Corp.*,
  No. AP 13-50530-CSS, 2022 WL 2666888 (D. Del. July 11, 2022) .................................. 48, 50

*Jefferson v. Sewon Am., Inc.*,
  891 F.3d 911 (11th Cir. 2018) ......................................................................................... 11

*Jimenez v. Wellstar Health Sys.*,
  596 F.3d 1304 (11th Cir. 2010) .................................................................................. 21, 22

*Kinnon v. Arcoub, Gopman & Assocs., Inc.*,
  490 F.3d 886 (11th Cir. 2007) ......................................................................................... 11

*Kitroser v. Hurt*,
  85 So. 3d 1084 (Fla. 2012) .............................................................................................. 29

*Kronenberg v. Katz*,
  872 A.2d 568 (Del. Ch. 2004) ......................................................................................... 42

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del. Ch. 2009) .................................................................................... 43, 44

*LaFreniere v. Craig-Myers*,
  264 So. 3d 232 (Fla. 1st DCA 2018) ...................................................................... 29, 33, 34

*Lamb v. Outback Steakhouse of Fla., Inc.*,
  No. 8:13-CV-794-T-35MAP, 2014 WL 12689882 (M.D. Fla. Sept. 4, 2014) ........................... 45

*Lebanon Cnty. Emps.' Ret. Fund v. Collis*,
  287 A.3d 1160 (Del. Ch. 2022) ........................................................................................ 51

*Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*,
  193 So. 3d 902 (Fla. 3d DCA 2015) .................................................................................. 38

*Matter of Burger*,
  125 B.R. 894 (Bankr. D. Del. 1991) ......................................................................... 47, 49, 50

*Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*,
  761 So. 2d 306 (Fla. 2000) .............................................................................................. 35

*McDonald v. Santa Fe Trail Transp. Co.*,
  427 U.S. 273 (1976) ....................................................................................................... 12

*McIntosh Fish Camp, LLC v. Colwell*,
  315 So. 3d 784 (Fla. 5th DCA 2021) ................................................................................. 42

*McKenzie v. Davenport-Harris Funeral Home*,
  834 F.2d 930 (11th Cir. 1987) ............................................................................. 32

*Merrill v. Crothall-Am., Inc.*,
  606 A.2d 96 (Del. 1992) ...................................................................................... 45

*Miller v. HCP Trumpet Invs., LLC*,
  2018 WL 4600818 (Del. Sept. 20, 2018) ............................................................. 20

*Moore v. Grady Mem'l Hosp. Corp.*,
  834 F.3d 1168 (11th Cir. 2016) ........................................................................... 18

*Moore v. Liberty Nat. Life Ins. Co.*,
  267 F.3d 1209 (11th Cir. 2001) ........................................................................... 31

*N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*,
  124 F.4th 1322 (11th Cir. 2025) .......................................................................... 10

*Newcal Indus., Inc. v. Ikon Office Sol.*,
  513 F.3d 1038 (9th Cir. 2008) ............................................................................. 37

*Nicolet, Inc. v. Nutt*,
  525 A.2d 146 (Del. 1987) .................................................................................... 38

*Norton v. Poplos*,
  443 A.2d 1 (Del. 1982) ....................................................................................... 39

*Nunez v. First Union Nat. Bank of Fla.*,
  996 F.2d 287 (11th Cir. 1993) ........................................................................ 21, 22

*OC Tint Shop, Inc. v. CPFilms, Inc.*,
  No. CV 17-1677-RGA, 2018 WL 4658211 (D. Del. Sept. 27, 2018) ...................... 44

*Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*,
  202 A.3d 482 (Del. 2019) .................................................................................... 20

*Palisades Collection, LLC v. Unifund CCR Partners*,
  No. N14C–08–036 EMD CCLD, 2015 WL 6693962 (Del. Super. Ct. Nov. 3, 2015) ........ 48, 49

*Pettway v. Am. Cast Iron Pipe Co.*,
  494 F.2d 211 (5th Cir. 1974) ............................................................................... 26

*Prieto v. Smook, Inc.*,
  97 So. 3d 916 (Fla. 4th DCA 2012) ...................................................................... 36

*Rice-Lamar v. City of Ft. Lauderdale*,
   232 F.3d 836 (11th Cir. 2000) .................................................................................. 12

*Rizzitiello v. McDonald's Corp.*,
   868 A.2d 825 (Del. 2005) ................................................................................ 20, 44

*Robinson v. Orange Cnty.*, Fla.,
   No. 6:05-CV-717-ORL31DAB, 2006 WL 1678967 (M.D. Fla. June 16, 2006) ....................... 19

*Rodriguez v. Procter & Gamble Co.*,
   338 F. Supp. 3d 1283 (S.D. Fla. 2018) ............................................................. Passim

*Runyon v. McCrary*,
   427 U.S. 160 (1976) .................................................................................... 21, 22

*Saunders v. E.I. DuPont de Nemours & Co.*,
   2017 WL 679853 (D. Del. Feb. 17, 2017) ................................................................ 45

*SkyHop Techs. v. Narra*,
   58 F.4th 1211 (11th Cir. 2023) ........................................................................... 34

*Smith v. Mattia*,
   No. 4498-VCN, 2010 WL 412030 (Del. Ch., 2010). .................................................. 48, 51

*SPX Corp. v. Garda USA, Inc.*, No. CIV.A.,
   N10C10162 WCC, 2012 WL 6841398 (Del. Super. Ct. Dec. 6, 2012) ................................. 48

*State, Office of Attorney Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.*,
   869 So.2d 592 (Fla. 1st DCA 2004) ...................................................................... 29

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (1931) ....................................................................................... 26

*Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*,
   No. CV N19C-11-092 PRW CCLD, 2021 WL 117036 (Del. Super. Ct. Jan. 13, 2021) ........... 39

*Taylor v. Birmingham Airport Auth.*,
   2024 WL 4048840 (N.D. Ala. Sep. 4, 2024) ............................................................ 23

*Timm v. Progressive Steel Treating, Inc.*,
   137 F.3d 1008 (7th Cir.1998) ............................................................................. 26

*Tisdale v. Fed. Express Corp.*,
   415 F.3d 516 (6th Cir.2005) ............................................................................... 26

*TocMail Inc. v. Microsoft Corp.*,
No. 20-60416-CIV, 2020 WL 9210739 (S.D. Fla. Nov. 6, 2020) ............................................... 37

*Tolbert v. Queens Coll.*,
242 F.3d 58 (2d Cir. 2001) ............................................................................................. 24, 26

*Town of Cheswold v. Vann*,
9 A.3d 467 (Del. 2010) ........................................................................................................ 43

*Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*,
318 A.3d 450 (Del. Ch. 2024) ............................................................................................ 36

*United States v. Bestfoods*,
524 U.S. 51 (1998) .............................................................................................................. 32

*United States v. Burke*,
504 U.S. 229 (1992) ............................................................................................................ 31

*USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*,
2016 WL 4250668 (S.D. Fla. Apr. 12, 2016) .................................................................... 37

*VIS Holdings Corp. v. Cooper*,
2007 WL 9702900 (S.D. Fla. Dec. 11, 2007) .................................................................... 31

*Vokes v. Arthur Murray, Inc.*,
212 So. 2d 906 (Fla. 2d DCA 1968) .................................................................................. 38

*Watts v. Joggers Run Prop. Owners Ass'n, Inc.*,
133 F.4th 1032 (11th Cir. 2025) .................................................................................. 10, 14

*Weiss v. Swanson*,
948 A.2d 433 (Del. Ch. 2008) ............................................................................................ 51

**Statutes and Rules**

10 Del. C. § 8106 ........................................................................................................................ 52

42 U.S.C. § 1658 ........................................................................................................................ 30

42 U.S.C. § 1981 ................................................................................................................... 20, 21

Fla. Stat. § 48.193 ...................................................................................................................... 29

Fed. R. Civ. P. 8 ................................................................................................................... 10, 45

Fed. R. Civ. P. 12 ....................................................................................................................... 10

x

**INTRODUCTION**

This case is about how Defendants treated Plaintiff Steven D. Miller—and his career—as disposable because of the color of his skin. Plaintiff was recruited by Icahn Capital, LP to execute the firm's signature shareholder activism strategy in what was falsely represented to be a $9.3 billion fund. As part of this activism strategy, Plaintiff staked his reputation on a career-defining investment involving Bausch + Lomb Corporation. But an express agreement between Bausch + Lomb and Icahn Capital to racially discriminate in appointments to Bausch + Lomb's board prevented Plaintiff from effectively prosecuting this activist strategy, while Carl Icahn's concealment of $5.1 billion of debt resulted in the sudden and unforeseen liquidation of this and other investments, an SEC penalty, and the collapse of the firm. In taking these actions, billionaire Carl Icahn acted as if he was above the law with regard to both longstanding federal nondiscrimination law and SEC disclosure regulations. Bausch + Lomb similarly hid the facially unlawful agreement to discriminate in appointments to its board in a "Side Letter" it did not file with the SEC. Plaintiff brought this lawsuit as a last resort: he opposed the Side Letter from the outset and later warned Defendants that their discriminatory conduct violated section 1981. But Defendants refused to heed his warnings and continued to willfully violate the law, severely harming Plaintiff's career in the process. [1]

Plaintiff would have been a director of Bausch + Lomb Corporation but for the fact that he is white. Bausch + Lomb and Bausch Health Companies, Inc. intentionally denied him this opportunity by colluding with their major shareholder Icahn Capital to require that one of its two appointments to Bausch + Lomb's board of directors be "diverse." All involved knew—as was

---

[1] Unless context demands otherwise, the term "Defendants" refers to all Defendants; the term "Bausch Defendants," as used below, means Bausch Health Companies, Inc; Bausch + Lomb Corporation; Thomas Ross; and Christina Ackermann, collectively; and the term "Icahn Defendants" means Icahn Enterprises, L.P. and Icahn Enterprises G.P. Inc. (collectively, "IEP"); Icahn Capital, LP ("Icahn Capital"); Carl Icahn; and Brett Icahn, collectively.

stated in writing—that this would require Icahn Capital to appoint a non-white director. Defendants Christina Ackermann and Thomas "Tom" Ross worked on behalf of Bausch + Lomb and Bausch Health to obtain Icahn Capital's written agreement to this racial discrimination against its preferred candidate.

The agreement worked as designed. Plaintiff, as the Portfolio Manager for Icahn Capital's investment in Bausch Health and Bausch + Lomb, was Icahn Capital's preferred appointee to the board and the obvious choice. He was intimately familiar with Bausch + Lomb and had then served on four other public company boards (with two more to follow). But according to Bausch + Lomb's diversity mandate dictated by Bausch Health, his skin was the wrong color. So, the Defendants conspired to have Icahn Capital withdraw its preferred appointment of Plaintiff and replaced him with Gary Hu, who was "diverse" by virtue of his non-white, Asian heritage.

This was not happenstance. The Bausch Defendants' general counsel Ms. Ackermann knew this racially discriminatory agreement was illegal. But at the direction of Mr. Ross, a Bausch + Lomb board member, she concealed it from the SEC by placing it in a "Side Letter" that Bausch + Lomb never filed. Plaintiff protested to Icahn Capital, arguing the racial discrimination against him violated federal law, but the Icahn Defendants directed him to take one for the team. Defendants' conduct violated 42 U.S.C. § 1981, which bars racial discrimination in contracting (Count I), breached the covenant of good faith in Plaintiff's employment contract (Count II), and tortiously interfered with that contract (Count VI).[2]

Plus, for the Icahn Defendants, the racially discriminatory Side Letter was not the only thing they hid from the SEC nor the only wrong they perpetrated on Plaintiff. Shockingly, the Icahn

---

[2] Plaintiff intends to voluntarily dismiss both his claims against Defendant Gary Hu and his unjust enrichment claims (Count VII).

2

Defendants also failed to disclose to the SEC that their $9.3 billion investment portfolio was funded with the proceeds of massive margin loans of $5.1 billion. They hid the same information from Plaintiff, inducing him to join the firm to manage a portfolio that, due to the undisclosed margin loans, could reliably invest less than half of the amount they represented. And, not surprisingly, when the $5.1 billion in margin loans were made public, they were called by the lenders, forcing Icahn Capital to liquidate investments at deep discounts and triggering an SEC investigation and penalties from the failure to disclose. This caused Plaintiff millions of dollars in harm. Plaintiff thus asserts claims for breach of contract (Count III), fraudulent concealment (Count IV), and fraudulent inducement (Count V) against the Icahn Defendants.

Plaintiff's Complaint easily surpasses the Rule 8 standard for plausible claims. The Complaint outlines Defendants' wrongful conduct against Plaintiff in exquisite detail over the course of a hundred pages, with specific statements, precise dates, and supporting documents. Indeed, because the Complaint is so detailed, Defendants' motion to dismiss pays little attention to its allegations.

Instead of looking at Plaintiff's allegations, Defendants ask the Court to focus on *their* factual contentions about the case. They offer various bluster about "poor performance," for instance, and ask the Court to credit those unsubstantiated charges, rather than heeding Rule 8 and drawing all reasonable inferences in Plaintiff's favor based on the allegations in the Complaint. At most, such defenses raise merits questions for further litigation—not grounds to toss the suit from the outset on a motion to dismiss. And even accepting Defendants' view of the facts, many of their arguments rest on an incorrect view of controlling law. The Court should reject each of them, as follows:

*First*, Defendants' challenge to Plaintiff's claims under section 1981 ignores the allegations of the Complaint and relies on a misreading of the legal standard for causation. Defendants wish

to focus on the hypothetical possibility that "diversity" could have involved discrimination based on other characteristics, but the Complaint pleads facts that show it meant racial discrimination. As Ms. Ackermann said, the Side Letter required appointment of "[w]omen and minorities," and neither Plaintiff nor Mr. Hu is a woman. And in any event, causation under section 1981 requires only that the discrimination based on race be a "but for" cause, and the Complaint amply—and credibly—alleges Plaintiff would have been a board member but for his race. Nor can Defendants cancel out the Side Letter's overt racial discrimination through the fiction that it was rescinded at the same moment the Defendants implemented it by appointing Mr. Hu.

*Second*, Plaintiff adequately alleged his claims for tortious interference with contract. The law does not require that Plaintiff have been contractually entitled to a board seat so long as he alleges—as the Complaint does here—that the Defendants' actions intentionally interfered with a contractual relationship that would have yielded that board seat. The Complaint also alleges that Defendants did interfere with contractual rights he held under his Employment Agreement and asserts numerous facts showing that Defendants were aware that their actions would injure him.

*Third*, Plaintiff pled a sound basis for personal jurisdiction as to each Defendant in this case. Defendants' attempts to escape the Court's jurisdiction largely hinge on their efforts to defeat the intentional tort claims against them. But Plaintiff pleads two intentional tort theories—his section 1981 claims and his tortious interference claims—and Defendants' attempts to dismiss those theories on the pleadings are meritless. That satisfies both Florida statutes and due process requirements for personal jurisdiction.

*Fourth*, Plaintiff properly pled fraud claims against the Icahn Defendants, and their attempts to challenge elements of those claims are meritless. Plaintiff pleads a cognizable fraudulent inducement claim by alleging the Icahn Defendants misrepresented both the size of and plans for their portfolio. He pleads a cognizable fraudulent concealment claim in connection with

the Icahn Defendants' failure to disclose the margin loans, which they had a duty to disclose given their other statements on the subject and because it was material information. And finally, controlling law forecloses the Icahn Defendants' argument that the contact's integration clause bars claims of fraud.

*Fifth*, and finally, Plaintiff properly pled his breach of contract claims against the Icahn Defendants. The Delaware law that controls this issue recognizes that both racial discrimination and fraud in the inducement violate the covenant of good faith and fair dealing. And those claims are timely under the continuing breach doctrine.

The Court should deny the motions to dismiss.

## BACKGROUND

### A.      Plaintiff Joins Icahn Capital and Crafts the Bausch Investment Strategy.

Plaintiff was and is a Florida resident who works at Icahn Capital in Florida as a portfolio manager. Plaintiff joined Icahn Capital in 2020, fresh on the heels of his success at a prior hedge fund, where his compensation averaged $1.5 million per year over a five-year period. Compl. ¶¶ 50–51. He was hired by Carl Icahn and his son Brett Icahn as one of four of the firm's portfolio managers—an activist investor role that had historically earned performance bonuses exceeding $200 million. *Id.* ¶¶ 54–58. Under the terms of Plaintiff's Employment Agreement, governed by Delaware law, that bonus would pay, among other things, 2.0% of the profits and losses attributable to their investments for the firm at its conclusion in 2027. *Id.* ¶¶ 60–64.

In his role as portfolio manager, Plaintiff recommended that Icahn Capital invest in Bausch Health, a publicly traded company. *Id.* ¶ 75. Plaintiff's investment strategy was to use Bausch Health's bond indentures to facilitate a tax-free IPO spinoff of Bausch + Lomb, its "crown jewel" subsidiary. *Id.* ¶¶ 77–78. Doing so would leave Bausch Health with modest assets sufficient to service its debt as well as significant upside from the successful performance of Bausch + Lomb.

5

*Id.* Icahn Capital agreed with Plaintiff's recommendation and made a significant investment in Bausch Health. *Id.* ¶¶ 76, 79.

Implementing this activist investment strategy required Icahn Capital to exert control over the companies it had invested in. To that end, after substantial investment, Icahn Capital negotiated an agreement with Bausch Health that would allow Brett Icahn and Plaintiff to be appointed to its board, which was consummated in March 2021. Compl. ¶¶ 80–81. And Icahn Capital worked to negotiate a similar agreement contemplating the same for Bausch + Lomb upon its spinoff, *id.* ¶¶ 101–105, with the draft and final versions of the agreement naming Brett Icahn and Plaintiff as prospective appointees four separate times. *Id.* ¶¶ 109–11. It was easy to see why Plaintiff was Icahn Capital's preferred choice for the Bausch + Lomb board, given his central role in developing the Bausch investment strategy. *Id.* ¶¶ 151–58.

**B.      Defendants Keep Plaintiff Off the Bausch + Lomb Board Due to His Race.**

It was not to be. Institutional Shareholder Services (ISS), a proxy advisor, adopted a policy to recommend voting against the chair of a public company's governance committee "where the board has no apparent racially or ethnically diverse members." *Id.* ¶¶ 91–93. Both Bausch Health and Bausch + Lomb were acutely aware of the risk that this standard would lead to the ouster of incoming Bausch + Lomb governance committee chair Tom Ross, a non-diverse man. *Id.* ¶¶ 95–99. Plus, Bausch + Lomb had resolved in 2022 "to achieve a target of 30% of [sic] women and/or minority representation on the Board of Directors by the end of 2024." *Id.* ¶ 96.

Unwilling to alter either their racial quotas or the current board composition, Defendants resolved to instead deprive Plaintiff of a board seat. They did so by replacing Plaintiff with a non-white appointee who would meet the quota. This intent was no secret—Christina Ackermann, general counsel for Bausch Health and Bausch + Lomb wrote that "[a]s Brett and Steven know, it is the intention of the [Bausch + Lomb] board to look and engage another female/minority over

6

time." *Id.* ¶ 106. Plaintiff pushed back, unsuccessfully, against this attempt to memorialize racial discrimination as board policy but noted to the Icahn team that the Bausch Defendants "didn't move at all on diversity." *Id.* ¶ 112. Icahn Capital's counsel, referring to the Bausch Defendants, even noted that "I had a snarky cover note written accusing them of racism, but then I thought better of it." *Id.* ¶ 113.

Though Plaintiff was Icahn Capital's preferred candidate for the board, the Icahn Defendants ultimately joined with the Bausch Defendants' insistence to keep Plaintiff off the board because of his race. And so while the formal "Director Appointment and Nomination Agreement" with Icahn Capital had referred to Plaintiff four times as a prospective board appointee, Defendants negotiated a "Side Letter" to that agreement in June 2022 that ultimately excluded him through the following terms:

> **1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(i) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, *if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.*

Compl. ¶ 120 (emphasis added).

The Side Letter thus allowed Icahn Capital to appoint one "diverse" director and one other director. *Id.* ¶ 116. Ms. Ackermann was open about what "diverse" meant: "[w]omen and minorities." *Id.* But she was not open about the Side Letter that modified the Director Appointment and Nomination Agreement—she filed only the latter with the SEC, holding back the Side Letter

that modified its terms in a racially discriminatory manner. *Id.* ¶¶ 122–126. As she explained, "We will attach the agreement (Not the side letter) to the S-1 that we will file." *Id.* ¶ 126.

When Icahn Capital chose to exercise its appointment rights in June 2022, it demanded that Brett Icahn and Plaintiff be seated on the Bausch + Lomb board as contemplated by the Director Appointment and Nomination Agreement. *Id.* ¶ 141. But, as Brett Icahn explained to Plaintiff, Ms. Ackermann and Mr. Ross would not allow it pursuant to the Side Letter because of Plaintiff's race. *Id.* So instead, Icahn Capital nominated Brett Icahn and Mr. Hu—a Chinese American also employed as a portfolio manager with Icahn Capital. *Id.* ¶¶ 145–150. The board cited "furtherance of … Board diversity" as the reason for the appointment. *Id.* ¶ 148. Indeed, given Plaintiff's vastly greater familiarity with the Bausch Investment, merit qualifications could not justify that decision. *Id.* ¶¶ 151–158.

The racially discriminatory decision to keep Plaintiff off the board worked great harm to him. For one, it deprived him of over $5 million in compensation he would have earned over the customary term of a board appointment. *Id.* ¶¶ 202–204. And he was excluded from the supervisory role he would otherwise have had over the investment he had recommended, *id.* ¶¶ 167–176, 193–201, 211–253.

### C.    Icahn Defendants Mislead Plaintiff by Hiding Massive $5.1B Margin Loans.

The Icahn Defendants separately harmed Plaintiff by inducing him to join Icahn Capital through fraud. They convinced him to join as a portfolio manager by misstating their financial resources and concealing $5.1 billion in margin loans Carl Icahn used to capitalize Icahn Capital. During the course of negotiating Plaintiff's Employment Agreement in 2020, Brett Icahn represented that the investment funds that would be deployable under the agreement could be between $9 and $11 billion—numbers that ignored the margin loans and proved to be false. *Id.*

¶¶ 292–299. And when Plaintiff asked for documentary support for these numbers, Brett Icahn referred him to the company's SEC filings, which also did not disclose the margin loans. *Id.*

Unable to reconcile Brett Icahn's representations with the SEC filings, Plaintiff asked to receive private information about the company's finances under an NDA. *Id.* ¶¶ 300–303. At this point, Brett Icahn engaged in affirmative misdirection, rebuffing the request and suggesting that asking for the information revealed a deficiency in Plaintiff's abilities as a securities analyst. *Id.* In fact, Brett Icahn knew his statements were false because of the margin loans. *Id.* ¶¶ 304–308. So did Carl Icahn when he repeatedly ignored the loans in stating the value of the portfolio in internal daily reports. *Id.* ¶¶ 309–313.

The truth didn't come out until years later. In February 2022, the Icahn Defendants first disclosed the existence of the margin loans in securities filings but did not disclose their amount. *Id.* ¶ 258. Three months later, Hindenburg Research published a report criticizing this lack of disclosure and noting that it had taken a short position in Icahn Enterprises stock because of it. *Id.* ¶ 259. In the month following the report, Icahn stock tumbled by 57%. *Id.* ¶ 260.

The stock collapse triggered two other major consequences. First, the SEC initiated proceedings over the failure to disclose the margin loans, issuing cease and desist orders and fining Carl Icahn $500,000 and the company $1.5 million. *Id.* ¶¶ 261–264. And second, the stock collapse caused lenders to call the margin loans, which required Icahn Capital to liquidate huge portions of its portfolio to satisfy the demand. *Id.* ¶¶ 265–273. Ultimately, that included selling all the voting shares of the Bausch Investment at undervalued prices, which triggered Plaintiff's removal from the Bausch Health board per the applicable agreements. *Id.* ¶¶ 274–282.

The Icahn Defendants' misrepresentations and omissions that he would be managing a portfolio twice its actual size injured Plaintiff in many ways. Plaintiff seeks damages to be proven at trial, in amounts represented by, among other things: (1) his benefit of the bargain had the

representations been true, as determined by the performance bonuses previously awarded to portfolio managers; and/or (2) the compensation he would have earned if he joined another firm rather than Icahn Capital.

**LEGAL STANDARD**

To state a claim, Rule 8 requires only that the pleader make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. Thus, surviving a Rule 12(b)(6) motion requires only that the complaint "include enough facts to state a claim to relief that is plausible on its face." *Watts v. Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th 1032, 1039 (11th Cir. 2025) (cleaned up). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Courts must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." *Id.* at 1038–39.

When "a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss," the district court may either "(1) hold an evidentiary hearing before trial to make factual findings about personal jurisdiction or (2) decide the motion to dismiss under a prima facie standard without an evidentiary hearing." *N. Am. Sugar Indus., Inc. v. Xinjiang Goldwind Sci. & Tech. Co.*, 124 F.4th 1322, 1333 (11th Cir. 2025) (quotations omitted). Here, where the Defendants have not submitted evidence to refute personal jurisdiction, the prima facie standard is appropriate. Nevertheless, even if the defendant does submit affidavits, "the district court must construe all reasonable factual inferences in favor of the plaintiff" *Id.* (quotation omitted). And if the district court "applies the prima facie standard and denies the motion to dismiss," the final determination of personal jurisdiction is "deferred until the trial." *AcryliCon USA, LLC v. Silikal GmbH*, 985 F.3d 1350, 1365 (11th Cir. 2021) (quotation omitted).

**ARGUMENT**

**I.      Plaintiff States Prima Facie Claims Under 42 U.S.C. § 1981.**

Plaintiff has alleged ample facts that plausibly support the inference that Defendants discriminated against him because of his race in colluding to exclude him from the Bausch + Lomb board. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts," *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999), and guarantees to all persons "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship" regardless of race, *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 n.2 (11th Cir. 2007) (quoting 42 U.S.C. § 1981)). A claim under section 1981 requires showing that "the plaintiff is a member of a racial" group, "the defendant intended to discriminate on the basis of race," and "the discrimination concerned one or more of the activities enumerated in the statute," i.e., making or enforcing of contracts. *Id.* at 891. The plaintiff must also establish that race was a but-for cause of his injury. *Comcast Corp. v. Nat'l Ass'n of Afr. Am. Owned Media*, 589 U.S. 327, 333 (2020).

"[A] plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1255 (11th Cir. 2012). "Direct evidence is evidence, that, if believed, proves the existence of a fact without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up). Direct evidence sufficient to withstand a motion to dismiss includes "alleg[ations] that the defendant acted pursuant to a facially discriminatory policy requiring adverse treatment based on a protected trait." *Rodriguez v. Procter & Gamble Co.*, 338 F. Supp. 3d 1283, 1287 (S.D. Fla. 2018). Proving discrimination by indirect evidence requires the plaintiff to show he is a member of a protected class, he was subjected to an adverse action, the decisionmaker treated similarly situated individuals who are not members of the protected class more favorably, and he was qualified for

11

the benefit at issue. *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842–43 & n.11 (11th Cir. 2000); *see also McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976) ("[O]ur examination of the language and history … convinces us that § 1981 is applicable to racial discrimination in private employment against white persons."); *Am. All. for Equal Rts. v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 777 n.6 (11th Cir. 2024) (similar).

Plaintiff has plausibly alleged facts that would serve as both direct and indirect evidence of a discriminatory agreement between the Defendants that prevented his appointment as a director of Bausch + Lomb because of his race. This discrimination denied him both race-neutral enjoyment of the benefits, privileges, terms, and conditions of his Employment Agreement with Icahn Capital, and the right to compete on equal terms and not be refused a contract with Bausch + Lomb because of his race. *E.g.*, Compl. ¶¶ 339–74. Here, the allegations of direct evidence of discrimination are alone sufficient to defeat a motion to dismiss. *Rodriguez*, 338 F. Supp. 3d at 1287. And they are only bolstered by the allegations of indirect evidence—that Plaintiff was qualified and preferred by Icahn Capital for the Bausch + Lomb board position but passed over for Mr. Hu because of his race. Compl. ¶¶ 151–158, 348–354. Defendants offered no race-neutral explanation for any of this. *Id.* ¶¶ 157, 190.

Defendants' motions to dismiss, at most, raise defenses for trial—not grounds to dismiss on the pleadings. They argue that factors other than race led Defendants to replace Plaintiff with Mr. Hu as Icahn Capital's appointee to Bausch + Lomb's board. Common MTD, ECF No. 81, at 9–13.[3] They also insist the Side Letter was not a but-for cause of Plaintiff's injury because it was not legally in effect when Mr. Hu was appointed, and that Plaintiff's chance to be a Bausch + Lomb

---

[3] All citations to pages in the Defendants' motions to dismiss (ECF Nos. 75 (Icahn Defendants and Mr. Hu), 80 (Bausch + Lomb Corporation, Mr. Ross, and Ms. Ackermann), and 81 (Common) are to the page numbers appearing at the bottom of the page rather than the top right corner.

director was merely a speculative business opportunity. *Id.* at 13–15. And the Icahn Defendants add, in the alternative, that they lacked intent to discriminate because they had no racial animus. Icahn MTD, ECF No. 75 at 13–14, 17. Each of these arguments fundamentally misapply the applicable legal standards, particularly on a motion to dismiss, and ignore Plaintiff's detailed factual allegations.

### A.    Race Caused Plaintiff's Exclusion from the Board.

Defendants argue Plaintiff has not adequately alleged that race was a but-for cause of the decision to deny him a seat as a Bausch + Lomb director. Common MTD, ECF No. 81 at 9–12; Icahn MTD, ECF No. 75 at 9. But that argument is untenable for several reasons. To begin, the Complaint pleads detailed factual allegations that describe how Defendants appointed Mr. Hu instead of Plaintiff *precisely because of his race*. They did so to comply with the ISS quota for racially diverse boards. And Ms. Ackermann specifically stated that diverse meant minority (non-white) and female, when there were no female candidates.

Plus, in any event, Defendants' argument is premised on a misapplication of the causation standard. Though section 1981 claims employ a but-for causation standard, Defendants would have the Court apply a "sole cause" standard that allows them to discriminate so long as it is "not solely race-based." ECF No. 81 at 12. Defendants thus claim that by engaging in *more* (unlawful) discrimination, such as on the basis of sex, they can escape liability. That is not the law. Plaintiff needs only to allege that race was *a* but-for cause, which is exactly what he pleads.

#### 1.    The Complaint Alleges Overt Racial Discrimination.

The Complaint amply pleads racial discrimination under any standard. Its allegations foreclose the notion that Bausch + Lomb would have accepted a white appointee with non-racial "diverse" characteristics. As the Complaint explains, the Bausch Defendants were determined to meet ISS racial diversity guidelines. Compl. ¶ 98, Ex. G at 74. And those guidelines required

Defendants to appoint at least one non-white director to Bausch + Lomb's board or else ISS would recommend shareholders vote against retaining Bausch + Lomb's nominating and governance committee chair, Mr. Ross. *Id.* And to make the point even more clear, Defendants defined the term "diverse" in correspondence to mean only "[w]omen and minorities," when there were no female candidates. Compl. ¶ 116. Given these allegations, only a non-white director would assuage this driving concern, and Plaintiff was not the correct race. At the motion to dismiss stage, the Court must credit the truth of these allegations and draw all reasonable inferences in Plaintiff's favor. *Joggers Run Prop. Owners Ass'n, Inc.*, 133 F.4th at 1038–39. Those allegations plausibly show overt racial discrimination under any standard, and the Court need not even consider Defendants' causation arguments to deny their motion to dismiss.

### 2.  *Defendants Misconstrue But-For Cause as "Sole Cause."*

In any event, Defendants' causation arguments are meritless. They misstate the causation standard as allowing them to discriminate based on race, so long as race was one of multiple reasons for discrimination—in other words, so long as they do not discriminate against all people of that race. As the Bausch Defendants put it, they would have accepted the appointment of a white "woman, religious minority, gay person, person with disabilities, or even a person with non-traditional business experience." Common MTD, ECF No. 81 at 9. This argument misses the mark and does nothing to refute Plaintiff's claim that he would have been appointed if he were another race.

The Supreme Court has been clear that section 1981 "directs our attention to the counterfactual" by asking "what would have happened if the plaintiff had been" of a different race. *Comcast Corp.*, 589 U.S. at 333. "[I]f the defendant would have responded differently but for the plaintiff's race, it follows that the plaintiff has not received the same right" that section 1981 guarantees to all persons regardless of race. *Id.* Plaintiff plausibly alleges that Defendants would

have made him a Bausch + Lomb director if he were not white. Defendants never dispute this. The fact that Defendants discriminated in many other, often illegal ways is irrelevant.

Courts in this District have rejected attempts to impose a more stringent "sole cause" standard. In *Rodriguez v. Procter & Gamble Co.*, 338 F. Supp. 3d 1283 (S.D. Fla. 2018), for example, the court observed "it is well established that plaintiff need not allege discrimination against the whole class to establish a section 1981 claim." *Id.* at 1287. In that case, the defendant refused to hire the plaintiff because he was an alien with only temporary authorization to work in the United States. *Id.* at 1284–85. The plaintiff alleged discrimination on the basis of alienage, and the defendant responded that it did not discriminate against aliens because it only refused to hire aliens with temporary immigration statuses. *Id.* at 1286. This court rejected that defense because discrimination "against a subclass of lawfully present aliens" is still discrimination on the basis of alienage under section 1981. *Id.* at 1287. It is no excuse that Defendants discriminate only against white people they do not consider otherwise "diverse," including Plaintiff.

Defendants try to mask their unsupported "sole cause" standard by suggesting race must be "the" but-for cause. See Common MTD, ECF No. 81 at 9 ("Race Was Not the But-For Cause"), 14 ("the Side Letter could not have been the but-for cause"); Icahn MTD, ECF No. 75 at 9 ("B+L's Board Diversity Policy" if "improper" … "was the but-for cause of Plaintiff's injury"). But courts uniformly reject the notion that multiple bases for discrimination means there is no discrimination at all. Both the Supreme Court and the Eleventh Circuit "have made clear, there can be multiple but-for causes." *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181, 1200 (11th Cir. 2024) (listing cases); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020) ("Often, events have multiple but-for causes."). Even if Defendants are right that Plaintiff was excluded from the Bausch + Lomb board because of his sex, sexual orientation, religion, and other characteristics, Defendants are still liable because they also "would have responded differently" if Plaintiff were a different race. *Comcast*

15

*Corp.*, 589 U.S. at 333; *see also Bostock*, 590 U.S. at 656 ("the traditional but-for causation standard means a defendant cannot avoid liability just by citing some *other* factor that contributed to its challenged employment decision.").

Defendants' other causation argument merely restates their first—that the Side Letter was not racially discriminatory because it discriminates only against a subclass of white people by considering sex, religion, disability, and other characteristics as well. *E.g.*, Common MTD, ECF No. 81 at 9 ("regardless of race, a woman, religious minority [etc.] … could have been nominated in compliance with the express language of the Diversity Policy"). Even if this view of the facts, which falls outside the allegations of the Complaint, were true, it would still not be a legal defense—it does not refute the allegations that race was among the but-for causes of Plaintiff's exclusion. The Side Letter clearly espouses "a facially discriminatory policy requiring adverse treatment based on a protected trait," and Plaintiff alleges the "defendant[s] acted pursuant to" that policy. *Rodriguez*, 338 F. Supp. 3d at 1287. As such, the Side Letter alone sustains Plaintiff's claim under section 1981. *Id.*

**B.      The Side Letter's Legal Effect on Day of Mr. Hu's Appointment Is Irrelevant.**

Defendants next try to avoid the damning contents of the Side Letter by arguing that it could not have harmed Plaintiff because they rescinded it simultaneous with appointing Mr. Hu as a director. Common MTD, ECF No. 81 at 13–14. This argument is too cute by half. Under Defendants' reading, parties could always avoid liability for an agreement that calls for blatant racial discrimination so long as they agree to make it technically void at the same moment they implement the discrimination it requires. As the Complaint alleges, all parties had already acted on the Side Letter prior to Mr. Hu's official appointment. Regardless of Defendants' superficial claim to have voided the agreement after its purpose was accomplished, the Side Letter directed and is evidence of Defendants' discriminatory actions and intent.

16

### 1.      *Icahn Capital Withdrew Plaintiff's Appointment Under the Side Letter.*

The Side Letter caused Plaintiff injury, regardless of whether it was legally effective on the day of Mr. Hu's appointment or thereafter. Icahn Capital withdrew Plaintiff as its appointed Bausch + Lomb director, and substituted Mr. Hu in his place, because of the Bausch Defendants' insistence that Icahn Capital comply with the discriminatory Side Letter. *See* Compl. ¶¶ 104–127, 141–148. The Bausch Defendants insisted on the Side Letter, and the Icahn Defendants acted on it. Moreover, Icahn Capital made this race-based substitution *before* the Side Letter was allegedly extinguished. Compl. ¶¶ 141-150. So if the Side Letter were extinguished after the discriminatory act was a *fait accompli*, it would not be any less a but-for cause of the discriminatory harm to Plaintiff. The Side Letter expressly made Plaintiff unacceptable on account of his race and thus provides direct evidence of discrimination. *Rodriguez*, 338 F. Supp. 3d at 1287. This alone establishes a prima facie claim under section 1981.

### 2.      *Defendants' Correspondence Supports the Section 1981 Claim.*

In addition, Plaintiff pled other facts showing discrimination independent of the Side Letter or its purported legal effect. Emails attached to the Complaint show that all relevant actors knew Icahn Capital wanted and intended to appoint Plaintiff. *See* Compl. ¶ 105, Ex. G at 173 (email from Ms. Ackermann referring to Plaintiff and Brett Icahn as Icahn Capital's intended appointees). And Icahn Capital's general counsel understood the Side Letter as an effort to make Icahn Capital "commit now to only designate non-white male directors." Compl. ¶ 112, Ex. G at 293. Everyone knew there were no female candidates, *see id.* ¶ 117, so the Bausch Defendants were knowingly demanding that Icahn Capital engage in "racism," as Icahn Capital's general counsel put it, *id.* ¶ 113, Ex. G at 294. Or, as Brett Icahn told Plaintiff, Plaintiff could not be appointed because of his race. Compl. ¶ 141.

Defendants offer a hypothetical argument about what they think "would have" happened had the "Original DANA" (that is, the Director Appointment and Nomination Agreement between Icahn Capital and Bausch + Lomb) not been amended. Common MTD, ECF No. 81 at 14 n.7. But this motion turns on the factual allegations of the Complaint, not Defendants' hypotheticals. And in any event, Defendants' argument is irrelevant because the agreement *was* amended. As Defendants acknowledge, "[t]he Amended DANA was executed on June 21, 2022." Common MTD, ECF No. 81 at 13. Plaintiff's allegations are more than enough to establish race discrimination.

**C.**      **Defendants Denied Plaintiff a Race-Neutral Employment Agreement.**

Defendants next argue that Plaintiff does not establish a section 1981 claim because he was required "to plead that he had any contractual right to a B+L Board seat." Common MTD, ECF No. 81 at 14. That argument fails for two reasons. First, Plaintiff alleges that Defendants' discriminatory actions denied him race-neutral benefits and enjoyment of the terms of his Employment Agreement with Icahn Capital. Second, and independently, Plaintiff alleges that Defendants' discriminatory actions caused Bausch + Lomb's refusal to form a contract with him to serve on its board. It does not matter, as Bausch Health argues, that some of the responsible Defendants were not parties to the contracts at issue, Bausch MTD, ECF No. 82 at 8, because Eleventh Circuit has squarely held that a third party is still liable under section 1981 for its discriminatory interference with a contract. *See, e.g.*, *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1172 (11th Cir. 2016); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975).[4]

---

[4] Nor is Plaintiff seeking to hold Bausch Health "vicariously liable for any actions taken by Ms. Ackermann or Mr. Ross on behalf of Bausch + Lomb." ECF No. 82 at 7. In addition to acting for Bausch + Lomb, Ms. Ackermann discriminated as general counsel of Bausch Health and Mr. Ross as a director of Bausch Health. *See infra* § II.

### 1.    *Defendants Interfered with Plaintiff's Employment Agreement.*

The Complaint alleges Icahn Capital treated Plaintiff differently under the terms of his Employment Agreement because of his race, including by choosing Plaintiff as its board appointee under the terms of their Employment Agreement, and then colluding to withdraw Plaintiff's appointment because of his race. This is classic interference with contract. A plaintiff states a section 1981 claim by pleading that "the defendant would have responded differently" under the terms of a contract "but for the plaintiff's race." *Comcast Corp.*, 589 U.S. at 333; *cf. Foster v. Echols Cnty. Sch. Dist.*, 169 F.4th 1291, 1298 (11th Cir. 2026) (holding defendants violate a plaintiff's "equal right to enjoy the 'benefits' of their contractual relationship" when the defendants' "conduct denied her the benefit of her bargain" "because of [her] race"). Here, Plaintiff was eligible to become a director at Bausch + Lomb under the terms of his Employment Agreement, and he had a reasonable expectation of that appointment. Compl. ¶ 2. Moreover, Icahn Capital put Plaintiff forward as the appointee to the Bausch + Lomb board.

Defendants cannot interfere with Plaintiff's contract by denying him benefits because of his race. Defendants suggest that an employer could blatantly discriminate on the basis of race in any decision about an employee that involves even the slightest degree of discretion—including promotions, raises, bonuses, work hours, etc. That outcome is too absurd to take seriously. *See Robinson v. Orange Cnty.*, Fla., No. 6:05-CV-717-ORL31DAB, 2006 WL 1678967, at *7 (M.D. Fla. June 16, 2006) (rejecting argument that "any employer could discriminate in any phase of the decision-making process … and then mask that discrimination by simply claiming that the employee was not qualified"). As laid out in the Complaint, had Plaintiff not been white, Icahn Capital would have selected Plaintiff under the terms of their Employment Agreement. In other words, they "would have responded differently but for the plaintiff's race." *Comcast Corp.*, 589 U.S. at 333.

19

In addition, as noted above, one of the Employment Agreement's terms is that "Employee may … be requested by Employer … to act as an officer, director, advisor or agent to other entities … and Employee agrees that he will do so." Compl., Ex. C at 2. That Icahn Capital confirmed it "may" request Plaintiff to serve as a director does not diminish its obligations under the implied covenant of good faith and fair dealing. *See Oxbow Carbon & Minerals Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC,* 202 A.3d 482, 504 n.92 (Del. 2019) (the permissive "may" encompasses an "obligation to use that discretion consistently with the implied covenant of good faith and fair dealing.") (quoting *Miller v. HCP Trumpet Invs., LLC*, 2018 WL 4600818, at *1–2 (Del. Sept. 20, 2018)). And race-based discrimination violates that covenant and interferes with the relevant contract. *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005).

Indeed, Icahn Capital invoked this term. It requested Plaintiff to serve as a director on Bausch + Lomb's board—Icahn Capital wrote Plaintiff's name four times into the Appointment Agreement, Compl. ¶ 152, and Brett Icahn demanded that Bausch + Lomb seat Plaintiff on its board, Compl. ¶ 141. But Defendants' subsequent agreement to withdraw Plaintiff's appointment because of his race, or otherwise not consider or select him for that position, unlawfully deprived him of "the enjoyment of" these contract "terms" as a person of another race would have experienced them, such as Mr. Hu. 42 U.S.C. § 1981(a). Had Plaintiff not been white, Icahn Capital would not have withdrawn Plaintiff's nomination to the Bausch + Lomb board after putting him forward pursuant to this term. Defendants therefore violated Plaintiff's "equal right to enjoy" this contractual term, *Foster*, 169 F.4th at 1299, regardless of whether the Employment Agreement expressly *required* Icahn Capital to appoint Plaintiff.

2.     *Defendants Refused Plaintiff the Ability to Contract with Bausch + Lomb.*

The Complaint also alleges that Defendants interfered with Plaintiff's right to contract with Bausch + Lomb for service on its board of directors because of his race. Section 1981 prohibits

the interference of a person's right "*to make* and enforce contracts" because of race. 42 U.S.C. § 1981(a) (emphasis added). The Supreme Court and Eleventh Circuit have been clear that "a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006); *see also Am. All. for Equal Rts.*, 103 F.4th at 776. Refusing to contract with someone because of race is "a classic violation of § 1981." *Runyon v. McCrary*, 427 U.S. 160, 172 (1976); *Faraca*, 506 F.2d at 958 (explaining that section 1981 applies to "racially based interference with prospective contract rights, otherwise" it "could be thwarted in many instances by the expedient of refusing to contract with" people of a disfavored race); *Nunez v. First Union Nat. Bank of Fla.*, 996 F.2d 287, 289 (11th Cir. 1993) (section 1981 "prohibits … a racially discriminatory refusal to contract or the offer of contracting only on discriminatory terms"); *Busby v. City of Orlando*, 931 F.2d 764, 771 n.6 (11th Cir. 1991) (holding section 1981 enables "actions for *refusal to enter into* a contract because of race") (emphasis original). Plaintiff's allegations here are no different.

Icahn Capital selected Plaintiff as one of its appointees to the Bausch + Lomb board. Compl. ¶¶ 109, 111. Plaintiff would have contracted to serve as a Bausch + Lomb director, at Icahn Capital's behest, but Bausch + Lomb refused to contract with Plaintiff and demanded that the Icahn Defendants appoint a non-white director instead. *See, e.g.*, *id.* ¶¶ 343, 346. The Icahn Defendants agreed, substituted the non-white Mr. Hu for Plaintiff as a board appointee, and thereby precluded Plaintiff from contracting with Bausch + Lomb to serve on its board of directors. *Id.* ¶¶ 343–47. This plainly violates section 1981. *Runyon*, 427 U.S. at 172.

Defendants wrongly characterize Plaintiff's harm as "'too speculative,'" and assert that the thwarted contract with Bausch + Lomb was "nothing more than a 'potential business opportunity.'" Common MTD, ECF No. 81 at 15 (quoting *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1310

21

(11th Cir. 2010), and *Adem v. Jefferson Mem'l Hosp. Ass'n*, No. 411-CV-2102-JAR, 2012 WL 5493856, at *3 (E.D. Mo. Nov. 13, 2012)). But once Icahn Capital selected Plaintiff to serve on the Bausch + Lomb board, his appointment became more than a speculative business opportunity. And the *only* reason the Bausch Defendants refused to contract with Plaintiff was because of his race. *See* Compl. ¶¶ 104–127, 141–148. Defendants' logic would make it impossible to prove a refusal-to-contract claim, since it would require that the contract was actually finalized. Nothing in section 1981 supports this view and Defendants offer no case law to support it. Instead, precedent unequivocally rejects it. *See, e.g.*, *Domino's Pizza*, 546 U.S. at 476; *Runyon*, 427 U.S. at 172; *Am. All. for Equal Rts.*, 103 F.4th at 776; *Faraca*, 506 F.2d at 958; *Nunez*, 996 F.2d at 289; *Busby v. City of Orlando*, 931 F.2d at 771 n.6.

The two cases Defendants do cite are inapposite because they do not concern refusal to contract. *Jimenez* and *Adem* both involved claims by doctors against hospitals that terminated their admitting privileges after discovering the doctors had engaged in repeated inappropriate patient treatment. *Jimenez*, 596 F.3d at 1307–08; *Adem*, 2012 WL 5493856, at *1. The courts held that those doctors could not base section 1981 claims on "future contracts [they] might have formed with patients admitted after [their] suspension," *Jimenez*, 596 F.3d at 1310; *see Adem*, 2012 WL 5493856, at *4, or unidentified "business opportunities with colleagues," *Adem*, 2012 WL 5493856, at *4. Critically, the doctors "failed to identify any contract [t]he[y] attempted to enter or maintain," *id.* at *4; *see Jimenez*, 596 F.3d at 1307–12, and were refused because of their race. By contrast, Plaintiff identified a contract he attempted to enter—a contract with Bausch + Lomb to serve on its board—which Icahn Capital made nonspeculative by selecting Plaintiff as a board appointee, that the Bausch Defendants refused to contract with him for that position because of his race, and that Icahn Capital withdrew his appointment. Compl. ¶¶ 141–49, 343–47.

22

**D.      Icahn Capital Intended to Discriminate Against Plaintiff Based on His Race.**

The Icahn Defendants argue in the alternative that they are not liable under section 1981 because they lacked any race-based ill will and thus did not intend to racially discriminate against Plaintiff. Icahn MTD, ECF No. 75 at 8–9. The Eleventh Circuit has squarely rejected this argument as well: in answering the "whether a defendant who acts with no racial animus but makes job assignments on the basis of race can be held liable for intentional discrimination under § 1981," the Eleventh Circuit held "[c]learly, the answer is yes." *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472–73 (11th Cir. 1999). The Icahn Defendants' intent to discriminate establishes a section 1981 claim even if it turns out, as they insist, that their intent was reluctant.

The Icahn Defendants argue the opposite by citing another district court's characterization of the legal standard as "purposeful, intentional discrimination," *Taylor v. Birmingham Airport Auth.*, 2024 WL 4048840, at *4 (N.D. Ala. Sep. 4, 2024), and then claiming this requires pleading racial animus, malice, or ill-will. Icahn MTD, ECF No. 75 at 8–9. But nothing in that case so holds. Defendants' intent to replace Plaintiff with a non-white appointee is all the law requires. *See, e.g.*, *Ferrill*, 168 F.3d at 472–73.

Finally, the Icahn Defendants try to mischaracterize Plaintiff as alleging a mere failure to protect him from the Bausch Defendants' discrimination. Icahn MTD, ECF No. 75 at 9. That is false. The Complaint alleges that the Icahn Defendants *agreed in writing* to participate in racial discrimination. Plaintiff has squarely alleged that by entering and executing the Side Letter—or following the terms of the Side Letter even if it was not binding—the Icahn Defendants (not some third party) intentionally withdrew Plaintiff as their director appointee because of his race and selected Mr. Hu instead. *Ferrill*, 168 F.3d at 472–73. This is more than enough for section 1981.

23

### E.       Damages from the Section 1981 Violation are Well-Pleaded.

Defendants argue there is no "plausible connection between the allegedly discriminatory conduct" and "supposed damages," making the section 1981 claim "defective as a matter of law." Common MTD, ECF No. 81 at 20. But the Complaint outlines a detailed path to proving multiple theories of damages. The law does not allow the defendants to profit from their own wrongdoing by claiming it is too "speculative" to estimate the damages caused by their discriminatory exclusion of Plaintiff. And because Plaintiff can "prov[e] a civil rights violation" under "Section 1981," he is at least "entitled as a matter of law to an award of nominal damages." *Tolbert v. Queens Coll.*, 242 F.3d 58, 74, 69, 74 (2d Cir. 2001). Thus Plaintiff's section 1981 claim is assuredly not "defective as a matter of law" for want of damages. Common MTD, ECF No. 81 at 20.

### 1.       *The Complaint Pleads Several Bases for Relief.*

Plaintiff alleges several harms that directly result from Defendants' section 1981 violation. First, Mr. Hu received $993,255 in Bausch + Lomb board fees that would have gone to Plaintiff. Compl. ¶ 202. Second, Plaintiff would have earned "$5,250,000 over a typical fifteen-year term" on the Bausch + Lomb board. *Id*. ¶ 204.[5] Third, Bausch + Lomb lowered its 2026 earnings forecast by a vast amount while Plaintiff was excluded from its board, which directly resulted in a multi-million-dollar bonus reduction for Plaintiff. *Id.* ¶ 221. The majority of this profit reduction could have been offset by two specific projects identified in the Complaint, where Mr. Hu failed to implement Plaintiff's margin-improvement strategy and his opposition to a material acquisition. *Id.* ¶¶ 229–242. Fourth, Plaintiff was deprived of information essential to his performance as an activist Portfolio Manager, which harmed his actual and perceived value proposition and career at

---

[5] Such an expected tenure had precedent at Icahn Capital even when the applicable appointment agreements lapsed. Compl. ¶ 68. Bausch + Lomb's decision not to retain Mr. Hu beyond August 2025 speaks only to its appraisal of Mr. Hu's merits. *Id.* at 282.

Icahn Capital. *Id.* ¶ 253. Fifth, the section 1981 violation interfered with an employment contract in which Plaintiff had a $235 million expectation interest and for which two similarly situated comparators were paid $223 million each. *Id*. ¶ 369. Sixth, the resulting poor investment performance harmed Plaintiff's "investment track record and industry reputation." *Id.* ¶ 371. Seventh, the lost board seat deprived Plaintiff of its attendant "recognition and business relationships." *Id.* ¶ 371. Eighth, this caused emotional harm to Plaintiff, *id.* ¶ 374, and ninth, it warrants punitive damages due to Defendants' actions with malice or reckless indifference, *id.* ¶ 355–360.

Defendants argue that Plaintiff had other indirect levers with which he could have prevented or mitigated his damages. Common MTD, ECF No. 81 at 20. But Plaintiff's "separate and inherently unequal" Bausch Health board seat had limited oversight over Bausch + Lomb, which Plaintiff called "inadequate." Compl. ¶¶ 243–247. Using Gary Hu and Brett Icahn as proxies was ineffective. *Id.* ¶¶ 248–252. Moreover, Plaintiff had no obligation to mitigate damages through performing a "demeaning" role. *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982). Plaintiff described the arrangement as "the most humiliating and infuriating event in my entire career." Compl. ¶ 185. He complained in writing that it violated federal law. Compl. Ex. B.

2.      *Wrongdoer Rule Applies to Damages Uncertainty Caused by Defendants.*

Defendants argue it is too "speculative" to calculate damages based on "what *could* have happened had [Plaintiff] been nominated." Common MTD, ECF No. 81 at 19. But this self-inflicted uncertainty is precisely what the so-called "wrongdoer rule" is meant to address.

"[W]here the wrong is of such a nature as to preclude exact ascertainment of the amount of damages, plaintiff may recover upon a showing of the extent of the damages as a matter of just and reasonable inference, although the result may be only an approximation." *Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.*, 543 F.2d 1107, 1110-11 (5th Cir. 1976) (quotation

omitted). "The wrongdoer may not complain of inexactness where his actions preclude precise computation of the extent of the injury." *Id.* at 1111 (quotation omitted). "[T]he wrongdoer is not entitled to complain" when "he alone is responsible" for the uncertainty, but rather "the risk of the uncertainty should be thrown upon the wrongdoer." *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) (quotation omitted).

The same principle also applies to the equitable remedies Plaintiff seeks. When awarding backpay, "uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer." *EEOC v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1376 (S.D. Fla. 1998) (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir. 1974)).

   3. *Section 1981 Claims Cannot Be Dismissed for Lack of Actual Damages.*

Finally, Plaintiff's section 1981 claim would still be sufficient even if he had not identified any pathway to prove actual damages. When a plaintiff "has proven a civil rights violation" under "Section 1981," he "is entitled as a matter of law to an award of nominal damages." *Tolbert v. Queens Coll.*, 242 F.3d 58, 74, 69, 74 (2d Cir. 2001). So, a facially plausible section 1981 claim such as Plaintiff's cannot be dismissed for lack of actual damages. Moreover, at least three circuits have held that a jury may award punitive damages for a section 1981 violation that results in only nominal damages. *See Tisdale v. Fed. Express Corp.,* 415 F.3d 516, 534–35 (6th Cir.2005); *Cush–Crawford v. Adchem Corp.*, 271 F.3d 352, 359 (2d Cir.2001); *Timm v. Progressive Steel Treating, Inc.,* 137 F.3d 1008, 1010–11 (7th Cir.1998) (Easterbrook, J.). Thus, the amount of Plaintiff's damages is a jury question, not a basis for dismissal.

## II.      Plaintiff Properly Pleaded Tortious Interference Claims.

Defendants make three attacks on Plaintiff's tortious interference claims. But at most, they raise factual questions for the jury—not legal grounds to dismiss the Complaint. The Court should reject them all.

*First*, Defendants argue that the tortious interference claims fail because, they say, Plaintiff's Employment Agreement "did not provide [him] with any contractual right to a B+L Board seat." Common MTD, ECF No. 81 at 18. This is both legally and factually mistaken. For one, Florida holds that even an "unenforceable agreement" involving "prospective legal or contractual rights" can sustain a tortious interference claim so long as "the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (quotations omitted). And for another, the Complaint alleges several actual contractual rights that Defendants interfered with. They induced the breach of "the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement," denied Plaintiff "the Bausch + Lomb director position that he otherwise would have received," and "substantially reduced Plaintiff's profits-based compensation under the Employment Agreement." Compl. ¶ 433. Whether Defendants infringed those rights is a question for the jury.

*Second*, the Court should reject the meritless contention of the Bausch Defendants that they could not have known about Plaintiff's Employment Agreement because the Icahn Defendants represented that the Side Letter complied with the law. Common MTD, ECF No. 81 at 18–19. Whether the Icahn Defendants made those representations is wholly immaterial to whether the Bausch Defendants knew about the Employment Agreement from other sources—as alleged by the Complaint, through the imputed knowledge of Ms. Ackermann and Mr. Ross. Compl. ¶¶ 437–438. At most, the Side Letter's false representations about legal compliance give the Bausch

27

Defendants claims against the Icahn Defendants. But they do not excuse the Bausch Defendants from liability to Plaintiff.

*Third*, Bausch Health tries but fails to brush aside the following specific allegations about its knowledge of Plaintiff's employment relationship with the Icahn Group:

➢ On February 22, 2021, Plaintiff "disclosed his employment with Icahn Capital in Bausch Health's directors' and officers' questionnaire," including that his "compensation may be affected by the performance of the Icahn entities' investment" in Bausch. Compl. ¶¶ 82, 434.

➢ Ms. Ackermann, as general counsel of Bausch Health, read that disclosure because she replied to the email containing the questionnaire. *Id.* ¶ 434.

➢ Bausch Health, "advised by outside activist-defense bankers and law firms," knew of "the profit-based terms of Plaintiff's employment," which were publicly disclosed in an October 2020 press release and Form 8-K filing. *Id.* ¶ 437.

➢ Bausch Health had this knowledge at the time Gary Hu was appointed to the Bausch + Lomb board, thereby interfering with Plaintiff's Employment Agreement. *Id.* ¶ 436.

Trying to characterize these detailed allegations as "threadbare recitals of a cause of action's elements" is simply not colorable. *See* Bausch MTD at 9 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Bausch Health does not cite a single case that has ever held that such particularized factual allegations of the source and date of a defendant's knowledge failed to state a claim for tortious interference. The Court should decline to impose additional hurdles found nowhere in the Federal Rules or applicable caselaw.

### III.    This Court Has Personal Jurisdiction Over All Defendants.

Defendants Bausch Health, Bausch + Lomb, Ms. Ackermann, and Mr. Ross argue that Florida's long-arm statute and federal due process preclude asserting personal jurisdiction over them. But their effort to defeat personal jurisdiction largely hinges on their merits arguments against the section 1981 and tortious interference claims. Florida's corporate shield doctrine does not limit personal jurisdiction over such intentional torts. And for the same reasons, due process

recognizes that a defendant who commits intentional tortious acts is subject to suit in the state where he should know those acts will cause harm. Personal jurisdiction is proper under Fla. Stat. § 48.193(1)(a)(2) and the due process clause, and the Court should deny the motion to dismiss.

### A.      The Corporate Shield Doctrine Does Not Apply Here.

Ms. Ackermann and Mr. Ross argue that Florida's corporate shield doctrine precludes the Court from asserting personal jurisdiction over them based on actions they took outside Florida on behalf of their corporate employers. But they concede that "the corporate shield doctrine typically does not prevent the exercise of jurisdiction over a defendant alleged to have committed an intentional tort." B+L, Ross, & Ackermann MTD, ECF No. 80 at 4 (citing *LaFreniere v. Craig-Myers*, 264 So. 3d 232, 238 (Fla. 1st DCA 2018)). And Plaintiff alleges two such claims here: (1) Defendants' violation of section 1981; and (2) tortious interference with business relationships. The corporate shield doctrine thus does not exempt any Defendant from the Court's jurisdiction.

Intentional torts by individual defendants defeat the rationale of the corporate shield doctrine. That doctrine rests on the premise "that it may be unfair" to require an individual to defend an action where "his only relevant contacts are acts performed totally outside the forum state and not for his own benefit but for the exclusive benefit of his employer." *Kitroser v. Hurt*, 85 So. 3d 1084, 1088 (Fla. 2012); *accord LaFreniere*, 264 So. 3d at 237. But the doctrine does not apply to cases that allege intentional torts: if wrongful conduct is "aimed at a Florida resident," even if it is "committed outside of Florida," then the defendant should "reasonably anticipate being haled into court in Florida." *LaFreniere*, 264 So. 3d at 238 (quotation omitted); *accord State, Office of Attorney Gen., Dep't of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So.2d 592, 597 (Fla. 1st DCA 2004). Such conduct is "calculated to inflict a direct injury upon a resident of Florida" because it is done with knowledge "that it would have a potentially devastating impact upon the victim" in Florida. *LaFreniere*, 264 So. 3d at 239 (quotation omitted).

Both Plaintiff's Section 1981 claim and his tortious interference claim fit this standard. Plaintiff's section 1981 claim alleges that all Defendants acted intentionally to seat Gary Hu on the Bausch + Lomb board based on his race, knowing that it would deprive Plaintiff, a Florida resident, of that same seat and the benefits that flow from it. *See* Compl. ¶¶ 344–346. And his tortious interference claim alleges that Bausch Health, Bausch + Lomb, Ms. Ackermann, and Mr. Ross intentionally interfered with his Employment Agreement "by insisting on execution and enforcement of a racially discriminatory covenant in the side letter," *id.* ¶ 433, knowing it would harm Plaintiff in Florida. *Id.* ¶¶ 436–445. These allegations of intentional torts amply state a basis for personal jurisdiction.

Defendants do not even dispute that Plaintiff has pleaded facts for his section 1981 and tortious interference claims showing that they acted intentionally, knowing the potential devastating impact on him. Instead, they offer only technical legal rebuttals. None has merit.

*First*, Defendants mistakenly contend that a section 1981 claim is not an exception to the corporate shield doctrine. They say that "only" tort claims, and not statutory claims, "trigger the exception to the corporate shield doctrine." B+L, Ross, & Ackermann MTD, ECF No. 80 at 4 n.2. But they do not cite any case for that critical contention. It's easy to see why: the federal courts have uniformly construed section 1981 claims under "the law of torts." *Comcast Corp.*, 589 U.S. at 329–30. In fact, in *Goodman v. Lukens Steel Company*, the Supreme Court held that the statute of limitations for Section 1981 claims should be evaluated under state-law principles applicable to tort claims, rather than contract claims. 482 U.S. 656, 661 (1987), *superseded by statute on other grounds*, 42 U.S.C. § 1658. As other Justices later explained, *Goodman* held that "42 U.S.C. § 1981 actions sound in tort," *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 169 (1987) (Scalia, J., concurring), and recognized that "the tort-like nature of a § 1981 claim was

30

clear." *United States v. Burke*, 504 U.S. 229, 251 (1992) (O'Connor, J., dissenting). And for the same reasons, the Eleventh Circuit has applied the statute of limitations "for personal injury torts" to claims under Section 1981. *Moore v. Liberty Nat. Life Ins. Co.*, 267 F.3d 1209, 1219 (11th Cir. 2001). Plaintiff's Section 1981 claim is thus not subject to the corporate shield doctrine.

*Second*, as to tortious interference, Defendants' jurisdictional arguments offer little more than a rehash of their merits arguments. They do not dispute that a tortious interference claim is not subject to the corporate shield doctrine, but contend that "that claim fails as a matter of law, … so the exception does not apply." B+L, Ross, & Ackermann MTD, ECF No. 80 at 4. In fact, Defendants' attempts to dismiss the tortious interference claim are meritless, *see supra* § II, and so is their attempt to frustrate personal jurisdiction on that basis.

*Third*, Defendants argue that Florida's corporate shield doctrine requires Plaintiff to allege Ms. Ackermann's actions "were taken for [her] own personal benefit." B+L, Ross, & Ackermann MTD, ECF No. 80 at 4 (quoting *VIS Holdings Corp. v. Cooper*, 2007 WL 9702900, at *8 (S.D. Fla. Dec. 11, 2007)). This is doubly mistaken. For one, none of the Florida cases that *VIS Holdings* cited held that "personal benefit" is a required element of tortious interference claim. And in any event, Plaintiff has made such allegations. The Complaint pleads that Ms. Ackermann took the challenged actions "because she considered it expedient to her career to take direction from Tom Ross and separately to act in furtherance of Bausch + Lomb's purported ESG goals." Compl. ¶ 354.

*Fourth*, Bausch Health's effort to defeat personal jurisdiction hinges on avoiding vicarious liability for the actions of Ms. Ackermann and Mr. Ross. *See* ECF No. 80 at 6. But the Complaint alleges numerous facts that suggest Ms. Ackermann and Mr. Ross took the critical actions on behalf of Bausch Health. Ms. Ackermann was general counsel and Mr. Ross was lead independent

31

director of Bausch Health in April 2022 when the discriminatory covenant was executed and concealed from the SEC. Compl. ¶¶ 40–41, 104–16, 118–21; *id.*, Ex. G at 173, 182–214, 283. And Ms. Ackermann's April 2022 emails came from an "@bauschhealth.com" address with a signature block identifying her in her role with "Bausch Health Companies Inc." *Id.*, Ex. G at 332–34.

Bausch Health responds by citing *United States v. Bestfoods*, 524 U.S. 51 (1998), for the general presumption that "directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary." *Id.* at 69–70. But that case only illustrates why the motion to dismiss should be denied. *Bestfoods* was decided on a full record after a trial on the merits—it does not provide a basis to resist any discovery, particularly where Plaintiff has pled facts showing a basis to rebut the presumption. In any event, Ms. Ackermann was not one of the "directors" of Bausch Health and Bausch + Lomb, but their general counsel, so *Bestfoods* does not speak to her actions at all. Whether Bausch Health and Bausch + Lomb "should be treated as a single or joint employer" is also a question for trial that cannot be decided at this stage when, as here, "there was common ownership, and, to some extent, common management." *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). Plaintiff's Complaint and attached exhibits clearly support this Court's exercise of personal jurisdiction.

### B. Personal Jurisdiction Satisfies Due Process.

The Bausch Defendants also insist that exercising personal jurisdiction here would violate due process. They focus on the connection between Florida contacts and Plaintiff's claims, saying the Complaint does not allege they "avail[ed] themselves of Florida law, does not tie any Florida contacts to allegedly tortious conduct, and does not plead that [they] had knowledge that Miller was domiciled in Florida." B+L, Ross, & Ackermann MTD, ECF no. 80 at 4-7. But they ignore the U.S. Supreme Court's directly controlling decision in *Calder v. Jones,* 465 U.S. 783 (1984)—

a precedent cited by the very Florida decisions on which they rely, *see LaFreniere*, 264 So. 3d at 239—which rejected these arguments over 40 years go.

In *Calder*, two Florida journalists for the National Enquirer argued that due process forbade suing them in California for libeling a California resident. 465 U.S. at 789. They made the same points that Defendants raise here: that they had few contacts with California and "no direct economic stake in their employer's sales in a distant State." 465 U.S. at 789. The Supreme Court unanimously rejected that view, since the defendants were "not charged with mere untargeted negligence," but rather with "intentional, and allegedly tortious, actions" that "were expressly aimed at California." *Id.* They wrote an article "they knew would have a potentially devastating impact" that "would be felt by respondent in the State in which she lives and works," which was enough for due process. *Id.* Those who "knowingly cause the injury" in another state must reasonably expect to be sued there. *Id.*

The same goes here. Plaintiff has pled intentional tort claims under section 1981 and tortious interference theories against Bausch Health, Bausch + Lomb, Ms. Ackermann, and Mr. Ross. The Complaint alleges that those Defendants all knew that enforcing the racially discriminatory side letter would cause a devastating impact to Plaintiff "in the State in which [he] lives." *See id.*; Compl. ¶¶ 346–354, 358–359, 362, 437–438. Bausch Health and Bausch + Lomb had that knowledge individually and by imputation from Ms. Ackermann and Mr. Ross. Compl. ¶¶ 437–438; *see also supra* § II. And even if knowledge of the specific state at issue were required—something that *Calder* never addressed—Plaintiff expressly disclosed both his principal residence and business addresses as being in Florida. Compl. Ex. J at 67. It is also reasonable to infer that Defendants would have known that Plaintiff, as an Icahn Capital employee, lived in Florida. *See* Compl. ¶ 36. Thus, the same facts that show the corporate shield doctrine does not

33

apply also show that personal jurisdiction comports with due process—indeed, Florida's test for intentional torts under the corporate shield doctrine is drawn directly from *Calder*. *See LaFreniere*, 264 So. 3d at 239. And because both "the effects test and the traditional minimum-contacts test" can satisfy due process for intentional torts, the fact that the former is satisfied makes it unnecessary to "consider the traditional minimum-contacts test." *SkyHop Techs. v. Narra,* 58 F.4th 1211, 27 (11th Cir. 2023). The Court should deny the motion to dismiss.

**IV.      Plaintiff Properly Pled Fraud Claims Against the Icahn Defendants.**

The Complaint states claims against the Icahn Defendants for fraudulent concealment and fraudulent inducement. The Icahn Defendants recruited Plaintiff as a portfolio manager whose compensation was dependent in large part on the size and success of the fund's investments. During the hiring process, the Defendants concealed the existence of enormous margin loans that affected both the size and success of the fund, dramatically restricting Plaintiff's ability to invest effectively. When Plaintiff inquired as to funds available, the Icahn Defendants responded with lies and misleading disclosures that omitted the margin loans. Based on this deception—deception that went directly to the heart of Plaintiff's ability to earn money at the job Defendants offered him—Plaintiff entered the Employment Agreement. That is classic fraud: Defendants lied and misled in order to make Plaintiff believe he would earn more than he really would.

The Complaint expressly pleads each of these points, setting out with particularity the misstatements, Defendants' knowledge of their falsity, Plaintiff's reliance on the misstatements, and his damages. The Complaint pleads each allegation clearly and specifically. The Icahn Defendants' arguments to the contrary either ignore the plain language of the Complaint or run directly into well-established principles of law.

34

### A.       Florida Law Governs Plaintiff's Fraud Claims.

Defendants argue that the choice-of-law provision in Plaintiff's employment contract obligates the Court to apply Delaware law to his fraud claims, but the Eleventh Circuit has held that "[a] choice of law provision that relates only to the agreement will not encompass related tort claims." *Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009). To be more specific, where a choice-of-law provision states something to the effect of "[t]his release shall be governed and construed in accordance with the laws of the State of [X]," the Eleventh Circuit will construe it narrowly to reach only the agreement itself and not related tort claims. *Id.* Plaintiff's employment contract uses almost exactly the phrasing the Eleventh Circuit considered in *Cooper*. It states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the Delaware [sic]." *See* Compl. Ex. C at 9. "The clause does not refer to related tort claims or to any and all claims or disputes arising out of settlement or arising out of the relationship of the parties" and therefore "only the [contract] itself is to be construed in accordance with the laws of the State of Delaware." *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1300 (11th Cir. 2003). Plaintiff's fraud claims thus are not governed by the choice-of-law provision in his employment contract.

Because the choice-of-law provision does not apply to Plaintiff's fraud claims, they are governed by the law of the state with the most significant relationship to the claims. *See Garcia v. Pub. H. Trust of Dade Cnty.*, 841 F.2d 1062, 1064–65 (11th Cir.1988). Here, that is plainly Florida. Plaintiff and all of the Icahn Defendants, both corporate and individual, are Florida residents. *See* Compl. ¶¶ 36, 43–47.

In a footnote, the Icahn Defendants argue to the contrary by citing *Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 313 (Fla. 2000). But once again, the Eleventh Circuit has directly rejected their position, having already held that *Mazzoni Farms* does not apply

35

in precisely this circumstance: "*Mazzoni Farms* did not address what state's laws would govern the elements of any tort claims not barred by the [contract]." *Green Leaf Nursery*, 341 F.3d at 1301. Rather, the case "dealt with whether the tort claims were still viable in light of the [contract]." *Id.* It does not apply here.

Finally, even if Delaware law applied, the fraud claims would still be timely because of the Defendants' fraudulent concealment. *See infra* § V.D.

### B.       The Complaint States a Claim for Fraudulent Inducement.

The Complaint states a claim for fraudulent inducement against the Icahn Defendants. In Florida, the elements of fraudulent inducement are (1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement ; (3) the maker intended to induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment. *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012). In Delaware, the elements are functionally identical. *See Trifecta Multimedia Holdings Inc. v. WCG Clinical Servs. LLC*, 318 A.3d 450, 463 n.34 (Del. Ch. 2024). The Complaint pleads each of these elements with particularity.

The Icahn Defendants challenge only the first element of fraudulent inducement: a false statement of material fact. *See* Icahn MTD, ECF No. 75 at 18–19. But their attempt to dismiss those misstatements as puffery or being immaterial is not colorable. The single puffery case they cite does not support their argument, and they cite no authority for their materiality argument. That's because those statements about the margin loans were so patently false and material that, when the truth was revealed, IEP was sanctioned by the SEC and IEP's stock plummeted by more than 50%.

Nothing about the misstatements in this case resembles puffery. Puffery, according to the very case cited by the Icahn Defendants, consists of "generalized, vague, non-quantifiable

36

statements of corporate optimism … Think, for example, Disneyland's claim to be 'The Happiest Place on Earth.'" *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1318 (11th Cir. 2019). Puffery cannot be the basis of a claim for fraud because "no reasonable buyer would rely" on the statements. *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, 2016 WL 4250668, at *2 (S.D. Fla. Apr. 12, 2016). Put another way, "[a] statement is considered puffery if the claim is extremely unlikely to induce consumer reliance." *TocMail Inc. v. Microsoft Corp.*, No. 20-60416-CIV, 2020 WL 9210739, at *4 (S.D. Fla. Nov. 6, 2020) (quoting *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008)). Nor are they puffery if they are "determinate" or "verifiable." *City of Warren Gen. Emps.' Ret. Sys. v. Teleperformance SE*, 746 F. Supp. 3d 1395, 1406 (S.D. Fla. 2024). Statements are not puffery if they provide a "specific, quantifiable estimate" of future performance that would be important to the other party. *Apollo Mgmt. Grp. v. Croxall*, No. 22-62398-CIV, 2023 WL 11799719, at *10 (S.D. Fla. July 17, 2023).

Here, in contrast, the Icahn Defendants made concrete, specific, and *quantifiable* representations about the funds available for investment. That is not puffery. The misstatements include direct representations regarding verifiable financial data, including spreadsheets and accounting figures. *See* Compl. ¶¶ 293–299. Icahn did not just misrepresent the plans for its funds, it misrepresented the fund's liquidity, including inventing $2.4 billion in fictitious funds to inflate the value of IEP's investments. *See* Compl. ¶ 307. The same is true of IEP's annual reports. *See* Compl. ¶¶ 296–298. These were not statements equivalent to calling Disneyland "the happiest place on earth," they were representations of fact on which any prospective portfolio manager would rely given his need to be familiar with the funds available to him.

The Icahn Defendants' secondary argument on this point is even less well taken. They argue that "it would be odd for a sophisticated investor not to use margin. Plaintiff, an experienced

investor, knew this. As did the market, which had no reaction in 2022 when the margin loans were disclosed." Icahn MTD, ECF No. 75 at 19. This is an outlandish characterization of the facts, and the opposite of a reasonable inference for Plaintiff. The critical issue is not just the existence of the loans, but their amounts, which the 2022 disclosure completely omitted. *See* Compl. ¶ 258. And that omission quite plainly was material—when the terms of the loans were revealed in 2023, IEP stock dropped by 57%, the SEC instituted an investigation, and IEP eventually settled with the SEC for violations relating to its failure to disclose the margin loans. *See* Compl. ¶¶ 259–264. These allegations plainly offer sufficient facts to infer materiality, which is all that Rule 8 requires. *See* Compl. ¶¶ 271, 300, 315–316, 326, 415, 425. The Icahn Defendants' argument is meritless.

### C. The Complaint States a Claim for Fraudulent Concealment.

The Complaint states a claim for fraudulent concealment. The elements of fraudulent concealment largely overlap with those of fraudulent inducement, with one additional element: the defendant must have had a duty to disclose the concealed fact. *See Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015); *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987). Here, that duty existed because Defendants undertook partial disclosure, which created a duty to disclose the margin loans. Their failure to disclose the loans caused substantial damages to Plaintiff, which is properly and thoroughly pleaded by the Complaint.

#### 1. The Icahn Defendants Had a Duty to Disclose the Margin Loans.

In both Florida and Delaware, a party to a negotiation has a duty to speak where silence would render their statements misleading. This means that when a party undertakes to disclose some facts on a topic, they have a duty to disclose all facts necessary to prevent their statements from being misleading. *See Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 908 (Fla. 3d DCA 2015) ("A duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him."); *Vokes v. Arthur*

38

*Murray, Inc.*, 212 So. 2d 906, 909 (Fla. 2d DCA 1968) ("Even in contractual situations where a party to a transaction owes no duty to disclose facts within his knowledge or to answer inquiries respecting such facts, the law is if he undertakes to do so he must disclose the Whole truth."); *Norton v. Poplos,* 443 A.2d 1, 5 (Del. 1982) ("[A]lthough a statement or assertion may be facially true, it may constitute an actionable misrepresentation if it causes a false impression as to the true state of affairs, and the actor fails to provide qualifying information to cure the mistaken belief."); *BAE Sys. N. Am. Inc. v. Lockheed Martin Corp.*, No. CIV.A. 20456, 2004 WL 1739522, at *8 (Del. Ch. Aug. 3, 2004) ("[A] duty to speak arises when necessary to make a previous statement not misleading ….").

The Icahn Defendants engaged in such a partial disclosure by making representations to Plaintiff about the value and liquidity of Icahn Capital's funds, its plans to invest those inflated funds, and by declining to answer Plaintiff's requests for more information. *See* Compl. ¶ 301–306. Partial disclosures which mask liabilities or overstate an asset's value create a duty of disclosure sufficient to sustain a fraudulent concealment claim. *See, e.g., Surf's Up Legacy Partners, LLC v. Virgin Fest, LLC*, No. CV N19C-11-092 PRW CCLD, 2021 WL 117036, at *14 (Del. Super. Ct. Jan. 13, 2021) (duty to disclose existed where defendant's statements "cloaked current liabilities," "misrepresented … anticipated cash flow," and did not "revea[l] the extent to which [the relevant entities] were indebted to their trade creditors."); *see also Aviation W. Charters, LLC v. Freer*, No. C.A. No. N14C–09–271 WCC CCLD, 2015 WL 5138285, at *7 (Del. Super. Ct. July 2, 2015) (permitting fraud claim based on allegations that executive "knowingly concealed" an entity's "true financial condition.").

The Icahn Defendants attempt to downplay their concealment by calling Brett Icahn's statements "estimates" and implying that Plaintiff's claim is premised on securities filings. *See*

Icahn MTD, ECF No. 75 at 16–17. Not so. As the Complaint explains, Brett Icahn directly misrepresented the funds available for investment by concealing the margin loans. *See* Compl. ¶ 306. It further alleges that Plaintiff twice specifically requested information related to the funds available and that twice Brett Icahn withheld crucial information. *See id.* ¶¶ 301–303. These omissions and misstatements are more than sufficient to give rise to a claim for fraud.

### 2. The Complaint Properly Pleads Fraud Damages.

The Icahn Defendants' final argument on the fraud claims is that Plaintiff has not properly alleged damages from the fraud. But the Complaint pleads facts supporting every one of Plaintiff's claims for damages.

The Complaint pleads nine detailed paragraphs setting out how Defendants' fraud caused Plaintiff's damages. *See* Compl. ¶¶ 283–291. In short, Defendants' fraud not only induced Plaintiff to enter his Employment Agreement, it also altered the terms to which he agreed, informed his conduct during his employment, and reduced the benefits available to him during his employment. *Id.* It caused him reputational harm by causing him to unknowingly associate with an entity that violated the securities laws. *Id.* None of these allegations is conclusory and none are a recitation of the elements of fraud. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Icahn Defendants mischaracterize Plaintiff's claim for damages related to their fraud and cite the wrong section of the Complaint. *See* Icahn MTD, ECF No. 75 at 17–18 (citing only paragraph 421); *compare* Compl. ¶¶ 283–91 (detailed damages allegations).

The Icahn Defendants claim that Plaintiff cannot seek damages from any liquidated investments because his Employment Agreement—which they fraudulently induced—allocates to Plaintiff the risk of any sold investments. *See* Icahn MTD, ECF No. 75 at 17–18. But this is exactly the point. Plaintiff would not have agreed to bear the risk of a fund liquidation had he known of the margin loans. *See* Compl. ¶ 284. He would not have made his compensation contingent on

40

investment performance had he known that poor investment performance was all but inevitable. And, in any event, "[a] party may not contractually limit liability in a contract induced by fraud." *Banks v. Pub. Storage Mgmt., Inc.*, 585 So. 2d 476, 477 (Fla. 3d DCA 1991). The employment contract may waive many claims connected to the non-fraudulent liquidation of Defendants' funds, but it does not, and cannot, waive claims of fraud: "The law in Florida is well settled that a party may not contractually thwart liability for its own fraud." *See Burton v. Linotype Co.*, 556 So. 2d 1126, 1127 (Fla. 3d DCA 1989). That is not how the law of fraud works and it is certainly not how the law of pleading works.

### 3. *The Fraud Claims Are Independent Torts.*

The Icahn Defendants mistakenly argue that Plaintiff's fraudulent inducement and fraudulent concealment claims are "inextricably intertwined" with the "performance" of the underlying contract, seek "identical" damages to the breach claim, and are "thus barred." Icahn MTD, ECF No. 75 at 20 n.6. The rule Defendants invoke is called the "independent tort rule" and it does not apply here for two reasons. First, the rule does not apply to claims like fraudulent inducement, which rely on pre-contract statements. *See HTP, Ltd. v. Lineas Aereas Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996); *CEMEX Constr. Materials Fla., LLC v. Armstrong World Indus., Inc.*, No. 3:16-CV-186-J-34JRK, 2018 WL 905752, at *11 (M.D. Fla. Feb. 15, 2018). Second, the two tort claims arise from misrepresentations prior to the October 1, 2020, execution of the contract and rely on standards outside the contract. The contract claim encompasses fraud during the performance of the contract, including that Carl Icahn and "Carl's End of Day Report" concealed the margin loans for years. Compl. ¶¶ 309, 337. Unlike the breach claim, which seeks expectation damages under Delaware contract law, the tort claims seek damages applying Florida tort law, including for "lost earnings capacity" and "punitive damages." Compl. ¶¶ 410, 421, 429.

41

**D.      The Integration Clause Does Not Bar Plaintiff's Fraud Claims.**

The Icahn Defendants argue that Plaintiff's fraud claims are barred by the integration clause of his Employment Agreement, *see* Icahn MTD, ECF No. 75 at 19–20, but controlling precedent flatly rejects this argument. Delaware law (which governs interpretation of the contract per the choice of law provision) holds that integration clauses do not bar fraud claims based on pre-contract statements. And to the extent it is relevant, Florida law holds the same.

The Delaware Court of Chancery has established clear rules for when an integration clause bars a fraudulent inducement claim. In *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004), the court engaged in an extensive discussion of the topic. It reasoned that a contract bars a fraud in the inducement claim only if it "contain[s] language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.* at 593. In contrast, "the presence of a standard integration clause alone," without "explicit anti-reliance representations and … contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims." *Id.* Even the cases cited by the Icahn Defendants recognize this point, though the Icahn Defendants characterize them as addressing contracts with a "clear anti-reliance clause." Icahn MTD, ECF No. 75 at 19. And the rule is the same under Florida law. *See McIntosh Fish Camp, LLC v. Colwell*, 315 So. 3d 784, 787 (Fla. 5th DCA 2021).

There is no anti-reliance clause in Plaintiff's Employment Agreement. *See* Compl. Ex. C at 8.  There is no anti-reliance language at all. The integration clause the Icahn Defendants cite is a standard integration clause that says nothing about pre-contractual language or reliance thereon. *See id.* Plaintiff's fraud claims are therefore not barred by any provision of his employment contract.

**V.      Plaintiff Properly Pleaded Breach of Contract Claims Against Icahn Defendants.**

The Complaint states a claim for breach of contract against the Icahn Defendants. Taken at face value, the allegations state two claims for breach of the covenant of good faith and fair dealing: one based on the Icahn Defendants' race discrimination, and one based on the Icahn Defendants' fraudulent concealment of the margin loans. Delaware law clearly recognizes both claims and the Complaint expressly pleads each element.

Every employment contract governed by Delaware law includes an implied covenant of good faith and fair dealing. *See Town of Cheswold v. Vann*, 9 A.3d 467, 473 n.17 (Del. 2010). "The Covenant is best understood as a way of implying terms in the agreement." *E.I. DuPont de Nemours & Co. v. Pressman*, 679 A.2d 436, 443 (Del. 1996) (internal quotation marks omitted). It serves to ensure that the reasonable expectations of the parties are honored, even where they aren't reduced to writing in the contract itself. *See id.* The covenant applies in limited circumstances to fill the gaps in a written contract and prevent "arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.,* 878 A.2d 434, 442 (Del.2005)).

Delaware courts have identified certain courses of conduct that constitute a breach of the covenant as a matter of law. This case involves two such courses of conduct: racial discrimination and fraudulent inducement. Yet the Icahn Defendants' motion to dismiss does not address, or even cite, the controlling cases on these questions. And where it actually addresses the law, its arguments—about damages, timeliness, and what Plaintiff will or will not be able to establish at trial—are not appropriate for a motion to dismiss. Nothing in the Icahn Defendants' motion hinders Plaintiff's contract claims in the slightest.

43

### A.       Racial Discrimination Breaches Good Faith and Fair Dealing.

The Delaware Supreme Court expressly recognized the very claim that Plaintiff brings here in *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825 (Del. 2005). In that case, it held that pleading intentional race discrimination in the employment relationship, "as evidenced by … disparate treatment," states a claim for breach of the covenant of good faith and fair dealing if it leads to an adverse employment action. *Id.* at 830; *see also ASB Allegiance Real Est. Fund v. Scion Breckenridge Managing Member, LLC*, 50 A.3d 434, 444 (Del. Ch. 2012), *rev'd on other gounds*, 68 A.3d 665 (Del. 2013) (characterizing *Rizzitiello* as "recognizing claim for breach of the implied covenant based on race discrimination.").

That is exactly what Plaintiff alleges here. He pled that Icahn Group engaged in "intentional race discrimination" against him, Compl. ¶ 99; *see id.* ¶¶ 115–121, 141–150, that other employees of a different race were treated better, *see* Compl. ¶¶ 144–145, and that the discrimination resulted in an adverse employment action, *see* Compl. ¶¶ 144–149, 211–221. This is all that's required. *See Rizzitiello*, 868 A.2d at 830.

The Icahn Defendants' motion to dismiss does not even cite *Rizzitiello* or engage with the substance of Plaintiff's claim. Instead, it argues that "a breach of contract claim based on the same alleged conduct to support a Section 1981 claim would create redundant remedies." Icahn MTD, ECF No. 75 at 11. But Delaware law specifically recognizes that "if the alleged contractual breach is accompanied by the breach of an independent duty imposed by law, the same factual assertions may support both a breach of contract and tort claim." *OC Tint Shop, Inc. v. CPFilms, Inc.*, No. CV 17-1677-RGA, 2018 WL 4658211, at *5 (D. Del. Sept. 27, 2018); *see Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009); *Cornell Glasgow, LLC v. La Grange Props., LLC*, No. C.A. No. N11C–05–016 JRS CCLD, 2012 WL 2106945, at *8 n.77 (Del. Super. Ct. June 6, 2012). The notion that a plaintiff cannot plead different causes of action for the same relief

44

conflicts with the Federal Rules, which provide that "[a] party may state as many separate claims … as it has, regardless of consistency." *See* Fed. R. Civ. P. 8(d)(3).

The Icahn Defendants' effort to circumvent this rule and manufacture legal support for their theory strains credulity. They cite two cases for the proposition that Plaintiff cannot bring both a section 1981 claim and a good faith and fair dealing claim. The first, *Saunders v. E.I. DuPont de Nemours & Co.*, 2017 WL 679853, at *9 (D. Del. Feb. 17, 2017), concerns the Delaware Discrimination in Employment Act, which contains an express provision stating that it is the sole remedy for certain state law employment discrimination claims for those subject to its jurisdiction. That case has no application whatsoever here to a claim by a Florida resident arising in the State of Florida—Defendants do not contend that the Delaware Discrimination in Employment Act applies or is in any way relevant. And the second, *Lamb v. Outback Steakhouse of Fla., Inc.*, No. 8:13-CV-794-T-35MAP, 2014 WL 12689882 (M.D. Fla. Sept. 4, 2014), is a Florida case holding that employers have no duty to prevent sexual harassment and discrimination among employees. That is totally unrelated.

### B.     Fraud in the Inducement Is a Breach of Good Faith and Fair Dealing.

The Icahn Defendants also ignore another Delaware Supreme Court case that expressly blessed Plaintiff's claim for breach of the covenant of good faith and fair dealing based on fraudulent inducement. In *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992), the Delaware Supreme Court held that an employer breaches the covenant of good faith and fair dealing when it "induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." 606 A.2d at 101. Under *Merrill*, Plaintiff's pleading of fraud in the inducement states a claim for breach of the covenant of good faith and fair dealing. *See* 606 A.2d at 102. Plaintiff has

also pleaded that the Icahn Defendants' fraud during the performance of the Employment Agreement supports this claim.

The Icahn Defendants say the Employment Agreement's integration clause bars his claim. This argument fails for the same reason it fails when applied to Plaintiff's fraudulent inducement claim. Plaintiff did not disclaim reliance on the Icahn Defendants' statements, and integration clauses do not bar fraudulent inducement claims under Delaware of Florida law. *See supra* § IV.D.

### C. Defendants' Opinions on Plaintiff's Damages Do Not Support Dismissal.

The Icahn Defendants' final argument with respect to Plaintiff's good faith and fair dealing claims is that his alleged damages "lack support, are wildly speculative, and are based on unknowable future events." Icahn MTD, ECF No. 75 at 13. But Defendants' disagreement is not a ground for dismissal—to the contrary, it is a reason for full ventilation of claims in litigation. And proof of damages and their certainty "need not be offered in the complaint in order to state a claim." *Anglo Am. Sec. Fund, L.P. v. S.R. Glob. Int'l Fund, L.P.*, 829 A.2d 143, 156 (Del. Ch. 2003). "[A] court can vindicate a breach of contract through an award of nominal damages" and therefore "[a]lleging specific monetary harm is not a requirement" to state a claim for breach of contract, although Plaintiff here pleads detailed monetary harm. *Cygnus Opportunity Fund, LLC v. Wash. Prime Grp., LLC*, 302 A.3d 430, 454 (Del. Ch. 2023); *see Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) ("a plaintiff need not plead monetary damages to sustain a breach of contract claim"). Whatever Defendants may think of Plaintiff's damages theories, their opinions are not grounds for a motion to dismiss.

Plus, the Icahn Defendants direct their arguments at only one possible source of damages: Plaintiff's Make Whole Bonus. But Plaintiff pleads facts showing that he suffered far more harm than just reduced compensation under the Employment Agreement. The Icahn Defendants' breach of the covenant of good faith and fair dealing cost Plaintiff millions of dollars in lost earnings and

other damages not including any lost compensation under the Employment Agreement itself, as one example. *See* Compl. ¶¶ 283–291. Plaintiff could have been a successful portfolio manager at another firm, but was instead defrauded into joining Icahn, where the undisclosed margin loans reduced his compensation. At trial, Plaintiff will be free to prove these and other categories of damages flowing from the Icahn Defendants' breach of the covenant of good faith and fair dealing. He is entitled to proceed to discovery on that basis.

> ### D.      Plaintiff's Claims Are Timely.

The Icahn Defendants argue that Plaintiff's breach of contract claims are untimely, but their argument fails for three separate reasons. First, their arguments raise issues of fact and cannot be resolved at this stage of the litigation. Second, even if the Court could consider the issue, the claims are timely because the continuing breach doctrine applies. Finally, Plaintiff could not have discovered the breach that underlies Count III until May 2, 2023, rendering the Complaint timely.

> #### 1.      *The Continuous Breach Doctrine Presents a Question of Fact.*

Plaintiff contends this action is timely because, among other reasons, the continuous breach doctrine applies to both of his breach of contract claims. *See* Icahn MTD, ECF No. 75 at 11–12. But the Court need not even reach that issue because applying the continuous breach doctrine is a question of fact for summary judgment, not a motion to dismiss.

Broadly speaking, the continuous breach exception applies when a contract imposes continuous duties such that full and complete damages for breach cannot be determined until the end of the contractual period. *See Matter of Burger*, 125 B.R. 894, 902 (Bankr. D. Del. 1991). When "the continuing breach exception applies, … the statute [of limitations] begins to run the moment "full damages can be determined and recovered."" *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. 7639-VCS & 7668-VCS, 2016 WL 4440476, at *11 (Del. Ch., 2016).. Because of the nature of continuous contracts, this "generally" is not "until the contract's termination." *Smith*

*v. Mattia*, No. 4498-VCN, 2010 WL 412030, at *4 (Del. Ch., 2010). Determining whether the continuous breach exception applies "requires an analysis of whether the obligations under a contract are continuous or severable which turns on the parties' intent, … ascertained through the contract's terms and subject matter, taken together with the pertinent facts and circumstances surrounding its formation." *In re ASHINC Corp.*, No. AP 13-50530-CSS, 2022 WL 2666888, at *9 (D. Del. July 11, 2022), *dismissed,* No. 22-2442, 2023 WL 9596751 (3d Cir. Sept. 12, 2023) (cleaned up).

This fact-intensive inquiry cannot be resolved on Defendants' motion to dismiss. The exception turns on whether the parties intended the contract to be "continuous or severable," and "the parties' intent cannot be resolved on a motion to dismiss, as it is a factual issue that must be resolved by trial." *Am. Tower Corp. v. Unity Commc'ns, Inc.* ("*American Tower*"), No. CIV.A. 09C-03-122 PLA, 2010 WL 1077850, at *2 (Del. Super. Ct. Mar. 8, 2010); *Palisades Collection, LLC v. Unifund CCR Partners*, No. N14C–08–036 EMD CCLD, 2015 WL 6693962, at *7 (Del. Super. Ct. Nov. 3, 2015) (agreeing that "whether a contract is continuous or severable" "usually cannot be resolved on a motion to dismiss"); *SPX Corp. v. Garda USA, Inc.*, No. CIV.A. N10C10162 WCC, 2012 WL 6841398, at *3 (Del. Super. Ct. Dec. 6, 2012) (same); *Smith v. Mattia, et al.* , No. CIV.A. 4498-VCN, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010) (stating that this issue presents "questions of fact, and cannot fairly be resolved here upon the Defendants' motion to dismiss").

It does not matter whether the Icahn Defendants disagree that the doctrine applies. In *American Tower*, the court denied a motion to dismiss a breach of contract claim as untimely even when the plaintiff "acknowledge[d] that it does not consider it likely that the license agreements be found to support continuing causes of action." 2010 WL 1077850, at *2. Alleging a continuing

48

contract was sufficient to keep the claim alive because "the question of the parties' intent cannot be resolved on a motion to dismiss." *Id.* The same is true here.

### 2. The Complaint Alleges Facts That Show Continuous Breach.

Even if the Court could resolve the continuous breach question on a motion to dismiss, the Complaint's allegations show that it applies here. Because Plaintiff's Employment Agreement, a fixed-term contract with a contingent payment due at the end of the term, has not yet expired, the statute of limitations on Plaintiff's breach of contract claims has yet to commence.

The widely cited case, *Matter of Burger*, 125 B.R. 894 (Bankr. D. Del. 1991), illustrates how the doctrine applies in such circumstances. *Burger* involved a services agreement in which "investors in a dairy herd agreed to finance the purchase of the herd, pay for its ongoing costs, and retained Burger to 'manage, maintain and expand' the herd." *Palisades Collection, LLC v. Unifund CCR Partners*, 2015 WL 6693962, at *5 (quoting *Burger*, 125 B.R. at 898). As his compensation, "Burger was entitled to 50% of any annual cash revenues once the Investors had" received "a 15% annual return on their investment." "By 1989, Burger filed for bankruptcy." Later, the investors sued, alleging that Burger breached the contract because he "failed to expand the herd," 125 B.R. at 901, and otherwise mismanaged the cattle, *id.* at 902.

*Burger* held that the continuous breach doctrine applied because "there was a continuous contract for a fixed seven-year period where full and complete damages could not be determined by either party until the end of that time. And any claim by the Investors for damages necessarily relie[d] on" contingent events. *Id.* "Furthermore, th[e] contract was continuously acknowledged by both parties throughout the seven-year period by the various payments made between the parties." *Id.*

The same elements are present here. Plaintiff's Employment Agreement is a fixed-term contract with payment determined at the end of the fixed term based on the performance of

investments during the term. Further, "any claim by" Plaintiff for damages "necessarily relies on" contingent events—the performance of Icahn Capital investments during the contractual term. Also, the Employment Agreement has been continuously acknowledged by periodic salary payments to Plaintiff. Just as in *Burger*, the statute of limitations will begin running only when "full damages can be determined and recovered," which will "not happen until the contract terminates," which is currently scheduled for 2027. *AM Gen. Holdings LLC*, 2016 WL 4440476, at \*11 (quotation omitted).

It is immaterial that, for the claim based on race discrimination, "there was a discrete and readily determinable breach," since "that breach led to an unforeseeable chain of events and with serious consequences for [Plaintiff] and damages that could not have been known (or sought) at the time of the breach." *In re ASHINC Corp.*, 2022 WL 2666888, at \*11. Defendants' race-based exclusion of Plaintiff from the Bausch + Lomb board of directors altered the board's decision-making in unforeseeable ways that had serious consequences for Plaintiff's performance-based compensation under the Employment Agreement. And the effects on his compensation could not have been known at the time of Defendants' discrimination. In such cases, "the narrow continuous breach doctrine" still applies. *Id.* at 10–11 (quotation omitted). The statute of limitations has not even begun to run.

3. *Plaintiff Could Not Have Discovered Breach Until May 2023.*

Plaintiff's breach of contract claim based on Carl Icahn's margin loans is timely for the additional reason that Plaintiff could not have discovered the key facts until May 2, 2023. The Icahn Defendants fraudulently concealed the relevant information from Plaintiff (and all of their investors), rendering it impossible for Plaintiff to bring his claim. Their concealment tolled the statute of limitations until that information was disclosed—the same disclosure that led to the collapse of IEP stock.

As explained above, the Complaint states a claim for fraudulent concealment against the Icahn Defendants. *See supra* § IV.C. In addition to constituting an independent tort, fraudulent concealment tolls the statute of limitations for any actions premised upon the concealed facts. *See Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1214 (Del. Ch. 2022) (fraudulent concealment "tolls the statute of limitations and extends the time for suit under the doctrine of laches "when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth."); *Weiss v. Swanson*, 948 A.2d 433, 451 (Del. Ch. 2008); *Smith v. Mattia*, No. CIV.A. 4498-VCN, 2010 WL 412030, at *4 (Del. Ch. Feb. 1, 2010). In cases of fraudulent concealment, the limitations period begins when the Plaintiff learns "of facts sufficient to put a person of ordinary intelligence and prudence on inquiry which if pursued, would lead to the discovery of the injury." *Mattia*, 2010 WL 412030, at *4 (alteration accepted).

Here, Plaintiff alleges that Carl Icahn fraudulently concealed his margin loans by filing intentionally deficient SEC disclosures that omitted the loans' existence entirely until February 23, 2022. *See* Compl. ¶¶ 258–259. And he thereafter omitted key information necessary to give notice that the loans might threaten Icahn Capital's working capital and that he—the CEO of Icahn Capital—might have committed securities violations regarding the loans. *See id.* This key information included "loan to value (LTV), maintenance thresholds, principal amount, [and] interest rates" for the loans. *Id.* ¶ 258 (quoting Hindenburg Research report). Plaintiff also alleges that Carl Icahn intentionally concealed this information by refusing to provide it to Plaintiff during negotiation of the Employment Agreement and instead directing Plaintiff to evaluate Icahn Capital's financial health based solely on securities filings that Brett Icahn knew to be deficient. ECF No. 1, ¶¶ 29, 255–256.

51

It was not until May 2, 2023, when Hindenburg Research issued a report that shed light on this concealment, that a reasonable person would have suspected the truth of the margin loans. Indeed, even the United States did not have notice before then, as evidenced by the failure of the U.S. Attorney's Office for the Southern District of New York and the SEC to investigate until after the report's release. *See* Compl. ¶ 261. Thus, Plaintiff had until May 2026 to bring his breach of contract claim based on the margin loans. *See* 10 Del. C. § 8106(a). His claim in December 2025 is timely.

**CONCLUSION**

For these reasons, the Court should deny the motions to dismiss.

Dated: April 17, 2026

Respectfully submitted,

/s/ Emily Percival
Gene Hamilton
Will Scolinos
James Rogers
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, DC 20003
(301) 893-4177
emily.percival@aflegal.org
william.scolinos@aflegal.org
james.rogers@aflegal.org

Jared M. Kelson (*pro hac vice*)
Nicholas A. Cordova (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Ave. NW
Washington, DC 20006
(202) 955-0620
jkelson@boydengray.com
ncordova@boydengray.com

Michael L. Francisco (*pro hac vice*)
James Compton (*pro hac vice*)
First & Fourteenth PLLC
800 Connecticut Ave. NW, Suite 300
Washington, DC 20006
(202) 998-1978
michael@first-fourteenth.com
james@first-fourteenth.com

Christopher O. Murray (*pro hac vice*)
First & Fourteenth PLLC
2 N. Cascade Ave. Suite 1430
Colorado Springs, CO 80903
(719) 428-4937
chris@first-fourteenth.com

Lincoln Davis Wilson (*pro hac vice*)
First & Fourteenth PLLC
784 S. Clearwater Loop # 8011
Post Falls, ID 83854
(719) 234-0938
lincoln@first-fourteenth.com

*Counsel for Plaintiff Steven D. Miller*

53

**CERTIFICATE OF SERVICE**

I hereby certify that on this date, I filed this document, which I understand will serve all

parties via CM/ECF. I will also have a copy sent by email to counsel for Defendants.

Dated: April 17, 2026

*/s/ Emily C. Percival*
Emily C. Percival

*Counsel for Plaintiff*

53