# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **STEVEN D. MILLER,** | |
| *Plaintiff*, | |
| v. | Case No. 1:25-cv-25893 |
| **BAUSCH HEALTH COMPANIES, INC; BAUSCH + LOMB CORPORATION; THOMAS ROSS; CHRISTINA ACKERMANN; GAOXIANG HU; ICAHN ENTERPRISES, L.P.; ICAHN ENTERPRISES G.P. INC.; ICAHN CAPITAL, LP; CARL ICAHN; BRETT ICAHN,** | **PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION TO DEFENDANT BAUSCH HEALTH COMPANIES, INC** |
| *Defendants*. | |

Pursuant to Rule 34 of the Federal Rules of Civil Procedure and Local Rule of Civil Procedure 26.1(e), Plaintiff Steven D. Miller hereby requests that Defendant Bausch Health Companies, Inc. produce documents responsive to this First Set of Requests for Production of Documents within 30 days of the service of this request.

**INSTRUCTIONS**

1.      These instructions incorporate by reference all those found in Local Rule of Civil Procedure 26.1(e). To the extent that any instruction herein differs from Local Rule 26.1(e), the Local Rule shall control.

2.      These Requests for Production are continuing in nature. Defendant must file supplemental responses to this First Set of Requests as soon as it discovers that it has, within its possession, custody, or control, any additional responsive documents.

1

3.      Unless stated otherwise in a specific request, the time period for these Requests for Production is January 1, 2020 to the present.

4.      If documents or records cannot be located, describe with particularity the efforts made to locate the documents or records and the specific reasons for their unavailability.

5.      If documents or records exist that are not available to you, state where they are located, including the name, title, and address of their present custodian to the best of your knowledge.

6.      If you contend that any of the requested information is protected by the attorney-client privilege, work-product doctrine, or any other privilege, please comply with the instructions described in Local Rule of Civil Procedure 26.1(e)(2)(B)-(D).

7.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

8.      The singular and plural forms of any word are interchangeable, as are masculine and feminine pronouns.

9.      The words "and" and "or" are to be construed interchangeably and in the broadest sense, so that each word includes both conjunctive and disjunctive forms.

10.     The term "including" shall mean "including without limitation."

11.     Whenever you object to a term as undefined, vague, or ambiguous, please state how you are defining or interpreting that term in responding to the Request for Production.

12.     For each response to a request, please identify responsive records by Bates number or an applicable range of Bates numbers.

**DEFINITIONS**

Unless otherwise indicated, as used within the context of these Requests for Production of Documents:

1.      The terms "Bausch Health," "you," or "your" mean Defendant Bausch Health Companies, Inc.

2.      "Bausch + Lomb," means Defendant Bausch + Lomb Corporation.

3.      "Communication" means the transmittal of information, both verbal and documentary and shall include, but not be limited to, in-person statements, telephone conversations, documents transmitted by physical mail or other delivery services, word processing documents, spreadsheets, slide decks or other presentation materials, e-mails (including company accounts and any private accounts, such as gmail.com, used for company purposes), text messages, electronic applications (*e.g.*, WhatsApp, Slack, Signal, *etc.*), voicemail messages, or video meetings (*e.g.*, Microsoft Teams, Zoom, Webex, *etc.*), however formal or informal.

4.      "Document" and "record" are to be used interchangeably and include all items referred to in Fed. R. Civ. P. 34, as well as all handwritten, typed, graphic or electronic communications, all electronically stored information (ESI), including emails and text messages, and all handwritten, typed, graphic, or electronic materials of any kind or description, however produced or reproduced, whether in  draft or final form, original or reproduced, including, but not limited to, agreements, correspondence, facsimiles, photographs, films, diagrams, recordings of any type, transcripts, notes of telephone conversations, diaries, calendars, charts, memoranda, instructions, pamphlets, manuals, circulars, conversations or telephone calls, books of records or accounts, work papers, invoices, receipts, checks, other evidence of indebtedness, reports, studies, and any other written, printed, or recorded material or statements of any kind known to you or in

your custody or control, your attorneys, accountants, investigators, partners, agents, representatives, or to which you can obtain access.

5. "Director Appointment and Nomination Agreement" means the written agreement between Bausch + Lomb Corporation and Icahn Capital, LP and related or affiliated individuals and entities that was executed on April 28, 2022 and amended on June 21, 2022. A copy of the Director Appointment and Nomination Agreement and amended Director Appointment and Nomination Agreement is included here as Attachment A.

6. "Icahn Capital" means Defendant Icahn Capital, L.P.

7. "Icahn Group" means Carl Icahn and the entities under common control by him, including Icahn Capital and IEP.

8. "IEP" means Defendants Icahn Enterprises L.P. and Icahn Enterprises G.P. Inc., collectively.

9. "ISS Board Composition Policy" means the "Board Composition – Racial/Ethnic Diversity" policy change in the Institutional Shareholder Services Americas Proxy Voting Guidelines Updates for 2021, Benchmark Policy Changes for U.S., Canada, and Latin America, dated November 12, 2020 ("ISS Voting Guidelines"). A copy is included here as Attachment B.

10. "Margin loans" means the margin loans collateralized by IEP securities that are the subject of SEC Administrative Proceeding 3-22011.

11. "Person" is defined as any a natural person, firm, association, organization, partnership, business, trust, corporation, or any type of entity.

12. "Plaintiff" means Plaintiff Steven D. Miller.

13. "Side Letter" means the written agreement between Icahn Capital, LP and Bausch + Lomb Corporation executed on April 28, 2022. A copy is included here as Attachment C.

4

**REQUESTS FOR PRODUCTION**

1.      All documents concerning the Side Letter.

2.      From January 1, 2020 to December 31, 2022, all documents and communications concerning the ISS Board Composition Policy. Responsive documents should include, but not be limited to, all records of communications regarding how the ISS Voting Guidelines may affect the selection of officers, executives, directors, or employees at Bausch Health and/or its subsidiaries.

3.      From January 1, 2020 to December 31, 2022, all documents and communications concerning Icahn Group's appointment of directors to the Bausch + Lomb board.

4.      Organizational charts illustrating the corporate structure and executive leadership of Bausch Health immediately before and after the Bausch + Lomb initial public offering.

5.      All documents and communications concerning or discussing compliance with 42 U.S.C. § 1981.


Respectfully submitted this 11th day of March, 2026.

/s/ Emily Percival
Gene Hamilton (*pro hac vice*)
Emily Percival (Fla. Bar No. 119313)
Will Scolinos (*pro hac vice*)
James Rogers (*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, D.C. 20003
(301) 893-4177
emily.percival@aflegal.org
william.scolinos@aflegal.org
james.rogers@aflegal.org

Jared M. Kelson (*pro hac vice*)
James R. Wedeking (*pro hac vice*)
Nicholas A. Cordova (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900
Washington DC 20006
(202) 955-0620
jkelson@boydengray.com
jwedeking@boydengray.com
ncordova@boydengray.com

*Counsel for Plaintiff*

6

# Attachment A

Original Agreement

EX-10.25 6 d178785dex1025.htm EX-10.25

**Exhibit 10.25**

**REDACTED**

**Certain identified information, indicated by [*****], has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm if publicly disclosed.**

**DIRECTOR APPOINTMENT AND NOMINATION AGREEMENT**

This Director Appointment and Nomination Agreement, dated as of April 28, 2022 (this "**Agreement**"), is by and among the persons and entities listed on Schedule A (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**"). In consideration of and reliance upon the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. **Board Representation and Board Matters.**

    (a)   The Company and the Icahn Group agree as follows:

    (i)   As soon as practicable following the written election of the Icahn Group (which written election, in order to be valid, must be delivered to the Company between the date (the "**Distribution Effective Date**") of consummation of the spin-off transaction by which Bausch Health Companies Inc. ("**BHC**") transfers any or all of its remaining indirect equity interest in the Company to BHC's then-current shareholders (the "**B+L Distribution**") and such date that is twelve (12) months after the Distribution Effective Date (such period, the "**Election Period**"), the Company shall take or shall have taken all necessary action to increase the size of the Board of Directors of the Company (the "**Board**") by two, and following consultation with the Icahn Group, to appoint two individuals identified by the Icahn Group and reasonably acceptable to the Company (such individuals, collectively, the "**Icahn Designees**" and each an "**Icahn Designee**") to fill the resulting vacancies, each with a term expiring at the first annual general meeting of stockholders of the Company following such written election (the "**First Annual Meeting**"). Prior to such date as the Icahn Designees are seated as members of the Board, the Icahn Group shall not request and the Company shall not provide any material non-public information relating to or involving the Company. For the avoidance of doubt, it shall not be deemed unreasonable for the Company to reject a designee in accordance with this **Section 1(a)(i)** if such designee does not satisfy the Director Criteria (as hereafter defined) or the criteria set forth on Annex 1 attached hereto (the **"Tax Criteria"**).

    (ii)   the Company shall use reasonable best efforts to cause the election of each of the Icahn Designees at the First Annual Meeting (including by (x) recommending that the Company's stockholders vote in favor of the election of each of the Icahn Designees, (y) including each of the Icahn Designees in the Company's proxy statement and proxy card for the First Annual Meeting, and (z) otherwise supporting each of the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate). The Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to the First Annual Meeting. As a condition to the Icahn Designees' appointment to the Board, the Icahn Designees shall execute and deliver a customary joinder to this Agreement. Prior to the execution and delivery of such joinder to the Company, the Icahn Group shall cause the Icahn Designees to comply with the covenants, agreements and other provisions herein applicable to the Icahn Designees.

Complaint Ex. D 0001

(iii)   that as a condition to the Icahn Designees' appointment to the Board and subsequent nomination for election, the Icahn Designees each agree to provide to the Company, prior to nomination and appointment and on an on-going basis while serving as a member of the Board, such information and materials as the Company routinely receives from other members of the Board or as is required to be disclosed in proxy statements under applicable law or as is otherwise reasonably requested by the Company from time-to-time from all members of the Board in connection with the Company's legal, regulatory, auditor or stock exchange requirements, including, but not limited to, a completed D&O Questionnaire in the form separately provided by the Company to the Icahn Group (the "**Nomination Documents**").

(iv)   That, subject to **Section 1(c)** below, should any Icahn Designee resign from the Board or be rendered unable to, or refuse to, be appointed to, or for any other reason fail to serve or is not serving, on the Board (other than as a result of not being nominated by the Company for election at an annual meeting of stockholders subsequent to the First Annual Meeting, following which the Icahn Group's replacement rights pursuant to this **Section 1(a)(iv)** shall terminate with respect to such Icahn Designee), as long as the Icahn Group has not materially breached this Agreement and failed to cure such breach within five (5) business days of written notice from the Company specifying any such breach, the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, or as a nominee on the Company's slate of nominees for election to the Board at the First Annual Meeting (collectively, the "**First BLCO Slate**"), as applicable, a replacement that is approved by the Board, such approval not to be unreasonably withheld, conditioned or delayed (an "**Acceptable Person**") (and if such proposed designee is not an Acceptable Person, the Icahn Group shall be entitled to continue designating a recommended replacement until such proposed designee is an Acceptable Person) (a "**Replacement Designee**"). Any such Replacement Designee who becomes a Board member in replacement of any Icahn Designee shall be deemed to be an Icahn Designee for all purposes under this Agreement and, as a condition to being appointed to the Board, shall be required to sign a customary joinder to this Agreement.

(v)   For the avoidance of doubt, the Board's approval of a Replacement Designee pursuant to **Section 1(a)(iv)** shall not be considered unreasonably withheld if: (1) such replacement does not (A) qualify as "independent" pursuant to the NYSE Rules (as defined below), (B) have the relevant financial and business experience to be a director of the Company, or (C) satisfy the requirements set forth in the Company Policies (as defined below), in each case as in effect as of the Distribution Effective Date or such additional or amended guidelines and policies approved by the Board that are applicable to all directors of the Company (collectively clauses (A) through (C), the **"Director Criteria"**); provided that no Director Criteria will be adopted that would prevent any employee or affiliate of the Icahn Group from becoming directors by virtue of the fact that such person is an employee or affiliate of the Icahn Group had such criteria been in effect today; or (2) such Replacement Designee does not satisfy the Tax Criteria.

2

Complaint Ex. D 0002

(vi)    that (1) for any annual general meeting of stockholders subsequent to the First Annual Meeting, the Company shall notify the Icahn Group in writing no less than thirty-five (35) calendar days before the advance notice deadline set forth in the Company's Articles of Incorporation whether the Icahn Designees will be nominated by the Company for election as directors at such annual general meeting and, (2) if the Icahn Designees are to be so nominated, shall use reasonable best efforts to cause the election of the Icahn Designees so nominated by the Company (including by (x) recommending that the Company's stockholders vote in favor of the election of the Icahn Designees, (y) including the Icahn Designees in the Company's proxy statement and proxy card for such annual general meeting and (z) otherwise supporting the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate), and the Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to any such annual general meeting at which the Company has nominated Icahn Designees and such Icahn Designees have consented to being named, and are named, in the proxy statement relating to such annual general meeting.

(vii)   that from and after the date of this Agreement, so long as an Icahn Designee is seated as a member of the Board, without the approval of the Icahn Designees then on the Board (such approval not to be unreasonably withheld, delayed or conditioned), (w) the Board shall not form an Executive Committee or any other committee with functions similar to those customarily granted to an Executive Committee; (x) the Board shall not form any other new committee (other than committees formed with respect to matters for which there are actual conflicts of interest between the Icahn Designees and the Company) without offering to at least one Icahn Designee the opportunity to be a member of such committee (provided, however that if such committee has more than five (5) members then both Icahn Designees shall be offered to be appointed to such committee (to the extent there are two Icahn Designees then on the Board)), (y) the Board shall not increase the size of any committee and (z) any Board consideration of appointment and employment of named executive officers, mergers and acquisitions of material assets, or dispositions of material assets, or similar extraordinary transactions, such consideration, and voting with respect thereto shall take place only at the full Board level or in committees of which one of the Icahn Designees is a member (for the avoidance of doubt, nothing in this Agreement changes, amends, or modifies the authority, duties and obligations of the Talent & Compensation Committee of the Board).

(viii)  each of the Icahn Designees confirms that he or she will recuse himself or herself from such portions of Board or committee meetings, if any, involving actual conflicts between the Company and the Icahn Group. Promptly following the receipt of the Nomination Documents, the Board shall make a determination as to whether the Icahn Designees, based solely upon the representations provided by the Icahn Group in **Section 7** of this Agreement (which representations shall be updated by the Icahn Group to be current as of the date of the written election made pursuant to **Section 1(a)(i)**) and the information provided to the Board by the Icahn Designees in the Nomination Documents, are independent under the Board's independence guidelines, the independence requirements of the New York Stock Exchange (the "**NYSE Rules**"), and the independence standards applicable to the Company under paragraph (a)(1) of Item 407 of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "**Exchange Ac**t").

3

Complaint Ex. D 0003

(ix)  that, to the extent permitted by law and the Company's then-existing insurance coverage, from and after the date that the Icahn Designees are seated as members of the Board, the Icahn Designees shall be covered by the same indemnification and insurance provisions and coverage as are applicable to the individuals that are directors of the Company as of such time, and at such time the Icahn Designees are no longer members of the Board, then the same indemnification and insurance provisions and coverage as are applicable to former directors of the Company as of such time.

(i)  Notwithstanding the foregoing, the Company acknowledges that for so long as the Icahn Designees are members of the Board, the Icahn Designees shall have the same rights as any other director with respect to being permitted to attend (as an observer and without voting rights) any committee meeting regardless of whether such director is a member of such committee.

(b)  At all times from the date that the Icahn Designees are seated as members of the Board through the termination of their service as a member of the Board, each of the Icahn Designees shall comply with all written policies, procedures, processes, codes, rules, standards and guidelines applicable to all non-employee Board members and of which the Icahn Designees have been provided written copies in advance (or which have been filed with the Securities and Exchange Commission ("**SEC**") or posted on the Company's website), including the Company's code of business conduct, corporate policies on ethical business conduct, political contributions, lobbying and other political activities policy, conflicts of interest policy, insider trading policy, anti-hedging policy and governance policies (collectively, the "**Company Policies**"), and shall preserve the confidentiality of Company business and information, including discussions or matters considered in meetings of the Board or Board committees (except to the extent permitted in the Confidentiality Agreement (as defined below) to be entered into pursuant to Section 5 of this Agreement). In addition, each of the Icahn Designees is aware of and shall act in accordance with his or her fiduciary duties with respect to the Company and its stockholders. For the avoidance of doubt, the Parties agree that notwithstanding the terms of any Company Policies, in no event shall any Company Policy apply to the Icahn Group, other than the Icahn Designees in their capacity as members of the Board.

(c)  Any provision in this Agreement to the contrary notwithstanding, if at any time after the Distribution Effective Date, the Icahn Group, together with any Icahn Affiliates (as defined below), ceases collectively to beneficially own (for all purposes in this Agreement, the terms "beneficially own" and "beneficial ownership" shall have the meaning ascribed to such terms as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act), an aggregate Net Long Position (x) in at least six percent (6%) of the total outstanding common shares of the Company ("**Common Shares**") as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) one of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee; or (y) in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) each of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board

4

Complaint Ex. D 0004

and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee(s). For clarity, "Common Shares" will include the shares of the entity resulting from the amalgamation of the Company expected to be effected in connection with the B+L Distribution for which the Common Shares are exchanged pursuant to such amalgamation.

The Icahn Group, upon request, shall keep the Company regularly apprised of the Net Long Position of the Icahn Group and the Icahn Affiliates to the extent that such position differs from the ownership positions publicly reported on the Icahn Schedule 13D and amendments thereto.

For purposes of this Agreement: the term "Net Long Position" shall mean: such Common Shares beneficially owned, directly or indirectly, that constitute such person's net long position as defined in Rule 14e-4 under the Exchange Act *mutatis mutandis*, provided that "Net Long Position" shall not include any shares as to which such person does not have the right to vote or direct the vote, or as to which such person has entered into a derivative or other agreement, arrangement or understanding that hedges or transfers, in whole or in part, directly or indirectly, any of the economic consequences of ownership of such shares; and the terms "person" or "persons" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

Each of the Icahn Designees shall, prior to his or her appointment to the Board (including any Replacement Designee), and each member of the Icahn Group shall cause each of the Icahn Designees (including any Replacement Designee) to, execute an irrevocable resignation in the form attached to this Agreement as **Exhibit A**.

(d)     So long as the Icahn Group, together with the Icahn Affiliates, beneficially owns an aggregate Net Long Position in at least six percent (6%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations or similar type events), the Company shall not adopt a Rights Plan with an "Acquiring Person" beneficial ownership threshold below 20.0% of the then-outstanding Common Shares, unless (x) such Rights Plan provides that, if such Rights Plan is not ratified by the Company's stockholders within 105 days of such Rights Plan being adopted, such Rights Plan shall automatically expire and (y) the "Acquiring Person" definition of such Rights Plan exempts the Icahn Group up to a beneficial ownership of 19.95% of the then-outstanding Common Shares. The term "**Rights Plan**" shall mean any plan or arrangement of the sort commonly referred to as a "rights plan" or "stockholder rights plan" or "shareholder rights plan" or "poison pill" that is designed to increase the cost to a potential acquirer of exceeding the applicable ownership thresholds through the issuance of new rights, common stock or preferred shares (or any other security or device that may be issued to stockholders of the Company, other than ratably to all stockholders of the Company) that carry severe redemption provisions, favorable purchase provisions or otherwise, and any related rights agreement.

2.      **Additional Agreements.**

(a)     Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, solely in connection with the First Annual Meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting

5

Complaint Ex. D 0005

Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the First Annual Meeting, in each case that are entitled to vote at the First Annual Meeting, to be present for quorum purposes and to be voted, at the First Annual Meeting or at any adjournment or postponement thereof, (A) for each nominee on the First BLCO Slate, (B) against any nominees that are not nominated by the Board for election at the First Annual Meeting, (C) against any stockholder proposal to increase the size of the Board and (D) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence and in Section 2(b), the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual or special meeting.

(b)    Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, that for any annual general meeting or special meeting of stockholders subsequent to the First Annual Meeting, if the Board has agreed to nominate the Icahn Designees then serving on the Board for election at such annual general meeting or special meeting and the Icahn Designees have consented to be nominated at such annual general meeting or special meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the applicable annual general meeting or special meeting, in each case that are entitled to vote at such annual general meeting or special meeting, to be present for quorum purposes and to be voted at such annual general meeting or special meeting or at any adjournment or postponement thereof, (A) for each director nominated by the Board for election at such annual general meeting, (B) against any (i) stockholder proposal to increase the size of the Board and (ii) nominees that are not nominated by the Board for election at such annual general meeting or special meeting, and (C) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence, the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual general meeting or special meeting following the First Annual Meeting.

As used in this Agreement, the term "**Voting Securities**" shall mean the Common Shares that such person has the right to vote or has the right to direct the vote. For purposes of this Section 2, no person shall be, or be deemed to be, the "beneficial owner" of, or to "beneficially own," any securities beneficially owned by any director of the Company to the extent such securities were acquired directly from the Company by such director as or pursuant to director compensation for serving as a director of the Company. For purposes of this Agreement, (A) the term "**Affiliate**" shall have the meaning set forth in Rule 12b-2 promulgated by the SEC under the Exchange Act, and the term "**Icahn Affiliate**" shall mean such Affiliates that are controlled by the members of the Icahn Group, and (B) the term "**Associate**" shall mean (A) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (B) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of such person or of any of its parents or subsidiaries.

6

Complaint Ex. D 0006

3.  **Icahn Group Restrictions**

(a)  From and after the date that the Icahn Designees are seated as members of the Board, until the later of (i)(x) the end of the First Annual Meeting and (y) such date as no Icahn Designee is on the Board and the Icahn Group has no right to designate a Replacement Designee (including if the Icahn Group has irrevocably waived such right in writing), and (ii) solely with respect to **Section 3(a)(i)(x)**, the Butterfly Date (as hereafter defined) (the "**Standstill Period**"), so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, no member of the Icahn Group shall, directly or indirectly, and each member of the Icahn Group shall cause each of the Icahn Affiliates and its Associates not to, directly or indirectly (it being understood that the foregoing shall not restrict the Icahn Designees from discussing the matters set forth below with other members of the Board):

(i)  acquire, offer or propose to acquire any voting securities (or beneficial ownership thereof), or rights or options to acquire any voting securities (or beneficial ownership thereof) of the Company if after any such case, immediately after the taking of such action the Icahn Group, together with its respective Icahn Affiliates, would in the aggregate, beneficially own more than 19.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments); provided that: (x) if, solely as a result of their acquisition of Common Shares or securities or other instruments convertible into Common Shares, the Icahn Group, together with its respective Icahn Affiliates and its Associates, become the beneficial owners of more than 9.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), then neither the Icahn Group nor the Icahn Affiliates nor its Associates shall sell any Common Shares or securities or other instruments convertible into Common Shares (but excluding, for the avoidance of doubt, any swaps or other instruments that do not allow for settlement in property other than cash) following the Distribution Effective Date and prior to the Butterfly Date without first obtaining a supplemental tax ruling from the Canada Revenue Agency ("**CRA**") or an opinion of a nationally recognized accounting firm or law firm that is in form and substance satisfactory to the Company, acting reasonably, that such sale will not cause the B+L Distribution to be taxed in a manner inconsistent with that provided for in the tax ruling issued by the CRA in connection with the B+L Distribution; and (y) the term **"Butterfly Date"** shall mean the date that is the earlier of (A) eighteen (18) months after the Distribution Effective Date and (B) the date the Company delivers written notice to the Icahn Group in accordance with Section 12 confirming that BHC is not proceeding with a Canadian "butterfly" form of spin out with respect to the B+L Distribution;

(ii)  except with respect to the signatories to the Icahn Group's Schedule 13D filed with the SEC with respect to the Company (the "**Icahn Schedule 13D**"), form or join in a partnership, limited partnership, syndicate or a "group" as defined under Section 13(d) of the Exchange Act, with respect to the securities of the Company;

7

Complaint Ex. D 0007

(iii) present (or request to present) at any annual general meeting or any special meeting of the Company's stockholders, any proposal for consideration for action by stockholders or engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" (as such terms are defined in Regulation 14A under the Exchange Act) of proxies or consents (including, without limitation, any solicitation of consents that seeks to call a special meeting of stockholders) or, except as provided in this Agreement, otherwise publicly propose (or publicly request to propose) any nominee for election to the Board or seek representation on the Board or the removal of any member of the Board;

(iv) grant any proxy, consent or other authority to vote with respect to any matters (other than to the named proxies included in the Company's proxy card for any annual general meeting or special meeting of stockholders) or deposit any Voting Securities in a voting trust or subject them to a voting agreement or other arrangement of similar effect (excluding customary brokerage accounts, margin accounts, prime brokerage accounts and the like), in each case, except as provided in Sections 2(a) or (b);

(v) call or seek to call any special meeting of the Company or action by consent resolutions;

(vi) institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against or involving the Company;

(vii) separately or in conjunction with any other person in which it is or proposes to be either a principal, partner or financing source or is acting or proposes to act as broker or agent for compensation, submit a proposal for or offer of (with or without conditions), any Extraordinary Transaction (as defined below); provided that the Icahn Group shall be permitted to sell or tender their Common Shares, and otherwise receive consideration, pursuant to any Extraordinary Transaction; and provided further that (A) if a third party (other than the Icahn Group or an Icahn Affiliate) commences a tender offer or exchange offer for all of the outstanding Common Shares that is not rejected by the Board in its Recommendation Statement on Schedule 14D-9, then the Icahn Group shall similarly be permitted to make an offer for the Company or commence a tender offer or exchange offer for all of the outstanding Common Shares at the same or higher consideration per share, provided that the foregoing (y) will not relieve the Icahn Group of its obligations under the Confidentiality Agreement and (z) will not be deemed to require the Company to make any public disclosures and (B) the Company may waive the restrictions in this Section 3(a)(vii) with the approval of the Board. "Extraordinary Transaction" means, collectively, any of the following involving the Company or any of its subsidiaries or its or their securities or all or substantially all of the assets or businesses of the Company and its subsidiaries: any tender offer or exchange offer, merger, acquisition, business combination, reorganization, restructuring, recapitalization, sale or acquisition of material assets, or liquidation or dissolution; provided that Extraordinary Transaction shall not include, and neither this Section 3(a) nor any other term of this Agreement, shall restrict the Icahn Group from commencing and consummating a tender offer pursuant to applicable Canadian laws and regulations to acquire additional Common Shares, so long as upon consummation of such tender offer(s) the Icahn Group would comply with **Section 3(a)(i)**; provided, further that this Section 3(a)(vi) shall not prevent an Icahn Designee acting in his or her capacity as a director of the Company from raising such matter privately at the Board;

8

Complaint Ex. D 0008

(viii)  seek, or encourage any person, to submit nominations in furtherance of a "contested solicitation" for the election or removal of directors with respect to the Company or, except as expressly provided in this Agreement, seek, encourage or take any other action with respect to the election or removal of any directors;

(ix)  make any public communication in opposition to (A) any merger, acquisition, amalgamation, recapitalization, restructuring, disposition, distribution, spin-off, asset sale, joint venture or other business combination (including the B+L Distribution) or (B) any financing transaction, in each case involving the Company;

(x)  seek to advise, encourage, support or influence any person with respect to the voting or disposition of any securities of the Company at any annual general meeting or special meeting of stockholders, except in accordance with Section 2(a) or (b);

(xi)  publicly disclose any intention, plan or arrangement inconsistent with any provision of this Section 3; or

(xii)  publicly encourage or support any other person to take any of the actions described in this Section 3 that the Icahn Group is restricted from doing.

(b)  Subject to applicable law, from the date of this Agreement until the end of the Standstill Period, (i) so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, neither a member of the Icahn Group nor any of the Icahn Affiliates or its Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) the Company or the Company's respective current or former officers or directors and (ii) so long as the Icahn Group has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Company specifying any such breach, neither the Company nor any of its Affiliates or Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) any member of the Icahn Group or Icahn Affiliates or any of their respective current or former officers or directors.

4.  **Public Announcements.** The Company acknowledges that the Icahn Group intends to file this Agreement as an exhibit to the Icahn Group's Schedule 13D with respect to the Company promptly following the Distribution Effective Date, and the Icahn Group acknowledges that the Company intends to file this Agreement as an exhibit to the Company's Form S-1/A promptly following the execution of this Agreement. The Icahn Group will not issue a press release. The Company shall have an opportunity to review in advance any Schedule 13D filing made by the Icahn Group with respect to this Agreement, and the Icahn Group shall have an opportunity to review in advance the relevant portion of the Form S-1/A filing to be made by the Company with respect to this Agreement.

9

Complaint Ex. D 0009

5. **Confidentiality Agreement.** The Company hereby agrees that, following the appointment of the Icahn Designees to the Board: (i) the Icahn Designees are permitted to and may provide confidential information subject to and in accordance with the terms of the confidentiality agreement in the form attached to this Agreement as **Exhibit B** (the "**Confidentiality Agreement**") (which the Icahn Group agrees to execute upon the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)** and deliver to the Company and cause the Icahn Designees to abide by) and (ii) the Company will execute and deliver the Confidentiality Agreement to the Icahn Group substantially contemporaneously with execution and delivery thereof by the other signatories thereto. At any time an Icahn Designee is a member of the Board, the Board shall not adopt a policy precluding members of the Board from speaking to Mr. Icahn, and the Company confirms that it will advise members of the Board, including the Icahn Designees, that they may, but are not obligated to, speak to Mr. Icahn (but subject to the Confidentiality Agreement), if they are willing to do so and subject to their fiduciary duties and Company Policies (but may caution them regarding specific matters, if any, that involve conflicts between the Company and the Icahn Group).

6. **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

7. **Representations and Warranties of Icahn Group.** Each member of the Icahn Group jointly represents and warrants that, as of the date of this Agreement, (a) the Icahn Group collectively beneficially own, an aggregate of 34,721,118 common shares, no par value (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), of BHC ("**BHC Common Shares**") and no Common Shares, (b) except as set forth in the preceding clause (a) and the Icahn Group's Schedule 13Ds with respect to BHC or the Company or as otherwise disclosed to the Company, no member of the Icahn Group, individually or in the aggregate with any Icahn Affiliate, has any other beneficial ownership of, or economic exposure to, any BHC Common Shares or Common Shares, nor does it currently have or have any right to acquire any interest in any other securities of BHC or the Company (or any rights, options or other securities convertible into or exercisable or exchangeable (whether or not convertible, exercisable or exchangeable immediately or only after the passage of time or the occurrence of a specified event) for such securities or any obligations measured by the price or value of any securities of BHC, the Company or any of their respective controlled Affiliates, including any swaps or other derivative arrangements designed to produce economic benefits and risks that correspond to the ownership of BHC Common Shares or Common Shares, whether or not any of the foregoing would give rise to beneficial ownership (as determined under Rule 13d-3 promulgated under the Exchange Act), and whether or not to be settled by delivery of BHC Common Shares or Common Shares, payment of cash or by other consideration, and without regard to any short position under any such contract or arrangement), and (c) no member of the Icahn Group has any knowledge of any other stockholder of BHC or the Company that intends to submit a notice to the Company to nominate directors at the next Annual Meeting of shareholders of BHC or the Company.

10

Complaint Ex. D 0010

8.  **Representations and Warranties and Covenants of the Company.** The Company represents and warrants, that as of the date of this Agreement, the Company expects that the directors so identified in the Company's Form S-1 filed with the SEC on January 13, 2022 shall be all of the directors on the Board as of the completion of the Company's initial public offering of Common Shares. Further, the Company agrees that if the Company enters into an agreement, arrangement or understanding, or otherwise grants any rights, to any other stockholder of the Company to avoid a proxy or similar contest with such stockholder at any time during the three (3) months following the date that the Icahn Designees are seated as directors of the Company, then to the extent such agreement, arrangement or understanding grants any right or rights that are more favorable than those set forth in this Agreement, the Company agrees it shall offer the same such rights to the Icahn Group.

9.  **Miscellaneous.** This Agreement shall terminate and be of no further force or effect upon the earliest of the occurrence of any of the following events: (a) following the Board's appointment of the Icahn Designees to the Board pursuant to **Section 1(a)(i)**, (i) no Icahn Designee then serving on the Board and (ii) the Icahn Group no longer being entitled to designate a Replacement Designee for any Icahn Designee, (b) the expiry of the Election Period without the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)**, (c) following the completion of the B+L Distribution, the Icahn Group not collectively beneficially owning an aggregate Net Long Position in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), and (d) any breach by the Icahn Group of its covenants and obligations set forth in **Section 1(a)(ii)** and **Section 3(a)** (including any action taken prior to the commencement of the Standstill Period that would be a breach of **Section 3(a)** if taken during the Standstill Period). Notwithstanding anything herein to the contrary, **Section 3(a)(i)** shall survive any such termination through the Butterfly Date. The parties hereto recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, each party agrees that in addition to other remedies the other party shall be entitled to at law or equity, the other party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law. Furthermore, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery or the other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (iv) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (v) irrevocably consents to service of process by a reputable overnight mail delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

11

Complaint Ex. D 0011

10.  **No Waiver.** Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

11.  **Entire Agreement.** This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

12.  **Notices.** All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy and email is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Email: [*****]
Attention: Christina Ackermann, General Counsel

With copies to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York, NY 10019
Attention: Igor Kirman, [*****]
          Mark Veblen, [*****]
          Sabastian Niles, [*****]

if to the Icahn Group:

Icahn Capital LP
16690 Collins Avenue, Penthouse Suite
Sunny Isles Beach, FL 33160
Attention: Jesse Lynn, Chief Operating Officer
Email: [*****]

13.  **Severability.** If at any time subsequent to the date of this Agreement, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

14.  **Counterparts.** This Agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

12

Complaint Ex. D 0012

15. **Successors and Assigns.** This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

16. **No Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other persons.

17. **Fees and Expenses.** Neither the Company, on the one hand, nor the Icahn Group, on the other hand, will be responsible for any fees or expenses of the other in connection with this Agreement.

18. **Interpretation and Construction.** Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Unless context otherwise requires, references herein to Exhibits, Sections or Schedules mean the Exhibits, Sections or Schedules attached to this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. In all instances, the term "or" shall not be deemed to be exclusive. For all purposes of this Agreement, and any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A), the Icahn Group and its Icahn Affiliates shall in no event be deemed to beneficially own less than six percent (6%), or three percent (3%), as applicable, of the outstanding Common Shares unless the Icahn Group's crossing of any such threshold is the result of sales of Common Shares or transactions described in Rule 14e-4(a)(1) of the Exchange Act (but excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments) by, or on behalf of, the Icahn Group or its Icahn Affiliates (i.e., issuances of Common Shares, or similar actions, by the Company shall have no effect on the deemed beneficial ownership of Common Shares by the Icahn Group and its Icahn Affiliates for purposes of this this Agreement, or any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A)).

[Signature Pages Follow]

13

Complaint Ex. D 0013

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

**BAUSCH + LOMB CORPORATION**

By:   /s/ Christina M. Ackermann

Name:  Christina M. Ackermann

Title:   Executive Vice President and General Counsel

[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0014

**ICAHN GROUP**

/s/ Carl C. Icahn
_____
Carl C. Icahn

ICAHN PARTNERS LP

By:     /s/ Jesse Lynn
_____
Name:  Jesse Lynn
Title:   Chief Operating Officer

ICAHN PARTNERS MASTER FUND LP

By:     /s/ Jesse Lynn
_____
Name:  Jesse Lynn
Title:   Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By:     /s/ Ted Papapostolou
_____
Name:  Ted Papapostolou
Title:   Chief Financial Officer


[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0015

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By:    /s/ Ted Papapostolou

Name:  Ted Papapostolou
Title:    Chief Financial Officer

IPH GP LLC

By:    /s/ Jesse Lynn

Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN CAPITAL LP

By:    /s/ Jesse Lynn

Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN ONSHORE LP

By:    /s/ Jesse Lynn

Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN OFFSHORE LP

By:    /s/ Jesse Lyn

Name:  Jesse Lynn
Title:    Chief Operating Officer

BECKTON CORP

By:    /s/ Jesse Lyn

Name:  Jesse Lynn
Title:    Vice President

[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0016

**SCHEDULE A**

CARL C. ICAHN

ICAHN PARTNERS LP

ICAHN PARTNERS MASTER FUND LP

ICAHN ENTERPRISES G.P. INC.

ICAHN ENTERPRISES HOLDINGS L.P.

IPH GP LLC

ICAHN CAPITAL LP

ICAHN ONSHORE LP

ICAHN OFFSHORE LP

BECKTON CORP.

Complaint Ex. D 0017

**EXHIBIT A**

[FORM OF RESIGNATION]

[DATE]

Board of Directors
Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Re:    Resignation

Ladies and Gentlemen:

      This irrevocable resignation is delivered pursuant to that certain Director Appointment and Nomination Agreement, dated as of April [__], 2022 (the "Agreement") among Bausch + Lomb Corporation and the Icahn Group. Capitalized terms used herein but not defined shall have the meaning set forth in the Agreement.

      Pursuant to Section 1(c) of the Agreement, effective only upon, and subject to, such time as the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least six percent (6%) of the total outstanding Common Shares as of the Distribution Effective Date, I hereby irrevocably resign from my position as a director of the Company and from any and all committees of the Board on which I serve; *provided, however*, that if this resignation is tendered pursuant to Section 1(c) of the Agreement, this resignation shall not be effective if any other resignation of an Icahn Designee is tendered and accepted pursuant to Section 1(c) of the Agreement (and the Icahn Group shall determine in its sole discretion which resignation of the Icahn Designees shall be effective) unless and until the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date.

Sincerely,

_____

Name:

B-1

Complaint Ex. D 0018

**EXHIBIT B**

[CONFIDENTIALITY AGREEMENT]

B-1

Complaint Ex. D 0019

**CONFIDENTIALITY AGREEMENT**

**BAUSCH + LOMB CORPORATION**

[DATE]

To: Each of the persons or entities listed on Schedule A (the "Icahn Group" or "you")

Ladies and Gentlemen:

This letter agreement shall become effective upon the appointment of any Icahn Designee to the Board of Directors (the "Board") of Bausch + Lomb Corporation (the "Company"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Director Appointment and Nomination Agreement (the "Nomination Agreement"), dated as of April [__], 2022, among the Company and the Icahn Group. The Company understands and agrees that, subject to the terms of, and in accordance with, this letter agreement, an Icahn Designee may, if and to the extent he or she desires to do so, disclose information he or she obtains while serving as a member of the Board to you and your Representatives (as hereinafter defined), and may discuss such information with any and all such persons, subject to the terms and conditions of this Agreement, and that other members of the Board may similarly disclose information to you. As a result, you may receive certain non-public information regarding the Company. You acknowledge that this information is proprietary to the Company and may include trade secrets or other business information the disclosure of which could harm the Company. In consideration for, and as a condition of, the information being furnished to you and your agents, representatives, attorneys, advisors, directors, officers or employees, subject to the restrictions in paragraph 2 (collectively, the "Representatives"), you agree to treat any and all information concerning or relating to the Company or any of its subsidiaries or current or former affiliates that is furnished to you or your Representatives (regardless of the manner in which it is furnished, including in written or electronic format or orally, gathered by visual inspection or otherwise) by any Icahn Designee, or by or on behalf of the Company or any Company Representative (as defined below), including discussions or matters considered in meetings of the Board or Board committees, together with any notes, analyses, reports, models, compilations, studies, interpretations, documents, records or extracts thereof containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, "Evaluation Material"), in accordance with the provisions of this letter agreement, and to take or abstain from taking the other actions hereinafter set forth.

1.  The term "Evaluation Material" does not include information that (i) is or has become generally available to the public other than as a result of a direct or indirect disclosure by you or your Representatives in violation of this letter agreement or any other obligation of confidentiality, (ii) was within your or any of your Representatives' possession on a non-confidential basis prior to its being furnished to you by any Icahn Designee, or by or on behalf of the Company or its agents, representatives, attorneys, advisors, directors (other than the Icahn Designees), officers or employees (collectively, the "Company Representatives"), or (iii) is received from a source other than any Icahn Designee, the Company or any of the Company Representatives; *provided,* that in the case of (ii) or (iii) above, the source of such information was not believed by you, after reasonable inquiry, to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other person with respect to such information at the time the information was disclosed to you.

2.  You and your Representatives will, and you will cause your Representatives to, (a) keep the Evaluation Material strictly confidential and (b) not disclose any of the Evaluation Material in any manner whatsoever without the prior written consent of the Company; *provided, however,* that you may privately disclose any of such information: (A) to your Representatives (i) who need to know

B-2

Complaint Ex. D 0020

such information for the purpose of advising you on your investment in the Company and (ii) who are informed by you of the confidential nature of such information and agree to be bound by the terms of this Agreement as if they were a party hereto; *provided, further,* that you will be responsible for any violation of this letter agreement by your Representatives as if they were parties to this letter agreement; and (B) to the Company and the Company Representatives. It is understood and agreed that no Icahn Designee shall disclose to you or your Representatives any Legal Advice (as defined below) that may be included in the Evaluation Material with respect to which such disclosure would constitute waiver of the Company's attorney client privilege or attorney work product privilege. "Legal Advice" as used in this letter agreement shall be solely and exclusively limited to the advice provided by legal counsel and shall not include factual information or the formulation or analysis of business strategy that is not protected by the attorney-client or attorney work product privilege.

3. In the event that you or any of your Representatives are required by applicable subpoena, legal process or other legal requirement to disclose any of the Evaluation Material, you will (a) promptly notify (except where such notice would be legally prohibited) the Company in writing by email, facsimile and certified mail so that the Company may seek a protective order or other appropriate remedy (and if the Company seeks such an order, you will provide such cooperation as the Company shall reasonably request), at its cost and expense and (b) produce or disclose only that portion of the Evaluation Material which your outside legal counsel of national standing advises you in writing is legally required to be so produced or disclosed and you inform the recipient of such Evaluation Material of the existence of this letter agreement and the confidential nature of such Evaluation Material. In no event will you or any of your Representatives oppose action by the Company to obtain a protective order or other relief to prevent the disclosure of the Evaluation Material or to obtain reliable assurance that confidential treatment will be afforded the Evaluation Material. For the avoidance of doubt, it is understood that there shall be no "legal requirement" requiring you to disclose any Evaluation Material solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative or other voluntary transactions with respect to the Common Shares of the Company or otherwise proposing or making an offer to do any of the foregoing, or you would be unable to file any proxy or other solicitation materials in compliance with Section 14(a) of the Exchange Act or the rules promulgated thereunder.

4. You acknowledge that (a) none of the Company or any of the Company Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any Evaluation Material, and (b) none of the Company or any of the Company Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom. You and your Representatives (or anyone acting on your or their behalf) shall not directly or indirectly initiate contact or communication with any executive or employee of the Company other than the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, General Counsel, or such other persons approved by the foregoing or the Board concerning Evaluation Material, or to seek any information in connection therewith from any such person other than the foregoing, without the prior consent of the Company; *provided, however,* the restriction in this sentence shall not in any way apply to any Icahn Designee acting in his or her capacity as a Board member (nor shall it apply to any other Board members).

5. All Evaluation Material shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of any disclosure of or your use of any Evaluation Material acquire any rights with respect thereto, all of which rights (including all intellectual property rights) shall remain exclusively with the Company. At any time after the date on which no Icahn Designee is a

B-3

Complaint Ex. D 0021

director of the Company, upon the request of the Company for any reason, you will promptly return to the Company or destroy all hard copies of the Evaluation Material and use reasonable best efforts to permanently erase or delete all electronic copies of the Evaluation Material in your or any of your Representatives' possession or control (and, upon the request of the Company, shall promptly certify to the Company that such Evaluation Material has been erased or deleted, as the case may be). Notwithstanding the foregoing, the obligation to return or destroy Evaluation Material shall not cover information (i) that is maintained on routine computer system backup tapes, disks or other backup storage devices as long as such backed-up information is not used, disclosed, or otherwise recovered from such backup devices or (ii) retained on a confidential basis solely to the extent required to comply with applicable law and/or any internal record retention requirements; provided that such materials referenced in this sentence shall remain subject to the terms of this Agreement applicable to Evaluation Material, and you and your Representatives will continue to be bound by the obligations contained herein for as long as any such materials are retained by you or your Representatives.

6. You acknowledge, and will advise your Representatives, that the Evaluation Material may constitute material non-public information under applicable federal, state or provincial securities laws, and you agree that you shall not, and you shall use reasonable best efforts to ensure that your Representatives do not, trade or engage in any derivative or other transaction on the basis of such information in violation of such laws.

7. You hereby represent and warrant to the Company that (i) you have all requisite company power and authority to execute and deliver this letter agreement and to perform your obligations hereunder, (ii) this letter agreement has been duly authorized, executed and delivered by you, and is a valid and binding obligation, enforceable against you in accordance with its terms, (iii) this letter agreement will not result in a violation of any terms or conditions of any agreements to which you are a party or by which you may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting you, and (iv) your entry into this letter agreement does not require approval by any owners or holders of any equity or other interest in you (except as has already been obtained).

8. Any waiver by the Company of a breach of any provision of this letter agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this letter agreement. The failure of the Company to insist upon strict adherence to any term of this letter agreement on one or more occasions shall not be considered a waiver or deprive the Company of the right thereafter to insist upon strict adherence to that term or any other term of this letter agreement.

9. You acknowledge and agree that the value of the Evaluation Material to the Company is unique and substantial, but may be impractical or difficult to assess in monetary terms. You further acknowledge and agree that in the event of an actual or threatened violation of this letter agreement, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, you acknowledge and agree that, in addition to any and all other remedies which may be available to the Company at law or equity, the Company shall be entitled to an injunction or injunctions to prevent breaches of this letter agreement and to enforce specifically the terms and provisions of this letter agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this letter agreement, you shall not allege, and you hereby waive the defense, that there is an adequate remedy at law.

B-4

Complaint Ex. D 0022

10. Each of the parties (a) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this letter agreement or the transactions contemplated by this letter agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it shall not bring any action relating to this letter agreement or the transactions contemplated by this letter agreement in any court other than the Delaware Court of Chancery or other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (d) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (e) irrevocably consents to service of process by a reputable overnight delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS LETTER AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

11. This letter agreement and the Nomination Agreement contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior or contemporaneous agreements or understandings, whether written or oral. This letter agreement may be amended only by an agreement in writing executed by the parties hereto.

12. All notices, consents, requests, instructions, approvals and other communications provided for in this letter agreement and all legal process in regard to this letter agreement shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4
Email: [*****]
Attention: Christina Ackermann, General Counsel

With copies to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York, NY 10019
Attention: Igor Kirman, [*****]
          Mark Veblen, [*****]
          Sabastian Niles, [*****]

B-5

Complaint Ex. D 0023

if to the Icahn Group:

Icahn Capital LP
16690 Collins Avenue, Penthouse Suite
Sunny Isles Beach, FL 33160
Attention: Jesse Lynn, Chief Operating Officer
Email: [*****]

13. If at any time subsequent to the date hereof, any provision of this letter agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this letter agreement.

14. This letter agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. This letter agreement and the rights and obligations herein may not be assigned or otherwise transferred, in whole or in part, by you without the express written consent of the Company. This letter agreement, however, shall be binding on successors of the parties to this letter agreement.

16. The Icahn Group shall cause any Replacement Designee appointed to the Board pursuant to the Nomination Agreement to execute a copy of this letter agreement.

17. This letter agreement shall expire two (2) years from the date on which no Icahn Designee remains a director of the Company; except that you shall maintain in accordance with the confidentiality obligations set forth herein any Evaluation Material constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3) and (ii) retained pursuant to Section 5.

18. No licenses or rights under any patent, copyright, trademark, or trade secret are granted or are to be implied by this letter agreement.

19. Each of the parties acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this letter agreement, and that it has executed the same with the advice of said counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties, and any controversy over interpretations of this agreement shall be decided without regards to events of drafting or preparation. The term "including" shall in all instances be deemed to mean "including without limitation." In all instances, the term "or" shall not be deemed to be exclusive.

[Signature Pages Follow]

B-6

Complaint Ex. D 0024

Please confirm your agreement with the foregoing by signing and returning one copy of this letter agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

BAUSCH + LOMB CORPORATION

By: _____
Name:
Title:

Accepted and agreed as of the date first written above:

CARL C. ICAHN

_____
Carl C. Icahn

ICAHN PARTNERS LP

By: _____
Name:   Jesse Lynn
Title:   Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0025

ICAHN PARTNERS MASTER FUND LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By: _____
Name:  Ted Papapostolou
Title:    Chief Financial Officer

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By: _____
Name:  Ted Papapostolou
Title:    Chief Financial Officer

IPH GP LLC

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN CAPITAL LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer

ICAHN ONSHORE LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0026

ICAHN OFFSHORE LP

By:   _____

Name:  Jesse Lynn
Title:   Chief Operating Officer

BECKTON CORP

By:   _____

Name:  Jesse Lynn
Title:   Vice President

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0027

SCHEDULE A

Beckton Corp.

Icahn Capital LP

Icahn Enterprises Holdings L.P.

Icahn Enterprises G.P. Inc.

Icahn Offshore LP

Icahn Onshore LP

Icahn Partners LP

Icahn Partners Master Fund LP

IPH GP LLC

Icahn Capital LP

Carl C. Icahn

Complaint Ex. D 0028

ANNEX 1

**Tax Criteria**

From and after the Distribution Effective Date, the Icahn Group shall not be permitted to designate any individual as a director of the Company if: (x) such individual, at the time of such designation, is also a member of the board of directors of BHC; and (y) immediately following such designation, more than two (2) individuals are members of the boards of directors of both BHC and the Company. For example, if on the date of any such designation, Brett Icahn and Steven Miller continue to be members of the board of directors of BHC, then: (x) if no other individuals are members of the boards of directors of both BHC and the Company, then both Brett Icahn and Steven Miller would be permitted to join the board of directors of the Company; (y) if two (2) other individuals are members of the boards of directors of both BHC and the Company, then neither Brett Icahn nor Steven Miller would be permitted to join the board of directors of the Company; and (z) if one (1) other individual is a member of the boards of directors of both BHC and the Company, then Brett Icahn or Steven Miller (but not both) would be permitted to join the board of directors of the Company.

Complaint Ex. D 0029

Amended Agreement

10/16/25, 2:50 PM

EX-10.1 2 dp175752_ex1001.htm EXHIBIT 10.1

**Exhibit 10.1**

*Execution Version*

**REDACTED**

**Certain identified information, indicated by [*****], has been omitted pursuant to Item 601(b)(10) because it is (i) not material and (ii) contains personal information.**

**AMENDED AND RESTATED DIRECTOR APPOINTMENT AND NOMINATION AGREEMENT**

This Amended and Restated Director Appointment and Nomination Agreement, dated as of June 21, 2022 (this "**Agreement**"), is by and among the persons and entities listed on Schedule A (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**"). In consideration of and reliance upon the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.        **Board Representation and Board Matters.**

        (a)        The Company and the Icahn Group agree as follows:

                (i)        as soon as practicable following the date hereof, the Company shall take or shall have taken all necessary action to increase the size of the Board of Directors of the Company (the "**Board**") by two, and following consultation with the Icahn Group, to appoint two individuals identified by the Icahn Group and reasonably acceptable to the Company (such individuals, collectively, the "**Icahn Designees**" and each an "**Icahn Designee**") to fill the resulting vacancies, each with a term expiring at the first annual general meeting of stockholders of the Company following such written election (the "**First Annual Meeting**"). Prior to such date as the Icahn Designees are seated as members of the Board, the Icahn Group shall not request and the Company shall not provide any material non-public information relating to or involving the Company. For the avoidance of doubt, it shall not be deemed unreasonable for the Company to reject a designee in accordance with this **Section 1(a)(i)** if such designee does not satisfy the Director Criteria (as hereafter defined) or the criteria set forth on Annex 1 attached hereto (the **"Tax Criteria"**).

                (ii)        the Company shall use reasonable best efforts to cause the election of each of the Icahn Designees at the First Annual Meeting (including by (x) recommending that the Company's stockholders vote in favor of the election of each of the Icahn Designees, (y) including each of the Icahn Designees in the Company's proxy statement and proxy card for the First Annual Meeting, and (z) otherwise supporting each of the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate). The Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to the First Annual Meeting. As a condition to the Icahn Designees' appointment to the Board, the Icahn Designees shall execute and deliver a customary joinder to this Agreement. Prior to the execution and delivery of such joinder to the Company, the Icahn Group shall cause the Icahn Designees to comply with the covenants, agreements and other provisions herein applicable to the Icahn Designees.

                (iii)        that as a condition to the Icahn Designees' appointment to the Board and subsequent nomination for election, the Icahn Designees each agree to provide to

Complaint Ex. E 0001

the Company, prior to nomination and appointment and on an on-going basis while serving as a member of the Board, such information and materials as the Company routinely receives from other members of the Board or as is required to be disclosed in proxy statements under applicable law or as is otherwise reasonably requested by the Company from time-to-time from all members of the Board in connection with the Company's legal, regulatory, auditor or stock exchange requirements, including, but not limited to, a completed D&O Questionnaire in the form separately provided by the Company to the Icahn Group (the "**Nomination Documents**").

(iv)     That, subject to **Section 1(c)** below, should any Icahn Designee resign from the Board or be rendered unable to, or refuse to, be appointed to, or for any other reason fail to serve or is not serving, on the Board (other than as a result of not being nominated by the Company for election at an annual meeting of stockholders subsequent to the First Annual Meeting, following which the Icahn Group's replacement rights pursuant to this **Section 1(a)(iv)** shall terminate with respect to such Icahn Designee), as long as the Icahn Group has not materially breached this Agreement and failed to cure such breach within five (5) business days of written notice from the Company specifying any such breach, the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, or as a nominee on the Company's slate of nominees for election to the Board at the First Annual Meeting (collectively, the "**First BLCO Slate**"), as applicable, a replacement that is approved by the Board, such approval not to be unreasonably withheld, conditioned or delayed (an "**Acceptable Person**") (and if such proposed designee is not an Acceptable Person, the Icahn Group shall be entitled to continue designating a recommended replacement until such proposed designee is an Acceptable Person) (a "**Replacement Designee**"). Any Replacement Designee who becomes a Board member in replacement of any Icahn Designee pursuant to this Section 1(a)(iv) or Section 1(e) shall be deemed to be an Icahn Designee for all purposes under this Agreement and, as a condition to being appointed to the Board, shall be required to sign a customary joinder to this Agreement.

(v)     For the avoidance of doubt, the Board's approval of a Replacement Designee pursuant to **Section 1(a)(iv)** or **Section 1(e)** shall not be considered unreasonably withheld if: (1) such replacement does not (A) qualify as "independent" pursuant to the NYSE Rules (as defined below), (B) have the relevant financial and business experience to be a director of the Company, or (C) satisfy the requirements set forth in the Company Policies (as defined below), in each case as in effect as of the date hereof or such additional or amended guidelines and policies approved by the Board that are applicable to all directors of the Company (collectively clauses (A) through (C), the **"Director Criteria"**); provided that no Director Criteria will be adopted that would prevent any employee or affiliate of the Icahn Group from becoming directors by virtue of the fact that such person is an employee or affiliate of the Icahn Group had such criteria been in effect today; or (2) such Replacement Designee does not satisfy the Tax Criteria.

(vi)     that (1) for any annual general meeting of stockholders subsequent to the First Annual Meeting, the Company shall notify the Icahn Group in writing no less than thirty-five (35) calendar days before the advance notice deadline set forth in the Company's Articles of Incorporation whether the Icahn Designees will be

2

Complaint Ex. E 0002

nominated by the Company for election as directors at such annual general meeting and, (2) if the Icahn Designees are to be so nominated, shall use reasonable best efforts to cause the election of the Icahn Designees so nominated by the Company (including by (x) recommending that the Company's stockholders vote in favor of the election of the Icahn Designees, (y) including the Icahn Designees in the Company's proxy statement and proxy card for such annual general meeting and (z) otherwise supporting the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate), and the Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to any such annual general meeting at which the Company has nominated Icahn Designees and such Icahn Designees have consented to being named, and are named, in the proxy statement relating to such annual general meeting.

(vii)    that from and after the date of this Agreement, so long as an Icahn Designee is seated as a member of the Board, without the approval of the Icahn Designees then on the Board (such approval not to be unreasonably withheld, delayed or conditioned), (w) the Board shall not form an Executive Committee or any other committee with functions similar to those customarily granted to an Executive Committee; (x) the Board shall not form any other new committee (other than committees formed with respect to matters for which there are actual conflicts of interest between the Icahn Designees and the Company) without offering to at least one Icahn Designee the opportunity to be a member of such committee (provided, however that if such committee has more than five (5) members then both Icahn Designees shall be offered to be appointed to such committee (to the extent there are two Icahn Designees then on the Board)), (y) the Board shall not increase the size of any committee and (z) any Board consideration of appointment and employment of named executive officers, mergers and acquisitions of material assets, or dispositions of material assets, or similar extraordinary transactions, such consideration, and voting with respect thereto shall take place only at the full Board level or in committees of which one of the Icahn Designees is a member (for the avoidance of doubt, nothing in this Agreement changes, amends, or modifies the authority, duties and obligations of the Talent & Compensation Committee of the Board).

(viii)    each of the Icahn Designees confirms that he or she will recuse himself or herself from such portions of Board or committee meetings, if any, involving actual conflicts between the Company and the Icahn Group. Promptly following the receipt of the Nomination Documents, the Board shall make a determination as to whether the Icahn Designees, based solely upon the representations provided by the Icahn Group in **Section 7** of this Agreement (which representations shall be updated by the Icahn Group to be current as of the date of the written election made pursuant to **Section 1(a)(i)**) and the information provided to the Board by the Icahn Designees in the Nomination Documents, are independent under the Board's independence guidelines, the independence requirements of the New York Stock Exchange (the "**NYSE Rules**"), and the independence standards applicable to the Company under paragraph (a)(1) of Item 407 of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

(ix)    that, to the extent permitted by law and the Company's then-existing insurance coverage, from and after the date that the Icahn Designees are seated as members

3

Complaint Ex. E 0003

of the Board, the Icahn Designees shall be covered by the same indemnification and insurance provisions and coverage as are applicable to the individuals that are directors of the Company as of such time, and at such time the Icahn Designees are no longer members of the Board, then the same indemnification and insurance provisions and coverage as are applicable to former directors of the Company as of such time.

(i)    notwithstanding the foregoing, the Company acknowledges that for so long as the Icahn Designees are members of the Board, the Icahn Designees shall have the same rights as any other director with respect to being permitted to attend (as an observer and without voting rights) any committee meeting regardless of whether such director is a member of such committee.

(b)    At all times from the date that the Icahn Designees are seated as members of the Board through the termination of their service as a member of the Board, each of the Icahn Designees shall comply with all written policies, procedures, processes, codes, rules, standards and guidelines applicable to all non-employee Board members and of which the Icahn Designees have been provided written copies in advance (or which have been filed with the Securities and Exchange Commission ("**SEC**") or posted on the Company's website), including the Company's code of business conduct, corporate policies on ethical business conduct, political contributions, lobbying and other political activities policy, conflicts of interest policy, insider trading policy, anti-hedging policy and governance policies (collectively, the "**Company Policies**"), and shall preserve the confidentiality of Company business and information, including discussions or matters considered in meetings of the Board or Board committees (except to the extent permitted in the Confidentiality Agreement (as defined below) to be entered into pursuant to **Section 5** of this Agreement). In addition, each of the Icahn Designees is aware of and shall act in accordance with his or her fiduciary duties with respect to the Company and its stockholders. For the avoidance of doubt, the Parties agree that notwithstanding the terms of any Company Policies, in no event shall any Company Policy apply to the Icahn Group, other than the Icahn Designees in their capacity as members of the Board.

(c)    Any provision in this Agreement to the contrary notwithstanding, if at any time after the date hereof, the Icahn Group, together with any Icahn Affiliates (as defined below), ceases collectively to beneficially own (for all purposes in this Agreement, the terms "beneficially own" and "beneficial ownership" shall have the meaning ascribed to such terms as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act), an aggregate Net Long Position (x) in at least six percent (6%) of the total outstanding (A) common shares of Bausch Health Companies Inc. ("**BHC**" and such common shares, "**BHC Common Shares**"), for so long as BHC owns at least 80% of the common shares of the Company ("**Common Shares**"), or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) one of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee; or (y) in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) each of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and

4

Complaint Ex. E 0004

the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee(s). For clarity, "Common Shares" will include the shares of the entity resulting from the amalgamation of the Company expected to be effected in connection with the consummation of the spin-off transaction by which BHC transfers any or all of its remaining indirect equity interest in the Company to BHC's then-current shareholders (the "**B+L Distribution**") for which the Common Shares are exchanged pursuant to such amalgamation.

The Icahn Group, upon request, shall keep the Company regularly apprised of the Net Long Position of the Icahn Group and the Icahn Affiliates to the extent that such position differs from the ownership positions publicly reported on the Icahn Schedule 13D and amendments thereto.

For purposes of this Agreement: the term "Net Long Position" shall mean: such Common Shares beneficially owned, directly or indirectly, that constitute such person's net long position as defined in Rule 14e-4 under the Exchange Act *mutatis mutandis*, provided that "Net Long Position" shall not include any shares as to which such person does not have the right to vote or direct the vote, or as to which such person has entered into a derivative or other agreement, arrangement or understanding that hedges or transfers, in whole or in part, directly or indirectly, any of the economic consequences of ownership of such shares; and the terms "person" or "persons" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

Each of the Icahn Designees shall, prior to his or her appointment to the Board (including any Replacement Designee), and each member of the Icahn Group shall cause each of the Icahn Designees (including any Replacement Designee) to, execute an irrevocable resignation in the form attached to this Agreement as **Exhibit A**.

(d)     So long as the Icahn Group, together with the Icahn Affiliates, beneficially owns an aggregate Net Long Position in at least six percent (6%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations or similar type events), the Company shall not adopt a Rights Plan with an "Acquiring Person" beneficial ownership threshold below 20.0% of the then-outstanding Common Shares, unless (x) such Rights Plan provides that, if such Rights Plan is not ratified by the Company's stockholders within 105 days of such Rights Plan being adopted, such Rights Plan shall automatically expire and (y) the "Acquiring Person" definition of such Rights Plan exempts the Icahn Group up to a beneficial ownership of 19.95% of the then-outstanding Common Shares. The term "**Rights Plan**" shall mean any plan or arrangement of the sort commonly referred to as a "rights plan" or "stockholder rights plan" or "shareholder rights plan" or "poison pill" that is designed to increase the cost to a potential acquirer of exceeding the applicable ownership thresholds through the issuance of new rights, common stock or preferred shares (or any other security or device that may be issued to stockholders of the Company, other than ratably to all stockholders of the Company) that carry severe redemption provisions, favorable purchase provisions or otherwise, and any related rights agreement.

(e)     If, on any date that is ten or fewer business days prior to the Distribution Effective Date, an Icahn Designee would not satisfy the Tax Criteria if such Icahn Designee were initially

5

Complaint Ex. E 0005

designated immediately after the Distribution Effective Date, (i) such Icahn Designee shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits, and (ii) the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, a Replacement Designee.

2.      **Additional Agreements.**

(a)      Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, solely in connection with the First Annual Meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the First Annual Meeting, in each case that are entitled to vote at the First Annual Meeting, to be present for quorum purposes and to be voted, at the First Annual Meeting or at any adjournment or postponement thereof, (A) for each nominee on the First BLCO Slate, (B) against any nominees that are not nominated by the Board for election at the First Annual Meeting, (C) against any stockholder proposal to increase the size of the Board and (D) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence and in Section 2(b), the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual or special meeting.

(b)      Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, that for any annual general meeting or special meeting of stockholders subsequent to the First Annual Meeting, if the Board has agreed to nominate the Icahn Designees then serving on the Board for election at such annual general meeting or special meeting and the Icahn Designees have consented to be nominated at such annual general meeting or special meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the applicable annual general meeting or special meeting, in each case that are entitled to vote at such annual general meeting or special meeting, to be present for quorum purposes and to be voted at such annual general meeting or special meeting or at any adjournment or postponement thereof, (A) for each director nominated by the Board for election at such annual general meeting, (B) against any (i) stockholder proposal to increase the size of the Board and (ii) nominees that are not nominated by the Board for election at such annual general meeting or special meeting, and (C) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence, the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual general meeting or special meeting following the First Annual Meeting.

As used in this Agreement, the term "**Voting Securities**" shall mean the Common Shares that such person has the right to vote or has the right to direct the vote. For purposes of this Section 2, no person shall be, or be deemed to be, the "beneficial owner" of, or to "beneficially own," any securities beneficially owned by any director of the Company to the extent such securities were acquired directly from the Company by such director as or

6

Complaint Ex. E 0006

pursuant to director compensation for serving as a director of the Company. For purposes of this Agreement, (A) the term "**Affiliate**" shall have the meaning set forth in Rule 12b-2 promulgated by the SEC under the Exchange Act, and the term "**Icahn Affiliate**" shall mean such Affiliates that are controlled by the members of the Icahn Group, and (B) the term "**Associate**" shall mean (A) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (B) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of such person or of any of its parents or subsidiaries.

**3.      Icahn Group Restrictions**

(a)      From and after the date that the Icahn Designees are seated as members of the Board, until the later of (i)(x) the end of the First Annual Meeting and (y) such date as no Icahn Designee is on the Board and the Icahn Group has no right to designate a Replacement Designee (including if the Icahn Group has irrevocably waived such right in writing), and (ii) solely with respect to **Section 3(a)(i)(x)**, the Butterfly Date (as hereafter defined) (the "**Standstill Period**"), so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, no member of the Icahn Group shall, directly or indirectly, and each member of the Icahn Group shall cause each of the Icahn Affiliates and its Associates not to, directly or indirectly (it being understood that the foregoing shall not restrict the Icahn Designees from discussing the matters set forth below with other members of the Board):

(i)      acquire, offer or propose to acquire any voting securities (or beneficial ownership thereof), or rights or options to acquire any voting securities (or beneficial ownership thereof) of the Company if after any such case, immediately after the taking of such action the Icahn Group, together with its respective Icahn Affiliates, would in the aggregate, beneficially own more than 19.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments); provided that: (x) if, solely as a result of their acquisition of Common Shares or securities or other instruments convertible into Common Shares, the Icahn Group, together with its respective Icahn Affiliates and its Associates, become the beneficial owners of more than 9.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), then neither the Icahn Group nor the Icahn Affiliates nor its Associates shall sell any Common Shares or securities or other instruments convertible into Common Shares (but excluding, for the avoidance of doubt, any swaps or other instruments that do not allow for settlement in property other than cash) following the date of the B+L Distribution (the "**Distribution Effective Date**") and prior to the Butterfly Date without first obtaining a supplemental tax ruling from the Canada Revenue Agency ("**CRA**") or an opinion of a nationally recognized accounting firm or law firm that is in form and substance satisfactory to the Company, acting reasonably, that such sale will not cause the B+L Distribution to be taxed in a manner inconsistent with that provided for in the tax ruling issued by the CRA in connection with the B+L Distribution; and (y) the term "**Butterfly Date**" shall mean the date that is the earlier of (A) eighteen (18) months after the Distribution Effective Date and (B) the date the Company delivers written notice to the Icahn Group in accordance

Complaint Ex. E 0007

with Section 12 confirming that BHC is not proceeding with a Canadian "butterfly" form of spin out with respect to the B+L Distribution;

(ii)    except with respect to the signatories to the Icahn Group's Schedule 13D filed with the SEC with respect to the Company (the "**Icahn Schedule 13D**"), form or join in a partnership, limited partnership, syndicate or a "group" as defined under Section 13(d) of the Exchange Act, with respect to the securities of the Company;

(iii)    present (or request to present) at any annual general meeting or any special meeting of the Company's stockholders, any proposal for consideration for action by stockholders or engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" (as such terms are defined in Regulation 14A under the Exchange Act) of proxies or consents (including, without limitation, any solicitation of consents that seeks to call a special meeting of stockholders) or, except as provided in this Agreement, otherwise publicly propose (or publicly request to propose) any nominee for election to the Board or seek representation on the Board or the removal of any member of the Board;

(iv)    grant any proxy, consent or other authority to vote with respect to any matters (other than to the named proxies included in the Company's proxy card for any annual general meeting or special meeting of stockholders) or deposit any Voting Securities in a voting trust or subject them to a voting agreement or other arrangement of similar effect (excluding customary brokerage accounts, margin accounts, prime brokerage accounts and the like), in each case, except as provided in Sections 2(a) or (b);

(v)    call or seek to call any special meeting of the Company or action by consent resolutions;

(vi)    institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against or involving the Company;

(vii)    separately or in conjunction with any other person in which it is or proposes to be either a principal, partner or financing source or is acting or proposes to act as broker or agent for compensation, submit a proposal for or offer of (with or without conditions), any Extraordinary Transaction (as defined below); provided that the Icahn Group shall be permitted to sell or tender their Common Shares, and otherwise receive consideration, pursuant to any Extraordinary Transaction; and provided further that (A) if a third party (other than the Icahn Group or an Icahn Affiliate) commences a tender offer or exchange offer for all of the outstanding Common Shares that is not rejected by the Board in its Recommendation Statement on Schedule 14D-9, then the Icahn Group shall similarly be permitted to make an offer for the Company or commence a tender offer or exchange offer for all of the outstanding Common Shares at the same or higher consideration per share, provided that the foregoing (y) will not relieve the Icahn Group of its obligations under the Confidentiality Agreement and (z) will not be deemed to require the Company to make any public disclosures and (B) the Company may waive the restrictions in this Section 3(a)(vii) with the approval of the Board. "Extraordinary Transaction" means, collectively, any of the following involving the Company or any of its subsidiaries or its or their securities or all or substantially all of the assets or businesses of the Company and its subsidiaries: any tender offer or exchange

8

Complaint Ex. E 0008

offer, merger, acquisition, business combination, reorganization, restructuring, recapitalization, sale or acquisition of material assets, or liquidation or dissolution; provided that Extraordinary Transaction shall not include, and neither this Section 3(a) nor any other term of this Agreement, shall restrict the Icahn Group from commencing and consummating a tender offer pursuant to applicable Canadian laws and regulations to acquire additional Common Shares, so long as upon consummation of such tender offer(s) the Icahn Group would comply with **Section 3(a)(i)**; provided, further that this Section 3(a)(vi) shall not prevent an Icahn Designee acting in his or her capacity as a director of the Company from raising such matter privately at the Board;

(viii)   seek, or encourage any person, to submit nominations in furtherance of a "contested solicitation" for the election or removal of directors with respect to the Company or, except as expressly provided in this Agreement, seek, encourage or take any other action with respect to the election or removal of any directors;

(ix)   make any public communication in opposition to (A) any merger, acquisition, amalgamation, recapitalization, restructuring, disposition, distribution, spin-off, asset sale, joint venture or other business combination (including the B+L Distribution) or (B) any financing transaction, in each case involving the Company;

(x)   seek to advise, encourage, support or influence any person with respect to the voting or disposition of any securities of the Company at any annual general meeting or special meeting of stockholders, except in accordance with Section 2(a) or (b);

(xi)   publicly disclose any intention, plan or arrangement inconsistent with any provision of this Section 3; or

(xii)   publicly encourage or support any other person to take any of the actions described in this Section 3 that the Icahn Group is restricted from doing.

(b)   Subject to applicable law, from the date of this Agreement until the end of the Standstill Period, (i) so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, neither a member of the Icahn Group nor any of the Icahn Affiliates or its Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) the Company or the Company's respective current or former officers or directors and (ii) so long as the Icahn Group has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Company specifying any such breach, neither the Company nor any of its Affiliates or Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business

9

Complaint Ex. E 0009

criticism) any member of the Icahn Group or Icahn Affiliates or any of their respective current or former officers or directors.

4.    **Public Announcements.** The Company acknowledges that the Icahn Group intends to file this Agreement as an exhibit to the Icahn Group's Schedule 13D with respect to the Company promptly following the date hereof, and the Icahn Group acknowledges that the Company intends to file this Agreement as an exhibit to a Current Report on Form 8-K promptly following the execution of this Agreement. The Icahn Group will not issue a press release. The Company shall have an opportunity to review in advance any Schedule 13D filing made by the Icahn Group with respect to this Agreement, and the Icahn Group shall have an opportunity to review in advance the relevant portion of the Current Report on Form 8-K filing to be made by the Company with respect to this Agreement.

5.    **Confidentiality Agreement.** The Company hereby agrees that, following the appointment of the Icahn Designees to the Board: (i) the Icahn Designees are permitted to and may provide confidential information subject to and in accordance with the terms of the confidentiality agreement in the form attached to this Agreement as **Exhibit B** (the "**Confidentiality Agreement**") (which the Icahn Group agrees to execute upon the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)** and deliver to the Company and cause the Icahn Designees to abide by) and (ii) the Company will execute and deliver the Confidentiality Agreement to the Icahn Group substantially contemporaneously with execution and delivery thereof by the other signatories thereto. At any time an Icahn Designee is a member of the Board, the Board shall not adopt a policy precluding members of the Board from speaking to Mr. Icahn, and the Company confirms that it will advise members of the Board, including the Icahn Designees, that they may, but are not obligated to, speak to Mr. Icahn (but subject to the Confidentiality Agreement), if they are willing to do so and subject to their fiduciary duties and Company Policies (but may caution them regarding specific matters, if any, that involve conflicts between the Company and the Icahn Group).

6.    **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

7.    **Representations and Warranties of Icahn Group.** Each member of the Icahn Group jointly represents and warrants that, as of the date of this Agreement, (a) the Icahn Group collectively beneficially own, an aggregate of 34,721,118 BHC Common Shares and 3,500,000 Common Shares (in each case excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), (b) except as set forth in the preceding clause (a) and the Icahn Group's Schedule 13Ds with respect to BHC or the Company or as otherwise disclosed to the Company, no member of the Icahn Group, individually or in the aggregate with any Icahn Affiliate, has any other beneficial ownership of, or economic exposure to, any BHC Common Shares or Common Shares, nor does it currently have or have any right to acquire any interest in any other securities of BHC or the Company (or any rights, options or other securities convertible into or exercisable or exchangeable (whether or not convertible, exercisable or exchangeable immediately or only after the passage of time or the occurrence of a specified event) for such securities or any obligations measured by the price or value of any securities of BHC, the Company or any of their respective controlled Affiliates, including any swaps or other derivative arrangements designed to produce

10

Complaint Ex. E 0010

economic benefits and risks that correspond to the ownership of BHC Common Shares or Common Shares, whether or not any of the foregoing would give rise to beneficial ownership (as determined under Rule 13d-3 promulgated under the Exchange Act), and whether or not to be settled by delivery of BHC Common Shares or Common Shares, payment of cash or by other consideration, and without regard to any short position under any such contract or arrangement), and (c) no member of the Icahn Group has any knowledge of any other stockholder of BHC or the Company that intends to submit a notice to the Company to nominate directors at the next Annual Meeting of shareholders of BHC or the Company.

8.  **Representations and Warranties and Covenants of the Company.** The Company represents and warrants, that as of the date of this Agreement, the directors identified in the Company's final prospectus filed with the SEC and dated May 5, 2022 are all of the directors on the Board. Further, the Company agrees that if the Company enters into an agreement, arrangement or understanding, or otherwise grants any rights, to any other stockholder of the Company to avoid a proxy or similar contest with such stockholder at any time during the three (3) months following the date that the Icahn Designees are seated as directors of the Company, then to the extent such agreement, arrangement or understanding grants any right or rights that are more favorable than those set forth in this Agreement, the Company agrees it shall offer the same such rights to the Icahn Group.

9.  **Miscellaneous.** This Agreement shall terminate and be of no further force or effect upon the earliest of the occurrence of any of the following events: (a) following the Board's appointment of the Icahn Designees to the Board pursuant to **Section 1(a)(i)**, (i) no Icahn Designee then serving on the Board and (ii) the Icahn Group no longer being entitled to designate a Replacement Designee for any Icahn Designee, (b) [reserved], (c) the Icahn Group not collectively beneficially owning an aggregate Net Long Position in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), and (d) any breach by the Icahn Group of its covenants and obligations set forth in **Section 1(a)(ii)** and **Section 3(a)** (including any action taken prior to the commencement of the Standstill Period that would be a breach of **Section 3(a)** if taken during the Standstill Period). Notwithstanding anything herein to the contrary, **Section 3(a)(i)** shall survive any such termination through the Butterfly Date. The parties hereto recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, each party agrees that in addition to other remedies the other party shall be entitled to at law or equity, the other party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law. Furthermore, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery or the other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (iv) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (v) irrevocably consents to service of process by a reputable overnight mail

11

Complaint Ex. E 0011

delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

10.     **No Waiver.** Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

11.     **Entire Agreement.** This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

12.     **Notices.** All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy and email is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

> if to the Company:
>
>> Bausch + Lomb Corporation
>> 520 Applewood Crescent
>> Vaughan, Ontario, Canada L4K 4B4
>> Email: [*****]
>> Attention: Christina Ackermann, General Counsel
>
> With copies to (which shall not constitute notice):
>
>> Wachtell, Lipton, Rosen & Katz
>> 51 West 52 Street
>> New York, NY 10019
>> Attention:         Igor Kirman, [*****]
>>                    Mark Veblen, [*****]
>>                    Sabastian Niles, [*****]
>
> if to the Icahn Group:
>
>> Icahn Capital LP
>> 16690 Collins Avenue, Penthouse Suite
>> Sunny Isles Beach, FL 33160
>> Attention: Jesse Lynn, Chief Operating Officer
>> Email: [*****]

Complaint Ex. E 0012

13. **Severability.** If at any time subsequent to the date of this Agreement, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

14. **Counterparts.** This Agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. **Successors and Assigns.** This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

16. **No Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other persons.

17. **Fees and Expenses.** Neither the Company, on the one hand, nor the Icahn Group, on the other hand, will be responsible for any fees or expenses of the other in connection with this Agreement.

18. **Interpretation and Construction.** Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Unless context otherwise requires, references herein to Exhibits, Sections or Schedules mean the Exhibits, Sections or Schedules attached to this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. In all instances, the term "or" shall not be deemed to be exclusive. For all purposes of this Agreement, and any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A), the Icahn Group and its Icahn Affiliates shall in no event be deemed to beneficially own less than six percent (6%), or three percent (3%), as applicable, of the outstanding Common Shares unless the Icahn Group's crossing of any such threshold is the result of sales of Common Shares or transactions described in Rule 14e-4(a)(1) of the Exchange Act (but excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments) by, or on behalf of, the Icahn Group or its Icahn Affiliates (i.e., issuances of Common Shares, or similar actions, by the Company shall have no effect on the deemed beneficial ownership of Common Shares by the Icahn Group and its Icahn Affiliates for purposes of this this Agreement, or any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A)).

[Signature Pages Follow]

13

Complaint Ex. E 0013

IN WITNESS WHEREOF, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

**BAUSCH + LOMB CORPORATION**

By:   /s/ Christina Ackermann

Name: Christina Ackermann

Title:  EVP, General Counsel

[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0014

**ICAHN GROUP**

CARL C. ICAHN

/s/ Carl C. Icahn
Carl C. Icahn

ICAHN PARTNERS LP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title:  Chief Operating Officer

ICAHN PARTNERS MASTER FUND LP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title:  Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By:   /s/ Ted Papapostolou
Name:Ted Papapostolou
Title:  Chief Financial Officer

[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0015

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By:   /s/ Ted Papapostolou
Name:Ted Papapostolou
Title: Chief Financial Officer

IPH GP LLC

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title: Chief Operating Officer

ICAHN CAPITAL LP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title: Chief Operating Officer

ICAHN ONSHORE LP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title: Chief Operating Officer

ICAHN OFFSHORE LP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title: Chief Operating Officer

BECKTON CORP

By:   /s/ Jesse Lynn
Name:Jesse Lynn
Title: Vice President

[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0016

**SCHEDULE A**

CARL C. ICAHN

ICAHN PARTNERS LP

ICAHN PARTNERS MASTER FUND LP

ICAHN ENTERPRISES G.P. INC.

ICAHN ENTERPRISES HOLDINGS L.P.

IPH GP LLC

ICAHN CAPITAL LP

ICAHN ONSHORE LP

ICAHN OFFSHORE LP

BECKTON CORP.

Complaint Ex. E 0017

**EXHIBIT A**

[FORM OF RESIGNATION]

[DATE]

Board of Directors
Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Re: <u>Resignation</u>

Ladies and Gentlemen:

This irrevocable resignation is delivered pursuant to that certain Director Appointment and Nomination Agreement, dated as of April __, 2022 (the "Agreement") among Bausch + Lomb Corporation and the Icahn Group. Capitalized terms used herein but not defined shall have the meaning set forth in the Agreement.

Pursuant to Section 1(c) of the Agreement, effective only upon, and subject to, such time as the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least six percent (6%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of June [ ], 2022, I hereby irrevocably resign from my position as a director of the Company and from any and all committees of the Board on which I serve; *provided, however*, that if this resignation is tendered pursuant to Section 1(c) of the Agreement, this resignation shall not be effective if any other resignation of an Icahn Designee is tendered and accepted pursuant to Section 1(c) of the Agreement (and the Icahn Group shall determine in its sole discretion which resignation of the Icahn Designees shall be effective) unless and until the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of June [ ], 2022.

Sincerely,

_____

Name:

A-1

Complaint Ex. E 0018

**EXHIBIT B**

[CONFIDENTIALITY AGREEMENT]

B-1

Complaint Ex. E 0019

10/16/25, 2:50 PM

**CONFIDENTIALITY AGREEMENT**

**BAUSCH + LOMB CORPORATION**

[DATE]

To: Each of the persons or entities listed on Schedule A (the "Icahn Group" or "you")

Ladies and Gentlemen:

This letter agreement shall become effective upon the appointment of any Icahn Designee to the Board of Directors (the "Board") of Bausch + Lomb Corporation (the "Company"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Amended and Restated Director Appointment and Nomination Agreement (the "Nomination Agreement"), dated as of June 21, 2022, among the Company and the Icahn Group. The Company understands and agrees that, subject to the terms of, and in accordance with, this letter agreement, an Icahn Designee may, if and to the extent he or she desires to do so, disclose information he or she obtains while serving as a member of the Board to you and your Representatives (as hereinafter defined), and may discuss such information with any and all such persons, subject to the terms and conditions of this Agreement, and that other members of the Board may similarly disclose information to you. As a result, you may receive certain non-public information regarding the Company. You acknowledge that this information is proprietary to the Company and may include trade secrets or other business information the disclosure of which could harm the Company. In consideration for, and as a condition of, the information being furnished to you and your agents, representatives, attorneys, advisors, directors, officers or employees, subject to the restrictions in paragraph 2 (collectively, the "Representatives"), you agree to treat any and all information concerning or relating to the Company or any of its subsidiaries or current or former affiliates that is furnished to you or your Representatives (regardless of the manner in which it is furnished, including in written or electronic format or orally, gathered by visual inspection or otherwise) by any Icahn Designee, or by or on behalf of the Company or any Company Representative (as defined below), including discussions or matters considered in meetings of the Board or Board committees, together with any notes, analyses, reports, models, compilations, studies, interpretations, documents, records or extracts thereof containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, "Evaluation Material"), in accordance with the provisions of this letter agreement, and to take or abstain from taking the other actions hereinafter set forth.

1.     The term "Evaluation Material" does not include information that (i) is or has become generally available to the public other than as a result of a direct or indirect disclosure by you or your Representatives in violation of this letter agreement or any other obligation of confidentiality, (ii) was within your or any of your Representatives' possession on a non-confidential basis prior to its being furnished to you by any Icahn Designee, or by or on behalf of the Company or its agents, representatives, attorneys, advisors, directors (other than the Icahn Designees), officers or employees (collectively, the "Company Representatives"), or (iii) is received from a source other than any Icahn Designee, the Company or any of the Company Representatives; *provided,* that in the case of (ii) or (iii) above, the source of such information was not believed by you, after reasonable inquiry, to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other person with respect to such information at the time the information was disclosed to you.

2.     You and your Representatives will, and you will cause your Representatives to, (a) keep the Evaluation Material strictly confidential and (b) not disclose any of the Evaluation Material in any manner whatsoever without the prior written consent of the Company; *provided, however,* that you

B-2

Complaint Ex. E 0020

may privately disclose any of such information: (A) to your Representatives (i) who need to know such information for the purpose of advising you on your investment in the Company and (ii) who are informed by you of the confidential nature of such information and agree to be bound by the terms of this Agreement as if they were a party hereto; *provided, further,* that you will be responsible for any violation of this letter agreement by your Representatives as if they were parties to this letter agreement; and (B) to the Company and the Company Representatives. It is understood and agreed that no Icahn Designee shall disclose to you or your Representatives any Legal Advice (as defined below) that may be included in the Evaluation Material with respect to which such disclosure would constitute waiver of the Company's attorney client privilege or attorney work product privilege. "Legal Advice" as used in this letter agreement shall be solely and exclusively limited to the advice provided by legal counsel and shall not include factual information or the formulation or analysis of business strategy that is not protected by the attorney-client or attorney work product privilege.

3.      In the event that you or any of your Representatives are required by applicable subpoena, legal process or other legal requirement to disclose any of the Evaluation Material, you will (a) promptly notify (except where such notice would be legally prohibited) the Company in writing by email, facsimile and certified mail so that the Company may seek a protective order or other appropriate remedy (and if the Company seeks such an order, you will provide such cooperation as the Company shall reasonably request), at its cost and expense and (b) produce or disclose only that portion of the Evaluation Material which your outside legal counsel of national standing advises you in writing is legally required to be so produced or disclosed and you inform the recipient of such Evaluation Material of the existence of this letter agreement and the confidential nature of such Evaluation Material. In no event will you or any of your Representatives oppose action by the Company to obtain a protective order or other relief to prevent the disclosure of the Evaluation Material or to obtain reliable assurance that confidential treatment will be afforded the Evaluation Material. For the avoidance of doubt, it is understood that there shall be no "legal requirement" requiring you to disclose any Evaluation Material solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative or other voluntary transactions with respect to the Common Shares of the Company or otherwise proposing or making an offer to do any of the foregoing, or you would be unable to file any proxy or other solicitation materials in compliance with Section 14(a) of the Exchange Act or the rules promulgated thereunder.

4.      You acknowledge that (a) none of the Company or any of the Company Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any Evaluation Material, and (b) none of the Company or any of the Company Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom. You and your Representatives (or anyone acting on your or their behalf) shall not directly or indirectly initiate contact or communication with any executive or employee of the Company other than the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, General Counsel, or such other persons approved by the foregoing or the Board concerning Evaluation Material, or to seek any information in connection therewith from any such person other than the foregoing, without the prior consent of the Company; *provided, however,* the restriction in this sentence shall not in any way apply to any Icahn Designee acting in his or her capacity as a Board member (nor shall it apply to any other Board members).

5.      All Evaluation Material shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of any disclosure of or your use of any Evaluation Material acquire any rights with respect thereto, all of which rights (including all intellectual property rights) shall

B-3

Complaint Ex. E 0021

remain exclusively with the Company. At any time after the date on which no Icahn Designee is a director of the Company, upon the request of the Company for any reason, you will promptly return to the Company or destroy all hard copies of the Evaluation Material and use reasonable best efforts to permanently erase or delete all electronic copies of the Evaluation Material in your or any of your Representatives' possession or control (and, upon the request of the Company, shall promptly certify to the Company that such Evaluation Material has been erased or deleted, as the case may be). Notwithstanding the foregoing, the obligation to return or destroy Evaluation Material shall not cover information (i) that is maintained on routine computer system backup tapes, disks or other backup storage devices as long as such backed-up information is not used, disclosed, or otherwise recovered from such backup devices or (ii) retained on a confidential basis solely to the extent required to comply with applicable law and/or any internal record retention requirements; provided that such materials referenced in this sentence shall remain subject to the terms of this Agreement applicable to Evaluation Material, and you and your Representatives will continue to be bound by the obligations contained herein for as long as any such materials are retained by you or your Representatives.

6. You acknowledge, and will advise your Representatives, that the Evaluation Material may constitute material non-public information under applicable federal, state or provincial securities laws, and you agree that you shall not, and you shall use reasonable best efforts to ensure that your Representatives do not, trade or engage in any derivative or other transaction on the basis of such information in violation of such laws.

7. You hereby represent and warrant to the Company that (i) you have all requisite company power and authority to execute and deliver this letter agreement and to perform your obligations hereunder, (ii) this letter agreement has been duly authorized, executed and delivered by you, and is a valid and binding obligation, enforceable against you in accordance with its terms, (iii) this letter agreement will not result in a violation of any terms or conditions of any agreements to which you are a party or by which you may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting you, and (iv) your entry into this letter agreement does not require approval by any owners or holders of any equity or other interest in you (except as has already been obtained).

8. Any waiver by the Company of a breach of any provision of this letter agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this letter agreement. The failure of the Company to insist upon strict adherence to any term of this letter agreement on one or more occasions shall not be considered a waiver or deprive the Company of the right thereafter to insist upon strict adherence to that term or any other term of this letter agreement.

9. You acknowledge and agree that the value of the Evaluation Material to the Company is unique and substantial, but may be impractical or difficult to assess in monetary terms. You further acknowledge and agree that in the event of an actual or threatened violation of this letter agreement, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, you acknowledge and agree that, in addition to any and all other remedies which may be available to the Company at law or equity, the Company shall be entitled to an injunction or injunctions to prevent breaches of this letter agreement and to enforce specifically the terms and provisions of this letter agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this letter agreement, you shall not allege, and you hereby waive the defense, that there is an adequate remedy at law.

B-4

Complaint Ex. E 0022

10.     Each of the parties (a) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this letter agreement or the transactions contemplated by this letter agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it shall not bring any action relating to this letter agreement or the transactions contemplated by this letter agreement in any court other than the Delaware Court of Chancery or other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (d) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (e) irrevocably consents to service of process by a reputable overnight delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS LETTER AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

11.     This letter agreement and the Nomination Agreement contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior or contemporaneous agreements or understandings, whether written or oral. This letter agreement may be amended only by an agreement in writing executed by the parties hereto.

12.     All notices, consents, requests, instructions, approvals and other communications provided for in this letter agreement and all legal process in regard to this letter agreement shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

        if to the Company:

                Bausch + Lomb Corporation
                520 Applewood Crescent
                Vaughan, Ontario, Canada L4K 4B4
                Email: [*****]
                Attention: Christina Ackermann, General Counsel

        With copies to (which shall not constitute notice):

                Wachtell, Lipton, Rosen & Katz
                51 West 52 Street
                New York, NY 10019
                Attention:      Igor Kirman, [*****]
                                Mark Veblen, [*****]
                                  Sabastian Niles, [*****]

B-5

Complaint Ex. E 0023

if to the Icahn Group:

> Icahn Capital LP
> 16690 Collins Avenue, Penthouse Suite
> Sunny Isles Beach, FL 33160
> Attention: Jesse Lynn, Chief Operating Officer
> Email: [*****]

13. If at any time subsequent to the date hereof, any provision of this letter agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this letter agreement.

14. This letter agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. This letter agreement and the rights and obligations herein may not be assigned or otherwise transferred, in whole or in part, by you without the express written consent of the Company. This letter agreement, however, shall be binding on successors of the parties to this letter agreement.

16. The Icahn Group shall cause any Replacement Designee appointed to the Board pursuant to the Nomination Agreement to execute a copy of this letter agreement.

17. This letter agreement shall expire two (2) years from the date on which no Icahn Designee remains a director of the Company; except that you shall maintain in accordance with the confidentiality obligations set forth herein any Evaluation Material constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3) and (ii) retained pursuant to Section 5.

18. No licenses or rights under any patent, copyright, trademark, or trade secret are granted or are to be implied by this letter agreement.

19. Each of the parties acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this letter agreement, and that it has executed the same with the advice of said counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties, and any controversy over interpretations of this agreement shall be decided without regards to events of drafting or preparation. The term "including" shall in all instances be deemed to mean "including without limitation." In all instances, the term "or" shall not be deemed to be exclusive.

[Signature Pages Follow]

B-6

Complaint Ex. E 0024

10/16/25, 2:50 PM

Please confirm your agreement with the foregoing by signing and returning one copy of this letter agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

BAUSCH + LOMB CORPORATION

By: _____
Name:
Title:

Accepted and agreed as of the date first written above:

CARL C. ICAHN

_____
Carl C. Icahn

ICAHN PARTNERS LP
By: _____
Name:Jesse Lynn
Title:  Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0025

10/16/25, 2:50 PM

ICAHN PARTNERS MASTER FUND LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By: _____
Name: Ted Papapostolou
Title:  Chief Financial Officer

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By: _____
Name: Ted Papapostolou
Title:  Chief Financial Officer

IPH GP LLC

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN CAPITAL LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN ONSHORE LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0026

ICAHN OFFSHORE LP

By: _____
Name:Jesse Lynn
Title:  Chief Operating Officer

BECKTON CORP

By: _____
Name:Jesse Lynn
Title:  Vice President

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0027

10/16/25, 2:50 PM

SCHEDULE A

Beckton Corp.

Icahn Capital LP

Icahn Enterprises Holdings L.P.

Icahn Enterprises G.P. Inc.

Icahn Offshore LP

Icahn Onshore LP

Icahn Partners LP

Icahn Partners Master Fund LP

IPH GP LLC

Icahn Capital LP

Carl C. Icahn

---

Complaint Ex. E 0028

10/16/25, 2:50 PM

ANNEX 1

**Tax Criteria**

Subject to **Section 1(e)**, from and after the Distribution Effective Date, the Icahn Group shall not be permitted to designate any individual as a director of the Company if: (x) such individual, at the time of such designation, is also a member of the board of directors of BHC; and (y) immediately following such designation, more than two (2) individuals are members of the boards of directors of both BHC and the Company.

For example, if on the date of any such designation, Brett Icahn and Steven Miller continue to be members of the board of directors of BHC, then: (x) if no other individuals are members of the boards of directors of both BHC and the Company, then both Brett Icahn and Steven Miller would be permitted to join the board of directors of the Company; (y) if two (2) other individuals are members of the boards of directors of both BHC and the Company, then neither Brett Icahn nor Steven Miller would be permitted to join the board of directors of the Company; and (z) if one (1) other individual is a member of the boards of directors of both BHC and the Company, then Brett Icahn or Steven Miller (but not both) would be permitted to join the board of directors of the Company.

Complaint Ex. E 0029

# Attachment B



# AMERICAS

# PROXY VOTING GUIDELINES UPDATES FOR 2021

Benchmark Policy Changes for U.S., Canada, and Latin America

Effective for Meetings on or after February 1, 2021

Published November 12, 2020

ISSGOVERNANCE.COM

© 2020 | Institutional Shareholder Services and/or its affiliates

Complaint Ex. G 0001

**AMERICAS**
POLICY UPDATES FOR 2021



# TABLE OF CONTENTS

All Markets ...................................................................................................................................................... 4

    Board of Directors- Director Elections ............................................................................................................ 4

        Governance Failures: Material Environmental & Social Risk Oversight Failures ................................................ 4

United States ................................................................................................................................................... 5

    Board of Directors – Voting on Director Nominees in Uncontested Elections ........................................................ 5

        Board Composition – Gender Diversity ............................................................................................................ 5

        Board Composition – Racial/Ethnic Diversity ................................................................................................... 6

        Board Independence – Classification of Directors ............................................................................................. 10

        Board Accountability – Poison Pills ................................................................................................................... 15

    Other Board-Related Proposals .................................................................................................................... 16

        Board Refreshment (Age/Term Limits) ............................................................................................................ 16

    Shareholder Rights & Defenses .................................................................................................................... 18

        Advance Notice Requirements for Shareholder Proposals/Nominations ........................................................... 18

        Shareholder Litigation Rights ........................................................................................................................... 19

        Virtual Shareholder Meetings .......................................................................................................................... 22

    Social and Environmental Issues .................................................................................................................. 23

        Gender, Race/Ethnicity Pay Gaps .................................................................................................................... 23

        Mandatory Arbitration ..................................................................................................................................... 24

        Sexual Harassment ........................................................................................................................................... 25

    Mutual Funds ................................................................................................................................................. 26

        Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes ..................................................... 26

Canada ............................................................................................................................................................ 27

    Board of Directors (TSX-Listed Companies) ................................................................................................. 27

        Voting on Director Nominees in Uncontested Elections: Board Gender Diversity ............................................. 27

    Shareholder Rights & Defenses (TSX-Listed Companies and Venture Companies) ...................................... 30

~~Redlined~~ = deleted; <span style="color:green">green</span> = added

Complaint Ex. G 0002 of 241



Exclusive Forum Proposals ....................................................................................................................... 30

**Brazil** ......................................................................................................................................................... 31

Board of Directors ....................................................................................................................................... 31

Director Elections- Board Independence ................................................................................................... 31

**Brazil and Americas Regional Policy** .......................................................................................................... 35

Board of Directors ....................................................................................................................................... 35

Director Elections- Board Gender Diversity .............................................................................................. 35
Director Elections- Overboarding .............................................................................................................. 36

**Americas Regional** ................................................................................................................................... 38

Board of Directors ....................................................................................................................................... 38

Director Elections- Independence .............................................................................................................. 38

Complaint Ex. G 0003 41

**AMERICAS**
POLICY UPDATES FOR 2021



# All Markets

## Board of Directors- Director Elections

### Governance Failures: Material Environmental & Social Risk Oversight Failures

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Under extraordinary circumstances, vote against or withhold from directors individually, committee members, or the entire board, due to:<br><br>■ Material failures of governance, stewardship, risk oversight*, or fiduciary responsibilities at the company;<br>■ Failure to replace management as appropriate; or<br>■ Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.<br><br>* Examples of failure of risk oversight include but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; demonstrably poor risk oversight of environmental and social issues, including climate change; significant adverse legal judgments or settlement; or hedging of company stock. | **General Recommendation:** Under extraordinary circumstances, vote against or withhold from directors individually, committee members, or the entire board, due to:<br><br>■ Material failures of governance, stewardship, risk oversight*, or fiduciary responsibilities at the company;<br>■ Failure to replace management as appropriate; or<br>■ Egregious actions related to a director's service on other boards that raise substantial doubt about his or her ability to effectively oversee management and serve the best interests of shareholders at any company.<br><br>* Examples of failure of risk oversight include but are not limited to: bribery; large or serial fines or sanctions from regulatory bodies; demonstrably poor risk oversight of environmental and social issues, including climate change; significant adverse legal judgments or settlement; or hedging of company stock. |

### Rationale for Change:

While the specific language regarding the "Governance Failures" policy varies from market to market, every ISS policy guideline document in this region is being updated to include explicit references to poor risk oversight of environmental and social issues as examples of material failure that may result in adverse vote recommendations.

Complaint Ex. G 0004 41

**AMERICAS**
POLICY UPDATES FOR 2021



# United States

## Board of Directors – Voting on Director Nominees in Uncontested Elections

### Board Composition – Gender Diversity

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Gender** **Diversity:** For companies in the Russell 3000 or S&P 1500 indices, generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) at companies where there are no women on the company's board. An exception will be made if there was a woman on the board at the preceding annual meeting and the board makes a firm commitment to return to a gender-diverse status within a year.<br><br>Mitigating factors include:<br><br>• Until Feb. 1, 2021, a firm commitment, as stated in the proxy statement, to appoint at least one woman to the board within a year;<br>▪ The presence of a woman on the board at the preceding annual meeting and a firm commitment to appoint at least one woman to the board within a year.; or<br>▪ Other relevant factors as applicable. | **Gender Diversity:** For companies in the Russell 3000 or S&P 1500 indices, generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) at companies where there are no women on the company's board. An exception will be made if there was a woman on the board at the preceding annual meeting and the board makes a firm commitment to return to a gender-diverse status within a year. |

### Rationale for Change:

Under ISS' 2019 announcement of the policy regarding board gender diversity on boards, a transitional year (2020) was provided so that a company that previously had not had a female director could make a commitment to add one by the following year. This transitional year has now passed, so the policy is being updated to remove it.

Starting in Feb 2021, the only exception to the adverse vote recommendations for companies with no women on their board will be if the board has temporarily lost its gender diversity: that is, if there was at least one woman on the board at the previous annual meeting, and the board commits to restoring its gender diversity by the next annual meeting.

Complaint Ex. G 0005 41



## Board Composition – Racial/Ethnic Diversity

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Racial and/or Ethnic Diversity:** For companies in the Russell 3000 or S&P 1500 indices, highlight boards with no apparent racial and/or ethnic diversity[1]. <br><br> For companies in the Russell 3000 or S&P 1500 indices, effective for meetings on or after Feb. 1, 2022, generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members. An exception will be made if there was racial and/or ethnic diversity on the board at the preceding annual meeting **and the board makes a firm commitment to appoint at least one racial and/or ethnic diverse member** within a year. | **Racial and/or Ethnic Diversity:** For companies in the Russell 3000 or S&P 1500 indices, highlight boards with no apparent racial and/or ethnic diversity[1]. <br><br> For companies in the Russell 3000 or S&P 1500 indices, effective for meetings on or after Feb. 1, 2022, generally vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members. An exception will be made if there was racial and/or ethnic diversity on the board at the preceding annual meeting and the board makes a firm commitment to appoint at least one racial and/or ethnic diverse member within a year. |

## Rationale for Change:

Recent social unrest has put racial and ethnic injustices and inequalities at the forefront of many investors' minds and many boards' deliberations. Many investors have expressed interest in seeing ethnic or racial diversity on boards, citing reasons of equality and good corporate governance.

### ISS Policy survey results

In ISS' 2020-2021 Global Policy Survey, when asking about the importance of ethnic and/or racial diversity on corporate boards, almost 60 percent of investors indicated that boards should aim to reflect the company's customer base and the broader societies in which they operate by including directors drawn from racial and ethnic minority groups. When asked about actions considered appropriate to increase the racial and ethnic make-up of the board, 86 percent of investor respondents and 92 percent of non-investor respondents indicated that it would be appropriate to engage with the company to encourage increased racial and ethnically diverse directors. Support of shareholder proposals on topics of workplace diversity disclosure and targets, and "Rooney rule" type shareholder proposals were the second and third most popular answer for both investors and non-investors. Notwithstanding, a majority of investors (57 percent) responded that they would consider voting against members of the nominating committee (or other directors) where board racial and ethnic diversity is lacking.

---

[1] Aggregate diversity statistics provided by the board will only be considered if specific to racial and/or ethnic diversity.

---

Complaint Ex. G 0006 41



**AMERICAS**
POLICY UPDATES FOR 2021

In 2021, the ISS research reports will highlight boards that lack racial and/or ethnic diversity to help investors identify companies with which to engage and will foster dialogue between investors and issuers on this topic. While the US ISS Benchmark policy will not use any lack of racial and/or ethnic diversity as a factor in its vote recommendations on directors in 2021, ISS will identify in its reports when a board lacks racial and ethnic diversity.

For 2022, ISS will issue adverse vote recommendations, generally voting against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent ethnically or racially diverse members.

**A recruiting priority, legislation in California and SEC developments**

Obstacles to increasing racial and ethnic representation on board are highlighted in the "Black Corporate Directors Time Capsule Project"[2], a survey conducted by seasoned retired corporate director Barry Lawson Williams. Recruiting through social networks has perhaps had the most negative effect of "perpetuating long-standing inequities". Another obstacle to achieving increased diversity on corporate boards is the recruiting pipeline, which itself is not conducive for diverse candidates to "feed into future CEO and board roles"[3]. A Korn Ferry study conducted for the Executive Leadership Council, which advocates for promotion of black executives into the top executive ranks and boardrooms, also came to a similar finding; African-American executives are disproportionately in support roles versus senior executives in so-called "profit and loss jobs"[4].

While great strides have been made to increase the gender diversity of boards, efforts to increase the racial and ethnic make-up of corporate boards has been slow[5] and even declining. Conversely, the 2019 U.S. Spencer Stuart Board Index[6] found that diversity is a priority for boards; of the 432 directors added to corporate boards of the S&P 500 index in 2019, 59 percent were women and/or minorities. Of the new directors, 23 percent were minorities (defined as African-American, Hispanic/Latino or Asian in the study). Minority women represented 10 percent of the incoming class, up slightly from 9 percent for director appointments in 2018. Minority men represented 13 percent of the new directors, an increase from 10 percent last year but still down from 14 percent two years ago. Moreover, according to a Bloomberg article, the "executive recruiting firm Spencer Stuart Inc., the firm says the percentage of Black executives joining boards in 2020 fell to 11% from 13% the year before"[7].

Interestingly, the study found that of the surveyed Nominating/Governance committee members, the highest priority board recruiting profiles in the next three years included recruiting minorities " Looking ahead, digital/social media experience, as well as minority status, will become more important qualities in recruiting profiles, replacing financial and operational skill sets in the top 5 priorities."[5]

---

[2] (https://barrylawsonwilliams.com/bcd-time-capsule )
[3] (https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3587498 ).
[4] https://www.bloomberg.com/news/articles/2019-10-10/black-executives-hold-few-positions-that-lead-to-ceo-job
[5] (https://hbr.org/2020/08/why-do-boards-have-so-few-black-directors)
[6] https://www.spencerstuart.com/-/media/2019/ssbi-2019/us_board_index_2019.pdf
[7] (https://www.bloombergquint.com/onweb/companies-seek-more-black-directors-after-adding-women)

---

Redlined = deleted; green = added
ISSGOVERNANCE.COM

Complaint Ex. G 0007



**AMERICAS**
POLICY UPDATES FOR 2021

---

Furthermore, the state legislature in California has passed, and the Governor approved on Sept 30, 2020, a new bill, AB 979, to promote "underrepresented communities" on boards of directors.

Speaking at the CII conference on Sept. 22, 2020, Commissioner Allison Herren Lee noted the SEC could go farther by strengthening existing guidance on board candidate diversity characteristics. This year, the SEC adopted amendments to Regulation S-K[8], a regulation which governs the description of business, legal proceedings, and risk factor disclosure, to add human capital as a topic for disclosure. This amendment reflects a general trend that the SEC has slowly established regarding diversity disclosure. In 2009, the SEC demanded companies disclose how diversity was considered as a factor in the hiring process for directors. In 2018, the SEC issued guidance to "encourage the disclosure of self-identified characteristics of board candidates"[9].

**Investor initiatives**

Large institutional investors, such as Vanguard and State Street Global Advisors (SSGA), have traditionally focused more of their diversity efforts on gender. However, as awareness of the lack of minority representation on U.S. boards has drawn growing attention, there seems to be a shift by such institutional investors to focus on efforts regarding improving the number of racially diverse directors on corporate boards.

In its August 27, 2020 letter addressed to chairs of corporate boards, SSGA states "the lack of racial and ethnic diversity and inclusion poses risks to companies that senior managements and boards should understand and manage." SSGA "believes it is critical for boards and investors to have more robust information and data regarding the racial and ethnic workforce diversity of companies in their portfolios and to understand the steps they are taking to achieve relevant goals."

In August of the prior year, Vanguard put companies that it invests in on notice to seek greater diversity on their boards. According to its 2019 Investment Stewardship Annual Report, Vanguard stated:

> We have long believed in the importance of diversity in the boardroom, and we have increasingly advocated for greater representation of women on corporate boards. We are expanding our focus to more explicitly urge boards to seek greater diversity across a wide range of personal characteristics, such as gender, race, ethnicity, national origin, and age.

Vanguard requests companies to disclose their diversity policies and report on the race and ethnicity makeup of the board, at least on the aggregate level. Vanguard expects companies to make progress in boardroom diversity by encouraging companies to widen their search for director candidates.[10] Moreover, SSGA appeals for

---

[8] https://www.sec.gov/rules/final/2020/33-10825.pdf
[9] Speech at CII conference https://www.sec.gov/news/speech/lee-cii-2020-conference-20200922#_ftn28
[10] https://www.thecorporatecounsel.net/blog/2020/09/vanguards-expectations-for-board-diversity.html

---

Redlined = deleted; green = added

Complaint Ex. G 0008   41



companies to disclose racial and ethnic diversity at the board level and at the overall employee level. Engagement with the company is SSGA's main way of addressing racial and ethnic diversity, but they are prepared to use proxy voting as another means of holding companies accountable.[11]

In addition, a number of investor groups advocating for increased ethnic minority representation on corporate boards have come out with a plan to call out corporate America. Recently formed coalitions, The Board Diversity Action Alliance and The Board Challenge, have sprung into action with announcements in September 2020 regarding their efforts to increase the racial makeup of corporate boards in the US. The Board Diversity Action Alliance, founded by Teneo, the Ford Foundation, and The Executive Leadership Council, describes itself as a business-led initiative with a focus aimed at increasing the representation of racially and ethnically diverse directors on corporate boards beginning with Black directors, as well as an additional focus on disclosure[12]. The Board Challenge, a group comprised of 43 public and private companies and organizations, has launched a pledge for U.S. corporate board of directors to add a Black director within the next year. The Board Challenge has over 40 signatories and is aiming to grow to more than 400 signatories within the next year.[13] Meanwhile Latino Voices for Boardroom Equity, a new initiative led by Latino Corporate Directors Association (LCDA) in partnership with a number of civic and business leaders, aims to improve Latino boardroom representation. The main objectives are to: (1) triple Latino representation on public company boards by 2023; (2) act to target corporations with no Latino representation; and (3) track progress through publication of a quarterly scorecard.[14]

Despite obstacles, it remains clear that an increase in the racial and/or ethnic make-up of corporate boards is a priority for investors and society.

---

[11] https://www.thecorporatecounsel.net/blog/2020/08/dialed-in-ssga-letter-calls-for-diversity-disclosures.html
[12] https://boarddiversityactionalliance.com/
[13] https://theboardchallenge.org/
[14] https://latinocorporatedirectors.org/latino_voices_for_boardroom_eq.php

---

Redlined = deleted; green = added

Complaint Ex. G 0009 41



**AMERICAS**
POLICY UPDATES FOR 2021

## Board Independence – Classification of Directors

| Current ISS Classification: | New ISS Classification: |
|---|---|
| 1. **Executive Director**<br>1.1. Current ~~employee or current~~ officer[1] of the company or one of its affiliates[2]. | 1. **Executive Director**<br>1.1. Current officer[1] of the company or one of its affiliates[2]. |
| 2. **Non-Independent Non-Executive Director**<br>Board Identification<br>2.1. Director identified as not independent by the board.<br>Controlling/Significant Shareholder<br>2.2. Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).<br>Current Employment at Company or Partnership<br>2.3. Non-officer employee of the firm (including employee representatives).<br>2.4. Officer[1], former officer, or general or limited partner of a joint venture or partnership with the company.<br>Former Employment ~~Former CEO/Interim Officer~~<br>2.5. Former CEO of the company. [3, 4]<br>2.6. Former non-CEO officer[1] of the company~~,~~ or an affiliate[2], ~~or an acquired firm~~ within the past five years.<br>2.7. Former officer[1] ~~CEO~~ of an acquired company within the past five years.[4]<br>2.8. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off ~~from the parent/predecessor~~ within the past five years.<br>2.9. Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made.[5]<br>~~Non-CEO Executives~~<br>~~2.10. Former officer[1] of the company, an affiliate[2], or an acquired firm within the past five years.~~<br>~~2.11. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off from the parent/predecessor within the past five years.~~<br>Family Members | 2. **Non-Independent Non-Executive Director**<br>Board Identification<br>2.1. Director identified as not independent by the board.<br>Controlling/Significant Shareholder<br>2.2. Beneficial owner of more than 50 percent of the company's voting power (this may be aggregated if voting power is distributed among more than one member of a group).<br>Current Employment at Company or Related Company<br>2.3. Non-officer employee of the firm (including employee representatives).<br>2.4. Officer[1], former officer, or general or limited partner of a joint venture or partnership with the company.<br>Former Employment<br>2.5. Former CEO of the company. [3, 4]<br>2.6. Former non-CEO officer[1] of the company or an affiliate[2] within the past five years.<br>2.7. Former officer[1] of an acquired company within the past five years.[4]<br>2.8. Officer[1] of a former parent or predecessor firm at the time the company was sold or split off within the past five years.<br>2.9. Former interim officer if the service was longer than 18 months. If the service was between 12 and 18 months an assessment of the interim officer's employment agreement will be made. [5]<br>Family Members<br>2.10. Immediate family member[6] of a current or former officer[1] of the company or its affiliates[2] within the last five years.<br>2.11. Immediate family member[6] of a current employee of company or its affiliates[2] where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role). |

~~Redlined~~ = deleted; green = added
ISSGOVERNANCE.COM

Complaint Ex. G 0010   41



2.10. Immediate family member[6] of a current or former officer[1] of the company or its affiliates[2] within the last five years.

2.11. Immediate family member[6] of a current employee of company or its affiliates[2] where additional factors raise concern (which may include, but are not limited to, the following: a director related to numerous employees; the company or its affiliates employ relatives of numerous board members; or a non-Section 16 officer in a key strategic role).

Professional, Transactional, ~~Professional, Financial~~, and Charitable Relationships

2.12. Director who ~~Currently provides~~ (or whose ~~an~~ immediate family member[6] ~~provides~~) currently provides professional services[7] in excess of $10,000 per year to: the company, ~~to~~ an affiliate[2] ~~of the company~~, or an individual officer of the company or an ~~one of its~~ affiliate~~s in excess of $10,000 per year~~; either directly; or is (or whose family member is) a partner, employee, or controlling shareholder of an organization which provides the services.

~~2.13. Is (or an immediate family member[6] is) a partner in, or a controlling shareholder or an employee of, an organization which provides professional services[7] to the company, to an affiliate[2] of the company, or an individual officer of the company or one of its affiliates in excess of $10,000 per year.~~

2.13. Director who ~~Has~~ (or whose ~~an~~ immediate family member[6]) currently has~~)~~ any material transactional relationship[8] with the company or its affiliates[2]; or who is (or whose immediate family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship[8] (excluding investments in the company through a private placement).

~~2.14. Is (or an immediate family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has any material transactional relationship[8] with the company or its affiliates[2] (excluding investments in the company through a private placement).~~

2.14. Director who ~~Is~~ (or whose ~~an~~ immediate family member[6]) is~~)~~ a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments[8] from the company or its affiliates[2].

Other Relationships

Professional, Transactional, and Charitable Relationships

2.12. Director who (or whose immediate family member[6]) currently provides professional services[7] in excess of $10,000 per year to: the company, an affiliate[2], or an individual officer of the company or an affiliate; or who is (or whose immediate family member[6] is) a partner, employee, or controlling shareholder of an organization which provides the services.

2.13. Director who (or whose immediate family member[6]) currently has any material transactional relationship[8] with the company or its affiliates[2]; or who is (or whose immediate family member[6] is) a partner in, or a controlling shareholder or an executive officer of, an organization which has the material transactional relationship[8] (excluding investments in the company through a private placement).

2.14. Director who (or whose immediate family member[6]) is a trustee, director, or employee of a charitable or non-profit organization that receives material grants or endowments[8] from the company or its affiliates[2].

Other Relationships

2.15. Party to a voting agreement[9] to vote in line with management on proposals being brought to shareholder vote.

2.16. Has (or an immediate family member[6] has) an interlocking relationship as defined by the SEC involving members of the board of directors or its Compensation Committee.[10]

2.17. Founder[11] of the company but not currently an employee.

2.18. Director with pay comparable to Named Executive Officers.

2.19. Any material[12] relationship with the company.

3. **Independent Director**

   3.1. No material[12] connection to the company other than a board seat.

**Footnotes:**

1. The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes: the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will generally be classified as a Non-Independent Non-Executive Director under



**AMERICAS**
POLICY UPDATES FOR 2021

2.15. Party to a voting agreement[9] to vote in line with management on proposals being brought to shareholder vote.

2.16. Has (or an immediate family member[6] has) an interlocking relationship as defined by the SEC involving members of the board of directors or its Compensation Committee.[10]

2.17. Founder[11] of the company but not currently an employee.

2.18. Director with pay comparable to Named Executive Officers.

2.19. Any material[12] relationship with the company.

3. **Independent Director**

   3.1. No material[12] connection to the company other than a board seat.

**Footnotes:**

*1.* The definition of officer will generally follow that of a "Section 16 officer" (officers subject to Section 16 of the Securities and Exchange Act of 1934) and includes: the chief executive, operating, financial, legal, technology, and accounting officers of a company (including the president, treasurer, secretary, controller, or any vice president in charge of a principal business unit, division, or policy function). Current interim officers are included in this category. For private companies, the equivalent positions are applicable. A non-employee director serving as an officer due to statutory requirements (e.g. corporate secretary) will generally be classified as a Non-Independent Non-Executive Director under ~~2.19:~~ "Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation exceeding $10,000 per year for serving in that capacity, then the director will be classified as an Independent Director.

*2.* "Affiliate" includes a subsidiary, sibling company, or parent company. ISS uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

*3.* Includes any former CEO of the company prior to the company's initial public offering (IPO).

*4.* When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company, ISS will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.

*5.* ISS will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard

"Any material relationship with the company." However, if the company provides explicit disclosure that the director is not receiving additional compensation exceeding $10,000 per year for serving in that capacity, then the director will be classified as an Independent Director.

*2.* "Affiliate" includes a subsidiary, sibling company, or parent company. ISS uses 50 percent control ownership by the parent company as the standard for applying its affiliate designation. The manager/advisor of an externally managed issuer (EMI) is considered an affiliate.

*3.* Includes any former CEO of the company prior to the company's initial public offering (IPO).

*4.* When there is a former CEO of a special purpose acquisition company (SPAC) serving on the board of an acquired company, ISS will generally classify such directors as independent unless determined otherwise taking into account the following factors: the applicable listing standards determination of such director's independence; any operating ties to the firm; and the existence of any other conflicting relationships or related party transactions.

*5.* ISS will look at the terms of the interim officer's employment contract to determine if it contains severance pay, long-term health and pension benefits, or other such standard provisions typically contained in contracts of permanent, non-temporary CEOs. ISS will also consider if a formal search process was under way for a full-time officer at the time.

*6.* "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

*7.* Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include but are not limited to the following: investment banking/financial advisory services, commercial banking (beyond deposit services), investment services, insurance services, accounting/audit services, consulting services, marketing services, legal services, property management services, realtor services, lobbying services, executive search services, and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services, IT tech support services, educational services, and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of,

~~Redlined~~ = deleted; green = added

**Complaint Ex. G 0012** ~~41~~ 41



provisions typically contained in contracts of permanent, non-temporary CEOs. ISS will also consider if a formal search process was under way for a full-time officer at the time.

6. "Immediate family member" follows the SEC's definition of such and covers spouses, parents, children, step-parents, step-children, siblings, in-laws, and any person (other than a tenant or employee) sharing the household of any director, nominee for director, executive officer, or significant shareholder of the company.

7. Professional services can be characterized as advisory in nature, generally involve access to sensitive company information or to strategic decision-making, and typically have a commission- or fee-based payment structure. Professional services generally include but are not limited to the following: investment banking/financial advisory services, commercial banking (beyond deposit services), investment services, insurance services, accounting/audit services, consulting services, marketing services, legal services, property management services, realtor services, lobbying services, executive search services, and IT consulting services. The following would generally be considered transactional relationships and not professional services: deposit services, IT tech support services, educational services, and construction services. The case of participation in a banking syndicate by a non-lead bank should be considered a transactional (and hence subject to the associated materiality test) rather than a professional relationship. "Of Counsel" relationships are only considered immaterial if the individual does not receive any form of compensation (in excess of $10,000 per year) from, or is a retired partner of, the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

8. A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity, exceeding the greater of: $200,000 or 5 percent of the recipient's gross revenues, for a company that follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, for a company that follows NYSE listing standards. For a company that follows neither of the preceding standards, ISS will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

9. Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as Independent Directors if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that

the firm providing the professional service. The case of a company providing a professional service to one of its directors or to an entity with which one of its directors is affiliated, will be considered a transactional rather than a professional relationship. Insurance services and marketing services are assumed to be professional services unless the company explains why such services are not advisory.

8. A material transactional relationship, including grants to non-profit organizations, exists if the company makes annual payments to, or receives annual payments from, another entity, exceeding the greater of: $200,000 or 5 percent of the recipient's gross revenues, for a company that follows NASDAQ listing standards; or the greater of $1,000,000 or 2 percent of the recipient's gross revenues, for a company that follows NYSE listing standards. For a company that follows neither of the preceding standards, ISS will apply the NASDAQ-based materiality test. (The recipient is the party receiving the financial proceeds from the transaction).

9. Dissident directors who are parties to a voting agreement pursuant to a settlement or similar arrangement may be classified as Independent Directors if an analysis of the following factors indicates that the voting agreement does not compromise their alignment with all shareholders' interests: the terms of the agreement; the duration of the standstill provision in the agreement; the limitations and requirements of actions that are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.

10. Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).

Redlined = deleted; green = added

Complaint Ex. G 0013    41



| |  |
|---|---|
| are agreed upon; if the dissident director nominee(s) is subject to the standstill; and if there any conflicting relationships or related party transactions.<br><br>*10.* Interlocks include: executive officers serving as directors on each other's compensation or similar committees (or, in the absence of such a committee, on the board); or executive officers sitting on each other's boards and at least one serves on the other's compensation or similar committees (or, in the absence of such a committee, on the board).<br><br>*11.* The operating involvement of the founder with the company will be considered; if the founder was never employed by the company, ISS may deem him or her an Independent Director.<br><br>*12.* For purposes of ISS's director independence classification, "material" will be defined as a standard of relationship (financial, personal or otherwise) that a reasonable person might conclude could potentially influence one's objectivity in the boardroom in a manner that would have a meaningful impact on an individual's ability to satisfy requisite fiduciary standards on behalf of shareholders. | |

### Rationale for Change:

The primary change being made to the ISS classification of directors is to limit the "Executive Director" classification to only officers, not other employees, such as those on the board as employee representatives.

This change will not result in any vote recommendation changes under the ISS Benchmark Policy. However, for institutional investors whose overboarding policies consider each Executive Director position as a mandate, this change will result in a more accurate assessment of their executive positions.

Pay comparable to Named Executive Officers: Currently ISS looks at the pay of directors, and in some cases, where the pay is considerable and on par with NEO pay for multiple years, the director has been classified as non-independent under "Other material relationships with the company". To better ensure data capture and categorization of material relationships, this factor is being made explicit.

The other changes are generally to arrange and consolidate the classifications and to simplify the language where possible.

Complaint Ex. G 0014   41

**AMERICAS**
POLICY UPDATES FOR 2021



## Board Accountability — Poison Pills

| Current ISS Policy, incorporating changes: | New ISS Policy: |
| --- | --- |
| **General Recommendation:**<br><br>**Poison Pills:** Vote against or withhold from all nominees (except new nominees, who should be considered case-by-case) if:<br><br>- The company has a poison pill that was not approved by shareholders[15]. However, vote case-by-case on nominees if the board adopts an initial pill with a term of one year or less, depending on the disclosed rationale for the adoption, and other factors as relevant (such as a commitment to put any renewal to a shareholder vote)~~.~~;<br>- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval~~.~~; or<br>- The pill, whether short-term[16] or long-term, has a deadhand or slowhand feature. | **General Recommendation:**<br><br>**Poison Pills:** Vote against or withhold from all nominees (except new nominees, who should be considered case-by-case) if:<br><br>- The company has a poison pill that was not approved by shareholders[15]. However, vote case-by-case on nominees if the board adopts an initial pill with a term of one year or less, depending on the disclosed rationale for the adoption, and other factors as relevant (such as a commitment to put any renewal to a shareholder vote);<br>- The board makes a material adverse modification to an existing pill, including, but not limited to, extension, renewal, or lowering the trigger, without shareholder approval; or<br>- The pill, whether short-term[16] or long-term, has a deadhand or slowhand feature. |

## Rationale for Change:

When ISS last updated its policy on poison pill adoption without a shareholder vote in 2017, there remained only a handful of companies with a deadhand or slowhand feature in their poison pills. All of them were long-term, non-shareholder approved pills, so ISS was already recommending against all nominees to their board, and therefore a separate bullet point on deadhand features was no longer deemed necessary. Unfortunately, the almost defunct deadhand feature has come back to life.

With the market volatility experienced during the COVID-19 pandemic, many companies rushed to implement short-term (one year or shorter) pills. Some companies included deadhand or slowhand features in these new short-term pills: American Finance Trust, Inc., Global Net Lease, Inc., New York City REIT, Inc., and Whitestone REIT.

A deadhand provision is generally phrased as a "continuing director (or trustee)" or "disinterested director" clause and restricts the board's ability to redeem or terminate the pill. Continuing directors are directors not associated with the acquiring person, and who were directors on the board prior to the adoption of the pill or

---

[15] Public shareholders only, approval prior to a company's becoming public is insufficient.
[16] If the short-term pill with a deadhand or slowhand feature is enacted but expires before the next shareholder vote, ISS will generally still recommend withhold/against nominees at the next shareholder meeting following its adoption.

---

Complaint Ex. G 0015 41



were nominated by a majority of such directors. The pill can only be redeemed if the board consists of a majority of continuing directors, so even if the board is replaced by shareholders in a proxy fight, the pill cannot be redeemed: the defunct board prevents that. A slowhand is where this redemption restriction applies only for a period of time (generally 180 days).

The adoption of a device like a deadhand poison pill or its variants (such as slowhand pills) is unjustifiable from a governance standpoint, as it is explicitly intended to thwart the will of shareholders in situations where they vote to replace the board in order to enable an offer to proceed. The policy for unilateral (without a shareholder vote) adoptions of pills is thus being updated to bring back the explicit referral to deadhand/slowhand features.

Because the unilateral adoption of a deadhand or slowhand pill is considered a material governance failure, the inclusion of such a feature in a poison pill may be grounds for adverse director recommendations at the next annual meeting, even if the pill itself has expired by the time of that meeting.

## Other Board-Related Proposals

### Board Refreshment (Age/Term Limits)

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Board Refreshment** ~~(Age/Term Limits)~~ | **Board Refreshment** |
| Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and diversity as needed. | Board refreshment is best implemented through an ongoing program of individual director evaluations, conducted annually, to ensure the evolving needs of the board are met and to bring in fresh perspectives, skills, and diversity as needed. |
| **Term/Tenure Limits** | **Term/Tenure Limits** |
| **General Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering: | **General Recommendation:** Vote case-by-case on management proposals regarding director term/tenure limits, considering: |
| ▪ The rationale provided for adoption of the term/tenure limit;<br>▪ The robustness of the company's board evaluation process;<br>▪ Whether the limit is of sufficient length to allow for a broad range of director tenures;<br>▪ Whether the limit would disadvantage independent directors compared to non-independent directors; and | ▪ The rationale provided for adoption of the term/tenure limit;<br>▪ The robustness of the company's board evaluation process;<br>▪ Whether the limit is of sufficient length to allow for a broad range of director tenures;<br>▪ Whether the limit would disadvantage independent directors compared to non-independent directors; and |

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0016



| | |
|---|---|
| ▪ Whether the board will impose the limit evenly, and not have the ability to waive it in a discriminatory manner.<br><br>Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:<br><br>▪ The scope of the shareholder proposal; and<br>▪ Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.<br><br>**Age Limits**<br><br>**General Recommendation:** Generally v~~V~~ote against management and shareholder proposals to limit the tenure of independent ~~outside~~ directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits.<br><br>~~Vote against management proposals to limit the tenure of outside directors through term limits. However, scrutinize boards where the average tenure of all directors exceeds 15 years for independence from management and for sufficient turnover to ensure that new perspectives are being added to the board.~~ | ▪ Whether the board will impose the limit evenly, and not have the ability to waive it in a discriminatory manner.<br><br>Vote case-by-case on shareholder proposals asking for the company to adopt director term/tenure limits, considering:<br><br>▪ The scope of the shareholder proposal; and<br>▪ Evidence of problematic issues at the company combined with, or exacerbated by, a lack of board refreshment.<br><br>**Age Limits**<br><br>**General Recommendation:** Generally vote against management and shareholder proposals to limit the tenure of independent directors through mandatory retirement ages. Vote for proposals to remove mandatory age limits. |

**Rationale for Change:**

With the growing emphasis on achieving board diversity, the issue of board refreshment mechanisms has been garnering more attention. Generally, board refreshment is best achieved through an ongoing program of individual director evaluations. However, many companies employ other methods to achieve board turnover, such as age limits or tenure limits. These can be problematic: age limits are arbitrary, imply an impairment to ability solely due to age, and have been used in the past to remove dissenting voices from the board. Term/tenure limits can be problematic if poorly designed, e.g., enforcing too short a limit and thus not allowing a range of director tenures to provide a balance of experience with new perspectives. Or, at companies with multiple company executives on the board, a quick turnover forced on only the independent directors further limits their power vis-à-vis that of the insiders.

Worse still is when the age or tenure limit is waived for one director but not another, lessening its credibility and creating unequal treatment of supposedly equal boardroom participants. Yet, they are quite common: ISS' data on companies in the current Governance QualityScore (GQS) universe of ~ 3,050 U.S. companies found 673 companies had director age limits: of these only 40 had a limit that was mandatory while 633 had limits that could be waived. Fewer companies had a director term/tenure limit: only 66, and for all of them, it could be waived.

Complaint Ex. G 0017 ~~22 of 41~~



ISS' policy has been to recommend against all director term or age limits, and the policy to generally recommend against age limits will continue. However, ISS policy will now take a case-by-case approach on term limits. For those, ISS will take a case-by-case approach looking for well-designed management proposals that provide appropriate balance. For shareholder proposals, in cases where there are problematic board issues/governance failures at the company where lack of board turnover appears to be contributing factor, ISS may support a shareholder proposal for director term limits.

## Shareholder Rights & Defenses

### Advance Notice Requirements for Shareholder Proposals/Nominations

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory, and shareholder review.<br><br>To be reasonable, the company's deadline for shareholder notice of a proposal/nominations must ~~not be more than 60 days prior to the meeting, with a submittal window of at least 30 days prior to the deadline.~~ be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter than 30 days from the beginning of the notice period (also known as a 90-120 day window). The submittal window is the period under which ~~a~~ shareholders must file ~~his~~ their proposals/nominations prior to the deadline.<br><br>In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals. | **General Recommendation:** Vote case-by-case on advance notice proposals, giving support to those proposals which allow shareholders to submit proposals/nominations as close to the meeting date as reasonably possible and within the broadest window possible, recognizing the need to allow sufficient notice for company, regulatory, and shareholder review.<br><br>To be reasonable, the company's deadline for shareholder notice of a proposal/nominations must be no earlier than 120 days prior to the anniversary of the previous year's meeting and have a submittal window of no shorter than 30 days from the beginning of the notice period (also known as a 90-120 day window). The submittal window is the period under which shareholders must file their proposals/nominations prior to the deadline.<br><br>In general, support additional efforts by companies to ensure full disclosure in regard to a proponent's economic and voting position in the company so long as the informational requirements are reasonable and aimed at providing shareholders with the necessary information to review such proposals. |

### Rationale for Change:

Complaint Ex. G 0018

**AMERICAS**
POLICY UPDATES FOR 2021



In recent years, it has become more common in the U.S. market for companies to set advance notice provisions that provide for shareholder notice of action (via director nomination or other business) 120 days prior to the meeting, allowing for at least a 30-day submittal period. This policy change recognizes the balance needed between allowing shareholder submissions sufficiently close to the meeting to account for developing issues, and still allowing sufficient time for shareholders to evaluate and vote the items on all the agenda items in the proxy.

Advance notice provisions do not apply to shareholder proposals submitted under SEC Rule 14a-8(e)(2), nor to director nominations submitted under proxy access provisions.

## Shareholder Litigation Rights

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Shareholder Litigation Rights** ~~(including Exclusive Venue and Fee-Shifting Bylaw Provisions)~~ | **Shareholder Litigation Rights** |
| **Federal Forum Selection Provisions** | **Federal Forum Selection Provisions** |
| Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law. | Federal forum selection provisions require that U.S. federal courts be the sole forum for shareholders to litigate claims arising under federal securities law. |
| **General Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders. | **General Recommendation:** Generally vote for federal forum selection provisions in the charter or bylaws that specify "the district courts of the United States" as the exclusive forum for federal securities law matters, in the absence of serious concerns about corporate governance or board responsiveness to shareholders. |
| Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy. | Vote against provisions that restrict the forum to a particular federal district court; unilateral adoption (without a shareholder vote) of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy. |
| **Exclusive Forum Provisions for State Law Matters** | **Exclusive Forum Provisions for State Law Matters** |
| Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state | Exclusive forum provisions in the charter or bylaws restrict shareholders' ability to bring derivative lawsuits against the company, for claims arising out of state |

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0019   |   41



corporate law, to the courts of a particular state (generally the state of incorporation).

~~Bylaw provisions impacting shareholders' ability to bring suit against the company may include exclusive venue provisions, which provide that the state of incorporation shall be the sole venue for certain types of litigation, and fee-shifting provisions that require a shareholder who sues a company unsuccessfully to pay all litigation expenses of the defendant corporation.~~

**General Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, v~~V~~ote case-by-case on ~~bylaws~~ exclusive forum provisions ~~which impact shareholders' litigation rights~~, taking into consideration ~~account factors such as~~:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from ~~shareholder lawsuits in which plaintiffs were unsuccessful or~~ duplicative shareholder lawsuits in more than one forum ~~outside the jurisdiction of incorporation~~;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

---

corporate law, to the courts of a particular state (generally the state of incorporation).

**General Recommendation:** Generally vote for charter or bylaw provisions that specify courts located within the state of Delaware as the exclusive forum for corporate law matters for Delaware corporations, in the absence of serious concerns about corporate governance or board responsiveness to shareholders.

For states other than Delaware, vote case-by-case on exclusive forum provisions, taking into consideration:

- The company's stated rationale for adopting such a provision;
- Disclosure of past harm from duplicative shareholder lawsuits in more than one forum;
- The breadth of application of the charter or bylaw provision, including the types of lawsuits to which it would apply and the definition of key terms; and
- Governance features such as shareholders' ability to repeal the provision at a later date (including the vote standard applied when shareholders attempt to amend the charter or bylaws) and their ability to hold directors accountable through annual director elections and a majority vote standard in uncontested elections.

Generally vote against provisions that specify a state other than the state of incorporation as the exclusive forum for corporate law matters, or that specify a particular local court within the state; unilateral adoption of such a provision will generally be considered a one-time failure under the Unilateral Bylaw/Charter Amendments policy.

**Fee shifting**

---

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0020  41



---

| | |
|---|---|
| **Fee shifting**<br><br>Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.<br><br>**General Recommendation:** Generally vote against ~~bylaws~~ provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).<br><br>Unilateral adoption of a fee-shifting ~~by the board of bylaw~~ provision~~s which affect shareholders' litigation rights~~ will generally be considered an ongoing failure under the ~~will be evaluated under ISS' policy on~~ Unilateral Bylaw/Charter Amendments policy. | Fee-shifting provisions in the charter or bylaws require that a shareholder who sues a company unsuccessfully pay all litigation expenses of the defendant corporation and its directors and officers.<br><br>**General Recommendation:** Generally vote against provisions that mandate fee-shifting whenever plaintiffs are not completely successful on the merits (i.e., including cases where the plaintiffs are partially successful).<br><br>Unilateral adoption of a fee-shifting provision will generally be considered an ongoing failure under the Unilateral Bylaw/Charter Amendments policy. |

## Rationale for Change:

When evaluating proposals to establish the state of incorporation as the exclusive forum for cases arising under state corporate law, shareholders must balance the advantages (potential cost savings from eliminating duplicative litigation in more than one forum; eliminating risks of unpredictable or incorrect outcomes from courts that are unfamiliar with the law of the state of incorporation, or even unfamiliar with corporate law generally) against the disadvantages (inconvenience to plaintiffs who must bring suit in another state and hire local counsel there). However, exclusive <u>federal</u> forum provisions seen to date generally require only that federal securities litigation be brought in the district courts of the United States, and generally do not specify a particular federal district. Plaintiffs are therefore free to file such suits in the district courts in their home states. Without the argument that an exclusive forum provision for federal law cases would seriously inconvenience plaintiffs, the benefits of eliminating duplicative litigation and ensuring that cases are heard by courts that are well-versed in the applicable law carry greater weight. However, it is acknowledged that separate exclusive forum provisions for state corporate law claims and federal securities law claims will likely prevent plaintiffs from bringing cases alleging both types of claims in the same court.

Because Delaware has a separate court system specializing in corporate law cases, with a large body of precedent stemming from Delaware's status as the most common state of incorporation in the US, the likelihood of a speedy and efficient resolution of Delaware corporate law cases, in particular, is considered to be greater if they are heard in Delaware courts. Therefore, in the absence of concerns about abuse of the provision or about poor governance more generally, ISS will generally recommend in favor of charter or bylaw provisions designating courts in Delaware as the exclusive forum for state corporate law matters at companies incorporated in that state.

Charter and bylaw provisions designating US federal courts as the exclusive forum for cases arising under federal securities law (the Securities Act of 1933, as amended), which had previously been held to be impermissible by the Delaware Court of Chancery, were deemed to be facially valid under Delaware law in a March 2020 ruling by the Delaware Supreme Court. Some companies began incorporating such provisions into their governing documents almost immediately, either in the form of a bylaw amendment (which can be accomplished unilaterally by the board) or a charter amendment (which requires shareholder approval). This necessitates a new policy on

---

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0021 41



**AMERICAS**
POLICY UPDATES FOR 2021

these new voting items and provides an opportunity to re-examine the existing policy on exclusive forum provisions for state law matters and to reorganize the entire litigation rights section for clarity. The policy on fee-shifting remains unchanged.

## Virtual Shareholder Meetings

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[17] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.<br><br>Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:<br><br>▪ Scope and rationale of the proposal; and<br>▪ Concerns identified with the company's prior meeting practices. | **General Recommendation:** Generally vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only[17] meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting.<br><br>Vote case-by-case on shareholder proposals concerning virtual-only meetings, considering:<br><br>▪ Scope and rationale of the proposal; and<br>▪ Concerns identified with the company's prior meeting practices. |

## Rationale for Change:

The COVID-19 global pandemic has significantly changed how shareholders' meetings are held due to the widespread use of virtual-only meeting formats in response to lockdowns and other social distancing requirements adopted in most markets. In the U.S., regulations regarding company meeting formats (virtual, in-person or hybrid) are determined at the state level. While some states already included virtual meetings as part of the pre-COVID-19 regulatory framework, others had to set rules for the adoption of virtual meeting formats expeditiously as the pandemic continued to expand. As a result, virtual-only and/or hybrid (combined on-line and physical) shareholders meetings are being considered by more companies for future meetings.

While there is a compelling rationale for restricting physical meetings during an unprecedented global pandemic, the potential long-term impacts of moving to virtual-only formats on the rights of shareholders is the subject of debate. While some express concerns over company abuses during shareholder meetings, others propose the format as beneficial to shareholders. In their paper, "Back to the Future? Reclaiming Shareholder Democracy Through Virtual Annual Meetings," authors Yaron Nili

---

[17] Virtual-only shareholder meeting" refers to a meeting of shareholders that is held exclusively using technology without a corresponding in-person meeting.

Redlined = deleted; green = added
ISSGOVERNANCE.COM

Complaint Ex. G 0022 4 1



& Megan Wischmeier Shaner assert: "Virtual meetings allow shareholders to attend meetings at a low cost, holding the promise of re-engaging retail shareholders in corporate governance. If structured properly, virtual meetings can reinvigorate the annual meeting, reviving shareholder democracy while maintaining the efficiency benefits of proxy voting." However, in the same paper, it is noted that many large institutional shareholders and activist groups including CII, CalPERS, CalSTRS and the New York City Pension Funds have voiced opposition to virtual-only shareholders meetings, stating a preference for technology to supplement rather than supplant in-person meetings. These types of investors have stated that they may oppose directors in elections held at virtual-only meetings. These opinions could shift depending on the evolving technological capability to provide a virtual meeting experience that sufficiently approximates the in-person meeting.

The ISS US Benchmark policy currently does not have a stated policy for management proposals allowing for the convening of meetings by electronic means. This change is establishing a policy to generally recommend a vote for management proposals allowing for the convening of shareholder meetings by electronic means, so long as they do not preclude in-person meetings. Companies are encouraged to disclose the circumstances under which virtual-only meetings would be held, and to allow for comparable rights and opportunities for shareholders to participate electronically as they would have during an in-person meeting. In addition, the policy establishes a case-by-case approach on potential shareholder proposals on shareholder meeting formats.

## Social and Environmental Issues

### Gender, Race/Ethnicity Pay Gaps

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** ~~Generally~~ vVote case-by-case on requests for reports on a company's pay data by gender or~~,~~ race/~~, or~~ ethnicity, or a report on a company's policies and goals to reduce any gender or~~,~~ race/~~, or~~ ethnicity pay gaps, taking into account: | **General Recommendation:** Vote case-by-case on requests for reports on a company's pay data by gender or race/ ethnicity, or a report on a company's policies and goals to reduce any gender or race/ethnicity pay gaps, taking into account: |
| <ul><li>The company's current policies and disclosure related to both its diversity and inclusion policies and practices and its compensation philosophy on fair and equitable compensation practices;</li><li>Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to gender, race, or ethnicity pay gap issues; ~~and~~</li><li>~~Whether the company's reporting regarding gender, race, or ethnicity pay gap policies or initiatives is lagging its peers.~~</li><li>The company's disclosure regarding gender, race, or ethnicity pay gap policies or initiatives compared to its industry peers; and</li></ul> | <ul><li>The company's current policies and disclosure related to both its diversity and inclusion policies and practices and its compensation philosophy on fair and equitable compensation practices;</li><li>Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to gender, race, or ethnicity pay gap issues;</li><li>The company's disclosure regarding gender, race, or ethnicity pay gap policies or initiatives compared to its industry peers; and</li><li>Local laws regarding categorization of race and/or ethnicity and definitions of ethnic and/or racial minorities.</li></ul> |

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0023  41



| |
|---|
| ▪ Local laws regarding categorization of race and/or ethnicity and definitions of ethnic and/or racial minorities. |

## Rationale for Change:

ISS is updating the policy language to clarify how ISS evaluates a company's policies and practices compared to its peers. ISS also wants to highlight that some legal jurisdictions do not allow companies to categorize employees by race and/or ethnicity and that definitions of ethnic and/or racial minorities differ from country to country, so a global racial and/or ethnicity statistic would not necessarily be meaningful or possible to provide.

## Mandatory Arbitration

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Vote case-by-case on requests for a report on a company's use of mandatory arbitration on employment-related claims, taking into account:<br><br>▪ The company's current policies and practices related to the use of mandatory arbitration agreements on workplace claims;<br>▪ Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to the use of mandatory arbitration agreements on workplace claims; and<br>▪ The company's disclosure of its policies and practices related to the use of mandatory arbitration agreements compared to its peers. | **General Recommendation:** Vote case-by-case on requests for a report on a company's use of mandatory arbitration on employment-related claims, taking into account:<br><br>▪ The company's current policies and practices related to the use of mandatory arbitration agreements on workplace claims;<br>▪ Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to the use of mandatory arbitration agreements on workplace claims; and<br>▪ The company's disclosure of its policies and practices related to the use of mandatory arbitration agreements compared to its peers. |

## Rationale for Change:

A number of shareholder proposals on mandatory arbitration were filed in 2019 and 2020, and several of them have gone to a vote. The proposals have received increased support from shareholders, with one receiving majority support in 2020. ISS clients have expressed interest in a specific policy on this topic. As a result, ISS is creating a new policy based off ISS' existing global approach on E&S shareholder proposals.

Complaint Ex. G 0024 41



**AMERICAS**
POLICY UPDATES FOR 2021

In recent years, with the rise in employment litigation, many employers have turned to mandatory arbitration agreements as a way to avoid lengthy and costly litigation processes, including class action lawsuits. They argue that arbitration is a quicker and more cost-efficient way of resolving employment disputes. In addition, since arbitrations are private, the proceedings and outcomes are confidential, which can conceal embarrassing matters from becoming public. They note that arbitration also helps relieve an overburdened court system.

On the other hand, those against the use of this practice argue that mandatory arbitration agreements preclude employees from suing in court for violations like wage theft, discrimination and sexual harassment, and which require them to submit to private arbitration. They point out that private arbitration has been found to favor companies and discourage claims. They also point to numerous legal developments, such as the bill to end mandatory arbitration of sexual harassment claims that passed in the U.S. House of Representatives in September 2019, California's ban on the practice of requiring arbitration agreements as a condition of employment and Washington State's law enacted in 2018 that invalidates contracts requiring arbitration of sexual harassment or assault claims. They argue that due to their private and contractual nature, arbitrating employment-related claims can allow a toxic culture to flourish, increasing the severity of eventual consequences and harming employee morale.

## Sexual Harassment

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Vote case-by-case on requests for a report on company actions taken to strengthen policies and oversight to prevent workplace sexual harassment, or a report on risks posed by a company's failure to prevent workplace sexual harassment, taking into account:<br><br>▪ The company's current policies, practices, oversight mechanisms related to preventing workplace sexual harassment;<br>▪ Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to workplace sexual harassment issues; and<br>▪ The company's disclosure regarding workplace sexual harassment policies or initiatives compared to its industry peers. | **General Recommendation:** Vote case-by-case on requests for a report on company actions taken to strengthen policies and oversight to prevent workplace sexual harassment, or a report on risks posed by a company's failure to prevent workplace sexual harassment, taking into account:<br><br>▪ The company's current policies, practices, oversight mechanisms related to preventing workplace sexual harassment;<br>▪ Whether the company has been the subject of recent controversy, litigation, or regulatory actions related to workplace sexual harassment issues; and<br>▪ The company's disclosure regarding workplace sexual harassment policies or initiatives compared to its industry peers. |

## Rationale for Change:

Sexual harassment in the workplace is a serious form of employment discrimination with the potential for significant legal, human capital, and reputational costs to a company. Sexual harassment claims can damage a company's reputation, alienate its employees and customers, and can be a marker for poor corporate governance.

Redlined = deleted; green = added
ISSGOVERNANCE.COM

Complaint Ex. G 0025  41



A number of shareholder proposals filed on this issue in 2019 and 2020, and several have gone to a vote. The topic is high profile in nature and has garnered media attention. The proposals on this issue have received increased support from shareholders. ISS clients have expressed interest in a specific policy on this topic. As a result, ISS is creating a new policy on this particular issue based off ISS' existing global approach on E&S shareholder proposals.

## Mutual Funds

### Closed End Funds- Unilateral Opt-In to Control Share Acquisition Statutes

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote. | **General Recommendation:** For closed-end management investment companies (CEFs), vote against or withhold from nominating/governance committee members (or other directors on a case-by-case basis) at CEFs that have not provided a compelling rationale for opting-in to a Control Share Acquisition statute, nor submitted a by-law amendment to a shareholder vote. |

### Rationale for Change:

In May 2020, the SEC published guidance and withdrew a prior SEC staff letter known as the Boulder Letter in improving protections for boards of CEFs by allowing CEFs to defend themselves against investors using measures permitted under state corporate law. In recent years, some activist investors have targeted CEFs to extract profits by pushing for actions such as fund liquidations or conversions of CEFs into open-end funds.

As such, CEF boards will have a protective measure known as the Control Share Acquisition statute (for example, the Maryland Control Share Acquisition Act), which requires that an investor who has acquired a large percentage of a fund's outstanding shares (as defined by state law) must receive approval from the other shareholders in the fund in order to be able to vote all their shares.

As the staff of the Division of Investment Management may no longer recommend enforcement action to the SEC against a CEF under section 18(i) of the 1940 Act for opting in to the CSAA, CEF shareholders are denied important voting rights and are subject to management entrenchment.

Complaint Ex. G 0026   41



## Canada

### Board of Directors (TSX-Listed Companies)

**Voting on Director Nominees in Uncontested Elections: Board Gender Diversity**

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** For S&P/TSX Composite Index companies, effective February 2022, generally vote withhold for the Chair of the Nominating Committee or Chair of the committee designated with the responsibility of a nominating committee, or Chair of the board of directors if no nominating committee has been identified or no chair of such committee has been identified, where women comprise less than 30% of the board of directors, and: | **General Recommendation:** For S&P/TSX Composite Index companies, effective February 2022, generally vote withhold for the Chair of the Nominating Committee or Chair of the committee designated with the responsibility of a nominating committee, or Chair of the board of directors if no nominating committee has been identified or no chair of such committee has been identified, where women comprise less than 30% of the board of directors, and: |
| ▪ The company has not disclosed a formal written gender diversity policy[18]; or<br>▪ The company's formal written gender diversity policy does not include a commitment to achieve at least 30% women on the board over a reasonable timeframe. | ▪ The company has not disclosed a formal written gender diversity policy[18]; or<br>▪ The company's formal written gender diversity policy does not include a commitment to achieve at least 30% women on the board over a reasonable timeframe. |
| The gender diversity policy should include an explicit percentage or numerical target for women's representation that is at least 30% of the board. Where such target has not been attained, a reasonable timeframe should be provided under which the company commits to achieving a representation of at least 30%. | The gender diversity policy should include an explicit percentage or numerical target for women's representation that is at least 30% of the board. Where such target has not been attained, a reasonable timeframe should be provided under which the company commits to achieving a representation of at least 30%. |
| For widely-held companies[19] which are **not** also S&P/TSX Composite Index constituents, generally vote withhold for the Chair of the Nominating Committee or Chair of the committee designated with the responsibility of a nominating committee, or Chair of the board of directors if no nominating committee has been identified or no chair of such committee has been identified, where: | For widely-held companies[19] which are **not** also S&P/TSX Composite Index constituents, generally vote withhold for the Chair of the Nominating Committee |

[18] Per NI 58-101 and Form 58-101F1, the issuer should disclose whether it has adopted a written policy relating to the identification and nomination of women directors. The policy, if adopted, should provide a short summary of its objectives and key provisions; describe the measures taken to ensure that the policy has been effectively implemented; disclose annual and cumulative progress by the issuer in achieving the objectives of the policy, and whether and, if so, how the board or its nominating committee measures the effectiveness of the policy.

[19] "Widely-held" refers to S&P/TSX Composite Index companies as well as other companies that ISS designates as such based on the number of ISS clients holding securities of the company.

Redlined = deleted; green = added

Complaint Ex. G 0027        41 of 41



- The company has not disclosed a formal written gender diversity policy[18], and
- There are zero women on the board of directors.

The gender diversity policy should include a clear commitment to increase board gender diversity. Boilerplate or contradictory language may result in withhold recommendations for directors.

The gender diversity policy should include measurable goals and/or targets denoting a firm commitment to increasing board gender diversity within a reasonable period of time.

When determining a company's commitment to board gender diversity, consideration will also be given to the board's disclosed approach to considering gender diversity in executive officer positions and stated goals or targets or programs and processes for advancing women in executive officer roles, and how the success and processes is monitored.

**Non-S&P/TSX Composite Exemptions:**
This policy will not apply to:

- Newly-publicly-listed companies within the current or prior fiscal year;
- Companies that have transitioned from the TSXV within the current or prior fiscal year; or
- Companies with four or fewer directors.

**Rationale:** Gender diversity has become remained a high-profile corporate governance issue in the Canadian market. Effective Dec. 31, 2014, as per National Instrument 58-101 Disclosure of Corporate Governance Practices, TSX-listed issuers are required to provide proxy disclosures regarding whether, and if so how, the board or nominating committee considers the level of representation of women on the board in identifying and nominating candidates for election or re-election to the board. Also required is disclosure of policies or targets, if any, regarding the representation of women on the board. The disclosure requirement has been a catalyst for the addition of women on the boards of many widely-held TSX-listed reporting issuers. Widely-held TSX-listed company boards lacking a policy commitment and having zero female directors are now have been deemed to be outliers lagging market expectations in this regard.

or Chair of the committee designated with the responsibility of a nominating committee, or Chair of the board of directors if no nominating committee has been identified or no chair of such committee has been identified, where:

- The company has not disclosed a formal written gender diversity policy[18]; and
- There are zero women on the board of directors.

The gender diversity policy should include a clear commitment to increase board gender diversity. Boilerplate or contradictory language may result in withhold recommendations for directors.

The gender diversity policy should include measurable goals and/or targets denoting a firm commitment to increasing board gender diversity within a reasonable period of time.

**Non-S&P/TSX Composite Exemptions:**

This policy will not apply to:

- Newly-publicly-listed companies within the current or prior fiscal year;
- Companies that have transitioned from the TSXV within the current or prior fiscal year; or
- Companies with four or fewer directors.

**Rationale:** Gender diversity has remained a high-profile corporate governance issue in the Canadian market. Effective Dec. 31, 2014, as per National Instrument 58-101 Disclosure of Corporate Governance Practices, TSX-listed issuers are required to provide proxy disclosures regarding whether, and if so how, the board or nominating committee considers the level of representation of women on the board in identifying and nominating candidates for election or re-election to the board. Also required is disclosure of policies or targets, if any, regarding the representation of women on the board. The disclosure requirement has been a catalyst for the addition of women on the boards of many widely-held TSX-

Complaint Ex. G 0028   41



| | |
|---|---|
| Further to this objective, in September 2017, the Canadian 30% Club Investor Group committed to exercising ownership rights to encourage increased representation of women on S&P/TSX Composite Index company boards to a minimum 30% threshold. In 2020, the Capital Markets Modernization Task Force recommended an overhaul to the "comply or explain" regime and would instead require TSX-listed companies to set diversity targets and provide data on the progress being made. As the sentiment supporting representation of women at boards has steadily grown in Canada, it has become clear that a higher standard of representation by women is expected, with S&P/TSX Composite Index constituents playing a vital role in this process as market leaders. | listed reporting issuers. Widely-held TSX-listed company boards lacking a policy commitment and having zero female directors have been deemed to be outliers lagging market expectations in this regard.<br><br>Further to this objective, in September 2017, the Canadian 30% Club Investor Group committed to exercising ownership rights to encourage increased representation of women on S&P/TSX Composite Index company boards to a minimum 30% threshold. In 2020, the Capital Markets Modernization Task Force recommended an overhaul to the "comply or explain" regime and would instead require TSX-listed companies to set diversity targets and provide data on the progress being made. As the sentiment supporting representation of women at boards has steadily grown in Canada, it has become clear that a higher standard of representation by women is expected, with S&P/TSX Composite Index constituents playing a vital role in this process as market leaders. |

**Rationale for Change:**

ISS has received ongoing feedback from institutional investor clients regarding its current Gender Diversity Policy for Canada, which provides that a widely-held company must have either one woman on the board, or a formal gender diversity policy including goals and defined targets to attain representation of women on the board to avoid adverse voting recommendations. A number of large Canadian institutions are signatories of the 30% Club Statement of Intent, calling for a minimum of 30 percent women on boards and at the executive management level of S&P/TSX Composite Index companies by 2022. Additionally, a number of Composite Index issuers are signatories of the 2022 Catalyst Accord, calling for similar objectives to that of the 30% Club.

Accordingly, the updated policy will set a higher minimum threshold of 30 percent female women board representation, being a percentage or number of directors constituting 30 percent of the board instead of single board member, at for S&P/TSX Composite issuers from 2022 onward. In addition, it is being made explicit that where such minimum 30 percent threshold has not been met, the company's commitment to gender diversity must include a reasonable timetable to comply with the policy to avoid an adverse voting recommendation. The policy change will be effective February 1, 2022, providing companies a one-year transition period to meet or exceed the higher threshold. The change will align Canadian benchmark policy with prevailing client expectations and the direction in which market participants are heading.

Redlined = deleted; green = added

Complaint Ex. G 0029 41

**AMERICAS**
POLICY UPDATES FOR 2021



## Shareholder Rights & Defenses (TSX-Listed Companies and Venture Companies)

### Exclusive Forum Proposals

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **General Recommendation:** Vote case-by-case on proposals to adopt an exclusive forum by-law or to amend by-laws to add an exclusive forum provision, taking the following into consideration: | **General Recommendation:** Vote case-by-case on proposals to adopt an exclusive forum by-law or to amend by-laws to add an exclusive forum provision, taking the following into consideration: |
| ▪ Jurisdiction of incorporation; <br> ▪ Board rationale for adopting exclusive forum; <br> ▪ Legal actions subject to the exclusive forum provision; <br> ▪ Evidence of past harm as a result of shareholder legal action against the company originating outside of the jurisdiction of incorporation; <br> ▪ Company corporate governance provisions and shareholder rights; <br> ▪ Any other problematic provisions that raise concerns regarding shareholder rights. | ▪ Jurisdiction of incorporation; <br> ▪ Board rationale for adopting exclusive forum; <br> ▪ Legal actions subject to the exclusive forum provision; <br> ▪ Evidence of past harm as a result of shareholder legal action against the company originating outside of the jurisdiction of incorporation; <br> ▪ Company corporate governance provisions and shareholder rights; <br> ▪ Any other problematic provisions that raise concerns regarding shareholder rights. |

### Rationale for Change:

Exclusive forum by-laws, which have been adopted widely in the US market, are still relatively new to the Canadian market, although an increasing number of companies continue to adopt these provisions as by-laws which require shareholder approval. There is merit to the notion that judges based in a corporation's jurisdiction of incorporation are best suited to apply that jurisdiction's law to those companies. As well, given a corporation's typically strong presence in that province or jurisdiction, an exclusive forum provision may help to reduce the likelihood of high legal costs accrued through litigation outside of the jurisdiction of incorporation.

It can be argued, however, that there is often more than one proper forum available to shareholder plaintiffs, and this proposal would curtail the right of shareholders to select any proper forum of their choosing. The proposed exclusive forum jurisdiction and the details of the extent and types of legal actions that would be subject to the exclusive forum by-law provide critical information to shareholders whose rights may be impacted. This information together with the board of directors' rationale in adopting an exclusive forum by-law will be key considerations in evaluating the acceptability of such a proposal. As well, the absence of a compelling company-specific history with regard to out-of-province/jurisdiction shareholder litigation is important in light of the limitation on shareholder litigation rights that this provision represents. More generally, a company's track record vis-à-vis corporate governance and shareholder rights should be examined to identify any other concerns when considering the acceptability of an exclusive forum by-law.

This policy codifies the policy approach currently applied as it is expected that more companies will adopt exclusive forum by-laws, providing more transparency and a rationale.

Redlined = deleted; green = added
ISSGOVERNANCE.COM

Complaint Ex. G 0030 41



# Brazil

## Board of Directors

### Director Elections- Board Independence

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Voting on Director Nominees under Uncontested Election**<br><br>In Brazil, the revised version of the code of best practice of corporate governance, from the Brazilian Institute of Corporate Governance (IBGC), as well as the country's newly-created Brazilian Code of Corporate Governance (2016) recommend that boards should have a "relevant number of independent directors" or be, at a minimum, one-third independent, respectively. These recommendations have become increasingly pertinent as the free float of Brazilian companies continues to grow. Majority independent boards remain rare in Brazil.<br><br>The revised version of the Sao Paulo Stock Exchange's (B3) Novo Mercado listing segment regulations, effective as of Jan. 2, 2018, states that member companies are required to maintain a minimum of 20-percent board independence or two independent members, whichever results in a higher independence level. The previous rule established only a minimum of 20-percent board independence, which could technically be met with one independent director depending on the size of the board. Companies listed under the Nivel 2 listing segment are required to maintain a minimum of 20-percent independent board, and B3 regulations continue to allow these companies (Nivel 2) to round down the required number of independent directors.<br><br>Companies that are part of the Nivel 1 and the non-differentiated ("Traditional") listing segments are not subject to a minimum independence requirement. Institutional investors largely believe that the aforementioned board independence requirements are presently inadequate, in light of the current free float and average board independence of companies in the differentiated listing segments.<br><br>ISS' benchmark board independence policy specifies that the boards of issuers belonging to the Novo Mercado and Nivel 2, the country's highest levels of | **Voting on Director Nominees under Uncontested Election**<br><br>In Brazil, the revised version of the code of best practice of corporate governance, from the Brazilian Institute of Corporate Governance (IBGC), as well as the country's newly-created Brazilian Code of Corporate Governance (2016) recommend that boards should have a "relevant number of independent directors" or be, at a minimum, one-third independent, respectively. These recommendations have become increasingly pertinent as the free float of Brazilian companies continues to grow. Majority independent boards remain rare in Brazil.<br><br>The revised version of the Sao Paulo Stock Exchange's (B3) Novo Mercado listing segment regulations, effective as of Jan. 2, 2018, states that member companies are required to maintain a minimum of 20-percent board independence or two independent members, whichever results in a higher independence level. The previous rule established only a minimum of 20-percent board independence, which could technically be met with one independent director depending on the size of the board. Companies listed under the Nivel 2 listing segment are required to maintain a minimum of 20-percent independent board, and B3 regulations continue to allow these companies (Nivel 2) to round down the required number of independent directors.<br><br>Companies that are part of the Nivel 1 and the non-differentiated ("Traditional") listing segments are not subject to a minimum independence requirement. Institutional investors largely believe that the aforementioned board independence requirements are presently inadequate, in light of the current free float and average board independence of companies in the differentiated listing segments.<br><br>ISS' benchmark board independence policy specifies that the boards of issuers belonging to the Novo Mercado and Nivel 2, the country's highest levels of |

Complaint Ex. G 0031



**AMERICAS**
POLICY UPDATES FOR 2021

corporate governance, must be at least 50-percent independent, while companies listed under Nivel 1 or the Traditional segment must have at least one-third of the board or two directors, whichever is higher, classified as independent. Such thresholds are consistent with proportional board representation best practices and the growing expectations of institutional investors.

~~In addition, as of Feb. 1, 2018, ISS benchmark policy was updated to also recommend a minimum of at least one independent director for companies listed under the Nivel 1 differentiated corporate governance segment and the Traditional segment.~~

The most common market practice in Brazil remains slate elections. Nonetheless, in recent years, the market has experienced an increase in the number of individual board elections.

While directors nominated by a controlling shareholder must be disclosed at a minimum of 15 days prior to the meeting date, minority shareholders may present the names of their nominees up to the time of the meeting. These rules were designed to minimize restrictions on minority shareholders, but may negatively impact international investors, who must often submit voting instructions in the absence of complete nominee information.

Brazilian companies are required to provide its shareholders with a remote voting option, through the Remote Voting Card (RVC) as regulated by the Brazilian Securities Regulator (CVM) through its original Instruction 561/2015 and amended by Instruction 594/2017. For additional information regarding the Remote Voting Card and its disclosure requirements, refer to the Brazil Remote Voting Card (FAQ), available on the ISS Policy Gateway website.

**Bundled Elections**
**General Recommendation:** Vote for the bundled election of management nominees, unless:
- Adequate disclosure of management nominees has not been provided in a timely manner;
- There are clear concerns over questionable finances or restatements;
- There have been questionable transactions with conflicts of interest;
- There are any records of abuses against minority shareholder interests;
- The board fails to meet minimum corporate governance standards; or

corporate governance, must be at least 50-percent independent, while companies listed under Nivel 1 or the Traditional segment must have at least one-third of the board or two directors, whichever is higher, classified as independent. Such thresholds are consistent with proportional board representation best practices and the growing expectations of institutional investors.

The most common market practice in Brazil remains slate elections. Nonetheless, in recent years, the market has experienced an increase in the number of individual board elections.

While directors nominated by a controlling shareholder must be disclosed at a minimum of 15 days prior to the meeting date, minority shareholders may present the names of their nominees up to the time of the meeting. These rules were designed to minimize restrictions on minority shareholders, but may negatively impact international investors, who must often submit voting instructions in the absence of complete nominee information.

Brazilian companies are required to provide its shareholders with a remote voting option, through the Remote Voting Card (RVC) as regulated by the Brazilian Securities Regulator (CVM) through its original Instruction 561/2015 and amended by Instruction 594/2017. For additional information regarding the Remote Voting Card and its disclosure requirements, refer to the Brazil Remote Voting Card (FAQ), available on the ISS Policy Gateway website.

**Bundled Elections**
**General Recommendation:** Vote for the bundled election of management nominees, unless:
- Adequate disclosure of management nominees has not been provided in a timely manner;
- There are clear concerns over questionable finances or restatements;
- There have been questionable transactions with conflicts of interest;
- There are any records of abuses against minority shareholder interests;
- The board fails to meet minimum corporate governance standards; or

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0032    41



- Minority shareholders have presented timely disclosure of minority board nominees to be elected under separate elections, as allowed under Brazilian law (see Election of Minority Nominees – Separate Election below).

**Minimum Independence Levels**
Vote against the bundled election of directors if the post-election board at Novo Mercado and Nivel 2 companies would not be at least ~~30~~ 50-percent independent. A two-year phase-in period will apply in 2021 and 2022 to allow companies to gradually increase their overall board independence and adapt to the recommended independence threshold. During the transitional period (2021-2022), vote against proposed boards with overall independence level below 40 percent.

Vote against the bundled election of directors if the post-election board of Nivel 1 and Traditional companies would not have at least one-third of the board or two ~~independent member~~ directors, whichever is higher, classified as independent by ISS.

- Minority shareholders have presented timely disclosure of minority board nominees to be elected under separate elections, as allowed under Brazilian law (see Election of Minority Nominees – Separate Election below).

**Minimum Independence Levels**
Vote against the bundled election of directors if the post-election board at Novo Mercado and Nivel 2 companies would not be at least 50-percent independent.

A two-year phase-in period will apply in 2021 and 2022 to allow companies to gradually increase their overall board independence and adapt to the recommended independence threshold. During the transitional period (2021-2022), vote against proposed boards with overall independence level below 40 percent.

Vote against the bundled election of directors if the post-election board of Nivel 1 and Traditional companies would not have at least one-third of the board or two directors, whichever is higher, classified as independent by ISS.

## Rationale for Change:

According to ISS Data, average board independence of Brazilian companies covered by ISS that held board elections in 2020 is currently at 40.6 percent, including all listing segments (Novo Mercado, Nivel 2, Nivel 1, and Traditional). ISS policy guidelines for the Brazilian market have traditionally recommended independence levels above the minimum regulatory requirements of the differentiated corporate governance segments (Novo Mercado, Nivel 2, and Nivel 1). However, the previous time ISS updated its board independence policy for companies listed in the highest corporate governance segments of the Sao Paulo Stock Exchange (B3) was in 2012, when ISS policy started recommending a minimum of 30 percent board independence for companies listed in the Novo Mercado and Nivel 2 segments, while listing rules required a minimum board independence of 20 percent. In 2017, ISS Brazil Voting Guidelines introduced, for the first time, a minimum independence requirement (one independent director) for companies listed under the Nivel 1 corporate governance segment and the Traditional listing segment, both of which do not have a regulatory requirement of a minimum board independence.

Considering evolving market practices and the current average independence levels practices by Brazilian companies, the update to the minimum independence requirements under the Brazil Proxy Voting Guidelines is warranted. Therefore, ISS is updating its policy guidelines to increase the minimum board independence threshold for all listing segments, maintaining a more stringent requirement for companies listed in the B3 segments with the highest corporate governance standards, as can be seen in the table below.



| | 2019 average board independence* | 2020 average board independence* | Listing Segment Requirement | Current ISS policy | Updated ISS policy |
|---|---|---|---|---|---|
| **Brazil overall** | 40.4% | 40.6% | | | |
| **Brazil - NM** | 45.0% | 43.1% | 20% or two independent directors, whichever is higher | 30% minimum independence level | Minimum 40% independence in 2021 and 2022; minimum 50% independence starting in 2023 |
| **Brazil – N2** | 37.0% | 40.2% | 20% minimum independence level | 30% minimum independence level | Minimum 40% independence in 2021 and 2022; minimum 50% independence starting in 2023 |
| **Brazil – N1** | 37.9% | 32.4% | No minimum independence requirement | At least one independent director | 1/3 independence level or two independent directors, whichever is higher (applicable from 2021) |
| **Brazil - Traditional** | 21.2% | 27.0% | No minimum independence requirement | At least one independent director | 1/3 independence level or two independent directors, whichever is higher (applicable from 2021) |

*Companies covered by ISS with board election in FY2019 and FY2020, respectively. The universe of companies included in the calculation of the average board independence is not the same in both years given that two-year board terms are common in the Brazilian market.

The policy update will align Brazil's policy guidelines with those more commonly found in other markets covered by ISS (i.e., one-third and 50 percent independent). For Novo Mercado and Nivel 2 listing segments, the 50 percent independence level will be implemented in 2023, with a 40 percent independence threshold required in fiscal years 2021 and 2022. For the Nivel 1 and Traditional segments, the threshold of one-third independence level or two independent directors, whichever is higher, will be implemented in 2021.

Complaint Ex. G 0034



**AMERICAS**
POLICY UPDATES FOR 2021

# Brazil and Americas Regional Policy

## Board of Directors

### Director Elections- Board Gender Diversity

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Gender Diversity**<br>For meetings on or after Feb. 1, 2022, generally vote against director elections at companies where the post-election board contains no female directors.<br><br>• For bundled elections, vote against the entire slate.<br>• For unbundled elections, vote against the chair of the Nominating Committee or chair of the committee designated with the responsibility of a nominating committee, or all such committee members if no committee chair has been identified. In case no nominating committee has been disclosed, vote against the chair of the board, or the entire board if no board chair has been identified.<br><br>A one-year transitional period will apply in 2021 to allow companies to incorporate gender diversity into their board compositions. During this transitional period, vote recommendations will not be impacted by the gender diversity policy. The gender diversity policy will come into effect on Feb. 1, 2022. | **Gender Diversity**<br>For meetings on or after Feb. 1, 2022, generally vote against director elections at companies where the post-election board contains no female directors.<br><br>• For bundled elections, vote against the entire slate.<br>• For unbundled elections, vote against the chair of the Nominating Committee or chair of the committee designated with the responsibility of a nominating committee, or all such committee members if no committee chair has been identified. In case no nominating committee has been disclosed, vote against the chair of the board, or the entire board if no board chair has been identified.<br><br>A one-year transitional period will apply in 2021 to allow companies to incorporate gender diversity into their board compositions. During this transitional period, vote recommendations will not be impacted by the gender diversity policy. The gender diversity policy will come into effect on Feb. 1, 2022. |

### Rationale for Change:

Boards of Latin American companies generally suffer from a lack of or low gender diversity. Regional markets have few hard or soft laws on the subject, and many issuers have failed to adopt best practices regarding board diversity. For the largest Latin American markets covered by ISS (Argentina, Brazil, Chile, Colombia, Mexico, and Peru), the number of companies lacking diversity on boards remain high; 38.2 percent of all Latin American companies covered by ISS with board elections in 2020 did not have a female director.

Global investors as well as civil organizations in the region and throughout the world have made strides to advance board diversity in general, often with a focus on increased female participation. Moreover, large institutional investors such as Goldman Sachs and State Street Global Advisors have recently committed publicly to board diversity principals, reflecting the importance of diversity, including gender diversity, to improve companies' corporate governance and long-term results.

Redlined = deleted; green = added
ISSGOVERNANCE.COM

AMERICAS
POLICY UPDATES FOR 2021



In this context, ISS has updated the Brazil and Americas Regional policies to require the presence of at least one woman on boards of directors. The implementation of the new board gender diversity policy brings the Latin American market in line with other international ISS policies, which have already established guidelines on the subject. Moreover, the adoption of such policy provides an additional incentive for companies in the region to consider gender when assessing and evaluating their board compositions.

## Director Elections- Overboarding

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Overboarding** <br><br> Generally, vote against management nominees who: <br><br> • Sit on more than five public company boards; or <br> • Are CEOs of public companies who sit on the boards of more than two public companies besides their own— recommend against only at their outside boards[20]. <br><br> Generally, vote against the bundled election of directors if one or more nominees, if elected, would be overboarded. | **Overboarding** <br><br> Generally, vote against management nominees who: <br><br> • Sit on more than five public company boards; or <br> • Are CEOs of public companies who sit on the boards of more than two public companies besides their own— recommend against only at their outside boards[20]. <br><br> Generally, vote against the bundled election of directors if one or more nominees, if elected, would be overboarded. |

## Rationale for Change:

Directors need sufficient time and energy to be effective representatives of shareholder interests, and directors' responsibilities are increasingly complex as board and key committee memberships demand greater time commitments. According to a 2014-2015 Public Company Governance Survey conducted by the National Association of Corporate Directors (NACD), directors of public companies committed an annual average of 278 hours to board-related matters in 2014. A review of NACD's annual surveys reveals the average director time commitment has grown by 46 percent, from 190 hours in 2005 to 278 hours in 2014. There is a need to balance the additional

[20] Although all of a CEO's subsidiary boards with publicly-traded common stock will be counted as separate boards, ISS will not recommend an against vote for the CEO of a parent company board or any of the controlled (>50 percent ownership) subsidiaries of that parent but may do so at subsidiaries that are less than 50 percent controlled and boards outside the parent/subsidiary relationships.

Redlined = deleted; green = added

Complaint Ex. G 0036
41



**AMERICAS**
POLICY UPDATES FOR 2021

insight gained by directors' participation on different boards with the need to limit the number of commitments to allow directors sufficient time for the preparation, attendance, and participation at board and committee meetings in an ever more complex and challenging governance landscape.

A number of ISS' international benchmark policies apply overboarding policies to their vote recommendations of board elections. Based on ISS data, the Latin American markets currently have a high concentration of directors serving on multiple boards. Of the approximately 440 Latin American issuers covered by ISS benchmark research, 63 issuers have directors serving on more than five boards.

This overboarding policy follows global trends towards greater scrutiny regarding the time and energy needed to be an effective representative of shareholder interests and the greater demands sought in board and key committee memberships. Furthermore, an overboarding policy can promote greater board refreshment, potentially bringing new members and perspectives to boards. Lastly, the policy brings the Brazil and Americas Regional Policies in line with a number of ISS global benchmark policies, harmonizing the approach to board elections across various global markets and in particular the Americas markets.

Complaint Ex. G 0037 41



**AMERICAS**
POLICY UPDATES FOR 2021

# Americas Regional

## Board of Directors

### Director Elections- Independence

| Current ISS Policy, incorporating changes: | New ISS Policy: |
|---|---|
| **Bundled Elections**<br><br>**General Recommendation:** Vote for the bundled election of management nominees, unless:<br><br>• Adequate disclosure has not been provided in a timely manner;<br>• There are clear concerns over questionable finances or restatements;<br>• There have been questionable transactions with conflicts of interest;<br>• There are any records of abuses against minority shareholder interests;<br>• The board fails to meet minimum corporate governance standards, including gender diversity and overboarding thresholds recommended under ISS policy;<br>• There are specific concerns about ~~the~~ individual nominees, such as criminal wrongdoing or breach of fiduciary responsibilities; or<br>• The company ~~does not comply with market legal requirements for minimum board independence, or~~ does not have at least ~~one independent board member~~ one-third board independence or two independent directors, whichever is higher.<br><br>In a bundled election, vote against the election of directors at all companies if the name(s) of the nominee(s) is(are) not disclosed in a timely manner prior to the meeting, ~~and~~ or if the company ~~does not comply with market legal requirements for minimum board independence or~~ does not have at least ~~one independent board member~~ one-third board independence or two independent directors, whichever is higher.<br><br>**Unbundled Elections** | **Bundled Elections**<br><br>**General Recommendation:** Vote for the bundled election of management nominees, unless:<br><br>• Adequate disclosure has not been provided in a timely manner;<br>• There are clear concerns over questionable finances or restatements;<br>• There have been questionable transactions with conflicts of interest;<br>• There are any records of abuses against minority shareholder interests;<br>• The board fails to meet minimum corporate governance standards, including gender diversity and overboarding thresholds recommended under ISS policy;<br>• There are specific concerns about individual nominees, such as criminal wrongdoing or breach of fiduciary responsibilities; or<br>• The company does not have at least one-third board independence or two independent directors, whichever is higher.<br><br>In a bundled election, vote against the election of directors at all companies if the name(s) of the nominee(s) is(are) not disclosed in a timely manner prior to the meeting, or if the company does not have at least one-third board independence or two independent directors, whichever is higher.<br><br>**Unbundled Elections** |



**AMERICAS**
POLICY UPDATES FOR 2021

| | |
|---|---|
| **General Recommendation:** In an unbundled election, support for all director nominees is recommended, unless:<br><br>▪ The company has not provided adequate disclosure of the proposed nominees; or<br>▪ The minimum independence level recommended under ISS policy is not met.<br><br>However, if the proposed board falls below the minimum independence level recommended under ISS policy guidelines ~~and/or market regulations~~,<br><br>▪ Vote for the independent nominees presented individually; and<br>▪ Vote against the non-independent candidates.<br><br>In making the above vote recommendations, ISS generally will not recommend against the election of the board chair, due to the relevance of the board leadership position in the absence of other governance concerns. | **General Recommendation:** In an unbundled election, support for all director nominees is recommended, unless:<br><br>▪ The company has not provided adequate disclosure of the proposed nominees; or<br>▪ The minimum independence level recommended under ISS policy is not met.<br><br>However, if the proposed board falls below the minimum independence level recommended under ISS policy guidelines,<br><br>▪ Vote for the independent nominees presented individually; and<br>▪ Vote against the non-independent candidates.<br><br>In making the above vote recommendations, ISS generally will not recommend against the election of the board chair, due to the relevance of the board leadership position in the absence of other governance concerns. |

**Rationale for Change:**

The current ISS' benchmark Americas Regional Policy for board elections is focused mainly on the timely disclosure of the nominees' names and on the overall board independence. Based on ISS data, however, the market practice in the region has improved, and the average board independence is already above the minimum threshold included in the Americas Regional policy guidelines.

As such, in light of evolving market practices and the average board independence levels of companies covered by ISS, an update to the minimum independence requirements under the Americas Regional Proxy Voting Guidelines is timely. Therefore, ISS updates its policy guidelines to increase the minimum board independence threshold for all markets covered by such policy to one-third or two independent directors, whichever is higher. Furthermore, as shown in the table below, the new policy has the benefit of harmonizing the minimum board independence requirement throughout the region:

| | 2019 average board independence* | 2020 average board independence* | Current ISS policy** | New ISS policy |
|---|---|---|---|---|
| **Argentina** | 42% | 39.2% | Two independent directors | One-third board independence or two independent directors, whichever is higher |

~~Redlined~~ = deleted; green = added

Complaint Ex. G 0039



| | | | | |
|---|---|---|---|---|
| **Chile** | 22% | 26.1% | One independent director | One-third board independence or two independent directors, whichever is higher |
| **Colombia** | 41% | 42.4% | 25 percent board independence | One-third board independence or two independent directors, whichever is higher |
| **Mexico** | 36% | 34.2% | 25 percent board independence | One-third board independence or two independent directors, whichever is higher |
| **Peru** | 24% | 31.5% | One independent director | One-third board independence or two independent directors, whichever is higher |

*\*Companies covered by ISS with board elections in FY2019 and FY2020, respectively. The universe of companies included in the calculation of the average board independence is not the same in both years given that two- and three-year board terms are common in the Latin American markets.*

*\*\*ISS Policy is currently based on local regulations for minimum board independence, which vary by market.*

Complaint Ex. G 0040



# We empower investors and companies to build for long-term and sustainable growth by providing high-quality data, analytics, and insight.

## GET STARTED WITH ISS SOLUTIONS

Email sales@issgovernance.com or
visit issgovernance.com for more information.

Founded in 1985, the Institutional Shareholder Services group of companies ("ISS") is the world's leading provider of corporate governance and responsible investment solutions alongside fund intelligence and services, events, and editorial content for institutional investors, globally. ISS' solutions include objective governance research and recommendations; responsible investment data, analytics, and research; end-to-end proxy voting and distribution solutions; turnkey securities class-action claims management (provided by Securities Class Action Services, LLC); reliable global governance data and modeling tools; asset management intelligence, portfolio execution and monitoring, fund services, and media. Clients rely on ISS' expertise to help them make informed investment decisions.

This document and all of the information contained in it, including without limitation all text, data, graphs, and charts (collectively, the "Information") is the property of Institutional Shareholder Services Inc. (ISS), its subsidiaries, or, in some cases third party suppliers.

The Information has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body. None of the Information constitutes an offer to sell (or a solicitation of an offer to buy), or a promotion or recommendation of, any security, financial product or other investment vehicle or any trading strategy, and ISS does not endorse, approve, or otherwise express any opinion regarding any issuer, securities, financial products or instruments or trading strategies.

The user of the Information assumes the entire risk of any use it may make or permit to be made of the Information.

ISS MAKES NO EXPRESS OR IMPLIED WARRANTIES OR REPRESENTATIONS WITH RESPECT TO THE INFORMATION AND EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES (INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTIES OF ORIGINALITY, ACCURACY, TIMELINESS, NON-INFRINGEMENT, COMPLETENESS, MERCHANTABILITY, AND FITNESS for A PARTICULAR PURPOSE) WITH RESPECT TO ANY OF THE INFORMATION.

Without limiting any of the foregoing and to the maximum extent permitted by law, in no event shall ISS have any liability regarding any of the Information for any direct, indirect, special, punitive, consequential (including lost profits), or any other damages even if notified of the possibility of such damages. The foregoing shall not exclude or limit any liability that may not by applicable law be excluded or limited.

© 2020 | Institutional Shareholder Services and/or its affiliates

Redlined = deleted; green = added

Complaint Ex. G 0041   41

# Attachment C

*STRICTLY CONFIDENTIAL*
*Execution Version*

**SIDE LETTER**

Reference is made to the Director Appointment and Nomination Agreement, dated as of April __, 2022 (the "**Agreement**"), by and among the persons and entities listed on Schedule A to the Agreement (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**") (capitalized terms used but not defined in this side letter (this "**Side Letter**") shall have the meanings given such terms in the Agreement). In consideration of and reliance upon the mutual covenants and agreements contained in the Agreement and this Side Letter, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(i) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "**Policy**") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.

2.   **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Side Letter and to perform its obligations hereunder; (b) this Side Letter has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Side Letter will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

3.   **Miscellaneous Provisions.** The provisions of Sections 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 of the Agreement are incorporated into this Side Letter mutatis mutandis.

[Signature Pages Follow]

Complaint Ex. A 0001

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Side Letter or caused the same to be executed by its duly authorized representative as of the date first above written.

**BAUSCH + LOMB CORPORATION**

By: _____
Name:
Title:

[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0002

**ICAHN GROUP**

CARL C. ICAHN

_____

Carl C. Icahn

ICAHN PARTNERS LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN PARTNERS MASTER FUND LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By: _____
Name: Ted Papapostolou
Title: Chief Financial Officer

[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0003

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By: _____
Name:  Ted Papapostolou
Title:    Chief Financial Officer


IPH GP LLC

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer


ICAHN CAPITAL LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer


ICAHN ONSHORE LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer


ICAHN OFFSHORE LP

By: _____
Name:  Jesse Lynn
Title:    Chief Operating Officer


BECKTON CORP

By: _____
Name:  Jesse Lynn
Title:    Vice President


[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0004

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| STEVEN D. MILLER,<br><br>      Plaintiff,<br><br>      v.<br><br>BAUSCH HEALTH COMPANIES INC.;<br>BAUSCH + LOMB CORPORATION;<br>THOMAS ROSS; CHRISTINA<br>ACKERMANN; GAOXIANG HU; ICAHN<br>ENTERPRISES L.P.; ICAHN<br>ENTERPRISES G.P. INC.; ICAHN<br>CAPITAL LP; CARL ICAHN; BRETT<br>ICAHN,<br>      Defendants. | No. 1:25-CV-25893-<br>Bloom/Elfenbein<br><br>**DEFENDANT BAUSCH<br>HEALTH COMPANIES INC.'S<br>RESPONSES AND OBJECTIONS<br>TO PLAINTIFF'S FIRST SET OF<br>REQUESTS FOR PRODUCTION** |

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, and Rule 26(e) of the Local Rules of the U.S. District Court for the Southern District of Florida (together, the "Applicable Rules"), Bausch Health Companies Inc. ("Bausch Health"), by its undersigned counsel, hereby submits the following Responses and Objections to Plaintiff's March 11, 2026 First Set of Requests for Production to Defendant Bausch Health (the "Response" to the "Requests" and each, a "Request") in the above-captioned action (the "Action"). Bausch Health submits this Response without waiving its objection to lack of personal jurisdiction.

### GENERAL RESPONSES, LIMITATIONS, AND OBJECTIONS

Bausch Health hereby makes the following General Objections, which apply to each and every Request and are incorporated by reference into each and every response below as if set forth fully therein. Bausch Health's responses to each and every Request are made subject

to, and without waiving, these General Objections or any specific objections.  Failure to reiterate a General Objection below does not constitute a waiver of that or any other objection.

1.      Bausch Health objects to the Requests to the extent that they purport to impose burdens or obligations on Bausch Health that are broader than or inconsistent with the permissible scope of discovery under the Applicable Rules.  Bausch Health will construe the Requests consistently with the Applicable Rules.

2.      Bausch Health's Response, and any production of documents or information made in response to the Requests are not intended to be, and shall not be construed as, an admission that any factual predicates, allegations, or argumentative assertions stated in the Requests are accurate. Any response, or provision of information in response to the Requests is not intended to provide, and shall not constitute or be construed as providing, a legal conclusion concerning any of the terms used in the Requests or an admission of the correctness of any allegation or assertion contained within the Requests.

3.      Bausch Health objects to the Requests on the grounds that, taken as a whole and as written, they are vague, ambiguous, overly broad, lacking in particularity, and oppressive.

4.      Bausch Health objects to the Requests to the extent they seek documents that are neither relevant to the claims, defenses, or subject matter of, nor proportionate to the needs of, the Action.  Bausch Health also objects to the Requests to the extent that they are unduly burdensome because they would impose significant expense and inconvenience.

5.      Bausch Health objects to the Requests to the extent that they seek production of "all" documents or "all" communications on the grounds that (i) it is impractical and unduly burdensome to attempt to collect, review, and produce "all" such documents or communications responsive to a particular Request; and (ii) Bausch Health cannot ensure that it has located every

document or communication responsive to a particular Request.  Bausch Health objects to the Requests to the extent that they purport to require it to (a) produce documents not in its possession, custody, or control; (b) create, generate, compile or develop documents not currently in its possession, custody, or control; (c) produce documents that are available from a more comprehensive, more convenient, more efficient, less burdensome, or less expensive source than Bausch Health or through a more convenient, more efficient, less burdensome, or less expensive means than the Requests; (d) produce documents that are public, equally available to, or already in the possession, custody, or control of Plaintiff; or (e) produce documents that may have been lost, discarded, or destroyed.  Bausch Health does not agree to seek documents from anyone other than itself.

6.      Bausch Health objects to the Requests to the extent that they purport to require it to preserve, conduct anything beyond a reasonable and diligent search of, or produce from, its readily accessible files, including for electronically stored information ("ESI"), from centralized, readily accessible sources where responsive documents reasonably would be expected to be found.  Any Request that purports to require Bausch Health to do more than that seeks to impose an undue burden and/or unreasonable costs upon it.  Bausch Health further objects to the Requests to the extent that they purport to require the production of any original or duplicative documents, which is unduly burdensome and not proportional to the needs of the Action.  Bausch Health will respond to the Requests consistent with its obligations under the Applicable Rules and any agreement reached by Bausch Health and Plaintiff as to the production of ESI in this Action.

7.      Bausch Health objects to the Requests to the extent they seek the disclosure of trade secrets or documents that relate to information that is confidential, proprietary, commercially sensitive, or competitively significant.

8.      Bausch Health objects to the Requests to the extent they seek material protected by the attorney-client privilege, the work-product doctrine, the joint-defense and/or common-interest privilege, or any other applicable privilege, immunity, or discovery protection, or that otherwise is protected from disclosure under applicable law.  Specific objections on the grounds of privilege are provided for emphasis and clarity only, and the absence of a specific objection is neither intended, nor should be interpreted, as evidence that Bausch Health does not object to a Request on the basis of or waive an applicable privilege, immunity, or protection.  Bausch Health does not intend to produce privileged information, and any inadvertent disclosure of documents or information containing privileged information shall not be deemed, nor is it intended, to constitute a waiver of any applicable privilege, in whole or in part.  Bausch Health shall withhold any such materials in accordance with the Applicable Rules.

9.      Bausch Health objects to the Requests insofar as they incorporate purported facts. Nothing in this Response shall be deemed, nor is it intended, to mean that Bausch Health adopts, acquiesces in, or otherwise accepts the way in which the Requests describe or characterize the facts, circumstances, subject matter, or events discussed.  Although Bausch Health may use certain of the Requests' defined terms in its Response, such usage is solely for convenience and clarity and does not constitute an endorsement of, or agreement to, any purported facts stated or implied by the Requests' defined terms.  Bausch Health's failure to object to any Request on a particular ground or grounds shall not be construed as a waiver of its right to object on any additional ground(s) consistent with further investigation and discovery.

10.     Bausch Health objects to the Requests to the extent that the information they seek is more properly obtained through interrogatories, not document requests.

11.     Except as otherwise stated herein, Bausch Health's agreement to produce documents in response to one or more Requests shall not be construed as an admission that responsive documents exist and means only that Bausch Health will produce such documents to the extent that they (a) are identified through a reasonable search, without undue burden and expense, of Bausch Health's readily accessible files that are reasonably likely to contain such documents; (b) are not privileged or otherwise protected from disclosure; and (c) fall within a reasonable time period.

12.     Bausch Health reserves its rights to amend, supplement, correct, clarify and/or add to its responses and objections to each Request, including as a result of further investigation and discovery.  Moreover, should Bausch Health at any time supplement or amend its responses to these Requests, by agreement or otherwise, it expressly reserves the right to assert any applicable objection, privilege, or other protection in connection with such supplement or amendment. Bausch Health also reserves the right to use or rely on, at any time, subsequently discovered information and/or documents.

13.     Bausch Health reserves all objections that may be available to it at any hearing or trial or on any motion related to the use or admissibility of any information provided, as well as the right to object to further discovery relating to the subject matter of any information provided.

**OBJECTIONS TO INSTRUCTIONS**

1.     Bausch Health objects to Instruction Nos. 2, 4, 5, 11, and 12 to the extent that they seek to impose duties on Bausch Health that exceed what is imposed by the Applicable Rules.

2.      Bausch Health objects to Instruction No. 3 to the extent that the relevant time period covered by the Requests—January 1, 2020 to the present—is inconsistent with the proper scope of discovery by Plaintiff on the ground that it is vastly overbroad and unduly burdensome, including because Plaintiff was allegedly not nominated to the board of directors of Bausch +

-4-

Lomb Corporation ("Bausch + Lomb") in June 2022.  Bausch Health avers that the relevant time period is March 1, 2021 to June 23, 2022 (the "Relevant Time Period").

## OBJECTIONS TO DEFINITIONS

1.       Bausch Health objects to Plaintiffs' Definitions to the extent to which they diverge from their legal definitions in the Applicable Rules.

## RESPONSES AND OBJECTIONS TO PLAINTIFF'S FIRST SET OF REQUESTS FOR PRODUCTION

These Responses and Objections are made subject to and without waiver of the General Objections stated above.

**REQUEST NO. 1:**

All documents concerning the Side Letter.

**RESPONSE TO NO. 1:**

In addition to its General Objections, Bausch Health objects to this Request to the extent it seeks documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense and/or common-interest privilege, or any other applicable privilege, protection, immunity, or exemption.

Subject to and without waiver of the foregoing objections, Bausch Health will produce non-privileged documents from the Relevant Time Period that are responsive to this Request that it locates in its possession, custody or control after a reasonable search.

**REQUEST NO. 2:**

From January 1, 2020 to December 31, 2022, all documents and communications concerning the ISS Board Composition Policy.  Responsive documents should include, but not be limited to, all records of communications regarding how the ISS Voting Guidelines may affect the selection of officers, executives, directors, or employees at Bausch Health and/or its subsidiaries.

**RESPONSE TO NO. 2:**

-5-

In addition to its General Objections, Bausch Health objects to this Request to the extent it seeks documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense and/or common-interest privilege, or any other applicable privilege, protection, immunity, or exemption.  Bausch Health further objects to this Request on the grounds that it seeks documents that are not relevant to any party's claim or defense and not proportional to the needs of this Action, including, without limitation, because (i) the selection of officers, executives, directors, or employees at Bausch Health is not at issue in this Action; and (ii) the selection of executives and employees at Bausch + Lomb is not at issue in this Action.

Subject to and without waiver of the foregoing objections, Bausch Health will produce non-privileged documents from the Relevant Time Period that are responsive to this Request that it locates in its possession, custody or control after a reasonable search.

**REQUEST NO. 3:**

From January 1, 2020 to December 31, 2022, all documents and communications concerning Icahn Group's appointment of directors to the Bausch + Lomb board.

**RESPONSE TO NO. 3:**

In addition to its General Objections, Bausch Health objects to this Request to the extent it seeks documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense and/or common-interest privilege, or any other applicable privilege, protection, immunity, or exemption.

Subject to and without waiver of the foregoing objections, Bausch Health will produce non-privileged documents from the Relevant Time Period that are responsive to this Request that it locates in its possession, custody or control after a reasonable search.

**REQUEST NO. 4:**

Organizational charts illustrating the corporate structure and executive leadership of Bausch Health immediately before and after the Bausch + Lomb initial public offering.

-6-

**RESPONSE TO NO. 4:**

Subject to its General Objections, Bausch Health will produce organizational charts sufficient to show the corporate structure between Bausch Health and Bausch + Lomb and the executive leadership of Bausch Health immediately before and after the Bausch + Lomb initial public offering.

**REQUEST NO. 5:**

All documents and communications concerning or discussing compliance with 42 U.S.C. § 1981.

**RESPONSE TO NO. 5:**

In addition to its General Objections, Bausch Health objects to this Request to the extent it seeks documents protected by the attorney-client privilege, the work-product doctrine, the joint-defense and/or common-interest privilege, or any other applicable privilege, protection, immunity, or exemption.  Bausch Health further objects to this Request on the grounds that it is overly broad as well as vague and ambiguous because the term "compliance with 42 U.S.C. § 1981" is not defined or is otherwise unclear in this context.  Bausch Health further objects to this Request to the extent it calls for a legal conclusion.

Subject to and without waiver of the foregoing objections, Bausch Health will produce non-privileged documents from the Relevant Time Period that are responsive to this Request that it locates in its possession, custody or control after a reasonable search.

Dated:      April 10, 2026

Respectfully submitted,

/s/ Samuel A. Danon
Samuel A. Danon (FBN 892671)
HUNTON ANDREWS KURTH LLP
333 SE 2nd Avenue, Suite 2400
Miami, Florida  33131
(305) 810-2500
sdanon@hunton.com

Robert J. Giuffra, Jr. (*pro hac vice*)
Ann-Elizabeth Ostrager (*pro hac vice*)
William S. Wolfe (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York  10004
(212) 558-4000
giuffrar@sullcrom.com
ostragerae@sullcrom.com
wolfew@sullcrom.com

Brandon T. Wallace (*pro hac vice*)
SULLIVAN & CROMWELL LLP
1888 Century Park East, Floor 21
Los Angeles, CA  90067
(310) 712-6600
wallaceb@sullcrom.com

*Attorneys for Defendant Bausch Health
Companies Inc.*

-8-