# EXHIBIT C



**Michael Francisco**
FIRST & FOURTEENTH PLLC
800 Connecticut Ave, Ste 300
Washington, D.C. 20006
*michael@first-fourteenth.com*

28 April 2026

Jonathan R. Streeter
DECHERT LLP
1090 Avenue of the Americas
New York, New York 10036
Jonathan.streeter@dechert.com

Jay P. Lefkowitz, P.C.
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
lefkowitz@kirkland.com

Robert J. Giuffra Jr.
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
giuffrar@sullcrom.com

CC: all counsel of record

*Via Email*

**RE:  Deficiencies in Defendants' Initial Discovery Responses and Request for Conferral**

Dear Counsel,

Defendants' responses to Plaintiff's discovery requests are deficient and do not comply with either the Federal Rules, Local Rule 7.1, or Magistrate Judge Elfenbein's Discovery Order entered in this case (Dkt.55). Plaintiff requests conferral with each Defendant on the deficiencies identified below and others identified during good faith conferral. Counsel for Plaintiff will make time for conferral call(s) any time, 8:00 am to 6:00 pm tomorrow Wednesday April 28 through Monday May 4, including over the weekend if requested.

**1.  Global deficiencies.**

Rule 34(b)(2)(B) mandates that document production "be completed no later than the time for inspection specified in the request or another reasonable time specified in the

*Colorado Springs |Denver |Kansas City |Washington, D.C.*

28 April 2026
Page 2



response." Yet none of Defendants' responses either produce any documents or specify when documents will be produced.

Instead, Defendants commit only to undertaking a search for responsive documents at some unspecified date or willing to meet and confer regarding a request without any promise of production.[1] We assume that any search will have taken place long ago—at the very latest, in connection with furnishing your responses to Plaintiff's targeted requests. But to be clear, the obligation to produce rests squarely on Defendants, who may not sit on their hands awaiting entry of a protective order—the discovery and trial schedule in this case precludes it. The governing Order Setting Discovery Procedure states that even in the case of a pending motion to stay discovery, production cannot be withheld while a motion is pending. (Dkt.55). If Defendants have not yet undertaken the promised searches, please let us know immediately. No party sought, and Plaintiff does not consent to, an extension of time to respond to discovery. *See also* Dkt.55 7 ("**7. Agreed Orders:** … The Court does not enter agreed orders extending the due date of discovery responses.").

Defendants' objections to Plaintiff's requests are also deficient. Their responses frequently begin with prohibited boilerplate general objections, which violate Local Rule 26.1(e)(2)(A) and are waived. *See, e.g., Guzman v. Irmadan, Inc.*, 249 F.R.D. 399, 400 (S.D. Fla. Apr. 10, 2008). The Court's order directs that "Parties should avoid reciting a formulaic or 'General objections' followed by an answer to the request," which "preserves nothing and constitutes only a waste of effort and resources of both the parties and the Court." (Dkt.55 at 7). The governing Order Setting Discovery Procedures specifically disfavors general objections based on privilege. (Dkt.55 at 8). Defendants' objections fail to heed these instructions.[2]

Plus, both the Federal Rules and the Court's Order require an objecting party to "state whether any responsive materials are being withheld on the basis of that objection." Fed. R. Civ. P. 34(b)(2)(C); Dkt.55 at 7; *Johnson v. Modern Source, LLC*, 2019 WL 13174327, at *1 (S.D. Fla. June 20, 2019). As the Court has directed in this case, "counsel shall include in the answer a **clear statement** that all responsive documents or information identified have, in fact, been produced or provided or otherwise describe the category of documents

---

[1] *See* Brett Icahn Resp. to RFP Nos. 1-5; Icahn Group Resp. to RFP Nos. 1-6; Carl Icahn Resp. to RFP Nos. 1-7; Bausch and Lomb Corp. Resp. to RFP Nos. 1-4; Bausch Health Co. Resp. to RFP Nos. 1-5 (stating Defendant "will produce" documents with no specific delivery date); Thomas Ross Resp. to RFP Nos. 1-4.

[2] *See* Brett Icahn Resp. Resp. ¶¶ 4-6 and Resp. to RFP Nos. 1-5 (as to attorney client privilege and work product); Icahn Group Resp. Resp. ¶¶ 4-6 and Resp. to RFP Nos. 1-6 (as to attorney client privilege and work product); Carl Icahn Resp. ¶¶ 4-6  and Resp. to RFP Nos. 1-7 (as to attorney client privilege and work product); Bausch and Lomb Corp. Resp. "general objections" and "objections to instructions" and RFP Nos. 1-4; Bausch Health Co. Resp. "general responses" and "objections to instructions" and Resp. to RFP Nos. 1-5; Thomas Ross Resp. "general objections" and "objections to definitions and instructions" and Resp. to RFP Nos. 1-4.

28 April 2026
Page 3



or information that has been withheld based on the objection." (Dkt.55 at 7-8) (emphasis added). Defendants repeatedly fail to do so. Instead, Defendants often commit only to conducting a search for documents at some unspecified date or even worse, to confer about a request with no promise of production. *See* footnote 1 supra.

Please confirm that (1) you have commenced and completed your searches for responsive documents (identifying the date of commencement, along with relevant custodians and search terms, if any); (2) you will complete your document production within 14 days of this date; and (3) you withdraw your general objections.

## 2.    Icahn Defendants' deficiencies.

The Icahn Defendants do not commit to producing *any* documents relating to the margin loans, offering, at most, only to confer about them. *See* Brett Icahn's Resp. to RFP No. 5; Icahn Group Resp. to RFP No. 5-6; Carl Icahn Resp. to RFP No. 7. That position is entirely baseless. The facts relating to the existence of the margin loans and their size lie at the heart of several of Plaintiff's claims. *See* Compl. ¶¶ 395-430. And nearly 100 paragraphs of the Complaint address the Icahn Defendants' representations and omissions about the size of the Icahn portfolio in light of the margin loans, *see id.* ¶¶ 254-338, making the knowledge that they possessed (and concealed) about those loans unquestionably relevant to this case. Plaintiff's limited requests are also patently proportional to the needs of the case. The Icahn Defendants cite no valid basis for stonewalling this disclosure.

The Icahn Defendants also seek to impose arbitrary date limits on their searches for responsive documents. Carl Icahn Resp. to RFP Nos. 2, 4, 6, 7; Icahn Group Resp. to RFP Nos. 1, 3-6; Brett Icahn Resp. to RFP Nos. 2, 4-5. The Icahn Defendants don't make a specific showing of undue burden or lack of proportionality from the original date ranges requested by Plaintiff, as required by the Court's order. (Dkt.55 at 6). Plaintiff stands by the specific date ranges in the requests for production.

They are also meritless. For example, Brett Icahn's responses seek to impose date limits on searches for responsive documents concerning section 1981, proposing to begin as of the date Plaintiff first complained about section 1981, rather than beforehand, as requested in Plaintiff's Request for Production. *See* Brett Icahn's Resp. to RFP No. 4. But Brett Icahn's responses cite **no basis** for this self-help limitation. Indeed, documents showing that Brett Icahn discussed section 1981, especially with reference to Plaintiff, including before the arbitrary date Brett Icahn proffers, bear directly on the Plaintiff's claims. This objection is groundless.

As another example, Carl Icahn's response to RFP No. 7 seeks to limit discovery on the margin loans to the period prior to October 1, 2020. This is because the Complaint only purportedly states a claim for the loans being "fraudulently concealed from Plaintiff

28 April 2026
Page 4



during the course of his negotiations for employment with Icahn Capital." To the contrary, the Third Cause of Action alleges a breach of contract stemming from the ongoing concealment of the margin loans in "Carl's End of Day Report" at all relevant times during Plaintiff's employment. *See* Compl. ¶¶ 309-313, 405.

To be clear, the above examples are not exhaustive. Plaintiff stands by the date ranges in all the requests for production to the Icahn Defendants and will confer about each of the proffered objections and suggestions for a more limited date range. See Carl Icahn Resp. to RFP Nos. 2, 4, 6, 7; Icahn Group Resp. to RFP Nos. 1, 3-6; Brett Icahn Resp. to RFP Nos. 2, 4-5. Under the governing Order Governing Discovery Procedures Defendants have an obligation to respond to discovery notwithstanding a dispute about the scope of a request. (Dkt.55 at 7 "If there is an objection based on an overly broad scope, such as timeframe or geographic location, discovery should be provided as to those matters within the scope that are not disputed.").

Please confirm that the Icahn Defendants will (1) produce all responsive documents, consistent with Plaintiff's request for production, within 14 days of this date; and (2) withdraw the date restrictions specified in their responses to Plaintiff's RFPs.

### 3.   Bausch Defendants' deficiencies.

The Bausch Defendants object to certain requests as vague.[3] But the Court has ordered that "[i]f a party believes that a request is vague, the party shall attempt to obtain clarification **prior to objecting on this ground**." (Dkt.55 at 7) (emphasis added). None of the Bausch Defendants followed the Court's order or attempted to obtain any clarification before asserting the objections. Plaintiff's counsel have been readily available to confer about any bona fide vagueness concerns. The Bausch Defendants' vagueness objections are therefore waived.

In any event, those vagueness objections are meritless—some are even inexplicable. For example, the Bausch Defendants contend that references to 42 U.S.C. § 1981, the Director Appointment and Nomination Agreement, the ISS Guidelines, and that the Icahn Group's appointment of directors to B+L's board are vague. *See* Bausch & Lomb Resp. to RFP Nos. 2-4; Bausch Resp. to RFP No. 2-4; Ross Resp. to RFP No. 2-4. Yet not only does the Complaint describe each of those matters in great factual detail, but the Bausch Defendants themselves filed motions to dismiss describing what they regard as the key features of each of those matters. *See* Common MTD at 8, 11, 14, 16-17. The Bausch Defendants cannot claim ignorance about matters that they also contend entitle them to dismissal.

---

[3] *See* Bausch & Lomb Resp. ¶¶ 2, 5, Resp. to RFP Nos. 2-4; Thomas Ross Resp. ¶¶ 2, 4, Resp. to RFP Nos. 2-4; Bausch Health Cos. Resp. ¶ 3, Resp. to RFP No. 5.

28 April 2026
Page 5



Further, the Bausch Defendants have committed only to searching for non-privileged documents and have not committed to producing a privilege log. But all Defendants bear a duty to search for responsive documents, regardless of privilege, and may not limit their searches only to those documents they maintain are not privileged. If that search yields documents Defendants maintain are privileged, then they may withhold production and produce a privilege log explaining the basis for the withholding. *Rivera v. 2K Clevelander, LLC*, 2017 WL 5496158, at *2 (S.D. Fla. Feb. 22, 2017). That has not been done. The Bausch Defendants cannot gloss over the issue with a general assertion of privilege. As the Court has instructed, "[i]f a general objection of privilege is made without attaching a proper privilege log, the objection of privilege may be deemed waived." (Dkt.55 at 8).

Bausch Defendant Ross improperly objects to providing any responsive documents and states only that he is willing to meet and confer "with Plaintiff in an effort to understand what documents Plaintiff believes may be uniquely in Defendant's possession." Thomas Ross Resp. to RFP Nos. 1-4. This blanket refusal to provide responsive documents, or to only "confer" about which documents *Plaintiff believes* is "uniquely" in Defendant's control amounts to a refusal to respond to discovery or to shift the burden to Plaintiff to identify documents that are in Defendant's possession.

Please confirm that the Bausch Defendants will (1) withdraw their vagueness objections; (2) search for all responsive documents and produce them within 14 days of this date; and (3) produce a privilege log identifying any documents withheld on that basis, concurrent with their document production.

## Conclusion

Plaintiff requests timely conferral about these deficiencies and all others to be reviewed on an objection and request specific basis during conferral. To reiterate, Plaintiff is available for a conferral meeting with each Defendant, individually or by groups, any time between 8:00 am and 6:00 pm this Wednesday, April 29 through Monday, May 4, including over the weekend if requested. If these deficiencies cannot be satisfactorily resolved with conferral, or if any Defendant refuses to confer, Plaintiff will file a Notice of Hearing and request three dates within 14-days when all counsel are available for an in-person hearing. See Dkt.55 2-3.

Cordially,

Michael Francisco

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-212-558-4000
FACSIMILE: 1-212-558-3588
WWW.SULLCROM.COM

*125 Broad Street*
*New York, New York 10004-2498*

LOS ANGELES • PALO ALTO • WASHINGTON, D.C.

BRUSSELS • FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

May 4, 2026

Michael Francisco,
    First & Fourteenth PLLC,
        800 Connecticut Ave, Ste 300,
            Washington, D.C. 20006

Dear Michael:

I write on behalf of Bausch Health Companies Inc. ("Bausch Health") in response to your April 28, 2026 letter (the "Letter") addressing Bausch Health's April 10, 2026 Responses and Objections ("Responses") to Plaintiff Steven Miller's First Set of Requests for Production ("Requests"), and further to the parties' April 30, 2026 conference.[1]   For the reasons discussed below, we disagree with Plaintiff's characterizations of Bausch Health's responses and objections.  As we discussed during our conference, Bausch Health has and will continue to comply in good faith with the Federal Rules of Civil Procedure, the Local Rules for the Southern District of Florida, and the Order Setting Discovery Procedures (Dkt. 55) (together the "Applicable Rules").

We disagree that the Responses are deficient.  Bausch Health timely served specific, tailored objections to the Requests and has worked diligently to prepare documents for production, and we do not believe there is any material dispute that would require Court intervention at this time.

1. **Bausch Health will begin producing responsive, non-privileged documents once the Protective Order is entered.**

As discussed at the April 30, 2026 conference, Bausch Health has begun to collect documents and will serve an initial production of responsive, non-privileged documents soon after the Protective Order is entered by the Court.  Bausch Health is not, as the Letter claims, "sit[ting] on their hands awaiting entry of a protective order."

---

[1]   Bausch Health responds to the Letter and is producing documents without waiving its objection to lack of personal jurisdiction in the Southern District of Florida.

Michael Francisco                                                                                    -2-

The Letter insists that "the discovery and trial schedule in this case precludes" delay, but there is nothing in the Order Setting Discovery Procedures that "precludes" Defendants from insisting on entry of a Protective Order prior to document production, as is common practice. *See*, *e.g.*, *Loomer* v. *Maher*, 2025 WL 1992373, at *2 (M.D. Fla. July 17, 2025) (denying motion to compel where "Defendants have refused to produce documents without a confidentiality agreement"). The Letter cites to an unrelated provision of the Order Setting Discovery Procedures relating to delay of discovery during pendency of a motion to stay, not a protective order restricting the use of confidential documents and does not provide any support for Plaintiff's position.

We also represented during the parties' conference that once a protective order is entered, Bausch Health will make its productions quickly and that productions will be completed months before the discovery cut-off date. We explained that we could not commit to a date certain by which our productions would be complete, but we noted that we would provide further information regarding the timing of Bausch Health's productions once we learn the number of documents that will require review based on applying search terms to email communications. Based on the discovery efforts that Bausch Health has taken to date and the discussion at the parties' conference, we disagree that there is any dispute regarding the timing of productions that is ripe for the Court.

2. **Bausch Health's objections are proper.**

The Letter further accuses the Defendants of asserting "prohibited boilerplate general objections." This is untrue, and Plaintiff is mistaken to assert that any of Defendants' objections are therefore "waived." The Letter also introduces confusion and inaccuracy by insisting on referring to Bausch Health and Bausch + Lomb, who are separately represented and served separate responses, as the "Bausch Defendants," even when raising issues that do not appear in the Responses.

The one objection that the Letter identified for conferral—Bausch Health's objection to the request for "All documents and communications concerning or discussing compliance with 42 U.S.C. § 1981"—was resolved during the parties' conference. You explained that this Request seeks documents that discuss Section 1981 by name, and not all documents that reflect the abstract concept of "compliance with 42 U.S.C. § 1981." Given that the scope of the request was unclear, Bausch Health's vagueness objection was proper. But, based upon the clarification you provided on April 30, Bausch Health will withdraw its objection to the vagueness of Request 5 and produce responsive, non-privileged documents that explicitly refer to Section 1981 by name.

3. **Bausch Health will comply with its privilege log obligations.**

As discussed during the parties' conference, the Letter's assertion that "the Bausch Defendants have committed only to searching for non-privileged documents" is

Michael Francisco                                                                      -3-

inaccurate.  The Responses indicated that Bausch Health will *produce* non-privileged documents.  Bausch Health will, of course, search for and review all potentially relevant documents that it identifies after a reasonable search.  It will produce responsive and non-privileged documents, and it will withhold or redact any responsive, privileged documents.  If Bausch Health identifies responsive, privileged documents that require withholding or redaction, it will prepare a privilege log consistent with the Applicable Rules.

4. **Bausch Health has clearly stated the basis for its objections and will specify the reasons for withholding any responsive documents.**

The Letter states that Defendants have "repeatedly fail[ed]" to comply with the Court's direction to describe the categories of documents that are being withheld, but Bausch Health has clearly stated the basis for each of its objections.  As we explained during the conference, Bausch Health will state with specificity the basis for withholding any responsive documents and for its objections to the scope of discovery as it did in the Responses, with respect to the objection to the overly broad and unduly burdensome time period imposed by Requests 1, 2, 3, and 5.

During the parties' conference, you offered to narrow the period for which Plaintiff is requesting documents to January 1, 2021 through December 31, 2022 (for RFP 2 and RFP 3) and to January 1, 2021 through October 1, 2025 (for RFP 1 and RFP 5) in exchange for Bausch Health withdrawing its objection to the breadth and burden imposed by the time period that Plaintiff was originally requesting.  Bausch Health agrees to the time periods for RFPs 1-2 and 4-5 discussed in this paragraph that Plaintiff proposed, and will expand its searches to encompass the agreed period, not to be expanded further by Plaintiff.

Bausch Health will continue to review documents in good faith, and will produce responsive, non-privileged documents from these time periods once identified, and after entry of the protective order.

\*        \*        \*

Because there remain no material disputes between the parties, we do not believe Court intervention is required or appropriate at this early stage of the discovery process.  We remain available to meet and confer further if necessary.

Sincerely,

*/s/ Ann-Elizabeth Ostrager*
Ann-Elizabeth Ostrager

5/18/26, 8:43 PM    RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request Lincoln ...

Case 1:25-cv-25893-RB   Document 94.3   Entered on FLSD Docket 05/19/2026   Page 10 of
1550

 **Outlook**

---

## RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

---

**From** Michael Francisco <Michael@first-fourteenth.com>

**Date** Tue 5/5/2026 4:34 PM

**To** Wallace, Brandon T. <wallaceb@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>

**Cc** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking <jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>

📎 1 attachment (4 KB)

image001.png;

Ms. Ostrager,

Thank you for your letter dated yesterday addressing our conferral call on April 30 regarding the many deficiencies Plaintiff has identified in your clients' discovery responses. We disagree that Bausch Health has complied with the Rules and the discovery requests Based on our personal conferral, Plaintiff cannot conclude that Bausch Health will comply with the requisite obligations.

Bausch Health has not complied with the obligation to produce responsive documents nor provided any reasonable assurance of when production will take place. Plaintiff continues to request production of responsive documents (past due) within 14 days of the April 28, 2026 deficiency letter. As discussed during conferral, Plaintiff would consider a good-faith agreement that production will be completed *within 30 days.* Bausch Health has declined either invitation. Instead, Bausch Health indicates that production "will be completed months before the discovery cut-off." The timing of all document production remains an area of disagreement.

Bausch Health maintains that all objections stated are proper, including general objections and unknowable objections to be specified later. Plaintiff disagrees that the objections are in compliance with the governing discovery procedures.

Bausch Health offers only a conditional acceptance of Plaintiff's offer to modify the initial responsive date range for certain requests (Nos. 1, 3, and 5), stating that "Bausch Health agrees [to the modified scope], not to be expanded further by Plaintiff." P.3. Plaintiff rejects the conditional counteroffer and maintains his initial offer to limit the initial responsive date range, subject to Plaintiff's ability to request additional documents, including from additional time periods, in the future.

Cordially,

Michael Francisco

## Michael Francisco

Partner, First & Fourteenth, PLLC

Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <wallaceb@sullcrom.com >
**Sent:** Monday, May 4, 2026 7:23 PM
**To:** Michael Francisco <Michael@first-fourteenth.com >; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com >; Wilson, Maude S. <wilsonms@sullcrom.com >; Wolfe, William S. <wolfew@sullcrom.com >; Giuffra Jr., Robert J. <giuffrar@sullcrom.com >
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com >; Jared Kelson <jkelson@boydengray.com >; Jim Wedeking <jwedeking@boydengray.com >; James Compton <James@first-fourteenth.com >
**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached correspondence.

Thanks,

Brandon

**Brandon T. Wallace**
+1 310 712 6694

---

**From:** Michael Francisco <Michael@first-fourteenth.com>
**Sent:** Thursday, April 30, 2026 6:05 PM
**To:** Wallace, Brandon T. <wallaceb@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking <jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>
**Subject:** [EXTERNAL] RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Brandon and Ann-Elizabeth,

Thank you for conferring today about our concerns with the Bausch Health Company responses and objections to our discovery request. You indicated that Plaintiff would hear back from Bausch Health "next week" (or probably next week) on the many issues of existing disagreement.

Please provide any change in position or additional response you have on the discussed deficiencies by close of business next Tuesday.

The governing discovery order will require areas of disagreement to be raised with the magistrate judge *before* the end of next week, so we wanted to make sure that you understood the need for a deadline to provide us with notice of any change of position from the call today.

While we are willing to discuss matters should your position change, we stand by all of our identified concerns and objections. As discussed on the call, we are willing to narrow the timeframe for RFP 1 and RFP 5 to cover January 1, 2021 to October 1, 2025, if Bausch Health would agree that timeframe resolves the timeframe objection for those requests.   Absent an agreement, Plaintiff stands by the timeframe in the Request for Production.

Cordially,
Michael

**Michael Francisco**

Partner, First & Fourteenth, PLLC

Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <wallaceb@sullcrom.com>
**Sent:** Wednesday, April 29, 2026 5:01 PM
**To:** Michael Francisco <Michael@first-fourteenth.com>
**Cc:** Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>
**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

5/18/26, 8:43 PM

Case 1:25-cv-25893-BB Document 94-3 Entered on FLSD Docket 05/19/2026 Page 13 of 1550

RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request - Lincoln …

Michael,

Is Plaintiff's counsel available at 1:30pm ET tomorrow to confer with Bausch Health?

Thank you,

Brandon

**Brandon T. Wallace**
<u>+1 310 712 6694</u>

---

**From:** Michael Francisco <<u>Michael@first-fourteenth.com</u>>
**Sent:** Tuesday, April 28, 2026 8:56 PM
**To:** Streeter, Jonathan <<u>Jonathan.Streeter@dechert.com</u>>; Lefkowitz, Jay P. <<u>lefkowitz@kirkland.com</u>>; Giuffra Jr., Robert J. <<u>giuffrar@sullcrom.com</u>>
**Cc:** Ostrager, Ann-Elizabeth <<u>ostragerae@sullcrom.com</u>>; Wilson, Maude S. <<u>wilsonms@sullcrom.com</u>>; Danon, Sam <<u>sdanon@hunton.com</u>>; Wallace, Brandon T. <<u>wallaceb@sullcrom.com</u>>; Emily Percival <<u>emily.percival@aflegal.org</u>>; James Compton <<u>James@first-fourteenth.com</u>>; Nicholas Cordova <<u>ncordova@boydengray.com</u>>; Gene Hamilton <<u>gene.hamilton@aflegal.org</u>>; Jared Kelson <<u>jkelson@boydengray.com</u>>; Chris Murray <<u>Chris@first-fourteenth.com</u>>; James Rogers <<u>james.rogers@aflegal.org</u>>; Will Scolinos <<u>william.scolinos@aflegal.org</u>>; Jim Wedeking <<u>jwedeking@boydengray.com</u>>; Lincoln Wilson <<u>Lincoln@first-fourteenth.com</u>>; Gottlieb, Brian <<u>bgottlieb@hunton.com</u>>; Chris Murray <<u>Chris@first-fourteenth.com</u>>
**Subject:** [EXTERNAL] Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached letter.

Regards,

Michael

5/18/26, 8:45 PM    RE: Mike & Bausch Health Companies Inc. et al, 25-cv-26893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request - Lincoln …

Case 1:25-cv-25893-RB   Document 94-3   Entered on FLSD Docket 05/19/2026   Page 14 of 1550



**Michael Francisco**

Partner

**Work:**  202.998.1978

**Cell:** 202.754.0522

michael_@first-fourteenth.com

**First & Fourteenth PLLC**
Washington, D.C.
first-fourteenth.com

**\*\*This is an external message from:** Michael@first-fourteenth.com **\*\***

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

## Lincoln Wilson

| | |
|---|---|
| **From:** | Michael Francisco |
| **Sent:** | Thursday, May 14, 2026 6:04 AM |
| **To:** | Wallace, Brandon T.; Ostrager, Ann-Elizabeth; Wilson, Maude S.; Wolfe, William S.; Giuffra Jr., Robert J. |
| **Cc:** | Lincoln Wilson; Jared Kelson; Jim Wedeking; James Compton; Chris Murray |
| **Subject:** | RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request |

Counsel,

There remain material disputes between the parties on discovery, including the timing of discovery responses. Plaintiff will be filing a notice of hearing latter today (after 3 pm).  Plaintiffs strenuously disagree that document production need only be completed by the close of discovery. And to reiterate, Plaintiff never offered and will not agree to modify dates of production in exchange for any agreement to forgo the ability to expand dates of requests and production in the future. Again, for clarity, Plaintiff disagrees with many claims in your self-serving letter.

The seven-day stipulated extension has not resolved the discovery disputes.

The governing procedures require the parties to provide the court three dates within 14 days of today that counsel for all parties can be present for an in-person hearing.  We expect to file a notice of hearing about deficiencies with each defendant group's discovery responses.

Plaintiffs are available any date in the 14-day window.
Bausch + Lomb has indicated they are available May 25-29.
Icahn – no dates yet provided.

Please provide dates you are available as soon as possible. We have been requesting date availability for multiple weeks.

Regards,
Michael Francisco

**Michael Francisco**
Partner, First & Fourteenth, PLLC
Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <wallaceb@sullcrom.com>
**Sent:** Monday, May 4, 2026 7:23 PM
**To:** Michael Francisco <Michael@first-fourteenth.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking <jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>

**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached correspondence.

Thanks,
Brandon

**Brandon T. Wallace**
+1 310 712 6694

---

**From:** Michael Francisco <Michael@first-fourteenth.com>
**Sent:** Thursday, April 30, 2026 6:05 PM
**To:** Wallace, Brandon T. <wallaceb@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking <jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>
**Subject:** [EXTERNAL] RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Brandon and Ann-Elizabeth,

Thank you for conferring today about our concerns with the Bausch Health Company responses and objections to our discovery request. You indicated that Plaintiff would hear back from Bausch Health "next week" (or probably next week) on the many issues of existing disagreement.

Please provide any change in position or additional response you have on the discussed deficiencies by close of business next Tuesday.

The governing discovery order will require areas of disagreement to be raised with the magistrate judge *before* the end of next week, so we wanted to make sure that you understood the need for a deadline to provide us with notice of any change of position from the call today.

While we are willing to discuss matters should your position change, we stand by all of our identified concerns and objections. As discussed on the call, we are willing to narrow the timeframe for RFP 1 and RFP 5 to cover January 1, 2021 to October 1, 2025, if Bausch Health would agree that timeframe resolves the timeframe objection for those requests.  Absent an agreement, Plaintiff stands by the timeframe in the Request for Production.

Cordially,
Michael



**Michael Francisco**

2

Partner, First & Fourteenth, PLLC
Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <wallaceb@sullcrom.com>
**Sent:** Wednesday, April 29, 2026 5:01 PM
**To:** Michael Francisco <Michael@first-fourteenth.com>
**Cc:** Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>
**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Michael,

Is Plaintiff's counsel available at 1:30pm ET tomorrow to confer with Bausch Health?

Thank you,
Brandon

**Brandon T. Wallace**
+1 310 712 6694

---

**From:** Michael Francisco <Michael@first-fourteenth.com>
**Sent:** Tuesday, April 28, 2026 8:56 PM
**To:** Streeter, Jonathan <Jonathan.Streeter@dechert.com>; Lefkowitz, Jay P. <lefkowitz@kirkland.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Danon, Sam <sdanon@hunton.com>; Wallace, Brandon T. <wallaceb@sullcrom.com>; Emily Percival <emily.percival@aflegal.org>; James Compton <James@first-fourteenth.com>; Nicholas Cordova <ncordova@boydengray.com>; Gene Hamilton <gene.hamilton@aflegal.org>; Jared Kelson <jkelson@boydengray.com>; Chris Murray <Chris@first-fourteenth.com>; James Rogers <james.rogers@aflegal.org>; Will Scolinos <william.scolinos@aflegal.org>; Jim Wedeking <jwedeking@boydengray.com>; Lincoln Wilson <Lincoln@first-fourteenth.com>; Gottlieb, Brian <bgottlieb@hunton.com>; Chris Murray <Chris@first-fourteenth.com>
**Subject:** [EXTERNAL] Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached letter.

Regards,
Michael

3



**Michael Francisco**
Partner
**Work:** 202.998.1978
**Cell:** 202.754.0522
michael@first-fourteenth.com

**First & Fourteenth PLLC**
Washington, D.C.
first-fourteenth.com

---

**This is an external message from:** Michael@first-fourteenth.com **

---

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

# Lincoln Wilson

| | |
|---|---|
| **From:** | Wallace, Brandon T. <wallaceb@sullcrom.com> |
| **Sent:** | Thursday, May 14, 2026 1:04 PM |
| **To:** | Michael Francisco; Giuffra Jr., Robert J.; Ostrager, Ann-Elizabeth; Wolfe, William S.; Wilson, Maude S.; Danon, Sam; Gottlieb, Brian |
| **Cc:** | Lincoln Wilson; Jared Kelson; Jim Wedeking; James Compton; Chris Murray |
| **Subject:** | RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request |

Michael,

As explained in Bausch Health's letter of May 4, 2026, Bausch Health does not believe there is any material discovery dispute that would require Court intervention at this time, and we believe that to the extent there are any unresolved issues, we can continue to work to resolve them without the involvement of the Court.

Bausch Health timely served responses and objections to Plaintiff's First Set of Requests for Production, conferred regarding those objections, and in many cases agreed to produce the documents that Plaintiff has requested notwithstanding those objections.  We also represented that we are working diligently to make productions and that we would provide an estimated time of completion as soon as we were able.

There are also several inaccuracies in your email of May 14, 2026.  Bausch Health has never asserted that "document production need only be completed by the close of discovery."  Instead, Bausch Health explained both at the April 30, 2026 conference and in its May 4, 2026 letter that, subject to the entry of the protective order, it intends to begin producing documents in the very near future, that it does not believe its productions will take long to complete, and that "productions will be completed *months before* the discovery cut-off date."  Given that Plaintiff served requests demanding documents, including electronic communications, spanning a more than five-year period, Plaintiff's insistence that productions be complete "within 14 days of" Plaintiff's April 28, 2026 letter is unreasonable and unsupported by the Federal and Local Rules.

Further, Plaintiff's attempt to reserve the right "to expand dates of requests and productions in the future," notwithstanding the concessions that Bausch Health made with respect to its search parameters during the conferral process, does not create a dispute that is ripe for the Court.  If Plaintiff attempts to broaden the scope of documents it is requesting, and if such new request constitutes an impermissibly burdensome demand on Bausch Health, the parties may have a dispute to submit to the Magistrate Judge in the future.  Presently, there is no such dispute.

To the extent that you would like to prematurely raise Plaintiff's purported issues with Magistrate Judge Elfenbein, Bausch Health is available for an in-person hearing on May 27-29, 2026.  Bausch Health will attend such hearing without waiving its objection to lack of personal jurisdiction in the Southern District of Florida.

**Brandon T. Wallace**
+1 310 712 6694

---

**From:** Michael Francisco <Michael@first-fourteenth.com>
**Sent:** Thursday, May 14, 2026 6:04 AM
**To:** Wallace, Brandon T. <wallaceb@sullcrom.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking

<jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>; Chris Murray <Chris@first-fourteenth.com>
**Subject:** [EXTERNAL] RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

There remain material disputes between the parties on discovery, including the timing of discovery responses. Plaintiff will be filing a notice of hearing latter today (after 3 pm).  Plaintiffs strenuously disagree that document production need only be completed by the close of discovery. And to reiterate, Plaintiff never offered and will not agree to modify dates of production in exchange for any agreement to forgo the ability to expand dates of requests and production in the future. Again, for clarity, Plaintiff disagrees with many claims in your self-serving letter.

The seven-day stipulated extension has not resolved the discovery disputes.

The governing procedures require the parties to provide the court three dates within 14 days of today that counsel for all parties can be present for an in-person hearing.  We expect to file a notice of hearing about deficiencies with each defendant group's discovery responses.

Plaintiffs are available any date in the 14-day window.
Bausch + Lomb has indicated they are available May 25-29.
Icahn – no dates yet provided.

Please provide dates you are available as soon as possible. We have been requesting date availability for multiple weeks.

Regards,
Michael Francisco

**Michael Francisco**
Partner, First & Fourteenth, PLLC
Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <wallaceb@sullcrom.com>
**Sent:** Monday, May 4, 2026 7:23 PM
**To:** Michael Francisco <Michael@first-fourteenth.com>; Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Wolfe, William S. <wolfew@sullcrom.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Lincoln Wilson <Lincoln@first-fourteenth.com>; Jared Kelson <jkelson@boydengray.com>; Jim Wedeking <jwedeking@boydengray.com>; James Compton <James@first-fourteenth.com>
**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached correspondence.

Thanks,

2

Brandon

**Brandon T. Wallace**
<u>+1 310 712 6694</u>

---

**From:** Michael Francisco <<u>Michael@first-fourteenth.com</u>>
**Sent:** Thursday, April 30, 2026 6:05 PM
**To:** Wallace, Brandon T. <<u>wallaceb@sullcrom.com</u>>; Ostrager, Ann-Elizabeth <<u>ostragerae@sullcrom.com</u>>; Wilson, Maude S. <<u>wilsonms@sullcrom.com</u>>; Wolfe, William S. <<u>wolfew@sullcrom.com</u>>; Giuffra Jr., Robert J. <<u>giuffrar@sullcrom.com</u>>
**Cc:** Lincoln Wilson <<u>Lincoln@first-fourteenth.com</u>>; Jared Kelson <<u>jkelson@boydengray.com</u>>; Jim Wedeking <<u>jwedeking@boydengray.com</u>>; James Compton <<u>James@first-fourteenth.com</u>>
**Subject:** [EXTERNAL] RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Brandon and Ann-Elizabeth,

Thank you for conferring today about our concerns with the Bausch Health Company responses and objections to our discovery request. You indicated that Plaintiff would hear back from Bausch Health "next week" (or probably next week) on the many issues of existing disagreement.

Please provide any change in position or additional response you have on the discussed deficiencies by close of business next Tuesday.

The governing discovery order will require areas of disagreement to be raised with the magistrate judge *before* the end of next week, so we wanted to make sure that you understood the need for a deadline to provide us with notice of any change of position from the call today.

While we are willing to discuss matters should your position change, we stand by all of our identified concerns and objections. As discussed on the call, we are willing to narrow the timeframe for RFP 1 and RFP 5 to cover January 1, 2021 to October 1, 2025, if Bausch Health would agree that timeframe resolves the timeframe objection for those requests.  Absent an agreement, Plaintiff stands by the timeframe in the Request for Production.

Cordially,
Michael

**Michael Francisco**
Partner, First & Fourteenth, PLLC
Cell: 202.754.0522

---

**From:** Wallace, Brandon T. <<u>wallaceb@sullcrom.com</u>>
**Sent:** Wednesday, April 29, 2026 5:01 PM
**To:** Michael Francisco <<u>Michael@first-fourteenth.com</u>>
**Cc:** Ostrager, Ann-Elizabeth <<u>ostragerae@sullcrom.com</u>>

3

**Subject:** RE: Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Michael,

Is Plaintiff's counsel available at 1:30pm ET tomorrow to confer with Bausch Health?

Thank you,
Brandon

**Brandon T. Wallace**
+1 310 712 6694

---

**From:** Michael Francisco <Michael@first-fourteenth.com>
**Sent:** Tuesday, April 28, 2026 8:56 PM
**To:** Streeter, Jonathan <Jonathan.Streeter@dechert.com>; Lefkowitz, Jay P. <lefkowitz@kirkland.com>; Giuffra Jr., Robert J. <giuffrar@sullcrom.com>
**Cc:** Ostrager, Ann-Elizabeth <ostragerae@sullcrom.com>; Wilson, Maude S. <wilsonms@sullcrom.com>; Danon, Sam <sdanon@hunton.com>; Wallace, Brandon T. <wallaceb@sullcrom.com>; Emily Percival <emily.percival@aflegal.org>; James Compton <James@first-fourteenth.com>; Nicholas Cordova <ncordova@boydengray.com>; Gene Hamilton <gene.hamilton@aflegal.org>; Jared Kelson <jkelson@boydengray.com>; Chris Murray <Chris@first-fourteenth.com>; James Rogers <james.rogers@aflegal.org>; Will Scolinos <william.scolinos@aflegal.org>; Jim Wedeking <jwedeking@boydengray.com>; Lincoln Wilson <Lincoln@first-fourteenth.com>; Gottlieb, Brian <bgottlieb@hunton.com>; Chris Murray <Chris@first-fourteenth.com>
**Subject:** [EXTERNAL] Miller v. Bausch Health Companies Inc. et al, 25-cv-25893 (S.D. Fla.) - Discovery Deficiencies and Conferral Request

Counsel,

Please see the attached letter.

Regards,
Michael



**Michael Francisco**
Partner
**Work:** 202.998.1978
**Cell:** 202.754.0522
michael@first-fourteenth.com

**First & Fourteenth PLLC**
Washington, D.C.
first-fourteenth.com

---

**\*\*This is an external message from:** Michael@first-fourteenth.com **\*\***

This e-mail is sent by a law firm and contains information that may be privileged and confidential. If you are not the intended recipient, please delete the e-mail and notify us immediately.

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **STEVEN D. MILLER,** | |
| *Plaintiff,* | |
| v. | Case No.1:25-cv-25893 |
| **BAUSCH HEALTH COMPANIES, INC.;** | **COMPLAINT**[*] |
| **BAUSCH + LOMB CORPORATION;** | |
| **THOMAS ROSS; CHRISTINA** | JURY DEMANDED |
| **ACKERMANN; GAOXIANG HU; ICAHN** | |
| **ENTERPRISES L.P.; ICAHN** | |
| **ENTERPRISES G.P. INC.; ICAHN** | |
| **CAPITAL LP; CARL ICAHN; BRETT** | |
| **ICAHN,** | |
| *Defendants.* | |

Plaintiff Steven D. Miller ("Plaintiff"), by and through his counsel, and for his Complaint

against Defendants Bausch Health Companies, Inc. ("Bausch Health" or "BHC"), Bausch + Lomb

Corporation ("Bausch + Lomb" or "BLCO"), Thomas "Tom" Ross, Christina Ackermann,

Gaoxiang "Gary" Hu, Icahn Enterprises L.P. and its general partner Icahn Enterprises G.P. Inc.

(collectively, "IEP"), Icahn Capital LP ("Icahn Capital"), Carl Icahn, and Brett Icahn

(collectively, "Defendants"), hereby alleges as follows:

---

[*]This Complaint and the attached exhibits comply with Plaintiff's representation to the Court in his December 17, 2025 Motion for Leave to File Complaint and Exhibits Under Seal that he would publicly file a version of the Complaint with only limited redactions. *See* ECF No. 14 at 6–7; *see also* ECF No. 15 (granting Motion). All parties have conferred and agreed to the redactions in this version of the Complaint and attached exhibits. Plaintiff, however, expressly reserves all rights as to the admissibility of the redacted information and does not concede that any redacted information is subject to any privilege.

1

**NATURE OF THE ACTION**

1.      This is a racial discrimination case in which a public company, Bausch + Lomb, entered into a written agreement allowing its major investor, Icahn Capital, to appoint two new members to its board of directors, provided one such director must be "Diverse," a term that all the relevant actors knew would require Icahn Capital to appoint a *non-white* director.

2.      The proviso worked as designed. It caused Icahn Capital to forgo appointing its expressly (and repeatedly) announced and preferred appointee, i.e., Plaintiff, solely because he is white, and instead appoint an Asian American. It was obvious why Plaintiff was Icahn Captial's preferred appointee. He has served on six other public company boards with a perfect record of shareholders voting in favor of his re-election. But according to Bausch + Lomb's self-imposed diversity mandate, his skin was the wrong color. Bausch + Lomb's general counsel, knowing the illegality of this racial discrimination, even devised a scheme to hide the discriminatory proviso from a required securities filing by placing it in a "side letter" that Bausch + Lomb did not disclose to regulators. Plaintiff made a written complaint to Icahn Capital arguing the proviso violated federal law, but he was directed to sweep the incident under the rug.

3.      As explained below, Defendants' actions violate 42 U.S.C. § 1981, which bars racial discrimination in contracting, and also amounted to a breach of the covenant of good faith in Plaintiff's employment contract, tortious interference with that contract, and unjust enrichment of Bausch + Lomb board members who directed or willingly participated in the discrimination.

4.      Aside from these race-based claims, Plaintiff also alleges breach of contract, intentional misrepresentation, and fraudulent inducement because his employer Icahn Capital and its affiliates committed a massive and well-publicized fraud by unlawfully misstating their debt balances to Plaintiff and the SEC by over $5 billion. The ensuing SEC investigation, penalty, and

2

debt spiral led to the collapse of Icahn Capital, the liquidation of the majority of its investment funds, and substantial harm to Plaintiff's investment portfolio and career.

<center>***</center>

5.     At all relevant times, Plaintiff has been a Portfolio Manager at investment fund Icahn Capital under a seven-year Employment Agreement dated October 1, 2020.

6.     As an activist investment fund, Icahn Capital's strategy involves buying large ownership stakes in publicly traded companies, negotiating the right to appoint new highly motivated directors to such company's board, and relying on these directors to implement operational and strategic improvements.

7.     Under this strategy, Plaintiff proposed and became responsible for an investment in Bausch + Lomb and related entities. The investment consisted principally of a 34% interest in the shares of Bausch Health—sole and later supermajority owner of Bausch + Lomb, its "crown jewel" subsidiary—at a cost of approximately ██████. Plaintiff was entitled to a bonus at the end of his Employment Agreement tied to ██% of his profits on this and other investments, a provision that was reasonably expected to result in Plaintiff receiving hundreds of millions of dollars.

8.     In March 2021, Plaintiff and his manager, Brett Icahn, were appointed to the Bausch Health board (not Bausch + Lomb, to be clear) under an appointment agreement.

9.     When Bausch + Lomb established its own independent board in connection with its May 2022 Initial Public Offering ("IPO"), Icahn Capital sought similar appointment rights to the Bausch + Lomb board.

10.     Icahn Capital inserted Plaintiff's name into the appointment agreement, where it appeared *four times* as one of two contemplated appointees to the board (together with Brett Icahn).

<center>3</center>

11. However, in the course of negotiations, Bausch + Lomb's general counsel expressed concerns to her counterpart at Icahn Capital that the preliminary board slate would consist only of white men and women, therefore falling afoul of racial diversity quotas Bausch + Lomb adopted to please Institutional Shareholder Services Inc. ("ISS"), a proxy advisory company that had announced that it would recommend voting against certain board candidates if a company's board did not have a minimum number of members who were "non-Caucasian in race or non-white in colour."

12. Icahn Capital's ███████████████████████████████████, but Bausch + Lomb demanded and ultimately obtained a covenant from Icahn Capital that allowed it to appoint one "Diverse" director and one other director.

13. Bausch + Lomb was required to file this agreement (the "Director Appointment and Nomination Agreement") with the United States Securities and Exchange Commission ("SEC"). However, in a scheme to hide the racially discriminatory covenant from the SEC and the public, the diversity covenant was extracted and labeled a "Side Letter regarding the Director Appointment and Nomination Agreement," which was executed on the same date by the same parties. Bausch + Lomb's general counsel assured her counterpart at Icahn Capital that "[w]e will attach the agreement (Not the side letter)" to the required SEC filing.

14. This "side letter" meant that Plaintiff had to go. He was classified as "white" and therefore did not help Bausch + Lomb meet ISS's non-binding racial quota. Contemporaneous e-mail records confirm the decision was made to appoint "non-white" directors, also explicitly referred to as racial "minorities" in contemporaneous discussions.

15. Thus, even though he had been expressly named as a presumptive board member *four times* beforehand in the appointment agreement, and even though Brett Icahn confirmed that

Plaintiff and Brett Icahn were the firm's only two preferred board members, Plaintiff was not chosen for the board in June 2022 when Icahn Capital exercised its appointment rights at Bausch + Lomb.

16.     Instead of Plaintiff, Icahn Capital appointed Gaoxiang "Gary" Hu, another Portfolio Manager at Icahn Capital with the same role and tenure as Plaintiff but who identifies as a Chinese American man. At no point did the relevant players claim that Hu was selected on any basis aside from race. To the contrary, the accompanying board resolutions openly described his appointment as being "in furtherance of the [Bausch + Lomb] Board's commitment to Board diversity."

17.     As Brett Icahn acknowledged, Plaintiff was in fact the better candidate. Unlike Gary Hu, Plaintiff remained responsible for the Bausch Investment, had written Icahn Capital's investment memorandum, was highly motivated because he was entitled to a bonus tied to ▮▮ of the investment's profits, personally owned Bausch Health stock, and was already intimately familiar with Bausch + Lomb by serving on its parent company's board. Unsurprisingly, Gary Hu later demonstrated no exceptional effort on the board of Bausch + Lomb.

18.     Given this record, no inference is needed: it was openly acknowledged that Hu was chosen over Plaintiff because of race.

19.     Selecting Hu over Plaintiff had predictably disastrous consequences for Bausch + Lomb. Plaintiff had a detailed track record of exceptional performance improving shareholder value at other companies, whereas Hu proved to be an absentee board member who did nothing as the company made repeated poor decisions that Plaintiff tried to stop—and he could have stopped them if he had not been excluded from the board due to his race.

20.     For a brief period from June 2022 to December 2022, Plaintiff was hopeful that he could vigorously execute the activist strategy he engineered for Bausch + Lomb by performing

5

many of Gary Hu's duties in substance. In August 2022, Plaintiff was invited to become a non-official member of the highly sensitive Bausch + Lomb CEO search committee. Gary Hu was not invited. In December 2022, Bausch + Lomb arranged for Plaintiff to undertake a listening tour, meeting with eye surgeons and ophthalmologists. Gary Hu did not attend. In December 2022, Plaintiff was in direct contact with Bausch + Lomb's Chief Financial Officer and its Chief Medical Officer to engage in due diligence inquiries of the sort that would be customary for an activist director.

21. However, in January 2023, Bausch + Lomb's general counsel put a stop to Plaintiff's efforts. She demanded that Gary Hu "chaperone" Plaintiff in future interactions with Bausch + Lomb. In response, Brett Icahn directed Plaintiff to send drafts of future questions to Gary Hu, who then plagiarized them in messages to Bausch + Lomb sent under his own name and without attribution. Plaintiff was humiliated by the practice, which was a continuation of the underlying discriminatory arrangement.

22. As a direct result of this situation, on January 9, 2023, Plaintiff sent a written complaint to Brett Icahn and Icahn Capital's general counsel. Plaintiff argued that the agreement to pick Hu over Plaintiff had violated "Section 1981," which bars racial discrimination in contracting. His written complaint was rebuffed in a meeting on January 10, 2023, in which Brett Icahn instructed Plaintiff to, in substance, "take one for the team" to maintain good relations with Bausch + Lomb and directed Plaintiff not to contact Bausch + Lomb regarding the matter.

23. Gary Hu was forced out of Icahn Capital in December 2024 following his losses on unrelated investments but nonetheless remained on the board of Bausch + Lomb.

24. While Plaintiff was barred from the Bausch + Lomb boardroom from June 2022 onward, the company failed to meet budget forecasts by hundreds of millions of dollars and

engaged in a multi-billion-dollar drug acquisition it later regretted—an acquisition that Plaintiff had tried to warn against but could not directly oppose before the Bausch + Lomb board.

25.     In fact, Plaintiff's service on other public company boards of directors—a total of six to be exact—demonstrates a track record and the necessary skills to prevent these blunders.

26.     Plaintiff's reasonable expectations of earning a substantial bonus from Icahn Capital through the Bausch Investment were obliterated, while the discriminatory covenant left him powerless to meaningfully affect the situation, as he otherwise would have done as a director of Bausch + Lomb, but for his race-based exclusion.

27.     Defendants' actions clearly violated 42 U.S.C. § 1981, which bars race-based contracting. Icahn Capital's blatant race discrimination was also an act of bad faith toward Plaintiff, breaching the Employment Agreement's implied covenant of good faith and fair dealing. And the racial discrimination further entitles Plaintiff to restitution of the director's fees that were awarded to two other directors because of the racially discriminatory covenant.

28.     In addition to those race-based claims, Plaintiff also seeks recovery for breach of contract, intentional misrepresentation, and fraudulent inducement because of Icahn Capital's careful concealment from Plaintiff of the fact that Carl Icahn had borrowed $5.1 billion against his ownership stake in IEP, used the proceeds to personally supplement Icahn Capital's investment liquidity, and unlawfully concealed the scheme from his securities disclosures with the SEC.

29.     Despite Plaintiff reporting directly to Carl Icahn, the massive debt amounts were concealed from Plaintiff both before and during his employment. When Plaintiff asked for information about available investment funds during negotiations on the Employment Agreement—at one point asking to "sign an NDA to get more detail" on IEP—Brett Icahn made false and misleading representations, referred Plaintiff to the deficient securities filings, and

7

refused requests for additional private information. Brett Icahn thereby intentionally misled Plaintiff and deprived him of any opportunity to discover the loan. Plaintiff would not have signed the Employment Agreement had he known that his career at Icahn Capital would depend on a fraudulent $5.1 billion scheme never coming to light.

30.     This loan and the scheme to conceal it posed a severe threat to Icahn Capital's liquidity and thus to Plaintiff's ability to function as a Portfolio Manager at Icahn Capital. Indeed, that threat materialized when the SEC discovered the undisclosed loan, leading Carl Icahn's lenders to insist on accelerated paydowns that, together with investment losses from forced liquidations, reduced the funds available for investment by over 65 percent, from $9.3 billion to $3.2 billion. Icahn Capital was forced to liquidate shares of Plaintiff's primary investment at deeply discounted prices, even as Carl Icahn's own son insisted the shares were "way undervalued," which thus annihilated any possibility of Plaintiff receiving his non-discretionary, profits-based performance bonus.

31.     Defendants' actions were unlawful. Their discrimination violated Plaintiff's civil rights, breached and tortiously interfered with the Employment Agreement, and caused unjust enrichment. And Icahn Capital's concealment of the $5.1 billion margin loans propped up by ongoing securities violations breached the Employment Agreement, fraudulently induced Plaintiff to enter it, and intentionally misrepresented Icahn Capital's financial situation to him.

32.     As a result of Defendants' unlawful conduct, Plaintiff has suffered harm in the forms of lost past and future income and business opportunities, reputational harm, and emotional pain and suffering. Because of the nature of these harms, damages are reasonably calculated to be well over a hundred million dollars, and the jury should further award punitive damages.

**JURISDICTION AND VENUE**

33.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 because this action involves a claim arising under 42 U.S.C. § 1981 and claims arising under state law that share a "common nucleus of operative fact" with the federal claim, *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

34.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to this action, particularly Plaintiff's employment at Icahn Capital, Icahn Capital's negotiation of the racially discriminatory covenant, and the actual discrimination against Plaintiff, occurred in this district.

35.      Venue is proper in this district also pursuant to the forum selection clause in Plaintiff's Employment Agreement with Icahn Capital, which provides that "all disputes arising out of or related to [the Employment Agreement] shall be submitted to the state and federal courts of Florida located in Miami-Dade County" and that Icahn Capital "irrevocably consents to such personal jurisdiction and waives all objections thereto."

**PARTIES**

36.      Plaintiff Steven Miller is a resident of the State of Florida. Since October 1, 2020, Plaintiff has been employed as a Portfolio Manager of Icahn Capital LP, reporting jointly to Carl Icahn and Brett Icahn. From February 24, 2021, to August 14, 2025, Plaintiff served on the Board of Directors of Bausch Health Companies Inc. Plaintiff's ancestors immigrated to the United States from present-day Ireland and Poland. Plaintiff's race would be commonly described as "white," as he disclosed to Icahn Capital in a pre-employment questionnaire (Ex. F at 1).

37.      Defendant Bausch Health Companies Inc. is incorporated under the provincial laws of British Columbia, Canada, and maintains its U.S. headquarters in Somerset County, New Jersey.

Together with its subsidiaries, it operates as a diversified specialty pharmaceutical and medical device company. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BHC."

38.     Defendant Bausch + Lomb Corporation is incorporated under the federal laws of Canada and maintains its U.S. headquarters in Somerset County, New Jersey, and an executive office for its Chief Executive Officer in Miami-Dade County, Florida. Together with its subsidiaries, it operates as a diversified eye health company.

39.     Prior to the completion of its initial public offering on May 10, 2022, Bausch + Lomb was wholly owned by Bausch Health and its subsidiaries. After the initial public offering, Bausch + Lomb became approximately 88% owned by Bausch Health and its subsidiaries and 12% owned by public shareholders including its directors and officers. The company's common shares are dual-listed on the New York Stock Exchange and Toronto Stock Exchange under the symbol "BLCO."

40.     Defendant Thomas "Tom" Ross has served on the board of Bausch + Lomb since April 2022, including as Chairman of the Board from July 19, 2022, to March 6, 2023, and as Lead Independent Director from May 2022 to July 18, 2022, and from March 6, 2023, to present. On February 10, 2025, Mr. Ross attended a Bausch + Lomb board meeting in Florida. Mr. Ross served on the board of Bausch Health from March 2016 to May 14, 2024, including as Lead Independent Director from June 2016 to June 2022.

41.     Defendant Christina Ackermann was general counsel of Bausch Health from August 2016 to May 2022. Ms. Ackermann was general counsel and President of Ophthalmic Pharmaceuticals at Bausch + Lomb from May 2022 until April 28, 2023.

10

42.    Defendant Gaoxiang "Gary" Hu was a Portfolio Manager of Icahn Capital at its headquarters in Miami-Dade County, Florida from October 1, 2020, to December 2024 and, as a result of intentional race discrimination against Plaintiff, was a director of Bausch + Lomb from June 23, 2022, to August 14, 2025.

43.    Defendant Icahn Enterprises L.P. is a master limited partnership formed in Delaware and headquartered in Miami-Dade County, Florida. Together with its subsidiaries and affiliates, it manages an investment securities segment and several other non-investment segments which operate businesses in several industries.

44.    Defendant Icahn Enterprises G.P. Inc. is the general partner of Icahn Enterprises L.P. (the two collectively, "IEP"). Icahn Enterprises G.P. Inc. is also formed in Delaware and headquartered in Miami-Dade County, Florida. References to the Board of Directors of IEP and to its Chairman refer to the Board of Directors of Icahn Enterprises G.P. Inc. References to the SEC filings, partnership assets, and subsidiaries of IEP refer to those of Icahn Enterprises L.P. According to IEP's SEC filings, Icahn Enterprises G.P. Inc. "has exclusive management powers over the business and affairs of Icahn Enterprises [L.P.]."

45.    Defendant Icahn Capital LP is a subsidiary of IEP (Ex. F at 2) which operates IEP's investment securities segment. Icahn Capital LP is also formed in Delaware and headquartered in Miami-Dade County, Florida. From December 14, 2020, Icahn Capital and its subsidiaries funded the Bausch Investment, consisting principally of shares in Bausch Health and Bausch + Lomb.

46.    Defendant Carl Icahn is a resident of Miami-Dade County, Florida. Carl Icahn is and was at all relevant times the Chairman of IEP and the Chief Executive Officer of Icahn Capital. According to IEP's filings with the SEC, Carl Icahn has at all relevant times indirectly owned and controlled Icahn Enterprises G.P. Inc., the general partner of IEP. According to the same, Carl Icahn

11

owned approximately 86% of the limited partnership depository units of IEP as of December 31, 2024, and has owned a substantial majority of such units at all other relevant times.

47. Defendant Brett Icahn is a resident of Miami-Dade County, Florida. Since October 1, 2020, Brett Icahn has been employed as a Portfolio Manager of Icahn Capital, reporting to Carl Icahn. From about 2017 until September 30, 2020, Brett Icahn was a consultant to IEP under a consulting agreement. From February 24, 2021, to August 14, 2025, Brett Icahn served on the Board of Directors of Bausch Health. From June 23, 2022, to August 14, 2025, Brett Icahn served on the Board of Directors of Bausch + Lomb. Since October 1, 2020, Brett Icahn has served on the Board of Directors of IEP. Brett Icahn is the son of Carl Icahn.

48. The "Icahn Group" refers collectively to Carl Icahn and the entities under common control by him, namely Icahn Capital and IEP.

## FACTUAL ALLEGATIONS

### I. PLAINTIFF'S EMPLOYMENT AT ICAHN CAPITAL

49. Plaintiff was born and raised in Palm Beach County, Florida, where he was a high school valedictorian and awarded the National Merit Scholarship. Plaintiff received a Bachelor of Science degree, *summa cum laude*, from Duke University in May 2011.

50. From July 2011 to February 2013, Plaintiff was employed as an analyst at Goldman, Sachs & Co. in New York City. From February 2013 to December 2019, Plaintiff was employed as research analyst at hedge fund BlueMountain Capital Management, LLC ("BlueMountain") in New York City with a starting annual compensation of $200,000 in 2013.

51. Plaintiff excelled at BlueMountain. Following a series of successful investments, his taxable compensation from the firm grew as follows (Ex. F at 3–10):

| Tax year 2015 | $496,126 |
| Tax year 2016 | $1,177,282 |

12

| | |
|---|---|
| Tax year 2017 | $1,856,149 |
| Tax year 2018 | $684,229 |
| Tax year 2019 + subsequent vesting | $3,207,050 |
| Total | $7,420,836 |

52.     On April 2, 2020, Plaintiff first spoke with Brett Icahn about potential employment as a Portfolio Manager at Icahn Capital after being introduced by an executive search firm.

53.     The "Portfolio Manager" title is commonly used in the hedge fund and investment management industry to designate a firm's most senior and highly compensated investment professionals. This represented a promotion from Plaintiff's prior title of "research analyst" and came with generally higher market compensation expectations.

54.     Plaintiff was already aware of Icahn Capital's reputation as an activist investor—a type of investment fund that seeks to generate returns by acquiring influential or controlling equity stakes in publicly traded companies, negotiating significant corporate influence through board appointment rights, and capitalizing on that influence to enact shareholder-friendly changes to business strategy, management composition, cost structure, and capital allocation.

55.     Plaintiff was also aware of Icahn Capital's reputation of overseeing substantial cost cuts at its portfolio companies in pursuit of its activist strategy.[1] Plaintiff reasonably expected to be able to oversee the implementation of such measures at portfolio companies as part of his employment.

56.     Plaintiff was also aware of, and induced by, the Icahn Group's history of paying large performance-based bonuses to its investment professionals. Plaintiff was aware that co-

---

[1] In a November 2015 interview describing his investment strategy, Carl Icahn recounted that, after conferring with a consulting firm, he had once fired "twelve floors of people" at railcar manufacturer ACF Industries. Similarly, IEP stated that "[m]anagement teams often fail to improve their operations and profitability, relying on lax oversight from an overly friendly board of directors" which is therefore "conducive to activism."

13

Portfolio Managers Brett Icahn, then age 36, and David Schechter, then age 40, were each paid a $223 million bonus in 2016 as the culmination of a management agreement struck in 2012.

57. Over the subsequent six months, Plaintiff, Brett Icahn, and the Icahn Group negotiated a series of agreements under which Icahn Capital, led by Chief Executive Officer Carl Icahn, would employ four Portfolio Managers to execute the firm's activist investment strategy, including by serving on relevant corporate boards.

58. The four Portfolio Managers were, alphabetically, Gary Hu, Brett Icahn, Plaintiff Steven Miller, and Andrew Teno. Brett Icahn reported directly to Carl Icahn and his compensation was governed by the Manager Agreement. The other three reported jointly to Carl Icahn and Brett Icahn and had identical Employment Agreements.

59. Brett Icahn told Plaintiff that he had reviewed approximately one hundred candidates prior to selecting Plaintiff and his two peers. Plaintiff and Andrew Teno were originally notified of their selection in July 2020, while Gary Hu was selected in September 2020 as a backup after another candidate dropped out.

60. On October 1, 2020, the Manager Agreement and Employment Agreements (Ex. C) were executed, IEP issued a press release describing the agreements and naming the four Portfolio Managers, and Plaintiff's employment began. The IEP press release made Plaintiff's employment as a Portfolio Manager a matter of public record (Ex. J at 35).

61. Accompanying the press release, IEP filed a Form 8-K with the SEC disclosing a facsimile of the Manager Agreement. The Manager Agreement in turn refers to the employment of "up to three portfolio managers … pursuant to the agreements attached hereto as Exhibit A."

14

62.     While "Exhibit A" was redacted from the Form 8-K, the Manager Agreement discloses that the compensation for the three Portfolio Managers involves three components: "Base Salary", "Bonus Amounts", and "Net Profit-Sharing Amounts."

63.     The Employment Agreements themselves stated they "shall be governed by and construed in accordance with the laws of the [sic] Delaware applicable to agreements made and/or to be performed in that State." Governing law for tort or statutory claims was not specified.

64.     The Employment Agreements provided that a bonus would be payable to each Portfolio Manager after the September 30, 2027 termination of the agreement. For each new investment, the Portfolio Manager proposing such investment would be allocated ██% of the profits and losses, while each other Portfolio Manager could also elect to be allocated an additional ██% of the profits and losses, in all cases subject to a ██% hurdle rate.[2] The final bonus for each Portfolio Manager would be the sum of such allocations for every investment, subject to various other adjustments.

65.     The new Portfolio Managers had access to the Icahn Group's full $9.3 billion in investment funds, of which $4.3 billion was funded by IEP and $5.0 billion was funded by Carl Icahn personally.[3] From the execution of the Employment Agreements until 2024, the four new hires were Icahn Capital's only Portfolio Managers and, together with Carl Icahn, had exclusive responsibility for all new investments made during that time. From and after January 2025, Plaintiff and Brett Icahn were the only two Portfolio Managers of Icahn Capital.

---

[2] A hurdle rate is a return rate that an investment must achieve before its manager is entitled to any share of profits. Here, for example, ███████████████████████████████

[3] As disclosed in the IEP annual report of December 31, 2020.

15

66.     Exhibit 4 to the Employment Agreements provided examples to illustrate the calculation of Portfolio Manager compensation and the final bonus. Even the lowest scenario contemplated multi-million-dollar compensation over the term of the agreement.

67.     Each Portfolio Manager was further entitled to retain any compensation personally received in connection with service on the Board of Directors of any public company, provided such company was not majority-owned by IEP.

68.     Plaintiff was aware of, and induced by, the fact that many of Icahn Capital's former Portfolio Managers and investment professionals continued to serve long terms and earn compensation on certain public company boards even after Icahn Capital had exited the relevant investment and terminated any related appointment agreement.[4] Plaintiff understood a customary term for public company board members to be 15 years.

69.     At various times during Plaintiff's tenure with Icahn Capital, he served on six public company boards of directors: Bausch Health and JetBlue Airways Corp., which were Plaintiff's investments, and also Conduent Inc., Dana Inc., Herc Holdings Inc., and Xerox Holdings Corp.

**Icahn Capital's Prior Compensation Practices for Portfolio Managers**

70.     Plaintiff's Employment Agreement was consistent with Icahn Capital's historical practice of contractual performance-based compensation for its Portfolio Managers. Over the preceding ten years, Icahn Capital had previously entered into three iterations of such deals.

71.     The first iteration, known as Old Sargon, was in effect from April 1, 2010, to August 1, 2012. According to IEP's SEC filings, Portfolio Managers Brett Icahn and David Schechter

---

[4] Among former Icahn Group senior employees, Jonathan Christodoro has served on the board of PayPal since 2015 (10 years). Sam Merksamer has served on the board of Transocean since 2013 (12 years). Vince Intrieri has served on the board of Transocean since 2014 (11 years) and Hertz since 2016 (9 years).

managed a portfolio of not more than $3 billion and were entitled to a final payment of 5.1% of the profits in excess of an undisclosed hurdle rate. After termination of the deal, each of the Portfolio Managers had accrued approximately $17 million in compensation.[5] This represented per-annum compensation of about $7.3 million.

72. The second iteration, known as New Sargon, was in effect from August 1, 2012, until July 31, 2016. Brett Icahn and David Schechter reprised their roles as Portfolio Managers and were entitled each to 7.5% of the profits in excess of a 4.0% hurdle rate. The initial portfolio was allocated $3 billion, 20% of which was funded personally by Carl Icahn. At the termination of the deal, each of the Portfolio Managers was paid $223 million.[6] This represented per-annum compensation of about $55.8 million. It was disclosed that the combined "Sargon Portfolio generated annualized gross returns of 26.8% from its formation on April 1, 2010, through its expiration on July 31, 2016."

73. The third iteration was in effect from December 2016 until March 2020. Carl Icahn selected two new Portfolio Managers, Courtney Mather and Nicholas Graziano. The terms were not publicly disclosed because neither was considered a related party of IEP, unlike Carl Icahn's son Brett.

74. In summary, over the ten-year period, Icahn Capital disclosed $480 million in compensation to its Portfolio Managers, of which it had only two at any given time. This represents per-annum compensation for each of at least $24 million.

---

[5] This $17 million disclosure was made as of December 31, 2012, and therefore may include New Sargon compensation from August 1, 2012 onward. The Old Sargon payment date was March 31, 2013.

[6] According to the SEC filings, this amount was $256 million as of December 31, 2015, but reduced by $33 million during 2016. The former amount was widely reported in the press.

**The Icahn Group Makes an Investment in Bausch Health**

75.     On December 1, 2020, Plaintiff delivered an investment memorandum to Carl Icahn and Brett Icahn describing a proposed investment in the common stock of Bausch Health.

76.     By December 14, 2020, the proposed investment had received unanimous support from Carl Icahn, Brett Icahn, and each of the other two Portfolio Managers, who elected to receive their ███ % allocation of the profits (Ex. F at 14). Icahn Capital began acquiring shares of Bausch Health on the open market.[7]

77.     The investment thesis accepted within Icahn Capital generally held that Bausch + Lomb was the "crown jewel" asset of Bausch Health, ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

78.     In summary, the majority of the future value of the investment was expected to come from distributed Bausch + Lomb shares, while a minority would come from ███████ shares. Therefore, operational excellence at Bausch + Lomb was paramount to Icahn Capital's expectation to profit from the investment.

79.     On February 11, 2021, the Icahn Group publicly filed a Schedule 13D with the SEC declaring it had acquired beneficial ownership of 27,807,410 shares of Bausch Health's common stock, representing 7.83% of the outstanding amount.

---

[7] References to securities transactions by Icahn Capital include transactions by funds advised by Icahn Capital and by Icahn Capital's subsidiaries, including by non-parties Icahn Partners LP and Icahn Partners Master Fund LP.

**Plaintiff Is Appointed to the Board of Directors of Bausch Health**

80.     On February 23, 2021, following a negotiation with Bausch Health, the Icahn Group entered into a Director Appointment and Nomination Agreement under which Brett Icahn and Plaintiff were to be appointed to the Board of Directors of Bausch Health on or prior to March 17, 2021.

81.     On March 17, 2021, Brett Icahn and Plaintiff were appointed to the Board of Directors of Bausch Health (to be clear, not Bausch + Lomb).

82.     Plaintiff disclosed his employment with Icahn Capital to Bausch Health in his initial directors' and officers' questionnaire dated February 22, 2021, by stating "I am a Portfolio Manager of Icahn Capital LP, and my compensation may be affected by the performance of the Icahn entities' investment in the Company" (Ex. J at 83).

83.     On March 18, 2021, Bausch Health filed its annual Definitive Proxy Statement with the SEC to solicit shareholder votes for the upcoming Annual General Meeting. The statement included a description of Plaintiff's professional background and the following endorsement: "The Board has determined that Mr. Miller's experience as a portfolio manager and securities analyst has provided him with experience in investing and finance and complex debt matters, respectively, which qualifies him to serve as a member of the Board and the committees on which he serves."

84.     On or about March 29, 2021, Bausch Health delivered a presentation (Ex. F at 15-136) to Plaintiff and Brett Icahn, which Plaintiff saw as validating Icahn Capital's investment thesis and reinforcing expectations of significant profit. As shown below, it forecast a Bausch Health share price of ▮▮▮▮ ▮▮▮▮ after executing the company's strategic plan, compared to a then-current share price of ▮▮▮▮ representing a compound return of ▮▮▮ per annum.

19



85. On April 27, 2021, the Annual General Meeting of Bausch Health was held. Plaintiff received 200,857,243 shareholder votes, representing approval by approximately 97% of votes cast, thereby being elected to a further one-year term on the board.

## II. DEFENDANTS' SCHEME BARS PLAINTIFF FROM BAUSCH + LOMB BOARD

### Bausch + Lomb Prepares for IPO

86. On August 6, 2020, Bausch Health issued a press release announcing its intention to "spin off" its Bausch + Lomb business as a separate publicly traded company.

87. Over the subsequent 21 months, as documented extensively in Bausch Health board materials provided to Plaintiff, preparations were made to conduct an IPO to sell approximately ████ of Bausch + Lomb shares to the public and list those shares on the New York Stock Exchange. Plans further called for the remaining approximately ████ of Bausch + Lomb shares to subsequently be distributed to Bausch Health shareholders via a tax-free distribution, subject to achieving a successful IPO and obtaining a solvency opinion for Bausch Health.

88. On January 13, 2022, Bausch + Lomb filed its Form S-1 with the SEC. In the Form S-1, it listed eight directors to govern the company after the consummation of the IPO: Joseph

20

Papa (CEO and Chairman), Thomas Ross (Lead Director), Nathalie Bernier, Andrew von Eschenbach, Sarah Kavanaugh, John Paulson, Russel Robertson, and Richard De Schutter.

89. Of these eight directors, two identified as women and none then identified as minorities.[8]

90. Bausch + Lomb decided to engage in overt discrimination to change that.

**Bausch + Lomb Adopts a Minority Quota for Its Board of Directors**

91. Maryland-based Institutional Shareholder Services Inc. ("ISS") operates as a "proxy advisor," i.e., a for-profit company that makes influential voting recommendations with respect to public company annual general meetings and other corporate actions. It provides these recommendations to "its approximately 4,200 clients" including "many of the world's leading institutional investors."

92. ISS has no formal governmental or regulatory authority. Instead, it threatens to direct its clients to vote in a coordinated fashion against certain, specifically identified, director nominees at an issuer's upcoming annual general meeting.

93. On November 12, 2020, ISS published a change to its "proxy voting guidelines" for certain U.S.-listed public companies (Ex. G at 6). According to the new policy:

> For companies in the Russell 3000 or S&P 1500 indices, effective for meetings on or after Feb. 1, 2022, [ISS will] generally [recommend that its clients] vote against or withhold from the chair of the nominating committee (or other directors on a case-by-case basis) where the board has no apparent racially or ethnically diverse members.

---

[8] John Paulson, who had previously been identified by Bausch Health and, on information and belief, by Bausch + Lomb as "white," began to describe himself as "diverse" beginning with the 2023 Annual General Meeting. This change was formally documented at the October 20, 2022, meeting of the Bausch Health Nomination and Corporate Governance Committee (Ex. G at 94). Prior to this date, Plaintiff and Brett Icahn understood Mr. Paulson to be "white."

21

94.     On November 30, 2022, ISS adopted the substantially same race quota policy for certain Canadian-listed public companies (Ex. G at 73). The Canadian policy defined diversity as:

> Aboriginal peoples (means persons who are Indigenous, Inuit or Métis) and members of visible minorities (means persons, other than Aboriginal peoples, who are non-Caucasian in race or non-white in colour).

95.     At the time, Bausch + Lomb had no diverse directors (compared to the ISS quota of one).

96.     To demonstrate its intended conformance to ISS's "guidelines," Bausch + Lomb included a new disclosure in its Amendment No. 2 to Form S-1, filed with the SEC on April 28, 2022, that "[t]he Company has proposed to achieve a target of 30% of [sic] women and/or minority representation on the Board of Directors by the end of 2024."

97.     Plaintiff was not privy to Bausch + Lomb's full internal deliberations about adopting a racial quota, but Plaintiff was able to observe Bausch Health's concerns, which for instance were expressed in the following October 20, 2022, excerpt presented to the Nomination and Corporate Governance Committee (Ex. G at 91):



98.     This excerpt from Bausch Health's board materials shows that Bausch + Lomb had a problem. More specifically, Chairman of the Nominating and Corporate Governance Committee ("NCGC") Tom Ross had a problem. He feared that, at ISS's recommendation, shareholders would vote him out of the chairmanship because Bausch + Lomb had no non-white directors.

22

99.     To prevent this, Bausch + Lomb would engage in intentional race discrimination and insist that the Icahn Group do so, too.

**The Icahn Group Negotiates Bausch + Lomb Board Representation**

100.     On December 14, 2021, Bausch + Lomb's general counsel, Christina Ackermann, sent an initial draft of a shareholder agreement to IEP's and Icahn Capital's general counsel, Jesse Lynn (Ex. G at 95–96). The draft shareholder agreement was designed to govern the relationship between the Icahn Group and Bausch + Lomb after the IPO. In particular, Bausch + Lomb sought to limit the Icahn Group's ability to dispose of shares of Bausch Health or Bausch + Lomb ███

████████████████████████████████████████████████████████

101.     In phone conversations beginning December 17, 2021, and continuing in the subsequent weeks, Brett Icahn, Carl Icahn, and Plaintiff discussed potential responses to the request (Ex. G at 98). Carl Icahn observed that Bausch Health had made a strategic error in not demanding such a foreseeably necessary ██████ covenant in its earlier February 2021 agreement. He proposed that the Icahn Group only agree to the ██████ covenant on the condition that it receive certain board appointment rights at Bausch + Lomb.

102.     The discussion turned to whether to immediately exercise any such rights. Brett Icahn argued against seeking immediate representation, because he thought it would be too onerous to subject the Icahn Group to the periodic insider trading restrictions on Bausch + Lomb stock that accompany board representation. Brett Icahn believed that Bausch + Lomb stock would trade favorably after the IPO and subsequent spin off, and therefore he wanted the flexibility to sell in the open market without restriction.

103.     Therefore, the Icahn Group did not seek immediate board representation at Bausch + Lomb. Instead it sought appointment rights it could elect to exercise at a later date.

23

104.    On January 13, 2022, Jesse Lynn sent Christina Ackermann a draft Director Appointment and Nomination Agreement that provided the Icahn Group the right to appoint two directors to the Bausch + Lomb board (Ex. G at 100–33). The draft, which was redlined to the February 2021 agreement with Bausch Health, contained no covenants related to the race or ethnicity of the two appointees.

105.    On January 17, 2022, Christina Ackermann delivered a markup of the agreement (Ex. G at 182–214) that now required the initial Icahn Designees to also satisfy certain "Director Criteria," which was broadly defined to include any "guidelines" and "policies" adopted by the board.

106.    In the same email, she made note of the following "policy" (Ex. G at 173):

> Additionally, please keep in mind that at the July 26, 2021 board meeting, at the N&CGC, the committee (confirmed at the board meeting on July 27) agreed to amend its Board Diversity Policy to adhere to the Canadian ISS voting guidelines to have 30% female representation on boards. At the July N&CGC meeting, the board agreed to the edits to the Board diversity policy requiring the company to achieve a target 30% women and/or minority representation by the end of 2024. Since B+L is a Canadian company as well, the same policy was adopted. At this time, we have 8 board members and 2 are female. As Brett and Steven know, it is the intention of the board to look and engage another female/minority over time.

107.    Plaintiff studied the markup and immediately became concerned that the new provisions could be used to exclude him or other preferred appointees from the board on the basis of their race. Plaintiff implored Jesse Lynn to fight back.

108.    On January 18, 2022, Plaintiff asked Jesse Lynn,  Mr. Lynn replied that ▮▮▮▮▮▮▮▮▮▮▮ (Ex. G at 215).

109.    Mr. Lynn ultimately made two relevant edits to the draft (Ex. G at 217–49). First, Mr. Lynn created a record that "Brett Icahn and Steven Miller" were in fact the Icahn Group's

preferred appointees by inserting their names *four times* into the agreement through the use of a clarifying example (*Id.* at 247). Second, at Plaintiff's insistence, Mr. Lynn drafted the following protective clause and sent the modified agreement to Christina Ackermann (Ex. G at 251–52):

> […] to the extent that the Board Diversity Policy would prevent any Icahn Designee or Replacement Designee from joining the Board, the size of the Board would be expanded to accommodate the seating of such Icahn Designee or Replacement Designee.

110.    On January 20, 2022, Christina Ackermann struck the proposed protective clause (Ex. G at 250–82). She noted in a cover email that "I spoke with [Lead Independent Director and Chairman of the Nominating and Corporate Governance Committee] Tom Ross earlier today and [Ms. Ackerman's] edits on this point were approved by him" (*Id.* at 283).

111.    Ms. Ackermann apparently failed to appreciate the evidentiary value of Plaintiff's name appearing four times in the draft agreement. She did not strike the references to "Brett Icahn and Steven Miller," which ultimately survived to the final execution version and was filed publicly.

112.    That same day, Jesse Lynn sent an ███████████ to the Icahn team. ███████████ ██████████████████████████████████████████ ████████████████████████████████ (Ex. G at 293). Plaintiff noted to the Icahn team that ████████████████████████████████████████████ ████████████████████████ (*Id.* at 291).

113.    On January 21, 2022, at 1:47 pm, Jesse Lynn replied to Christina Ackermann with a draft that re-inserted the protective clause exempting Icahn appointees from the Board Diversity Policy (*See* Ex. G at 295–99). In his email to Plaintiff and Brett Icahn describing the edits, he joked, ████████████████████████████████████████████ (*Id.* at 294).

25

114. Sometime in the subsequent two hours, Jesse Lynn and Christina Ackermann engaged in a phone call, immediately after which the concept of a "side letter" appeared. In an email at 3:18 pm, Jesse Lynn acknowledged to Ms. Ackermann that "per our conversation … Draft side letter to follow." In an email at 4:16 pm, Jesse Lynn sent the first draft of the side letter to Ms. Ackermann and acknowledged that "Brett and Steven are receiving [this document for the first time] simultaneously" (Ex. G at 300). By contrast, Mr. Lynn's draft side letter bore a signature block for Carl Icahn (Ex. G at 311), indicating that Carl Icahn had, without consulting Plaintiff, already authorized Mr. Lynn—who himself lacked such authority—to offer the deal.

**The Racially Discriminatory Side Letter**

115. The draft side letter (Ex. G at 309–12) ("Side Letter regarding the Director Appointment and Nomination Agreement") to which its parties, who did not include Plaintiff, preliminarily agreed (*Id.* at 313) on January 21, 2022, operated primarily through the following paragraph (*Id.* at 309):

> **1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(1) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (y) one or more incumbent directors will resign or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; **provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy** [emphasis added]**.**

116. In substance, the agreement allowed the Icahn Group to appoint one "Diverse" director and one other director. When asked to clarify "Diverse," Christina Ackermann said "[w]omen and minorities" (Ex. G at 324–25).

26

117.    Furthermore, as Bausch + Lomb and its specialist activist-defense counsel (Wachtell, Lipton, Rosen & Katz) knew or should have known, Icahn Capital had a consistent and longstanding practice of preferring to appoint its own Portfolio Managers and other senior employees to board seats,[9] and as Icahn Capital at all relevant times only employed male Portfolio Managers, in practice it would give Icahn one "white" seat and one "non-white" seat.

118.    This situation perfectly coincided with Bausch + Lomb's interests because only the appointment of a non-white director would prevent ISS from advising its clients to vote Bausch + Lomb NCGC Chairman Tom Ross off the board; the appointment of a white female would not have satisfied the racial quota.

119.    Over the subsequent three months, the Director Appointment and Nomination Agreement was held in anticipation of being signed immediately prior to the filing of the final Form S-1 with the SEC.

120.    On April 18, 2022, Christina Ackermann sent the "final execution agreements" to Jesse Lynn (Ex. A, D). Paragraph 1 of the side letter was unchanged from Jesse Lynn's first draft, except that clause (y) (i.e., "(y) one or more incumbent directors will resign") had been stricken:

> **1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(i) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.

---

[9] Carl Icahn was quoted in the Illumia Inc. 2023 definitive proxy statement as stating that "he 'would not even support Jesus Christ' as an independent candidate over an Icahn Nominee as 'my guys answer to me.'" In the case of Illumina, all three Icahn Nominees were current or former employees of the Icahn Group.

121.     On April 28, 2022, the Director Appointment and Nomination Agreement and the Side Letter regarding the Director Appointment and Nomination Agreement were executed.

**Christina Ackermann Intentionally Omits the Side Letter from the SEC Filing**

122.     As a new issuer under the U.S. securities laws, Bausch + Lomb was required under 17 C.F.R. § 229.601(b)(10) to attach copies of certain "material contract[s]" as exhibits to its initial registration statement (known as Form S-1). However, in a scheme to hide the racially discriminatory covenant from the SEC and the public, the "Director Appointment and Nomination Agreement" ("head agreement") was indeed filed as an exhibit to the S-1, but the "Side Letter regarding the Director Appointment and Nomination Agreement," which was executed on the same date by the same parties, was not.

123.     The side letter has the same parties, signatories, effective date, and subject matter as the head agreement. The side letter and head agreement share defined terms and the side letter references the head agreement. There was no bona fide reason not to combine them. In fact, they were part and parcel.

124.     Instead, on information and belief, the only purpose of splitting the parties' agreement into a "head agreement" and a "side letter" was to attempt to evade the SEC regulation by cleverly purporting that the side letter, standing alone, was immaterial and need not be filed.

125.     In fact, the "side letter" was material because it directly contradicted the head agreement's implication that "Brett Icahn and Steven Miller" were eligible and contemplated to be appointed by Icahn Capital. It was also material because it proved determinative in the selection of Gary Hu as a future director of Bausch + Lomb. Finally, being illegal on its face, it was material because of the potential material liability it created for the company.

28

126. On April 25, 2022, Christina Ackermann sent an email to Jesse Lynn noting that "We will attach the agreement (Not the side letter) to the S-1 that we will file Wednesday morning at 7:00 AM" (Ex. G at 333).

127. Indeed, on April 28, 2022, Bausch + Lomb filed Amendment No. 2 to Form S-1 with the SEC. On page 200, the Director Appointment and Nomination Agreement was described in detail. However, the description on page 200 makes no reference to the side letter, either expressly or in substance.

128. Further, as Exhibit 10.25 to the same filing, a facsimile of the Director Appointment and Nomination Agreement—together with five various schedules, exhibits, and annexes—was filed in its entirety (Ex. D). However, no mention whatsoever was made to the racially discriminatory side letter in Exhibit 10.25, the Form S-1, or in any other SEC filing.

129. Exhibit 10.25 purports to indicate that any information that had been redacted for immateriality had been identified with bracketed asterisks.[10] However, only certain personal phone numbers and email addresses were identified with bracketed asterisks as being redacted. No disclosure was made that the part-and-parcel side letter had been redacted from Exhibit 10.25 or that it existed at all.

**<u>The IPO Is Consummated; Icahn Buys Bausch + Lomb Shares</u>**

130. On May 5, 2022, Bausch + Lomb priced its IPO, selling 35 million shares at a price of $18.00/share. The transaction closed on May 10, 2022.

131. As part of the IPO, Icahn Capital directly acquired 3,500,000 shares (approximately 1% of the outstanding) of Bausch + Lomb at the IPO price of $18.00/share. The Icahn Group

---

[10] "Certain identified information, indicated by [*****], has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm if publicly disclosed."

disclosed its ownership of these shares as of June 30, 2022, on its form 13F-HR, filed with the SEC on August 15, 2022.

132.    Icahn Capital's buying continued after the IPO. In "more than one hundred trades, executed between May 26, 2021 and September 8, 2023," the Icahn Group acquired "additional long economic exposure to 90.72 million [Bausch Health] shares through equity swaps," according to a regulatory disclosure by Bausch Health. "Taken together Icahn now has an economic interest covering approximately 34% of [Bausch Health's] outstanding common shares."

133.    Finally, Icahn Capital ███████████████████████████████████████.

134.    In summary, the Bausch Investment stood relatively constant from September 8, 2023, to August 13, 2025, with ████████ shares in Bausch Health (which owned 88% of Bausch + Lomb) at a cost basis of ████████ and ██ million shares in Bausch + Lomb at a cost basis of ████████. The total investment had a cost basis of $████████.

135.    Plaintiff's ████ interest in Icahn Capital's investment profits covered each of these direct and indirect interests in Bausch + Lomb, thereby highly motivating Plaintiff to improve the financial performance of Bausch + Lomb through all the means available to the Icahn Group as a significant activist investor.

**The IPO Disappoints; Icahn Seeks to Exercise Board Rights**

136.    The IPO price of $18.00/share was disappointingly below the "between $21.00 and $24.00 per common share" range disclosed just two weeks earlier in the Second Amended Form S-1 filed April 28, 2022.

137.    Additionally, the 35 million shares represented a sale of only about 10% of its outstanding shares, a disappointment compared to the prior plan of ███.

138.     The execution was so poor that Bausch + Lomb canceled its ceremonial bell ringing at the New York Stock Exchange, which Plaintiff was scheduled to attend (Ex. G at 336–37).

139.     After the IPO, Carl Icahn informed Brett Icahn and Plaintiff that he was disappointed in the low IPO price that was realized, which Carl Icahn attributed to a lack of investor confidence in CEO Joseph Papa.

140.     Therefore, beginning after the May 10, 2022, IPO and culminating on June 21, 2022, the Icahn Group negotiated to exercise its rights to appoint two directors to the Bausch + Lomb board under the Director Appointment and Nomination Agreement.

**Brett Icahn Expresses a Preference to Appoint Plaintiff, But for His Race**

141.     On or about the week of June 13, 2022, Brett Icahn called Plaintiff to inform him that he had demanded that Bausch + Lomb seat both himself and Plaintiff as the two Icahn appointees. However, Mr. Icahn stated that Christina Ackermann and Tom Ross would not allow it pursuant to the side letter because of Plaintiff's race.

142.     Brett's preference to appoint Plaintiff was no surprise. Plaintiff was the Portfolio Manager responsible for the Bausch Investment, served on the parent company board, wrote the investment memo, was incentivized by a ▮▮▮ interest in the investment profits, and was further incentivized by personal ownership of Bausch Health stock earned from past board service and from personal open market purchases.

143.     Bausch + Lomb must not have been surprised by the request either. "Brett Icahn and Steven Miller" were mentioned by name as the only two hypothetical appointees in the publicly filed Director Appointment and Nomination Agreement, which Bausch + Lomb negotiated and signed.

31

144. The appointment of Plaintiff would have been a foregone conclusion and would have complied with all other corporate governance policies of Bausch + Lomb. Nothing prevented his appointment—except his race.

**Gary Hu Is Appointed to the Board**

145. On June 20, 2022, Christina Ackermann sent an email to Jesse Lynn memorializing that: "I understand that Brett and the Icahn Group have requested that 2 board members be appointed and join the B+L board now (shortly) rather than upon full spin or thereafter. To that end the Icahn Group identified 2 persons: Brett Icahn and Gary Hu" (Ex. G at 341).

146. Gary Hu, who identifies as a Chinese-American, was also Portfolio Manager of Icahn Capital, starting such role on the same day and under the same terms as Plaintiff.

147. Ms. Ackermann noted that Mr. Hu had not yet cleared a "back ground check [sic]," but notwithstanding that, "the board may take action as early as tomorrow" (Ex. G at 343–45).

148. On June 21, 2022, Bausch Health solicited consent from its directors to approve the appointment of Brett Icahn and Gary Hu to its subsidiary Bausch + Lomb's board. The resolution's recitals (Ex. G at 347) expressly cite "furtherance of … Board diversity" as the reason for the solicitation:

> WHEREAS, in furtherance of the BLCO Board's commitment to Board diversity, BLCO requests the Company's approval to appoint two Icahn Group designees and increase the size of the BLCO Board from eight (8) to ten (10) directors;

149. On June 23, 2022, Bausch + Lomb issued a press release announcing that "Brett Icahn and Gary Hu Have Been Appointed to its Board of Directors." It also disclosed that the Director Appointment and Nomination Agreement had been amended (Ex. E) to allow the new directors to be seated immediately, rather than waiting until Bausch + Lomb had been established as a completely independent company from Bausch Health.

32

150.    Brett Icahn and Gary Hu remained on the Bausch + Lomb board for the subsequent three years, until August 14, 2025.

**Plaintiff Was Better Qualified and Understandably the Icahn Group's First Choice**

151.    As of June 23, 2022, Plaintiff was better qualified than Gary Hu to serve on the board of Bausch + Lomb and understandably was the Icahn Group's first choice. Both Plaintiff and Gary Hu had a similar academic and professional background and similar years of experience. Both started at Icahn Capital on the same date. However, as of June 23, 2022, Plaintiff had the following distinct and objective advantages:

152.    First, Plaintiff had the confidence of Icahn Capital. The Director Appointment and Nomination Agreement that gave Icahn Capital the right to appoint two directors to the Bausch + Lomb Board listed Plaintiff's name, along with Brett Icahn, as Icahn Capital's putative choice of directors. Plaintiff's name appeared in that document as a preferred candidate *four times*. Brett Icahn confirmed that Plaintiff remained Icahn Capital's preferred candidate even as it engaged in the discrimination against him. In June 2022, Brett Icahn expressed his regret to Plaintiff that, because of the discriminatory covenant, Icahn Capital was unable to appoint both Brett Icahn and Plaintiff, despite this being the firm's preference.

153.    Second, Plaintiff had greater familiarity with Bausch + Lomb than Gary Hu. Plaintiff had authored the Icahn Group's investment memoranda and financial models. Plaintiff had engaged frequently with Bausch + Lomb's incoming management team. In addition to regular board meetings, Plaintiff had already conducted a plant tour and spent approximately a week in the Bausch + Lomb headquarters in December 2021 reviewing its Fiscal 2022 budget with consultants from Alvarez & Marsal. On information and belief, Gary Hu had done no such work as of June 23, 2022.

33

154. <u>Third</u>, Plaintiff was the Portfolio Manager on the investment and therefore had a greater incentive to perform. Plaintiff's ▮ allocation of the profits of the Bausch Investment was eight times Gary Hu's ▮ allocation. The greater relevance of the investment to Plaintiff's track record and industry reputation also better incentivized him to perform.

155. <u>Fourth</u>, Plaintiff had a further financial incentive to perform through his personal stock ownership. According to SEC filings, Plaintiff beneficially owned 107,616 shares of Bausch Health stock as of June 24, 2022. These shares had a market value of approximately $782,368 as of the same date. On information and belief, Gary Hu owned no shares of either Bausch Health or Bausch + Lomb at that time.

156. <u>Fifth</u>, Plaintiff's investments at Icahn Capital were allocated more capital than those of Gary Hu, showing that Plaintiff was more respected at Icahn Capital and his investments were reasonably anticipated to perform better.

157. In summary, as of June 23, 2022, there was no basis in fact to support any novel pretext that Gary Hu could have been selected for any superior merit or even personal favoritism. At no point did any of the Defendants in fact even offer Plaintiff such a pretext.

158. However, Gary Hu identified as a Chinese American. This sole fact led to his appointment to the Bausch + Lomb board, at the expense of Plaintiff.

**Even Without a Board Seat, Plaintiff Endeavors to Engage with Bausch + Lomb**

159. Despite Gary Hu's appointment to the Bausch + Lomb Board, Plaintiff remained the Icahn Group's lead Portfolio Manager on the Bausch + Lomb investment and attempted to engage with its management team to the greatest extent he could.

160. From June 2022 to December 2022, Plaintiff was optimistic that it would be possible for him to continue to influence the investment by performing some of Gary Hu's duties in substance, a plan to which Gary Hu did not object.

34

161.    On July 20, 2022, Bausch + Lomb announced that its CEO Joseph Papa had been removed as Chairman of the Board effective immediately and would remain interim CEO until a successor was found. Immediately thereafter, Plaintiff was invited to become a non-official member of the highly sensitive Bausch + Lomb CEO search committee.

162.    From August 11, 2022, to August 18, 2022, Plaintiff interviewed four Bausch + Lomb CEO candidates alongside Bausch + Lomb board members Brett Icahn, Andrew von Eschenbach, Richard de Schutter, Tom Ross, and John Paulson (Ex. G at 348). Gary Hu was not invited and did not attend. Brent Saunders, whom Plaintiff interviewed, was ultimately selected as Bausch + Lomb's next CEO.

163.    The invitation to Plaintiff—who was not a director of Bausch + Lomb—to participate in the CEO interviews instead of Gary Hu was an acknowledgement by Bausch + Lomb, Brett Icahn, and the Icahn Group that they believed Plaintiff would have been a better director than Gary Hu, and had already begun to shift some of the directorship's duties to Plaintiff while allowing Gary Hu to enjoy all of its financial and reputational benefits.

164.    On December 14, 2022, Plaintiff proactively arranged through Bausch + Lomb management to spend a day meeting with ophthalmologists and optometrists in the South Florida area, accompanied by several members of the local Bausch + Lomb sales field force. Gary Hu did not attend (Ex. G at 352, 354).

165.    Plaintiff met with six doctors and took copious notes on their feedback on Bausch + Lomb products. One such doctor—an ophthalmic surgeon at the Bascom Palmer teaching hospital—invited Plaintiff to scrub up and enter his operating room while he performed a cataract surgery involving a Bausch + Lomb intraocular lens.

166. Plaintiff sent a four-page summary of his notes to the board of Bausch + Lomb immediately thereafter and received positive feedback from directors Tom Ross (Ex. G at 360) and Russ Robertson (*Id.* at 354).

**General Counsel Christina Ackermann Demands Gary Hu "Chaperone" Plaintiff**

167. Plaintiff's initial period of relatively unimpeded involvement with Bausch + Lomb came to an end in January 2023.

168. On December 8, 2022, Plaintiff, after conferring with Brett Icahn, sent an email to Bausch + Lomb CFO Sam Eldessouky requesting an analysis of the company's ███████████ ██████████ ███████████████████████ (Ex. G at 373–74). Plaintiff copied Brett Icahn and Gary Hu on the email. On December 15 (*Id.* at 372) and December 28 (*Id.* at 371), Plaintiff followed up with Mr. Eldessouky on the requested ████████ analysis, to no avail.

169. On December 15, 2022, Plaintiff contacted Bausch + Lomb Chief Medical Officer Yehia Hashad requesting a follow up discussion on the findings of his meetings with doctors and surgeons (Ex. G at 380).

170. On or about January 4, 2023, Plaintiff and Gary Hu were informed verbally by Jesse Lynn that Ms. Ackermann had requested that Mr. Hu "chaperone" Plaintiff in future interactions with Bausch + Lomb. Plaintiff was taken aback. Plaintiff later texted Jesse Lynn to ask if he had been able to "resolve this issue with Christina," to which he replied, "no satisfactory resolution."

171. On January 4, 2023, Gary Hu—now deputized as Plaintiff's chaperone—responded to the ████████ analysis email, stating "I would be really interested in seeing this model as well. Please send it over as soon as possible" (Ex. G at 371).

172. Later that day, Mr. Eldessouky sent over the requested plant expansion analysis. In his cover email—which was addressed directly to Gary Hu—Mr. Eldessouky noted, "I understand

that Christina [Ackermann] already had a discussion with your legal team regarding the sharing of this data" (Ex. G at 370).

173.    On January 9, 2023, Plaintiff sent a follow up email to Yehia Hashad to arrange to discuss the eye doctor meetings. On January 10, 2023, Christina Ackermann forwarded this email to Icahn general counsel Jesse Lynn (Ex. G at 378) with the note: "Seems that Steven continues to directly reach out to B+L. Can we talk again? Or have you resolved this at Ichan?"

174.    Later that day, Jesse Lynn forwarded Ms. Ackermann's email to Plaintiff. Plaintiff then forwarded Mr. Lynn's email to Brett Icahn, stating "see below—Christina now telling people not to even reply to me" (Ex. G at 378).

175.    Brett Icahn thereafter directed Plaintiff to prepare and send a question list to his "chaperone" Gary Hu to be sent onward to Mr. Hashad. The next day, Gary Hu copied and pasted Plaintiff's prepared questions into an email to Mr. Hashad (Ex. G at 388–89).

176.    Mr. Hu plagiarized Plaintiff's questions (Ex. G at 395–96) verbatim and without attribution, removed Plaintiff's signature, and sent the email in his own name.

**Plaintiff Complains that the Side Letter Violates Section 1981**

177.    After the events of the first two weeks of January 2023, Plaintiff could no longer contain his disappointment with the racially discriminatory arrangement that kept him from being a bona fide member of the Bausch + Lomb board.

178.    Plaintiff found the experience of being plagiarized by Gary Hu—ultimately for no other reason than his skin color—to be dishonest and humiliating.

179.    Plaintiff sought to devise a solution that could vindicate his civil rights and lead to his installation as a Bausch + Lomb director, so that he would have a fair chance to improve the performance of the investment and earn the attendant compensation.

180. Familiar with the legal concept of the unenforceability of an illegal agreement, Plaintiff began to research whether the operative provisions of the racially discriminatory side letter might violate an existing law. Plaintiff hoped that, with the right legal resources to substantiate the argument and confront Bausch + Lomb, the situation could be resolved informally and amicably.

181. Based on his initial research, on January 9, 2023, Plaintiff sent the following email (Ex. B) to Brett Icahn and Jesse Lynn:

Brett / Jesse,



Here's a blurb:

42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In *Runyon v. McCrary, 427 U.S. 160 (1976),* the Supreme Court held that Section 1981 regulated private conduct as well as governmental action."—Third Circuit model jury instructions memo (2020)

182. Plaintiff attached a copy of the side letter to the email.

183. That same day, Jesse Lynn responded, ███████████████████████ Later that day, Brett Icahn replied, ██████████████████████ (Ex. G at 397–400).

38

**Brett Icahn Rebuffs Plaintiff's Complaint**

184. A call with Plaintiff, Brett Icahn, and Jesse Lynn was scheduled for 5:00 pm on January 10, 2023. Eager to discuss the issue, Plaintiff called Brett Icahn directly before the scheduled call to explain his motivations.

185. Plaintiff described the entire arrangement with Gary Hu as "the most humiliating and infuriating event in my entire career." Brett Icahn jokingly responded, "you clearly have not had that much of an interesting career, then."

186. The conversation turned to more practical considerations. Brett Icahn expressed his concern that fighting the side letter would be an unnecessary waste of the Icahn Group's political capital with the Bausch Health and Bausch + Lomb boards, such capital being both finite and better used elsewhere.

187. Specifically, Brett Icahn recounted his belief that the number one priority for using political capital was ensuring the "full spin"—the ███████ distribution to shareholders of 88% of Bausch + Lomb shares still owned by the heavily indebted Bausch Health—which required the cooperation of both the Bausch Health and Bausch + Lomb boards.

188. Indeed,



189. These threats moved Brett Icahn to instruct Plaintiff to, in substance, "take one for the team," so that the Icahn Group could save all its political capital with the Bausch Health and Bausch + Lomb boards to achieve the "full spin."

39

190.     At no point during this call, nor or at any other time, did Brett Icahn even attempt to suggest that Gary Hu had been chosen based on merit.

191.     On the scheduled call with Brett Icahn and Jesse Lynn,

192.     Therefore, Icahn Capital, IEP, and their representatives Brett Icahn and Jesse Lynn did not take the actions requested by Plaintiff in his complaint. Specifically,

**Plaintiff to "Assist" and "Support"**

193.     On February 8, 2023—following Plaintiff's complaints to Brett Icahn and Jesse Lynn—Christina Ackermann sent a message addressed to Mr. Icahn and Mr. Hu, with Plaintiff copied, stating that she would be providing Plaintiff with electronic access to the Bausch + Lomb board meeting books.

194.     She recited that "in order to assist you [Brett and Gary] as BLCO board members, you would like Steven to review some of the BLCO board documents." She continued, "Steven, the data is being provided to you solely to support the Icahn BLCO board members" (Ex. G at 406).

195.     Plaintiff again felt humiliated by the charade that—solely because of skin color—he was relegated to "assist" and "support" Gary Hu.

196.     On February 16, 2023, Mr. Hu informed Plaintiff that Christina Ackermann had instructed that Plaintiff was not to inspect Bausch + Lomb's Tampa, Florida manufacturing facility without Mr. Hu acting as a chaperone (Ex. K at 19).

40

**Carl Icahn Acknolwedges Gary Hu's Board Tenure Was a Failure**

197.    After being instructed not to confront Bausch + Lomb on the discriminatory appointment agreement, Plaintiff feared adverse employment consequences at Icahn Capital if he further pushed the envelope of his relationship with Bausch + Lomb. Throughout 2023 and 2024, Plaintiff was invited to participate in numerous meetings with Bausch + Lomb management discussing a variety of matters. Gary Hu was generally in attendance, and Plaintiff did not attempt to break out of his second-class status.

198.    However, Plaintiff observed that Gary Hu's effort and involvement in Bausch + Lomb decreased over time, coinciding with the leadup to Mr. Hu's termination at Icahn Capital in December 2024, after his own unrelated investments had been underwater for years. As of December 31, 2024, Gary Hu's investments had lost a total of ███████████ for Icahn Capital. ██

██████████████████████████████████████████████

██████████████████████████

199.    Beginning in 2024, Carl Icahn began to acknowledge Mr. Hu's board tenure was a failure by excluding Mr. Hu from meetings involving himself and Bausch + Lomb management. For instance, Carl Icahn did not invite Mr. Hu to a dinner with Plaintiff, Brett Icahn, and Bausch + Lomb CEO Brent Saunders at Carl Icahn's home on May 7, 2024 (Ex. G at 408). At the dinner, Plaintiff did not recall any objection by Mr. Saunders to Mr. Hu's absence, despite Mr. Hu ostensibly being the Icahn Group's board designee and living only a few miles away.

200.    Gary Hu's comparative lack of engagement was also evidenced by his scant written work product. During his tenure, Mr. Hu had authored only a handful of documents saved to Icahn Capital's shared network about the Bausch Investment, whereas Plaintiff had authored well over one hundred despite being denied a Bausch + Lomb director's role.

41

201. Following Gary Hu's termination at Icahn Capital in December 2024, none of Plaintiff's subsequent calls with Bausch + Lomb management involved Mr. Hu, who still remained on the board. For example, Plaintiff attended a scheduled call on July 17, 2025, with Brett Icahn and the CEO and CFO of Bausch + Lomb to discuss ██████████████ (Ex. G at 410–14). Plaintiff came prepared with questions and observations. Mr. Hu was not invited and did not attend.

**Gary Hu Receives $993,255 from Bausch + Lomb; Plaintiff Receives $0**

202. By virtue of being the nominal board member of Bausch + Lomb, Gary Hu received full director compensation. According to Bausch + Lomb's annual proxy statements filed with the SEC, Mr. Hu's vested compensation from June 2022 to August 14, 2025 had a grant-date value of $993,255. According to the same, Mr. Hu's pay would have been $350,000 for the board term ending May 2026.

203. Plaintiff, who would have been the board designee but for his race, was paid nothing in director compensation from Bausch + Lomb, despite his efforts to directly engage with and improve Bausch + Lomb, which were far greater than Gary Hu's efforts to do the same.

204. At those rates, Plaintiff expected to earn, and would have earned, not less than $5,250,000 over a typical fifteen-year term on the board of Bausch + Lomb, just in director compensation. As explained in Section III, Plaintiff also lost out on hundreds of millions in reasonably expected Icahn Capital compensation.

**Defendants' Pattern of Discriminatory Director Recruiting**

205. The Icahn Group, Bausch Health, and Tom Ross discussed other sex and race-conscious board appointments both before and after the appointment of Gary Hu.

206. On July 27, 2021, Plaintiff texted Brett Icahn that Bausch Health director Tom Ross told Plaintiff it "would be great if [Brett Icahn] knew any women [director candidates]" and therefore "it seems like [Tom Ross] would accept a 3rd [Icahn-appointed Bausch Health] board

42

member who's a woman." Mr. Icahn replied, "Let's just get them to be ok with [Dr. Richard M]ulligan and let them find another woman" (Ex. K at 10–11).

207. On March 9, 2023, Brett Icahn directed Plaintiff to ask IEP's CEO if "he can find anyone diverse for [Bausch Health's] audit comm[ittee] chair." After Plaintiff suggested one female candidate, Mr. Icahn asked "Is she diverse?" When Plaintiff suggested she was not "diverse," Mr. Icahn replied "Woman is fine. It checks the box." (Ex. K at 12–14). Later, Mr. Icahn noted "there just aren't [many] female / diverse pharma execs". Subsequently, Mr. Icahn forwarded Plaintiff a presentation from an executive search firm proposing six candidates for the Bausch Health Audit and Risk Committee seat, none of whom were white men (Ex. G at 415–23).

**Several Icahn Group Officials Made Racialized and Other Inappropriate Remarks**

208. Several Defendants made improper remarks during the period at issue here, confirming a heightened and inappropriate focus on race and other protected categories and demonstrating that any purported interest in director diversity was opportunistic and cynical.

209. For example, Carl Icahn used inflammatory language about African Americans ("[n]igger in the woodpile" (Ex. K at 24) (at approximately 2:54 PM on December 20, 2023)) and about Jews (Bill Ackman is "like one of those little Jewish boys crying that the world was taking advantage of him" https://t.ly/9_4xf at 0:04–0:09).

210. Jesse Lynn made "jokes" about Catholics (asking Plaintiff, who is Catholic, if he was "eating wafers or some shit like that" on Good Friday (Ex. K at 1)), white people ("no honkies" (*Id.* at 29–30)), the Israelis ("the Israeli accent makes me want to stab someone" (*Id.* at 2)), the French ("Frenchy," "cook me some snails" (*Id.* at 3-4)), about women ("I broadened your wife's aperture" (*Id.* at 5)), immigrants ("not down with accents," "eat cats and dogs" (*Id.* at 6–7)), and

43

disabled people ("retarded" (*Id.* at 8)). [11] Mr. Lynn mocked the "insights" of ████████ ████████ after ████████ used a speech synthesizer to participate in his final ████████ prior to his death from ALS (*Id.* at 9).

### III.   DEFENDANTS' SCHEME DEPRIVES PLAINTIFF OF EXPECTED BONUSES

### Plaintiff Expected Bausch + Lomb to Meet Its Own December 2021 Forecast

211.    Plaintiff's baseline expectations for the long-term financial performance of Bausch + Lomb—immediately prior to the June 2022 appointment of Gary Hu—were established at a meeting of the Bausch Health Board of Directors[12] on December 7, 2021 (Ex. H at 1). Joseph Papa, who was selected to become the Bausch + Lomb CEO following the IPO, presented the forecast reproduced below (Ex. H at 2–7).

---

[11] Mr. Lynn sent additional such remarks to Plaintiff over Microsoft Teams, but on information and belief they and other relevant communications were automatically deleted on a rolling basis of not more than one year despite Mr. Lynn being on notice of Plaintiff's "Section 1981" complaint in January 2023.

[12] The meeting was styled a Special Transaction Committee meeting, but the entire board was invited.



212. The major finding of Bausch + Lomb's December 2021 forecast was that the company's EBITDA[13] ████████████████████████.[14]

213. Management incorporated a version of the forecast's conclusions in its "roadshow" materials for its SEC-regulated IPO. For example, while the internal forecast contemplated a ████ ████████████████████████████████████, the public-facing "roadshow" materials dated December 1, 2021, expressed "low 20s" margins "near-term" and "mid-20s long-term" (Ex. H at 8).

---

[13] Earnings Before Interest, Taxes, and Depreciation & Amortization, a common metric of business cashflow.

[14] Such amount does not include any EBITDA from the subsequent acquisition of XIIDRA, discussed below.

**After One Year, Bausch + Lomb Had** ████████████████████████████████ ████.

214. One year after Plaintiff was first excluded from the boardroom, Bausch + Lomb prepared a new forecast based on the views of incoming CEO Brent Saunders, who took office on March 6, 2023, and began pursuing a large acquisition opportunity in June 2023.

215. Plaintiff received a presentation from Bausch + Lomb, dated June 5, 2023, discussing the proposed acquisition of the drug XIIDRA from Novartis AG. The presentation contained two new long-term forecasts of Bausch + Lomb, both with and without the XIIDRA acquisition (Ex. H at 11).

216. Under the status quo without the XIIDRA acquisition, management's forecast of ████████████████████████████████. This represented ████████████████████ from the year ████████████████████████████ presented to Plaintiff in December 2021.

**After Three Years, Bausch + Lomb** ████████████████████████████████

217. Three years after Plaintiff was first excluded from the boardroom, Bausch + Lomb prepared a new forecast in connection with evaluating ████████████████. Plaintiff received this forecast in a presentation dated July 2025 (Ex. H at 23).

218. Under the status quo without ████████████████ (but with the XIIDRA acquisition having closed), management's forecast ████████████████████████. This had ████████████████ of ████████████ (inclusive of ████████ of XIIDRA EBITDA) from the June 5, 2023, presentation. This represented ████████████████████ ████.

219. In total, the ████████████████████████████████████ ████ (pro-forma for ████████ from XIIDRA) in December 2021 to ████████ in July 2025. This represents ████████████████████████.

46

220. In Plaintiff's experience as a securities analyst and six-time corporate board member, Bausch + Lomb's ████████████████████████ from December 2021 onward was highly unusual for a mature company and indicative of poor oversight.

221. Plaintiff watched from the sidelines in dismay while his expectations of a significant performance-based payout were upended. The first-order impact of the ████ swing was at least ████████ in lost market equity value for Bausch + Lomb, ████████ in lost profit for Icahn Capital's direct and indirect interest in BLCO of about ████, and ████ million in lost bonus for Plaintiff's ████ interest. The additional second-order impacts—increased debt, higher interest rates, and reduced valuation multiples—were of comparable or greater magnitude.

**Plaintiff's Exclusion from the Boardroom Prevented Him from Performing His Paramount Function Under the Employment Agreement, Implementing the Activist Strategy He Devised**

222. While Plaintiff tried his best to engage with and improve Bausch + Lomb from outside the boardroom, the formal exclusion of Plaintiff from a true directorship doomed his ability to implement the activism strategy he was hired and compensated by Icahn Capital to perform.

223. As further discussed below, Plaintiff had overseen a consulting project identifying up to ████████ in margin improvement for Bausch + Lomb, but Mr. Hu instead allowed the project to be abandoned, leading to ████████ in budget declines. Instead of a focus on costs, Mr. Hu allowed management to be distracted by the unwise, multi-billion dollar acquisition of the drug XIIDRA, which Plaintiff opposed and ████████████████████ ████. Only once Mr. Hu was gone did management revisit a margin improvement program, belatedly validating Plaintiff's earlier findings of substantial unrealized cost and revenue potential.

**Gary Hu Failed to Implement Plaintiff's Margin Improvement Strategy**

224. Shareholder activists often oversee the planning and implementation of margin improvement initiatives. In years when Plaintiff served on the boards of JetBlue, Xerox, and Dana,

47

each company announced margin improvement plans of $800 to $900 million ("JetForward"), $300 million ("Reinvention"), and $200 million, respectively. Further, Xerox announced another $825 million of cost-cut realizations from 2021 to 2022 from an earlier plan ("Project Own-It").

225.    Plaintiff expected no less from Bausch + Lomb. In December 2021, Plaintiff rallied support to engage respected consulting firm Alvarez & Marsal to develop such a plan. Plaintiff then flew to Bausch + Lomb's headquarters in New Jersey to embed himself with the Alvarez & Marsal team while they interviewed several layers of management, inspected general ledger level financial statements, and spoke with outside industry experts (Ex. H at 28–58). ███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

226.    However, during Mr. Hu's tenure, the plan was never implemented, and instead, Bausch + Lomb ████████████████████████████████████████████.

227.    Plaintiff, having been relegated by Christina Ackermann to "assist" and "support," could no longer spearhead the initiative. For example, the Alvarez & Marsal report recommended that Bausch + Lomb ████████████████████. Even after Mr. Hu was appointed, Plaintiff continued to ask Christina Ackermann whether management ████████████, but he was supplied with shifting answers (Ex. H at 178–185). In fact, as of the date of this complaint, ████████████████████████████████████████.

228.    Finally, after Mr. Hu had left the board, Bausch + Lomb held its first-ever investor day as a public company on November 13, 2025. It announced that the "next phase of our strategy" was to "expand profitability" by driving a "step change margin expansion profile." As part of this supposedly new, comprehensive program, management disclosed $306 to $375 million in margin

expansion levers.[15] It was a much-belated admission that Plaintiff's concerns over the cost and margin structure were correct all along and that Mr. Hu had failed to take timely action.

**Gary Hu Failed to Implement Plaintiff's Capital Discipline Strategy**

229.    Shareholder activists often exercise skepticism over the wisdom of business acquisitions and set a high bar for underwriting and due diligence. Plaintiff was able to successfully block acquisitions on several of the boards on which he served when he found them unwise.

230.    Such a situation arose in June 2023, when Bausch + Lomb management proposed to acquire the drug XIIDRA from Novartis AG. After studying the limited information provided to him regarding the deal, Plaintiff found it "marginal" and recommended to Brett Icahn and Gary Hu that Bausch + Lomb ▮▮▮▮▮▮▮▮▮ in what was described to Plaintiff as a competitive auction (Ex H at 186-188). Mr. Hu agreed with Plaintiff (*Id.*), but, armed with few facts from his own limited due diligence, Mr. Hu was unable to persuade management or the board. To win the auction, Bausch + Lomb ultimately raised its headline purchase price to $2.5 billion.[16]

231.    The acquisition failed spectacularly. Management's due diligence, overseen in part by Mr. Hu, predicted that XIIDRA, already an established and mature product, would contribute ▮▮▮▮▮▮ in revenue to Bausch + Lomb in 2024 (Ex. H at 11). Instead, it added ▮▮▮▮▮ (Ex. H at 198), making the estimates off by ▮▮▮▮▮, or ▮▮. Plaintiff was told that ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[15] Specifically, it disclosed 250 basis points of "product mix [and] manufacturing efficiencies" and 400 basis points of "operating efficiencies [and] P&L leverage," offset by negative 50 basis points of "R&D investment." These apply to a $5,100 million revenue guidance for 2025 and up to $6,248 million in revenue projected for 2028.

[16] Of this $2.5 billion amount, $1.75 billion represented upfront cash and the rest represented milestone payments.

232. The results were so devastating that Bausch + Lomb management began exploring the possibility that ███████████████ XIIDRA's ███████████████ ████████████████████████████████—a risk Plaintiff had identified prior to his recommendation not to bid higher. Plaintiff, chaperoned by Gary Hu, was later invited to a call with Bausch + Lomb's new general counsel Bob Bailey—held March 14, 2024—to discuss ██████████████████████████ By then, however, the damage had been done.

233. This result would likely not have occurred with Plaintiff on the board. For instance, in his directorship at Bausch Health, Plaintiff was instrumental in blocking the acquisition of ██ ██████████████████████. Plaintiff leaned into the due diligence and was granted access to review the drug's then-confidential Phase 3 clinical trial data together with fellow board member and Harvard Medical School professor Richard Mulligan, Ph.D. (Ex. H at 236–37). At a meeting on ████████ (Ex. H at 235), Plaintiff, Dr. Mulligan, and Brett Icahn succeeded in persuading the board of Bausch Health to adopt a more conservative bidding strategy than proposed by management, leading to the ultimate demise of the deal (Ex. H at 233–34).

**Gary Hu Failed to Implement Plaintiff's Management Oversight Strategy**

234. Shareholder activists seek to select, motivate, and, when appropriate, replace members of management to drive a successful outcome. For example, during Plaintiff's service at Dana, the board oversaw the replacement of its CEO "effective immediately" (Ex. H at 25–27).

235. However, on Mr. Hu's watch, Bausch + Lomb's CEO Brent Saunders refused to relocate to the corporate headquarters in New Jersey and instead established a small satellite office for himself in Miami-Dade County. Flight records indicate the corporate jet made at least 30 round trips between Florida and New Jersey in 2024, apparently to accommodate this arrangement.

236. Blocked from the boardroom, Plaintiff was unable to question management during board meetings about the ███████████████████████, the failure of the XIIDRA

50

acquisition, or the questionable appearance of a remote CEO. Plaintiff could not identify pockets of frustration or dissent on the board or build support for tougher oversight.

237.     Outside the boardroom, Plaintiff knew his ongoing ad hoc access to Bausch + Lomb management was limited and being offered as a courtesy, as he was not a bona fide board member. Plaintiff knew that if he became too critical or pried too much, he could be shut out entirely. This reality limited Plaintiff's ability to engage in critical evaluation of management's plans.

238.     Plaintiff also had limited oversight over other Bausch + Lomb personnel decisions. For example, Plaintiff was not consulted on the replacement of its seasoned Chief Quality Officer with another executive, without the same credentials, who had been ███████████████. [17] Later, in April 2025, Bausch + Lomb encountered a serious and costly quality lapse that caused it to recall a significant volume of its intraocular lenses used in cataract surgeries after reports of infections. In addition to damaging the company's reputation with surgeons, the recall caused a 3% reduction to revenue, or about $38 million, in the second quarter of 2025 alone.

**Plaintiff was Blocked from Serving on Bausch + Lomb Board Committees**

239.     Plaintiff was unable to serve on, or chair, the various board committees of Bausch + Lomb. On several other boards, Plaintiff has served as chairman of board committees, including two he helped found. Such committees can engage and retain outside professional firms at the company's expense, allowing them to solve discrete problems more nimbly than a full board.



[17]

240. As one example, Plaintiff was a member and later elevated to chairman of the Finance and Transactions Committee of the board of parent Bausch Health. Plaintiff was deeply involved in the selection and direction of counsel and financial advisors which ultimately led to a series of coercive below-par debt exchanges and open-market debt repurchases that reduced Bausch Health's debt by approximately $3 billion. After this success led to him being promoted to chairman, Plaintiff insisted that the committee meet weekly for over a year—a highly unusual cadence for a board committee but demonstrative of Plaintiff's work ethic.

241. In another example, Plaintiff was the founding chairman of the Litigation Committee of the board of parent Bausch Health (Ex. H at 248). Plaintiff was involved in proposing and selecting counsel for appellate proceedings which in April 2024 ultimately upheld the patent protection and market exclusivity of Bausch Pharma's largest product, XIFAXAN, which generated revenue of approximately $2 billion in 2024 (*Id.* at 251-255; Ex. K at 18). Plaintiff reviewed at least one key brief prior to filing and was the only independent director to attend oral arguments at the Court of Appeals for the Federal Circuit (Ex. H at 256, 258).

242. As another example, Plaintiff was the founding chairman of the Technology Committee of the board of Xerox Holdings Corporation, publicly disclosed to be chartered to review "matters of technology, innovation and capital allocation, including investments in research and development, and commercial initiatives."

**Plaintiff's Bausch Health Board Seat Was No Substitute**

243. Plaintiff's service on the Bausch Health board was not an adequate substitute for also serving on the Bausch + Lomb board. The seat was separate and inherently unequal.

244. While Plaintiff served on the Bausch Health board from March 17, 2021, through August 14, 2025, factors unique to the structure of the Bausch Health board limited his ability to influence Bausch + Lomb as a Bausch Health director.

52

245. Following the IPO of Bausch + Lomb, the Bausch Health board meeting agendas did not regularly dedicate time to discussing the Bausch + Lomb operations or regularly require its CEO Brent Saunders to present. Instead, the agendas focused on Bausch Pharma operations. On February 8, 2023, Plaintiff complained to Bausch Health general counsel Seana Carson that "the BHC board materials have inadequate information on BLCO" (Ex. K at 15).

246. Additionally, the Bausch Health board regularly deferred to Bausch + Lomb on matters pertaining to the latter's business. Plaintiff cannot recall any request by Bausch + Lomb, approved by its board, which the Bausch Health board then formally denied. In substance, it was a rubber stamp.

247. Finally, Plaintiff had no oversight over Bausch + Lomb's discriminatory board diversity policy and practices. By comparison, he was involved ███████████████████ as a director of Bausch Health. At the July 2025 board meeting, he voted to "█████████████████ ████████████████████████████████ (Ex. L).

**<u>Brett Icahn's Efforts Were No Substitute</u>**

248. With respect to Brett Icahn, at all relevant times he had responsibility for roughly a dozen investments—more than Plaintiff—and therefore he did not have as much time to dedicate to Bausch + Lomb. By contrast, Bausch was at all relevant times Plaintiff's largest investment and principal focus. This distinction manifested itself, for instance, in Plaintiff encamping with Alvarez & Marsal at Bausch + Lomb's headquarters while Brett Icahn was concerned with other matters.

249. Plaintiff complied with his contractual requirements to work in person at Icahn Capital's Florida headquarters, while Brett Icahn primarily worked from home starting no later

than 2023 despite a provision in the Manager Agreement to the contrary.[18] While Brett Icahn was working remotely, Plaintiff recalls Mr. Icahn occasionally being unreachable during business hours or with background noise indicating he was in a car or a restaurant. After believing he missed a call scheduled the morning of January 26, 2023, Mr. Icahn texted Plaintiff at 10:30 am, "[s]orry I overslept" (Ex. K at 16). After missing the August 12, 2025, Bausch Health board meeting, Mr. Icahn texted Plaintiff, "I forgot about it. Whoops" (*Id.* at 17).

250.     On information and belief, in the three years since Gary Hu and Brett Icahn were appointed to the Bausch + Lomb board, neither had engaged in an in-person operational review similar to Plaintiff's Alvarez & Marsal engagement.

**<u>Gary Hu Was an Ineffective Proxy</u>**

251.     The process of requiring Plaintiff to use Gary Hu as a "chaperone" was slow and cumbersome. As one anecdote, it took over five weeks for Mr. Hu to receive an adequate response to Plaintiff's question regarding consultant expenses (Ex. H at 240–47). On January 23, 2023, Plaintiff asked Gary Hu to request that Bausch + Lomb produce a table of its ten largest outside vendors for professional services, including those of consultant McKinsey & Company. As was the custom, Mr. Hu plagiarized Plaintiff's request to Bausch + Lomb's CFO under his own name later that day. Over the subsequent five weeks, Gary Hu failed to obtain the requested information. Twice during that period, Mr. Hu had forgotten to follow up with Bausch + Lomb. When asked each time by Plaintiff whether he had remembered to follow up, Mr. Hu replied, "Nope."

252.     On March 2, 2023, Gary Hu finally obtained the requested information. Jesse Lynn had noted it was "[o]dd that this information cannot be produced within 15 minutes."

---

[18] "Cause" for Brett Icahn's termination defined as "(c) failure to come to work on a full-time basis at Employer's offices in Sunny Isles Beach, Florida, other than on holidays, vacation days, sick days, or other days off under Employer's business Policies … ."

**Access to Information Was a Separate Source of Harm**

253.    Plaintiff was also harmed in the performance of his duties as an Icahn Capital Portfolio Manager by his lack of direct access to the same information on Bausch + Lomb available to its directors to inform Icahn Capital's investment and trading decisions subject to applicable law. During authorized quarterly trading windows, Plaintiff could have recommended that Icahn Capital buy or sell shares based on his firsthand appraisal of the ability of Bausch + Lomb to achieve its long-term forecasts. Additionally, Plaintiff's firsthand knowledge could have proved instrumental in persuading the Icahn Group to undertake a leveraged buyout of Bausch + Lomb, which in fact was put up for sale in 2024.[19]

## IV.    THE ICAHN GROUP'S SCHEME TO HIDE AN ENORMOUS LOAN FROM PLAINTIFF AND THE SEC UNRAVELS, FURTHER HARMING PLAINTIFF

254.    In addition to the unlawful race-based actions described above, the Icahn Group was engaged in other unlawful conduct it improperly hid from Plaintiff, much to his detriment.

255.    As explained in more detail below, beginning in May 2023, Plaintiff began to discover that the Icahn Group had been deceiving him and IEP's unitholders by failing to make the mandatory securities disclosure that, since at least 2018, Carl Icahn had personally entered into margin loans totaling about $5.1 billion, collateralized by his stake in IEP, primarily to supplement Icahn Capital's investment liquidity (collectively "margin loans").

256.    When Plaintiff specifically asked Brett Icahn for a more detailed accounting of the assets available for investments while negotiating the Employment Agreement in 2020, Brett Icahn made false and misleading representations, directed Plaintiff to IEP's deficient securities filings,

---

[19] The Icahn Group publicly described this strategy as "taking outright control of a company in order to bring about the change we think is required to unlock value" and "acquiring control of those target companies that we believe we could run more profitably ourselves." Former targets of this strategy include Trans World Airlines and Pep Boys.

which did not disclose the margin loans' existence, and refused requests for additional private information. This concealment amounted to a \$5.1 billion overstatement of the Icahn Group's liquidity, which Plaintiff relied on when he proposed the Bausch Investment in December 2020, believing that Icahn Capital had the resources to hold or increase the Bausch Investment for as long as it remained undervalued and that it was a suitable activist target.

257. When the margin loans came to light, however, Icahn Capital's assets dropped precipitously, eventually forcing Icahn Capital to sell the Bausch Investment at prices far below what Plaintiff and Brett Icahn believed it to be worth, to Plaintiff's significant detriment.

**Carl Icahn and IEP Fined by the SEC for Failing to Disclose \$5.1 Billion Margin Loans**

258. On February 23, 2022, IEP filed its annual report for 2021, which disclosed for the first time that Carl Icahn had pledged 181 million out of the 300 million IEP shares he beneficially owned as collateral for certain "personal indebtedness" of an undisclosed amount.

259. On May 2, 2023, the research firm Hindenburg Research, LLC published a memorandum critical of IEP and noted that it had "taken a short position in units of Icahn Enterprises L.P." The memorandum was critical of IEP's limited disclosure regarding Carl Icahn's margin loan scheme, adding that "Icahn has not disclosed basic metrics around his margin loans like loan to value (LTV), maintenance thresholds, principal amount, or interest rates." In fact, each of these was a material term that should have been disclosed.

260. In the month since the report was published, the closing price of IEP units fell from \$50.42 on May 1 to \$21.81 on June 1—a decline of 57%.

261. According to IEP's subsequent securities filings, "Icahn Enterprises L.P. was contacted on May 3, 2023 by the U.S. Attorney's office for the Southern District of New York and on June 21, 2023 by the staff of the Division of Enforcement of the U.S. Securities and Exchange Commission."

262.    On August 19, 2024, the SEC issued Cease-and-Desist Orders under Section 21C of the Securities Exchange Act of 1934 against both Carl Icahn and IEP. The orders state that the SEC found (Ex. I at 1–5):

> IEP, a public company, failed to disclose that Carl C. Icahn, its founder, controlling shareholder, and Chairman of the Board of Directors of its general partner, pledged IEP securities as collateral to secure personal margin loans under agreements with various lenders in its Forms 10-K for at least the fiscal years ended December 31, 2018 through December 31, 2020, as required by Item 403(b) of Regulation S-K. IEP's failures to disclose deprived existing and prospective IEP investors of information required to be disclosed.

> As a result, IEP violated Section 13(a) of the Exchange Act and Rule 13a-1 thereunder.

263.    The order against Carl Icahn stated that (Ex. I at 6–12):

> Notwithstanding his collateral pledges, [Carl] Icahn did not file amendments to his Schedule 13D, as required by Section 13(d)(2) and Rule 13d-2(a) to reflect material changes to the facts reported under Item 6, describing his personal margin loan agreements and associated amendments that pledged IEP securities as collateral, until July 10, 2023, and similarly did not file exhibits under Item 7 of his Schedule 13D, disclosing his wholly-owned entities' entry into guaranty agreements in connection with the aforementioned loan agreements and amendments, including with respect to the amendment to Schedule 13D filed on July 10, 2023. The failures to file amendments to Schedule 13D deprived existing and prospective IEP investors of required information.

> As a result, [Carl] Icahn violated Section 13(d)(2) of the Exchange Act and Rule 13d2(a) thereunder.

264.    On the same date, "IEP and [Carl] Icahn agreed to cease and desist from future violations and to pay the civil penalties" of $1.5 million for IEP and $500,000 for Carl Icahn.

**Banks Demand Repayment from Carl Icahn**

265.    Following the Hindenburg report and SEC investigation, Carl Icahn was forced by his lenders to pay down at least ▮▮▮▮▮▮ of the margin loans through August 2025.

266.    From December 2022 to July 2023, Carl Icahn paid down about ▮▮▮▮▮▮ of the $5.1 billion margin loans described by the SEC, including a full paydown for 2 of the 7 margin lender banks.

267. On July 10, 2023, Carl Icahn entered into a new loan agreement (Ex. I at 14) with the 5 remaining banks, which "consolidates all borrowings of Mr. Icahn" of approximately $3.6 billion. The consolidated loan agreement required a "principal payment of $500 million on or before September 1, 2023, quarterly principal payments of $87.5 million beginning in September 2024, and a final principal payment of $2.5 billion at the end of the [three year] term."

268. On July 2, 2024, Carl Icahn entered into the first amendment to the loan agreement (Ex. I at 18). The amendment required Carl Icahn to post additional IEP shares as collateral, accelerated the payment schedule to require an immediate "principal payment of approximately $453 million," and extended the final maturity to July 9, 2027.

269. On August 13, 2025, Carl Icahn entered into the third amendment to the loan agreement. The amendment required Carl Icahn to post additional IEP shares as collateral, accelerated the payment schedule to require an immediate "approximately $300 million" payment on the loan, and extended the final maturity to July 7, 2028 (Ex. I at 34).

**Icahn Capital Sells Investments to Cover Margin Loans**

270. In order to fund at least ▮▮▮▮▮ in Carl Icahn's margin calls, pay an ongoing quarterly cash dividend at IEP, and cover other operating and financial cashflows at IEP, investments were sold within the Investment segment from May 2023 onward.

271. From December 2020 until September 2025, the available investment funds declined from $9.3 billion to $3.2 billion. The $6.1 billion decline proved material to Plaintiff's ability to profit from existing investments and propose new investments of comparable size to those expected at the outset of the Employment Agreement.

| "Investment Funds" Disclosed by IEP (*In $MM*) | | | | | | |
|---|---|---|---|---|---|---|
| | Dec-20 | Dec-21 | Dec-22 | Dec-23 | Dec-24 | Sep-25 |
| C. Icahn Investment | 5,000 | 5,000 | 4,900 | 2,100 | 1,500 | 800 |
| (+) IEP Investment | 4,300 | 4,200 | 4,200 | 3,200 | 2,800 | 2,400 |

58

| Total Funds | 9,300 | 9,200 | 9,100 | 5,300 | 4,300 | 3,200 |

272. IEP expressly acknowledged that investments were being sold to cover the margin loans. For example, on February 25, 2025, IEP disclosed that "Mr. Icahn has made withdrawals from the Investment Funds in recent months, including in connection with the principal payment made in connection with Amendment No. 1 to the Loan Agreements, and may make additional withdrawals in the future, in order to repay a portion of his loans and for other purposes."

273. During this period, Icahn Capital completely exited significant activist investments in Cheniere Energy Inc., Conduent Inc., Crown Holdings Inc., Dana Inc., First Energy Corp., Herc Holdings Inc., and Xerox Holdings Corp.

**Bausch Investment Untouched as Brett Icahn Insists It Is "Way Undervalued"**

274. Despite the significant reduction in Icahn Capital's funds following Carl Icahn's margin calls, not a single share of the Bausch Investment was sold from the May 2, 2023, Hindenburg report until August 13, 2025. This was because Carl Icahn, Brett Icahn, and Plaintiff all expressed the belief that the shares were undervalued.

275. From 2021 to 2025, Brett Icahn consistently expressed the opinion that Bausch Health shares were undervalued. For example, in one independent valuation dated March 15, 2025, Mr. Icahn presented a single scenario to Plaintiff and Carl Icahn which valued Bausch Health shares at █████████ compared to the last closing price of $7.15/share (Ex. I at 37–38).

276. On April 8, 2025, Brett Icahn sent an email to Bausch Health Chairman John Paulson and the CEO and CFO of Bausch Health, copying Plaintiff. Mr. Icahn stated he agreed with Mr. Paulson that "the stock price [of Bausch Health] is way undervalued relative to our underlying value" (Ex. I at 39).

59

**Bausch Shares Sold to Cover Carl Icahn's Margin Loans**

277. On August 13, 2025, Carl Icahn entered into the third amendment to his consolidated margin loan agreement, requiring an immediate "approximately $300 million" paydown (Ex. I at 34).

278. On August 14, 2025, Icahn Capital sold $312 million worth of shares of Bausch Health in a single block trade ▮▮▮▮▮▮▮ (Ex. I at 43).

279. In substance, the Bausch shares were sold to cover Carl Icahn's previously undisclosed margin loans, even though Icahn Capital, as stated by its representative Brett Icahn, believed the shares to be "way undervalued" by a factor of about ▮▮▮▮. This was the epitome of a forced sale.

280. This trade represented the sale of all of Icahn Capital's approximately 9% interest in the voting stock of Bausch Health. Icahn Capital retained its interest in a non-voting cash settled swap agreement with Nomura representing a further approximately 25% of the shares of Bausch Health.

281. Carl Icahn's decision to finally begin selling the Bausch Investment to cover his margin loans was mainly influenced by the investment's excessive concentration in Icahn Capital's portfolio caused by Icahn Capital's dwindling capital base. On information and belief, it was also likely influenced by his son's ill-fated attempt to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[20]

[20] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

282. Under the terms of the respective appointment agreements, Brett Icahn and Plaintiff were deemed to resign from the board of Bausch Health and Brett Icahn and Gary Hu were deemed to resign from the board of Bausch + Lomb, in both cases effective August 14, 2025.

**The Margin Loan Debacle Shrank Plaintiff's Compensation Under the Employment Agreement**

283. Plaintiff's final bonus was dramatically reduced by the collapse of Icahn Capital resulting from the undisclosed margin loans and ongoing securities law violations that had been concealed from Plaintiff when entering into the Employment Agreement and when making the Bausch Investment.

284. <u>First</u>, Plaintiff would not have agreed in October 2020 to key economic terms of the Employment Agreement—such as the ███ payout—had he known that the Icahn Group's liquidity was actually $5.1 billion lower than indicated by the deficient public filings to which he was referred by Brett Icahn.

285. <u>Second</u>, Plaintiff would not have recommended the Bausch Investment in December 2020, including being formally allocated the investment on December 3 (Ex. F at 14) and recommending the first trade on December 14, had he known the Icahn Group's actual liquidity. He would have concluded that Bausch Health's market capitalization of approximately $7 billion at the end of December 2020 was too large relative to the Icahn Group's actual investment liquidity for it to be a suitable activist target.

286. <u>Third</u>, Plaintiff never would have recommended investing ███████ in the Bausch Investment from 2020 to 2023 if he knew that margin calls would lead to its forced liquidation in 2025 despite Brett Icahn's insistence that the investment was "way undervalued."

61

287. <u>Fourth</u>, because the Icahn Group lost the wherewithal to make significant follow-on investments, Plaintiff lost the opportunity to benefit from further investment in components of the Bausch Investment from May 2023 onward, up to and including a leveraged buyout.

288. In fact, the Icahn Group was presented by Bausch Health with a draft Investment and Backstop Agreement dated August 9, 2024, and concurrent discussions contemplated up to a ███████████████████████████ (Ex. I at 45). In discussions with Plaintiff, Carl Icahn seriously considered the proposal but lacked the wherewithal to move forward.

289. Later, on December 12, 2024, Bausch + Lomb announced it was conducting a process "to explore a potential sale" of the company. Again, as a direct result of the margin calls, the Icahn Group no longer had the wherewithal to even consider a bid to acquire the company.

290. <u>Fifth,</u> because the Icahn Group was primarily occupied with liquidating investments from May 2023 onward, Plaintiff had a greatly diminished opportunity and balance sheet to make new and profitable investments for the final four years of the term of the Employment Agreement and thereby augment his final bonus.

**Plaintiff Also Suffered Reputational Harm from the Margin Loan Debacle**

291. Plaintiff's career and future income were also harmed by the margin loan scheme through (i) the harm to his track record from the forced liquidation of the Bausch Investment and (ii) the harm to his professional reputation through his association with the Icahn Group during a time when it was determined to have violated the securities laws.

V.  **PLAINTIFF RELIED UPON FALSE AND MISLEADING REPRESENTATIONS OF AVAILABLE INVESTMENT FUNDS BOTH PRIOR TO AND DURING HIS EMPLOYMENT; ACTIVE CONCEALMENT ALSO OCCURRED**

**During Negotiations, Brett Icahn Represented Up to $██████ in Investment Capacity**

292. During the initial negotiation of the Employment Agreement, Plaintiff repeatedly sought access to private information concerning the amount and structure of IEP's and Icahn

Capital's investment funds to evaluate his expected compensation. During this time, Brett Icahn generally directed Plaintiff to IEP's securities filings, but he also made certain express representations to Plaintiff concerning the capacity to make investments.

293. On April 18, 2020, Brett Icahn stated that it was "conservative" to assume the team would make twelve investments, each garnering ▮▮▮▮▮ from IEP and Carl Icahn, for a total of ▮▮▮▮▮ invested—of which ▮▮▮▮▮ was from IEP and ▮▮▮▮▮ was from Carl Icahn (Ex. I at 47–49). An attached spreadsheet contained a sensitivity which increased these "conservative" amounts by up to 50%, resulting in a high estimate of ▮▮▮▮▮ invested.

294. On May 25, 2020, Brett Icahn amended his spreadsheet to further increase the high estimate of funds invested to $▮▮▮▮▮ (Ex. I at 50–51).

**Plaintiff Consulted and Relied on IEP's Filings**

295. To evaluate Brett Icahn's representation concerning a "conservative" average investment size of $▮▮▮▮▮, Plaintiff consulted and relied upon a disclosure on page 19 of IEP's 2019 Annual Report, which stated that the Investment Segment's five largest holdings had an average size of $1.2 billion each. The largest investment was a $2.1 billion position in the stock of Caesars Entertainment Corporation.

296. To evaluate Brett Icahn's representation concerning up to ▮▮▮▮▮ of investment capacity, Plaintiff consulted and relied upon a disclosure on page 32 of IEP's 2019 Annual Report, which stated that the "fair market value of investments in the Investment Funds" was $8.8 billion—of which $4.3 billion was funded by IEP and $4.5 billion was funded by Carl Icahn.

297. To evaluate Brett Icahn's representation concerning Carl Icahn's capability to personally fund a portion of the investment capital, Plaintiff consulted and relied upon the same $4.5 billion disclosure of Carl Icahn's investment in the funds.

63

298.     For the same purpose, Plaintiff also consulted and relied upon page 127 of IEP's 2019 Annual Report, which stated that Carl Icahn beneficially owned approximately 197 million units of IEP as of December 31, 2019. The units, assuming they were unencumbered, had an IEP-calculated "Indicative Net Asset Value" of about $6.5 billion. This disclosure of the 197 million units was specifically required under 17 C.F.R. § 229.403(b) to indicate whether any of these units had been "pledged as security." No such disclosure was made. In fact, the SEC investigation subsequently revealed that 108.5 million such units were pledged as collateral for $5.0 billion in margin debt as of December 31, 2019.

299.     Plaintiff also consulted and relied upon the risk factors identified on pages 10 to 27 of IEP's 2019 Annual Report. This disclosure was required under 17 C.F.R. § 229.105 to disclose "material factors that make an investment in the registrant or offering speculative or risky." No disclosure of the risks posed by Carl Icahn's then-undisclosed personal margin loans was made. Following the SEC investigation, IEP began to make voluminous such disclosures beginning with its 2023 Annual Report.

**Brett Icahn Actively Concealed the Margin Loans When Plaintiff Inquired**

300.     Plaintiff could not entirely square Brett Icahn's representations concerning investment capacity with the disclosures in IEP's securities filings. Brett Icahn's "conservative" ███████████ average investment size was materially lower than IEP's $1.2 billion disclosure for the average size of each of its five largest investments. Brett Icahn's ██████ ratio of IEP vs. Carl Icahn funding was materially different from the approximate 1-to-1 ratio disclosed in the 2019 Annual Report. Finally, Brett Icahn's "conservative" $████████ in total investment funds was materially lower than IEP's $8.8 billion disclosure, while the $████████ number was materially higher.

301. Accordingly, Plaintiff wanted more private information on the amount and structure of the investment funds and other factors material to the deal. For example, on May 12, 2020, Plaintiff requested to "sign an NDA to get more detail" on IEP (Ex. F at 12).

302. However, Brett Icahn actively concealed the requested information by not granting the request and withholding further private information concerning the funds.

303. Plaintiff again requested private information concerning the funds on a phone call on or about August 26, 2020. Plaintiff recalls that Brett Icahn expressed frustration at the request and described Plaintiff's ability to ascertain the desired information from IEP's public reporting as a test of Plaintiff's aptitude as a securities analyst.

**Brett Icahn's Representations Were Knowingly False or Misleading**

304. In fact, Brett Icahn's representations did not square with IEP's public reporting because Brett Icahn knew the risks presented by Carl Icahn's $5.0 billion margin loan and had accounted for some of this risk in his own ████████ "conservative" case.

305. Brett Icahn knew his "conservative" case was misleading because Plaintiff had no way to discern or evaluate the margin loan risk himself because both IEP and Brett Icahn concealed it from him and the public. Instead, Plaintiff consulted IEP's filings and dismissed the "conservative" case as too conservative.

306. Brett Icahn knew his "conservative" case was false because he knew IEP's investment funds were only $3.8 billion as of December 31, 2019, after subtracting the $5.0 billion margin loan which propped them up. In fact, IEP's investment funds fell to $3.2 billion as of September 30, 2025, after the SEC investigation of the margin loans and the subsequent debt spiral.

307. Brett Icahn knew his shifting upside case—originally ████████ on April 18, 2020, and later ████████ on May 25, 2025—was false and misleading because his concern over the margin loans led him to create the "conservative" case. Brett Icahn "found" the ██

█████ in fictitious additional funds in May 2020 in order to further induce Plaintiff to continue negotiating and ultimately enter into the Employment Agreement.

308. Brett Icahn knew that IEP's securities filings were materially false because the 2019 Annual Report failed to disclose that Carl Icahn's shares were pledged as required by 17 C.F.R. § 229.403(b) and that this presented a material risk disclosable under 17 C.F.R. § 229.105. Brett Icahn directed Plaintiff to these filings anyway because they presented a more favorable picture of Plaintiff's expected compensation than was truthful.

**During Plaintiff's Employment, "Carl's End of Day Report" Was Misleading**

309. Beginning on the afternoon of October 1, 2020, Plaintiff began to receive "Carl's End of Day report," which was provided to the Portfolio Managers and other senior executives of IEP and Icahn Capital (Ex. J at 31). Plaintiff is informed and believes that the format and substance of this report was dictated by Carl Icahn.

310. These daily reports never disclosed the existence or the amounts of Carl Icahn's personal margin loans, despite disclosing other affiliate liabilities including IEP's corporate debt and accrued interest (Ex. I at 52).

311. Instead, they made misleading disclosures that further inflated the apparent investment resources available to Icahn Capital.

312. For example, the October 1, 2020, report noted that assets under management were approximately $██████ , consistent with public disclosure. However, the report added a round ███████████ in "cash" attributable to IEP and Carl Icahn to produce a "Grand Total" of ████ █████ of investment funds. The report further noted ████████ in "Additional Borrowing Power Available at Prime Brokers," resulting ██████████ in total liquidity (Ex. I at 53).

313. Carl Icahn knew that the report was false and misleading because it did not disclose Mr. Icahn's $5.0 billion in margin loans. Instead, Mr. Icahn misled Plaintiff and the other Portfolio

Managers by instead making disclosures with further positive bias, such as disclosing $5.6 billion in additional "cash" and prime broker liquidity.

## VI.    CARL ICAHN KNEW THAT THE MARGIN LOANS WERE MATERIAL TO PLAINTIFF AND UNITHOLDERS AND THAT CONCEALING IT WAS UNLAWFUL

314.    At all relevant times, Carl Icahn knew of the margin loans because he personally entered into them. IEP knew of the margin loans because Carl Icahn was the Chairman of its Board and indirectly owned its general partner. Icahn Capital knew of the margin loans because Carl Icahn was its Chief Executive Officer. Brett Icahn knew of the margin loans because he was Carl Icahn's son and Plaintiff is informed and believes Brett Icahn discussed the margin loans with his father and attended meetings with the margin lender banks on his behalf.

315.    The margin loans were material information to the securities holders of IEP and to Plaintiff because the loans were obtained at such a high loan-to-value ("LTV") ratio that it was highly probable that a margin call or an inability to refinance in similar terms would occur. As disclosed in the table below, Carl Icahn's LTV ratio was higher than 100% for every year since 2020—even favorably assuming he had pledged all of his units—indicating he had borrowed more money than the underlying collateral was deemed to be worth by IEP in its own public filings.

| Carl Icahn Personal Margin Loan LTV (in $MM unless indicated) | | | | | |
|---|---|---|---|---|---|
| | Dec-18 | Dec-19 | Dec-20 | Dec-21 | Dec-22 |
| IEP "Indicative NAV" | 8,152 | 7,067 | 3,548 | 5,121 | 5,643 |
| Carl Icahn Ownership (%) | 92% | 92% | 92% | 90% | 87% |
| Carl Icahn "NAV" | 7,500 | 6,502 | 3,264 | 4,609 | 4,909 |
| Carl Icahn Margin Loan | 4,600 | 5,000 | 5,100 | 5,000 | 5,000 |
| Loan-to-Value (%) | 61% | 77% | 156% | 108% | 102% |

316.    Carl Icahn knew that the material terms of the margin loans—the total size, number of counterparty banks, interest rates, and covenants—were material to the average investor in IEP because Mr. Icahn was himself a sophisticated investor with extensive experience in public

company investing and thereby knew, for instance in December 2020, that a $5.1 billion margin loan with 156% LTV by a 92% controlling unitholder would be material information to the company's minority unitholders.

**Carl Icahn Intended to Obtain $1.9 Billion by Fraud**

317. Carl Icahn concealed the margin loan terms from Plaintiff and the public, despite knowing their materiality and the obligation to disclose them because keeping the material terms of the margins loans a closely guarded secret was essential to avoid upsetting the favorable results of IEP's ongoing unit issuance program and to induce investors to participate.

318. From 2020 until the program's suspension in 2023 amid the SEC investigation, IEP issued $1.9 billion in stock to what it admits were "almost entirely … individual investors" through an at-the-market ("ATM") stock issuance program.

319. Carl Icahn directed IEP to engage in the ATM issuance because the prices realized in the issuance were significantly higher than IEP's own, publicly disclosed "Indicative Net Asset Value" per unit. This allowed IEP to sell the units with "blue-sky" value, meaning extra value over and above net asset value. This was accretive and beneficial to any existing IEP unitholder who did not participate in purchasing the ATM shares. The largest beneficiary of this "blue-sky" issuance value was Carl Icahn.

320. A table of IEP's ATM issuances, based on its public filings, is shown below. In summary, Carl Icahn was personally enriched by the ATM issuances in the amount of $1.2 billion, such amount representing the "blue-sky" value of the shares sold, multiplied by Carl Icahn's personal ownership percentage of IEP's limited partnership interests. Substantially all of this enrichment, about $1.0 billion, occurred prior to the proper disclosure of the material terms of the margin loans.

| Carl Icahn Personal "Blue-Sky" Enrichment from ATM Program | | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 | Total |
| ATM proceeds ($MM) | 101 | 833 | 759 | 175 | 102 | 1,970 |
| (/) ATM units (MM) | 1.9 | 15.2 | 14.6 | 3.4 | 5.8 | 40.9 |
| Price / ATM unit ($) | $53.16 | $54.80 | $51.99 | $51.47 | $17.59 | $48.17 |
| (-) NAV / unit ($)[21] | $(24.04) | $(16.69) | $(17.03) | $(13.61) | $(8.69) | $(15.76) |
| Blue-sky / unit ($) | $29.12 | $38.11 | $34.95 | $37.86 | $8.90 | $32.40 |
| (x) ATM units (MM) | 1.9 | 15.2 | 14.6 | 3.4 | 5.8 | 40.9 |
| Blue-sky issued ($MM) | 55 | 579 | 510 | 129 | 52 | 1,325 |
| (x) C. Icahn shares (%) | 92% | 90% | 87% | 86% | 86% | 88% |
| **C. Icahn Blue-sky $MM** | **51** | **521** | **441** | **110** | **44** | **1,168** |

321. From 2024 onward, the ATM was later resumed. However, with the truth about Carl Icahn's margin loans and SEC violations made public, IEP realized much lower market unit prices, volumes, and proceeds. This proved that ATM investors were only willing to buy the shares at inflated prices during the period the fraudulent scheme was active.

322. Carl Icahn intended to defraud the ATM investors, and incidentally Plaintiff, into believing that units purchased in the ATM program would afford them the privilege to "truly invest *alongside* the iconic Mr. Icahn as co-owners of IEP," next to a "significant portion of Mr. Icahn's personal net worth," leading to "Mr. Icahn's true alignment with their interests." In truth, investors were unknowingly investing alongside the over-levered collateral of an undisclosed syndicate of banks, who under certain conditions could foreclose upon the units and dump them on the market.

323. New investors in the ATM issuance were further induced to purchase shares with "blue-sky" value because IEP offered them an attractive but unsustainable dividend yield—described by Hindenburg as "Ponzi-like"—where dividends exceeded IEP's net income in every year from 2020 to 2024.

---

[21] "Indicative Net Asset Value" as disclosed by IEP. NAV-per-unit is calculated by (a) taking the average of start-of-period NAV and end-of-period NAV disclosed by IEP and (b) dividing this average by the average diluted unit count for the period disclosed by IEP.

| IEP Pays an Unsustainable Dividend to Induce ATM Investors | | | | | |
|---|---|---|---|---|---|
| | 2020 | 2021 | 2022 | 2023 | 2024 |
| Net Income (Loss) / Unit ($) | $(7.33) | $(2.32) | $(0.57) | $(1.75) | $(0.94) |
| Dividends / Unit ($) | $8.00 | $8.00 | $8.00 | $6.00 | $3.50 |
| (/) Price / ATM Unit ($) | $53.16 | $54.80 | $51.99 | $51.47 | $17.59 |
| Issued Dividend Yield (%) | 15% | 15% | 15% | 12% | 20% |

324. The ATM program was of such great personal importance to Mr. Icahn that the so-called "Carl's End of Day report," which was printed daily for him, contained a scoreboard of the cumulative ATM proceeds obtained since the program's inception on May 7, 2019. This scoreboard was typically on one of the first few pages of the approximately 30-page daily report; its prominence was typically second only to the daily and year-to-date profit and loss (Ex. I at 54). This practice continued from at least October 1, 2020, to March 1, 2024. The removal of the scoreboard occurred during the pendency of the SEC investigation.

325. Eight days after the Hindenburg report's publication, Carl Icahn, rather than recuse himself, instead largely dictated a press release issued by IEP which failed to admit or correct any deficiencies in its securities filings, claimed IEP was a "victim" of the whistleblower, and stated that the ATM scheme was really about "welcom[ing] new investors to the IEP family."

326. In summary, Carl Icahn knew of the materiality of the margin loans but he and IEP failed to disclose them at all until February 2022 and failed to disclose them completely until no earlier than July 2023 because he was too captivated by being personally enriched by over $1.0 billion in "blue-sky" value from the ATM program, which came at the direct detriment of investors who later lost a substantial amount of money when the scheme unraveled.

**Absence of Mistake or Lack of Accident Demonstrated by Related Conduct**

327. The margin loan scheme would not have been the only failure of Carl Icahn to make an Item 6 disclosure on Schedule 13D. On April 17, 2025, an investigation by Bausch Health found

that Mr. Icahn had failed to disclose under Item 6 that he had an interest in about 25% of all outstanding Bausch Health shares under a cash settled swap agreement, despite a new SEC rule[22] specifically aimed at disclosing such swaps (Ex. N at 1–5). Bausch Health, citing the materiality to its own shareholders, ultimately undertook to disclose this amount itself (*Id.* at 25–27).

328. The margin loan scheme would not have been the only instance where Icahn Group business records were falsified at the direction of Carl Icahn.

[23]

**Carl Icahn's Scienter Revealed by His Reaction to the Bill Hwang Investigation and Arrest**

329. Plaintiff is informed and believes that Carl Icahn and IEP made the first disclosure of the margin loans' existence in February 2022—despite the SEC alleging its existence dating back to 2005—because Carl Icahn and Jesse Lynn were shaken by the collapse of Archegos Capital

---

[22] The SEC amended 17 C.F.R. § 240.13d-101 with an effective date of February 5, 2024 (Ex. N at 24). The new rule required Item 6 of Schedule 13D to, "describe any contracts … with respect to … security-based swaps or any other derivative securities" (*Id.*). In response, on February 7, 2024, Carl Icahn filed an amended Schedule 13D with the SEC with respect to Bausch Health (*Id.* at 20-21). Mr. Icahn elected to "describe" his interest in cash settled swaps referencing 90,720,000 Bausch Health shares by merely disclosing the *existence* of a swap position, without specifying the number of shares, which "increased [his] economic exposure" (*Id.*). The failure to disclose the number of underlying shares was inconsistent with the practice of at least five other peer funds (*Id.* at 28–100), was a misleading "half truth," and was not corrected for months after the entry of the Cease-and-Desist Order.

[23] Determining the motive requires discovery. Perhaps relatedly, although occurring later in time, on January 16, 2024, an Icahn Group employee was found by a civil court to have undertaken "unauthorized dissemination of Illumina's privileged and confidential information" to members of the Icahn Group, which then made "unauthorized use of it" (Ex. N at 185).

Management on March 26, 2021, and the investigation and subsequent arrest of its founder Bill Hwang on April 27, 2022, as a result of undisclosed securities lending and swaps arrangements with various banks.

330. From May to December 2021, Jesse Lynn copied Plaintiff on five separate messages to Mr. Icahn mentioning the Archegos matter (Ex. J at 1–18, 24–30). During 2021, Plaintiff personally discussed the subject of Archegos with Carl Icahn in the context of the firm's swaps arrangements. In November 2021, Plaintiff, referencing the Archegos collapse,

[REDACTED] (Ex. J at 21).

331. Plaintiff is informed and believes that Carl Icahn's and IEP's sudden change of course in favor of making a partial disclosure of the margin loans for the first time on February 25, 2022, in the IEP 2021 Annual Report, prompted by the concomitant federal criminal investigation of Archegos for a similar fact pattern, evidences Mr. Icahn's scienter.

332. Plaintiff is informed and believes that there was no other bona fide reason for Mr. Icahn to direct IEP to make the February 2022 disclosure besides the newfound fear of being caught in the act like Mr. Hwang. There was no material difference in the size of the margin loans in connection with the 2021 Annual Report as compared to the 2020 Annual Report; in fact, it was $100 million smaller at the end of 2021 according to the SEC. There was no material difference in closing unit price between the two years; 2020 closed at $50.67/unit and 2021 closed at $49.59/unit. Likewise, there was no material difference in net asset value per unit. There was a

material increase in consolidated revenue for IEP from $6 billion in 2020 to $11 billion in 2021; if anything, this would serve to increase IEP's overall materiality threshold and militate against a new disclosure. Similarly, net income was more favorable in 2021 compared to 2020.

**Carl Icahn's Scienter Revealed by the "Half Truth" in the 2021 Annual Report**

333. Prompted by the Archegos collapse, the first disclosure of Carl Icahn's margin loans in IEP's 2021 report was a "half-truth" compared to the more fulsome disclosure made in the 2023 report while under SEC investigation.

334. As summarized in the table below, the "half-truth" in February 2022 failed to disclose anything about the $5.1 billion principal balance of the loans, or their various maturity dates or covenants. Rather than undertake its own investigation or demand that Carl Icahn amend his Schedule 13D to make the appropriate disclosures, IEP instead deferred to Mr. Icahn's own personal assurance (as quoted in the footnote to the table below).

| IEP Annual Report Statements on Carl Icahn Margin Loan | | |
|---|---|---|
| Year 2020 | Feb-2022 (Year 2021) | Feb-2024 (Year 2023) |
| Item 1A: Risk Factors: "Risks Relating to Our Structure" | | |
| [None] | [None] | (a) Identification of the margin loan as a risk factor, (b) date of latest Loan Agreement, (c) description of loan collateral, (d) number of IEP units pledged, (e) principal balance, final maturity date, and amortization schedule of loan, (f) description of loan covenants, (g) risk of liquidations in the Investment Segment, (h) risk that Carl Icahn may sell IEP units and depress unit prices, (i) risk that a "margin call" or "foreclosure" could lead to Carl Icahn ceasing to be General Partner. |
| Item 12: Security Ownership of Certain Beneficial Owners and Management […] | | |
| [None] | (a) Number of IEP units pledged, (b) conclusory statement that "Mr. Icahn" | (a) Number of IEP units pledged, (b) reference to "Item 1A, Risk Factors" to |

73

| | had deemed that a default or margin call is unlikely.[24] | the terms of the loan and the risks presented. |
|---|---|---|

335.    Carl Icahn, by providing IEP with the assurance in connection with the annual report, was therefore obviously involved in the drafting of the "half-truth" disclosure.

336.    However, Carl Icahn's "half-truth" became twice as bad on April 27, 2022.[25] Carl Icahn, who two months earlier had clearly discussed his securities law disclosure obligations related to his personal margin loans in connection with giving his personal assurances in the Annual Report, filed his 64th amendment to his Schedule 13D with respect to IEP. The filing, which he signed, failed to disclose the material terms of the margin loans under Item 6 and Item 7 as required by law, including under 15 U.S.C. § 78m(d).

**Carl Icahn's Scienter Revealed by His Extreme Secrecy**

337.    Carl Icahn's scienter is further evidenced by the fact that he concealed the size and terms of the margin loans from Plaintiff even after Plaintiff's employment and confidentiality obligations began, despite the fact that Plaintiff reported directly to Mr. Icahn and the margin loan information was essential to Plaintiff's performance as an employee of Icahn Capital at all relevant times, including in relation to at least a billion dollars in investments after about June 2021. Under Mr. Icahn's direction, Icahn Capital's accountants provided Plaintiff with daily profit-and-loss and net-asset-value reports (Ex. J at 31) which never contained any reference to Carl Icahn's personal

---

[24] "Mr. Icahn has advised that he and his affiliates have sufficient additional assets to satisfy any obligations pursuant to these loans without recourse to the depositary units, he has no need or intention to allow foreclosure on such collateral, and that he is current on all principal and interest payments with respect to the loans, and there has never been an event of default or a default under any of the loans."

[25] Perhaps not coincidentally, that same morning Bill Hwang was arrested on 11 federal felony counts.

margin loans. In fact, Plaintiff never received or was provided access to any business records pertaining to the margin loans besides IEP and Carl Icahn's public filings. Plaintiff's ignorance of the margin loan amounts was demonstrated by the fact that Plaintiff was never interviewed by IEP's counsel, the SEC, or the Department of Justice during their respective investigations.

338. Plaintiff is informed and believes that Mr. Icahn's extreme secrecy with Plaintiff, despite Plaintiff's genuine business need-to-know, demonstrates Carl Icahn feared adverse consequences from disclosing the size and terms of the margin loans to Plaintiff because: (i) Mr. Icahn knew he was violating the securities laws; (ii) Mr. Icahn was afraid that Plaintiff would disclose the existence of the margin loans, by means of an SEC whistleblower report or otherwise, resulting in adverse consequences for the Icahn Group such as those which actually occurred after the Hindenburg report (including the investigations by the SEC and Department of Justice); and (iii) Mr. Icahn was concerned that Plaintiff would be able to discover that he had been defrauded in connection with the Employment Agreement and take action adverse to the Icahn Group.

<div align="center">

**FIRST CAUSE OF ACTION**

**(Intentional Race Discrimination in Violation of Section 1981—All Defendants)**

</div>

339. Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

340. Section 1981 guarantees to all "persons within the jurisdiction of the United States" the "right … to make and enforce contracts" and "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a), (b).

341. "Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts.'" *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022) (first quoting *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999), then citing 42 U.S.C. § 1981). "[A] private corporate employer … sued under

<div align="center">75</div>

§ 1981 may be liable under respondeat superior for the unlawful discriminatory employment decisions and actions of its employees occurring within the scope of their employment." *Taylor v. Birmingham Airport Auth.*, No. 2:24-CV-0056-JHE, 2024 WL 4048840, at \*6 (N.D. Ala. Sept. 4, 2024). And employees are personally liable when they, "through their 'own individual actions,' have 'acted with discriminatory purpose' to infringe Plaintiff's contractual rights." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)).

342. Additionally, Section 1981 "is applicable to racial discrimination in private employment against white persons." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286–87 (1976). "[A] plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1257 (11th Cir. 2012). "Direct evidence is evidence, that, if believed, proves the existence of discriminatory intent without inference or presumption." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 921 (11th Cir. 2018) (cleaned up).

343. Defendants violated Section 1981 by preventing Plaintiff from serving on the Bausch + Lomb board of directors, substituting Gary Hu for Plaintiff because of Plaintiff's race. This discrimination denied Plaintiff the right to contract with Bausch + Lomb[27] and denied him

---

[27] Corporate directorships involve a variety of contract rights protected by Section 1981. In this instance, the contractual relationship of a Bausch + Lomb director includes duties and relationships arising under the company's corporate governance documents, arising under the Canada Business Corporations Act and/or British Columbia Business Corporations Act, and other express and implied-in-fact agreements. Specifically, an appointed director of Bausch + Lomb becomes a party to or a beneficiary of at least four express contracts: the "Consent to Act as Director" agreement (*see* Ex. M, Plaintiff's signed "Consent to Act as Director" agreement with Bausch Health), the 2022 Omnibus Incentive Plan (as amended, replaced, or superseded) through which stock compensation is granted, a Confidentiality Agreement through which information is shared, and a Power of Attorney Agreement which facilitates the filing of SEC documents. Other written agreements governing the contractual relationship include Bausch + Lomb's Articles of Incorporation, its Charter of the Board of Directors, and the charters of each respective board committee. Other agreements which are at least implied-in-fact include recurring quarterly cash compensation payable to the director, access rights to an electronic data room for board materials, the right to attend and participate in board meetings, and access to management and facilities.

the enjoyment of benefits, privileges, terms, and conditions of his Employment Agreement with Icahn Capital because his appointment to serve as a director of Bausch + Lomb was a benefit, privilege, term, or condition of Plaintiff's Employment Agreement, which Plaintiff was induced to enter on the understanding that it would lead to his appointment as a director of companies he led investment in, as was customary for Portfolio Managers.

344. Defendants' entry into the side letter, which in practice restricted the Icahn Group to selecting one "white" and one "non-white" Portfolio Manager, was immediately responsible for the Icahn Group not appointing Plaintiff, who was the Icahn Group's preferred appointee, its most qualified appointee, and its best suited appointee. Entry into the side letter therefore denied Plaintiff the opportunity, because of his race, to enter into one or more prospective contractual relationship(s) directly with Bausch + Lomb to serve on its board of directors. Parties to the side letter and others involved in its procurement intended to discriminate against Plaintiff on the basis of his race because they knew that Icahn Capital's four Portfolio Managers were the only people whom Icahn Capital would consider appointing to the Bausch + Lomb board and that, of these four, only one—Gary Hu—was "diverse" because he is Asian American. The parties to the side letter also knew that the very purpose of the provision was to replace Plaintiff with Gary Hu as an Icahn Capital appointee.

345. This discriminatory act further denied Plaintiff enjoyment of the Employment Agreement's benefits, privileges, terms, and conditions by interfering with his ability to earn compensation under the Employment Agreement in at least two ways. First, Defendants' discriminatory decision to appoint a less competent director, Gary Hu, reduced the percentage-of-profits compensation due to Plaintiff under the Employment Agreement because Gary Hu's poor performance reduced the Bausch Investment's profits. Second, Defendants' discrimination denied

Plaintiff the compensation he would have received in connection with his service on Bausch + Lomb's board of directors, which he was also entitled to retain under the Employment Agreement.

346. Drafts of the Director Appointment and Nomination Agreement, the side letter, and email correspondence about these documents are direct evidence that the decision not to appoint Plaintiff to the Bausch + Lomb board of directors was made with discriminatory intent. An early draft of the Director Appointment and Nomination Agreement named "Brett Icahn and Steven Miller" as the directors Icahn Capital would intend to appoint to the Bausch + Lomb board. But the side letter required that, under conditions then present, "one of the two individuals designated by the Icahn Group must qualify as 'Diverse' in accordance with the terms of the [Board Diversity] Policy." Bausch + Lomb general counsel Christina Ackermann wrote that "Diverse" meant "[w]omen and minorities," and it became clear that Plaintiff—as a white man—would not qualify. Accordingly, Icahn Capital replaced Plaintiff with Gary Hu as its choice of director, as documented in Christina Ackerman's June 20, 2022, email.

347. This written evidence requires no inference to conclude that Plaintiff was replaced with Gary Hu because of Plaintiff's race. The director chosen had to "qualify as 'Diverse.'" And while Plaintiff, Icahn Capital's first choice, did not qualify, Gary Hu (an Asian male) did.

348. There is also indirect evidence of a Section 1981 violation. This requires the plaintiff to show: (1) he is a member of a protected class, (2) he was subjected to an adverse employment action, (3) his employer treated similarly situated employees who are not members of his protected class more favorably, and (4) he was qualified for the job or job benefit at issue. *Rice-Lamar v. City of Ft. Lauderdale*, 232 F.3d 836, 842–43 & n.11 (11th Cir. 2000).

349. All four elements are present here.

78

350.     First, Plaintiff, who would be classified as "white," is a member of a protected racial class. *See Santa Fe Trail Transp. Co.*, 427 U.S. at 286–87.

351.     Second, Plaintiff suffered the adverse employment actions of (i) Defendants denying him a seat on the Bausch + Lomb board of directors, and (ii) receiving less compensation under his Employment Agreement than he would have absent that discriminatory action.

352.     Third, Defendants, as Plaintiff's employer or prospective employer, treated Gary Hu, a similarly situated employee and prospective employee outside Plaintiff's racial class, more favorably by appointing Gary Hu to the Bausch + Lomb board even though all acknowledged that Icahn Capital believed at all times that Plaintiff was the better candidate.

353.     Fourth, Defendant was qualified to be a director of Bausch + Lomb and receive the attendant benefits of that position under his Employment Agreement, as Icahn Capital acknowledged by making Plaintiff its first choice to serve alongside Brett Icahn as Bausch + Lomb director.

354.     Additional evidence shows that Defendants intended to replace Plaintiff with Gary Hu because of Plaintiff's race:

    a)  Defendant Tom Ross intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against his reelection as a director of Bausch + Lomb beginning with the 2023 Annual General Meeting. Mr. Ross received not less than $1,245,164 in Bausch + Lomb director's fees, including $827,484 after the 2023 Annual General Meeting.

    b)  Defendant Christina Ackermann intended to discriminate on the basis of race because she considered it expedient to her career to take direction from Tom Ross

79

and separately to act in furtherance of Bausch + Lomb's purported ESG goals by insisting on the racially discriminatory covenant in the side letter.

c) Defendant Bausch + Lomb intended to discriminate on the basis of race because it was expedient to prevent ISS and other proxy advisory firms from recommending against the election of Tom Ross as a director of Bausch + Lomb. Bausch + Lomb expressly described the appointment of Gary Hu as being "in furtherance of the BLCO Board's commitment to Board diversity." The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

d) Defendant Bausch Health intended to discriminate on the basis of race because its own board resolution authorizing its subsidiary's appointment of Gary Hu stated that the appointment was "in furtherance of the BLCO Board's commitment to Board diversity." Bausch Health intended to enforce Bausch + Lomb board diversity, by means of discrimination, to serve its own purported ESG goals as the corporate parent. The intention of Bausch Health to discriminate on the basis of race is further evidenced by its pattern of race-based recruiting on its own board (*see supra* ¶¶ 205-207). The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

e) Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital intended to discriminate on the basis of race because it was expedient to obtaining the Director Appointment and Nomination Agreement and maintaining "political capital" with the board and management of Bausch Health and Bausch + Lomb by enabling them

80

to pursue their purported ESG goals and by facilitating Tom Ross's election to the Bausch + Lomb board.

355. Punitive damages are appropriate where a discriminatory act is performed with malice or reckless indifference to an employee's or prospective employee's federally protected rights. That means showing the employer "at least discriminate[s] in the face of a perceived risk that its actions will violate federal law." *Austrum v. Fed. Cleaning Contractors, Inc.*, 190 F. Supp. 3d 1132, 1134 (S.D. Fla. 2016) (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 536 (1999)).

356. Defendants knowingly discriminated in the face of a perceived risk that their conduct was unlawful, as evidenced by their attempt to conceal the side letter from regulators and the public.

357. Defendant Bausch + Lomb discriminated in the face of a perceived risk that its conduct was unlawful because it wrote its discriminatory intent into an express agreement approved by its Board of Directors and directed in part by Lead Independent Director Tom Ross, and the agreement was reviewed and approved by general counsel Christina Ackermann, who herself received advice from outside counsel on the Director Appointment and Nomination Agreement.

358. Defendant Tom Ross discriminated in the face of a perceived risk that his conduct was unlawful because, as a former lawyer and state court judge, Mr. Ross perceived a risk that the discriminatory covenant upon which he insisted violated federal law. Mr. Ross also intended the covenant to subject Plaintiff to racial discrimination.

359. Defendant Christina Ackermann discriminated in the face of a perceived risk that her conduct was unlawful because, as a lawyer and the general counsel of a global pharmaceutical

company that regularly received advice from sophisticated outside counsel, Ms. Ackermann perceived a risk that the discriminatory covenant violated federal law.

360. Defendants Carl Icahn, Brett Icahn, IEP, and Icahn Capital discriminated in the face of a perceived risk that their conduct was unlawful because their general counsel, Jesse Lynn, ███████████████████████████████████████████████ and they continued their discrimination for over two years after Plaintiff informed them that the discrimination likely violated Section 1981.

361. Icahn Capital's Employee Handbook confirmed that all "decisions regarding employees," including "training and development, benefits, [and] promotion," must be made "without discrimination or harassment based on race, color … or any other category protected by federal, state, or local law." This further confirms these Defendants knew that making race-based decisions was unlawful—yet they did so anyway. Further, as listed above, several Icahn Capital officials repeatedly made "jokes" about ethnicity and religion, and used inflammatory racialized language.

362. Defendants Bausch Health, Bausch + Lomb, IEP, and Icahn Capital are liable for the discrimination of their representatives Christina Ackermann, Tom Ross, and Jesse Lynn because these individuals' discriminatory actions were within the scope of their employment. Relevant to the instant action, Christina Ackermann, directed by Tom Ross, negotiated the racially discriminatory side letter in January 2022 while Ms. Ackermann was serving as general counsel of both Bausch Health and Bausch + Lomb and while Mr. Ross was serving as a director of Bausch Health and knew he would be appointed Lead Independent Director of the Bausch + Lomb board on or about April 2022 and would be seeking to maintain his seat at the company's first Annual General Meeting. Further, Christina Ackermann's and Tom Ross's creation of and insistence upon

82

the side letter scheme shows that they acted willfully, intending to subject Plaintiff to adverse employment action because of his race.

363.    Defendant Carl Icahn is liable for the discriminatory decision to replace Plaintiff with Gary Hu as Icahn Capital's choice of Bausch + Lomb director because Carl Icahn signed the racially discriminatory side letter acting within the scope of his employment as Chief Executive Officer of Icahn Capital.

364.    Defendant IEP is liable for the actions of Carl Icahn because Carl Icahn signed the racially discriminatory side letter acting within the scope of his employment as Chairman of IEP.

365.    Defendants knowingly and willfully agreed, combined, and conspired amongst themselves to deprive Plaintiff of the rights guaranteed by 42 U.S.C. § 1981. The side letter constituted the express agreement of Bausch + Lomb, Carl Icahn, IEP, and Icahn Capital to discriminate on the basis of race on future board appointments. Christina Ackermann, directed by Tom Ross, caused Bausch + Lomb to enter into the agreement within the scope of her employment at Bausch Health. In furtherance of this conspiracy, Defendants engaged in overt acts including, but not limited to: (i) the Icahn Group's nomination of Gary Hu to the board of Bausch + Lomb, in lieu of Plaintiff, for the sole reason of his race, as Brett Icahn informed Plaintiff, and (ii) Gary Hu's plagiarism, directed by Brett Icahn, of Plaintiff's work, knowing race had barred his service.

366.    Defendants' discrimination against Plaintiff has caused him to lose past and future income, compensation, and benefits that his Employment Agreement with Icahn Capital entitled him to and the contractual relationship he would have had with Bausch + Lomb, if only he were not white.

367.    When awarding backpay, "uncertainties in determining what an employee would have earned but for the discrimination should be resolved against the discriminating employer."

*EEOC v. Joe's Stone Crab, Inc.*, 15 F. Supp. 2d 1364, 1376 (S.D. Fla. 1998) (quoting *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211, 260–61 (5th Cir. 1974)).

368.    Because Defendants' discrimination obscured any direct measurement of the Bausch Investment's outcome with Plaintiff rightfully on the board of Bausch + Lomb, "back pay equal to the maximum amount which could have been earned but for the discrimination is appropriate." *Wooldridge v. Marlene Indus. Corp.*, 875 F.2d 540, 549 (6th Cir. 1989).

369.    Plaintiff accordingly seeks back pay in the amount of the Make Whole Bonus, as defined herein, calculated as though the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach or fraud, *see infra* ¶ 384, or alternatively, in the amount of $221,757,416.79, which would true-up his cumulative past compensation from Icahn Capital of $1,242,583.21 (Ex. I at 55–61) to the $223 million for each New Sargon Portfolio Manager, which set a benchmark for the compensation expectations of a performing Icahn Capital Portfolio Manager.

370.    The New Sargon bonus is an appropriate benchmark for determining Plaintiff's reasonable expectations because, at the outset of his Employment Agreement, Plaintiff was similarly situated to Brett Icahn at the outset of the New Sargon deal on August 1, 2012. Both started their careers at Goldman Sachs, obtained about nine to ten years of experience as buy-side investment professionals, earned multi-million-dollar per annum compensation in their prior employment based on superior investment returns, and had thereafter negotiated with Carl Icahn to become Portfolio Managers of Icahn Capital. Plaintiff is also entitled to back pay, in an amount to be proven at trial, for lost past board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

371.    With respect to front pay, Plaintiff could have reasonably expected to earn similar per-annum compensation for the remainder of his career had Defendants' actions not: (i) damaged his investment track record and industry reputation from the Bausch Investment's poor performance during the discriminatory period, and (ii) deprived Plaintiff of the recognition and business relationships that would have attended serving on the board of Bausch + Lomb starting from June 2022 and extending into the future. This amount is to be proven at trial. Plaintiff is also entitled to injunctive relief or, alternatively, front pay in an amount to be proven at trial, for future service on the Bausch Health and Bausch + Lomb boards that would have occurred but for the discrimination.

372.    With respect to damages at law, Plaintiff is entitled to an amount not less than the Make Whole Bonus for harms suffered related to the Employment Agreement and an amount to be proven at trial for lost past and future board fees from the Bausch Health and Bausch + Lomb boards that he would have earned but for the discrimination.

373.    Plaintiff is entitled to additional damages in an amount to be proven at trial for lost earnings capacity resulting from the reputational harm. *See Hanna v. WCI Cmty.*, 348 F. Supp. 2d 1332, 1334 (S.D. Fla. 2004) ("When reputational injury caused by an employer's unlawful discrimination diminishes a plaintiff's future earnings capacity, [he] cannot be made whole without compensation for the lost future earnings [he] would have received absent the employer's unlawful activity.") (citations omitted).

374.    Defendants' discrimination against Plaintiff has also caused him to suffer severe mental anguish and emotional pain and suffering for the three years he was excluded from the Bausch + Lomb boardroom on the basis of race and unable to control his destiny in his career at Icahn Capital, compensable in an amount to be proven at trial.

## SECOND CAUSE OF ACTION

### (Breach of Contract (Discrimination)—Icahn Capital)

375. Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

376. The "implied covenant of good faith and fair dealing exists in every employment contract in Delaware." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992). The covenant requires "a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (cleaned up).

377. Intentional race discrimination by an employer violates this implied covenant in an employment contract. Thus, a Plaintiff can "sustain a disparate treatment claim for a breach of the implied covenant of good faith and fair dealing" by showing "that []he suffered intentional discrimination because of h[is] race, as evidenced by an employer's disparate treatment of h[im] and similarly situated persons, and that the intentional discrimination resulted in an adverse employment action." *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005).

378. To find a breach of the covenant of good faith and fair dealing, "the analysis should proceed under the same considerations as a claim under Title VII." *Rizzitiello v. McDonald's Corp.*, No. CIV.A. 00C-12-027CLS, 2004 WL 396411, at *2 (Del. Super. Ct. Feb. 11, 2004), *aff'd,* 868 A.2d 825 (Del. 2005). Title VII has a statutory "motivating factor" causation standard, 42 U.S.C. § 2000e-2(m), which is far exceeded here.

379. The same allegations that support Plaintiff's claim under Section 1981 (First Cause of Action) also establish that Icahn Capital breached the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement by subjecting him to disparate treatment in

connection with his employment when Icahn Capital denied him a seat on Bausch + Lomb's board of directors because of his race.

380. Icahn Capital—through the actions of its representatives Carl Icahn, Brett Icahn, and Jesse Lynn—further exacerbated and continued this breach by: (i) reaching a preliminary agreement on the racially-discriminatory covenant with Bausch + Lomb on January 21, 2022, over Plaintiff's express objections; (ii) executing the final agreement on April 28, 2022; (iii) harming Plaintiff's reputation by agreeing with Bausch + Lomb to hide that race was the true reason for Mr. Hu's selection over Plaintiff; (iv) directing Plaintiff to use Gary Hu as a "chaperone" from January 4, 2023, onward; (v) directing Plaintiff to create work product which Mr. Hu fraudulently plagiarized as his own from January 4, 2023, onward; (vi) ignoring Plaintiff's written complaint on January 9, 2023, that the arrangement likely violated Section 1981; (vii) directing Plaintiff on January 10, 2023, not to contact Bausch + Lomb or otherwise pursue his Section 1981 claim; and (viii) harming Plaintiff's ability to control his destiny in the pursuit of a final bonus.

381. Icahn Capital again breached the implied covenant and caused further reputational harm on November 5, 2025, when, two weeks after Plaintiff made a confidential discrimination complaint to Icahn Capital related to the instant action, Carl Icahn was quoted in an on-the-record interview with the *Wall Street Journal* which reported the relationship with Plaintiff "recently became contentious" (Ex. I at 65). Icahn Capital breached its express representations in its employee handbook that "allegations of discrimination" will be handled with "confidentiality" and that "retaliation" is prohibited, defined to include "remarks" and "revenge."

382. Under the express terms of the Employment Agreement, Plaintiff would have had a right or expectation to serve on the board of Bausch + Lomb. The agreement provides that: (i) "every [investment] will be allocated to one—and only one—of the [three Portfolio

87

Managers]," (ii) Plaintiff may "be requested by Employer … to act as an officer, director, advisor or agent" of such target company, and (iii) "remuneration or other property obtained as a result of acting as an officer, director, advisor or agent … shall remain the property of Employee." As the Bausch Investment was expressly allocated to Plaintiff (Ex. F at 14), Plaintiff expected to serve on the Bausch + Lomb board to the exclusion of any of the other Portfolio Managers, namely Gary Hu.

383.    Because "the standard remedy for breach of contract is based upon" the "principle of expectation damages," *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001), Plaintiff is entitled to expectation damages in the amount of the Make Whole Bonus, which is reasonably equivalent to the amount of the bonus Plaintiff would have received had there been no breach of the Employment Agreement. Such an amount "is based upon the reasonable expectations of the parties *ex ante*." *Id.*

384.    Assuming that the Employment Agreement was performed under its terms and in accordance with the reasonable expectations of the parties with no breach or fraud, the amount of the Make Whole Bonus is no less than $235,846,562.94, calculated as follows:

| Make Whole Bonus Calculation |
|---|
| Gross Pay = (Capital/Port. Mgr.)*((1 + Return - Hurdle)^(Term) - 1)*( ██ + ██ + ██ ) |
| Gross Pay = ($9,200 / 3)*((1 + 26.8% - ██ )^(7) - 1)*( ██ ) |
| Gross Pay = ($3,066)*( ██ )*( ██ ) |
| Gross Pay = $237 million = $237,089,146.15 |
| Make Whole Bonus = Gross Pay - Cumulative Compensation Paid (Oct. 2020 to Nov. 2025) |
| Make Whole Bonus = $237,089,146.15 - $1,242,583.21 = $235,846,562.94 |

88

385.    Compared to the New Sargon bonus of $223 million, Plaintiff's Make Whole Bonus of approximately $236 million contemplates greater initial investment capital ███████████ [27] vs. $3.0 billion), longer duration to compound (████ vs. 4 years), lower percentage payouts (████ ██████████ vs. 7.5%), and capital being divided evenly across three peer Portfolio Managers instead of being shared by two. The 26.8% rate of return of the combined Sargon portfolio is held constant.

386.    It was reasonable for Icahn Capital's representatives Carl Icahn and Brett Icahn to expect that their new partnership would achieve similar investment performance to the Icahn father-son duo's last such deal together, Sargon. Evidencing this expectation, IEP's October 1, 2020, press release announcing the deal touted the "26.8%" investment returns achieved under Sargon. In fact, Sargon's performance was below Carl Icahn's average historical audited investment returns of ████ in the 26 years during and prior to Sargon (Ex. J at 33–36):

| Fund | Period | Annual Gross Return |
|---|---|---|
| Carl Icahn "Exam-Level Review by KPMG" | 1990-1995 | ████ |
| Carl Icahn "Exam Level Review by Grant Thornton" | 1996-2004 | |
| Icahn Partners L.P.—February 2011 press release | 2004-2011 | 10.9% |
| Sargon portfolio—October 2020 press release | 2010-2016 | 26.8% |
| **Compound Average** | **1990-2016** | ████ |

387.    With respect to Plaintiff's reasonable expectations, he similarly believed that the Sargon performance could be achieved or exceeded; further, he expected that his talent, discipline, and work ethic—as evidenced by his prior track record as an investment professional—would be

---

[27] The investment capital was expected by both parties to have future inflows as IEP was in the process of undertaking a significant "At the Market" sale of units. IEP realized $833 million in proceeds in calendar 2021. This implied over $4 billion in future expected inflows throughout the Term of the Employment Agreement.

additive to this performance. Both parties knew that "[e]lite portfolio managers at hedge-fund firms can command pay packages of more than $100 million over several years."[28]

388.    While the Make Whole Bonus does not explicitly contemplate the Bausch Investment, it is consistent with the reasonable expectations of the parties that the Sargon return could be achieved. According to the parties' own valuations of BHC shares (Ex. J at 37, 43, 58), the parties clearly expected to exceed 26.8% annualized returns over the life of the Bausch Investment:

| Valuation Date | BHC low | BHC high | Midpoint | Cost basis[29] | 4Y return[30] |
|---|---|---|---|---|---|
| Brett Icahn (Apr. 19, 2021) | ██ | ██ | ██ | ██ | 41.7% |
| Plaintiff (Jul. 29, 2021) | ██ | ██ | ██ | ██ | 36.0% |
| Plaintiff (Mar. 17, 2022) | ██ | ██ | ██ | ██ | 31.4% |

389.    Even reducing the amount to reflect present value as of the breach date yields a significant sum. The table below calculates the present value of the Make Whole Bonus payable on December 29, 2027, at each possible breach date alleged in this complaint using the agreed ██████████.[31] Pre- and post-judgment interest subsequently accrues on the breach-date value.

| Breach Date | Present Value of Make Whole Bonus |
|---|---|
| October 2, 2020 | $171,456,631.01 |
| December 14, 2020 | $172,972,691.83 |
| January 21, 2022 | $181,586,694.73 |
| June 23, 2022 | $184,968,235.48 |
| January 10, 2023 | $189,506,541.88 |

---

[28] Peter Rudgeair & Gregory Zuckerman, *The Frenzied Pursuit of Wall Street's Low-Profile All-Stars*, WSJ (June 13, 2025, 9:00 PM), https://www.wsj.com/finance/investing/the-frenzied-pursuit-of-wall-streets-low-profile-all-stars-ee51b33a.

[29] Cost basis of BHC shares on the relevant breach date (either January 21, 2022, or June 23, 2022).

[30] Compound annualized return over a four-year period from the cost basis to the midpoint price target.

[31] The Employment Agreement provides that the final bonus is due and payable on the 90th day following Term End.

390. Plaintiff is entitled to additional damages to be proven at trial, resulting from lost earnings capacity caused by the reputational harm.

391. Under Delaware law, when there is a "continuous contract and continuing breach, the applicable statute of limitations begins to run only when full damages can be ascertained and recovered," which is "typically" not "until the termination of the entire contract." *Palisades Collection, LLC v. Unifund CCR Partners*, No. CVN14C08036EMDCCLD, 2015 WL 6693962, at *5 (Del. Super. Ct. Nov. 3, 2015). The doctrine applies both when a single "discrete and readily determinable breach" causes "damages that could not have been known (or sought) at the time of the breach," *In re ASHINC Corp.*, No. AP 13-50530-CSS, 2022 WL 2666888, at *11 (D. Del. July 11, 2022), *dismissed,* No. 22-2442, 2023 WL 9596751 (3d Cir. Sept. 12, 2023) (citations omitted), and when the breaching party commits multiple "wrongful acts" that are "so inexorably intertwined that there is but one continuing wrong," *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, No. CV 7639-VCS, 2016 WL 4440476, at *12 (Del. Ch. Aug. 22, 2016). The doctrine has also been applied to a contract that prescribed obligations "for a fixed … period" where the contract was "continuously acknowledged by both parties throughout." *Matter of Burger*, 125 B.R. 894, 902 (Bankr. D. Del. 1991).

392. Icahn Capital's discrete breach of Plaintiff's Employment Agreement by racially discriminating against him, including through the actions of its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, caused him monetary damages that, because of the Employment Agreement's compensation structure, could not have been known at the time of the breach.

393. Additionally, these individuals' later wrongful actions exacerbating that discrete discriminatory act are so inexorably intertwined with it that they constitute one continuing harm.

394. Furthermore, Plaintiff's Employment Agreement is for a fixed term that ends September 30, 2027, and the parties have continuously acknowledged it even after Plaintiff was denied a seat on the Bausch + Lomb board of directors because of his race.

### THIRD CAUSE OF ACTION

**(Breach of Contract (Margin Loans)—Icahn Capital)**

395. Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

396. An employer breaches the implied covenant of good faith and fair dealing when the employer "induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." *Merrill*, 606 A.2d at 101.

397. For the six months from March to September 2020, Plaintiff discussed the terms of his future employment at Icahn Capital, including negotiating the Employment Agreement. During this period, Plaintiff had numerous discussions with Brett Icahn and Jesse Lynn and also spoke with Carl Icahn.

398. Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, knew and concealed from Plaintiff that (i) Carl Icahn had $5.1 billion in margin loans against his shares in IEP, which posed a grave risk to Icahn Capital and IEP; (ii) Carl Icahn was in ongoing violation of the securities laws by failing to disclose his margin loans on his Schedule 13D with respect to IEP; and (iii) IEP was in ongoing violation of the securities laws by failing to disclose Carl Icahn's margin loans.

399. Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, intended this concealment to deceive Plaintiff into believing that the Icahn Group had $5.1 billion more liquidity

than it actually did and was not vulnerable to a reputation-damaging SEC investigation and penalties.

400. Icahn Capital, through Brett Icahn, Jesse Lynn, and Carl Icahn, intended these misrepresentations to induce Plaintiff to enter the Employment Agreement. Brett Icahn, for example, demonstrated his intent to deceive by making false and misleading representations and directing Plaintiff to rely upon IEP's securities filings—which Brett Icahn knew illegally concealed the margin loans—to appraise the financial situation of Icahn Capital and the Icahn Group.

401. Plaintiff did consult and rely on these filings, including the 2019 Annual Report, while negotiating and when deciding to enter into the Employment Agreement.

402. The $5.1 billion overstatement of the Icahn Group's liquidity was material to Plaintiff's decision to enter the Employment Agreement because it vastly overstated the funds that would be available to Plaintiff to perform his duties, and thus vastly overstated his profit potential, under the Employment Agreement.

403. The concealment of the ongoing securities violations was material to Plaintiff's decision to enter the Employment Agreement because these violations exposed Plaintiff's professional reputation to potential severe damage by causing him to be associated with the SEC investigation and Cease-and-Desist Orders that could and did result from these violations.

404. Plaintiff would not have entered into the Employment Agreement on the same terms, or any terms, nor forgone alternative employment as a hedge fund Portfolio Manager had either Carl Icahn's margin loans or the ongoing securities violations been disclosed to him.

405. The ongoing concealment of the margin loans during Plaintiff's employment, by means of the misleading "Carl's End of Day report," the filing of additional unlawfully deficient SEC filings, and the continued silence of Carl Icahn and Brett Icahn, further harmed Plaintiff by

misinforming him at the inception of the Bausch Investment and later leading to the liquidation of all of Icahn Capital's Bausch Health voting shares on August 14, 2025, which reduced the compensation Plaintiff was entitled to under the Employment Agreement. *See supra* ¶ 278.

406. "The doctrine of fraudulent concealment tolls the statute of limitations and extends the time for suit under the doctrine of laches 'when a defendant has fraudulently concealed from a plaintiff the facts necessary to put him on notice of the truth.'" *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1214 (Del. Ch. 2022) (quoting *In re Tyson Foods, Inc.*, 919 A.2d 563, 581 (Del. Ch. 2007), *abrogated on other grounds by In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *30 (Del. Ch. Jan. 25, 2016)).

407. "To prevail under the doctrine of fraudulent concealment, a plaintiff must show: (1) defendant's knowledge of the alleged wrong and (2) an affirmative act by defendant to conceal the alleged wrong." *Hydrogen Master Rts., Ltd. v. Weston*, 228 F. Supp. 3d 320, 330 (D. Del. 2017) (citation omitted). Where this doctrine applies, "[t]olling ends when the plaintiff … knew or should have known about the wrongful act." *Collis*, 287 A.3d at 1214.

408. Plaintiff has pleaded that Icahn Capital, through its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, knew of the $5.1 billion margin loans and ongoing securities violations when negotiating the Employment Agreement with Plaintiff. For example, Carl Icahn personally entered the loans, but he nonetheless submitted securities filings that omitted mention of the loans. As a sophisticated investor with sophisticated legal advice, Carl Icahn knew this omission was unlawful.

409. Plaintiff has pleaded also that Icahn Capital, through its representatives Carl Icahn, Brett Icahn, and Jesse Lynn, affirmatively concealed the $5.1 billion margin loans and ongoing securities violations from Plaintiff, including by Carl Icahn and IEP making securities filings that

omitted or only partially disclosed the margin loans, Brett Icahn directing Plaintiff to those filings to appraise Icahn Capital's and the Icahn Group's financial situation when Plaintiff inquired about it, and Brett Icahn making other knowingly false and misleading representations concerning investment funds. *See supra* ¶¶ 292-308; *LGM Holdings, LLC v. Schurder*, 340 A.3d 1134, 1148 (Del. 2025) (holding that fraudulent concealment's affirmative act requirement can be satisfied by "partial disclosure of facts in a misleading or incomplete way") (citation omitted).

410.    Because "the standard remedy for breach of contract is based upon" the "principle of expectation damages," which "require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract," *Duncan*, 775 A.2d at 1022, Plaintiff is entitled to expectation damages in the amount of the Make Whole Bonus. *See supra* ¶ 384. Such an amount "is based upon" Plaintiff's "reasonable expectations," *id.*, because it is comparable to the New Sargon bonus earned by past Icahn Capital Portfolio Managers. Plaintiff is entitled to additional damages to be proven at trial, resulting from lost earnings capacity caused by the reputational harm.

411.    Even if Plaintiff's Employment Agreement were not a continuous contract that tolls the commencement of the statute of limitations until the contract's termination, Icahn Capital's fraudulent concealment would still toll the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation, giving Plaintiff inquiry notice of the margin loans and deficient securities filings.

### FOURTH CAUSE OF ACTION

**(Fraudulent Concealment—IEP, Icahn Capital, Carl Icahn, Brett Icahn**)

412.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

95

413.     Fraudulent concealment occurs when "(1) the [defendants] concealed or failed to disclose a material fact; (2) the [defendants] knew or should have known the material fact should be disclosed; (3) the [defendants] knew their concealment of or failure to disclose the material fact would induce the plaintiffs to act; (4) the [defendants] had a duty to disclose the material fact; and (5) the plaintiff[] detrimentally relied on the misinformation." *Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015) (quotation omitted). The same is true under Delaware law,[32] which requires "(1) Deliberate concealment by the defendant of a material past or present fact, or silence in the face of a duty to speak; (2) That the defendant acted with scienter; (3) An intent to induce plaintiff's reliance upon the concealment; (4) Causation; and (5) Damages resulting from the concealment." *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149 (Del. 1987).

414.     Plaintiff's pleadings in support of his breach of contract claim based on Carl Icahn's $5.1 billion margin loans and Carl Icahn's and IEP's ongoing securities violations (Third Cause of Action), also support his claim for fraudulent concealment.

415.     Carl Icahn and Brett Icahn, individually and as representatives of IEP and Icahn Capital (also represented by Jesse Lynn), deliberately concealed the facts of Carl Icahn's margin loans and the ongoing securities violations from Plaintiff during negotiation of the Employment Agreement, in part by directing Plaintiff to assess Icahn Capital's and Icahn Group's financial situation by securities filings that unlawfully omitted mention of the margin loans and also by Brett Icahn making false and misleading representations concerning available investment funds.

---

[32] Because the choice-of-law clause in Plaintiff's Employment Agreement does not extend to tort claims, *see Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1162 (11th Cir. 2009), each of Plaintiff's tort claims is governed by the law of the state that has the most significant relationship to the claim, *Green Leaf Nursery v. E.I. DuPont De Nemours & Co.*, 341 F.3d 1292, 1301 (11th Cir. 2003), which is generally Florida.

Plaintiff has pleaded that these were material facts because Plaintiff would not have entered into the Employment Agreement on the same terms, or any terms, nor forgone alternative employment as a hedge fund Portfolio Manager had either the margin loans or the ongoing securities violations been disclosed to him.

416. Carl Icahn and Brett Icahn, individually and as representatives of IEP and Icahn Capital, also knew that they should have disclosed Carl Icahn's margin loans and the ongoing securities violations because they knew that these materially affected Icahn Capital's and Icahn Group's financial situation and that an accurate understanding of this situation was necessary for Plaintiff to decide whether to accept employment as a Portfolio Manager at Icahn Capital. Brett Icahn, individually and as a representative of IEP and Icahn Capital, also knew that he should have disclosed this information because Plaintiff directly asked him for information about Icahn Capital's and the Icahn Group's financial situation.

417. Carl Icahn, Brett Icahn, IEP, and Icahn Capital each had a duty to disclose the margin loans and ongoing securities violations, and their submission of deficient securities filings and subsequent failure to disclose the margin loans and securities violations to Plaintiff during negotiation of the Employment Agreement are also silence in the face of a duty to speak. *See Palmer v. Shearson*, 622 So. 2d 1085, 1093 (Fla. 1st DCA 1993) ("violation of the statutory reporting requirements are legally sufficient to show the existence of a legal duty owed" to those harmed by the nondisclosure); *see also Greco v. Columbia/HCA Healthcare Corp.*, No. CIV. A. 16801, 1999 WL 1261446, at *9 (Del. Ch. Feb. 12, 1999) (expressing "little doubt that" "officer[s] of a Delaware corporation" negotiating "a highly expensive contract" "have an affirmative duty to disclose" a personal financial position relevant to the subject of the contract).

418.    Carl Icahn, Brett Icahn, IEP, and Icahn Capital also each acted with scienter because Carl Icahn and Brett Icahn knew about the $5.1 billion margin loans, their materiality to the Employment Agreement, and their duty to disclose the loans in their securities filings, yet intentionally concealed the loans from the SEC and from Plaintiff.

419.    Florida law imputes Carl Icahn's and Brett Icahn's knowledge of materiality and wrongdoing to IEP and Icahn Capital because Carl Icahn and Brett Icahn each deceived Plaintiff when "acting in the course of his employment" at IEP and Icahn Capital. *Nerbonne, N.V. v. Lake Bryan Int'l Props.*, 685 So. 2d 1029, 1032 (Fla. 5th DCA 1997). Likewise, Delaware law imputes Carl Icahn's and Brett Icahn's scienter to IEP and Icahn Capital because, at the time of these acts, Carl Icahn was the Chairman of the Board of the former and the Chief Executive Officer of the latter and Brett Icahn was then engaged as a consultant of IEP, held himself out to Plaintiff as an agent of IEP and Icahn Capital, and knew he would imminently begin serving as a director of IEP and Portfolio Manager at Icahn Capital to whom Plaintiff would report. *See In re Tyson Foods, Inc.*, No. CIV.A. 01-425-SLR, 2004 WL 1396269, at *12 (D. Del. June 17, 2004) (explaining that, for scienter to be imputed to a corporation "scienter must be present with respect to at least one of the officers or agents").

420.    The Icahn Group Defendants intended their concealment to induce Plaintiff to enter the Employment Agreement and knew that it would have this inducing effect.

421.    Defendants' concealment of the $5.1 billion margin loans and ongoing securities violations caused Plaintiff damage by (i) causing the Icahn Group's liquidation of significant portions of the Bausch Investment to pay down part of the loan, which significantly reduced the compensation Plaintiff was entitled to under the Employment Agreement; (ii) inducing Plaintiff to forgo alternative employment as a Portfolio Manager at another firm that was not in an undisclosed

precarious financial situation; and (iii) harming Plaintiff's professional reputation by causing him to be associated with a forced sale of a major investment and an SEC investigation and Cease-and-Desist Orders issued for securities violations. The amount of these damages is to be determined through discovery and proven at trial, not less than the Make Whole Bonus amount above, plus additional damages resulting from lost earnings capacity caused by the reputational harm, plus punitive damages.

422.    The Icahn Group Defendants' fraudulent concealment tolled the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation. *See S.A.P. v. State, Dep't of Health & Rehab. Servs.*, 704 So. 2d 583, 585 (Fla. 1st DCA 1997) (explaining that fraudulent concealment tolls statute of limitations under Florida law).

## FIFTH CAUSE OF ACTION

### (Fraudulent Inducement—IEP, Icahn Capital, Carl Icahn, Brett Icahn)

423.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

424.    The elements of fraudulent inducement are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012) (citation omitted), or, under Delaware's formulation: "1) a false statement or misrepresentation; 2) that the defendant knew was false or made with reckless indifference to the truth; 3) the statement induced the plaintiff to enter the agreement; 4) the plaintiff's reliance was reasonable; and 5) the plaintiff was injured as a result." *ITW Glob. Invs. Inc. v. Am. Indus. Partners*

*Cap. Fund IV, L.P.*, No. CVN14C10236JRJCCLD, 2017 WL 1040711, at *6 (Del. Super. Ct. Mar. 6, 2017) (citation omitted).

425.    Plaintiff's pleadings in support of his breach of contract claim based on Carl Icahn's $5.1 billion margin loans and Carl Icahn's and IEP's ongoing securities violations (Third Cause of Action) and his fraudulent concealment claim (Fourth Cause of Action) also support his fraudulent inducement claim. Plaintiff pleaded that the Icahn Group Defendants knowingly misled Plaintiff into entering into the Employment Agreement by knowingly misrepresenting to him that the Icahn Group and Icahn Capital had $5.1 billion more liquidity than they did and that Carl Icahn and IEP were in ongoing violation of the securities laws by failing to disclose $5.1 billion in margin loans. Plaintiff pleaded that these Defendants intended for him to rely on these misrepresentations to enter into the Employment Agreement, that this reliance was reasonable because Brett Icahn directed him to deficient securities filings to assess Icahn Capital's and IEP's financial situation, and that this reliance caused harm to his compensation and professional reputation because, if not for the fraud, Plaintiff would have accepted alternative employment as a Portfolio Manager at a comparable firm.

426.    Brett Icahn made false statements of material fact to Plaintiff that Mr. Icahn knew to be false and were intended to, and did, induce reliance by Plaintiff including: (i) that it was "conservative" that ███████ would be invested under the Employment Agreements, (ii) that this amount could be as high as $███████, and (iii) that, one month later, this amount could be as high as $███████ without any justification for the $███████ increase.

427.    "[W]here a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed." *Gutter v. Wunker*, 631 So. 2d 1117, 1118–19 (Fla. 4th DCA 1994). An arm's length party "may have no duty to speak, yet 'if he does assume to speak, he must

make a full and fair disclosure as to the matters about which he assumes to speak. He must then avoid a deliberate nondisclosure.'" *Prentice v. R.J. Reynolds*, 338 So. 3d 831, 839–40 (Fla. 2022) (citations omitted).

428.    Brett Icahn's judgment of a "conservative" amount of funds to be invested required him to disclose all material facts relevant to forming such a judgment, including the risk of a debt spiral triggered by the undisclosed margin loans. The "conservative" judgment was a statement of fact, but even if it were an opinion, "[a] statement of a party having … superior knowledge may be regarded as a statement of fact although it would be considered as opinion if the parties were dealing on equal terms." *Vokes v. Arthur Murray*, 212 So. 2d 906, 909 (Fla. 2nd DCA 1968) (citation omitted).

429.    Plaintiff is therefore entitled to an award of damages in an amount to be determined through discovery and proven at trial, not less than the Make Whole Bonus amount, plus additional damages resulting from lost earnings capacity caused by the reputational harm, plus punitive damages.

430.    The Icahn Group Defendants' fraudulent concealment of the $5.1 billion loans and ongoing securities violations from Plaintiff tolled the commencement of the statute of limitations until at least May 2, 2023, when the Hindenburg Research memorandum revealed the incomplete disclosure of the margin loans and prompted an SEC investigation.

## SIXTH CAUSE OF ACTION

**(Tortious Interference with Contract/Business Relationship—Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross)**

431.    Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

101

432.    "The elements of tortious interference with a business relationship are: (1) the existence of a business relationship ... (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship." *Ethan Allen, Inc. v. Georgetown Manor, Inc.*, 647 So. 2d 812, 814 (Fla. 1994) (citation omitted). "An action for intentional interference is appropriate even though it is predicated on an unenforceable agreement, if the jury finds that an understanding between the parties would have been completed had the defendant not interfered." *Id.* Even if the law of New Jersey applied (where Bausch + Lomb and Bausch Health have their corporate headquarters), there would be no difference because it similarly requires "(1) a protected interest; (2) … defendant's intentional interference without justification; (3) a reasonable likelihood that the interference caused the loss of the prospective gain; and (4) resulting damages." *Vosough v. Kierce*, 97 A.3d 1150, 1159 (N.J. App. Div. 2014); *accord MacDougall v. Weichert*, 677 A.2d 162, 174 (N.J. 1996).

433.    Christina Ackermann and Tom Ross, individually and as representatives of Bausch + Lomb and Bausch Health, intentionally interfered with Plaintiff's Employment Agreement with Icahn Capital by insisting on execution and enforcement of a racially discriminatory covenant in the side letter regarding the Director Appointment and Nomination Agreement between Icahn Capital and Bausch + Lomb, which: (1) induced Icahn Capital to breach the implied covenant of good faith and fair dealing in Plaintiff's Employment Agreement; (2) denied Plaintiff the Bausch + Lomb director position that he otherwise would have received as a result of the Employment Agreement; and (3) substantially reduced Plaintiff's profits-based compensation under the Employment Agreement by preventing him from (i) implementing his proven activist strategy for increasing Bausch + Lomb's profitability, (ii) directly opposing the unwise acquisition of XIIDRA,

102

and (iii) implementing better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

434. On February 22, 2021, the date Plaintiff disclosed his employment with Icahn Capital in Bausch Health's directors' and officers' questionnaire, Christina Ackermann was the general counsel of Bausch Health. Plaintiff is informed and believes she received and read the questionnaire because she replied to the email Plaintiff sent to her containing the questionnaire (Ex. J at 59–63).

435. On January 21, 2021, the date Bausch + Lomb and Icahn Capital preliminarily agreed to the discriminatory covenant, Christina Ackermann was still general counsel of Bausch Health.

436. On the date Gary Hu was appointed to the Bausch + Lomb board, June 23, 2022, Christina Ackermann was general counsel of Bausch + Lomb. Her knowledge of Plaintiff's disclosure of the profits-based nature (Ex. J at 83) of his compensation was permitted to travel with her under the confidentiality provisions of the Master Separation Agreement by and between Bausch Health and Bausch + Lomb and is thereby imputed to Bausch + Lomb.

437. Bausch Health and Bausch + Lomb, being advised by outside activist-defense bankers and law firms, either knew about the profit-based terms of Plaintiff's employment, which had been publicly disclosed by IEP's October 1, 2020, press release and accompanying Form 8-K filing, or knew generally about the profits-based compensation arrangements of activist hedge funds, in particular those of Icahn Capital. Christina Ackermann, as an experienced lawyer, and Tom Ross, as a former judge, also knew that Plaintiff's Employment Agreement contained an implied covenant of good faith and fair dealing by operation of state law and that racial discrimination by Icahn Capital against Plaintiff would materially breach that covenant. Bausch

Health and Bausch + Lomb knew the same through the knowledge of their representatives Ms. Ackermann and Mr. Ross and separately through the advice of inside and outside counsel.

438. Bausch Health and Bausch + Lomb, through their employment of Christina Ackermann, Tom Ross, and others, knew that Plaintiff's Employment Agreement would have caused Plaintiff's appointment as a director of Bausch + Lomb because Plaintiff's name appeared four times in the draft Director Appointment and Nomination Agreement that Ms. Ackermann edited with Mr. Ross's review and approval, and the prospect of Plaintiff's appointment was the impetus for Ms. Ackermann and Mr. Ross to insist on a racially discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement.

439. Bausch Health and Bausch + Lomb, through their shared representatives Christina Ackermann and Tom Ross, demanded and obtained the racially discriminatory covenant from Icahn Capital in the Side Letter regarding the Director Appointment and Nomination Agreement and applied it against Plaintiff to unjustifiably prevent his appointment to Bausch + Lomb's board.

440. This intentional act by Bausch + Lomb and Bausch Health induced Icahn Capital to breach the Employment Agreement with Plaintiff, namely the implied covenant of good faith and fair dealing thereunder, by causing Icahn Capital to participate in intentional race discrimination against Plaintiff.

441. This same act further interfered with Plaintiff's Employment Agreement by preventing it from operating to cause Plaintiff's appointment to Bausch + Lomb's board, as it otherwise would have.

442. This same act further interfered with Plaintiff's Employment Agreement by foreseeably reducing his profits-based compensation under it as a result of his inability to (i) implement his proven activist strategy for increasing Bausch + Lomb's profitability as a

member of its board, (ii) formally oppose the unwise acquisition of XIIDRA, and (iii) implement better-informed investment decisions as a Portfolio Manager through his firsthand knowledge of Bausch + Lomb's long-term prospects as a director.

443. Bausch + Lomb's, Bausch Health's, Christina Ackermann's, and Tom Ross's insistence on and enforcement of the racially discriminatory covenant is unjustified, used improper means, and had improper motives because the covenant itself is illegal on its face, was intended to discriminate against Plaintiff on the basis of his race (*see supra* ¶¶ 344, 354),was made self-servingly in breach of Tom Ross's fiduciary duty to Bausch + Lomb and Bausch Health, to protect his own board seat, was against the best interests of each company and its respective shareholders because of the material liability it created, was unlawfully concealed from the shareholders and regulators by Christina Ackermann because of its wrongfulness, was not a suitable exercise of business judgment, and was against public policy, including under Section 1981. Sufficient "bad motive" under Florida law exists in a "tortious interference claim where [the] sole basis for defendant's interference was plaintiff's race." *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1294 & n.9 (11th Cir. 2001) (citing *Nizzo v. Amoco Oil Co.*, 333 So. 2d 491, 493 (Fla. 11th DCA 1976)).

444. Plaintiff here specifically realleges the injury allegations in his breach of contract claim based on race discrimination (Second Cause of Action).

445. Plaintiff is additionally entitled to an award of punitive damages.

## **SEVENTH CAUSE OF ACTION**

### **(Unjust Enrichment—Tom Ross, Gary Hu)**

446. Plaintiff hereby repeats and realleges the allegations in Paragraphs 1 through 338 as if fully set forth herein.

447.    Assuming Delaware law applies to this claim, "the standard Delaware formulation" of unjust enrichment looks for "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Garfield on behalf of ODP Corp. v. Allen*, 277 A.3d 296, 341 (Del. Ch. 2022) (quoting *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010)). "Outside of a dispute over jurisdiction, however, it is not necessary for a plaintiff to plead or later prove the absence of an adequate remedy at law." *Id.* at 351. Nor need a claimant "suffer an actual financial loss" if he was "deprived of the benefit unjustifiably conferred upon the defendant," *id.* at 345, because "the restitutionary recovery is not, as in damages, the *harm* to the plaintiff, but rather the *benefit* received by the defendant," *id.* at 344.

448.    Tom Ross received ongoing director's fees from his seat on the Bausch + Lomb board only because he directed Christina Ackermann to insist upon the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement to prevent Plaintiff's appointment to the board in favor of a non-white candidate, since only this would prevent ISS from recommending that shareholders vote against Tom Ross beginning with the initial April 24, 2023 Annual General Meeting. *See supra* ¶ 98. These fees enriched Tom Ross by no less than $1,165,900 within the three-year limitations period.

449.    Tom Ross's insistence that Bausch + Lomb engage in discrimination so that he could continue serving on the board caused him to receive this benefit of director's fees, which Plaintiff would have received instead, if not for Tom Ross's discrimination to protect himself at Plaintiff's expense. Plaintiff was thus impoverished by Tom Ross's enrichment. *See Garfield*, 277 A.3d at 345.

450.     This intentional race discrimination was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

451.     Plaintiff is accordingly entitled to restitution in an amount not less than $1,165,900, the amount of director's fees Tom Ross received within the three-year limitations period as a result of discriminating against Plaintiff.

452.     Gary Hu received director's fees from his seat on the Bausch + Lomb board only because the discriminatory covenant in the Side Letter regarding the Director Appointment and Nomination Agreement prevented Plaintiff's appointment to the board by requiring that the appointee be non-white. These fees enriched Gary Hu by no less than $966,589 within the three-year limitations period.

453.     Gary Hu retained these fees even though he knew that he had been appointed rather than Plaintiff only because of their race and that Plaintiff performed many of the duties of a Bausch + Lomb director, which Gary Hu neglected and willingly allowed Plaintiff to perform without compensation. Gary Hu even plagiarized Plaintiff's questions and requests without attribution on multiple occasions. Gary Hu further participated in Bausch Health's, Bausch + Lomb's, Christina Ackermann's, and Tom Ross's racial discrimination against Plaintiff by acting as Plaintiff's "chaperone" at Christina Ackermann's insistence from January 4, 2023, onward.

454.     Gary Hu would not have received director's fees had he not willingly participated in intentional race discrimination against Plaintiff. If not for the intentional race discrimination against Plaintiff, Plaintiff would have received these fees instead.

455. Gary Hu's participation in intentional race discrimination against Plaintiff was without justification and, because there is no question that this Court has jurisdiction to hear this case, Plaintiff need not show absence of a remedy at law.

456. Plaintiff is accordingly entitled to restitution in an amount not less than $966,589, the amount of director's fees Gary Hu received within the three-year limitations period as a result of his participation in intentional discrimination against Plaintiff.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendants, containing the following relief:

A. A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate 42 U.S.C. § 1981;

B. A declaratory judgment that Icahn Capital breached the implied covenant of good faith and fair dealing under Plaintiff's Employment Agreement dated October 1, 2020;

C. A declaratory judgment that IEP, Icahn Capital, Carl Icahn intentionally misrepresented and fraudulently concealed Icahn Capital's and the Icahn Group's financial situation during and after negotiation of the Employment Agreement with Plaintiff;

D. A declaratory judgment that IEP, Icahn Capital, Carl Icahn, and Brett Icahn fraudulently induced Plaintiff to enter into the Employment Agreement with Icahn Capital;

E. A declaratory judgment that Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross tortiously interfered with Plaintiff 's Employment Agreement with Icahn Capital.

F. An injunction and order that Bausch + Lomb appoint Plaintiff to its board of directors effective immediately, that Bausch + Lomb award Plaintiff back pay in an amount to be proven at trial, that Bausch + Lomb continue to nominate Plaintiff alongside its other director

candidates in its own proxy statement for election at each subsequent annual general meeting until Plaintiff has served for 15 years; or, in the alternative, an award of back and front pay in an amount not less than $5,250,000;

G.      The same injunction and order with respect to Bausch Health; or, in the alternative, an award of back and front pay in an amount not less than $3,850,000;

H.      An award of damages, back pay, and front pay against all Defendants to compensate Plaintiff for all the economic harm he suffered from disparate treatment based on his race in an amount to be determined at trial not less than $221,757,417, plus prejudgment interest;

I.      An award of damages against the Icahn Group for breaching Plaintiff's Employment Agreement, intentionally misrepresenting Icahn Capital's financial situation to him, and fraudulently inducing him to enter into the Employment Agreement with Icahn Capital in an amount to be determined at trial not less than $171,456,631, plus prejudgment interest;

J.      An award of damages against Bausch + Lomb, Bausch Health, Christina Ackermann, and Tom Ross for tortiously interfering with Plaintiff's Employment Agreement with Icahn Capital in an amount to be determined at trial not less than $181,586,695, plus prejudgment interest;

K.      An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all mental anguish and emotional pain and suffering;

L.      An award of back pay, front pay, and damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation, earnings capacity, and loss of career fulfillment;

M.      An award of punitive damages in an amount to be proven at trial;

N.      An award of restitution against Tom Ross in an amount not less than $1,245,164;

O.     An award of restitution against Gary Hu in an amount not less than $966,589;

P.     An award of costs that Plaintiff has incurred in this action, as well as Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

Q.     Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Respectfully submitted this 5th day of February 2026.

<div style="text-align:right">

/s/ Emily Percival
Gene Hamilton (*pro hac vice*)
Emily Percival (Fla. Bar No. 119313)
Will Scolinos (*pro hac vice*)
James Rogers (*pro hac vice*)
America First Legal Foundation
611 Pennsylvania Avenue SE #231
Washington, D.C. 20003
(301) 893-4177
emily.percival@aflegal.org
william.scolinos@aflegal.org
james.rogers@aflegal.org

Jared M. Kelson (*pro hac vice*)
Jim Wedeking (*pro hac vice*)
Nicholas A. Cordova (*pro hac vice*)
Boyden Gray PLLC
800 Connecticut Ave. NW
Suite 900
Washington DC 20006
(202) 955-0620
jkelson@boydengray.com
jwedeking@boydengray.com
ncordova@boydengray.com

*Counsel for Plaintiff*

</div>

Complaint Ex. A

*STRICTLY CONFIDENTIAL*
*Execution Version*

**SIDE LETTER**

Reference is made to the Director Appointment and Nomination Agreement, dated as of April __, 2022 (the "**Agreement**"), by and among the persons and entities listed on Schedule A to the Agreement (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**") (capitalized terms used but not defined in this side letter (this **"Side Letter"**) shall have the meanings given such terms in the Agreement). In consideration of and reliance upon the mutual covenants and agreements contained in the Agreement and this Side Letter, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(i) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the **"Policy"**) would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.

2.   **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Side Letter and to perform its obligations hereunder; (b) this Side Letter has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Side Letter will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

3.   **Miscellaneous Provisions.** The provisions of Sections 9, 10, 11, 12, 13, 14, 15, 16, 17 and 18 of the Agreement are incorporated into this Side Letter mutatis mutandis.

[Signature Pages Follow]

Complaint Ex. A 0001

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Side Letter or caused the same to be executed by its duly authorized representative as of the date first above written.

<div align="center">

**BAUSCH + LOMB CORPORATION**

</div>

By: _____
Name:
Title:

[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0002

**ICAHN GROUP**

CARL C. ICAHN

_____

Carl C. Icahn

ICAHN PARTNERS LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN PARTNERS MASTER FUND LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By: _____
Name: Ted Papapostolou
Title: Chief Financial Officer

[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0003

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By:    _____
Name:  Ted Papapostolou
Title: Chief Financial Officer

IPH GP LLC

By:    _____
Name:  Jesse Lynn
Title: Chief Operating Officer

ICAHN CAPITAL LP

By:    _____
Name:  Jesse Lynn
Title: Chief Operating Officer

ICAHN ONSHORE LP

By:    _____
Name:  Jesse Lynn
Title: Chief Operating Officer

ICAHN OFFSHORE LP

By:    _____
Name:  Jesse Lynn
Title: Chief Operating Officer

BECKTON CORP

By:    _____
Name:  Jesse Lynn
Title: Vice President

[Signature Page to Side Letter regarding the Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. A 0004

# Complaint Ex. B

# BLCO side letter

**Steven Miller** <SMiller@icahncap.com>
01/09/2023 at 11:26 AM

| | |
|---|---|
| **From:** | **Steven Miller** <SMiller@icahncap.com> |
| **Sent:** | 01/09/2023 at 11:26 AM |
| **To:** | **Brett Icahn** <Blcahn@sfire.com>,  **Jesse Lynn** <JLynn@sfire.com> |
| **Cc:** | |

📎 1 Attachment(s) Total 34.3 KB   View ⌃

📄 B+L SIDE LETTER (00544982).docx (34.3 KB)

Brett / Jesse,

███████████████████████████████████████
███████████████

███████████████████████████████████████
████████████████████                    Here's a blurb:

"42 U.S.C. § 1981 prohibits race discrimination in the making and enforcing of contracts. It prohibits racial discrimination against whites as well as nonwhites. *See McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 295 (1976) (Section 1981 was intended to "proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race"). In *Runyon v. McCrary, 427 U.S. 160 (1976)*, the Supreme Court held that Section 1981 regulated private conduct as well as governmental action." – Third Circuit model jury instructions memo (2020)

███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████████
████████████████████████     █████████████

Complaint Ex. B 0001

Case 1:25-cv-25893-BB   Document 54-2   Entered on FLSD Docket 05/09/2026   Page 141 of
1550

**Steven Miller**

Portfolio Manager

Icahn Capital LP

16690 Collins Avenue, PH

Sunny Isles Beach, FL 33160

T: (305) 422-4103

E: smiller@icahncap.com

Complaint Ex. B 0002

# Complaint Ex. C

Case 1:25-cv-28393-BB   Document 65-43   Entered on FLSD Docket 05/22/2026   Page 135 of 90
1550

Case 1:25-cv-23933-BB Document 68-3 Entered on FLSD Docket 05/22/2026 Page 155 of 90
1550

Case 1:25-cv-25393-BB   Document 63   Entered on FLSD Docket 05/22/2026   Page 26 of 90
1550

Case 1:25-cv-25393-BB   Document 65   Entered on FLSD Docket 05/22/2026   Page 165 of 1550

Case 1:25-cv-25393-BB Document 65-3 Entered on FLSD Docket 05/22/2026 Page 37 of 90

1550

Case 1:25-cv-23933-BB   Document 6-33   Entered on FLSD Docket 05/02/2026   Page 367 of 1550

Case 1:25-cv-25393-BB Document 65-3 Entered on FLSD Docket 05/22/2026 Page 138 of 90
1550

EX-10.1 2 tm2032213d1_ex10-1.htm EXHIBIT 10.1

**Exhibit 10.1**

## MANAGER AGREEMENT

Manager Agreement (the "Agreement") made as of 12:01 a.m. ET on the 1st day of October, 2020 (the "Execution Time"), by and among **Icahn Enterprises L.P.**, a Delaware limited partnership ("IEP"), **Icahn Capital LP**, a Delaware limited partnership (the "General Partner" and together with IEP, the "Employer"), **Brett Icahn** (the "Employee"), **Isthmus LLC**, a Delaware limited liability company wholly owned by the Employee ("Isthmus"), **Icahn Partners LP**, a Delaware limited partnership ("Icahn Partners"), and **Icahn Partners Master Fund LP**, a Delaware limited partnership ("Icahn Master" and together with Icahn Partners, the "Funds", which term will also include any and all other private investment funds or other entities that are Affiliates of the Employer that may, from time to time, hereafter be designated as a Fund by written notice from the Employer to the Employee). Unless otherwise defined herein a capitalized term used herein shall have the meaning attributed to it in Section 16 hereof.

RECITALS:

The General Partner operates the Funds.

As further described in the LPA, the Funds will include two separately tracked investment portfolios: (i) new investment positions in Securities which will be managed pursuant to Section 4 (the "Mesa Portfolio") and (ii) new investment positions in Securities which will be managed pursuant to Section 5 (the "River Portfolio").

The activities of the Mesa Portfolio and the River Portfolio will be conducted under this Agreement, and the securities of the Mesa Portfolio and the River Portfolio will be acquired, held and disposed of by the Funds, but such activities will be tracked as separate portfolios for purposes of determining the Profit-Sharing Payment under this Agreement. Isthmus shall make and hold investments in the Mesa Portfolio and the River Portfolio through the Co-Investment Portfolio pursuant to this Agreement and the LPA, and the profit and loss associated with the Co-Investment Portfolio shall be allocated to Isthmus in accordance with the LPA and shall not be taken into account in the Calculation of the Profit-Sharing Payment.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, desiring to be legally bound, hereby agree as follows:

1.        **Termination of Prior Relationships**. Except for (i) his right under any indemnity agreement or indemnity obligation now existing, (ii) his right under the RSU Agreement and (iii) the rights of the Employee expressly set forth in this Agreement, the Employee has no other contracts, agreements, rights, partnership or membership interests, profit rights or participations, or claims, against or relating to, any member of the Icahn Group of any kind or character, direct or indirect and any and all such contracts, agreements, rights, partnership or membership interests, profit rights or participations, and claims, if any, are hereby terminated, waived and released in all respect and are and shall be null and void and have no force or effect. In particular, the Employee is not entitled to any past or future base salary or bonus, and is not entitled to receive any salary or bonus in respect of the services he is to provide hereunder or any other payment or compensation, other than as expressly set forth in this Agreement and the RSU Agreement. Employee is not entitled to participate in the Icahn Enterprises L.P. Severance Pay Plan, or any other severance plan or program maintained by Employer or its Affiliates.

1

Complaint Ex. C 0044

2.     **Employment/Title/Benefits**. Subject to the terms of this Agreement, the Employer hereby employs the Employee to perform the duties described in Section 3(b), and the Employee hereby accepts such employment. During the term of his employment, the Employee shall serve as the Portfolio Manager of the Mesa Portfolio. The Employee hereby waives irrevocably all rights that the Employee (and/or, to the extent legally permissible, his future spouse and eligible children) may now or in the future have to participate in any and all benefit programs that the Employer makes available to its employees, including, without limitation, with respect to health insurance (medical, vision and dental), group term life insurance plan and disability coverage.

3.     **Term and Duties**.

(a)     Term. The term of employment will begin at the Execution Time and will end at 11:59 p.m. ET on September 30, 2027 (the "Term End") unless such employment ceases prior to the Term End for any reason.

(b)     Duties. The Employee will (a) act as the Portfolio Manager of the Mesa Portfolio and (b) provide the River Services upon the request of the Employer which are described to Employee prior to the time he elects to participate in a position to be held in the River Portfolio, in each case subject to and in accordance with the terms and provisions of this Agreement and the LPA. In addition, the Employee will provide research, analysis and advice with respect to Employer Positions from time to time as reasonably requested by the Employer. Except as provided in this Section 3(b) and Section 3(c), Employee shall have no other duties or responsibilities hereunder.

(c)     Board Seats. At the Execution Time, the Employee will be appointed as a director of IEPGP. In addition, the Employee may from time to time be requested by the Employer to act as a director of one or more issuers of Securities that are held in the Mesa Portfolio and/or the River Portfolio (each such entity, a "Portfolio Company") and the Employee agrees, subject to Section 17 of this Agreement, that he will fully cooperate with the Employer to stand for election/appointment to the board of any Portfolio Company designated by the Employer; provided, that, his failure to be elected or appointed to the board of any Portfolio Company shall not be a breach of this Agreement for any purpose. So long as the Employee remains employed by the Employer or, if Employee continues to be eligible to receive the Profit-Sharing Payment following the delivery of a Ride Notice, during the Non-Compete Period (as such term is defined in Section 13(b) below and modified by Section 13(c)), the Employee agrees that he will:

(x)     not resign during the then current term as a director of IEPGP or any Portfolio Company on whose board he is serving at the request of the Employer (but the Employee will not be required to accept any additional appointment or election to the board of IEPGP or any Portfolio Company following the last day of his employment by the Employer); and

(y)     resign from the board of directors of IEPGP and/or any Portfolio Company within five (5) business days following the request of the Employer that he do so.

2

Complaint Ex. C 0045

Any remuneration or other property obtained by the Employee as a result of acting as a board member of any Portfolio Company during the Term and thereafter shall remain the property of the Employee and shall not otherwise off-set or reduce, directly or indirectly, any rights to the Profit-Sharing Payment contemplated hereunder. In addition, as of the Execution Time, Employee serves on the Board of Directors of Newell Brands and the parties hereto agree that Employee's continued service on such board shall not violate this Agreement and/or any Policy that is applicable to Employee and any remuneration otherwise payable to Employee in respect of such service shall remain the property of Employee.

4.      **The Mesa Portfolio**.

(a)      <u>Mesa Operations</u>. The Mesa Portfolio may, pursuant to this Agreement, make only Permitted Investments. Once an investment has been designated as a Permitted Investment pursuant to the terms of this Agreement, all decisions relating to the timing, frequency, prices, quantities and all other matters concerning the: (x) purchase of any Securities comprising such Permitted Investment shall be made in the sole and absolute discretion of the Employer; <u>provided</u>, <u>however</u>, that in no event shall Isthmus be required to co-invest more than the Isthmus Amount to an investment in any single issuer without the prior written consent of the Employee; and (y) Sale of any Securities comprising such Permitted Investment shall, subject to the provisions of Section 4(d) below, be made only with the mutual consent of the Employer and the Employee.

Without limiting the foregoing, once an investment has been designated as a Permitted Investment for purposes of this Agreement, all other decisions regarding such Permitted Investment (including, without limitation, general strategy, actions that would result in or require any regulatory filing that would disclose a Permitted Investment publicly, and the content of any such filing or any press release, letter or other public statement regarding any Permitted Investment), shall be made by the Employer in its sole and absolute discretion; <u>provided</u>, <u>however</u>, that the Employer may, but shall not be required to, consult with the Employee regarding such matters.

(b)      <u>Co-Investment Portfolio</u>. With respect to any Permitted Investment to be made by the Mesa Portfolio, the Employer and Isthmus (in each case through capital contributions made to the Funds as required by this Agreement) shall co-invest in such Permitted Investment in the Buying Ratio until the Isthmus Amount has been reached, measured on an investment by investment basis (i.e., Isthmus is never required to invest more than $7,500,000 in any one Permitted Investment). Within one (1) business day following such time, if any, that the Isthmus Amount has been reached, the Employee must elect in writing to cause Isthmus to either: (x) continue co-investing in such Permitted Investment (which Isthmus shall have the right, but no obligation, to do without limit, but any such further co-investments shall be made only in the Buying Ratio); or (y) cease co-investing in such Permitted Investment, in which case (or if the Employee has not made any election within such one (1) business day period), the Employee may not, for the remainder of the Term, elect to cause Isthmus to resume co-investing in such Permitted Investment; <u>provided</u>, <u>however</u>, that if any further purchase of such Permitted Investment is proposed by the Employer to be made following an election by Isthmus to cease co-investing, then the Employee may elect to cause Isthmus to resume co-investing in such Permitted Investment (but any such further co-investments shall be made only in the Buying Ratio). In any case (i.e., whether the Employee elects to cause Isthmus to continue co-investing in such Permitted Investment, elects to cause Isthmus to cease co-investing in such Permitted Investment or makes no election), once the Isthmus Amount has been reached, any further purchases of such Permitted Investment during the Term (x) must be conducted through the Mesa Portfolio and (y) shall be taken into account in the Calculation of the Profit-Sharing Payment.

3

Complaint Ex. C 0046

10/16/25, 1:59 PM

(c)        Limitations With Respect to Mesa Portfolio. Unless the Employer and the Employee have consented in writing or as otherwise expressly permitted by this Agreement, during the Term:

(i) the Mesa Portfolio shall not purchase or Sell any River Positions, Employer Positions, Employee Positions, Rejected Positions (except as set forth in clause (ii) below) or Eligible Positions;

(ii) neither the Employer nor its Affiliates shall purchase or Sell: (x) outside of the Mesa Portfolio any Mesa Positions; (y) any Employee Positions; or (z) any Rejected Position, unless the Employer shall have notified the Employee in writing of the Employer's intention to do so (which the Employer shall be entitled to do regardless of whether the Employee or his Affiliates shall have previously made any purchases of such Rejected Position), in which case the Employee shall have two (2) business days following the time of delivery of such notice in which to elect to either (i) permit the Employer and its Affiliates to buy such Rejected Position outside of the Mesa Portfolio from time to time during the Term without limit or (ii) require that such Rejected Position be purchased by the Mesa Portfolio (but the Employee may only make this election if the Employee has, within such two-business day period, agreed in writing to cause Isthmus to contribute, or otherwise irrevocably make available to the Funds, in accordance with the Funding Protocol, not less than the Isthmus Amount to fund the purchase by the Funds of Isthmus' pro-rata portion of such Rejected Position), it being understood and agreed that if the Employee fails to make any election within such two-business day period then the Employee shall be deemed to have elected the option set forth in the foregoing clause (i); and

(iii) neither the Employee nor his Affiliates shall purchase or Sell: (w) outside of the Mesa Portfolio any Mesa Positions; (x) any Employer Positions; (y) any Employee Positions; or (z) any Eligible Positions.

For the avoidance of doubt, during the Term: (A) neither the Employee nor his Affiliates shall be prohibited from purchasing or Selling any Rejected Positions outside of the Mesa Portfolio prior to such time, if any, that such Rejected Positions are purchased by the Mesa Portfolio pursuant to clause (ii) above; and (B) neither the Employer nor its Affiliates shall be prohibited from purchasing or Selling any Eligible Positions outside of the Mesa Portfolio or proposing any Eligible Positions for purchase by the River Portfolio.

From and after the time of cessation of the Employee's employment under this Agreement for any reason (including as a result of a Terminating Event, a termination by the Employer for Cause and a resignation by the Employee other than by means of a Permitted Resignation): (x) neither the Employee nor his Affiliates shall have any right or obligation to co-invest with the Mesa Portfolio; (y) if a Ride Notice has been timely delivered by the Employee, neither the Employee nor his Affiliates shall purchase or Sell any Mesa Positions (including any Mesa Positions that have been distributed by the Funds to the Employee or his Affiliates) prior to the Term End without the prior written consent of the Employer (which consent may be granted or withheld by the Employer in its sole and absolute discretion); and (z) if a Ride Notice has not been timely delivered by the Employee, the provisions of this Section 4(c) (other than this paragraph) shall have no further force or effect; provided, however, that neither the Employee nor his Affiliates shall purchase or Sell any Mesa Positions (including any Mesa Positions that have been distributed by the Funds to the Employee or his Affiliates) prior to the date that is one (1) year following the time of cessation of the Employee's employment under this Agreement without the prior written consent of the Employer (such consent not to be unreasonably withheld).

4

Complaint Ex. C 0047

(d)        <u>Sales of Mesa Positions</u>. Notwithstanding the provisions of Section 4(a), (b) and (c):

(i)        the Employer shall have the right to cause the Funds to Sell any or all of the Mesa Positions, at any time and from time to time, and without the consent of the Employee; <u>provided</u>, <u>however</u>, that: (x) any such Sale of a Mesa Position by the Employer that is not a Permitted Sale shall be deemed for all purposes of this Agreement to be, and shall have the consequences of, a termination of this Agreement by the Employer without Cause; and (y) the Employer shall in no event cause the Funds to Sell any Securities attributable to the Co-Investment Portfolio without the prior written consent of the Employee (but the Employer must, subject to the provisions of Section 14(n), offer Isthmus the opportunity to Sell any such Securities on a pro-rata basis with the Funds); and

(ii)        notwithstanding clause (i) above, the Employer shall have the right to direct the Employee to cause the Funds to Sell any or all of the Mesa Positions, and no such Sale shall be treated as a termination of this Agreement by the Employer without Cause, but the Employer must exercise this right by providing Isthmus written notice thereof at a time that is not less than six (6) months prior to the Term End (any such notice delivered by the Employer shall be referred to as the "<u>Sale Notice</u>"; any Mesa Positions included in the Sale Notice shall be referred to as the "<u>Designated Positions</u>"; and all Mesa Positions not included in the Sale Notice shall be referred to as the "<u>Remaining Positions</u>"); provided, however, that the Employer shall not be permitted to include in the Sale Notice any Mesa Position which constitutes a Large Position as of the time of delivery of the Sale Notice (i.e., all Mesa Positions constituting Large Positions as of the time of delivery of the Sale Notice shall automatically be deemed to be Remaining Positions). If the Employer does not deliver a timely Sale Notice, then all Mesa Positions shall be deemed to be Remaining Positions. If the Employer delivers timely a Sale Notice to Isthmus, then Isthmus shall use best efforts to cause the Funds to Sell all the Designated Positions prior to the Term End but the timing and manner of all such Sales may be conducted at the discretion of the Employee. Any Designated Positions which are not Sold prior to the Term End, may, at the election of the Employer, be Sold by, and at the discretion of, the Employer during the 30-day period following the Term End.

<div align="center">5</div>

Complaint Ex. C 0048

5. **The River Portfolio**.

(a)       From time to time following the Execution Time, the Employer may request that the Employee and the NSAs provide services in relation to identified Securities and propose to the Employee that investments related to such Securities be included in the River Portfolio (it being understood, acknowledged and agreed that the Employer has no obligation to make any such proposals and may pursue any such transactions outside of the River Portfolio in its sole and absolute discretion). Each such proposal will include reasonable detail regarding the scope of requested services, which may include research, analysis and advice as to the relevant Securities and/or board service requirements for the Employee, among other matters. The services contemplated by this paragraph, collectively, the "River Services". All such River Services shall be disclosed to Employee prior to the time any position is proposed to be included in the River Portfolio and no new services may be assigned to Employee without his express written consent after a position has been included in the River Portfolio.

(b)       If, within one week of any proposal from the Employer regarding any Securities to be included in the River Portfolio, the Employee elects that Isthmus will: (x) co-invest in the Securities of such issuer and Isthmus has agreed in writing to contribute, or otherwise irrevocably make available to the Funds, in accordance with the Funding Protocol, the Isthmus Amount with respect to such Securities, then (A) the Employee shall provide the requested River Services with respect to such Securities and (B) except as otherwise provided in this Section 5, any purchase or Sale of such issuer's Securities shall be conducted by the River Portfolio and shall be subject to all of the other terms of this Agreement; or (y) not co-invest in the Securities of such issuer, or if the Employee does not make any election within such one week period, then the River Portfolio will not purchase Securities of such issuer and, at the discretion of the Employer, the Employer and its Affiliates may purchase and Sell such issuer's Securities outside of the River Portfolio.

(c)       All decisions relating to the timing, frequency, prices, quantities and all other matters concerning the purchase and/or Sale of any River Positions shall be made in the sole and absolute discretion of the Employer; provided, however, that in no event shall: (x) Isthmus be required to provide more than the Isthmus Amount to an investment in any single issuer without the prior written consent of the Employee; and (y) the Employer cause the Funds to Sell any Securities attributable to Isthmus' co-investment in any River Positions without the prior written consent of the Employee (but the Employer must, subject to the provisions of Section 14(n), offer Isthmus the opportunity to Sell any such Securities on a pro-rata basis with the Funds).

(d)       Without limiting the foregoing, once an investment has been designated as a River Position for purposes of this Agreement, all other decisions regarding such River Position (including, without limitation, general strategy, actions that would result in or require any regulatory filing that would disclose a River Position publicly, and the content of any such filing or any press release, letter or other public statement regarding any River Position), shall be made by the Employer in its sole and absolute discretion; provided, however, that the Employer may, but shall not be required to, consult with the Employee regarding such matters.

6

Complaint Ex. C 0049

(e)        The Employer and Isthmus (in each case through capital contributions made to the Funds as required by this Agreement) shall co-invest in each River Position in the Buying Ratio until the Isthmus Amount has been reached, measured on an investment by investment basis (i.e., Isthmus is never required to invest more than $7,500,000 in any one River Position). Within one (1) business day following such time, if any, that the Isthmus Amount has been reached, the Employee must elect in writing to cause Isthmus to either: (x) continue co-investing in such River Position (which Isthmus shall have the right, but no obligation, to do without limit, but any such further co-investments shall be made only in the Buying Ratio); or (y) cease co-investing in such River Position, in which case (or if the Employee has not made any election within such one (1) business day period), the Employee may not, for the remainder of the Term, elect to cause Isthmus to resume co-investing in such River Position. If the Employee elects to cause Isthmus to continue co-investing in such River Position, then, until such time as the Employee elects to cause Isthmus to cease co-investing in such River Position, any further purchases of such River Position during the Term (x) must be conducted through the River Portfolio and (y) shall be taken into account in the Calculation of the Profit-Sharing Payment. If the Employee elects to cause Isthmus to cease co-investing in such River Position (including after an election to continue co-investing) or makes no election within such one-business day period, then: (a) the River Portfolio shall terminate all further investment in such issuer; (b) the Employee and his Affiliates (including Isthmus) may not purchase or Sell any Securities of such issuer outside of the River Portfolio during the Term without the written consent of the Employer; (c) the Employer may elect, in its sole discretion, to purchase additional Securities of the relevant issuer outside of the River Portfolio; (d) the Securities of such issuer owned by the River Portfolio through the time at which such election is made will be included in the Calculation of the Profit-Sharing Payment; and (e) none of such Securities of such issuer purchased by the Employer outside of the River Portfolio as permitted by this Agreement will be included in the Calculation of the Profit-Sharing Payment.

(f)        Unless the Employer and the Employee have consented in writing or as otherwise expressly permitted by this Agreement, during the Term: (x) the River Portfolio shall not purchase or Sell any Mesa Positions, Employer Positions, Employee Positions and/or any Rejected Positions; and (y) neither the Employer or its Affiliates, nor the Employee or his Affiliates, shall purchase or Sell outside of the River Portfolio any River Positions.

From and after the time of cessation of the Employee's employment under this Agreement for any reason (including as a result of a Terminating Event, a termination by the Employer for Cause and a resignation by the Employee other than by means of a Permitted Resignation): (x) neither the Employee nor his Affiliates shall have any right or obligation to co-invest with the River Portfolio; (y) if a Ride Notice has been timely delivered by the Employee, neither the Employee nor his Affiliates shall purchase or Sell any River Positions (including any River Positions that have been distributed by the Funds to the Employee or his Affiliates) prior to the Term End without the prior written consent of the Employer (which consent may be granted or withheld by the Employer in its sole and absolute discretion); and (z) if a Ride Notice has not been timely delivered by the Employee, the provisions of this Section 5(f) (other than this paragraph) shall have no further force or effect; provided, however, that neither the Employee nor his Affiliates shall purchase or Sell any River Positions (including any River Positions that have been distributed by the Funds to the Employee or his Affiliates) prior to the date that is one (1) year following the time of cessation of the Employee's employment under this Agreement without the prior written consent of the Employer (such consent not to be unreasonably withheld).

7

Complaint Ex. C 0050

6.      **Staff**. The Employee will manage up to three portfolio managers ("NSAs") who will be employed by the Employer to work on the Mesa Portfolio and the River Portfolio pursuant to the agreements attached hereto as **Exhibit A** (all such agreements collectively, the "NSAs Agreements"). For the avoidance of doubt, Employee shall not be deemed to be in breach of this Agreement for any reason if the Employer fails to hire or retain any NSA and/or any NSA breaches his or her NSA Agreement or other Policy applicable to such individual. In addition, for purposes of this Agreement and the Calculations contemplated hereby, the aggregate Amount of any "Base Salary" and "Bonus Amounts" (as set forth in Exhibit A of the NSA Agreements) for each NSA shall not exceed the Amounts set forth in the NSAs Agreements attached as Exhibit A to this Agreement without the express written consent of the Employee.

7.      **Profit-Sharing Payment**.

(a)      Calculation. Subject to the terms and provisions of this Agreement, as of the Final Time, the Employee will become entitled to receive from the Employer, at the Manager Payment Time, a one-time payment (the "Profit-Sharing Payment") in an Amount equal to (x) the Final Manager Amount minus (y) the Offset Amount. If the Offset Amount is greater than the Final Manager Amount, then Isthmus or the Employee shall pay to the Employer, within five (5) business days following the Employee's receipt of written notice from the Employer, an Amount equal to the Excess Amount, which payment obligations shall constitute full recourse liability debt of Isthmus and the Employee. In the event that the Employee does not deliver the Excess Amount, if any, to the Employer in a timely manner, the Employer shall be entitled to withhold the Excess Amount from the Co-Investment Amount, and the portion of the Excess Amount withheld from each Fund shall be determined in the Employer's reasonable discretion. The Final Manager Amount, the Offset Amount, the Excess Amount, the Co-Investment Amount, and each of the components thereof, will be Calculated in accordance with the hypothetical examples attached hereto as **Schedule I**.

Notwithstanding the foregoing, in the case of a termination of this Agreement for any reason (including as a result of Employee's death or disability) other than (x) a termination by the Employer for Cause as a result of the Employee's conviction of a felony or (y) a resignation by the Employee other than by means of a Permitted Resignation, the Employee (or, in the case of Employee's death or disability, his estate or representative) shall have the right to elect that all (but not less than all) of the remaining Mesa Positions and River Positions (including, in each case, any Mesa Position or River Position that constitutes a Large Position as of the time of such termination) shall remain in the Mesa Portfolio and the River Portfolio, respectively, through the Cessation Time, but the Employee must exercise this right by providing the Employer irrevocable written notice thereof within two (2) business days (or in the event of his death or disability, within a reasonable period of time such that his executor and/or guardian may make such election upon notice of the Employer) following such termination (any such notice delivered by the Employee (or, in the case of Employee's death or disability, his estate or representative) shall be referred to as the "Ride Notice"; the companies that issued the Securities comprising such remaining Mesa Positions and River Positions shall be referred to as "Ride Companies"; and such remaining Mesa Positions and River Positions (including, in each case, any Large Positions), together with any and all additional Securities issued by any Ride Companies that are purchased by the Funds following such termination and prior to the Term End, shall be referred to as the "Ride Positions"). If the Employee (or, in the case of Employee's death or disability, his estate or representative) delivers timely a Ride Notice to the Employer, then all of the Ride Positions shall remain in the Mesa Portfolio and the River Portfolio, respectively, through the Cessation Time, and the Employer shall be permitted, but shall be under no obligation, to Sell any or all of the Ride Positions, at any time and from time to time, and the timing and manner of all such Sales may be conducted at the discretion of the Employer.

8

Complaint Ex. C 0051

If mutually agreed by the Employee and the Employer, in lieu of cash, the Profit-Sharing Payment (or any portion thereof) may be made via the delivery of Mesa Positions and /or River Positions.

For the avoidance of doubt, neither Isthmus nor the Employee is entitled to any Profit-Sharing Payment or other Amounts on any profit, investment, position or transaction that is made prior to the Execution Time or which occurs outside the Mesa Portfolio and the River Portfolio, and only investments that are allocated to the Mesa Portfolio or the River Portfolio in accordance with the terms of this Agreement (other than investments included in the Co-Investment Portfolio) shall be utilized for purposes of Calculating the Final Manager Amount and the components thereof.

(b)      Timing. The Profit-Sharing Payment, if any, will be made to the Employee at the Manager Payment Time. To the extent that any portion of the Profit-Sharing Payment is subject to Code Section 409A, the Employee and the Employer understand that, as permitted by Code Section 409A, such portion of the Profit-Sharing Payment will be treated as made at the Manager Payment Time if the payment is made at such time or at a later time within the same taxable year of Employee or, if later, by the 15th day of the third calendar month following the Manager Payment Time; provided, however, that the Employee shall not be permitted, directly or indirectly, to designate the taxable year of the payment. Notwithstanding the foregoing, following the termination of the Employee's employment and provided that a Ride Notice has not been delivered, the Employer may, in its discretion, accelerate the payment of all or any portion of the Profit-Sharing Payment after the Cessation Time, provided that any such acceleration of an amount subject to Code Section 409A is made pursuant to and in accordance with the termination and liquidation provisions of Treas. Reg. 1.409A-3(j)(4)(ix).

8.      **Track Record**.

(a)      Creation of Track Record. After the Final Time (except as set forth in Section 8(b) and subject to the terms of Sections 8(c) and 8(d)), if any, the Employee will have the right to disclose the Track Record and discuss the Covered Matters and the Employer will provide Employee with reasonable supporting documentation to verify such Track Record.

(b)      Limitations on Use. Anything herein to the contrary notwithstanding, Employee will not, and will not have any right or license to, use, employ, publish, market with, disclose or discuss, and is and will be prohibited from, using, employing, publishing, marketing with, disclosing or discussing the Covered Matters if his employment is terminated for Cause, or if he resigns other than by Permitted Resignation.

(c)      Limited License. The Track Record is and shall be, for all purposes, the sole and exclusive property of the Icahn Group, and any ability of the Employee to disclose or discuss the Track Record and any other Covered Matters constitutes a non-exclusive, non-transferable, royalty-free license to do so solely in accordance with, and subject to the terms and conditions set forth in, this Agreement.

9

Complaint Ex. C 0052

(d)      Employer Review. Any specific use or disclosure of the Covered Matters, both with respect to format and with respect to content, will require the prior written consent of the Employer, which will not be unreasonably withheld or delayed. The Employee will provide to the Employer, at least 20 days prior to any such use or disclosure: (i) a copy of any written disclosure; and (ii) a general script of any oral disclosure so as to provide a generalized understanding of the material to be presented orally, it being understood by the Employer that such oral communication will involve discussion and reply to questions that cannot be precisely scripted.

9.      **Termination**.

(a)      Power of Termination. The Employer may terminate the employment of Employee under this Agreement at any time, (x) for Cause, or (y) in the sole and absolute discretion of the Employer, without Cause. The Employee may terminate his employment under this Agreement at any time.

(b)      Consequences of Certain Terminating Events. In the event of the cessation of the Employee's employment under this Agreement for any reason (including termination of the Term as a result of (i) Employee's death or disability and (ii) the continuance of the employment of the Employee hereunder through the Term End) other than (x) a termination by the Employer for Cause as a result of the Employee's conviction of a felony or (y) a resignation by the Employee other than by means of a Permitted Resignation, the Employee will become eligible to receive the Profit-Sharing Payment at the Manager Payment Time as contemplated in Section 7 and subject to the other terms and provisions of this Agreement.

For the avoidance of doubt, as contemplated in Sections 4(b) and 14(q), any Sale of a Mesa Position conducted by the Employer or a counterparty of the Funds that, in either case, is not a Permitted Sale shall be deemed for all purposes of this Agreement to be, and shall have the consequences of, a termination of this Agreement by the Employer without Cause.

(c)      Other Termination. In the event of: (y) a voluntary termination (including by resignation) of employment by the Employee (which shall not be deemed to include a Permitted Resignation) prior to the Term End; or (z) termination of the employment of the Employee by the Employer for Cause prior to the Term End as a result of the Employee's conviction of a felony, then the Employee shall not receive the Profit-Sharing Payment and the Employee shall not be entitled to, or have any right, claim, power or privilege in respect of or for, any profit, payment or compensation of any kind or character.

(d)      Release/Notice. As a condition to the payment to the Employee of the Profit-Sharing Payment, the Employer must receive from Isthmus and the Employee a release in the form attached hereto as **Exhibit B** (the "Release") and the same shall have been executed by Isthmus and the Employee after the Term End and shall have become fully effective and non-revocable no later than sixty (60) days following the Term End. At least five (5) business days prior to the Term End, the Employer will provide written notice to the Employee informing him of the requirement to provide the Release in accordance with this Section 9(d).

10

Complaint Ex. C 0053

(e)      <u>Disability</u>. For purposes of this Agreement, disability shall be deemed to occur following illness or injury to the Employee that results in the Employee being unable to perform his duties hereunder at the offices of the Employer for a period of 30 consecutive business days or for 45 business days during any 60 business-day period, as determined by the Employer in its reasonable discretion.

(f)      <u>No Other Rights of the Employee</u>. In the event of the cessation of the employment of the Employee for any reason or no reason, the Employee shall cease to have any right to any Profit-Sharing Payment, cash compensation or any other payment or consideration or any other rights of any kind or character, other than as <u>expressly</u> set forth in this Agreement, the RSU Agreement, the LPA and his rights in respect of the Co-Investment Portfolio.

(g)      <u>Resignation</u>. The Employee may resign from his employment hereunder (but will remain subject to Sections 1, 3(c) 8, 9, 10, 11, 12, 13 and 14 hereof)). Any such resignation will not be on less than four (4) weeks' prior written notice to the Employer.

(h)      <u>Change in Control Termination</u>. If, during the Term, a Change in Control occurs without the written consent of the Employee, then this Agreement will automatically terminate at the Change in Control Termination Time and the Employee will become eligible to receive the Profit-Sharing Payment at the Manager Payment Time as contemplated in Section 7 and subject to the other terms and provisions of this Agreement.

(i)      <u>Control of IEPGP</u>. Notwithstanding any provisions to the contrary contained herein, Employee understands, acknowledges and agrees that the intention of the parties is that if, during the Term, in connection with a Key Man Event or otherwise, the Employee should acquire control, directly or indirectly, over IEPGP (either as a beneficial owner of the GP Interests, a beneficiary of a trust holding the GP Interests, a holder (through proxy, contract or otherwise) of the right to elect directors of IEPGP, or otherwise), such control shall remain vested in the Employee only for so long as the Employee continues to actively manage the Employer. If the Employee should cease to actively manage the Employer (other than due to any temporary absences due to illness or incapacity), the Employee shall reasonably cooperate to transition such control (at the sole cost and expense of the Chairman or, in the case of the Chairman's death or Permanent Disability, the Chairman's estate, including, without limitation, any taxes) to the Chairman or, in the case of the Chairman's death or Permanent Disability, the Chairman's estate or such other Person(s) as may be designated by the Chairman in his will (which, for the avoidance of doubt, may include the Employee, in which case, this Section 9(i) shall have no applicability).

10.      **Representations and Warranties**. The Employee represents as follows:

(a)      To the best of his knowledge, except as known to the Employer, he is not a party to, or involved in, or under investigation in, any pending or threatened litigation, proceeding or investigation of any governmental body or authority or any private person, corporation or other entity.

<div align="center">11</div>

Complaint Ex. C 0054

(b)        The Employee has never been suspended, censured or otherwise subjected to any disciplinary action or other proceeding by any state, federal, other governmental entities, agencies or self-regulatory organizations.

(c)        The Employee is not subject to any restriction whatsoever which would cause him to not be able fully to fulfill his duties under this Agreement.

11.        **Confidential Information**. During the Term and thereafter, the Employee shall hold in a fiduciary capacity for the benefit of the Icahn Group all Confidential Information. The Employee shall not, without the prior written consent of the Employer (which may be granted or withheld in its sole and absolute discretion; provided, however, that the Employee shall be permitted to use Confidential Information in connection with the performance of his duties with the Employer and its Affiliates without being required to obtain the written consent of the Employer), communicate or divulge any Confidential Information to anyone other than the Icahn Group and those designated by the Employer, except to the extent compelled pursuant to the order of a court or other body having jurisdiction over such matter or based upon the advice of his counsel that such disclosure is legally required; provided, however, that, to the extent legally permissible, the Employee will assist the Employer at the Employer's expense, in obtaining a protective order, other appropriate remedy or other reliable assurance that confidential treatment will be accorded such information so disclosed pursuant to the terms of this Agreement.

All Inventions shall be the property of the Employer or its designee and shall be promptly and fully disclosed by the Employee to the Employer. The Employee shall perform all reasonably necessary acts (including, without limitation, executing and delivering any confirmatory assignments, documents, or instruments requested by the Employer) to vest title to any Inventions in the Employer or in any person designated by the Employer and to enable the Employer or such person, at the Employer's sole expense, to secure and maintain domestic and/or foreign patents or any other rights for such Inventions.

All personal and not otherwise public information about the Icahn Group, including, without limitation, their respective investments, investors, transactions, historical performance, and all information regarding or concerning Carl C. Icahn and Mr. Icahn's family (excluding the Employee and, if applicable, his spouse and decedents) shall constitute Confidential Information for purposes of this Agreement. In no event shall the Employee, during or after Employee's employment hereunder, disparage any member of the Icahn Group, Mr. Icahn, his family members (excluding the Employee and, if applicable, his spouse and decedents), their respective Affiliates or any of their respective officers or directors. The Employee shall not write a book or article about Mr. Icahn or Mr. Icahn's family members (excluding the Employee and, if applicable, his spouse and decedents) in any media and shall not to publish or cause to be published in any media, any Confidential Information, and further shall keep confidential and not to disclose to any third party, including, but not limited to, newspapers, authors, publicists, journalists, bloggers, gossip columnists, producers, directors, media personalities, film-makers, and the like, any Confidential Information.

The forgoing provisions of this Section 11 shall not apply to any disclosure or use specifically permitted by the express terms of this Agreement, including, without limitation, Section 8 hereof.

12

Complaint Ex. C 0055

12.     **Remedy for Breach**. The Employee hereby acknowledges that the provisions of Sections 8, 11 and 13 of this Agreement are reasonable and necessary for the protection of the Icahn Group and Mr. Icahn's family members and are not unduly burdensome to the Employee, and the Employee also acknowledges such obligations under such covenants. The Employee further acknowledges that the Icahn Group and Mr. Icahn's family members will be irreparably harmed if such covenants are not specifically enforced. Accordingly, in addition to any other relief to which the Employer may be entitled, including claims for damages, each of the persons and entities that are included in the Icahn Group and Mr. Icahn's family members shall be entitled to seek and obtain injunctive relief (without the requirement of any bond) from a court of competent jurisdiction for the purpose of restraining the Employee from an actual or threatened breach of such covenants.

13.     **Competitive Services**.

(a)     Except as otherwise provided in this Agreement, neither the Employee nor any of his Affiliates shall, during the term of this Agreement, purchase any additional positions in the issuers of the Securities included on the List without the prior written consent of the Employer. For the avoidance of doubt: (i) any Securities included on the List which are Securities that were already held by the Funds and/or their Affiliates at the time of delivery of the List by the Employee shall not be eligible for the Mesa Portfolio; (ii) the Funds and/or their Affiliates may continue acquiring positions in such Securities without restriction; and (iii) such Securities will not be taken into account in Calculating the Profit-Sharing Payment.

(b)     Subject to Section 13(c), during the period that the Employee is employed under this Agreement and through the shorter of (i) a period ending on the Term End or (ii) twelve (12) months following Employee's termination of employment (the "Non-Compete Period"), neither the Employee nor any of his Affiliates will, directly or indirectly, except as expressly permitted by this Agreement: (1) invest in or manage, or participate or engage in any Covered Business or group of Affiliated Covered Businesses, whether for his own account or with, for or on behalf of any Covered Business, in any capacity, whether as an individual, investor, stockholder, partner, owner, equity owner, lender, agent, trustee, consultant, employee, advisor, manager, franchisee or in any other relationship or capacity, and will not enter into the employ of any Covered Business, render any services to any Covered Business, raise capital for any Covered Business, or otherwise become interested in or aid, represent or assist any Covered Business directly or indirectly in any manner; or (2) acquire, directly or indirectly, any Securities of publicly traded companies that would be suitable for the Mesa Portfolio; provided, however, that, the provisions in this Section 13(b) shall not be deemed to preclude the Employee from making investments in any Rejected Positions in accordance with the provisions of this Agreement (prior to such time, if any, that such Rejected Positions are purchased by the Mesa Portfolio) and/or investments in: (x) exchange traded funds, hedge funds, real estate, mutual funds, treasuries or such other similar investments which are passive in nature; or (y) following the termination of this Agreement, (i) private companies or (ii) public companies that constitute no more than five percent (5%) of any class or series of outstanding Securities of such corporation or entity. For the avoidance of doubt, nothing herein contain shall preclude Employee from retaining any investment he holds as of the Execution Time.

13

Complaint Ex. C 0056

(c)       Section 13(b) shall not be applicable following the termination of this Agreement if the employment of the Employee ceases as the result of: (i) termination of the employment of the Employee by Employer without Cause (including a deemed termination without Cause as a result of any Sale of a Mesa Position that is not a Permitted Sale); (ii) termination of the employment of the Employee by means of a Permitted Resignation; or (iii) termination of this Agreement upon a Change in Control.

(d)       From the Execution Time and through a period ending one (1) year from the last day of the Employee's employment under this Agreement, the Employee will not: (i) solicit, interfere with or endeavor to entice away from the Employer or any of its subsidiaries or Affiliates, any current or prospective customer or client who has received marketing materials within three (3) months of the last day of Employee's employment; (ii) attempt to direct or solicit any current or prospective customer or client away from the Employer or any of its subsidiaries or Affiliates; (iii) interfere with, entice away or otherwise attempt to obtain or induce the withdrawal of any employee of the Employer or any of its subsidiaries or Affiliates; (iv) advise any person not to do business with the Employer or any of its subsidiaries or Affiliates; or (v) attempt to direct, divert, or otherwise usurp any business opportunity or transaction that the Employee learned of during the Employee's employment with the Employer.

(e)       The Icahn Group has a worldwide reputation and operates on a worldwide basis and the scope of these covenants will and are intended to prohibit the Employee's activities throughout the world. The provisions of Sections 8, 0, 0, 13(b) and 0 are fair and reasonable and necessary to protect the business, reputation, goodwill and franchise of the Icahn Group and Mr. Icahn and his family. Considering the significant potential compensation of the Employee, the Employee is willing and well able to comply with its provisions without hardship.

14.    **Miscellaneous**.

(a)       <u>Amendments and Waivers</u>. No provisions of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the Employee and the Employer. The failure of a party to insist upon strict adherence to any term or provision of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or provision or any other term or provision of this Agreement.

(b)       <u>Governing Law</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and/or to be performed in that state, without regard to any choice of law provisions thereof. All disputes arising out of or related to this Agreement shall be submitted to the state and federal courts located in Miami-Dade County, Florida, and each party irrevocably consents to such personal jurisdiction and waives all objections thereto but does so only for the purposes of this Agreement.

(c)       <u>Severability</u>. If any provision of this Agreement is invalid or unenforceable, the balance of this Agreement shall remain in effect.

14

Complaint Ex. C 0057

(d)        Judicial Modification. If any court determines that any of the covenants in Section 13 or any part of any of them, is invalid or unenforceable, the remainder of such covenants and parts thereof shall not thereby be affected and shall be given full effect, without regard to the invalid portion. If any court determines that any of such covenants, or any part thereof, is invalid or unenforceable because of the geographic or temporal scope of such provision, such court or arbitrator shall reduce such scope to the extent necessary to make such covenants valid and enforceable.

(e)        Successors; Binding Agreement. This Agreement shall inure to the benefit of and be binding upon the permitted successors and assigns of the Employer, Isthmus and the Employee. Notwithstanding the foregoing, no party to this Agreement may Sell, convey, assign, pledge, encumber, transfer, delegate or otherwise dispose of, directly or indirectly, any of the rights, claims, powers, obligations, Amounts or interests established or payable hereunder or under any related agreements or documents (including, without limitation, any rights or interests in or with respect to the Profit-Sharing Payment, if any) other than with the prior written consent of each of the other parties hereto (which consents may be granted or withheld in the sole and absolute discretion of each party); provided, however, that (x) Employee's interest in Isthmus may, upon the death of the Employee, be transferred by will or intestate succession, to his estate, executors, administrators or heirs, whose rights therein shall for all purposes be deemed subject to the terms of this Agreement and Employee may transfer his interests in Isthmus as part of any estate planning activities (provided that Employee continues to control Isthmus following any such transfer) and (y) the direct or indirect interests of any Related Person in this Agreement may, upon the death of such Related Person, be transferred by will or intestate succession, to the estate, executors, administrators or heirs of such Related Person, whose rights therein shall for all purposes be deemed subject to the terms of this Agreement.

(f)        Limitation on Rights. Except as expressly provided herein, no provision in this Agreement shall create, or be deemed or construed to create, any claim, right or cause of action against the Employer or any member of the Icahn Group arising from any failure to: (i) agree to make any investment, (ii) provide any financing, (iii) take any profit, or (iv) make or Sell any investment, in each case whether for any reason or no reason. The Employer and its Affiliates shall have no duty or obligation of any kind or character to make, hold or continue any investment in the Funds or the Mesa Portfolio or the River Portfolio and may terminate the employment of the Employee at any time, for any reason or no reason, subject to the terms and conditions of this Agreement. The Employee acknowledges that the Employer could, for example, in its sole and absolute discretion, terminate the employment of the Employee at any time, even if the Mesa Portfolio and the River Portfolio were operating for months or years prior to such time, and in such event (unless the Employee has delivered timely a Ride Notice to the Employer or as otherwise contemplated by this Agreement), except in respect of the Co-Investment Portfolio, neither Isthmus nor the Employee would receive any payment, compensation, profit or interests of any kind or character if there was no Profit-Sharing Payment then due as of such time, and the Employee is freely accepting such risk in entering into this Agreement and waives and releases any right, claim, power or privilege that might or could, otherwise arise from the termination of the employment of the Employee in accordance with this Agreement (including any claim of bad faith, unfair dealing, quantum meruit, unjust enrichment, breach of contract or any other theory in law or equity). To the extent that any provision of this Agreement may result in any duplication of any Calculation, allocation, payment or Amount, such consequence is not intended, and no such duplicate Amount shall be included in any Calculation, allocation, payment or Amount.

15

Complaint Ex. C 0058

(g)        Taxes. All payments to Isthmus and/or the Employee, if any, shall be subject to applicable deductions, payroll and withholdings taxes, to the extent required by law, as determined by the Employer in its reasonable discretion.

(h)        Rights as a Limited Partner; Unfunded Nature of Compensation. Except as set forth in this Agreement and the LPA and the other documents referenced herein, including, without limitation, the Guaranty, Isthmus, the Employee and any other person claiming a right through such parties shall have no rights or priority in respect of any specified assets of the Funds (other than as partners in the Funds with respect to the Co-Investment Portfolio). For the avoidance of doubt, unless a position is to be included in the Mesa Portfolio or the River Portfolio, the Funds are not required to purchase, hold or dispose of any investments. To the extent that the Employee acquires a right to receive any Profit-Sharing Payment or other Amounts from the Employer under this Agreement (other than vesting of any units under the RSU Agreement) in the nature of compensation payable in a year following the year in which the Employee first attained a legally binding right to such compensation, whether or not such Amount is otherwise reportable on an IRS Form W-2, such right shall be unsecured and unfunded and shall be no greater than the right of any unsecured creditor of the Employer.

(i)        Distributions. For the avoidance of doubt, the provisions of this Agreement do not prohibit the limited partners of the Funds (including Isthmus, the General Partner and their Affiliates) from requesting distributions from time to time, pursuant to the terms of the LPA, of any or all of their allocable share of available cash in the Funds, subject to any reasonable reserves and/or re-contribution requirements that the General Partner may in its discretion establish; provided, however, that, with respect to Isthmus and its Affiliates, (x) the "allocable share of available cash in the Funds" shall be limited during the Term to only such cash that remains in those capital accounts of the Funds which track the Co-Investment Portfolio and (y) no Securities attributable to the Co-Investment Portfolio may be withdrawn by, or otherwise distributed to, Isthmus or its Affiliates prior to the Cessation Time (or, in the case of a Ride Notice, the Term End). Notwithstanding the foregoing, not later than the Co-Investment Distribution Time, any cash and/or Securities remaining in the Co-Investment Portfolio shall, subject to the provisions of Section 4(c) and 5(f), be distributed to Isthmus.

(j)        Errors. If Amounts paid (or in respect of which payments are made) under Section 7 or Section 9 are at any time required to be returned or otherwise paid over to any of the Funds or their investors or Affiliates, due to any miscalculation, mis-estimation or other error, or mistake or wrong doing, then the Employee and/or Isthmus shall be required (within 180 days following written notice thereof by the Employer) to return their pro rata share of such Amounts so returned or paid over even if such Amounts are returned or paid over following termination of employment of the Employee hereunder and this provision shall survive any termination or expiration of the Employee's employment hereunder.

16

Complaint Ex. C 0059

(k)         409A. The intent of the parties is that the payment of any Amounts or benefits under this Agreement which are subject to the provisions of Code Section 409A shall comply with Code Section 409A and, accordingly, to the maximum extent permitted, this Agreement shall be interpreted to comply therewith. To the extent required by Code Section 409A, a cessation or termination of the Employee's employment shall not be deemed to have occurred for purposes of Section 7 or Section 9 or any other provision of this Agreement providing for the payment of any Amounts or benefits subject to Code Section 409A upon or following a cessation or termination of employment unless such termination is also a Separation from Service. If the Employee is deemed at the time of his termination of employment to be a "specified employee" within the meaning of that term under Code Section 409(a)(2)(B)(i), then with regard to any payment or the provision of any benefit to the Employee that is considered deferred compensation under Code Section 409A payable on account of a Separation from Service, no such payment or benefit shall be made or provided prior to the earlier of (A) the expiration of the six (6) month period measured from the time of such Separation from Service of the Employee, and (B) the time of the Employee's death, to the extent required under Code Section 409A. For the avoidance of doubt, the parties intend that the Manager Payment Time is a "specified time" for purposes of Code Section 409A(a)(2)(A)(iv). Upon the expiration of the foregoing delay period, all payments and benefits delayed pursuant to this Section 14(k) (whether they would have otherwise been payable in a single sum or in installments in the absence of such delay) shall be paid or reimbursed to Isthmus or the Employee in a lump sum, and any remaining payments and benefits due under this Agreement shall be paid or provided in accordance with the normal payment times specified for them herein.

For purposes of Code Section 409A, the right of Isthmus or the Employee to receive any installment payments pursuant to this Agreement shall be treated as a right to receive a series of separate and distinct payments. Whenever a payment under this Agreement specifies a payment period, the actual time of payment within that specified period shall be within the sole discretion of the Employer.

Notwithstanding any other provision of this Agreement to the contrary, in no event shall any payment under this Agreement that constitutes "nonqualified deferred compensation" for purposes of Code Section 409A be subject to offset by any other Amount unless otherwise permitted by Code Section 409A.

If the amount of the Profit-Sharing Payment depends in part on the determination of an Approved Appraiser set forth in a Valuation Report, and the Employer or the Employee petitions a court of competent jurisdiction to correct or vacate such determination, then, to the extent permitted by Code Section 409A, the portion of the Profit-Sharing Payment that is not dependent upon the Fair Market Value of the asset subject to the Valuation Report shall be payable to the Employee at the Manager Payment Time, and the remaining portion of the Profit-Sharing Payment (the "Disputed Portion") shall be payable in accordance with Treas. Reg. Section 1.409A-3(g) (Disputed Payments and Refusals to Pay).

(l)         Survival. Sections 1, 3(c), 4 (subject to the provisions of Section 4(c) thereof), 5 (subject to the provisions of Section 5(f) thereof), 7, 8, 9, 10, 11, 12, 13, 14, 16 and 17 of this Agreement shall survive the termination of the employment of Employee hereunder and shall be and remain fully effective in accordance with their terms.

17

Complaint Ex. C 0060

(m)     No Continuation of Agreement. Following the termination of the Term the Employee will not be deemed to be employed under this Agreement, even if the employment of the Employee with the Employer or its Affiliates continues.

(n)     Pro-Rata Sales. Notwithstanding any provisions to the contrary contained in this Agreement, all Sales of Mesa Positions, River Positions and Rejected Positions shall be conducted on a pro-rata basis in accordance with the Buying Ratio; provided, however, that if, as a result of Isthmus ceasing further purchases following such time that the Isthmus Amount has been reached or otherwise, any Mesa Position, River Position or Rejected Position is held from time to time by the Employer and Isthmus in any ratio other than the Buying Ratio, then such Mesa Position, River Position or Rejected Position, as applicable, shall be sold solely for the account of the Employer until such time as such Mesa Position, River Position or Rejected Position is again held by the Employer and Isthmus in the Buying Ratio, at which time and henceforth all sales of such Mesa Position, River Position or Rejected Position shall be conducted on a pro-rata basis in accordance with the Buying Ratio. Subject to and without limiting the foregoing, if, during the Term and outside of the Mesa Portfolio or the River Portfolio, either the Employee or any of his Affiliates (including Isthmus) or the Employer or any of its Affiliates acquire any Mesa Positions, River Positions or Rejected Positions in a manner permitted by this Agreement, then each of the Employee and the Employer will, and will cause their Affiliates to, only Sell such Mesa Positions, River Positions or Rejected Positions at the same time and at the same price as any Mesa Positions, River Positions or Rejected Positions Sold by the Mesa Portfolio or the River Portfolio, as applicable.

(o)     Regulatory Filings. All decisions with respect to the (x) making of any purchase or Sale of Securities, or taking any other action pursuant to this Agreement (whether in connection with the Mesa Portfolio or the River Portfolio), that would result in or require any filing pursuant to Section 13D of the Exchange Act, any filing pursuant to the HSR Act, or any other filing that would disclose a position publicly and (y) content of any Section 13D filing, HSR Act filing, other regulatory filing or any other public statement regarding any Mesa Position or River Position, including any press release, letter or other document that may be issued or required to be filed as an exhibit to any filing, shall be acceptable to the Employer in its sole and absolute discretion. If, as a result of any investment in the Mesa Portfolio or the River Portfolio, the Employee or any of his Affiliates (including Isthmus) are considered to be part of a "group" with any member of the Icahn Group for the purposes of any governmental or regulatory filings, including but not limited to filings required by Section 13D of the Exchange Act, Section 16 of the Exchange Act or HSR Act, any such filing shall be prepared by, and made at the determination of, the Employer in its sole discretion.

(p)     Tracking. For purposes of tracking cash, profits, costs, etc., each of the Mesa Portfolio, the River Portfolio and the Co-Investment Portfolio will be accounted for, hypothetically, as if it were a separate entity within the Funds. All of the matters relating the Mesa Portfolio and the River Portfolio will be tracked by and accounted for by the Employer, whose determination, Calculation, allocation and treatment of all such matters, and all other matters necessary for, or related to, the implementation of the arrangements generally described in this Agreement will be final and binding on all parties to the Transaction Documents absent manifest error.

18

Complaint Ex. C 0061

(q)      Leverage. The Employer shall be permitted, without any consent or approval of the Employee, to (i) cause the Funds to utilize margin or any other types of borrowing and (ii) obtain margin or other loans or otherwise use any or all of the Mesa Positions and/or the River Positions, directly or indirectly, as collateral for loans. The General Partner and Isthmus, each in their capacity as partners in the Funds, shall: (x) execute all such further documentation that the General Partner reasonably determines to be necessary to facilitate such margin loans; and (y) be permitted, but shall be under no obligation, to withdraw from the Funds, at any time and from time to time, its percentage (Calculated in accordance with its capital accounts, relative to the capital accounts of all other partners, in the Funds) of any excess cash attributable to such margin loans that the General Partner may determine to be available for distribution, subject to any reasonable reserves and/or re-contribution requirements that the General Partner may in its discretion establish. For the avoidance of doubt: (x) any Sale (other than a Permitted Sale) of any Mesa Position that is conducted prior to the Final Time by any counterparty of the Funds pursuant to the terms of any agreements governing such margin loans, shall be deemed for all purposes of this Agreement to be, and shall have the consequences of, a termination by the Employer without Cause; and (y) any such margin borrowing will not be taken into account in the Calculation of the Net Profit, any Isthmus Amounts or the Co-Investment Amount.

(r)      Hedging. Neither the Employer and its Affiliates nor the Employee and his affiliates shall be restricted in any manner with respect to their hedging activities conducted outside of the Mesa Portfolio and the River Portfolio. Any hedging transactions proposed to be conducted within the Mesa Portfolio and the River Portfolio must be approved by both the Employer and the Employee (and if not so approved, any profit and loss associated with such hedging activities will not be taken into account in the Calculation of the Net Profit, any Isthmus Amounts or the Co-Investment Amount).

(s)      Trade Allocation. With respect to the Funds' investments in the Mesa Portfolio and the River Portfolio, trade allocation among the Funds will be made as determined by Employer in its sole and absolute discretion.

(t)      Process for Documenting Notices and Decisions. All notices hereunder and any decisions requiring mutual consent or the consent of one or more of the parties hereto shall be documented in writing, which may include email (it being the desire of the parties that all major decisions relating to the Mesa Portfolio and the River Portfolio be documented in reasonable detail in order to avoid disputes). Any such writing or email shall be sent to the Employee, the Chief Compliance Officer, the Chief Operating Officer of the Employer (currently Keith Cozza), the General Counsel of the Employer (currently Jesse Lynn) and the executive assistant to the Chairman (currently Susan Gordon). In the event that the Employer elects to delegate to the Employee any decisions with respect to the purchase or Sale of Securities, such decisions do not need to be made and communicated on a daily basis, but rather may be set as thresholds (e.g., "the Employer agreed that the Mesa Portfolio may purchase up to $10 million or 1 million shares or 1% of common stock of XYZ Company at the discretion of the Employee"), it being understood, acknowledged and agreed that no such communication shall be deemed to be a waiver of any provision of this Agreement. The failure by the Employer, Isthmus or the Employee to document any such notice or decision shall relieve the other parties hereto of any obligations with respect to such notice or decision, other than any such notice or decision as to which such party has actual knowledge; it being understood, acknowledged and agreed that no such failure by (x) Isthmus or the Employee shall in any event entitle the Employer to terminate the Employee's employment under this Agreement for Cause or (y) the Employer shall in any event entitle the Employee to resign by means of a Permitted Resignation.

<div align="center">19</div>

Complaint Ex. C 0062

(u)      Control Positions. At any time that the Mesa Portfolio and/or the River Portfolio, together with the Employer and/or its Affiliates, have beneficial ownership of Securities providing greater than 50% of the voting power of any entity, the Employer may at any time, in its discretion, by written notice to the Chief Compliance Officer, cause such Securities (including any portion thereof attributable to the Mesa Portfolio or the River Portfolio, as applicable) to be removed from the Funds and transferred (including by means of a Sale or a Sale Process) to an Affiliate of the Employer (any such removal, a "Removal"), in which event the portion of such Securities attributable to the Mesa Portfolio or the River Portfolio, as applicable, prior to such Removal will continue to be treated for all purposes of this Agreement as remaining in the Mesa Portfolio or the River Portfolio, as applicable (i.e., for purposes of Calculating any Amounts under the Transaction Documents, any such Removal will be ignored and the applicable Securities will not be deemed to have been Sold in connection therewith). For the avoidance of doubt, any Costs or Expenses associated with such Removal, including any taxes, shall not be borne by Isthmus and shall not be used in Calculating the Profit-Sharing Payment.

(v)      **Counsel/Review of Agreement. The Employee has read and understands all of the terms, provisions and conditions of this Agreement, the LPA and the other Transaction Documents and has consulted with independent legal and tax counsel of his choosing with respect to this Agreement, the LPA and the other Transaction Documents, or has had the opportunity to do so and determined, at his own risk, not to seek such counsel. The Employee shall be responsible for all expenses of any legal and tax counsel and other advisors retained by the Employee in connection with the transactions contemplated by this Agreement, the LPA and the other Transaction Documents.**

(w)      **Entire Agreement. This Agreement, together with the other Transaction Documents, represents the entire agreement of the parties and supersedes any prior agreements, discussions, arrangements or understandings among the parties. It specifically supersedes the Term Sheet dated September 5, 2019, and all prior and subsequent drafts thereof, which are not part of the agreement of the parties and should not be utilized for purposes of interpreting the Agreement. This Agreement is for the exclusive benefit and convenience of the parties hereto. Nothing contained herein shall be construed as granting, vesting, creating, or conferring any right of action or any other right or benefit upon past, present, or future employees of the Icahn Group, or upon any other third party (including, without limitation, the NSAs).**

15.      **Other**. The Employee shall comply with all written compliance manuals adopted by or in respect of the Employer from time to time that are applicable to all employees of the Employer generally and delivered or otherwise made available to the Employee (including through email notification to the Employee regarding policies posted on the Employer's intranet) (all such policies collectively, including all policies relating to insider trading and compliance with securities laws, as the same may be amended, modified or supplemented from time to time, "Policies").

20

Complaint Ex. C 0063

16.      **Definitions**.

"$" and "dollar" shall mean United States dollars.

"Affiliate" and "Control" shall have the meanings set forth in Rule 405 of Regulation C of the Securities Act of 1933, as amended. Any reference in this Agreement to an Affiliate or Affiliates in reference to any member of the Icahn Group shall include, without limitation, all persons and entities that are included in the Icahn Group, in each case, at the Execution Time and from time to time.

"Agreement" shall have the meaning given such term in the preamble to this Agreement.

"Amounts" means any and all amounts that are, or may become, allocable, calculable, determinable, payable, receivable or otherwise deliverable (whether by payment, distribution, contribution, allocation or other actual or notional transfer of cash, Securities or other property) by or to any party under any of the Transaction Documents or any third party, including, without limitation, the Clawback Amount, the Co-Investment Amount, the Deficit Amount, the Excess Amount, the Final Manager Amount, the Incentive Amount, the Individual Hurdle Amounts, the Individual Mesa Expenses, the Individual Mesa Net Profit Amounts, the Individual Mesa P&L Amounts, the Individual River Expenses, the Individual River Net Profit Amounts, the Individual River P&L Amounts, the Isthmus Amount, the Mesa Net Profit or Mesa Loss, the Net Loss or Net Profit, the Offset Amount, the Profit-Sharing Payment, the River Net Profit or River Loss, and the Value of any Property.

"Appraiser" shall have the meaning given such term within the definition of "Fair Market Value" contained in this Section 16.

"Approved Appraiser" shall have the meaning given such term within the definition of "Fair Market Value" contained in this Section 16.

"Associate" shall have the meaning set forth in Rule 14a-1 promulgated under the Exchange Act.

"Buying Ratio" means a ratio of $39:$1 for the Employer and Isthmus, respectively, such that, with respect to any investment as to which the Isthmus Amount has been reached, the Employer will have invested $292,500,000 and Isthmus will have invested $7,500,000, in each case through their investments in the Funds.

"Calculation" (and the related terms "Calculate", "Calculated" and "Calculating") means the determination, in the Employer's good faith and reasonable discretion in a manner consistent with the current and past practices utilized by the Funds, of the Value of any and all Amounts (including each of the components and elements thereof) that are required to be determined under any of the Transaction Documents, which determination, except as provided herein, will be final and binding on all parties to the Transaction Documents absent manifest error.

21

Complaint Ex. C 0064

"Cause" shall mean any of the following: (a) conviction of any crime (other than traffic violations and similar minor infractions of law); (b) failure to follow, in any material respect, the lawful directions given by Employer to Employee or the Policies or procedures adopted by Employer from time to time; (c) failure to come to work on a full-time basis at Employer's offices in Sunny Isles Beach, Florida, other than on holidays, vacation days, sick days, or other days off under Employer's business Policies; (d) impairment due to alcoholism, drug addiction or similar matters; and (e) a material breach of this Agreement, including, without limitation, any breach of Section 11 or 13 hereof. Prior to termination for Cause as a result of failure as contemplated in clause (b) or (c) above, Employee shall be given notice of his activity giving rise to such failure and will have 2 business days to correct such activity.

"Cessation Time" means, with respect to each:

(i)     Mesa Position (including any Remaining Position, but excluding any Designated Position or Ride Position) and River Position (excluding any Ride Position), the earlier of (x) the time of Sale for cash by the Funds of the last share or dollar Amount of such Mesa Position or River Position, as applicable, and (y) the Final Time;

(ii)     Designated Position, the earlier of (x) the time of Sale for cash by the Funds of the last share or dollar Amount of such Designated Position and (y) the date that is 30 days following the Term End; and

(iii)     Ride Position, the earlier of (x) the time of Sale for cash by the Funds of the last share or dollar Amount of such Ride Position and (y) the Term End;

provided, however, that, in the case of the termination of the employment of the Employee pursuant to Section 9(h), the Cessation Time shall be the earlier of (x) the time of Sale for cash by the Funds of the last share or dollar Amount of such Mesa Position, Remaining Position, River Position, Designated Position or Ride Position, as applicable, and (y) 11:59 p.m. ET on the business day immediately preceding the Change in Control.

"Chairman" shall mean the Chairman of the IEP Board (currently Carl C. Icahn).

"Change in Control" means the occurrence of any of the following events during the Term and following a Key Man Event (it being understood and agreed that, notwithstanding the occurrence of a Key Man Event and one or more of the following events during the Term, a Change in Control will not be deemed to have occurred if, at or prior to the Change in Control Termination Time, the Key Man Event and/or the applicable following event(s) have been cured or no longer exist): (i) the failure of the Employee, directly or indirectly, to constitute the sole (x) beneficial owner of the GP Interests or (y) beneficiary of a trust holding the GP Interests or (z) holder (through proxy, contract or otherwise) of the right to elect all of the directors of IEPGP, in each case following a Key Man Event, (ii) any action by the Board of Trustees or the holders of the limited partnership interests in IEP to remove IEPGP as the general partner of IEP while IEPGP is controlled by the Employee, (iii) any failure by the IEP Board to appoint the Employee as the chairman of the IEP Board and the chief investment officer of the General Partner within 48 hours following a Key Man Event, or (iv) following the appointments contemplated by sub-section (iii), any action by the IEP Board to remove the Employee as chairman of the IEP Board or as the chief investment officer of the General Partner without Cause.

22

Complaint Ex. C 0065

"Change in Control Termination Time" means 11:59 p.m. ET on the 14th day following a Change in Control.

"Chief Compliance Officer" means the Chief Compliance Officer of the Employer (currently Irene March).

"Clawback Amount" means the lower of: (x) 2.5% of the Deficit Amount; and (y) $2,000,000.

"Co-Investment Amount" means, as of the time of any determination, the Value of the Co-Investment Portfolio (i.e., including all Securities and cash).

"Co-Investment Distribution Time" means ten (10) business days following the time of cessation of the Employee's employment under this Agreement for any reason (including as a result of a Terminating Event, a termination by the Employer for Cause and a resignation by the Employee other than by means of a Permitted Resignation).

"Co-Investment Portfolio" means the positions held by the Funds in respect of any capital contributed to the Funds by Employee, Isthmus and/or their Affiliates during the Term to purchase Mesa Positions and River Positions (including, but not limited to, all Isthmus Amounts) as of the date such determination is relevant.

"Code Section 409A" means Section 409A of the Internal Revenue Code of 1986, as amended, and the regulations and other guidance thereunder.

"Competitor" means any Person that competes, directly or indirectly (or owns, controls or operates, directly or indirectly, any business that competes, directly or indirectly), with the business of any Affiliate of the Employer (or any business owned, controlled or operated, directly or indirectly, by such Affiliate); provided, however, that no Person shall be deemed hereunder to be a Competitor: (x) unless for the most recent fiscal year of such Person ended prior to the date of determination, the revenues derived by such Person from the competitive business constituted at least twenty percent (20%) of the total consolidated revenues of such Person; or (y) if such Person became an Affiliate of the Employer at any time following any investment by the Funds in any Securities of such Person, which investment constituted a Mesa Position hereunder.

"Confidential Information" means all secret or confidential information, knowledge or data, including without limitation trade secrets, investments, contemplated investments, business opportunities, valuation models and methodologies, relating to each member of the Icahn Group and their respective businesses: (i) obtained by the Employee from the Employer or any member of the Icahn Group during the Employee's employment hereunder and during his previous employment with any of the foregoing persons or entities and (ii) not otherwise in the public domain.

<div align="center">23</div>

Complaint Ex. C 0066

"Controlled Person" means any Person as to which the Funds, together with the Employer and/or its Affiliates, possess, directly or indirectly, 50% or more of the total voting power of the Voting Stock of such Person.

"Costs" shall have the meaning given such term within the definition of "Expenses" contained in this Section 16.

"Covered Business" means the business of investing in or managing, or the raising or pooling of cash or other assets for investment in, Securities, either individually or with any person, entity, venture, vehicle, limited liability company, business, fund, partnership, corporation, agency, proprietorship or any other enterprise, whether or not conducted for profit (including, without limitation, any hedge fund, mutual fund, investment company, managed account, fund of funds or other vehicles for the investment or management of money or assets).

"Covered Matters" means the Track Record of the Mesa Portfolio and River Portfolio and the activities related to Mesa Positions and River Positions (but only if those Mesa Positions and River Positions have been publicly disclosed).

"Deduction Amount" means the aggregate Amount of all Base Salary and Bonus Amounts actually paid by the Employer to all of the NSAs from the Execution Time through the Term End, not to exceed the Amounts set forth on Exhibit A of the NSAs Agreements. For the avoidance of doubt, the Deduction Amount shall not include the aggregate Net Profit-Sharing Amounts for all of the NSAs collectively.

"Deficit Amount" means the positive Amount, if any, by which: (x) the Deduction Amount; exceeds (y) the sum of all other Amounts (i.e., all Amounts other than Base Salary and Bonus Amounts) actually paid or due and owing to the NSAs collectively pursuant to the NSAs Agreements through the Term End.

"Derivatives" means forward contracts, option agreements, warrants, convertible Securities, swaps, futures contracts (and options thereon) and any other derivatives, agreements or products whose value is determined by an underlying Property, in each case whether exchange-traded, OTC, cleared or otherwise.

"Designated Positions" shall have the meaning given such term in Section 4(d)(ii) of this Agreement.

"Disputed Portion" shall have the meaning given such term in Section 14(k) of this Agreement.

"Eligible Position" shall have the meaning given such term within the definition of "Rejected Position" contained in this Section 16.

"Employee" shall have the meaning given such term in the preamble to this Agreement.

<center>24</center>

Complaint Ex. C 0067

"Employee Positions" means, and shall be limited to, Securities issued by any issuer listed from time to time on the "watchlist" maintained by the Employee (whether or not the Employee or his Affiliates own any position in such issuer) (the "Employee Watchlist"); provided, however, that: (1) each name that is under consideration by the Employee for purchase by the Mesa Portfolio must be placed on the Employee Watchlist; (2) the Employee Watchlist may not contain any Employer Positions, Rejected Positions, Mesa Positions or River Positions; (3) the Employee Watchlist may contain a maximum of 20 names at any given time; (4) no name may remain on the Employee Watchlist for more than three (3) months; (5) no name may be added to the Employee Watchlist again once such name has appeared on the Employee Watchlist and been removed; provided, however, that, with respect to each name that has been added to, and subsequently removed from, the Employee Watchlist, the Employee shall have a one-time right, exercisable only on (but not before or after) the date that is three (3) months following the date of such removal, to add that name again to the Employee Watchlist for a period not to exceed one (1) month (it being understood, acknowledged and agreed that any such name that has (x) been so removed from the Employee Watchlist and (y) subsequently become an Employer Position within the three-month period following such removal may not be added again to the Employee Watchlist); and (6) the Employee Watchlist must be updated and shared with the Employer on at least a weekly basis.

"Employee Recruiting Amount" means that portion of the Costs of any recruiting firm(s) used in connection with the hiring of the NSAs attributable to the Bonus Amounts (as opposed to the Base Salaries) payable to the NSAs.

"Employee Watchlist" shall have the meaning given such term within the definition of "Employee Positions" contained in this Section 16.

"Employer" shall have the meaning given such term in the preamble to this Agreement.

"Employer Positions" means, and shall be limited to, Securities issued by any issuer: (i) listed from time to time on the "watchlist" maintained by the Chief Compliance Officer (whether or not the Employer or its Affiliates own any position in such issuer) (the "Employer Watchlist"); provided, however, that the Employer Watchlist: (1) may not contain any Employee Positions, Rejected Positions, Mesa Positions or River Positions; (2) may contain a maximum of 20 names at any given time; and (3) must be updated and shared with the Employee on at least a weekly basis; or (ii) as to which the Icahn Group holds any investment position; or (iii) which is a Competitor.

Employer Watchlist shall have the meaning given such term within the definition of "Employer Positions" contained in this Section 16.

"Excess Amount" means the positive Amount, if any, by which: (x) the Offset Amount exceeds (y) the Final Manager Amount.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Execution Time" shall have the meaning given such term in the preamble to this Agreement.

25

Complaint Ex. C 0068

"Expenses" means any and all costs, fees, expenses, commissions, discounts, reimbursements, advancements, interest payments and other Amounts actually incurred, owed or to be incurred or actually owed which are not otherwise reimbursed (or reimbursable) or subject to recoupment (collectively, "Costs"), directly or indirectly, by or on behalf of the Funds in respect of the long and short investment positions maintained in or on behalf of the Funds, including, without limitation, brokerage and other trading Costs (including all Costs of executing brokers and prime brokers), legal Costs, investment banking Costs, financial advisory Costs, accounting Costs, underwriting Costs, transfer agent Costs, finder's Costs, broker-dealer Costs, Hart-Scott-Rodino Act filing Costs, SEC filing and transaction Costs, Costs relating to filings with FINRA, the New York Stock Exchange, NASDAQ and any other securities exchange or quotation service, Costs associated with research products and services, all Costs of conducting proxy contests, tender offers and exchange offers (including all Costs of director nominees, proxy solicitation firms, information agents, dealer-managers, depositaries, financial printers and mailing houses, and all Costs associated with travel to annual meetings, investor meetings, and meetings with proxy advisory firms such as ISS and Glass Lewis), all Costs of consultants, all Costs of any Appraisers and Approved Appraisers, all fines, judgments, settlements and Costs associated with any civil or criminal investigations or litigation, all Costs associated with any indemnification agreements or undertakings, all Costs associated with any Sale or Sale Process (other than a Removal), all Costs associated with transactions in Derivatives, all Costs associated with short Sales, and all Costs of any recruiting firm(s) used in connection with the hiring of the NSAs (other than the Employee Recruiting Amount). It is expressly understood and agreed that the foregoing list is not meant to be exhaustive but is provided merely for illustrative purposes. Notwithstanding the foregoing, Expenses shall not include (x) the administrative Costs of operating the Funds generally (i.e., those Costs customarily referred to as "overhead"), including Costs related to in-house counsel, salaries, employee benefits and bonuses of employees, occupancy expenses, technology and related support expenses, audit and tax return preparation fees, etc., (y) the Employee Recruiting Amount or (z) the Subscription Amount. In addition, Costs shall not include any fees (in the form of cash, equity, or otherwise) earned by Employee from any Portfolio Company. To the extent that an Expense or Cost could be properly allocated in respect of the Mesa Portfolio and/or the River Portfolio, then such Cost or Expense shall be allocated to the Mesa Portfolio and/or the River Portfolio in a pro-rata manner which is commercially reasonable and consistent with customary accounting practices generally applicable to the industry.

"Fair Market Value" means, with respect to any: (x) Property, other than Illiquid Positions, the U.S. dollar Value of such Property as Calculated by the Chief Compliance Officer in good faith consistent with the current and past practices utilized by the Funds, which Calculation will be final and binding on all parties to the Transaction Documents absent manifest error; and (y) Illiquid Position, the U.S. dollar Value of such Illiquid Position as Calculated (i) by the Chief Compliance Officer in good faith consistent with the current and past practices utilized by the Funds, which Calculation will be final and binding on all parties to the Transaction Documents absent manifest error, unless the Employee shall have objected to such Calculation in writing within 15 days after the Employee has received written notice thereof from the Employer, or (ii) in the event that the Employee shall have so objected within such 15-day period, by a nationally or regionally recognized independent accounting, appraisal or valuation firm (an "Appraiser") reasonably acceptable to both the Employer and the Employee. In the event that the Employer and the Employee are unable to agree as to such Appraiser within five business days after the expiration of such 15-day period, then the Employer and the Employee shall each choose, within the succeeding three business day period, an Appraiser and instruct those two Appraisers to jointly select, within fifteen days of being chosen, another Appraiser to determine such value. Within three business days following the time that the Appraiser is selected (such selected Appraiser, the "Approved Appraiser"), the Employer and the Employee shall each submit to the Approved Appraiser in writing their respective determinations of such Fair Market Value. Within thirty days after being selected, the Approved Appraiser shall determine the Fair Market Value, which shall be (x) the Fair Market Value submitted to the Approved Appraiser by either the Employer or the Employee, without modification, provided that the Approved Appraiser shall not choose any Fair Market Value that is inconsistent with the terms of the Transaction Documents, and (y) set forth in a written detailed report mutually addressed to the Employer and the Employee (the "Valuation Report"). The determination of the Approved Appraiser set forth in the Valuation Report shall be final and binding upon all parties to the Transaction Documents 15 days after the delivery of the Valuation Report to the Employer and the Employee unless, within such 15-day period, the Employer or the Employee petition a court of competent jurisdiction to correct or vacate such determination; it being understood, acknowledged and agreed that the Employer and the Employee may so petition a court only upon grounds that such determination by the Approved Appraiser was procured by fraud and may not petition a court to correct or vacate the determination for any other grounds or reasons.

Complaint Ex. C 0069

Complaint Ex. C 0070

"Final Manager Amount" means the lower of: (x) the Incentive Amount; and (y) 8.0% of the Net Profit.

"Final Time" means 11:59 p.m. ET on the date of occurrence of a Terminating Event.

"Final Valuation Time" means, if the Employer or the Employee timely petition a court in accordance with the terms of this Agreement to correct or vacate the determination of the Approved Appraiser set forth in the Valuation Report, such time that the Fair Market Value of the Property described in the Valuation Report is no longer subject to challenge by the Employer or the Employee (either as a result of a settlement, a final, non-appealable judgment issued by a court of competent jurisdiction, or otherwise).

"Funding Protocol" means, with respect to each Mesa Position and River Position, the following procedures: (i) at the time of inception of such Mesa Position or River Position, the Employee and Isthmus shall agree in writing to contribute, or otherwise irrevocably make available to the Funds, from time to time not less than the Isthmus Amount to fund the purchase by the Funds of Isthmus' allocable share of such Mesa Position or River Position in accordance with the Buying Ratio; (ii) at least two (2) business prior to the last business day of each calendar month during the Term, the General Partner shall notify the Employee in writing of the net Amount due from Isthmus (taking into account any cash balances in the Funds attributable the Co-Investment Portfolio, as adjusted by any distributions of cash to Isthmus, the receipt of cash dividends by the Funds in respect of positions in the Co-Investment Portfolio, the cash proceeds of any Sales of positions in the Co-Investment Portfolio, etc.) to fund the purchase by the Funds of Isthmus' allocable share of such Mesa Position or River Position during such month; (iii) not later than 3:00 p.m. ET on the last business day of each calendar month during the Term, Isthmus shall deliver such net Amount to the Funds in accordance with wiring instructions provided by the General Partner; (iv) any such net Amount not timely delivered by Isthmus to the Funds shall accrue interest at the rate of eighteen percent (18%) per annum, compounded daily, from the date such Amount was due through and including the date of payment by Isthmus; and (v) any such net Amount(s), together with any such accrued interest, that remains unpaid by Isthmus as of the Manager Payment Time shall be deducted from the Profit-Sharing Payment.

<center>27</center>

Complaint Ex. C 0071

"Funds" shall have the meaning given such term in the preamble to this Agreement.

"Guarantor" means American Entertainment Properties Corp., a Delaware corporation.

"Guaranty" means the Guaranty dated as of the Execution Time by the Guarantor in favor of the Employee.

"General Partner" shall have the meaning given such term in the preamble to this Agreement.

"GP Interests" means the equity interests in IEPGP.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"Icahn Group" means Mr. Carl C. Icahn and his Affiliates (including those now or hereafter his Affiliates), including, without limitation, the Employer and the Funds (including the Mesa Portfolio and the River Portfolio), individually and collectively.

"Icahn Master" shall have the meaning given such term in the preamble to this Agreement.

"Icahn Partners" shall have the meaning given such term in the preamble to this Agreement.

"IEP" shall have the meaning given such term in the preamble to this Agreement.

"IEP Board" means the board of directors of IEPGP.

"IEPGP" means Icahn Enterprises G.P. Inc., the general partner of IEP.

"Illiquid Position" means any Property issued by a Controlled Person, unless such Property is both: (x) listed or admitted to trading on a securities exchange, quotation system or public market as of the time of determination; and (y) have an average daily trading volume, over the 30-day period prior to the time of determination, of at least 0.5% of the shares then outstanding. For the avoidance of doubt, any Derivative that references an Illiquid Position shall also be deemed to be an Illiquid Position, unless such Derivative is both: (x) listed or admitted to trading on a securities exchange, quotation system or public market as of the time of determination; and (y) has an average daily trading volume, over the 30-day period prior to the time of determination, of at least 0.5% of the shares then outstanding.

28

Complaint Ex. C 0072

"Incentive Amount" means: (x) 10.0% of the Net Profit; minus (y) the sum of all Amounts actually paid or due and owing to the NSAs collectively pursuant to the NSAs Agreements; minus (z) 10% of the Subscription Amount.

"Inception Time" means, with respect to any Mesa Position or River Position, the time of purchase by the Funds of the first share or dollar Amount of such Mesa Position or River Position, as applicable.

"Individual Hurdle Amount" means, with respect to each individual Mesa Position (including any Mesa Position that is subsequently classified hereunder as a Designated Position, Remaining Position or Ride Position): (x) other than single name short positions and index short positions, an Amount equal to a return on the aggregate Amount of all Mesa Capital invested in such Mesa Position, at an annual rate of 4.5% compounded at the time of each change (i.e., increase or decrease) in the Amount of Mesa Capital, from the Inception Time through and including the Cessation Time; (y) which constitutes a single name short position, an Amount equal to a return on thirty percent (30%) of the aggregate Amount of all Mesa Capital invested in such Mesa Position, at an annual rate of 4.5% compounded at the time of each change (i.e., increase or decrease) in the Amount of Mesa Capital, from the Inception Time through and including the Cessation Time; and (z) which constitutes an index short position or a credit default swap short position (i.e., "buying protection"), an Amount equal to a return on ten percent (10%) of the aggregate Amount of all Mesa Capital invested in such Mesa Position, at an annual rate of 4.5% compounded at the time of each change (i.e., increase or decrease) in the Amount of Mesa Capital, from the Inception Time through and including the Cessation Time.

"Individual Mesa Expenses" means, with respect to each individual Mesa Position (including any Mesa Position that is subsequently classified hereunder as a Designated Position, Remaining Position or Ride Position), an Amount equal to all Expenses relating to such Mesa Position through and including the Cessation Time.

"Individual Mesa Net Profit Amount" means, with respect to each individual Mesa Position (including any Mesa Position that is subsequently classified hereunder as a Designated Position, Remaining Position or Ride Position – and excluding, for the avoidance of doubt, any portion of such Mesa Position attributable to the Co-Investment Portfolio), the Individual Mesa P&L Amount minus the Individual Hurdle Amount minus the Individual Mesa Expenses. For the avoidance of doubt, the Individual Mesa Net Profit Amount may be a positive or a negative Amount.

"Individual Mesa P&L Amount" means, with respect to each individual Mesa Position (including any Mesa Position that is subsequently classified hereunder as a Designated Position, Remaining Position or Ride Position – and excluding, for the avoidance of doubt, any portion of such Mesa Position attributable to the Co-Investment Portfolio), the aggregate increase (taking into account the receipt of interest and dividend income and any other income associated with Derivatives, as well as any fees – e.g., break-up fees, consent fees, amendment fees, commitment fees, etc. – which are actually received and retained by the Funds in respect of such Mesa Position) or decrease (taking into account the payment of interest, dividends and any other Amounts associated with Derivatives and Securities Sold short with respect to such Mesa Position) in the Value of such Mesa Position, including realized and unrealized gains and losses, from the Inception Time through and including the Cessation Time. For purposes of Calculating the Individual Mesa P&L Amount: (x) the Value of any Mesa Position (including any Designated Position, Remaining Position and/or Ride Position) that is Sold during the Term shall be the respective Sale prices obtained therefor; (y) the Value of any Mesa Position (including any Remaining Position and/or Ride Position, but excluding any Designated Position) remaining in the Mesa Portfolio at the Cessation Time shall be the Fair Market Value thereof at the Cessation Time; and (z) the Value of any Designated Position remaining in the Mesa Portfolio at the Cessation Time shall be the lowest Fair Market Value thereof during the 30-day period immediately following the Term End.

https://www.sec.gov/Archives/edgar/data/813762/000110465920111049/tm2032213d1_ex10-1.htm

Complaint Ex. C 0073

"Individual River Expenses" means, with respect to each individual River Position, an Amount equal to all Expenses relating to such River Position through and including the Cessation Time.

"Individual River Net Profit Amount" means, with respect to each individual River Position, 50% of the Individual River P&L Amount minus 50% of the Individual River Expenses. For the avoidance of doubt, the Individual River Net Profit Amount may be a positive or a negative Amount.

"Individual River P&L Amount" means, with respect to each individual River Position (excluding, for the avoidance of doubt, any portion of such River Position attributable to the Co-Investment Portfolio), the aggregate increase (taking into account the receipt of interest and dividend income and any other income associated with Derivatives, as well as any fees – e.g., break-up fees, consent fees, amendment fees, commitment fees, etc. – which are actually received and retained by the Funds in respect of such River Position) or decrease (taking into account the payment of interest, dividends and any other Amounts associated with Derivatives and Securities Sold short with respect to such River Position) in the Value of such River Position, including realized and unrealized gains and losses, from the Inception Time through and including the Cessation Time. For purposes of Calculating the Individual River P&L Amount: (x) the Value of any River Position (including any Ride Position) that is Sold during the Term shall be the respective Sale prices obtained therefor; and (y) the Value of any River Position (including any Ride Position) remaining in the River Portfolio at the Cessation Time shall be the Fair Market Value thereof at the Cessation Time.

"Inventions" means all processes, technologies, investments, contemplated investments, business opportunities, valuation models and methodologies, and inventions, including without limitation new contributions, improvements, ideas, business plans, discoveries, trademarks and trade names, conceived, developed, invented, made or found by the Employee, alone or with others (including the NSAs), during the period the Employee is employed hereunder, whether or not patentable and whether or not on the Employer's time or with the use of its facilities or materials.

"Isthmus" shall have the meaning given such term in the preamble to this Agreement.

"Isthmus Amount" means $7,500,000. For the avoidance of doubt, a portion of each Isthmus Amount to be contributed by Isthmus to the Funds shall be delivered by Isthmus to Icahn Partners LP and the remainder shall be delivered by Isthmus to Icahn Partners Master Fund LP, with the allocation between such Funds to be determined by the General Partner in its sole and absolute discretion.

<div align="center">30</div>

Complaint Ex. C 0074

"Key Man Event" means, with respect to Carl C. Icahn, any of the following: (i) death; (ii) Permanent Disability; (iii) resignation from his position as Chief Executive Officer of the General Partner; or (iv) Carl C. Icahn becomes unable to continue to act as Chief Executive Officer of the General Partner for any reason (whether voluntary or involuntary).

"Large Position" means any Mesa Position or River Position as to which, as of the time of determination, the Funds beneficially own 10% or more of the outstanding equity Securities of the relevant issuer.

"List" means the list of all Securities held by the Employee or his Affiliates, directly or indirectly, as of the Execution Time that would be suitable for the Mesa Portfolio, which list is attached hereto as **Exhibit C**.

"LPA" means, collectively, the agreements of limited partnership of the Funds, as the same may be amended from time to time, among the General Partner, Isthmus and the other partners thereof.

"Manager Payment Time" means the time of payment to the Employee of the Profit-Sharing Payment, which shall be the ninetieth (90th) day following the Term End. Notwithstanding the foregoing, with respect to any Disputed Portion, payment may be made following the Final Valuation Time in accordance with Treas. Reg. Section 1.409A-3(g).

"Memo" means, with respect to any investment proposed by the Employee to the Employer for consideration as a Permitted Investment, a memorandum describing in reasonable detail the potential investment thesis of such investment, it being understood, acknowledged and agreed that only Employee Positions may be so proposed by the Employee to the Employer for consideration as Permitted Investments.

"Mesa Capital" means the aggregate Amount of capital invested by the Employer or its Affiliates (in either case through their investments in, or by making capital contributions to, the Funds in accordance with this Agreement) in Mesa Positions on a notional basis (i.e., total exposure), excluding: (i) any appreciation or depreciation in such Mesa Positions; (ii) cash or other proceeds realized from the Sale or partial Sale of such Mesa Positions; (iii) distributions of Property by the Funds in respect of such Mesa Positions; and (iv) any Individual Mesa Expenses.

"Mesa Net Profit" means, with respect to all of the Mesa Positions in the aggregate (including any Mesa Positions that are subsequently classified hereunder as Designated Positions, Remaining Positions or Ride Positions – and excluding, for the avoidance of doubt, any Mesa Positions attributable to the Co-Investment Portfolio), an Amount equal to (x) the sum of all of the positive Individual Mesa Net Profit Amounts less (y) the absolute value of the sum of all of the negative Individual Mesa Net Profit Amounts (if this Calculation results in a negative number then the result will be referred to as the "Mesa Loss").

"Mesa Portfolio" shall have the meaning given such term in the Recitals of this Agreement.

31

Complaint Ex. C 0075

"Mesa Positions" means, and shall be limited to: (x) Securities of an issuer the Securities of which are held from time to time in the Mesa Portfolio; and (y) any Property received by the Funds in exchange therefor pursuant to any merger, exchange offer, like kind exchange or other transaction.

"Net Profit" will be Calculated as follows (if this Calculation results in a negative number, then the result will be referred to as a "Net Loss"):

- if both the Mesa Net Profit and the River Net Profit are positive Amounts, then the Net Profit will be equal to Mesa Net Profit, as increased by the River Net Profit [for example, if the Mesa Net Profit is $100 million and the River Net Profit is $80 million then the Net Profit will be $180 million];

- if the Mesa Net Profit is a positive Amount and there is a River Loss which does not exceed the Mesa Net Profit, then the Net Profit will be equal to the Mesa Net Profit, as decreased by the River Loss [for example, if the Mesa Net Profit is $100 million and the River Loss is $80 million then the Net Profit will be $20 million];

- if the Mesa Net Profit is a positive Amount and there is a River Loss which exceeds the Mesa Net Profit, then the Net Loss will be equal to the River Loss, as decreased by the Mesa Net Profit [for example, if the Mesa Net Profit is $100 million and the River Loss is $180 million then the Net Loss will be $80 million];

- if the River Net Profit is a positive Amount and there is a Mesa Loss which does not exceed the River Net Profit, then the Net Profit will be equal to the River Net Profit, as decreased by the Mesa Loss [for example, if the River Net Profit is $100 million and the Mesa Loss is $80 million then the Net Profit will be $20 million];

- if the River Net Profit is a positive Amount and there is a Mesa Loss which exceeds the River Net Profit, then the Net Loss will be equal to the Mesa Loss, as decreased by the River Net Profit [for example, if the River Net Profit is $100 million and the Mesa Loss is $180 million then the Net Loss will be $80 million]; and

- if there is both a Mesa Loss and a River Loss, then the Net Loss will be equal to the Mesa Loss, as increased by the River Loss [for example, if the Mesa Loss is $100 million and the River Loss is $80 million then the Net Loss will be $180 million].

"Non-Compete Period" shall have the meaning given such term in Section 13(b) of this Agreement.

"NSAs" shall have the meaning given such term in Section 6 of this Agreement.

"NSAs Agreements" shall have the meaning given such term in Section 6 of this Agreement.

<div align="center">32</div>

Complaint Ex. C 0076

"Offset Amount" means (x) the Clawback Amount plus (y) the Employee Recruiting Amount.

"Permanent Disability" means, with respect to Carl C. Icahn, that the IEP Board has determined that Mr. Icahn has become unable to be responsible for and manage his financial affairs due to physical or mental illness or injury which is reasonably likely to result in death or incapacity for a period of six (6) months.

"Permitted Investments" means, and shall be limited to, only those investments proposed by the Employee that are approved in writing by the Employer for purchase by the Mesa Portfolio; provided, however, that no investment shall be designated or considered a Permitted Investment for any purpose under this Agreement unless and until the Employee shall have (x) delivered to the Employer a Memo regarding such investment and (y) caused Isthmus to agree in writing to contribute, or otherwise irrevocably make available to the Funds, in accordance with the Funding Protocol, not less than the Isthmus Amount to fund the purchase by the Funds of Isthmus' pro-rata portion of such investment.

"Permitted Resignation" means the Employee's written resignation delivered by hand to the Chairman within 10 business days following an Uncured Employer Breach.

"Permitted Sale" means, with respect to any Mesa Position, a Sale of any Securities comprising such Mesa Position that is conducted either (i) with the consent of the Employee or (ii) at a time when the Value of such Mesa Position has appreciated by at least 15% on an annualized basis since the Inception Time.

"Person" means, any person, individual, entity, venture, vehicle, limited liability company, partnership, proprietorship, corporation, or any other business vehicle.

"Portfolio Company" shall have the meaning given such term in Section 3(c) of this Agreement.

"Profit-Sharing Payment" shall have the meaning given such term in Section 7(a) of this Agreement.

"Property" means and shall include any Securities, instruments, cash, cash equivalents, property, assets or entity.

"Policies" shall have the meaning given such term in Section 15 of this Agreement.

"Rejected Position" means any name that has (x) been proposed by the Employee to the Employer as a Permitted Investment pursuant to Section 4 and (y) not been approved by the Employer for purchase by the Mesa Portfolio within three (3) business following delivery by the Employee to the Employer of a Memo with respect to such Employee Position; provided, however, that, with respect to any name that becomes a Rejected Position in accordance with the foregoing, such name shall cease to constitute a Rejected Position for all purposes under this Agreement at the time that is one (1) year following the time that such name became a Rejected Position; it being understood that, immediately following the expiration of such one-year period, such name shall (if, but only if, such name shall not have been purchased by the Employer or its Affiliates or the Employee or his Affiliates as permitted by the terms of this Agreement during such one-year period) be designated automatically as an "Eligible Position" for all purposes under this Agreement unless and until such name is thereafter added to the Employee Watchlist, at which time such name shall (a) cease to constitute an Eligible Position and (b) be designated as an Employee Position.

33

Complaint Ex. C 0077

10/16/25, 1:59 PM

"<u>Related Persons</u>" means Carl C. Icahn, his Affiliates and Associates, or any of their respective officers, directors, agents, employees or family members, including natural persons, and all entities, corporations, limited liability companies, trusts, partnership and other business vehicles.

"<u>Release</u>" shall have the meaning given such term in Section 9(d) of this Agreement.

"<u>Remaining Positions</u>" shall have the meaning given such term in Section 4(d)(ii) of this Agreement.

"<u>Removal</u>" shall have the meaning given such term in Section 14(u) of this Agreement.

"<u>Ride Companies</u>" shall have the meaning given such term in Section 7(a) of this Agreement.

"<u>Ride Notice</u>" shall have the meaning given such term in Section 7(a) of this Agreement.

"<u>River Net Profit</u>" means, with respect to all of the River Positions in the aggregate, an Amount equal to (x) the sum of all of the positive Individual River Net Profit Amounts <u>less</u> (y) the absolute value of the sum of all of the negative Individual River Net Profit Amounts (if this Calculation results in a negative number then the result will be referred to as the "<u>River Loss</u>").

"<u>Ride Positions</u>" shall have the meaning given such term in Section 7(a) of this Agreement.

"<u>River Portfolio</u>" shall have the meaning given such term in the Recitals of this Agreement.

"<u>River Positions</u>" means, and shall be limited to: (x) Securities of an issuer the Securities of which are held from time to time in the River Portfolio; and (y) any Property received by the Funds in exchange therefor pursuant to any merger, exchange offer, like kind exchange or other transaction.

"<u>River Services</u>" shall have the meaning given such term in Section 5 of this Agreement.

"<u>RSU Agreement</u>" means the Restricted Unit Agreement dated as of the Execution Time, between IEP and the Employee, a form of which is attached hereto as **Exhibit D**.

"<u>Sale Notice</u>" shall have the meaning given such term in Section 4(d)(ii) of this Agreement.

"<u>Securities</u>" means securities and other financial instruments, including, without limitation: capital stock; preferred stock; shares of beneficial interest; partnership interests and similar financial instruments; bonds, bank debt, notes and debentures (whether subordinated, convertible or otherwise); equity and other Derivatives; loans; accounts and notes receivable and payable held by trade or other creditors; bankruptcy and trade claims; contract and other claims; executory contracts; participations; commercial paper; and any other obligations and instruments or evidences of indebtedness of whatever kind or nature; in each case, whether or not publicly traded or readily marketable. Each reference in this Agreement to "Securities issued by" a particular issuer, or "Securities of" an issuer, shall also be deemed to include Derivatives referencing such issuer or any of its Securities.

34

Complaint Ex. C 0078

"Sell" (and the related term "Selling") means, with respect to any Property, to sell, transfer, dispose of, or otherwise reduce such Property to cash, whether in ordinary course brokerage transactions, privately negotiated transactions, by means of a registered or underwritten initial public offering or secondary offering, through the consummation of a sale, auction or merger process, or otherwise (any such sale, transfer or other disposition shall be referred to as a "Sale"; any such offering or process shall be referred to as a "Sale Process"; and any Property sold, transferred or disposed of in connection with any such Sale or Sale Process shall be referred to as having been "Sold") (it being understood, acknowledged and agreed that, for purposes of Calculating any Amounts due to Isthmus, the Employee and/or the NSAs under the Transaction Documents, the terms Sell, Sale, Sale Process and Sold, shall in no event include any: (x) Removal; (y) direct or indirect sale, transfer or other disposition (including by means of a contribution or distribution) of any Property to a Fund; or (y) sale, transfer or other disposition of any Property for any consideration other than cash – i.e., it is the intention of the parties that if, pursuant to any sale, exchange offer, merger, reorganization or other transaction, all or any portion of the Property comprising a Mesa Position or River Position is converted into any new Property other than cash, such new Property shall continue to be considered part of such Mesa Position or River Position, as applicable, unless and until such new Property is reduced to cash).

"Separation from Service" means a "separation from service" as defined in Code Section 409A(a)(2)(A)(i) and the regulations thereunder, of the Employee from the Employer and, for purposes of any such provision of this Agreement, references to a "termination", "cessation of employment", "termination of employment" or like terms shall mean such Separation from Service.

"Subscription Amount" means the aggregate Amount of all subscription fees or other Amounts paid or incurred by the Employer, the Funds or their Affiliates during the Term for investment research services used by the Employee and/or the NSAs in connection with the performance of their services under this Agreement and the NSAs Agreements, respectively; it being understood and agreed that the aggregate Amount of such fees or other Amounts to be paid or incurred by the Employer, the Funds or their Affiliates shall not exceed $200,000 per year during the Term.

"Term" means the period beginning at the Execution Time and continuing through the last day of the Employee's employment hereunder.

"Term End" shall have the meaning given such term in Section 3(a) of this Agreement.

35

Complaint Ex. C 0079

"Terminating Event" means termination of the employment of the Employee pursuant to: (x) Section 9(b), in which case the time of occurrence of such termination shall be the time of cessation of the Employee's employment under this Agreement due to any of the matters set forth in Section 9(b); or (y) Section 9(h), in which case the time of occurrence of such termination shall be the Change in Control Termination Time. For the avoidance of doubt: (i) the termination for any reason (including by means of a resignation) prior to the Term End of (x) any or all of the NSAs Agreements and/or (y) the employment of any or all of the NSAs thereunder shall not in either case constitute a Terminating Event or otherwise trigger or accelerate the payment to Isthmus of the Profit-Sharing Payment or the payment to Isthmus or the Employee of any other Amounts hereunder; and (ii) while the occurrence of a Terminating Event hereunder prior to the Term End could require the Calculation of certain Amounts under the NSAs Agreements solely for purposes of determining any Profit-Sharing Payment due to Isthmus, any such Terminating Event or Calculation shall not in any event trigger or accelerate the termination of any or all of the NSAs Agreements, the termination of the employment of any or all of the NSAs thereunder, or the payment of any Amounts to the NSAs thereunder.

"Track Record" means the track record generated by the Mesa Portfolio and the River Portfolio.

"Transaction Documents" means this Agreement, the LPA, the NSAs Agreements, the RSU Agreement and/or any of the agreements or other documents that are attached as exhibits or schedules hereto or thereto.

"Uncured Employer Breach" means any of the following: (a) a material breach by the Employer of this Agreement and/or the RSU Agreement; (b) a material breach by the Employer or the General Partner of the LPA; or (c) a material breach by the Guarantor of the Guaranty; provided, however, that prior to termination for an Uncured Employer Breach as a result of a material breach under clauses (a)-(c), the Employer, the General Partner and/or the Guarantor, as the case may be, shall be given written notice of the activity giving rise to such failure and, if such activity is capable of being cured, will have 30 business days to cure such breach.

"Valuation Report" shall have the meaning given such term within the definition of "Fair Market Value" contained in this Section 16.

"Value" means, with respect to the Co-Investment Portfolio, the Mesa Positions, the River Positions and any other Amounts referenced in the Transaction Documents (including any Designated Positions, Remaining Positions or Ride Positions), the cumulative Amount of cash and the Fair Market Value of any Property attributable thereto. For purposes of Calculating the Value of any currency other than U.S. dollars, such currency shall be translated into U.S. dollars at the rate of exchange published in The Wall Street Journal (or, if no such rate is published, at Fair Market Value) on the business day immediately preceding the time of determination.

"Voting Stock" means, with respect to any Person, any class or classes of capital stock or partnership or limited liability company units or other ownership interests pursuant to which the holders thereof have the general voting power under ordinary circumstances to elect directors, managers or trustees of such Person (irrespective of whether or not, at the time, stock of any other class or classes has, or might have, voting power by reason of the happening of any contingency).

36

Complaint Ex. C 0080

Terms used in this Agreement that are plural include the singular and the singular includes the plural. The terms "share" and "shares" as used in this Agreement shall include, in addition to shares of common equity, other applicable units of measurement (such as shares of preferred stock, limited liability company interests or units of limited partnership interest, etc.) and Derivative equivalents, as the context requires. For the avoidance of doubt, terms defined above in this Section 16 as having the meanings given such terms in the NSAs Agreements shall continue to be so defined herein following the termination for any reason (including by means of a resignation) prior to the Term End of (x) any or all of the NSAs Agreements and/or (y) the employment of any or all of the NSAs thereunder.

17.        **Indemnification**. During the term of this Agreement and thereafter, the Employer agrees to provide to the Employee the indemnification coverage set forth in Section 6.15 of the Second Amended and Restated Agreement of Limited Partnership of IEP dated as of August 2, 2016 as it may be amended from time to time, in connection with any and all losses, claims, suits or actions to which Employee becomes subject arising from the performance of Employee's duties pursuant to this Agreement (including, without limitation, any service as a member of the board of directors of any Portfolio Company); provided, however, that the Employer's obligations under this Section 17 shall not apply with respect to any losses, claims, suits or actions to the extent that Employee receives payment in respect thereof under any policy of insurance or pursuant to the indemnification obligation of any other Person. If the Employee obtains payment with respect to any such losses, claims, suits or actions for which the Employer has already provided payment, from any insurance company or any other Person providing Employee with indemnification, then Employee shall return to the Employer that portion of the payment the Employer made to Employee equal to the amount so received by Employee from such insurance company or other Person.

<center>37</center>

Complaint Ex. C 0081

IN WITNESS WHEREOF, undersigned have executed this Manager Agreement as of October 1, 2020.

| | |
|---|---|
| **EMPLOYEE** | ISTHMUS LLC |
| /s/ Brett Icahn | By: /s/ Brett Icahn |
| Brett Icahn | Name: Brett Icahn |
| | Title: Sole Member |
| **EMPLOYER** | **EXISTING FUNDS** |
| ICAHN ENTERPRISES L.P. | ICAHN PARTNERS LP |
| By: Icahn Enterprises G.P. Inc., its general partner | By: Icahn Onshore LP, its general partner |
| By: /s/ Keith Cozza | By: /s/ Irene March |
| Name: Keith Cozza | Name: Irene March |
| Title: Chief Executive Officer | Title: Executive Vice President |
| ICAHN CAPITAL LP | ICAHN PARTNERS MASTER FUND LP |
| By: IPH GP LLC, its general partner | By: Icahn Offshore LP, its general partner |
| By: /s/ Irene March | By: /s/ Irene March |
| Name: Irene March | Name: Irene March |
| Title: Executive Vice President | Title: Executive Vice President |

[Signature Page to Manager Agreement]

38

Complaint Ex. C 0082

AMENDMENT NO. 1 TO MANAGER AGREEMENT WITH BRETT (00549038-8).DOCX   10/16/23, 1:59 PM

1550

EX-10.1 2 tmb-20220331xex10d1.htm EX-10.1

## AMENDMENT NO. 1 TO MANAGER AGREEMENT

Amendment No. 1 dated as of May 5, 2022 (this "Amendment") to the Manager Agreement dated as of October 1, 2020 (the "Agreement"), by and among **Icahn Enterprises L.P.**, a Delaware limited partnership ("IEP"), **Icahn Capital LP**, a Delaware limited partnership (the "General Partner" and together with IEP, the "Employer"), **Brett Icahn** (the "Employee"), **Isthmus LLC**, a Delaware limited liability company wholly owned by the Employee ("Isthmus"), **Icahn Partners LP**, a Delaware limited partnership ("Icahn Partners"), and **Icahn Partners Master Fund LP**, a Delaware limited partnership ("Icahn Master" and together with Icahn Partners, the "Funds"). Unless otherwise defined herein a capitalized term used herein shall have the meaning attributed to it in the Agreement.

RECITALS:

The Funds currently include two separately tracked investment portfolios, the Mesa Portfolio and the River Portfolio, the activities of which are currently, and will continue to be, conducted pursuant to the Agreement. Isthmus currently is, and will continue to be, eligible to make and hold investments in the Mesa Portfolio and the River Portfolio through the Co-Investment Portfolio.

The parties now wish to provide for the Funds to include two additional separately tracked investment portfolios to be known as the "Mesa 2.0 Portfolio" and the "River 2.0 Portfolio", the activities of which would be conducted outside of the Agreement. Isthmus would not be eligible to make or hold investments in the Mesa 2.0 Portfolio or the River 2.0 Portfolio through the Co-Investment Portfolio or otherwise.

NOW THEREFORE, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, desiring to be legally bound, hereby agree as follows:

1.      **Establishment of Mesa 2.0 Portfolio and River 2.0 Portfolio**. The Funds may create and include the Mesa 2.0 Portfolio and the River 2.0 Portfolio, the activities of which will be conducted outside of the Agreement. Neither Isthmus, the Employee nor their Affiliates will, or will be eligible to, make or hold investments in the Mesa 2.0 Portfolio or the River 2.0 Portfolio (or in any Securities held by the Mesa 2.0 Portfolio or the River 2.0 Portfolio) through the Co-Investment Portfolio or otherwise. For the avoidance of doubt, the Calculation of any Amounts under the Agreement in respect of Isthmus, the Employee and/or their

Complaint Ex. C 0083

Case 1:25-cv-23933-BB   Document 68-3   Entered on FLSD Docket 02/19/2026   Page 85 of 90
1550

Affiliates will in no event, directly or indirectly, take into account or be increased, decreased or otherwise affected by any activities conducted in the Mesa 2.0 Portfolio or the River 2.0 Portfolio. Without limiting the foregoing, it is expressly understood and agreed by the parties that (x) Expenses incurred in respect of the Mesa 2.0 Portfolio or the River 2.0 Portfolio will not, directly or indirectly, reduce any Amounts that may become payable to Isthmus, the Employee and/or their Affiliates under the Agreement and (y) gains and losses (whether realized or unrealized) in respect of the Mesa 2.0 Portfolio or the River 2.0 Portfolio will not, directly or indirectly, increase or decrease any Amounts that may become payable to Isthmus, the Employee and/or their Affiliates under the Agreement.

1

Complaint Ex. C 0084

AMENDMENT NO. 1 TO MANAGER AGREEMENT WITH BRETT (US490038-8).DOCX

2.      **Deemed Sales of Mesa Positions**. The Employer and the Employee may, from time to time, agree that any Mesa Position (or any portion thereof) will be deemed to have been (x) Sold for cash, in such Amounts and at such times and prices as may be agreed by the Employer (with the approval of the board of directors of the General Partner or the audit committee thereof) and the Employee, each in their sole and absolute discretion (it being understood and agreed that such deemed Sale prices will be based generally on the trading prices of the applicable Securities at the time of such deemed Sales, as reasonably adjusted to take into account liquidity and other relevant factors), and (y) purchased by the Mesa 2.0 Portfolio in the same Amounts and at the same times and prices as applicable to such deemed Sale, in which case: (i) such deemed Sale shall be considered for all purposes under the Agreement to be a Permitted Sale of such Mesa Position (or portion thereof); and (ii) with respect to each such Mesa Position (or portion thereof) deemed to have been Sold, the Individual Hurdle Amount, Individual Mesa Expenses, Individual Mesa Net Profit Amount and Individual Mesa P&L Amount will be Calculated as of the time of such deemed Sale. For the avoidance of doubt, (x) each such deemed Sale of a Mesa Position (or portion thereof) will include the deemed Sale of a pro-rata amount of any related Securities attributable to the Co-Investment Portfolio, (y) subject to the provisions of Section 14(i) of the Agreement (provided, that, for purposes thereof, Isthmus's pro-rata share of the deemed sale proceeds contemplated under this Section 2 shall be treated as cash under clause (x) of such Section 14(i) of the Agreement),  Isthmus shall be entitled to withdraw an Amount of cash equal to its share of the deemed Sale proceeds (it being understood that following such deemed sale, Isthmus will have no right to cash on an actual future sale of such Securities by the Mesa 2.0 Portfolio), and (z) the capital accounts of Isthmus in the Funds shall be appropriately adjusted as reasonably determined in good faith and consistent with past practices by the Employer to reflect the foregoing.

3.      **NSA Compensation**. For purposes of the Agreement and the Calculations contemplated thereby in respect of Isthmus, the Employee and/or their Affiliates, the aggregate Amount of any "Base Salary" and "Bonus Amounts" (as set forth in Exhibit A of the NSA Agreements) for each NSA shall not exceed the Amounts set forth in the NSAs Agreements attached as Exhibit A to the Agreement without regard to any amendments to such agreements which would otherwise increase the Base Salary and Bonus Amounts (such Amounts in the aggregate, the "Aggregate NSAs Compensation") without the express written consent of the Employee. In the event that the Employer agrees to increase the Aggregate NSAs Compensation or otherwise provide to the NSAs any other compensation in respect of the Mesa 2.0 Portfolio or the River 2.0 Portfolio that exceeds the Aggregate NSAs Compensation, any such Amounts in excess of the Aggregate NSAs Compensation shall in no event, directly or indirectly, be taken into account or increase, decrease or otherwise affect the Calculation of any Amounts under the

Complaint Ex. C 0085

Agreement in respect of Isthmus, the Employee and/or their Affiliates. Without limiting the foregoing, it is expressly understood and agreed by the parties that, in Calculating the Offset Amount as of the Final Time, the Amounts set forth on <u>Schedule 1</u> attached hereto shall not be exceeded.

4. **<u>Miscellaneous</u>**. The provisions of Section 14 (Miscellaneous) of the Agreement are incorporated into this Amendment mutatis mutandis.

2

Complaint Ex. C 0086

Except as specifically provided for herein, the Agreement shall remain in full force and effect and none of the provisions described in this Amendment are intended to alter Employee's employment status with the Employer for any purpose.

<div align="center">3</div>

Complaint Ex. C 0087

IN WITNESS WHEREOF, undersigned have executed this Amendment as of May 5, 2022.

**EMPLOYEE**                                    ISTHMUS LLC

_____          By:
Brett Icahn
                                                _____
                                                Name: Brett Icahn
                                                Title: Sole Member

**EMPLOYER**                                    **EXISTING FUNDS**

ICAHN ENTERPRISES L.P.                          ICAHN PARTNERS LP
By: Icahn Enterprises G.P. Inc., its general    By: Icahn Onshore LP, its general
partner                                         partner

By: _____      By: _____

   Name: Ted Papapostolou                  Name: Jesse Lynn
   Title: Chief Financial Officer          Title: Chief Operating Officer

ICAHN CAPITAL LP                                ICAHN PARTNERS MASTER FUND
By: IPH GP LLC, its general partner             LP
                                                By: Icahn Offshore LP, its general
                                                partner
By: _____

   Name: Jesse Lynn                     By: _____
   Title: Chief Operating Officer
                                                   Name: Jesse Lynn
                                                   Title: Chief Operating Officer

[Signature Page to Amendment No. 1 to Manager Agreement]
4

Complaint Ex. C 0088

AMENDMENT NO. 1 TO MANAGER AGREEMENT WITH BRETT (00549038-8).DOCX

Case 1:25-cv-23823-BB Document 66-3 Entered on FLSD Docket 07/01/2026 Page 92 of 90

1550

10/16/25, 1:59 PM

Complaint Ex. C 0089

# Complaint Ex. D

EX-10.25 6 d178785dex1025.htm EX-10.25

**Exhibit 10.25**

**REDACTED**

**Certain identified information, indicated by [*****], has been excluded from the exhibit because it is both (i) not material and (ii) would likely cause competitive harm if publicly disclosed.**

**DIRECTOR APPOINTMENT AND NOMINATION AGREEMENT**

This Director Appointment and Nomination Agreement, dated as of April 28, 2022 (this "**Agreement**"), is by and among the persons and entities listed on Schedule A (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**"). In consideration of and reliance upon the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    **Board Representation and Board Matters.**

(a)    The Company and the Icahn Group agree as follows:

(i)    As soon as practicable following the written election of the Icahn Group (which written election, in order to be valid, must be delivered to the Company between the date (the "**Distribution Effective Date**") of consummation of the spin-off transaction by which Bausch Health Companies Inc. ("**BHC**") transfers any or all of its remaining indirect equity interest in the Company to BHC's then-current shareholders (the "**B+L Distribution**") and such date that is twelve (12) months after the Distribution Effective Date (such period, the "**Election Period**"), the Company shall take or shall have taken all necessary action to increase the size of the Board of Directors of the Company (the "**Board**") by two, and following consultation with the Icahn Group, to appoint two individuals identified by the Icahn Group and reasonably acceptable to the Company (such individuals, collectively, the "**Icahn Designees**" and each an "**Icahn Designee**") to fill the resulting vacancies, each with a term expiring at the first annual general meeting of stockholders of the Company following such written election (the "**First Annual Meeting**"). Prior to such date as the Icahn Designees are seated as members of the Board, the Icahn Group shall not request and the Company shall not provide any material non-public information relating to or involving the Company. For the avoidance of doubt, it shall not be deemed unreasonable for the Company to reject a designee in accordance with this **Section 1(a)(i)** if such designee does not satisfy the Director Criteria (as hereafter defined) or the criteria set forth on Annex 1 attached hereto (the **"Tax Criteria"**).

(ii)    the Company shall use reasonable best efforts to cause the election of each of the Icahn Designees at the First Annual Meeting (including by (x) recommending that the Company's stockholders vote in favor of the election of each of the Icahn Designees, (y) including each of the Icahn Designees in the Company's proxy statement and proxy card for the First Annual Meeting, and (z) otherwise supporting each of the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate). The Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to the First Annual Meeting. As a condition to the Icahn Designees' appointment to the Board, the Icahn Designees shall execute and deliver a customary joinder to this Agreement. Prior to the execution and delivery of such joinder to the Company, the Icahn Group shall cause the Icahn Designees to comply with the covenants, agreements and other provisions herein applicable to the Icahn Designees.

Complaint Ex. D 0001

(iii)    that as a condition to the Icahn Designees' appointment to the Board and subsequent nomination for election, the Icahn Designees each agree to provide to the Company, prior to nomination and appointment and on an on-going basis while serving as a member of the Board, such information and materials as the Company routinely receives from other members of the Board or as is required to be disclosed in proxy statements under applicable law or as is otherwise reasonably requested by the Company from time-to-time from all members of the Board in connection with the Company's legal, regulatory, auditor or stock exchange requirements, including, but not limited to, a completed D&O Questionnaire in the form separately provided by the Company to the Icahn Group (the "**Nomination Documents**").

(iv)    That, subject to **Section 1(c)** below, should any Icahn Designee resign from the Board or be rendered unable to, or refuse to, be appointed to, or for any other reason fail to serve or is not serving, on the Board (other than as a result of not being nominated by the Company for election at an annual meeting of stockholders subsequent to the First Annual Meeting, following which the Icahn Group's replacement rights pursuant to this **Section 1(a)(iv)** shall terminate with respect to such Icahn Designee), as long as the Icahn Group has not materially breached this Agreement and failed to cure such breach within five (5) business days of written notice from the Company specifying any such breach, the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, or as a nominee on the Company's slate of nominees for election to the Board at the First Annual Meeting (collectively, the "**First BLCO Slate**"), as applicable, a replacement that is approved by the Board, such approval not to be unreasonably withheld, conditioned or delayed (an "**Acceptable Person**") (and if such proposed designee is not an Acceptable Person, the Icahn Group shall be entitled to continue designating a recommended replacement until such proposed designee is an Acceptable Person) (a "**Replacement Designee**"). Any such Replacement Designee who becomes a Board member in replacement of any Icahn Designee shall be deemed to be an Icahn Designee for all purposes under this Agreement and, as a condition to being appointed to the Board, shall be required to sign a customary joinder to this Agreement.

(v)    For the avoidance of doubt, the Board's approval of a Replacement Designee pursuant to **Section 1(a)(iv)** shall not be considered unreasonably withheld if: (1) such replacement does not (A) qualify as "independent" pursuant to the NYSE Rules (as defined below), (B) have the relevant financial and business experience to be a director of the Company, or (C) satisfy the requirements set forth in the Company Policies (as defined below), in each case as in effect as of the Distribution Effective Date or such additional or amended guidelines and policies approved by the Board that are applicable to all directors of the Company (collectively clauses (A) through (C), the **"Director Criteria"**); provided that no Director Criteria will be adopted that would prevent any employee or affiliate of the Icahn Group from becoming directors by virtue of the fact that such person is an employee or affiliate of the Icahn Group had such criteria been in effect today; or (2) such Replacement Designee does not satisfy the Tax Criteria.

2

Complaint Ex. D 0002

(vi)    that (1) for any annual general meeting of stockholders subsequent to the First Annual Meeting, the Company shall notify the Icahn Group in writing no less than thirty-five (35) calendar days before the advance notice deadline set forth in the Company's Articles of Incorporation whether the Icahn Designees will be nominated by the Company for election as directors at such annual general meeting and, (2) if the Icahn Designees are to be so nominated, shall use reasonable best efforts to cause the election of the Icahn Designees so nominated by the Company (including by (x) recommending that the Company's stockholders vote in favor of the election of the Icahn Designees, (y) including the Icahn Designees in the Company's proxy statement and proxy card for such annual general meeting and (z) otherwise supporting the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate), and the Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to any such annual general meeting at which the Company has nominated Icahn Designees and such Icahn Designees have consented to being named, and are named, in the proxy statement relating to such annual general meeting.

(vii)    that from and after the date of this Agreement, so long as an Icahn Designee is seated as a member of the Board, without the approval of the Icahn Designees then on the Board (such approval not to be unreasonably withheld, delayed or conditioned), (w) the Board shall not form an Executive Committee or any other committee with functions similar to those customarily granted to an Executive Committee; (x) the Board shall not form any other new committee (other than committees formed with respect to matters for which there are actual conflicts of interest between the Icahn Designees and the Company) without offering to at least one Icahn Designee the opportunity to be a member of such committee (provided, however that if such committee has more than five (5) members then both Icahn Designees shall be offered to be appointed to such committee (to the extent there are two Icahn Designees then on the Board)), (y) the Board shall not increase the size of any committee and (z) any Board consideration of appointment and employment of named executive officers, mergers and acquisitions of material assets, or dispositions of material assets, or similar extraordinary transactions, such consideration, and voting with respect thereto shall take place only at the full Board level or in committees of which one of the Icahn Designees is a member (for the avoidance of doubt, nothing in this Agreement changes, amends, or modifies the authority, duties and obligations of the Talent & Compensation Committee of the Board).

(viii)    each of the Icahn Designees confirms that he or she will recuse himself or herself from such portions of Board or committee meetings, if any, involving actual conflicts between the Company and the Icahn Group. Promptly following the receipt of the Nomination Documents, the Board shall make a determination as to whether the Icahn Designees, based solely upon the representations provided by the Icahn Group in **Section 7** of this Agreement (which representations shall be updated by the Icahn Group to be current as of the date of the written election made pursuant to **Section 1(a)(i)**) and the information provided to the Board by the Icahn Designees in the Nomination Documents, are independent under the Board's independence guidelines, the independence requirements of the New York Stock Exchange (the "**NYSE Rules**"), and the independence standards applicable to the Company under paragraph (a)(1) of Item 407 of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "**Exchange Ac**t").

3

Complaint Ex. D 0003

(ix)    that, to the extent permitted by law and the Company's then-existing insurance coverage, from and after the date that the Icahn Designees are seated as members of the Board, the Icahn Designees shall be covered by the same indemnification and insurance provisions and coverage as are applicable to the individuals that are directors of the Company as of such time, and at such time the Icahn Designees are no longer members of the Board, then the same indemnification and insurance provisions and coverage as are applicable to former directors of the Company as of such time.

(i)    Notwithstanding the foregoing, the Company acknowledges that for so long as the Icahn Designees are members of the Board, the Icahn Designees shall have the same rights as any other director with respect to being permitted to attend (as an observer and without voting rights) any committee meeting regardless of whether such director is a member of such committee.

(b)    At all times from the date that the Icahn Designees are seated as members of the Board through the termination of their service as a member of the Board, each of the Icahn Designees shall comply with all written policies, procedures, processes, codes, rules, standards and guidelines applicable to all non-employee Board members and of which the Icahn Designees have been provided written copies in advance (or which have been filed with the Securities and Exchange Commission ("**SEC**") or posted on the Company's website), including the Company's code of business conduct, corporate policies on ethical business conduct, political contributions, lobbying and other political activities policy, conflicts of interest policy, insider trading policy, anti-hedging policy and governance policies (collectively, the "**Company Policies**"), and shall preserve the confidentiality of Company business and information, including discussions or matters considered in meetings of the Board or Board committees (except to the extent permitted in the Confidentiality Agreement (as defined below) to be entered into pursuant to Section 5 of this Agreement). In addition, each of the Icahn Designees is aware of and shall act in accordance with his or her fiduciary duties with respect to the Company and its stockholders. For the avoidance of doubt, the Parties agree that notwithstanding the terms of any Company Policies, in no event shall any Company Policy apply to the Icahn Group, other than the Icahn Designees in their capacity as members of the Board.

(c)    Any provision in this Agreement to the contrary notwithstanding, if at any time after the Distribution Effective Date, the Icahn Group, together with any Icahn Affiliates (as defined below), ceases collectively to beneficially own (for all purposes in this Agreement, the terms "beneficially own" and "beneficial ownership" shall have the meaning ascribed to such terms as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act), an aggregate Net Long Position (x) in at least six percent (6%) of the total outstanding common shares of the Company ("**Common Shares**") as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) one of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee; or (y) in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) each of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board

4

Complaint Ex. D 0004

and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee(s). For clarity, "Common Shares" will include the shares of the entity resulting from the amalgamation of the Company expected to be effected in connection with the B+L Distribution for which the Common Shares are exchanged pursuant to such amalgamation.

The Icahn Group, upon request, shall keep the Company regularly apprised of the Net Long Position of the Icahn Group and the Icahn Affiliates to the extent that such position differs from the ownership positions publicly reported on the Icahn Schedule 13D and amendments thereto.

For purposes of this Agreement: the term "Net Long Position" shall mean: such Common Shares beneficially owned, directly or indirectly, that constitute such person's net long position as defined in Rule 14e-4 under the Exchange Act *mutatis mutandis*, provided that "Net Long Position" shall not include any shares as to which such person does not have the right to vote or direct the vote, or as to which such person has entered into a derivative or other agreement, arrangement or understanding that hedges or transfers, in whole or in part, directly or indirectly, any of the economic consequences of ownership of such shares; and the terms "person" or "persons" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

Each of the Icahn Designees shall, prior to his or her appointment to the Board (including any Replacement Designee), and each member of the Icahn Group shall cause each of the Icahn Designees (including any Replacement Designee) to, execute an irrevocable resignation in the form attached to this Agreement as **Exhibit A**.

(d)    So long as the Icahn Group, together with the Icahn Affiliates, beneficially owns an aggregate Net Long Position in at least six percent (6%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations or similar type events), the Company shall not adopt a Rights Plan with an "Acquiring Person" beneficial ownership threshold below 20.0% of the then-outstanding Common Shares, unless (x) such Rights Plan provides that, if such Rights Plan is not ratified by the Company's stockholders within 105 days of such Rights Plan being adopted, such Rights Plan shall automatically expire and (y) the "Acquiring Person" definition of such Rights Plan exempts the Icahn Group up to a beneficial ownership of 19.95% of the then-outstanding Common Shares. The term "**Rights Plan**" shall mean any plan or arrangement of the sort commonly referred to as a "rights plan" or "stockholder rights plan" or "shareholder rights plan" or "poison pill" that is designed to increase the cost to a potential acquirer of exceeding the applicable ownership thresholds through the issuance of new rights, common stock or preferred shares (or any other security or device that may be issued to stockholders of the Company, other than ratably to all stockholders of the Company) that carry severe redemption provisions, favorable purchase provisions or otherwise, and any related rights agreement.

2.    **Additional Agreements.**

(a)    Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, solely in connection with the First Annual Meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting

5

Complaint Ex. D 0005

Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the First Annual Meeting, in each case that are entitled to vote at the First Annual Meeting, to be present for quorum purposes and to be voted, at the First Annual Meeting or at any adjournment or postponement thereof, (A) for each nominee on the First BLCO Slate, (B) against any nominees that are not nominated by the Board for election at the First Annual Meeting, (C) against any stockholder proposal to increase the size of the Board and (D) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence and in Section 2(b), the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual or special meeting.

(b)    Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, that for any annual general meeting or special meeting of stockholders subsequent to the First Annual Meeting, if the Board has agreed to nominate the Icahn Designees then serving on the Board for election at such annual general meeting or special meeting and the Icahn Designees have consented to be nominated at such annual general meeting or special meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the applicable annual general meeting or special meeting, in each case that are entitled to vote at such annual general meeting or special meeting, to be present for quorum purposes and to be voted at such annual general meeting or special meeting or at any adjournment or postponement thereof, (A) for each director nominated by the Board for election at such annual general meeting, (B) against any (i) stockholder proposal to increase the size of the Board and (ii) nominees that are not nominated by the Board for election at such annual general meeting or special meeting, and (C) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence, the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual general meeting or special meeting following the First Annual Meeting.

As used in this Agreement, the term "**Voting Securities**" shall mean the Common Shares that such person has the right to vote or has the right to direct the vote. For purposes of this Section 2, no person shall be, or be deemed to be, the "beneficial owner" of, or to "beneficially own," any securities beneficially owned by any director of the Company to the extent such securities were acquired directly from the Company by such director as or pursuant to director compensation for serving as a director of the Company. For purposes of this Agreement, (A) the term "**Affiliate**" shall have the meaning set forth in Rule 12b-2 promulgated by the SEC under the Exchange Act, and the term "**Icahn Affiliate**" shall mean such Affiliates that are controlled by the members of the Icahn Group, and (B) the term "**Associate**" shall mean (A) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (B) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of such person or of any of its parents or subsidiaries.

6

Complaint Ex. D 0006

3.    **Icahn Group Restrictions**

(a)    From and after the date that the Icahn Designees are seated as members of the Board, until the later of (i)(x) the end of the First Annual Meeting and (y) such date as no Icahn Designee is on the Board and the Icahn Group has no right to designate a Replacement Designee (including if the Icahn Group has irrevocably waived such right in writing), and (ii) solely with respect to **Section 3(a)(i)(x)**, the Butterfly Date (as hereafter defined) (the "**Standstill Period**"), so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, no member of the Icahn Group shall, directly or indirectly, and each member of the Icahn Group shall cause each of the Icahn Affiliates and its Associates not to, directly or indirectly (it being understood that the foregoing shall not restrict the Icahn Designees from discussing the matters set forth below with other members of the Board):

(i)    acquire, offer or propose to acquire any voting securities (or beneficial ownership thereof), or rights or options to acquire any voting securities (or beneficial ownership thereof) of the Company if after any such case, immediately after the taking of such action the Icahn Group, together with its respective Icahn Affiliates, would in the aggregate, beneficially own more than 19.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments); provided that: (x) if, solely as a result of their acquisition of Common Shares or securities or other instruments convertible into Common Shares, the Icahn Group, together with its respective Icahn Affiliates and its Associates, become the beneficial owners of more than 9.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), then neither the Icahn Group nor the Icahn Affiliates nor its Associates shall sell any Common Shares or securities or other instruments convertible into Common Shares (but excluding, for the avoidance of doubt, any swaps or other instruments that do not allow for settlement in property other than cash) following the Distribution Effective Date and prior to the Butterfly Date without first obtaining a supplemental tax ruling from the Canada Revenue Agency ("**CRA**") or an opinion of a nationally recognized accounting firm or law firm that is in form and substance satisfactory to the Company, acting reasonably, that such sale will not cause the B+L Distribution to be taxed in a manner inconsistent with that provided for in the tax ruling issued by the CRA in connection with the B+L Distribution; and (y) the term "**Butterfly Date**" shall mean the date that is the earlier of (A) eighteen (18) months after the Distribution Effective Date and (B) the date the Company delivers written notice to the Icahn Group in accordance with Section 12 confirming that BHC is not proceeding with a Canadian "butterfly" form of spin out with respect to the B+L Distribution;

(ii)    except with respect to the signatories to the Icahn Group's Schedule 13D filed with the SEC with respect to the Company (the "**Icahn Schedule 13D**"), form or join in a partnership, limited partnership, syndicate or a "group" as defined under Section 13(d) of the Exchange Act, with respect to the securities of the Company;

7

Complaint Ex. D 0007

(iii)  present (or request to present) at any annual general meeting or any special meeting of the Company's stockholders, any proposal for consideration for action by stockholders or engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" (as such terms are defined in Regulation 14A under the Exchange Act) of proxies or consents (including, without limitation, any solicitation of consents that seeks to call a special meeting of stockholders) or, except as provided in this Agreement, otherwise publicly propose (or publicly request to propose) any nominee for election to the Board or seek representation on the Board or the removal of any member of the Board;

(iv)  grant any proxy, consent or other authority to vote with respect to any matters (other than to the named proxies included in the Company's proxy card for any annual general meeting or special meeting of stockholders) or deposit any Voting Securities in a voting trust or subject them to a voting agreement or other arrangement of similar effect (excluding customary brokerage accounts, margin accounts, prime brokerage accounts and the like), in each case, except as provided in Sections 2(a) or (b);

(v)  call or seek to call any special meeting of the Company or action by consent resolutions;

(vi)  institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against or involving the Company;

(vii)  separately or in conjunction with any other person in which it is or proposes to be either a principal, partner or financing source or is acting or proposes to act as broker or agent for compensation, submit a proposal for or offer of (with or without conditions), any Extraordinary Transaction (as defined below); provided that the Icahn Group shall be permitted to sell or tender their Common Shares, and otherwise receive consideration, pursuant to any Extraordinary Transaction; and provided further that (A) if a third party (other than the Icahn Group or an Icahn Affiliate) commences a tender offer or exchange offer for all of the outstanding Common Shares that is not rejected by the Board in its Recommendation Statement on Schedule 14D-9, then the Icahn Group shall similarly be permitted to make an offer for the Company or commence a tender offer or exchange offer for all of the outstanding Common Shares at the same or higher consideration per share, provided that the foregoing (y) will not relieve the Icahn Group of its obligations under the Confidentiality Agreement and (z) will not be deemed to require the Company to make any public disclosures and (B) the Company may waive the restrictions in this Section 3(a)(vii) with the approval of the Board. "Extraordinary Transaction" means, collectively, any of the following involving the Company or any of its subsidiaries or its or their securities or all or substantially all of the assets or businesses of the Company and its subsidiaries: any tender offer or exchange offer, merger, acquisition, business combination, reorganization, restructuring, recapitalization, sale or acquisition of material assets, or liquidation or dissolution; provided that Extraordinary Transaction shall not include, and neither this Section 3(a) nor any other term of this Agreement, shall restrict the Icahn Group from commencing and consummating a tender offer pursuant to applicable Canadian laws and regulations to acquire additional Common Shares, so long as upon consummation of such tender offer(s) the Icahn Group would comply with **Section 3(a)(i)**; provided, further that this Section 3(a)(vi) shall not prevent an Icahn Designee acting in his or her capacity as a director of the Company from raising such matter privately at the Board;

8

Complaint Ex. D 0008

    (viii)   seek, or encourage any person, to submit nominations in furtherance of a "contested solicitation" for the election or removal of directors with respect to the Company or, except as expressly provided in this Agreement, seek, encourage or take any other action with respect to the election or removal of any directors;

    (ix)   make any public communication in opposition to (A) any merger, acquisition, amalgamation, recapitalization, restructuring, disposition, distribution, spin-off, asset sale, joint venture or other business combination (including the B+L Distribution) or (B) any financing transaction, in each case involving the Company;

    (x)   seek to advise, encourage, support or influence any person with respect to the voting or disposition of any securities of the Company at any annual general meeting or special meeting of stockholders, except in accordance with Section 2(a) or (b);

    (xi)   publicly disclose any intention, plan or arrangement inconsistent with any provision of this Section 3; or

    (xii)   publicly encourage or support any other person to take any of the actions described in this Section 3 that the Icahn Group is restricted from doing.

(b)    Subject to applicable law, from the date of this Agreement until the end of the Standstill Period, (i) so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, neither a member of the Icahn Group nor any of the Icahn Affiliates or its Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) the Company or the Company's respective current or former officers or directors and (ii) so long as the Icahn Group has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Company specifying any such breach, neither the Company nor any of its Affiliates or Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) any member of the Icahn Group or Icahn Affiliates or any of their respective current or former officers or directors.

4.    **Public Announcements.** The Company acknowledges that the Icahn Group intends to file this Agreement as an exhibit to the Icahn Group's Schedule 13D with respect to the Company promptly following the Distribution Effective Date, and the Icahn Group acknowledges that the Company intends to file this Agreement as an exhibit to the Company's Form S-1/A promptly following the execution of this Agreement. The Icahn Group will not issue a press release. The Company shall have an opportunity to review in advance any Schedule 13D filing made by the Icahn Group with respect to this Agreement, and the Icahn Group shall have an opportunity to review in advance the relevant portion of the Form S-1/A filing to be made by the Company with respect to this Agreement.

9

Complaint Ex. D 0009

5. **Confidentiality Agreement.** The Company hereby agrees that, following the appointment of the Icahn Designees to the Board: (i) the Icahn Designees are permitted to and may provide confidential information subject to and in accordance with the terms of the confidentiality agreement in the form attached to this Agreement as **Exhibit B** (the "**Confidentiality Agreement**") (which the Icahn Group agrees to execute upon the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)** and deliver to the Company and cause the Icahn Designees to abide by) and (ii) the Company will execute and deliver the Confidentiality Agreement to the Icahn Group substantially contemporaneously with execution and delivery thereof by the other signatories thereto. At any time an Icahn Designee is a member of the Board, the Board shall not adopt a policy precluding members of the Board from speaking to Mr. Icahn, and the Company confirms that it will advise members of the Board, including the Icahn Designees, that they may, but are not obligated to, speak to Mr. Icahn (but subject to the Confidentiality Agreement), if they are willing to do so and subject to their fiduciary duties and Company Policies (but may caution them regarding specific matters, if any, that involve conflicts between the Company and the Icahn Group).

6. **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

7. **Representations and Warranties of Icahn Group.** Each member of the Icahn Group jointly represents and warrants that, as of the date of this Agreement, (a) the Icahn Group collectively beneficially own, an aggregate of 34,721,118 common shares, no par value (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), of BHC ("**BHC Common Shares**") and no Common Shares, (b) except as set forth in the preceding clause (a) and the Icahn Group's Schedule 13Ds with respect to BHC or the Company or as otherwise disclosed to the Company, no member of the Icahn Group, individually or in the aggregate with any Icahn Affiliate, has any other beneficial ownership of, or economic exposure to, any BHC Common Shares or Common Shares, nor does it currently have or have any right to acquire any interest in any other securities of BHC or the Company (or any rights, options or other securities convertible into or exercisable or exchangeable (whether or not convertible, exercisable or exchangeable immediately or only after the passage of time or the occurrence of a specified event) for such securities or any obligations measured by the price or value of any securities of BHC, the Company or any of their respective controlled Affiliates, including any swaps or other derivative arrangements designed to produce economic benefits and risks that correspond to the ownership of BHC Common Shares or Common Shares, whether or not any of the foregoing would give rise to beneficial ownership (as determined under Rule 13d-3 promulgated under the Exchange Act), and whether or not to be settled by delivery of BHC Common Shares or Common Shares, payment of cash or by other consideration, and without regard to any short position under any such contract or arrangement), and (c) no member of the Icahn Group has any knowledge of any other stockholder of BHC or the Company that intends to submit a notice to the Company to nominate directors at the next Annual Meeting of shareholders of BHC or the Company.

10

Complaint Ex. D 0010

8. **Representations and Warranties and Covenants of the Company.** The Company represents and warrants, that as of the date of this Agreement, the Company expects that the directors so identified in the Company's Form S-1 filed with the SEC on January 13, 2022 shall be all of the directors on the Board as of the completion of the Company's initial public offering of Common Shares. Further, the Company agrees that if the Company enters into an agreement, arrangement or understanding, or otherwise grants any rights, to any other stockholder of the Company to avoid a proxy or similar contest with such stockholder at any time during the three (3) months following the date that the Icahn Designees are seated as directors of the Company, then to the extent such agreement, arrangement or understanding grants any right or rights that are more favorable than those set forth in this Agreement, the Company agrees it shall offer the same such rights to the Icahn Group.

9. **Miscellaneous.** This Agreement shall terminate and be of no further force or effect upon the earliest of the occurrence of any of the following events: (a) following the Board's appointment of the Icahn Designees to the Board pursuant to **Section 1(a)(i)**, (i) no Icahn Designee then serving on the Board and (ii) the Icahn Group no longer being entitled to designate a Replacement Designee for any Icahn Designee, (b) the expiry of the Election Period without the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)**, (c) following the completion of the B+L Distribution, the Icahn Group not collectively beneficially owning an aggregate Net Long Position in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), and (d) any breach by the Icahn Group of its covenants and obligations set forth in **Section 1(a)(ii)** and **Section 3(a)** (including any action taken prior to the commencement of the Standstill Period that would be a breach of **Section 3(a)** if taken during the Standstill Period). Notwithstanding anything herein to the contrary, **Section 3(a)(i)** shall survive any such termination through the Butterfly Date. The parties hereto recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, each party agrees that in addition to other remedies the other party shall be entitled to at law or equity, the other party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law. Furthermore, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery or the other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (iv) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (v) irrevocably consents to service of process by a reputable overnight mail delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

<div align="center">11</div>

Complaint Ex. D 0011

10. **No Waiver.** Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

11. **Entire Agreement.** This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

12. **Notices.** All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy and email is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Email: [*****]
Attention: Christina Ackermann, General Counsel

With copies to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York, NY 10019
Attention: Igor Kirman, [*****]
               Mark Veblen, [*****]
               Sabastian Niles, [*****]

if to the Icahn Group:

Icahn Capital LP
16690 Collins Avenue, Penthouse Suite
Sunny Isles Beach, FL 33160
Attention: Jesse Lynn, Chief Operating Officer
Email: [*****]

13. **Severability.** If at any time subsequent to the date of this Agreement, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

14. **Counterparts.** This Agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

12

Complaint Ex. D 0012

15. **Successors and Assigns.** This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

16. **No Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other persons.

17. **Fees and Expenses.** Neither the Company, on the one hand, nor the Icahn Group, on the other hand, will be responsible for any fees or expenses of the other in connection with this Agreement.

18. **Interpretation and Construction.** Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Unless context otherwise requires, references herein to Exhibits, Sections or Schedules mean the Exhibits, Sections or Schedules attached to this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. In all instances, the term "or" shall not be deemed to be exclusive. For all purposes of this Agreement, and any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A), the Icahn Group and its Icahn Affiliates shall in no event be deemed to beneficially own less than six percent (6%), or three percent (3%), as applicable, of the outstanding Common Shares unless the Icahn Group's crossing of any such threshold is the result of sales of Common Shares or transactions described in Rule 14e-4(a)(1) of the Exchange Act (but excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments) by, or on behalf of, the Icahn Group or its Icahn Affiliates (i.e., issuances of Common Shares, or similar actions, by the Company shall have no effect on the deemed beneficial ownership of Common Shares by the Icahn Group and its Icahn Affiliates for purposes of this this Agreement, or any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A)).

[Signature Pages Follow]

13

Complaint Ex. D 0013

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

**BAUSCH + LOMB CORPORATION**

By:    /s/ Christina M. Ackermann

Name:  Christina M. Ackermann

Title:    Executive Vice President and General Counsel

[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0014

**ICAHN GROUP**

/s/ Carl C. Icahn
_____
Carl C. Icahn

ICAHN PARTNERS LP

By:      /s/ Jesse Lynn
_____
Name: Jesse Lynn
Title:   Chief Operating Officer

ICAHN PARTNERS MASTER FUND LP

By:      /s/ Jesse Lynn
_____
Name: Jesse Lynn
Title:   Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By:      /s/ Ted Papapostolou
_____
Name: Ted Papapostolou
Title:   Chief Financial Officer

[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0015

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By:      /s/ Ted Papapostolou
Name:  Ted Papapostolou
Title:   Chief Financial Officer

IPH GP LLC

By:      /s/ Jesse Lynn
Name:  Jesse Lynn
Title:   Chief Operating Officer

ICAHN CAPITAL LP

By:      /s/ Jesse Lynn
Name:  Jesse Lynn
Title:   Chief Operating Officer

ICAHN ONSHORE LP

By:      /s/ Jesse Lynn
Name:  Jesse Lynn
Title:   Chief Operating Officer

ICAHN OFFSHORE LP

By:      /s/ Jesse Lyn
Name:  Jesse Lynn
Title:   Chief Operating Officer

BECKTON CORP

By:      /s/ Jesse Lyn
Name:  Jesse Lynn
Title:   Vice President

[Signature Page to Director Appointment and Nomination Agreement between
Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0016

## SCHEDULE A

CARL C. ICAHN

ICAHN PARTNERS LP

ICAHN PARTNERS MASTER FUND LP

ICAHN ENTERPRISES G.P. INC.

ICAHN ENTERPRISES HOLDINGS L.P.

IPH GP LLC

ICAHN CAPITAL LP

ICAHN ONSHORE LP

ICAHN OFFSHORE LP

BECKTON CORP.

Complaint Ex. D 0017

**EXHIBIT A**

[FORM OF RESIGNATION]

[DATE]

Board of Directors
Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Re: <u>Resignation</u>

Ladies and Gentlemen:

This irrevocable resignation is delivered pursuant to that certain Director Appointment and Nomination Agreement, dated as of April [__], 2022 (the "Agreement") among Bausch + Lomb Corporation and the Icahn Group. Capitalized terms used herein but not defined shall have the meaning set forth in the Agreement.

Pursuant to Section 1(c) of the Agreement, effective only upon, and subject to, such time as the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least six percent (6%) of the total outstanding Common Shares as of the Distribution Effective Date, I hereby irrevocably resign from my position as a director of the Company and from any and all committees of the Board on which I serve; *provided, however*, that if this resignation is tendered pursuant to Section 1(c) of the Agreement, this resignation shall not be effective if any other resignation of an Icahn Designee is tendered and accepted pursuant to Section 1(c) of the Agreement (and the Icahn Group shall determine in its sole discretion which resignation of the Icahn Designees shall be effective) unless and until the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least three percent (3%) of the total outstanding Common Shares as of the Distribution Effective Date.

Sincerely,

_____

Name:

B-1

Complaint Ex. D 0018

**EXHIBIT B**

[CONFIDENTIALITY AGREEMENT]

B-1

Complaint Ex. D 0019

**CONFIDENTIALITY AGREEMENT**

**BAUSCH + LOMB CORPORATION**

[DATE]

To: Each of the persons or entities listed on Schedule A (the "Icahn Group" or "you")

Ladies and Gentlemen:

This letter agreement shall become effective upon the appointment of any Icahn Designee to the Board of Directors (the "Board") of Bausch + Lomb Corporation (the "Company"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Director Appointment and Nomination Agreement (the "Nomination Agreement"), dated as of April [__], 2022, among the Company and the Icahn Group. The Company understands and agrees that, subject to the terms of, and in accordance with, this letter agreement, an Icahn Designee may, if and to the extent he or she desires to do so, disclose information he or she obtains while serving as a member of the Board to you and your Representatives (as hereinafter defined), and may discuss such information with any and all such persons, subject to the terms and conditions of this Agreement, and that other members of the Board may similarly disclose information to you. As a result, you may receive certain non-public information regarding the Company. You acknowledge that this information is proprietary to the Company and may include trade secrets or other business information the disclosure of which could harm the Company. In consideration for, and as a condition of, the information being furnished to you and your agents, representatives, attorneys, advisors, directors, officers or employees, subject to the restrictions in paragraph 2 (collectively, the "Representatives"), you agree to treat any and all information concerning or relating to the Company or any of its subsidiaries or current or former affiliates that is furnished to you or your Representatives (regardless of the manner in which it is furnished, including in written or electronic format or orally, gathered by visual inspection or otherwise) by any Icahn Designee, or by or on behalf of the Company or any Company Representative (as defined below), including discussions or matters considered in meetings of the Board or Board committees, together with any notes, analyses, reports, models, compilations, studies, interpretations, documents, records or extracts thereof containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, "Evaluation Material"), in accordance with the provisions of this letter agreement, and to take or abstain from taking the other actions hereinafter set forth.

1. The term "Evaluation Material" does not include information that (i) is or has become generally available to the public other than as a result of a direct or indirect disclosure by you or your Representatives in violation of this letter agreement or any other obligation of confidentiality, (ii) was within your or any of your Representatives' possession on a non-confidential basis prior to its being furnished to you by any Icahn Designee, or by or on behalf of the Company or its agents, representatives, attorneys, advisors, directors (other than the Icahn Designees), officers or employees (collectively, the "Company Representatives"), or (iii) is received from a source other than any Icahn Designee, the Company or any of the Company Representatives; *provided,* that in the case of (ii) or (iii) above, the source of such information was not believed by you, after reasonable inquiry, to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other person with respect to such information at the time the information was disclosed to you.

2. You and your Representatives will, and you will cause your Representatives to, (a) keep the Evaluation Material strictly confidential and (b) not disclose any of the Evaluation Material in any manner whatsoever without the prior written consent of the Company; *provided, however,* that you may privately disclose any of such information: (A) to your Representatives (i) who need to know

B-2

Complaint Ex. D 0020

such information for the purpose of advising you on your investment in the Company and (ii) who are informed by you of the confidential nature of such information and agree to be bound by the terms of this Agreement as if they were a party hereto; *provided, further,* that you will be responsible for any violation of this letter agreement by your Representatives as if they were parties to this letter agreement; and (B) to the Company and the Company Representatives. It is understood and agreed that no Icahn Designee shall disclose to you or your Representatives any Legal Advice (as defined below) that may be included in the Evaluation Material with respect to which such disclosure would constitute waiver of the Company's attorney client privilege or attorney work product privilege. "Legal Advice" as used in this letter agreement shall be solely and exclusively limited to the advice provided by legal counsel and shall not include factual information or the formulation or analysis of business strategy that is not protected by the attorney-client or attorney work product privilege.

3.  In the event that you or any of your Representatives are required by applicable subpoena, legal process or other legal requirement to disclose any of the Evaluation Material, you will (a) promptly notify (except where such notice would be legally prohibited) the Company in writing by email, facsimile and certified mail so that the Company may seek a protective order or other appropriate remedy (and if the Company seeks such an order, you will provide such cooperation as the Company shall reasonably request), at its cost and expense and (b) produce or disclose only that portion of the Evaluation Material which your outside legal counsel of national standing advises you in writing is legally required to be so produced or disclosed and you inform the recipient of such Evaluation Material of the existence of this letter agreement and the confidential nature of such Evaluation Material. In no event will you or any of your Representatives oppose action by the Company to obtain a protective order or other relief to prevent the disclosure of the Evaluation Material or to obtain reliable assurance that confidential treatment will be afforded the Evaluation Material. For the avoidance of doubt, it is understood that there shall be no "legal requirement" requiring you to disclose any Evaluation Material solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative or other voluntary transactions with respect to the Common Shares of the Company or otherwise proposing or making an offer to do any of the foregoing, or you would be unable to file any proxy or other solicitation materials in compliance with Section 14(a) of the Exchange Act or the rules promulgated thereunder.

4.  You acknowledge that (a) none of the Company or any of the Company Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any Evaluation Material, and (b) none of the Company or any of the Company Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom. You and your Representatives (or anyone acting on your or their behalf) shall not directly or indirectly initiate contact or communication with any executive or employee of the Company other than the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, General Counsel, or such other persons approved by the foregoing or the Board concerning Evaluation Material, or to seek any information in connection therewith from any such person other than the foregoing, without the prior consent of the Company; *provided, however,* the restriction in this sentence shall not in any way apply to any Icahn Designee acting in his or her capacity as a Board member (nor shall it apply to any other Board members).

5.  All Evaluation Material shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of any disclosure of or your use of any Evaluation Material acquire any rights with respect thereto, all of which rights (including all intellectual property rights) shall remain exclusively with the Company. At any time after the date on which no Icahn Designee is a

B-3

Complaint Ex. D 0021

director of the Company, upon the request of the Company for any reason, you will promptly return to the Company or destroy all hard copies of the Evaluation Material and use reasonable best efforts to permanently erase or delete all electronic copies of the Evaluation Material in your or any of your Representatives' possession or control (and, upon the request of the Company, shall promptly certify to the Company that such Evaluation Material has been erased or deleted, as the case may be). Notwithstanding the foregoing, the obligation to return or destroy Evaluation Material shall not cover information (i) that is maintained on routine computer system backup tapes, disks or other backup storage devices as long as such backed-up information is not used, disclosed, or otherwise recovered from such backup devices or (ii) retained on a confidential basis solely to the extent required to comply with applicable law and/or any internal record retention requirements; provided that such materials referenced in this sentence shall remain subject to the terms of this Agreement applicable to Evaluation Material, and you and your Representatives will continue to be bound by the obligations contained herein for as long as any such materials are retained by you or your Representatives.

6. You acknowledge, and will advise your Representatives, that the Evaluation Material may constitute material non-public information under applicable federal, state or provincial securities laws, and you agree that you shall not, and you shall use reasonable best efforts to ensure that your Representatives do not, trade or engage in any derivative or other transaction on the basis of such information in violation of such laws.

7. You hereby represent and warrant to the Company that (i) you have all requisite company power and authority to execute and deliver this letter agreement and to perform your obligations hereunder, (ii) this letter agreement has been duly authorized, executed and delivered by you, and is a valid and binding obligation, enforceable against you in accordance with its terms, (iii) this letter agreement will not result in a violation of any terms or conditions of any agreements to which you are a party or by which you may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting you, and (iv) your entry into this letter agreement does not require approval by any owners or holders of any equity or other interest in you (except as has already been obtained).

8. Any waiver by the Company of a breach of any provision of this letter agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this letter agreement. The failure of the Company to insist upon strict adherence to any term of this letter agreement on one or more occasions shall not be considered a waiver or deprive the Company of the right thereafter to insist upon strict adherence to that term or any other term of this letter agreement.

9. You acknowledge and agree that the value of the Evaluation Material to the Company is unique and substantial, but may be impractical or difficult to assess in monetary terms. You further acknowledge and agree that in the event of an actual or threatened violation of this letter agreement, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, you acknowledge and agree that, in addition to any and all other remedies which may be available to the Company at law or equity, the Company shall be entitled to an injunction or injunctions to prevent breaches of this letter agreement and to enforce specifically the terms and provisions of this letter agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this letter agreement, you shall not allege, and you hereby waive the defense, that there is an adequate remedy at law.

B-4

Complaint Ex. D 0022

10. Each of the parties (a) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this letter agreement or the transactions contemplated by this letter agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it shall not bring any action relating to this letter agreement or the transactions contemplated by this letter agreement in any court other than the Delaware Court of Chancery or other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (d) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (e) irrevocably consents to service of process by a reputable overnight delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS LETTER AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

11. This letter agreement and the Nomination Agreement contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior or contemporaneous agreements or understandings, whether written or oral. This letter agreement may be amended only by an agreement in writing executed by the parties hereto.

12. All notices, consents, requests, instructions, approvals and other communications provided for in this letter agreement and all legal process in regard to this letter agreement shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4
Email: [*****]
Attention: Christina Ackermann, General Counsel

With copies to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York, NY 10019
Attention: Igor Kirman, [*****]
          Mark Veblen, [*****]
          Sabastian Niles, [*****]

B-5

Complaint Ex. D 0023

if to the Icahn Group:

Icahn Capital LP
16690 Collins Avenue, Penthouse Suite
Sunny Isles Beach, FL 33160
Attention: Jesse Lynn, Chief Operating Officer
Email: [*****]

13. If at any time subsequent to the date hereof, any provision of this letter agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this letter agreement.

14. This letter agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. This letter agreement and the rights and obligations herein may not be assigned or otherwise transferred, in whole or in part, by you without the express written consent of the Company. This letter agreement, however, shall be binding on successors of the parties to this letter agreement.

16. The Icahn Group shall cause any Replacement Designee appointed to the Board pursuant to the Nomination Agreement to execute a copy of this letter agreement.

17. This letter agreement shall expire two (2) years from the date on which no Icahn Designee remains a director of the Company; except that you shall maintain in accordance with the confidentiality obligations set forth herein any Evaluation Material constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3) and (ii) retained pursuant to Section 5.

18. No licenses or rights under any patent, copyright, trademark, or trade secret are granted or are to be implied by this letter agreement.

19. Each of the parties acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this letter agreement, and that it has executed the same with the advice of said counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties, and any controversy over interpretations of this agreement shall be decided without regards to events of drafting or preparation. The term "including" shall in all instances be deemed to mean "including without limitation." In all instances, the term "or" shall not be deemed to be exclusive.

[Signature Pages Follow]

B-6

Complaint Ex. D 0024

Please confirm your agreement with the foregoing by signing and returning one copy of this letter agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

Very truly yours,

BAUSCH + LOMB CORPORATION

By: _____
Name:
Title:

Accepted and agreed as of the date first written above:

CARL C. ICAHN

_____
Carl C. Icahn

ICAHN PARTNERS LP

By: _____
Name:   Jesse Lynn
Title:   Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0025

ICAHN PARTNERS MASTER FUND LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By: _____
Name: Ted Papapostolou
Title: Chief Financial Officer

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By: _____
Name: Ted Papapostolou
Title: Chief Financial Officer

IPH GP LLC

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN CAPITAL LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

ICAHN ONSHORE LP

By: _____
Name: Jesse Lynn
Title: Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0026

ICAHN OFFSHORE LP

By:    _____

Name:  Jesse Lynn
Title:   Chief Operating Officer

BECKTON CORP

By:    _____

Name:  Jesse Lynn
Title:   Vice President

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. D 0027

SCHEDULE A

Beckton Corp.

Icahn Capital LP

Icahn Enterprises Holdings L.P.

Icahn Enterprises G.P. Inc.

Icahn Offshore LP

Icahn Onshore LP

Icahn Partners LP

Icahn Partners Master Fund LP

IPH GP LLC

Icahn Capital LP

Carl C. Icahn

Complaint Ex. D 0028

ANNEX 1

**Tax Criteria**

From and after the Distribution Effective Date, the Icahn Group shall not be permitted to designate any individual as a director of the Company if: (x) such individual, at the time of such designation, is also a member of the board of directors of BHC; and (y) immediately following such designation, more than two (2) individuals are members of the boards of directors of both BHC and the Company. For example, if on the date of any such designation, Brett Icahn and Steven Miller continue to be members of the board of directors of BHC, then: (x) if no other individuals are members of the boards of directors of both BHC and the Company, then both Brett Icahn and Steven Miller would be permitted to join the board of directors of the Company; (y) if two (2) other individuals are members of the boards of directors of both BHC and the Company, then neither Brett Icahn nor Steven Miller would be permitted to join the board of directors of the Company; and (z) if one (1) other individual is a member of the boards of directors of both BHC and the Company, then Brett Icahn or Steven Miller (but not both) would be permitted to join the board of directors of the Company.

Complaint Ex. D 0029

# Complaint Ex. E

EX-10.1 2 dp175752_ex1001.htm EXHIBIT 10.1

**Exhibit 10.1**

*Execution Version*

**REDACTED**

**Certain identified information, indicated by [*****], has been omitted pursuant to Item 601(b)(10) because it is (i) not material and (ii) contains personal information.**

**AMENDED AND RESTATED DIRECTOR APPOINTMENT AND NOMINATION AGREEMENT**

This Amended and Restated Director Appointment and Nomination Agreement, dated as of June 21, 2022 (this "**Agreement**"), is by and among the persons and entities listed on Schedule A (collectively, the "**Icahn Group**", and each individually a "**member**" of the Icahn Group) and Bausch + Lomb Corporation (the "**Company**"). In consideration of and reliance upon the mutual covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      **Board Representation and Board Matters.**

(a)      The Company and the Icahn Group agree as follows:

(i)      as soon as practicable following the date hereof, the Company shall take or shall have taken all necessary action to increase the size of the Board of Directors of the Company (the "**Board**") by two, and following consultation with the Icahn Group, to appoint two individuals identified by the Icahn Group and reasonably acceptable to the Company (such individuals, collectively, the "**Icahn Designees**" and each an "**Icahn Designee**") to fill the resulting vacancies, each with a term expiring at the first annual general meeting of stockholders of the Company following such written election (the "**First Annual Meeting**"). Prior to such date as the Icahn Designees are seated as members of the Board, the Icahn Group shall not request and the Company shall not provide any material non-public information relating to or involving the Company. For the avoidance of doubt, it shall not be deemed unreasonable for the Company to reject a designee in accordance with this **Section 1(a)(i)** if such designee does not satisfy the Director Criteria (as hereafter defined) or the criteria set forth on Annex 1 attached hereto (the **"Tax Criteria"**).

(ii)      the Company shall use reasonable best efforts to cause the election of each of the Icahn Designees at the First Annual Meeting (including by (x) recommending that the Company's stockholders vote in favor of the election of each of the Icahn Designees, (y) including each of the Icahn Designees in the Company's proxy statement and proxy card for the First Annual Meeting, and (z) otherwise supporting each of the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate). The Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to the First Annual Meeting. As a condition to the Icahn Designees' appointment to the Board, the Icahn Designees shall execute and deliver a customary joinder to this Agreement. Prior to the execution and delivery of such joinder to the Company, the Icahn Group shall cause the Icahn Designees to comply with the covenants, agreements and other provisions herein applicable to the Icahn Designees.

(iii)      that as a condition to the Icahn Designees' appointment to the Board and subsequent nomination for election, the Icahn Designees each agree to provide to

Complaint Ex. E 0001

the Company, prior to nomination and appointment and on an on-going basis while serving as a member of the Board, such information and materials as the Company routinely receives from other members of the Board or as is required to be disclosed in proxy statements under applicable law or as is otherwise reasonably requested by the Company from time-to-time from all members of the Board in connection with the Company's legal, regulatory, auditor or stock exchange requirements, including, but not limited to, a completed D&O Questionnaire in the form separately provided by the Company to the Icahn Group (the "**Nomination Documents**").

(iv)     That, subject to **Section 1(c)** below, should any Icahn Designee resign from the Board or be rendered unable to, or refuse to, be appointed to, or for any other reason fail to serve or is not serving, on the Board (other than as a result of not being nominated by the Company for election at an annual meeting of stockholders subsequent to the First Annual Meeting, following which the Icahn Group's replacement rights pursuant to this **Section 1(a)(iv)** shall terminate with respect to such Icahn Designee), as long as the Icahn Group has not materially breached this Agreement and failed to cure such breach within five (5) business days of written notice from the Company specifying any such breach, the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, or as a nominee on the Company's slate of nominees for election to the Board at the First Annual Meeting (collectively, the "**First BLCO Slate**"), as applicable, a replacement that is approved by the Board, such approval not to be unreasonably withheld, conditioned or delayed (an "**Acceptable Person**") (and if such proposed designee is not an Acceptable Person, the Icahn Group shall be entitled to continue designating a recommended replacement until such proposed designee is an Acceptable Person) (a "**Replacement Designee**"). Any Replacement Designee who becomes a Board member in replacement of any Icahn Designee pursuant to this Section 1(a)(iv) or Section 1(e) shall be deemed to be an Icahn Designee for all purposes under this Agreement and, as a condition to being appointed to the Board, shall be required to sign a customary joinder to this Agreement.

(v)     For the avoidance of doubt, the Board's approval of a Replacement Designee pursuant to **Section 1(a)(iv)** or **Section 1(e)** shall not be considered unreasonably withheld if: (1) such replacement does not (A) qualify as "independent" pursuant to the NYSE Rules (as defined below), (B) have the relevant financial and business experience to be a director of the Company, or (C) satisfy the requirements set forth in the Company Policies (as defined below), in each case as in effect as of the date hereof or such additional or amended guidelines and policies approved by the Board that are applicable to all directors of the Company (collectively clauses (A) through (C), the **"Director Criteria"**); provided that no Director Criteria will be adopted that would prevent any employee or affiliate of the Icahn Group from becoming directors by virtue of the fact that such person is an employee or affiliate of the Icahn Group had such criteria been in effect today; or (2) such Replacement Designee does not satisfy the Tax Criteria.

(vi)     that (1) for any annual general meeting of stockholders subsequent to the First Annual Meeting, the Company shall notify the Icahn Group in writing no less than thirty-five (35) calendar days before the advance notice deadline set forth in the Company's Articles of Incorporation whether the Icahn Designees will be

2

Complaint Ex. E 0002

nominated by the Company for election as directors at such annual general meeting and, (2) if the Icahn Designees are to be so nominated, shall use reasonable best efforts to cause the election of the Icahn Designees so nominated by the Company (including by (x) recommending that the Company's stockholders vote in favor of the election of the Icahn Designees, (y) including the Icahn Designees in the Company's proxy statement and proxy card for such annual general meeting and (z) otherwise supporting the Icahn Designees for election in a manner no less rigorous and favorable than the manner in which the Company supports its other nominees in the aggregate), and the Icahn Group agrees not to conduct a proxy contest regarding any matter, including the election of directors, with respect to any such annual general meeting at which the Company has nominated Icahn Designees and such Icahn Designees have consented to being named, and are named, in the proxy statement relating to such annual general meeting.

(vii)    that from and after the date of this Agreement, so long as an Icahn Designee is seated as a member of the Board, without the approval of the Icahn Designees then on the Board (such approval not to be unreasonably withheld, delayed or conditioned), (w) the Board shall not form an Executive Committee or any other committee with functions similar to those customarily granted to an Executive Committee; (x) the Board shall not form any other new committee (other than committees formed with respect to matters for which there are actual conflicts of interest between the Icahn Designees and the Company) without offering to at least one Icahn Designee the opportunity to be a member of such committee (provided, however that if such committee has more than five (5) members then both Icahn Designees shall be offered to be appointed to such committee (to the extent there are two Icahn Designees then on the Board)), (y) the Board shall not increase the size of any committee and (z) any Board consideration of appointment and employment of named executive officers, mergers and acquisitions of material assets, or dispositions of material assets, or similar extraordinary transactions, such consideration, and voting with respect thereto shall take place only at the full Board level or in committees of which one of the Icahn Designees is a member (for the avoidance of doubt, nothing in this Agreement changes, amends, or modifies the authority, duties and obligations of the Talent & Compensation Committee of the Board).

(viii)   each of the Icahn Designees confirms that he or she will recuse himself or herself from such portions of Board or committee meetings, if any, involving actual conflicts between the Company and the Icahn Group. Promptly following the receipt of the Nomination Documents, the Board shall make a determination as to whether the Icahn Designees, based solely upon the representations provided by the Icahn Group in **Section 7** of this Agreement (which representations shall be updated by the Icahn Group to be current as of the date of the written election made pursuant to **Section 1(a)(i)**) and the information provided to the Board by the Icahn Designees in the Nomination Documents, are independent under the Board's independence guidelines, the independence requirements of the New York Stock Exchange (the "**NYSE Rules**"), and the independence standards applicable to the Company under paragraph (a)(1) of Item 407 of Regulation S-K under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**").

(ix)    that, to the extent permitted by law and the Company's then-existing insurance coverage, from and after the date that the Icahn Designees are seated as members

3

Complaint Ex. E 0003

of the Board, the Icahn Designees shall be covered by the same indemnification and insurance provisions and coverage as are applicable to the individuals that are directors of the Company as of such time, and at such time the Icahn Designees are no longer members of the Board, then the same indemnification and insurance provisions and coverage as are applicable to former directors of the Company as of such time.

(i)     notwithstanding the foregoing, the Company acknowledges that for so long as the Icahn Designees are members of the Board, the Icahn Designees shall have the same rights as any other director with respect to being permitted to attend (as an observer and without voting rights) any committee meeting regardless of whether such director is a member of such committee.

(b)     At all times from the date that the Icahn Designees are seated as members of the Board through the termination of their service as a member of the Board, each of the Icahn Designees shall comply with all written policies, procedures, processes, codes, rules, standards and guidelines applicable to all non-employee Board members and of which the Icahn Designees have been provided written copies in advance (or which have been filed with the Securities and Exchange Commission ("**SEC**") or posted on the Company's website), including the Company's code of business conduct, corporate policies on ethical business conduct, political contributions, lobbying and other political activities policy, conflicts of interest policy, insider trading policy, anti-hedging policy and governance policies (collectively, the "**Company Policies**"), and shall preserve the confidentiality of Company business and information, including discussions or matters considered in meetings of the Board or Board committees (except to the extent permitted in the Confidentiality Agreement (as defined below) to be entered into pursuant to **Section 5** of this Agreement). In addition, each of the Icahn Designees is aware of and shall act in accordance with his or her fiduciary duties with respect to the Company and its stockholders. For the avoidance of doubt, the Parties agree that notwithstanding the terms of any Company Policies, in no event shall any Company Policy apply to the Icahn Group, other than the Icahn Designees in their capacity as members of the Board.

(c)     Any provision in this Agreement to the contrary notwithstanding, if at any time after the date hereof, the Icahn Group, together with any Icahn Affiliates (as defined below), ceases collectively to beneficially own (for all purposes in this Agreement, the terms "beneficially own" and "beneficial ownership" shall have the meaning ascribed to such terms as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act), an aggregate Net Long Position (x) in at least six percent (6%) of the total outstanding (A) common shares of Bausch Health Companies Inc. ("**BHC**" and such common shares, "**BHC Common Shares**"), for so long as BHC owns at least 80% of the common shares of the Company ("**Common Shares**"), or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) one of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee; or (y) in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), (1) each of the Icahn Designees (or, if applicable, his or her Replacement Designee) shall, and

4

Complaint Ex. E 0004

the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits and (2) the Icahn Group shall not have the right to replace such Icahn Designee(s). For clarity, "Common Shares" will include the shares of the entity resulting from the amalgamation of the Company expected to be effected in connection with the consummation of the spin-off transaction by which BHC transfers any or all of its remaining indirect equity interest in the Company to BHC's then-current shareholders (the "**B+L Distribution**") for which the Common Shares are exchanged pursuant to such amalgamation.

The Icahn Group, upon request, shall keep the Company regularly apprised of the Net Long Position of the Icahn Group and the Icahn Affiliates to the extent that such position differs from the ownership positions publicly reported on the Icahn Schedule 13D and amendments thereto.

For purposes of this Agreement: the term "Net Long Position" shall mean: such Common Shares beneficially owned, directly or indirectly, that constitute such person's net long position as defined in Rule 14e-4 under the Exchange Act *mutatis mutandis*, provided that "Net Long Position" shall not include any shares as to which such person does not have the right to vote or direct the vote, or as to which such person has entered into a derivative or other agreement, arrangement or understanding that hedges or transfers, in whole or in part, directly or indirectly, any of the economic consequences of ownership of such shares; and the terms "person" or "persons" shall mean any individual, corporation (including not-for-profit), general or limited partnership, limited liability or unlimited liability company, joint venture, estate, trust, association, organization or other entity of any kind or nature.

Each of the Icahn Designees shall, prior to his or her appointment to the Board (including any Replacement Designee), and each member of the Icahn Group shall cause each of the Icahn Designees (including any Replacement Designee) to, execute an irrevocable resignation in the form attached to this Agreement as **Exhibit A**.

(d)     So long as the Icahn Group, together with the Icahn Affiliates, beneficially owns an aggregate Net Long Position in at least six percent (6%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations or similar type events), the Company shall not adopt a Rights Plan with an "Acquiring Person" beneficial ownership threshold below 20.0% of the then-outstanding Common Shares, unless (x) such Rights Plan provides that, if such Rights Plan is not ratified by the Company's stockholders within 105 days of such Rights Plan being adopted, such Rights Plan shall automatically expire and (y) the "Acquiring Person" definition of such Rights Plan exempts the Icahn Group up to a beneficial ownership of 19.95% of the then-outstanding Common Shares. The term "**Rights Plan**" shall mean any plan or arrangement of the sort commonly referred to as a "rights plan" or "stockholder rights plan" or "shareholder rights plan" or "poison pill" that is designed to increase the cost to a potential acquirer of exceeding the applicable ownership thresholds through the issuance of new rights, common stock or preferred shares (or any other security or device that may be issued to stockholders of the Company, other than ratably to all stockholders of the Company) that carry severe redemption provisions, favorable purchase provisions or otherwise, and any related rights agreement.

(e)     If, on any date that is ten or fewer business days prior to the Distribution Effective Date, an Icahn Designee would not satisfy the Tax Criteria if such Icahn Designee were initially

5

Complaint Ex. E 0005

designated immediately after the Distribution Effective Date, (i) such Icahn Designee shall, and the Icahn Group shall cause such Icahn Designee to, promptly tender his or her resignation from the Board and any committee of the Board on which he or she then sits, and (ii) the Icahn Group shall be entitled to designate, and the Company shall cause to be added as a member of the Board, a Replacement Designee.

2. **Additional Agreements.**

(a)     Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, solely in connection with the First Annual Meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the First Annual Meeting, in each case that are entitled to vote at the First Annual Meeting, to be present for quorum purposes and to be voted, at the First Annual Meeting or at any adjournment or postponement thereof, (A) for each nominee on the First BLCO Slate, (B) against any nominees that are not nominated by the Board for election at the First Annual Meeting, (C) against any stockholder proposal to increase the size of the Board and (D) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence and in Section 2(b), the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual or special meeting.

(b)     Unless the Company or the Board has breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, that for any annual general meeting or special meeting of stockholders subsequent to the First Annual Meeting, if the Board has agreed to nominate the Icahn Designees then serving on the Board for election at such annual general meeting or special meeting and the Icahn Designees have consented to be nominated at such annual general meeting or special meeting, each member of the Icahn Group shall (1) cause, in the case of all Voting Securities owned of record, and (2) instruct and cause the record owner, in the case of all shares of Voting Securities beneficially owned but not owned of record, directly or indirectly, by it, or by any Icahn Affiliate, in each case as of the record date of the applicable annual general meeting or special meeting, in each case that are entitled to vote at such annual general meeting or special meeting, to be present for quorum purposes and to be voted at such annual general meeting or special meeting or at any adjournment or postponement thereof, (A) for each director nominated by the Board for election at such annual general meeting, (B) against any (i) stockholder proposal to increase the size of the Board and (ii) nominees that are not nominated by the Board for election at such annual general meeting or special meeting, and (C) in favor of the ratification of the Company's auditors. Except as provided in the foregoing sentence, the Icahn Group shall not be restricted from voting "For", "Against" or "Abstaining" from any other proposals at any annual general meeting or special meeting following the First Annual Meeting.

As used in this Agreement, the term "**Voting Securities**" shall mean the Common Shares that such person has the right to vote or has the right to direct the vote. For purposes of this Section 2, no person shall be, or be deemed to be, the "beneficial owner" of, or to "beneficially own," any securities beneficially owned by any director of the Company to the extent such securities were acquired directly from the Company by such director as or

6

Complaint Ex. E 0006

pursuant to director compensation for serving as a director of the Company. For purposes of this Agreement, (A) the term "**Affiliate**" shall have the meaning set forth in Rule 12b-2 promulgated by the SEC under the Exchange Act, and the term "**Icahn Affiliate**" shall mean such Affiliates that are controlled by the members of the Icahn Group, and (B) the term "**Associate**" shall mean (A) any trust or other estate in which such person has a substantial beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (B) any relative or spouse of such person, or any relative of such spouse, who has the same home as such person or who is a director or officer of such person or of any of its parents or subsidiaries.

**3.**　　**Icahn Group Restrictions**

(a)　　From and after the date that the Icahn Designees are seated as members of the Board, until the later of (i)(x) the end of the First Annual Meeting and (y) such date as no Icahn Designee is on the Board and the Icahn Group has no right to designate a Replacement Designee (including if the Icahn Group has irrevocably waived such right in writing), and (ii) solely with respect to **Section 3(a)(i)(x)**, the Butterfly Date (as hereafter defined) (the "**Standstill Period**"), so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, no member of the Icahn Group shall, directly or indirectly, and each member of the Icahn Group shall cause each of the Icahn Affiliates and its Associates not to, directly or indirectly (it being understood that the foregoing shall not restrict the Icahn Designees from discussing the matters set forth below with other members of the Board):

(i)　　acquire, offer or propose to acquire any voting securities (or beneficial ownership thereof), or rights or options to acquire any voting securities (or beneficial ownership thereof) of the Company if after any such case, immediately after the taking of such action the Icahn Group, together with its respective Icahn Affiliates, would in the aggregate, beneficially own more than 19.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments); provided that: (x) if, solely as a result of their acquisition of Common Shares or securities or other instruments convertible into Common Shares, the Icahn Group, together with its respective Icahn Affiliates and its Associates, become the beneficial owners of more than 9.95% of the then outstanding Common Shares (excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), then neither the Icahn Group nor the Icahn Affiliates nor its Associates shall sell any Common Shares or securities or other instruments convertible into Common Shares (but excluding, for the avoidance of doubt, any swaps or other instruments that do not allow for settlement in property other than cash) following the date of the B+L Distribution (the "**Distribution Effective Date**") and prior to the Butterfly Date without first obtaining a supplemental tax ruling from the Canada Revenue Agency ("**CRA**") or an opinion of a nationally recognized accounting firm or law firm that is in form and substance satisfactory to the Company, acting reasonably, that such sale will not cause the B+L Distribution to be taxed in a manner inconsistent with that provided for in the tax ruling issued by the CRA in connection with the B+L Distribution; and (y) the term **"Butterfly Date"** shall mean the date that is the earlier of (A) eighteen (18) months after the Distribution Effective Date and (B) the date the Company delivers written notice to the Icahn Group in accordance

7

Complaint Ex. E 0007

with Section 12 confirming that BHC is not proceeding with a Canadian "butterfly" form of spin out with respect to the B+L Distribution;

(ii)    except with respect to the signatories to the Icahn Group's Schedule 13D filed with the SEC with respect to the Company (the "**Icahn Schedule 13D**"), form or join in a partnership, limited partnership, syndicate or a "group" as defined under Section 13(d) of the Exchange Act, with respect to the securities of the Company;

(iii)    present (or request to present) at any annual general meeting or any special meeting of the Company's stockholders, any proposal for consideration for action by stockholders or engage in any solicitation of proxies or consents or become a "participant" in a "solicitation" (as such terms are defined in Regulation 14A under the Exchange Act) of proxies or consents (including, without limitation, any solicitation of consents that seeks to call a special meeting of stockholders) or, except as provided in this Agreement, otherwise publicly propose (or publicly request to propose) any nominee for election to the Board or seek representation on the Board or the removal of any member of the Board;

(iv)    grant any proxy, consent or other authority to vote with respect to any matters (other than to the named proxies included in the Company's proxy card for any annual general meeting or special meeting of stockholders) or deposit any Voting Securities in a voting trust or subject them to a voting agreement or other arrangement of similar effect (excluding customary brokerage accounts, margin accounts, prime brokerage accounts and the like), in each case, except as provided in Sections 2(a) or (b);

(v)    call or seek to call any special meeting of the Company or action by consent resolutions;

(vi)    institute, solicit, assist or join, as a party, any litigation, arbitration or other proceeding against or involving the Company;

(vii)    separately or in conjunction with any other person in which it is or proposes to be either a principal, partner or financing source or is acting or proposes to act as broker or agent for compensation, submit a proposal for or offer of (with or without conditions), any Extraordinary Transaction (as defined below); provided that the Icahn Group shall be permitted to sell or tender their Common Shares, and otherwise receive consideration, pursuant to any Extraordinary Transaction; and provided further that (A) if a third party (other than the Icahn Group or an Icahn Affiliate) commences a tender offer or exchange offer for all of the outstanding Common Shares that is not rejected by the Board in its Recommendation Statement on Schedule 14D-9, then the Icahn Group shall similarly be permitted to make an offer for the Company or commence a tender offer or exchange offer for all of the outstanding Common Shares at the same or higher consideration per share, provided that the foregoing (y) will not relieve the Icahn Group of its obligations under the Confidentiality Agreement and (z) will not be deemed to require the Company to make any public disclosures and (B) the Company may waive the restrictions in this Section 3(a)(vii) with the approval of the Board. "Extraordinary Transaction" means, collectively, any of the following involving the Company or any of its subsidiaries or its or their securities or all or substantially all of the assets or businesses of the Company and its subsidiaries: any tender offer or exchange

8

Complaint Ex. E 0008

offer, merger, acquisition, business combination, reorganization, restructuring, recapitalization, sale or acquisition of material assets, or liquidation or dissolution; provided that Extraordinary Transaction shall not include, and neither this Section 3(a) nor any other term of this Agreement, shall restrict the Icahn Group from commencing and consummating a tender offer pursuant to applicable Canadian laws and regulations to acquire additional Common Shares, so long as upon consummation of such tender offer(s) the Icahn Group would comply with **Section 3(a)(i)**; provided, further that this Section 3(a)(vi) shall not prevent an Icahn Designee acting in his or her capacity as a director of the Company from raising such matter privately at the Board;

(viii)     seek, or encourage any person, to submit nominations in furtherance of a "contested solicitation" for the election or removal of directors with respect to the Company or, except as expressly provided in this Agreement, seek, encourage or take any other action with respect to the election or removal of any directors;

(ix)     make any public communication in opposition to (A) any merger, acquisition, amalgamation, recapitalization, restructuring, disposition, distribution, spin-off, asset sale, joint venture or other business combination (including the B+L Distribution) or (B) any financing transaction, in each case involving the Company;

(x)     seek to advise, encourage, support or influence any person with respect to the voting or disposition of any securities of the Company at any annual general meeting or special meeting of stockholders, except in accordance with Section 2(a) or (b);

(xi)     publicly disclose any intention, plan or arrangement inconsistent with any provision of this Section 3; or

(xii)     publicly encourage or support any other person to take any of the actions described in this Section 3 that the Icahn Group is restricted from doing.

(b)     Subject to applicable law, from the date of this Agreement until the end of the Standstill Period, (i) so long as the Company has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Icahn Group specifying any such breach, neither a member of the Icahn Group nor any of the Icahn Affiliates or its Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business criticism) the Company or the Company's respective current or former officers or directors and (ii) so long as the Icahn Group has not breached any material provision of this Agreement and failed to cure such breach within five (5) business days following the receipt of written notice from the Company specifying any such breach, neither the Company nor any of its Affiliates or Associates (including such persons' officers, directors and persons holding substantially similar positions however titled) shall make, or cause to be made, by press release or similar public statement, including to the press or media (including social media), or in an SEC or other public filing, any statement or announcement that disparages (as distinct from objective statements reflecting business

9

Complaint Ex. E 0009

criticism) any member of the Icahn Group or Icahn Affiliates or any of their respective current or former officers or directors.

4.  **Public Announcements.** The Company acknowledges that the Icahn Group intends to file this Agreement as an exhibit to the Icahn Group's Schedule 13D with respect to the Company promptly following the date hereof, and the Icahn Group acknowledges that the Company intends to file this Agreement as an exhibit to a Current Report on Form 8-K promptly following the execution of this Agreement. The Icahn Group will not issue a press release. The Company shall have an opportunity to review in advance any Schedule 13D filing made by the Icahn Group with respect to this Agreement, and the Icahn Group shall have an opportunity to review in advance the relevant portion of the Current Report on Form 8-K filing to be made by the Company with respect to this Agreement.

5.  **Confidentiality Agreement.** The Company hereby agrees that, following the appointment of the Icahn Designees to the Board: (i) the Icahn Designees are permitted to and may provide confidential information subject to and in accordance with the terms of the confidentiality agreement in the form attached to this Agreement as **Exhibit B** (the "**Confidentiality Agreement**") (which the Icahn Group agrees to execute upon the Icahn Group's valid exercise of its nomination rights pursuant to **Section 1(a)(i)** and deliver to the Company and cause the Icahn Designees to abide by) and (ii) the Company will execute and deliver the Confidentiality Agreement to the Icahn Group substantially contemporaneously with execution and delivery thereof by the other signatories thereto. At any time an Icahn Designee is a member of the Board, the Board shall not adopt a policy precluding members of the Board from speaking to Mr. Icahn, and the Company confirms that it will advise members of the Board, including the Icahn Designees, that they may, but are not obligated to, speak to Mr. Icahn (but subject to the Confidentiality Agreement), if they are willing to do so and subject to their fiduciary duties and Company Policies (but may caution them regarding specific matters, if any, that involve conflicts between the Company and the Icahn Group).

6.  **Representations and Warranties of All Parties.** Each of the parties represents and warrants to the other party that: (a) such party has all requisite company power and authority to execute and deliver this Agreement and to perform its obligations hereunder; (b) this Agreement has been duly and validly authorized, executed and delivered by it and is a valid and binding obligation of such party, enforceable against such party in accordance with its terms; and (c) this Agreement will not result in a violation of any terms or conditions of any agreements to which such person is a party or by which such party may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting such party.

7.  **Representations and Warranties of Icahn Group.** Each member of the Icahn Group jointly represents and warrants that, as of the date of this Agreement, (a) the Icahn Group collectively beneficially own, an aggregate of 34,721,118 BHC Common Shares and 3,500,000 Common Shares (in each case excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments), (b) except as set forth in the preceding clause (a) and the Icahn Group's Schedule 13Ds with respect to BHC or the Company or as otherwise disclosed to the Company, no member of the Icahn Group, individually or in the aggregate with any Icahn Affiliate, has any other beneficial ownership of, or economic exposure to, any BHC Common Shares or Common Shares, nor does it currently have or have any right to acquire any interest in any other securities of BHC or the Company (or any rights, options or other securities convertible into or exercisable or exchangeable (whether or not convertible, exercisable or exchangeable immediately or only after the passage of time or the occurrence of a specified event) for such securities or any obligations measured by the price or value of any securities of BHC, the Company or any of their respective controlled Affiliates, including any swaps or other derivative arrangements designed to produce

10

Complaint Ex. E 0010

economic benefits and risks that correspond to the ownership of BHC Common Shares or Common Shares, whether or not any of the foregoing would give rise to beneficial ownership (as determined under Rule 13d-3 promulgated under the Exchange Act), and whether or not to be settled by delivery of BHC Common Shares or Common Shares, payment of cash or by other consideration, and without regard to any short position under any such contract or arrangement), and (c) no member of the Icahn Group has any knowledge of any other stockholder of BHC or the Company that intends to submit a notice to the Company to nominate directors at the next Annual Meeting of shareholders of BHC or the Company.

8.  **Representations and Warranties and Covenants of the Company.** The Company represents and warrants, that as of the date of this Agreement, the directors identified in the Company's final prospectus filed with the SEC and dated May 5, 2022 are all of the directors on the Board. Further, the Company agrees that if the Company enters into an agreement, arrangement or understanding, or otherwise grants any rights, to any other stockholder of the Company to avoid a proxy or similar contest with such stockholder at any time during the three (3) months following the date that the Icahn Designees are seated as directors of the Company, then to the extent such agreement, arrangement or understanding grants any right or rights that are more favorable than those set forth in this Agreement, the Company agrees it shall offer the same such rights to the Icahn Group.

9.  **Miscellaneous.** This Agreement shall terminate and be of no further force or effect upon the earliest of the occurrence of any of the following events: (a) following the Board's appointment of the Icahn Designees to the Board pursuant to **Section 1(a)(i)**, (i) no Icahn Designee then serving on the Board and (ii) the Icahn Group no longer being entitled to designate a Replacement Designee for any Icahn Designee, (b) [reserved], (c) the Icahn Group not collectively beneficially owning an aggregate Net Long Position in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of the date hereof (as adjusted for any stock dividends, combinations, splits, recapitalizations and similar type events), and (d) any breach by the Icahn Group of its covenants and obligations set forth in **Section 1(a)(ii)** and **Section 3(a)** (including any action taken prior to the commencement of the Standstill Period that would be a breach of **Section 3(a)** if taken during the Standstill Period). Notwithstanding anything herein to the contrary, **Section 3(a)(i)** shall survive any such termination through the Butterfly Date. The parties hereto recognize and agree that if for any reason any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, each party agrees that in addition to other remedies the other party shall be entitled to at law or equity, the other party shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this Agreement, no party shall allege, and each party hereby waives the defense, that there is an adequate remedy at law. Furthermore, each of the parties hereto (i) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this Agreement or the transactions contemplated by this Agreement, (ii) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (iii) agrees that it shall not bring any action relating to this Agreement or the transactions contemplated by this Agreement in any court other than the Delaware Court of Chancery or the other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (iv) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (v) irrevocably consents to service of process by a reputable overnight mail

11

Complaint Ex. E 0011

delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

10.   **No Waiver.** Any waiver by any party of a breach of any provision of this Agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this Agreement. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

11.   **Entire Agreement.** This Agreement and the Confidentiality Agreement contain the entire understanding of the parties with respect to the subject matter hereof and may be amended only by an agreement in writing executed by the parties hereto.

12.   **Notices.** All notices, consents, requests, instructions, approvals and other communications provided for herein and all legal process in regard hereto shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy and email is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

    if to the Company:

        Bausch + Lomb Corporation
        520 Applewood Crescent
        Vaughan, Ontario, Canada L4K 4B4
        Email: [*****]
        Attention: Christina Ackermann, General Counsel

    With copies to (which shall not constitute notice):

        Wachtell, Lipton, Rosen & Katz
        51 West 52 Street
        New York, NY 10019
        Attention:      Igor Kirman, [*****]
                        Mark Veblen, [*****]
                        Sabastian Niles, [*****]

    if to the Icahn Group:

        Icahn Capital LP
        16690 Collins Avenue, Penthouse Suite
        Sunny Isles Beach, FL 33160
        Attention: Jesse Lynn, Chief Operating Officer
        Email: [*****]

12

Complaint Ex. E 0012

13. **Severability.** If at any time subsequent to the date of this Agreement, any provision of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this Agreement.

14. **Counterparts.** This Agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. **Successors and Assigns.** This Agreement shall not be assignable by any of the parties to this Agreement. This Agreement, however, shall be binding on successors of the parties hereto.

16. **No Third Party Beneficiaries.** This Agreement is solely for the benefit of the parties hereto and is not enforceable by any other persons.

17. **Fees and Expenses.** Neither the Company, on the one hand, nor the Icahn Group, on the other hand, will be responsible for any fees or expenses of the other in connection with this Agreement.

18. **Interpretation and Construction.** Each of the parties hereto acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this Agreement, and that it has executed the same with the advice of said independent counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this Agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this Agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties hereto, and any controversy over interpretations of this Agreement shall be decided without regards to events of drafting or preparation. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Unless context otherwise requires, references herein to Exhibits, Sections or Schedules mean the Exhibits, Sections or Schedules attached to this Agreement. The term "including" shall be deemed to mean "including without limitation" in all instances. In all instances, the term "or" shall not be deemed to be exclusive. For all purposes of this Agreement, and any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A), the Icahn Group and its Icahn Affiliates shall in no event be deemed to beneficially own less than six percent (6%), or three percent (3%), as applicable, of the outstanding Common Shares unless the Icahn Group's crossing of any such threshold is the result of sales of Common Shares or transactions described in Rule 14e-4(a)(1) of the Exchange Act (but excluding, for the avoidance of doubt, any cash-settled swaps or other cash-settled instruments) by, or on behalf of, the Icahn Group or its Icahn Affiliates (i.e., issuances of Common Shares, or similar actions, by the Company shall have no effect on the deemed beneficial ownership of Common Shares by the Icahn Group and its Icahn Affiliates for purposes of this this Agreement, or any exhibit, appendix or attachment hereto (including, for the avoidance of doubt, Exhibit A)).

[Signature Pages Follow]

13

Complaint Ex. E 0013

10/16/25, 2:50 PM

**IN WITNESS WHEREOF**, each of the parties hereto has executed this Agreement, or caused the same to be executed by its duly authorized representative as of the date first above written.

<div align="right">

**BAUSCH + LOMB CORPORATION**

By:    /s/ Christina Ackermann
Name: Christina Ackermann
Title:   EVP, General Counsel

</div>

[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0014

**ICAHN GROUP**

CARL C. ICAHN

/s/ Carl C. Icahn
_____
Carl C. Icahn


ICAHN PARTNERS LP

By:   /s/ Jesse Lynn
_____
Name: Jesse Lynn
Title:  Chief Operating Officer


ICAHN PARTNERS MASTER FUND LP

By:   /s/ Jesse Lynn
_____
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN ENTERPRISES G.P. INC.

By:   /s/ Ted Papapostolou
_____
Name: Ted Papapostolou
Title:  Chief Financial Officer


[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0015

ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By:      /s/ Ted Papapostolou
Name: Ted Papapostolou
Title:  Chief Financial Officer

IPH GP LLC

By:      /s/ Jesse Lynn
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN CAPITAL LP

By:      /s/ Jesse Lynn
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN ONSHORE LP

By:      /s/ Jesse Lynn
Name: Jesse Lynn
Title:  Chief Operating Officer

ICAHN OFFSHORE LP

By:      /s/ Jesse Lynn
Name: Jesse Lynn
Title:  Chief Operating Officer

BECKTON CORP

By:      /s/ Jesse Lynn
Name: Jesse Lynn
Title:  Vice President

[Signature Page to Director Appointment and Nomination Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0016

**SCHEDULE A**

CARL C. ICAHN

ICAHN PARTNERS LP

ICAHN PARTNERS MASTER FUND LP

ICAHN ENTERPRISES G.P. INC.

ICAHN ENTERPRISES HOLDINGS L.P.

IPH GP LLC

ICAHN CAPITAL LP

ICAHN ONSHORE LP

ICAHN OFFSHORE LP

BECKTON CORP.

Complaint Ex. E 0017

**EXHIBIT A**

[FORM OF RESIGNATION]

[DATE]

Board of Directors
Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4

Re: <u>Resignation</u>

Ladies and Gentlemen:

     This irrevocable resignation is delivered pursuant to that certain Director Appointment and Nomination Agreement, dated as of April __, 2022 (the "Agreement") among Bausch + Lomb Corporation and the Icahn Group. Capitalized terms used herein but not defined shall have the meaning set forth in the Agreement.

     Pursuant to Section 1(c) of the Agreement, effective only upon, and subject to, such time as the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least six percent (6%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of June [ ], 2022, I hereby irrevocably resign from my position as a director of the Company and from any and all committees of the Board on which I serve; *provided, however*, that if this resignation is tendered pursuant to Section 1(c) of the Agreement, this resignation shall not be effective if any other resignation of an Icahn Designee is tendered and accepted pursuant to Section 1(c) of the Agreement (and the Icahn Group shall determine in its sole discretion which resignation of the Icahn Designees shall be effective) unless and until the Icahn Group (together with the Icahn Affiliates) ceases collectively to beneficially own (as defined in Rule 13d-3 (as in effect from time to time) promulgated by the SEC under the Exchange Act) an aggregate Net Long Position in at least three percent (3%) of the total outstanding (A) BHC Common Shares, for so long as BHC owns at least 80% of the Common Shares, or (B) Common Shares, at any other time, in each case as of June [ ], 2022.

Sincerely,

_____

Name:

A-1

Complaint Ex. E 0018

**EXHIBIT B**

[CONFIDENTIALITY AGREEMENT]

B-1

Complaint Ex. E 0019

**CONFIDENTIALITY AGREEMENT**

**BAUSCH + LOMB CORPORATION**

[DATE]

To: Each of the persons or entities listed on Schedule A (the "<u>Icahn Group</u>" or "<u>you</u>")

Ladies and Gentlemen:

This letter agreement shall become effective upon the appointment of any Icahn Designee to the Board of Directors (the "<u>Board</u>") of Bausch + Lomb Corporation (the "<u>Company</u>"). Capitalized terms used but not otherwise defined herein shall have the meanings given to such terms in the Amended and Restated Director Appointment and Nomination Agreement (the "<u>Nomination Agreement</u>"), dated as of June 21, 2022, among the Company and the Icahn Group. The Company understands and agrees that, subject to the terms of, and in accordance with, this letter agreement, an Icahn Designee may, if and to the extent he or she desires to do so, disclose information he or she obtains while serving as a member of the Board to you and your Representatives (as hereinafter defined), and may discuss such information with any and all such persons, subject to the terms and conditions of this Agreement, and that other members of the Board may similarly disclose information to you. As a result, you may receive certain non-public information regarding the Company. You acknowledge that this information is proprietary to the Company and may include trade secrets or other business information the disclosure of which could harm the Company. In consideration for, and as a condition of, the information being furnished to you and your agents, representatives, attorneys, advisors, directors, officers or employees, subject to the restrictions in paragraph 2 (collectively, the "<u>Representatives</u>"), you agree to treat any and all information concerning or relating to the Company or any of its subsidiaries or current or former affiliates that is furnished to you or your Representatives (regardless of the manner in which it is furnished, including in written or electronic format or orally, gathered by visual inspection or otherwise) by any Icahn Designee, or by or on behalf of the Company or any Company Representative (as defined below), including discussions or matters considered in meetings of the Board or Board committees, together with any notes, analyses, reports, models, compilations, studies, interpretations, documents, records or extracts thereof containing, referring, relating to, based upon or derived from such information, in whole or in part (collectively, "<u>Evaluation Material</u>"), in accordance with the provisions of this letter agreement, and to take or abstain from taking the other actions hereinafter set forth.

1. The term "Evaluation Material" does not include information that (i) is or has become generally available to the public other than as a result of a direct or indirect disclosure by you or your Representatives in violation of this letter agreement or any other obligation of confidentiality, (ii) was within your or any of your Representatives' possession on a non-confidential basis prior to its being furnished to you by any Icahn Designee, or by or on behalf of the Company or its agents, representatives, attorneys, advisors, directors (other than the Icahn Designees), officers or employees (collectively, the "<u>Company Representatives</u>"), or (iii) is received from a source other than any Icahn Designee, the Company or any of the Company Representatives; *provided,* that in the case of (ii) or (iii) above, the source of such information was not believed by you, after reasonable inquiry, to be bound by a confidentiality agreement with or other contractual, legal or fiduciary obligation of confidentiality to the Company or any other person with respect to such information at the time the information was disclosed to you.

2. You and your Representatives will, and you will cause your Representatives to, (a) keep the Evaluation Material strictly confidential and (b) not disclose any of the Evaluation Material in any manner whatsoever without the prior written consent of the Company; *provided, however,* that you

B-2

Complaint Ex. E 0020

may privately disclose any of such information: (A) to your Representatives (i) who need to know such information for the purpose of advising you on your investment in the Company and (ii) who are informed by you of the confidential nature of such information and agree to be bound by the terms of this Agreement as if they were a party hereto; *provided, further,* that you will be responsible for any violation of this letter agreement by your Representatives as if they were parties to this letter agreement; and (B) to the Company and the Company Representatives. It is understood and agreed that no Icahn Designee shall disclose to you or your Representatives any Legal Advice (as defined below) that may be included in the Evaluation Material with respect to which such disclosure would constitute waiver of the Company's attorney client privilege or attorney work product privilege. "Legal Advice" as used in this letter agreement shall be solely and exclusively limited to the advice provided by legal counsel and shall not include factual information or the formulation or analysis of business strategy that is not protected by the attorney-client or attorney work product privilege.

3.  In the event that you or any of your Representatives are required by applicable subpoena, legal process or other legal requirement to disclose any of the Evaluation Material, you will (a) promptly notify (except where such notice would be legally prohibited) the Company in writing by email, facsimile and certified mail so that the Company may seek a protective order or other appropriate remedy (and if the Company seeks such an order, you will provide such cooperation as the Company shall reasonably request), at its cost and expense and (b) produce or disclose only that portion of the Evaluation Material which your outside legal counsel of national standing advises you in writing is legally required to be so produced or disclosed and you inform the recipient of such Evaluation Material of the existence of this letter agreement and the confidential nature of such Evaluation Material. In no event will you or any of your Representatives oppose action by the Company to obtain a protective order or other relief to prevent the disclosure of the Evaluation Material or to obtain reliable assurance that confidential treatment will be afforded the Evaluation Material. For the avoidance of doubt, it is understood that there shall be no "legal requirement" requiring you to disclose any Evaluation Material solely by virtue of the fact that, absent such disclosure, you would be prohibited from purchasing, selling, or engaging in derivative or other voluntary transactions with respect to the Common Shares of the Company or otherwise proposing or making an offer to do any of the foregoing, or you would be unable to file any proxy or other solicitation materials in compliance with Section 14(a) of the Exchange Act or the rules promulgated thereunder.

4.  You acknowledge that (a) none of the Company or any of the Company Representatives makes any representation or warranty, express or implied, as to the accuracy or completeness of any Evaluation Material, and (b) none of the Company or any of the Company Representatives shall have any liability to you or to any of your Representatives relating to or resulting from the use of the Evaluation Material or any errors therein or omissions therefrom. You and your Representatives (or anyone acting on your or their behalf) shall not directly or indirectly initiate contact or communication with any executive or employee of the Company other than the Chairman of the Board, Chief Executive Officer, Chief Financial Officer, General Counsel, or such other persons approved by the foregoing or the Board concerning Evaluation Material, or to seek any information in connection therewith from any such person other than the foregoing, without the prior consent of the Company; *provided, however,* the restriction in this sentence shall not in any way apply to any Icahn Designee acting in his or her capacity as a Board member (nor shall it apply to any other Board members).

5.  All Evaluation Material shall remain the property of the Company. Neither you nor any of your Representatives shall by virtue of any disclosure of or your use of any Evaluation Material acquire any rights with respect thereto, all of which rights (including all intellectual property rights) shall

B-3

Complaint Ex. E 0021

remain exclusively with the Company. At any time after the date on which no Icahn Designee is a director of the Company, upon the request of the Company for any reason, you will promptly return to the Company or destroy all hard copies of the Evaluation Material and use reasonable best efforts to permanently erase or delete all electronic copies of the Evaluation Material in your or any of your Representatives' possession or control (and, upon the request of the Company, shall promptly certify to the Company that such Evaluation Material has been erased or deleted, as the case may be). Notwithstanding the foregoing, the obligation to return or destroy Evaluation Material shall not cover information (i) that is maintained on routine computer system backup tapes, disks or other backup storage devices as long as such backed-up information is not used, disclosed, or otherwise recovered from such backup devices or (ii) retained on a confidential basis solely to the extent required to comply with applicable law and/or any internal record retention requirements; provided that such materials referenced in this sentence shall remain subject to the terms of this Agreement applicable to Evaluation Material, and you and your Representatives will continue to be bound by the obligations contained herein for as long as any such materials are retained by you or your Representatives.

6. You acknowledge, and will advise your Representatives, that the Evaluation Material may constitute material non-public information under applicable federal, state or provincial securities laws, and you agree that you shall not, and you shall use reasonable best efforts to ensure that your Representatives do not, trade or engage in any derivative or other transaction on the basis of such information in violation of such laws.

7. You hereby represent and warrant to the Company that (i) you have all requisite company power and authority to execute and deliver this letter agreement and to perform your obligations hereunder, (ii) this letter agreement has been duly authorized, executed and delivered by you, and is a valid and binding obligation, enforceable against you in accordance with its terms, (iii) this letter agreement will not result in a violation of any terms or conditions of any agreements to which you are a party or by which you may otherwise be bound or of any law, rule, license, regulation, judgment, order or decree governing or affecting you, and (iv) your entry into this letter agreement does not require approval by any owners or holders of any equity or other interest in you (except as has already been obtained).

8. Any waiver by the Company of a breach of any provision of this letter agreement shall not operate as or be construed to be a waiver of any other breach of such provision or of any breach of any other provision of this letter agreement. The failure of the Company to insist upon strict adherence to any term of this letter agreement on one or more occasions shall not be considered a waiver or deprive the Company of the right thereafter to insist upon strict adherence to that term or any other term of this letter agreement.

9. You acknowledge and agree that the value of the Evaluation Material to the Company is unique and substantial, but may be impractical or difficult to assess in monetary terms. You further acknowledge and agree that in the event of an actual or threatened violation of this letter agreement, immediate and irreparable harm or injury would be caused for which money damages would not be an adequate remedy. Accordingly, you acknowledge and agree that, in addition to any and all other remedies which may be available to the Company at law or equity, the Company shall be entitled to an injunction or injunctions to prevent breaches of this letter agreement and to enforce specifically the terms and provisions of this letter agreement exclusively in the Delaware Court of Chancery or other federal or state courts of the State of Delaware. In the event that any action shall be brought in equity to enforce the provisions of this letter agreement, you shall not allege, and you hereby waive the defense, that there is an adequate remedy at law.

B-4

Complaint Ex. E 0022

10. Each of the parties (a) consents to submit itself to the personal jurisdiction of the Delaware Court of Chancery or other federal or state courts of the State of Delaware in the event any dispute arises out of this letter agreement or the transactions contemplated by this letter agreement, (b) agrees that it shall not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, (c) agrees that it shall not bring any action relating to this letter agreement or the transactions contemplated by this letter agreement in any court other than the Delaware Court of Chancery or other federal or state courts of the State of Delaware, and each of the parties irrevocably waives the right to trial by jury, (d) agrees to waive any bonding requirement under any applicable law, in the case any other party seeks to enforce the terms by way of equitable relief, and (e) irrevocably consents to service of process by a reputable overnight delivery service, signature requested, to the address of such party's principal place of business or as otherwise provided by applicable law. THIS LETTER AGREEMENT SHALL BE GOVERNED IN ALL RESPECTS, INCLUDING VALIDITY, INTERPRETATION AND EFFECT, BY THE LAWS OF THE STATE OF DELAWARE APPLICABLE TO CONTRACTS EXECUTED AND TO BE PERFORMED WHOLLY WITHIN SUCH STATE WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES OF SUCH STATE.

11. This letter agreement and the Nomination Agreement contain the entire understanding of the parties with respect to the subject matter hereof and thereof and supersedes all prior or contemporaneous agreements or understandings, whether written or oral. This letter agreement may be amended only by an agreement in writing executed by the parties hereto.

12. All notices, consents, requests, instructions, approvals and other communications provided for in this letter agreement and all legal process in regard to this letter agreement shall be in writing and shall be deemed validly given, made or served, if (a) given by telecopy and email, when such telecopy is transmitted to the telecopy number set forth below and sent to the email address set forth below and the appropriate confirmation is received or (b) if given by any other means, when actually received during normal business hours at the address specified in this subsection:

if to the Company:

Bausch + Lomb Corporation
520 Applewood Crescent
Vaughan, Ontario, Canada L4K 4B4
Email: [*****]
Attention: Christina Ackermann, General Counsel

With copies to (which shall not constitute notice):

Wachtell, Lipton, Rosen & Katz
51 West 52 Street
New York, NY 10019
Attention:       Igor Kirman, [*****]
                 Mark Veblen, [*****]
                 Sabastian Niles, [*****]

B-5

Complaint Ex. E 0023

if to the Icahn Group:

> Icahn Capital LP
> 16690 Collins Avenue, Penthouse Suite
> Sunny Isles Beach, FL 33160
> Attention: Jesse Lynn, Chief Operating Officer
> Email: [*****]

13. If at any time subsequent to the date hereof, any provision of this letter agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision shall be of no force and effect, but the illegality or unenforceability of such provision shall have no effect upon the legality or enforceability of any other provision of this letter agreement.

14. This letter agreement may be executed (including by facsimile or PDF) in two or more counterparts which together shall constitute a single agreement.

15. This letter agreement and the rights and obligations herein may not be assigned or otherwise transferred, in whole or in part, by you without the express written consent of the Company. This letter agreement, however, shall be binding on successors of the parties to this letter agreement.

16. The Icahn Group shall cause any Replacement Designee appointed to the Board pursuant to the Nomination Agreement to execute a copy of this letter agreement.

17. This letter agreement shall expire two (2) years from the date on which no Icahn Designee remains a director of the Company; except that you shall maintain in accordance with the confidentiality obligations set forth herein any Evaluation Material constituting trade secrets for such longer time as such information constitutes a trade secret of the Company as defined under 18 U.S.C. § 1839(3) and (ii) retained pursuant to Section 5.

18. No licenses or rights under any patent, copyright, trademark, or trade secret are granted or are to be implied by this letter agreement.

19. Each of the parties acknowledges that it has been represented by counsel of its choice throughout all negotiations that have preceded the execution of this letter agreement, and that it has executed the same with the advice of said counsel. Each party and its counsel cooperated and participated in the drafting and preparation of this agreement and the documents referred to herein, and any and all drafts relating thereto exchanged among the parties shall be deemed the work product of all of the parties and may not be construed against any party by reason of its drafting or preparation. Accordingly, any rule of law or any legal decision that would require interpretation of any ambiguities in this agreement against any party that drafted or prepared it is of no application and is hereby expressly waived by each of the parties, and any controversy over interpretations of this agreement shall be decided without regards to events of drafting or preparation. The term "including" shall in all instances be deemed to mean "including without limitation." In all instances, the term "or" shall not be deemed to be exclusive.

[Signature Pages Follow]

B-6

Complaint Ex. E 0024

Please confirm your agreement with the foregoing by signing and returning one copy of this letter agreement to the undersigned, whereupon this letter agreement shall become a binding agreement between you and the Company.

<div align="right">

Very truly yours,

BAUSCH + LOMB CORPORATION

By: _____
Name:
Title:

</div>

Accepted and agreed as of the date first written above:

<div align="right">

CARL C. ICAHN

_____
Carl C. Icahn

ICAHN PARTNERS LP
By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

</div>

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0025

ICAHN PARTNERS MASTER FUND LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer


ICAHN ENTERPRISES G.P. INC.

By: _____
Name: Ted Papapostolou
Title:  Chief Financial Officer


ICAHN ENTERPRISES HOLDINGS L.P.

By: Icahn Enterprises G.P. Inc., its general partner

By: _____
Name: Ted Papapostolou
Title:  Chief Financial Officer


IPH GP LLC

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer


ICAHN CAPITAL LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer


ICAHN ONSHORE LP

By: _____
Name: Jesse Lynn
Title:  Chief Operating Officer

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0026

ICAHN OFFSHORE LP

By: _____

Name: Jesse Lynn

Title:  Chief Operating Officer

BECKTON CORP

By: _____

Name: Jesse Lynn

Title:  Vice President

[Signature Page to Confidentiality Agreement between Bausch + Lomb Corporation and the Icahn Group]

Complaint Ex. E 0027

<center>SCHEDULE A</center>

Beckton Corp.

Icahn Capital LP

Icahn Enterprises Holdings L.P.

Icahn Enterprises G.P. Inc.

Icahn Offshore LP

Icahn Onshore LP

Icahn Partners LP

Icahn Partners Master Fund LP

IPH GP LLC

Icahn Capital LP

Carl C. Icahn

Complaint Ex. E 0028

ANNEX 1

**Tax Criteria**

Subject to **Section 1(e)**, from and after the Distribution Effective Date, the Icahn Group shall not be permitted to designate any individual as a director of the Company if: (x) such individual, at the time of such designation, is also a member of the board of directors of BHC; and (y) immediately following such designation, more than two (2) individuals are members of the boards of directors of both BHC and the Company.

For example, if on the date of any such designation, Brett Icahn and Steven Miller continue to be members of the board of directors of BHC, then: (x) if no other individuals are members of the boards of directors of both BHC and the Company, then both Brett Icahn and Steven Miller would be permitted to join the board of directors of the Company; (y) if two (2) other individuals are members of the boards of directors of both BHC and the Company, then neither Brett Icahn nor Steven Miller would be permitted to join the board of directors of the Company; and (z) if one (1) other individual is a member of the boards of directors of both BHC and the Company, then Brett Icahn or Steven Miller (but not both) would be permitted to join the board of directors of the Company.

---

Complaint Ex. E 0029

# Complaint Ex. F

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/5/2026 Page 301 of 137 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/5/2026 Page 304 of 17
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 306 of 1550

Case 1:25-cv-23893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 307 of 1550

Case 1:25-cv-25893-BB   Document 6-3   Entered on FLSD Docket 05/19/2026   Page 308 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 309 of 1550

1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 213 of 187 1550

Case 1:25-cv-22893-BBB   Document 69-3   Entered on FLSD Docket 05/19/2026   Page 231 of 187
1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 318 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 319 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 320 of 1550

Case 1:25-cv-23893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 323 of 1550

Case 1:25-cv-25593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 324 of 1550

Case 1:25-cv-25893-BBB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 325 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 326 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 327 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 328 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 331 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 332 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 435 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 337 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/5/2026 Page 338 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 534 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 342 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 524 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 344 of 1550

Case 1:25-cv-25993-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 345 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 546 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 534 of 137
1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 349 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 350 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 351 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 352 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 258 of
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/5/2026 Page 354 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 355 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 356 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/5/2026 Page 637 of 1550

Case 1:25-cv-25593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 358 of 1550

Case 1:25-cv-23933-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 7 of 17
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 263 of 1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 364 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 365 of 1550

1550

Case 1:25-cv-25993-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 367 of 1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 368 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 369 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 837 of 1550

Case 1:25-cv-22893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 373 of 137
1550

Case 1:25-cv-25993-BBB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 375 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 376 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 367 of 137
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 379 of
1550

Case 1:25-cv-25993-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 380 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 283 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 384 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 485 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 386 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 390 of 1550

Case 1:25-cv-25893-BB   Document 66-6   Entered on FLSD Docket 03/09/2026   Page 404 of 1550

Complaint Ex. G

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 138 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 139 of 214

1550

Case 1:25-cv-25593-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 442 of 414
1550

Case 1:25-cv-25893-BB   Document 64-3   Entered on FLSD Docket 05/19/2026   Page 348 of 1550

Case 1:25-cv-23093-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 444 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 445 of
1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 146 of 1550

Case 1:25-cv-25593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 947 of 1550

Case 1:25-cv-25893-BB Document 69-4 Entered on FLSD Docket 05/19/2026 Page 248 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 149 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 250 of 414
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 351 of 414

Case 1:25-cv-25893-BBB Document 69-7 Entered on FLSD Docket 05/19/2026 Page 452 of 414
1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 454 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 455 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 456 of 1550

Case 1:25-cv-22893-BB Document 69-7 Entered on FLSD Docket 05/19/2026 Page 457 of 1550

Case 1:25-cv-25893-BB Document 69-4 Entered on FLSD Docket 05/5/2026 Page 458 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 459 of
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 360 of 1550

Case 1:25-cv-25933-BB Document 69-7 Entered on FLSD Docket 05/19/2026 Page 361 of 414
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 364 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 465 of 1550

Case 1:25-cv-25893-BB Document 94-3 Entered on FLSD Docket 05/19/2026 Page 366 of 414
1550

Case 1:25-cv-25893-BB Document 694-3 Entered on FLSD Docket 02/5/2026 Page 169 of 214
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 470 of 1550

Case 1:25-cv-25933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 447 of 414
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 473 of 414

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 474 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 475 of 1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 47 of 414
1550

Case 1:25-cv-23983-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 507 of 514
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 179 of 414

Case 1:25-cv-25933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 280 of 14
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 531 of
1550

Entered on FLSD Docket 05/19/2026

Case 1:25-cv-23593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 504 of 1550

Case 1:25-cv-22893-BB Document 69-4 Entered on FLSD Docket 05/19/2026 Page 485 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 586 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 587 of 1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 488 of 1550

Case 1:25-cv-25893-BB Document 69-4-3 Entered on FLSD Docket 02/15/2026 Page 489 of 14
1550

Case 1:25-cv-25933-BB Document 694-3 Entered on FLSD Docket 05/19/2026 Page 490 of 1550

Case 1:25-cv-25893-BBB Document 694-3 Entered on FLSD Docket 02/15/2026 Page 63 of 414
1550

Case 1:25-cv-25893-BBB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 64 of 214
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 65 of 14 1550

Case 1:25-cv-22893-BB Document 69-4 Entered on FLSD Docket 05/19/2026 Page 694 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 97 of 1550

Case 1:25-cv-25393-BB Document 69-4 Entered on FLSD Docket 05/19/2026 Page 199 of 214
1550

Case 1:25-cv-25893-BBB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 500 of 1550

Case 1:25-cv-25893-BB Document 694-3 Entered on FLSD Docket 05/19/2026 Page 750 of 414
1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 505 of
1550

Case 1:25-cv-25393-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 506 of 1550

Case 1:25-cv-25933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 7 of 14
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 508 of 1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 509 of 1550

Case 1:25-cv-25893-BB Document 69-7-3 Entered on FLSD Docket 05/19/2026 Page 85 of 14 1550

Case 1:25-cv-25893-BB Document 69-4 Entered on FLSD Docket 05/19/2026 Page 31 of 414
1550

Case 1:25-cv-25893-BB Document 69-7 Entered on FLSD Docket 05/19/2026 Page 85 of 214
1550

Case 1:25-cv-22893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 513 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 515 of 1550

[redacted]

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/5/2026 Page 521 of 1550

Case 1:25-cv-25883-BB   Document 69-4   Entered on FLSD Docket 12/15/2026   Page 525 of
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/55/2026 Page 526 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/05/2026 Page 527 of 1550

# Complaint Ex. H

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 861 of 259
1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 163 of 259
1550

Case 1:25-cv-23933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 365 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 168 of 259

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 769 of 1550

Case 1:25-cv-25993-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 187 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 287 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 273 of 259
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 274 of 259
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 375 of 1550

Case 1:25-cv-22593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 876 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 882 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 892 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/9/2026 Page 198 of 259
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 894 of 259 1550

Case 1:25-cv-25593-BB Document 69-3 Entered on FLSD Docket 05/29/2026 Page 597 of 259 1550

Case 1:25-cv-25383-BB Document 69-3 Entered on FLSD Docket 02/55/2026 Page 498 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/11/2026 Page 799 of 1550

Case 1:25-cv-25833-BB Document 64-3 Entered on FLSD Docket 05/15/2026 Page 901 of 259 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/51/2026 Page 902 of 259
1550

Case 1:25-cv-25833-BB Document 94-3 Entered on FLSD Docket 05/09/2026 Page 903 of 259
1550

Case 1:25-cv-25893-BB Document 94-3 Entered on FLSD Docket 02/55/2026 Page 305 of 259
1550

Case 1:25-cv-25593-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 540 of 259
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 02/05/2026 Page 590 of 259 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/55/2026 Page 531 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 591 of 259
1550

Case 1:25-cv-25893-BBB Document 68-3 Entered on FLSD Docket 05/19/2026 Page 691 of 259
1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 635 of 259
1550

Case 1:25-cv-25933-BBB Document 694-3 Entered on FLSD Docket 05/19/2026 Page 649 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 651 of 759
1550

Case 1:25-cv-25933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 918 of
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 02/5/2026 Page 919 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 692 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 92 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 792 of 259
1550

Case 1:25-cv-23933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 7 of 259
1550

Case 1:25-cv-25833-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 724 of 1550

Case 1:25-cv-22893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 325 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 927 of 1550

Case 1:25-cv-25893-BB Document 694-3 Entered on FLSD Docket 05/19/2026 Page 7 of 259
1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 729 of 259
1550

Case 1:25-cv-25893-BB Document 68-3 Entered on FLSD Docket 05/19/2026 Page 79 of 259
1550

Case 1:25-cv-25393-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 9 of 259
1550

Case 1:25-cv-25993-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 933 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 934 of 1550

Case 1:25-cv-22893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 335 of 359
1550

Case 1:25-cv-22893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 836 of 1550

Case 1:25-cv-23933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 857 of 259 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 938 of 1550

Case 1:25-cv-25993-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 939 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 940 of 259
1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/9/2026 Page 94 of 259
1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 994 of 259 1550

Case 1:25-cv-25993-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 944 of 1550

Case 1:25-cv-25933-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 945 of 1550

Case 1:25-cv-25393-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 946 of 1550

Case 1:25-cv-25893-BB Document 64-3 Entered on FLSD Docket 05/19/2026 Page 947 of 1550

Case 1:25-cv-25393-BB Document 63-3 Entered on FLSD Docket 05/19/2026 Page 948 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 949 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 950 of 1550

Case 1:25-cv-25893-BB Document 69-3 Entered on FLSD Docket 05/19/2026 Page 951 of 1550

Case 1:25-cv-23933-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1004 of 1550

Case 1:25-cv-22583-BB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1005 of 1550

Case 1:25-cv-22899-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1006 of 1550

Case 1:25-cv-25993-BB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1057 of 1550

Case 1:25-cv-25393-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1047 of 1550

Case 1:25-cv-23933-BB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1049 of 1550

Case 1:25-cv-25993-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1065 of 1550

Case 1:25-cv-23933-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1066 of 1550

Case 1:25-cv-23933-BB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1275 of 1550

Case 1:25-cv-23833-BBB   Document 96-3   Entered on FLSD Docket 05/05/2026   Page 1076 of 1550

# Complaint Ex. I

1550

1550

1550

Case 1:25-cv-25893-BB   Document 98-3   Entered on FLSD Docket 08/05/2026   Page 54 of 70

Case 1:25-cv-25893-BB   Document 58-3   Entered on FLSD Docket 08/15/2026   Page 59 of 70
1550

Case 1:25-cv-25893-BB   Document 98-3   Entered on FLSD Docket 08/15/2026   Page 647 of 70
1550

# Complaint Ex. J

Case 1:25-cv-22993-RRB   Document 96-10   Entered on FLSD Docket 05/29/2026   Page 119 of 150

Case 1:25-cv-23999-BB   Document 66-10   Entered on FLSD Docket 05/29/2026   Page 23 of 150

Case 1:25-cv-22593-BB Document 66-10 Entered on FLSD Docket 05/29/2026 Page 224 of 1550

Case 1:25-cv-25993-BBB   Document 96-10   Entered on FLSD Docket 07/03/2026   Page 231 of 1453

Case 1:25-cv-25993-BB   Document 66-10   Entered on FLSD Docket 05/29/2026   Page 1253 of 1550

Case 1:25-cv-25893-BB   Document 86-30   Entered on FLSD Docket 02/05/2006   Page 1299 of 1550

Case 1:25-cv-25893-BB   Document 96-30   Entered on FLSD Docket 02/05/2026   Page 132 of 150

# Complaint Ex. K

1550

# Complaint Ex. L

Case 1:25-cv-25893-BB   Document 94-12   Entered on FLSD Docket 05/29/2026   Page 1357 of 1550

# Complaint Ex. M

**BAUSCH HEALTH COMPANIES INC.**
(the "Company")

## CONSENT TO ACT AS DIRECTOR

I consent to act as a Director of the Company and confirm that I am not disqualified to become or to act as a director under s. 124 of the *Business Corporations Act* (British Columbia), the text of which is reproduced below. My consent is effective until revoked.

This consent may be delivered by electronic means, including portable document format (PDF) or DocuSign.

Dated: March 17, 2021.

_____
Signature
**STEVEN MILLER**

Print: First Name        Middle Name(s)        Last Name

400 Somerset Corporate Blvd
Bridgewater, NJ, USA  08807

| Delivery address of (i) the office at which the individual can usually be served with records between 9 a.m. and 4 p.m. on business days, or (ii) if there is no such office, the individual's residence. | Mailing address for the same office or residence, if different than the delivery address. |
|---|---|

Extract from the *Business Corporations Act* (British Columbia):

"124.    **Persons disqualified as Directors**
(1)   A person must not become or act as a director of a company unless that person is an individual who is qualified to do so.
(2)   An individual is not qualified to become to act as a director of a company if that individual is
(a)   under the age of 18 years,
(b)   found by a court, in Canada or elsewhere, to be incapable of managing the individual's own affairs,
(c)   an undischarged bankrupt, or
(d)   convicted in or out of British Columbia of an offence in connection with the promotion, formation or management of a corporation or unincorporated business, or of an offence involving fraud, unless:
(i)   the court orders otherwise,
(ii)   5 years have elapsed since the last to occur of
(A)   the expiration of the period set for suspension of the passing of sentence without a sentencing having been passed,
(B)   the imposition of a fine,
(C)   the conclusion of the term of any imprisonment, and
(D)   the conclusion of the term of any probation imposed, or
(iii)   a pardon was granted or issued, or a record suspension was ordered, under the *Criminal Records Act* (Canada) and the pardon or record suspension, as the case may be, has not been revoked or ceased to have effect.
(3)   A director who ceases to be qualified to act as a director of a company must promptly resign."

**Directors have substantial duties and obligations and may be subject to significant liabilities. As Osler, Hoskin & Harcourt LLP acts for the Company only, the individual signing this consent should obtain independent legal advice.**

Complaint Ex. M 0001

# Complaint Ex. N

Case 1:25-cv-25393-HB   Document 69-1   Entered on FLSD Docket 05/05/2026   Page 136 of 1

1550

Case 1:25-cv-25993-BB   Document 66-14   Entered on FLSD Docket 05/29/2026   Page 384 of 1550

Case 1:25-cv-25399-BB   Document 66-14   Entered on FLSD Docket 05/29/2026   Page 1392 of 1550

Case 1:25-cv-25993-BB   Document 66-14   Entered on FLSD Docket 05/29/2026   Page 422 of 1550

Case 1:25-cv-25093-BB   Document 66-14   Entered on FLSD Docket 05/29/2026   Page 424 of 1550

Case 1:25-cv-25993-BB   Document 96-14   Entered on FLSD Docket 05/29/2026   Page 429 of
1550

Case 1:25-cv-25993-BB   Document 66-14   Entered on FLSD Docket 05/29/2026   Page 435 of 1550

Case 1:25-cv-25893-BB   Document 86-34   Entered on FLSD Docket 02/05/2006   Page 1469 of 1550

Case 1:25-cv-25893-BB   Document 06-34   Entered on FLSD Docket 02/05/2006   Page 472 of 1550

Case 1:25-cv-25893-BB   Document 06-34   Entered on FLSD Docket 02/05/2006   Page 1490 of 1550