**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 25-cv-25893-BLOOM/Elfenbein**

STEVEN D. MILLER,

Plaintiff,

v.

BAUSCH HEALTH COMPANIES, INC,
BAUSCH + LOMB CORPORATION,
THOMAS ROSS, CHRISTINA
ACKERMANN, GAOXIANG HU, ICAHN
ENTERPRISES L.P., ICAHN
ENTERPRISES G.P., INC., ICAHN CAPITAL LP,
CARL ICAHN, and BRETT ICAHN,

Defendants.
______________________________________/

**OMNIBUS ORDER ON MOTIONS TO DISMISS**

**THIS CAUSE** is before the Court upon four Motions to Dismiss the Complaint by Defendants: (1) Defendants Icahn Enterprises L.P., Icahn Enterprises G.P. Inc., Icahn Capital LP, Carl Icahn, and Brett Icahn's (collectively, the "Icahn Defendants") Motion to Dismiss Plaintiff's Complaint, ECF No. [75]; (2) Defendants Bausch + Lomb Corporation, Thomas Ross, and Christina Ackermann's Motion to Dismiss the Complaint for Lack of Jurisdiction, ECF No. [80]; (3) Defendants' Common Motion to Dismiss the Complaint, ECF No. [81]; and (4) Bausch Health Companies Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. [82]. Plaintiff filed a Response in Opposition ("Response"), ECF No. [83], and Defendants filed Replies in Support, ECF Nos. [86]; [87]; [88]; and [89]. The Court has reviewed the Motions, the supporting and opposing submissions, the record, and is otherwise fully advised. For the reasons that follow, the Icahn Defendants' Motion, ECF No. [75], is granted in part and denied in part; Defendants

Bausch + Lomb Corporation, Thomas Ross, and Christina Ackermann's Motion, ECF No. [80], is granted; Defendants' Motion, ECF No. [81], is denied; and Defendant Bausch Health Companies Inc.'s Motion, ECF No. [82], is granted.

## I. BACKGROUND

As alleged in Plaintiff's Complaint, this is a racial discrimination case in which a public company, Bausch + Lomb Corporation, entered into a written agreement allowing its major investor, Icahn Capital LP, to appoint two new members to its Board of Directors. ECF No. [1] ¶ 1. Pursuant to that agreement, one director was required to be "Diverse," a term that all the relevant actors knew would require Icahn Capital LP to appoint a *non-white* director. *Id*. As a result, Icahn Capital LP did not appoint Plaintiff, a white man, and instead appointed an Asian American. *Id* ¶ 2. Plaintiff alleges that Bausch + Lomb Corporation's general counsel, knowing the illegality of this racial discrimination, devised a scheme to hide the discriminatory proviso from a required securities filing by placing it in a "side letter" that Bausch + Lomb Corporation did not disclose to regulators. *Id.*

Defendants include the following individuals and entities:

(1) Bausch Health Companies Inc. ("Bausch Health"): a specialty pharmaceutical and medical device company incorporated under the provincial laws of British Columbia, Canada with U.S. headquarters in Somerset County, New Jersey;
(2) Bausch + Lomb Corporation ("Bausch + Lomb"): a diversified eye health company incorporated under the federal laws of Canada with U.S. headquarters in Somerset County, New Jersey and an executive office for its Chief Executive Officer in Miami-Dade County, Florida;
(3) Thomas Ross ("Ross"): Chairman of the Board of Bausch + Lomb from July 2022 to March 2023 and Lead Independent Director of the Board of Bausch + Lomb from May 2022 to July 2022 and from March 2023 to present;
(4) Christina Ackermann ("Ackermann"): General Counsel of Bausch Health from August 2016 to May 2022 and General Counsel and President of Ophthalmic Pharmaceuticals at Bausch + Lomb from May 2022 until April 2023;
(5) Gaoxiang "Gary" Hu ("Hu"): a Portfolio Manager of Icahn Capital LP from October 2020 to December 2024 and a director of Bausch + Lomb from June 2022 to August 2025;

(6) Icahn Enterprises L.P.: a limited partnership formed in Delaware and headquartered in Miami-Dade County, Florida that manages an investment securities segment and several other non-investment segments;
(7) Icahn Enterprises G.P. Inc. (together with Icahn Enterprises L.P., "IEP"): the general partner of Icahn Enterprises L.P., formed in Delaware and headquartered in Miami-Dade County, Florida;
(8) Icahn Capital LP ("Icahn Capital"): a subsidiary of IEP which operates their investment securities segment, also formed in Delaware and headquartered in Miami-Dade County, Florida;
(9) Carl Icahn: a resident of Miami-Dade County, Florida and, at all relevant times, the Chairman of IEP and the Chief Executive Officer of Icahn Capital; and
(10) Brett Icahn: a resident of Miami-Dade County, Florida who, since October 2020, has been employed as a Portfolio Manager of Icahn Capital and, (i) from February 2021 to August 2025, served on the Board of Directors of Bausch Health, (ii) from June 2022 to August 2025, served on the Board of Directors of Bausch + Lomb, and (iii) since October 2020, has served on the Board of Directors of IEP.

*Id.* ¶¶ 37–47.

Beginning in April 2020, Plaintiff spoke with Brett Icahn about potential employment as a Portfolio Manager at Icahn Capital after being introduced by an executive search firm. *Id.* ¶ 52. Over the next six months, Plaintiff, Brett Icahn, and the Icahn Group negotiated a series of agreements under which Icahn Capital, led by Chief Executive Officer Carl Icahn, would employ four Portfolio Managers to execute the firm's activist investment strategy, including by serving on relevant corporate boards. *Id.* ¶ 57. The Portfolio Managers were Plaintiff, Gary Hu ("Hu"), Brett Icahn, and Andrew Teno. *Id.* ¶ 58. On October 1, 2020, the Manager Agreement and Employment Agreements were executed, and Plaintiff's employment began. *Id.* ¶ 60.

The Manager Agreements disclose that the compensation for the Portfolio Managers includes "Base Salary, Bonus Amounts, and Net Profit-Sharing Amounts." *Id.* ¶ 62. The Employment Agreements provided that a bonus would be payable to each Portfolio Manager after the September 30, 2027 termination of the Employment Agreement. *Id.* ¶ 64.

Portfolio Managers had access to the Icahn Group's[1] $9.3 billion in investment funds. From the execution of the Employment Agreements until 2024, the four Portfolio Managers had exclusive responsibility for all new investments. Beginning in January 2025, Plaintiff and Brett Icahn were the only two Portfolio Managers. *Id.* ¶ 65. Each Portfolio Manager was entitled to retain any compensation personally received in connection with service on the Board of Directors of any public company, provided such company was not majority-owned by IEP. *Id.* ¶ 67. Plaintiff was aware that many of Icahn Capital's former Portfolio Managers and investment professionals continued to serve long terms and earn compensation on certain public company boards even after Icahn Capital had exited the relevant investment and terminated any related appointment agreement. *Id.* ¶ 68. During Plaintiff's tenure with Icahn Capital, he served on six public boards of directors, including Bausch Health, JetBlue Airways Corp., Conduent Inc., Dana Inc., and Xerox Holdings Corp. *Id.* ¶ 69.

On December 1, 2020, Plaintiff delivered an investment memorandum to Carl Icahn and Brett Icahn describing a proposed investment in the common stock of Bausch Health. *Id.* ¶ 75. By December 14, 2020, the proposed investment had received support from Carl Icahn, Brett Icahn, and each of the other two Portfolio Managers. *Id.* ¶ 76. On February 11, 2021, the Icahn Group publicly filed a Schedule 13D with the SEC declaring it had acquired beneficial ownership of 27,807,410 shares of Bausch Health's common stock, representing 7.83% of the outstanding amount. *Id.* ¶ 79.

On February 23, 2021, following a negotiation with Bausch Health, the Icahn Group entered into a Director Appointment and Nomination Agreement ("DANA") under which Brett Icahn and Plaintiff were to be appointed to the Board of Directors of Bausch Health on or prior to

[1] Here, the "Icahn Group" refers collectively to Carl Icahn and the entities under control by him, including Icahn Capital and IEP. *Id.* ¶ 48.

March 17, 2021. *Id.* ¶ 80. On March 17, 2021, Plaintiff and Brett Icahn were appointed to the Board of Directors of Bausch Health. *Id.* ¶ 81.

On August 6, 2020, Bausch Health issued a press release announcing its intention to "spin off" its Bausch + Lomb business as a separate publicly traded company. *Id.* ¶ 86. On January 13, 2022, Bausch + Lomb filed its Form S-1 with the SEC and listed eight Directors to govern the company after the consummation of the IPO: Joseph Papa (CEO and Chairman), Ross (Lead Director), Nathalie Bernier, Andrew von Eschenbach, Sarah Kavanaugh, John Paulson, Russel Robertson, and Richard De Schutter. *Id.* ¶ 88. Of the eight directors, two identified as women and none identified as minorities. *Id.* ¶ 89. On April 28, 2022, Bausch + Lomb included a new disclosure in its Amendment No. 2 to Form S-1, filed with the SEC stating that "[t]he Company has proposed to achieve a target of 30% of [sic] women and/or minority representation on the Board of Directors by the end of 2024." *Id.* ¶ 96. The Icahn Group did not seek immediate Board representation at Bausch + Lomb. Instead, it sought appointment rights it could elect to exercise later. *Id.* ¶ 103.

On January 13, 2022, IEP and Icahn Capital's General Counsel, Jesse Lynn ("Lynn"), sent Bausch + Lomb's General Counsel, Ackermann, a draft DANA that provided the Icahn Group the right to appoint two directors to the Bausch + Lomb Board. *Id.* ¶ 104. On January 17, 2022, Ackermann delivered a markup of the DANA that now required the initial Icahn Capital's Board designees to also satisfy certain "Director Criteria," which was broadly defined to include any "guidelines" and "policies" adopted by the Board. *Id.* ¶ 105. In the email providing the markup of the DANA, Ackermann made note of a Board Diversity Policy that sought to achieve a 30% women and/or minority representation by the end of 2024. *Id.* ¶ 106.

Lynn and Ackermann thereafter had a phone call, immediately after which the concept of a "side letter" appeared. *Id.* ¶ 114. The draft side letter read as follows:

> **1. Board Diversity Policy.** The Company and the Icahn Group agree that, notwithstanding the provisions set forth in Sections 1(a)(1) and 1(a)(v) of the Agreement, if the Board Diversity Policy (the "Policy") would prevent any Icahn Designee or Replacement Designee from joining the Board, then either (x) the size of the Board will be expanded or (y) one or more incumbent directors will resign or (z) the Board will waive the applicable provisions of the Policy, in each case in order to accommodate the seating of such Icahn Designee or Replacement Designee as a director of the Company; provided, however, that, if at the time of designation of any Icahn Designee or Replacement Designee, the full Board (including the two individuals designated by the Icahn Group) would not be in compliance with the Policy, then one of the two individuals designated by the Icahn Group must qualify as "Diverse" in accordance with the terms of the Policy.

*Id.* ¶ 115. On April 28, 2022, the DANA and the side letter ("Side Letter") were executed. *Id.* ¶ 121. The Side Letter remained unchanged from the draft version except that the clause "(y) one of more incumbent directors will resign" had been stricken. *Id.* ¶ 120.

Beginning on May 10, 2022, after a disappointing IPO, and culminating on June 21, 2022, the Icahn Group negotiated to exercise its rights to appoint two directors to the Bausch + Lomb Board under the Director Appointment and Nomination Agreement. *Id.* ¶ 140. During the week on June 13, 2022, Brett Icahn called Plaintiff to inform him that he had demanded that Bausch + Lomb seat both himself and Plaintiff as the two Icahn appointees. However, Brett Icahn stated that Ackermann and Ross would not allow it pursuant to the Side Letter because of Plaintiff's race. *Id.* ¶ 141.

On June 20, 2022, Ackermann sent an email to Lynn memorializing that: "I understand that Brett and the Icahn Group have requested that 2 board members be appointed and join the B+L board now (shortly) rather than upon full spin or thereafter. To that end the Icahn Group identified 2 persons: Brett Icahn and Gary Hu." *Id.* ¶ 145. Hu, who identifies as Chinese-American,

was also Portfolio Manager of Icahn Capital, starting such role on the same day and under the same terms as Plaintiff. *Id.* ¶ 146. On June 21, 2022, Bausch Health solicited consent from its directors to approve the appointment of Brett Icahn and Hu to its subsidiary Bausch + Lomb's Board. *Id.* ¶ 148.

In May 2023, Plaintiff began to discover that the Icahn Group had been deceiving him as well as IEP's unitholders by failing to make the mandatory securities disclosure that, since at least 2018, Carl Icahn had personally entered into margin loans totaling about $5.1 billion, collateralized by his stake in IEP, primarily to supplement Icahn Capital's investment liquidity (collectively, "Margin Loans"). *Id.* ¶ 255. When Plaintiff asked Brett Icahn for a more detailed accounting of the assets available for investments while negotiating the Employment Agreement in 2020, Brett Icahn made false and misleading representations, directed Plaintiff to IEP's deficient securities filings—which did not disclose the Margin Loans' existence—and refused requests for additional private information. This concealment amounted to a $5.1 billion overstatement of the Icahn Group's liquidity, which Plaintiff relied on when he proposed the Bausch Investment in December 2020, believing that Icahn Capital had the resources to hold or increase the Bausch Investment for as long as it remained undervalued and that it was a suitable activist target. *Id.* ¶ 256. When the Margin Loans came to light, however, Icahn Capital's assets dropped precipitously, eventually forcing Icahn Capital to sell the Bausch Investment at prices far below what Plaintiff and Brett Icahn believed it to be worth. *Id.* ¶ 257.

To fund at least $2.7 billion in Carl Icahn's margin calls, pay an ongoing quarterly cash dividend at IEP, and cover other operating and financial cashflows at IEP, investments were sold within the Investment segment from May 2023 onward. *Id.* ¶ 270. From December 2020 until September 2025, the available investment funds declined from $9.3 billion to $3.2 billion. The

$6.1 billion decline proved material to Plaintiff's ability to profit from existing investments and propose new investments of comparable size to those expected at the outset of the Employment Agreement. *Id.* ¶ 258. IEP expressly acknowledged that investments were being sold to cover the Margin Loans. For example, on February 25, 2025, IEP disclosed that "Mr. Icahn has made withdrawals from the Investment Funds in recent months, including in connection with the principal payment made in connection with Amendment No. 1 to the Loan Agreements, and may make additional withdrawals in the future, in order to repay a portion of his loans and for other purposes." *Id.* ¶ 259. During this period, Icahn Capital completely exited significant activist investments in Cheniere Energy Inc., Conduent Inc., Crown Holdings Inc., Dana Inc., First Energy Corp., Herc Holdings Inc., and Xerox Holdings Corp. *Id.* ¶ 260.

On April 8, 2025, Brett Icahn sent an email to Bausch Health Chairman John Paulson and the CEO and CFO of Bausch Health, copying Plaintiff. Brett Icahn stated he agreed with John Paulson that "the stock price [of Bausch Health] is way undervalued relative to our underlying value". *Id.* ¶ 276. On August 13, 2025, Carl Icahn entered into the third amendment to his consolidated margin loan agreement, requiring an immediate "approximately $300 million" paydown. *Id.* ¶ 277. On August 14, 2025, Icahn Capital sold $312 million worth of shares of Bausch Health in a single block trade to John Paulson. *Id.* ¶ 278. Plaintiff's final bonus was dramatically reduced by the collapse of Icahn Capital resulting from the undisclosed Margin Loans and ongoing securities law violations that had been concealed from Plaintiff when entering into the Employment Agreement and when making the Bausch Investment. *Id.* ¶ 283.

On December 15, 2025 Plaintiff filed his Complaint alleging Intentional Race Discrimination in Violation of § 1981 (Count I) against all Defendants; Breach of Contract (Discrimination) (Count II) against Icahn Capital; Breach of Contract (Margin Loans) (Count III)

against Icahn Capital; Fraudulent Concealment (Count IV) against IEP, Icahn Capital, Carl Icahn, and Brett Icahn; Fraudulent Inducement (Count V) against IEP, Icahn Capital, Carl Icahn, and Brett Icahn; Tortious Interference with Contract/Business Relationship (Count VI) against Bausch + Lomb, Bausch Health, Ackermann, and Ross; and Unjust Enrichment (Count VII) against Ross and Hu.

Defendants collectively filed a Motion to Dismiss, ECF No. [81], arguing Plaintiff's § 1981 claim must be dismissed because race was not the but-for cause of Plaintiff's failure to be appointed to the Bausch + Lomb Board, the Side Letter was not in effect when Hu was appointed to the Board, and Plaintiff had no contractual right to a Bausch + Lomb Board seat. Moreover, Defendants contend Plaintiff fails to plead an unjust enrichment claim, Bausch Health and Bausch + Lomb did not tortiously interfere with Plaintiff's Employment Agreement or any prospective Bausch + Lomb contract, and Plaintiff's damages are wholly speculative and not casually connected to his failure to be appointed to the Bausch + Lomb Board. *See generally* ECF No. [81].

Defendants IEP, Icahn Capital, Carl Icahn, Brett Icahn, and Hu separately filed a Motion to Dismiss, ECF No. [75], arguing Plaintiff's discrimination claims fail because there was no intent to discriminate, Plaintiff's claim that Icahn Capital breached either his Employment Agreement or an implied covenant by not appointing him to the Bausch + Lomb Board fails, and the § 1981 claim against Hu must be dismissed. Additionally, Defendants contend there was no breach of contract based on the alleged failure to disclose the Margin Loans, and Plaintiff's fraudulent concealment and fraudulent inducement claims fail. *See generally* ECF No. [75].

Defendants Bausch + Lomb, Ross, and Ackermann separately filed a Motion to Dismiss, ECF No. [80], arguing that Plaintiff's Complaint fails to establish personal jurisdiction over them.

Defendant Bausch Health separately filed a Motion to Dismiss, ECF No. [82], arguing this Court lacks personal jurisdiction over it, and Plaintiff has failed to plead cognizable § 1981 and tortious interference claims against Bausch Health.

Plaintiff responds that he states a *prima facie* claim under § 1981, he has properly pleaded tortious interference, this Court has personal jurisdiction over all Defendants because the corporate shield doctrine does not apply, and he has properly pled his fraud claims and breach of contract claims. *See generally* ECF No. [83]. Plaintiff further contends his claims are timely and Defendants' opinions on Plaintiff's damages do not support dismissal. *Id.* at 46–52. On June 15, 2026, Plaintiff filed a Notice of Voluntary Dismissal as to Hu and as his Unjust Enrichment claim. ECF No. [104]. That Notice was approved and adopted by this Court on June 16, 2026. ECF No. [105].

## II. LEGAL STANDARD

The Federal Rules of Civil Procedure require a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that Rule 8(a)(2)'s pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). In the same vein, a complaint may not rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. These elements are required to survive a Rule 12(b)(6) motion, which requests dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).

When reviewing a motion under Rule 12(b)(6), a court generally must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in the plaintiff's favor. *See Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1084 (11th Cir. 2002). Courts generally "do not consider anything beyond the face of the complaint and documents attached thereto when analyzing a motion to dismiss." *Fin. Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284 (11th Cir. 2007) (citation omitted). However, there is an exception when "a plaintiff refers to a document in its complaint, the document is central to its claim, its contents are not in dispute, and the defendant attaches the document to its motion to dismiss." *Id.* (citation omitted). Furthermore, courts may consider "matters of which a court may take judicial notice" when ruling on a 12(b)(6) motion to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## III. DISCUSSION

### A. Defendant Bausch Health's Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. [82]

Defendant Bausch Health argues this Court lacks personal jurisdiction over it as Plaintiff fails to meet his burden of satisfying Florida's two-step inquiry to establish personal jurisdiction. ECF No. [82] at 8. Bausch Health further contends that Florida's long-arm statute authorizes personal jurisdiction over a defendant only where it engaged in substantial and not isolated activity within the state. *Id.* (citing Fla. Stat. § 48.193(2)). And the long-arm statute authorizes specific jurisdiction only where the cause of action arises from a defendant's acts in Florida. *Id.* (citing Fla. Stat. § 48.193(1)(a)).

As to general jurisdiction, Bausch Health contends that it is a Canadian company, not incorporated in Florida, and does not maintain any place of business in Florida. *Id.* at 8–9. As such, the Complaint contains no allegations to suggest that Bausch Health's contacts with Florida are so

constant and pervasive as to render it at home in the forum state. *Id*. at 9 (citing *Waite v. All Acquisition Corp.*, 901 F.3d 1307, 1311 (11th Cir. 2018) (holding no general jurisdiction where "there is no evidence that [defendant] is at home in Florida.")).

Bausch Health contends there is similarly no specific jurisdiction over it because Plaintiff's claims do not arise from any contacts between Bausch Health and Florida and that Plaintiff cannot impute the alleged conduct of Ackermann and Ross on Bausch Health. *Id*. Bausch Health cites to *United States v. Bestfoods*, 524 U.S. 51, 69–70 (1998), in which the Supreme Court held that "[s]ince courts generally presume that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary. . . it cannot be enough to establish liability here that dual officers and directors made policy decisions and supervised activities at the facility." *Id.* at 10. Bausch Health further contends it lacks sufficient minimum contacts with Florida to satisfy the due process requirement necessary to compel it to appear in this Court. *Id*.

In his Response, Plaintiff acknowledges there is no general jurisdiction as to Bausch Health. ECF No. [83] at 31. Rather, Plaintiff contends the Complaint alleges numerous facts that suggest Ackermann and Ross took critical action on behalf of Bausch Health. *Id.* at 31. Namely, Plaintiff points out that Ackermann was general counsel and Ross was lead independent director of Bausch Health in April 2022 when the "discriminatory covenant" was executed. *Id*. at 32. Plaintiff further responds that personal jurisdiction satisfies due process and this case is analogous to *Calder v. Jones,* 465 U.S. 783, 789 (1984), in which the United States Supreme Court held that jurisdiction did not violate due process where a defendant's intentional and tortious actions were aimed at a particular state. *Id.* at 32–33.

In addressing whether personal jurisdiction over a nonresident defendant exists, "[t]he district court must accept the facts alleged in the complaint as true, to the extent they are

uncontroverted by the defendant's affidavits." *Madara v. Hall*, 916 F.2d 1510, 1514 (11th Cir. 1990) (citing *Morris v. SSE, Inc.*, 843 F.2d 489, 492 (11th Cir. 1988)). Moreover, "where the plaintiff's complaint and the defendant's affidavits conflict, the district court must construe all reasonable inferences in favor of the plaintiff." *Id.*

Furthermore, a court must conduct a two-part inquiry when deciding the issue of personal jurisdiction. *Sculptchair, Inc. v. Century Arts, Ltd.*, 94 F.3d 623 (11th Cir. 1996). First, the court must determine whether the applicable state statute governing personal jurisdiction is satisfied. *Id.* at 626. Florida's long-arm statute recognizes two kinds of personal jurisdiction over a nonresident defendant: general jurisdiction and specific jurisdiction. *See* Fla. Stat. §§ 48.193(1)–(2); *see also easyGroup Ltd. v. Skyscanner, Inc.*, No. 20-20062-CIV, 2020 WL 5500695, at *6 (S.D. Fla. Sept. 11, 2020). The Eleventh Circuit has held that the reach of Florida's long-arm statute is a question of state law, and federal courts must adhere to the statutory constructions offered by the Florida Supreme Court and Florida's District Courts of Appeal. *See Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1352 (11th Cir. 2013). If the requirements of the long-arm statute are satisfied, under either general jurisdiction or specific jurisdiction, then the court must also consider the Due Process Clause. *Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1250–51 (11th Cir. 2000).

The Court's analysis of the Due Process Clause depends on three factors: (1) Defendant's purposeful availment of the forum state; (2) the cause of action arising out of the activities of which the Defendant purposefully availed himself; and (3) reasonable foreseeability of the Defendant being haled into court in the forum state. *See id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). In addition, the Court must determine whether exercising jurisdiction will comport with traditional notions of fair play and substantial justice, meaning the court must

balance: "(a) the burden on the Defendant; (b) the forum state's interest in adjudicating the dispute; (c) the Plaintiff's interest in obtaining convenient and effective relief; (d) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (e) the shared interest of the several states in furthering fundamental substantial social policies." *Id.* at 1251 (citing *Burger King*, 471 U.S. at 466).

At the outset, the Court agrees that there is no general jurisdiction over Bausch Health. As Bausch Health points out, it is a Canadian company and does not maintain any place of business in Florida such that it lacks the constant and pervasive contacts necessary to render it at home in Florida. Thus, in order to find that it has jurisdiction over Bausch Health, the Court must assess the alleged facts through the lens of specific jurisdiction.

And for this analysis, it is helpful to analyze the actions that Plaintiff argues subject Bausch Health to liability in this case. With respect to Count I, Plaintiff alleges:

> Defendant Bausch Health intended to discriminate on the basis of race because its own board resolution authorizing its subsidiary's appointment of Gary Hu stated that the appointment was "in furtherance of the BLCO Board's commitment to Board diversity." Bausch Health intended to enforce Bausch + Lomb board diversity, by means of discrimination, to serve its own purported ESG goals as the corporate parent. The intention of Bausch Health to discriminate on the basis of race is further evidenced by its pattern of race-based recruiting on its own board []. The intentions of its representatives Ross and Ackermann to discriminate on the basis of race are also imputed to it.

ECF No. [16-1] ¶ 354(d). With respect to Count VII, Plaintiff alleges the Ackermann and Ross, in part as representatives of Bausch Health, and Bausch Health on its own, tortiously interfered with Plaintiff's Employment Agreement with Icahn Capital. *Id.* ¶ 433–44.

Plaintiff alleges that personal jurisdiction is proper under Florida Statute § 48.193(1)(a)(2). ECF No. [83] at 39. That statute provides for personal jurisdiction where a cause of action arises from the defendant "[c]ommitting a tortious act within this state." Fla. Stat. § 48.193(1)(a)(2).

"Under Florida law, [] a tort arises in the jurisdiction where the last act necessary to establish liability occurred." *Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1578 (11th Cir. 1990) (citing *Meehan v. Celotex Corp.*, 466 So.2d 1100, 1106 (Fla. 3rd DCA 1985)). This view "focuses analysis not on where a plaintiff ultimately felt damages, but where a defendant's tortious conduct occurred." *Metnick & Levy, P.A. v. Seuling*, 123 So. 3d 639, 645 (Fla. 4th DCA 2013). Indeed, in the context of tortious interference in particular, what matters is whether "the acts were committed within Florida." *Rautenberg v. Falz*, 193 So. 3d 924, 930 (Fla. 2d DCA 2016) (citing *PK Computers, Inc. v. Indep. Travel Agencies of Am., Inc.*, 656 So.2d 254, 255 (Fla. 4th DCA 1995)).[2]

Based on this state of the law, the Court need not decide whether Ackermann and Ross' actions can be imputed to Bausch Health, because there are no allegations in the Complaint that *any* of the parties' wrongful actions took place in Florida. Indeed, the allegations of wrongful conduct—in particular, the appointment of Hu—all occurred outside of Florida. Plaintiff's argument that Bausch Health "knew that enforcing the racially discriminatory side letter would cause a devastating impact to Plaintiff 'in the State in which [he] lives'" is facially insufficient. ECF No. [83] at 33 (citing ECF No. [1]). Florida's long-arm statute is not satisfied.

Even if the long-arm statute were satisfied, the Court finds that asserting jurisdiction over Bausch Health would violate due process. Though Plaintiff relies on *Calder*, it is distinguishable.

[2] The Court is aware that, in cases *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339 (11th Cir. 2013) and *Licciardello v. Lovelady*, 544 F.3d 1280 (11th Cir. 2008), the Eleventh Circuit indicated "that a tortious act is committed in Florida even in cases when a defendant commits an act outside the state—as long as the injury occurs within Florida." *Organic Mattresses, Inc. v. Environmental Res. Outlet, Inc.*, No. 17-21905-CIV, 2017 WL 5665354, at *11 (S.D. Fla. Oct. 6, 2017), *report and recommendation adopted sub nom. Organic Mattresses, Inc. v. Env't Res. Outlet, Inc.*, No. 17-21905, 2017 WL 5665356 (S.D. Fla. Oct. 24, 2017). However, the courts in *Louis Vuitton* and *Lovelady* faced trademark infringement claims, which operate in a fundamentally different manner than discrimination and tortious interference claims. And courts have held that, under Florida law, in the discrimination and tortious interference contexts, the location where the damages are felt is not the deciding factor—what matters is where the defendant's actual actions occurred. *See, e.g.*, *Metnick & Levy, P.A.*, 123 So.3d at 645; *Crowe v. Paragon Relocation Res., Inc.*, 506 F. Supp. 2d 1113, 1121 (N.D. Fla. 2007).

In *Walden v. Fiore*, 571 U.S. 277, 286 (2014), the United States Supreme Court held that where intentional torts are involved, a forum state's jurisdiction over an out-of-state tortfeasor "must be based on intentional conduct by the defendant that creates the necessary contacts with the forum." As such, a "plaintiff cannot be the only link between the defendant and the forum." *Id*. at 285. The *Walden* Court explained that in *Calder*, forum contacts were ample, as defendants made phone calls to forum state sources, wrote a story about the plaintiff's activities in the forum state, and caused reputational injury by writing an allegedly libelous article that was widely circulated in the forum state. *Id*. at 287. Unlike *Calder*, Plaintiff argues Bausch Health knew the discriminatory Side Letter would cause a "devastating impact" to Plaintiff in Florida, but Bausch Health's alleged tortious conduct never targeted Florida, save for the fact that Plaintiff resides there. Plaintiff must show that Bausch Health's intentional tort was "expressly aimed" at the forum. *Aviation One of Florida, Inc. v. Airborne Ins. Consultants (PTY), Ltd*, 722 F. App'x 870, 882 (11th Cir. 2018). As such, the Court finds that any exercise of personal jurisdiction over Bausch Health would violate due process. Thus, Bausch Health's Motion to Dismiss, ECF No. [82], is granted.

### B. Defendants Bausch + Lomb Corporation, Thomas Ross, and Christina Ackermann's Motion to Dismiss for Lack of Personal Jurisdiction, ECF No. [80]

Defendants Bausch + Lomb, Ross, and Ackermann similarly move to dismiss all counts against them because Plaintiff's Complaint fails to establish personal jurisdiction. ECF No. [80] at 2. These Defendants contend that Florida's corporate shield doctrine prevents Plaintiff from establishing personal jurisdiction over Ackermann or Ross, who both reside outside of Florida, because Plaintiff alleges solely out-of-state acts performed within the scope of their employment. *Id.* at 7. Moreover, Defendants contend Plaintiff fails to allege sufficient minimum contacts with Florida. *Id.* at 9. Defendants acknowledge that the corporate shield doctrine does not typically prevent the exercise of jurisdiction over a defendant alleged to have committed an intentional tort,

such as tortious interference, but Defendants contend that the claim fails as a matter of law. *Id*. at 8.

As to minimum contacts, Defendants Ross and Ackermann contend Plaintiff does not allege any actions that either took to avail themselves of Florida, does not tie any Florida contacts to allegedly tortious conduct, and does not plead that either had knowledge that Plaintiff was domiciled in Florida. *Id.* at 9. Defendant Bausch + Lomb argues it is a Canadian company headquartered in New Jersey, and Plaintiff alleges conduct by Ackermann and Ross solely within the scope of their employment that at most incidentally affected Plaintiff, a Florida resident. *Id*. at 10.

Plaintiff responds that the corporate shield doctrine does not apply to Ackermann and Ross because Plaintiff pleads two separate intentional torts: (1) violation of § 1981; and (2) tortious interference with a business relationship ECF No. [80] at 29. Plaintiff makes the same minimum contacts arguments for Bausch + Lomb, Ackermann, and Ross that he made for Bausch Health. *Id*.

As was the case with Bausch Health, the Court finds Plaintiff has failed to plead that Defendants' alleged tortious conduct targeted Florida, save for the fact that Plaintiff resides there. As the Court previously stated, Plaintiff relies only on argument that Bausch Health "knew that enforcing the racially discriminatory side letter would cause a devastating impact to Plaintiff 'in the State in which [he] lives.'" ECF No. [83] at 33 (citing ECF No. [1]). But the minimum contacts analysis requires more: Defendant must have purposefully availed itself of the privileges of the forum state. *Future Tech. Today, Inc.*, 218 F.3d at 1250–51 (citing *Burger King*, 471 U.S. at 475). That is, Plaintiff must show the intentional torts were expressly aimed at Florida. To the extent Plaintiff relies on the fact that Ross attended a February 10, 2025 Bausch + Lomb Board meeting

in Florida satisfies due process, this meeting took place well after the alleged tortious conduct and cannot be used to retroactively establish personal jurisdiction based on tortious conduct. As such, the Court finds exercising jurisdiction over Bausch + Lomb, Ackermann, and Ross would violate due process and their Motion, ECF No. [80], is granted.

**C. Count I – Intentional Race Discrimination**

Each Defendant[3] argues that Plaintiff's § 1981 claim should be dismissed because Plaintiff fails to show that, absent racial bias, he would have been appointed to the Bausch + Lomb Board. ECF No. [81] at 8. Defendants contend that it is not enough for Plaintiff to show that race was a factor, but must show that, but for his race, he would have obtained the Board seat. *Id.* at 12. Thus, Defendants aver that Plaintiff must show that race had a determinative influence on his injury. *Id.* (citing *Mosley v. Preston Cycles W.*, LLC, 2024 WL 2873720, at *6 (11th Cir. June 7, 2024)). In support, Defendants cite to *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 589 U.S. 327, 339 (2020), in which the United States Supreme Court held that in a § 1981 claim, a plaintiff must prove race was a but-for cause of a Defendant's refusal to contract and not merely a "motivating factor."

Defendants argue the Diversity Policy incorporated by the Side Letter defines "Diverse" more broadly than Plaintiff's "race-centric reading", such that race cannot be the but-for cause of Plaintiff's alleged injury. *Id*. at 8. Defendants further contend that the Amended DANA under which Hu was appointed superseded the original DANA and extinguished the side letter. *Id*. at 8–9. Moreover, Plaintiff's § 1981 claim fails because he has not pled any contractual right to a seat

[3] Each Defendant in the case participated in a joint Motion to Dismiss, but Bausch Health, Bausch + Lomb, Ackermann, and Ross filed separate Motions to Dismiss for lack of jurisdiction. For the reasons stated above, the Court granted those Motions. As such, though Defendants make arguments on behalf of all Defendants as to the merits, the Court will only analyze those arguments as pertains to the remaining Defendants.

on the Board. Defendants assert that "there is no § 1981 injury where the plaintiff lacks a contract claim in the first place." *Id*. (citing *Massapequa Union Free Sch. Dist. v. New York State Bd. of Regents*, 2025 WL 3182580, at *36 (E.D.N.Y. Nov. 14, 2025)).

Defendants IEP, Icahn Capital, Carl Icahn, and Brett Icahn, separately move to dismiss Count I because there was no intent to discriminate. ECF No. [75] at 8. Specifically, Defendants argue Icahn Capital repeatedly pushed back against Bausch + Lomb's alleged mandate. *Id*.

Plaintiff responds that Defendants' Motion, at most, raises defenses for trial. ECF No. [83] at 12. Moreover, Plaintiff argues that Defendants' arguments misapply the causation standard—citing to *Akridge v. Alfa Ins. Companies*, 93 F.4th 1181 (11th Cir. 2024) and *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644 (2020), he contends that he need not assert race was the sole cause for why he did not get an appointment to the Board, but only that race was a but-for cause. *Id*. at 13. Plaintiff further responds that the Side Letter's legal effect on the day of Hu's appointment is irrelevant, and the Side Letter caused his injury regardless of whether it was effective on the day of Hu's appointment. *Id*. at 16–17. Plaintiff contends Icahn Capital substituted Hu into his Board spot before the Side Letter was allegedly extinguished. *Id*. Plaintiff avers that Defendants' discriminatory actions denied him race-neutral benefits and enjoyment of the terms of his Employment Agreement with Icahn Capital, and Defendants' discriminatory actions caused Bausch + Lomb's refusal to form a contract with him. *Id.* at 18. Plaintiff argues the Eleventh Circuit has held that a third party is still liable under § 1981 for its discriminatory interference with a contract. *Id*. at 18 (citing *Moore v. Grady Mem'l Hosp. Corp.*, 834 F.3d 1168, 1172 (11th Cir. 2016)).

The statutory provision found at 42 U.S.C. § 1981 "prohibits racial discrimination in the making and enforcement of private contracts." *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)

(citations omitted). To state a claim under § 1981, a plaintiff must allege facts demonstrating: "(1) that the plaintiff is a member of a racial minority; (2) that the defendant intended to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the activities enumerated in the statute[.]" *Kinnon v. Arcoub, Gopman & Assocs., Inc.*, 490 F.3d 886, 891 (11th Cir. 2007) (quoting *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1270 (11th Cir. 2004)). Those activities include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). The United States Supreme Court has held that § 1981 is applicable to racial discrimination in private employment against white persons. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 287 (1976).

"To state a claim under § 1981 for interference with a right to contract, 'a plaintiff must identify an impaired contractual relationship under which the plaintiff has rights.'" *Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1309 (11th Cir. 2010) (quoting *Kinnon*, 490 F.3d at 890). Plaintiff alleges that Defendants' discriminatory actions denied him race-neutral benefits and enjoyment of the terms of his Employment Agreement with Icahn Capital and that Defendants' discriminatory actions caused Bausch + Lomb's refusal to form a contract with him to serve on its Board.

**i. Causation**

Plaintiff's citation to *Akridge* and *Bostock* is inapposite. In each case, the court addressed the interpretation of a "but-for" cause element, but it did so in the context of the Americans with Disabilities Act and Title VII of the Civil Rights Act of 1964. Neither case addressed the "but-for" cause element in a § 1981 case. A private action under § 1981 affords "a federal remedy against discrimination. . . *on the basis of race*." *Comcast Corp.*, 589 U.S. at 335 (quoting *Johnson v. Ry.*

*Express Agency, Inc.*, 421 U.S. 454, 460 (1975)). As such, Plaintiff must plead that, absent racial bias, Plaintiff would have been appointed to the Bausch + Lomb Board.

A review of Bausch + Lomb's Board Diversity Policy defines diversity to include "gender, sexual preference, disability, age, ethnicity, religion, business experience, functional expertise, culture and geography." ECF No. [81-2]. Moreover, the Policy states:

> The Company seeks to maintain a Board comprised of talented and dedicated directors whose skills and backgrounds reflect the diverse nature of the business environment in which the Company operates. Board diversity promotes the inclusion of different perspectives and ideas, and ensures that the Company has the opportunity to benefit from all available talent, which makes prudent business sense, helps maintain a competitive advantage and makes for better corporate governance.

*Id*. While the Diversity Policy is broad and seeks to include Board members from all walks of life, Plaintiff specifically pleads in his Complaint that Brett Icahn stated he had demanded that Bausch + Lomb Board seats go to Brett and Icahn and Plaintiff, but that Ackermann and Ross would not allow it pursuant to the Side Letter *because of* Plaintiff's race. ECF No. [1] ¶ 141. As such, in the context of Ackermann and Ross' alleged statement about Plaintiff's race pursuant to the Side Letter, Plaintiff has sufficiently pled a but-for cause of Plaintiff's injury.

Defendants argue that because the Side Letter was not in effect when Hu was appointed to the Bausch + Lomb Board, any alleged racial restrictions imposed by the Side Letter could not have been the but-for cause of Plaintiff's alleged injury. ECF No. [81] at 8–9. But the Complaint alleges that on June 13, 2022, Brett Icahn informed Plaintiff that Ackermann and Ross would not accept his appointment to the Board because of his race and on June 20, 2022, Ackermann sent an e-mail to Lynn memorializing that Brett Icahn and Hu would be appointed to the Board. ECF No. [1] ¶ 145. As such, independent of whether the Side Letter was in effect, Plaintiff has pled that but for his race, he would have been appointed to the Board.

**ii. Plaintiff's Contractual Rights**

Defendants also argue that Plaintiff's § 1981 claim fails because Plaintiff fails to plead that he had any contractual right to a seat on the Bausch + Lomb Board. ECF No. [81] at 13. Under § 1981, a plaintiff must initially identify an impaired "contractual relationship" and that a "contractual relationship need not already exist because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006). Here, Plaintiff has pled that the parties drafted a DANA for Bausch + Lomb Board seats under which Plaintiff was mentioned by name, that Brett Icahn had demanded Plaintiff be sat on the Board, and ultimately, due to the Board Diversity Policy and Side Letter, Plaintiff would not be allowed appointment to the Board because of his race. ECF No. [1] ¶¶ 141–144. A such, Plaintiff has identified himself as a would-be contractor consistent with *McDonald*. The Motion to Dismiss, ECF No. [81] is denied as to Count I.

Defendants IEP, Icahn Capital, Carl Icahn, and Brett Icahn, separately moved to dismiss Count I because there was no intent to discriminate. ECF No. [75] at 8. Plaintiff correctly points out that the Eleventh Circuit has held that under § 1981, liability for intentional discrimination requires only that decisions be premised on race, not that decisions be motivated by invidious hostility or animus. *Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 473 (11th Cir. 1999). However, the Icahn Group Defendants did not make a decision in this case. While Plaintiff argues that entry into the Side Letter restricted his appointment to the Bausch + Lomb Board, the Side Letter makes no claims about whether someone of a particular race needs to be appointed to the Board. ECF No. [16-2]. The Side Letter only references the Board Diversity Policy, which lends itself to a host of candidates with experiences distinct from race. Plaintiff only alleged that Ackermann and Ross—not IEP, Icahn Capital, Carl Icahn, or Brett Icahn—actually decided Plaintiff could not be

appointed because of his race. As such, Defendants IEP, Icahn Capital, Carl Icahn, and Brett Icahn's Motion, ECF No. [75], is granted as to Count I.

**D. Count II – Breach of Contract (Discrimination)**

Plaintiff alleges Icahn Capital breached the implied covenant of good faith and fair dealing in his Employment Agreement by subjecting him to disparate treatment when Icahn Capital denied him a seat on Bausch + Lomb's Board of Directors because of his race. *Id.* ¶ 379. Plaintiff further contends Icahn Capital breached the implied covenant on November 5, 2025, when two weeks after Plaintiff made a confidential discrimination complaint to Icahn Capital, Carl Icahn was quoted in the *Wall Street Journal* reporting the relationship with Plaintiff as contentious. *Id.* ¶ 381. Plaintiff avers Icahn Capital breached its express representations in its Employee Handbook that "allegations of discrimination" will be handled with "confidentiality" and that "retaliation" is prohibited, defined to include "remarks" and "revenge." *Id.*

Icahn Capital seeks dismissal of Plaintiff's breach of contract claim because the implied covenant of good faith and fair dealing is not "free-floating" and must be expressly tied the parties' contractual relationship. ECF No. [75] at 13. Icahn Capital argues Delaware courts have consistently held that obligations under the covenant of good faith and fair dealing should be implied in rare instances and only to fill gaps where the contract is silent with respect to the issue in dispute. *Id.*

Plaintiff responds that racial discrimination is a breach of the implied covenant. ECF No. [83] at 44. Plaintiff cites to *Rizzitiello v. McDonald's Corp.*, 868 A.2d 825, 830 (Del. 2005), in which the Delaware Supreme Court held that "in order to sustain a disparate treatment claim for a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that she suffered intentional discrimination because of her race, as evidenced by an employer's disparate

treatment of her and similarly situated persons, and that the intentional discrimination resulted in an adverse employment action." *Id*.

The parties agree the Employment Agreement is governed by Delaware law. To succeed on a breach of contract claim under Delaware law, a plaintiff must demonstrate: (1) a contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Plaintiff argues Icahn Capital breached the implied covenant of good faith and fair dealing in his Employment Agreement as result of racial discrimination. Under Delaware law, the implied covenant of good faith and fair dealing "inheres in every contract and 'requires a party in a contractual relationship to refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits' of the bargain.'" *Kuroda v. SPJS Holdings*, L.L.C., 971 A.2d 872, 888 (Del. Ch. 2009) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005)). "The implied covenant of good faith and fair dealing involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated." *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap*, 878 A.2d at 441 (Del. 2005)). Moreover, "one generally cannot base a claim for breach of the implied covenant on conduct authorized by the terms of the agreement." *Dunlap*, 878 A.2d at 441 (Del. 2005). "[I]mplied good faith cannot be used to circumvent the parties' bargain, or to create a 'free-floating duty . . . unattached to the underlying legal document.'" *Id*. (quoting *Glenfed Fin. Corp., Commercial Fin. Div. v. Penick Corp.*, 276 N.J. Super. 163, 176 (App. Div. 1994)).

Here, Plaintiff's Employment Agreement expressly states that Plaintiff will be appointed as a director of IEP but is otherwise silent as to any other board position. ECF No. [16-4] ¶ 3(c).

The Employment Agreement does not guarantee any board seats to Plaintiff. Rather, it states that "his failure to be elected or appointed to the [B]oard of any Portfolio Company shall not be a breach of this Agreement for any purpose." *Id*.

Because Plaintiff is unable to source his breach of contract claim in any rights afforded him by the Employment Agreement, he relies upon *Rizzitiello* and the Delaware Supreme Court's adoption of the Title VII *McDonnell-Douglas* framework. In *Rizzitiello*, the Delaware Supreme Court held that:

> [I]n order to sustain a disparate treatment claim for a breach of the implied covenant of good faith and fair dealing, a plaintiff must show that she suffered intentional discrimination because of her race, as evidenced by an employer's disparate treatment of her and similarly situated persons, and that the intentional discrimination resulted in an adverse employment action.

However, subsequent to *Rizzitiello*, the Delaware legislature amended § 712(b) of the Delaware Discrimination in Employment Act ("DDEA") to provide the following:

> (b) The Department shall have jurisdiction over all cases arising under this chapter, affording review and oversight of employment practices in Delaware. The Department shall endeavor to eliminate unlawful discrimination in employment through its administrative process set forth below. **This subchapter shall afford the sole remedy for claims alleging a violation of this chapter to the exclusion of all other remedies.** Upon termination of the administrative process by the Department, the charging party may institute a civil action in Superior Court of the State of Delaware pursuant to §§ 714 and 715 of this title. (emphasis added)

19 Del. Code Ann. § 712(b) (emphasis added). Prior to the amendment, the Delaware Supreme Court held that the DDEA was not automatically exclusive because it was "silent on whether a plaintiff may file a separate cause of action independently of the statute." *Schuster v. Derocili*, 775 A.2d 1029, 1037 (Del. 2001). After the amendment, courts found that the language re-established the exclusive remedy put in question by *Schuster* and have reasoned that a plaintiff cannot assert a common law claim for the breach of the implied covenant of good faith and fair dealing where the Delaware state statute provides the exclusive remedy. *See, e.g.*, *Wilcoxon v. Red Clay Consol.*

*Sch. Dist. Bd. of Educ.*, 437 F. Supp. 2d 235, 247 (D. Del. 2006); *see also Saunders v. E.I. DuPont de Nemours & Co*., No. CV 14-329-RGA, 2017 WL 679853, at *9 (D. Del. Feb. 17, 2017) (precluding a breach of the implied covenant based in a discrimination claim because under Delaware law, 19 Del. C. § 710 *et seq.*, is the sole remedy for an aggrieved employee to the exclusion of all other remedies); *Shomide v. ILC Dover, Inc.*, 521 F. Supp. 2d 324, 333 (D. Del. 2007) ("Plaintiff's exclusive remedy for race discrimination in his employment, however, lies under the Delaware Discrimination Employment Statute, 19 Del.Code § 710, et seq."). As such, because Plaintiff's theory of breach of the implied covenant of good faith and fair dealing is racial discrimination in his employment, his exclusive remedy lies in 19 Del. Code § 710, *et seq*.

Plaintiff's Complaint alternatively alleges that Icahn Capital breached express representations in the Employee Handbook. ECF No. [16-1] ¶ 381. The Delaware Supreme Court has held that an employee handbook is a unilateral expression of the defendant's policies and procedures on a number of topics, issued for the guidance and benefit of employees. *Heideck v. Kent Gen. Hosp., Inc.*, 446 A.2d 1095, 1097 (Del. 1982). Plaintiff's Complaint makes no suggestion that Icahn Capital's Employee Handbook was anything other than a unilateral expression of policies. As such, the Motion is granted as to Count II, and Count II is dismissed.

**E. Count III – Breach of Contract (Margin Loans)**

In Count III of the Complaint, Plaintiff alleges Icahn Capital violated the implied covenant of good faith and fair dealing when it knew and concealed from Plaintiff: (1) that Carl Icahn had $5.1 billion in Margin Loans against his shares in IEP, which posed a grave risk to Icahn Capital and IEP; (2) Carl Icahn was in ongoing violation of the securities laws by failing to disclose his Margin Loans; and (3) IEP was in ongoing violation of the securities laws by failing to disclose Carl Icahn's Margin Loans. ECF No. [1] ¶ 398. Icahn Capital intended this concealment to deceive Plaintiff into believing the Icahn Group had $5.1 billion more liquidity than it did. *Id.* ¶ 399. Icahn

intended that these misrepresentations would induce Plaintiff to enter into the Employment Agreement. *Id*. ¶ 400.

Defendants seek dismissal of Plaintiff's Breach of Contract claim, arguing that it is time barred. ECF No. [75] at 14. Defendants contend that Delaware's statute of limitations for breach of contract and breach of the implied covenant is three years, and the claims accrue at the time of the breach. *Id*. (citing *AssuredPartners of Virginia, LLC v. Sheehan*, 2020 WL 2789706, at *12 (Del. Super. Ct. May 29, 2020)). Defendants point out that Plaintiff became aware of the Margin Loans on February 23, 2022, when IEP filed their annual report. *Id.* at 15. As such, Defendants contend Plaintiff was on notice on February 23, 2022 and the statute of limitations expired prior to Plaintiff filing his claim. *Id*.

Defendants also contend there is no breach of contract. Defendants point out that Plaintiff fails to identify any contractual provision that was breached and Plaintiff cannot rely on any statements made prior to entering into the Employment Agreement because the integration clause in the contract prohibits him from doing so. *Id.* at 13. As Defendants previously argued, the implied covenant should be implied only in rare instances and only to fill gaps where the contract is silent with respect to the issue in dispute. *Id*. Defendants aver there are no contractual gaps to fill and further argue that Plaintiff fails to adequately plead damages. *Id*.

Plaintiff responds that the Delaware Supreme Court has held that an employer breaches a covenant of good faith and fair dealing when it "induces another to enter into an employment contract through actions, words, or the withholding of information, which is intentionally deceptive in some way material to the contract." ECF No. [83] at 45 (citing *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 101 (Del. 1992)). Plaintiff further responds that his claims are timely and the continuous breach doctrine presents a question of fact. *Id.* at 47. Plaintiff argues that the

continuous breach exception applies when a contract imposes continuous duties such that full and complete damages for breach cannot be determined until the end of the contractual period. *Id*. Therefore, when the continuing breach exception applies, the statute of limitations begins to run only when full damages can be determined and recovered. *Id*. (citing *AM Gen. Holdings LLC v. The Renco Grp., Inc.*, 2016 WL 4440476, at *11 (Del. Ch., 2016)). To determine whether the continuous breach exception applies, Plaintiff argues the Court must determine whether "obligations under a contract are continuous or severable which turns on the parties' intent, . . . ascertained through the contract's terms and subject matter, taken together with the pertinent facts and circumstances surrounding its formation." *Id*. at 48 (quoting *In re ASHINC Corp.*, No. AP 13-50530-CSS, 2022 WL 2666888, at *9 (D. Del. July 11, 2022)).

The Court first turns to the sufficiency of the pleadings. Plaintiff is correct that under *Merrill*, fraud can be a basis to find breach of the implied covenant of good faith and fair dealing in a contract. In *Merrill*, the defendant induced the plaintiff into an employment contract by concealing from the plaintiff his intention to employ him temporarily. *Merrill*, 606 A.2d at 102. Defendants led plaintiff to believe his employment would be indefinite. *Id*. The Court determined that the duration of an employment contract was clearly material to one's decision to accept a new position. *Id*.

Here, the Court finds *Merrill* analogous as Plaintiff alleges Icahn Capital, through Brett Icahn, Lynn, and Carl Icahn, intended to deceive Plaintiff into believing that the Icahn Group had $5.1 billion more liquidity than it did and was not vulnerable to a reputation-damaging SEC investigation and penalties. ECF No. [1] ¶ 399. Plaintiff further alleges that the $5.1 billion overstatement of the Icahn Group's liquidity was material to Plaintiff's decision to enter into the Employment Agreement because it vastly overstated the funds that would be available to Plaintiff

to perform his duties, and thus vastly overstated his profit potential under the Employment Agreement. *Id.* ¶ 402. Such statements were clearly material to Plaintiff's decision to enter into the Employment Agreement.

Defendants also contend that Plaintiff does not adequately plead damages for his breach of contract claim. Specifically, Defendants describe Plaintiff's claim that he is owed a "Make Whole Bonus" or $236 million as "pipe dream". ECF No. [75] at 14. However, as Plaintiff points out, under Delaware law a court can vindicate a breach of contract through an award of nominal damages—alleging specific monetary harm is not a requirement. ECF No. [83] at 46 (citing *Cygnus Opportunity Fund, LLC v. Washington Prime Group, LLC*, 302 A.3d 430, 454 (Del. Ch. 2023)). As such, Plaintiff has sufficiently pleaded damages to survive the Motion to Dismiss.

Defendants further contend that Plaintiff's breach of contract claim is time-barred. However, under Delaware law, when a party pleads a continuing contract, the "applicable statute of limitations begins to run only when full damages can be ascertained and recovered." *Palisades Collection, LLC v. Unifund CCR Partners*, 2015 WL 6693962, at *5 (Del. Super. Ct. Nov. 3, 2015). Plaintiff alleges the Defendants' wrongful actions "constitute one continuing harm." ECF No. [1] ¶ 393. Moreover, the statute of limitations does not typically run against a continuing cause of action until the termination of the contract. *Palisades Collection, LLC*, 2015 WL 6693962, at *6. Plaintiff pleads that his Employment Agreement is for a fixed term that ends September 30, 2027, and the Parties have continuously acknowledged it. ECF No. [1] ¶ 394. Whether obligations of a contract are continuous or severable turns on the parties' intent, and the question of intent cannot be resolved on a motion to dismiss as it is a fact issue. *See Am. Tower Corp. v. Unity Communications, Inc.*, 2010 WL 1077850, at *2 (Del. Super. Ct. Mar. 8, 2010). As such, Defendants' Motion to Dismiss is denied as to Count III.

**F. Count IV – Fraudulent Concealment**

In Count IV, Plaintiff alleges fraudulent concealment as Carl Icahn and Brett Icahn, individually and as representatives of IEP and Icahn Capital, deliberately concealed the facts of Carl Icahn's Margin Loans and the ongoing securities violations from Plaintiff during negotiation of the Employment Agreement; they did so in part by directing Plaintiff to assess Icahn Capital's and Icahn Group's financial situation by securities filings that unlawfully omitted mention of the Margin Loans and also by Brett Icahn making false and misleading representations concerning available investment funds. ECF No. [1] ¶ 415.

Defendants move to dismiss, arguing Plaintiff does not plead any facts to support a claim that Defendants owed Plaintiff a duty to disclose the Margin Loans. ECF No. [75] at 16. Defendants argue Plaintiff cannot establish he was harmed by the concealment of the Margin Loans because Icahn Capital allegedly exercised its sole discretion to liquidate portions of its investments in Bausch Health. *Id*. Defendants contend that under the Employment Agreement, Plaintiff was not entitled to receive any profit and bore the risk that Icahn Capital might sell any investment at any time to his detriment. *Id*. at 17.

Plaintiff responds that Defendants had a duty to speak where silence would render their statements misleading. ECF No. [83] at 38. Plaintiff argues that when a party undertakes to disclose some facts on a topic, the other party has a duty to disclose all facts necessary to prevent their statements from being misleading. *Id*. (citing *Marriott Int'l, Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 908 (Fla. 3d DCA 2015) ("A duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him.")). Plaintiff argues Defendants engaged in a partial disclosure by making representations to Plaintiff about the value and liquidity of Icahn Capital's funds. *Id.* at 39.

Plaintiff contends that the Complaint properly pleads fraud damages. *Id.* at 40. The Complaint alleges Defendants' fraud not only induced Plaintiff to enter his Employment Agreement, but it also altered the terms to which he agreed, informed his conduct during his employment, and reduced the benefits available to him during his employment. *Id.*

To state a claim for fraudulent concealment, a plaintiff must allege that:

> (1) the defendant concealed or failed to disclose a material fact; (2) the defendant knew or should have known that the material fact should be disclosed; (3) the defendant knew the concealment of or failure to disclose would induce the plaintiff to act; (4) the defendant had a duty to disclose the material fact; and (5) there was detrimental reliance on the misinformation.

*Aprigliano v. Am. Honda Motor Co.*, 979 F. Supp. 2d 1331, 1342 (S.D. Fla. 2013); *see Hess v. Philip Morris USA, Inc.*, 175 So. 3d 687, 691 (Fla. 2015). "[A] duty to disclose arises 'when one party has information that the other party has the right to know because of the fiduciary or other relationship of trust or confidence between them.'" *Barnes v. Burger King Corp.*, 932 F. Supp. 1420, 1429-30 (S.D. Fla. 1996) (citing *State v. Marks, P.A.*, 654 So. 2d 1184, 1189 (Fla. 4th DCA 1995), *reh. denied*, May 24, 1995).

Defendants only contest whether they had a duty to disclose a material fact. Plaintiff contends Defendants established a duty to disclose a material fact when they engaged in a partial disclosure by making representations to Plaintiff about the value and liquidity of Icahn Capital's funds. A duty to disclose may arise where a party undertakes to disclose certain facts, such that the party must then disclose the entire truth known to him. *Marriott Intern., Inc. v. Am. Bridge Bahamas, Ltd.*, 193 So. 3d 902, 908 (Fla. 3d DCA 2015) (citing *Nicholson v. Kellin,* 481 So.2d 931, 936 (Fla. 5th DCA 1985)). The Complaint alleges Brett Icahn stated it was "conservative" to assume the team would make twelve investments. ECF No. [1] ¶ 293. The Complaint alleges that Plaintiff wanted more private information on the amount and structure of the investment funds,

but that Brett Icahn actively concealed the requested information. *Id*. ¶¶ 301, 302. And it alleges Brett Icahn knew his shifting upside case—originally $8.6 billion on April 18, 2020, and later $11.0 billion on May 25, 2025—was false and misleading because his concern over the margin loans led him to create the "conservative" case. *Id*. ¶ 307. Brett Icahn "found" the $2.4 billion in fictitious additional funds in May 2020 to further induce Plaintiff to continue negotiating and ultimately enter into the Employment Agreement. *Id*. As alleged, the Icahn Group made representations to Plaintiff about the validity and liquidity of its funds and declined to answer further questions from Plaintiff. At this stage, Plaintiff has sufficiently pleaded a duty to disclose a material fact. *See Gutter v. Wunker,* 631 So. 2d 1117, 1118 (Fla. 4th DCA 1994), *cause dismissed*, 637 So. 2d 235 (Fla. 1994) ("Furthermore, where a party in an arm's length transaction undertakes to disclose information, all material facts must be disclosed.") (citing *Vokes v. Arthur Murray, Inc.*, 212 So.2d 906 (Fla. 2d DCA 1986).

As to damages, Plaintiff alleged that he would not have agreed in October 2020 to key economic terms of the Employment Agreement—such as the 2.0% payout—had he known that the Icahn Group's liquidity was $5.1 billion lower than indicated by the deficient public filings to which he was referred by Brett Icahn. ECF No. [1] ¶ 284. Plaintiff has sufficiently pled that his career and future income were also harmed by the margin loan scheme through (i) the harm to his track record from the forced liquidation of the Bausch Investment; and (ii) the harm to his professional reputation through his association with the Icahn Group during a time when it was determined to have violated the securities laws. *Id*. ¶ 291. Plaintiff alleges he had a greatly diminished opportunity and balance sheet to make new and profitable investments for the final four years of the term of the Employment Agreement and thereby augment his final bonus. *Id.* ¶

290. As such, Plaintiff has properly alleged damages from the concealment of the Margin Loans, and Defendants' Motion is denied as to Count IV.

**G. Count V – Fraudulent Inducement**

In Count V, Plaintiff alleges fraudulent inducement, arguing that "Brett Icahn made false statements of material fact to Plaintiff that Mr. Icahn knew to be false and were intended to, and did, induce reliance by Plaintiff, including: (i) that it was 'conservative' that $5.8 billion would be invested under the Employment Agreements, (ii) that this amount could be as high as $8.6 billion, and (iii) that, one month later, this amount could be as high as $11.0 billion without any justification for the $2.4 billion increase." ECF No. [1] ¶ 426.

Defendants seek dismissal of Count V, arguing Plaintiff does not set forth facts to support the allegation that Defendants made any false statements of material fact. ECF No. [75] at 18. Defendants further argue that Plaintiff's reliance on pre-contractual statements is barred because the Employment Agreement contains a clear and unambiguous integration clause. *Id*. (citing *See Park7 Student Housing, LLC v. PR III/Park7 SH Holdings, LLC*, 340 A.3d 614, 618 619 (Del. Ch. 2025) ("[A]n integration clause functions to preclude a fraud claim where the extracontractual misrepresentation directly conflicts with an express term in the contract" therefore a "plaintiff cannot plead justifiable reliance on those conflicting and superseded pre-contract extracontractual statements.")). Defendants contend Plaintiff's fraudulent inducement claim is barred by the integration clause in his Employment Agreement which states the contract "specifically supersedes any and all term sheets, letters of intent, spreadsheets and other materials that may have been shared with [Plaintiff] at any time, and all subsequent drafts thereof, which [Plaintiff] understands, acknowledges and agrees are not part of the agreement of the parties and should not be utilized for purposes of interpreting this Agreement or for any other purpose." *Id*. (citing ECF No. [16-4]).

Plaintiff responds that Delaware law, which governs interpretation of contract per the choice of law provision, "has established clear rules for when an integration clause bars a fraudulent inducement claim." ECF No. [83] at 42. Plaintiff contends that under Delaware law, a contract bars a fraudulent inducement claim only if it "contain[s] language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract." *Id.* (citing *Kronenberg v. Katz*, 872 A.2d 568 (Del. Ch. 2004)). Plaintiff contends the Employment Agreement does not contain an anti-reliance clause. ECF No. [83] at 42. Plaintiff further responds that the Icahn Group made concrete, specific, and quantifiable representations about the funds available for investment, which included direct representations regarding verifiable financial data, which amounts to more than mere puffery. *Id*. at 37.

As to the integration clause, the Court agrees with Plaintiff that Delaware law requires explicit anti-reliance language to bar a claim for fraudulent inducement. *Kronenberg*, 872 A.2d at 593. In fact, "the presence of a standard integration clause alone . . . will not suffice to bar fraud claims." *Id*. Here, the integration clause reads, in relevant part:

> This Agreement represents the entire agreement of the parties and supersedes any and all existing agreements, oral or written, between Employee and Employer or any of its Affiliates relating to the subject matter hereof. It specifically supersedes any and all term sheets, letters of intent, spreadsheets and other materials that may have been shared with Employee at any time, and all subsequent drafts thereof, which Employee understands, acknowledges and agrees are not part of the agreement of the parties and should not be utilized for purposes of interpreting this Agreement or for any other purpose.

ECF No. [16-4]. Nothing within this fairly standard integration clause contemplates that Plaintiff cannot rely on the materials he reviewed in agreeing to the terms of his employment. The clause merely states that those materials should not be utilized for purposes of interpreting the contract. As the Court in *Kronenberg* stated, "Parties who wish to protect themselves against fraud claims

can seek explicit anti-reliance language that will have that effect. But if they fail to do so, they will not be able to escape responsibility in tort by latching on to a possible reading of an ambiguous integration clause, in an American legal environment that has tended, on balance, not to construe such provisions as barring fraud claims." *Kronenberg*, 872 A.2d at 593 (Del. Ch. 2004). As such, the Court finds that the integration clause does not bar Plaintiff's fraud claims.

Nonetheless, Defendants argue Plaintiff fails to plead facts to support the allegation that Defendants made any false statements of material fact. ECF No. [75] at 18–19. Defendants cite only *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320 (11th Cir. 2019), to support their argument. *Id.* at 19.

To state a claim for fraudulent inducement, a plaintiff must allege that (1) defendant made a false statement concerning a material fact; (2) defendant knew the representation was false; (3) defendant intended the representation to induce plaintiff's reliance; and (4) plaintiff was injured in justifiable reliance on the misrepresentation. *See Alvarez v. Royal Caribbean Cruises, Ltd.*, 905 F. Supp. 2d 1334, 1342 (S.D. Fla. 2012) (citation omitted). Additionally, because a claim for fraudulent inducement must also satisfy Federal Rule of Civil Procedure 9(b)'s particularity requirement, the allegations in the Complaint must set forth "some delineation of the underlying acts and transactions which are asserted to constitute fraud." *Kronotex USA, LLC. v. Hodges*, No. 07-21939 CIV, 2008 WL 11406179, at *4 (S.D. Fla. Apr. 25, 2008) (citation omitted).

In *Carvelli*, the Eleventh Circuit explained that "a misrepresentation or omission is material if, 'in the light of the facts existing at the time,' a 'reasonable investor, in the exercise of due care would have been misled by it.'" 934 F.3d at 1317 (quoting *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1305 (11th Cir. 2011)). *Carvelli* is inapplicable, as it concerns claims for securities fraud under Rule 10b-5. As Plaintiff explains, the Icahn Defendants made

"concrete, specific, and *quantifiable* representations about the funds available for investment.. . . The misstatements include direct representations regarding verifiable financial data, including spreadsheets and accounting figures." ECF No. [83] at 37 (citing ECF No. [1] ¶¶ 293-299). Moreover, Plaintiff pleads that the Icahn Defendants misrepresented the fund's liquidity, including finding $2.4 billion in fictitious additional funds in May 2020 in order to further induce Plaintiff to continue negotiating and ultimately enter into the Employment Agreement. ECF No. [1] ¶ 307. As pled, Plaintiff alleges false statements of material facts relevant to his entry into the Employment Agreement. As such, Defendants' Motion is denied as to Count V.

### H. Count VI – Tortious Interference and Count VII – Unjust Enrichment

In Count VI, Plaintiff alleges tortious interference with a business relationship against Bausch + Lomb, Bausch Health, Ross, and Ackermann. ECF No. [1] ¶ 431. Because the Court dismissed these Defendants for lack of jurisdiction, it need not address the tortious interference claim on the merits.

In Count VII, Plaintiff alleges unjust enrichment against Hu and Ross. Subsequent to the filing of the Defendants' Motion to Dismiss, Plaintiff filed a Notice of Voluntary Dismissal as all claims pertaining to Hu and as to the unjust enrichment claim. ECF No. [104]. As such, the Court need not address the unjust enrichment claim on the merits,

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion**, ECF No. [75],** is **GRANTED in part** and **DENIED in part**.
   a. **COUNTS I** and **II** of Plaintiff's Complaint, **ECF No. [1]**, are **DISMISSED WITH PREJUDICE** as to Defendants Icahn Enterprises L.P., Icahn Enterprises G.P. Inc., Gary Hu, Icahn Capital, LP, Carl Icahn, and Brett Icahn.
2. Defendants' Motion, **ECF No. [80]**, is **GRANTED**.

a. **COUNTS I** and **VI** of Plaintiff's Complaint, **ECF No. [1]**, are **DISMISSED WITHOUT PREJUDICE** as to Defendants Bausch + Lomb, Thomas Ross, and Christina Ackermann.

3. Defendants' Motion, **ECF No. [81]**, is **DENIED**.

4. Defendant's Motion, **ECF No. [82]**, is **GRANTED**.

   a. **COUNTS I** and **VI** of Plaintiff's Complaint, **ECF No. [1],** are **DISMISSED WITHOUT PREJUDICE** as to Defendant Bausch Health.

5. Defendants Icahn Enterprises, Icahn Enterprises G.P. Inc., Icahn Capital, LP, Carl Icahn, and Brett Icahn shall file their Answers to the Complaint, **ECF No. [1]**, by **September 17, 2026.**

**DONE AND ORDERED** in Chambers at Miami, Florida, on September 4, 2026.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc: counsel of record